COPY

1  WILLIAM F. SULLIVAN (SBN 78353)
   williamsullivan@paulhastings.com
2  HOWARD M. PRIVETTE (SBN 137216)
   howardprivette@paulhastings.com
3  JOHN S. DURRANT (SBN 217345)
   johndurrant@paulhastings.com
4  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   515 South Flower Street, 25th Floor
5  Los Angeles, CA 90071-2228
   Telephone: (213) 683-6000
6  Facsimile: (213) 627-0705

7  EDWARD HAN (SBN 196924)
   edwardhan@paulhastings.com
8  PAUL, HASTINGS, JANOFSKY & WALKER LLP
   55 Second Street, 24th Floor
9  San Francisco, CA 94127
   Telephone: (415) 856-7000
   Facsimile: (415) 856-7100

10 Attorneys for Defendants
11 UBS Securities, LLC and Mortgage Asset
   Securitization Transactions, Inc.

12

13               UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

ORIGINAL
FILED

JUL 1 2 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

SC

CV 10 3039

16 FEDERAL HOME LOAN BANK OF SAN
   FRANCISCO,
17
                        Plaintiff,
18
        vs.
19
   DEUTSCHE BANK SECURITIES, INC.;
20 DEUTSCHE ALT-A SECURITIES, INC.; DB
   STRUCTURED PRODUCTS, INC.; J.P. MORGAN
   SECURITIES, INC., f/k/a BEAR, STEARNS & CO.
21 INC.; STRUCTURED ASSET MORTGAGE
   INVESTMENTS II, INC.; THE BEAR STEARNS
22 COMPANIES, LLC, f/k/a THE BEAR STEARNS
   COMPANIES, INC.; COUNTRYWIDE
23 SECURITIES CORPORATION; CREDIT SUISSE
   SECURITIES (USA) LLC, f/k/a CREDIT SUISSE
24 FIRST BOSTON LLC; RBS SECURITIES, INC.,
   f/k/a GREENWICH CAPITAL MARKETS, INC.;
25 RBS ACCEPTANCE, INC., f/k/a GREENWICH
   CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS
26 USA, INC., f/k/a GREENWICH CAPITAL
   HOLDINGS, INC.; MORGAN STANLEY & CO.
27 INCORPORATED; UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
28

CASE NO. _____

(Superior Court of California for the
City and County of San Francisco
Case No. CGC-10-497839)

**NOTICE OF REMOVAL OF
CIVIL ACTION**

1  TRANSACTIONS, INC.; MERRILL LYNCH,
   PIERCE, FENNER & SMITH, INC.; WAMU
2  CAPITAL CORP.; WASHINGTON MUTUAL
   MORTGAGE SECURITIES CORP.; and DOES 1-
3  50,

4            Defendants.

5  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

6  DISTRICT OF CALIFORNIA:

7

8          PLEASE TAKE NOTICE THAT Defendants UBS Securities, LLC ("UBS") and

9  Mortgage Asset Securitization Transactions, Inc. ("MAST") (collectively, "Removing

10 Defendants"), pursuant to 28 U.S.C. § 1446(a), hereby remove this action from the Superior

11 Court of the State of California for the County of San Francisco to the United States District

12 Court for the Northern District of California, San Francisco Division.[1]  This removal arises under

13 12 U.S.C. § 1432 and 28 U.S.C. §§ 1334(b), 1345, 1367, 1441, 1446, and 1452(a).  As grounds

14 for removal, Removing Defendants state as follows:

15                              **SUMMARY**

16         1.      All claims and causes of action in this matter should be removed to this

17 Court under 28 U.S.C. § 1441 and/or § 1452 because:  (i) pursuant to 28 U.S.C. §§ 1334(b) and

18 1452(a), this action is "related to" ongoing bankruptcy proceedings; (ii) pursuant to 12 U.S.C. §

19 1432, this Court has original jurisdiction over this matter under the charter of Plaintiff Federal

20 Home Loan Bank of San Francisco ("FHLB-SF"); and (iii) pursuant to 28 U.S.C. § 1345, this

21 Court has original jurisdiction over this matter because FHLB-SF is an agency of the United

22 States "expressly authorized to sue by Act of Congress."

23         2.      FHLB-SF has not brought any claims against Removing Defendants under

24 the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.*  Accordingly, the provisions of 15 U.S.C.

25 § 77v do not apply to this Notice of Removal.

26

27 ──────────────────

28 [1] Removing Defendants appear specially for the purpose of removal only.  They reserve all
   defenses, as to jurisdiction, service, or otherwise that may be available in this action.

                                    -2-

## PROCEDURAL HISTORY AND BACKGROUND

3.     On or about March 15, 2010, FHLB-SF filed a complaint (the "Complaint") in the Superior Court of the State of California for the City and County of San Francisco (the "State Court") entitled "Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, et al.," Case No. CGC-10-497839 (the "State Court Action"). FHLB-SF did not serve the Complaint on any of the defendants named in the Complaint, including Removing Defendants.

4.     On or about May 5, 2010, FHLB-SF applied *ex parte* for an order in the State Court Action for leave to file and serve an amended complaint on or before June 11, 2010. On or about May 11, 2010, the State Court granted that application.

5.     On or about June 10, 2010, FHLB-SF filed an amended complaint (the "Amended Complaint") in the State Court Action.

6.     On June 10, 2010, FHLB-SF served the Amended Complaint on the defendants named therein, including Removing Defendants. Pursuant to 28 U.S.C. § 1446(a), copies of the Summons, Amended Complaint, and other process, pleadings, and orders served on Removing Defendants are attached hereto as **Exhibit A**. Copies of affidavits of service of Complaints and Summons by hand, filed by FHLB-SF are attached hereto as **Exhibit B**.

7.     As alleged in the schedules attached to the Amended Complaint, FHLB-SF claims that it purchased some 38 mortgage-backed securities ("MBS") issued or underwritten by various defendants. Residential home mortgages provide the collateral for each of the MBS at issue, such that mortgage payments made by thousands of homeowners back the MBS at issue in this case. FHLB-SF alleges that defendants provided FHLB-SF written materials in connection with the offering of the MBS that contained untrue or misleading statements. The allegations center on disclosures concerning the lending practices of originators of the mortgage loans that provide the collateral of the MBS.

8.     FHLB-SF purports to bring claims against UBS under the California Corporations Code and under the California Civil Code and "Common Law" for negligent misrepresentation and orders of rescission. FHLB-SF purports to bring claims against MAST

-3-

1    California Civil Code and "Common Law" for negligent misrepresentation.  Schedule Nos. 22

2    through 28 to the Amended Complaint describe the offerings alleged to be at issue in the claims

3    against the Removing Defendants.  These offerings involved securities with mortgage loan

4    collateral originated almost entirely by bankrupt entities.

5            9.      Removing Defendants deny that they have any liability whatsoever to

6    FHLB-SF.

7            10.     The Removing Defendants' time to answer the Summons and Complaint

8    has not expired, and no defendant has pled, answered, or otherwise appeared in the State Court

9    Action.

10           11.     No other motions have been brought in the State Court Action and no

11   further proceedings have occurred in the State Court Action.

12           12.     This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is

13   filed within thirty (30) days after receipt of the Summons and Complaint.

14                          **GROUNDS FOR REMOVAL**

15                  **JURISDICTION RELATED TO BANKRUPTCY**

16           13.     The allegations against Removing Defendants arise from the following

17   MBS, each of which contain mortgages issued by bankrupt entities:

| Schedule No. | Issuer | Description of Securitization | Underwriter | Defendant(s) Named by FHLB-SF |
|---|---|---|---|---|
| 22 | MASTR Resecuritization Trust, Mortgage Pass-Through Certificates, Series 2007-1 | Resecuritization that included as collateral IndyMac-related RAST securities | UBS | UBS and MAST |
| 23 | MASTR Adjustable Rate Mortgage Trust, Mortgage Pass-Through Certificates, Series 2007-1 | MBS that included as collateral loans originated by American Home Mortgage Corporation ("AHM") and IndyMac. | UBS | UBS and MAST |
| 24 | MASTR | MBS that included | UBS | UBS and MAST |

-4-

| | | | | |
|---|---|---|---|---|
| | Alternative Loan Trust, Pass-Through Certificates, 2006-2 | as collateral loans originated by AHM, Sun Trust Mortgage, Inc., and another originator | | |
| 25 | Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A11CB | MBS that included as collateral loans originated by IndyMac. | UBS | UBS |
| 26 | IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR10 | MBS that included as collateral loans originated by IndyMac. | UBS | UBS |
| 27 | Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A4 | MBS that included as collateral loans originated by IndyMac. | UBS | UBS |
| 28 | Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2004-IP2 | MBS that included as collateral loans originated by IndyMac. | UBS | UBS |

14.     AHM and Indymac originated nearly all of the collateral for the securities listed above.  AHM and IndyMac both made numerous representations to Removing Defendants regarding their respective loan underwriting standards and the nature of mortgage loan collateral for each of the above securities.

15.     On August 6, 2007, AHM filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, In re American Home Mortgage Holdings, Inc., Case No. 07-11047, et seq. (the "AHM Bankruptcy").

NOTICE OF REMOVAL

1    16.    On July 11, 2008, the Federal Deposit Insurance Corporation was

2    appointed receiver for IndyMac.  On July 31, 2008, IndyMac Bancorp, Inc. ("IndyMac Bancorp")

3    the parent holding company of IndyMac, filed a voluntary petition for relief under Title 11 of the

4    United States Code in the United States Bankruptcy Court for the Central District of California,

5    In re IndyMac Bancorp, Inc., Case No. 08-21752-BB (the "IndyMac Bankruptcy").

6    17.    Pursuant to agreements containing certain indemnification provisions for

7    the benefit of Removing Defendants, among others, and pursuant to statutory and common law,

8    AHM and IndyMac owe Removing Defendants indemnification and/or contribution for any

9    claims arising from actual or alleged material misstatements or omissions made by AHM and

10   IndyMac regarding the mortgage loans at issue.

11   18.    In addition, many of the MBS purchased by FHLB-SF were issued by

12   Residential Asset Securitization Trust and IndyMac INDX Mortgage Loan Trust, entities that are,

13   on information and belief, subsidiaries of IndyMac Bancorp.

14   19.    "A civil proceeding is 'related to' a title 11 case if 'the outcome of the

15   proceeding could conceivably have any affect on the estate being administered in bankruptcy.'"

16   McGuire v. United States, 550 F.3d 903, 913 (9th Cir. 2008).

17   20.    This action is related to both the IndyMac Bankruptcy and the AHM

18   Bankruptcy because IndyMac and AHM owe indemnity obligations to Removing Defendants.

19   An indemnity obligation of this type could effect the property of the debtor, and thus gives rise to

20   "related to" jurisdiction under 28 U.S.C. § 1334(b).  This action therefore may be removed to this

21   Court by the Removing Defendants pursuant to 28 U.S.C. § 1452(a).  See In re Fietz, 852 F.2d

22   455, 457 (9th Cir. 1988.); Pacific Life Ins. Co. v. J.P. Morgan Chase & Co., No. SA CV 03-813-

23   GLT, 2003 U.S. Dist. LEXIS 14705 at *2-3 (C.D. Cal. July 1, 2003); see also, Lone Star Fund V,

24   L.P. v. Barclays Bank, PLC, 594 F.3d 383, 387 (5th Cir. 2010).

25                    **JURISDICTION BASED ON**

26                    **STATUTORY CHARTER OF FHLB-SF**

27   21.    FHLB-SF is a Federal Home Loan Bank created by the Federal Home

28   Loan Bank Act, 12 U.S.C. § 1421, et seq.  The Federal Home Loan Bank Act created a series of

-6-

1    federally chartered banks that provide financing for home purchases, among other things. As a

2    federally chartered entity, FHLB-SF is subject to the "sue and be sued" clause of the statute

3    enacting the federal corporate charter for the Federal Home Loan Banks. See 12 U.S.C. §

4    1432(a) (providing that Federal Home Loan Banks have the authority "to sue and be sued, to

5    complain and to defend, in any court of competent jurisdiction, State or Federal"). As such, 12

6    U.S.C. § 1432(a) confers original jurisdiction over cases in which any Federal Home Loan Bank,

7    such as FHLB-SF, is a party. See 12 U.S.C. § 1432; 28 U.S.C. §§ 1441 (a)-(b); Am. Nat'l Red

8    Cross v. S.G., 505 U.S. 247, 255 (1992) (holding that "whenever a statute granting a federally

9    chartered corporation the 'power to sue and be sued' specifically mentions the federal courts . . .

10   the law will be deemed to confer on federal district courts jurisdiction over any and all

11   controversies to which that corporation is a party"); Pirelli Armstrong Tire Corp. Retiree Med.

12   Benefits Trust v. Raines, 534 F. 3d 779, 788 (D.C. Cir. 2008) ("express reference to federal courts

13   in a federal chartered entity's sue-and-be-sued clause was necessary and sufficient to confer

14   jurisdiction"); In re Fannie Mae 2008 Sec. Litig., Nos. 08 Civ. 7831 (PAC), 09 Civ. 1352 (PAC),

15   2009 WL 4067266 at *1, *3 (S.D.N.Y. Nov. 24, 2009) (same). Accordingly, removal is proper

16   under 28 U.S.C. § 1441(a)-(b).

17                    **JURISDICTION BECAUSE FHLB-SF**

18                    **IS AN AGENCY OF THE UNITED STATES**

19           22.    Federal Home Loan Banks are agencies of the United States. Fahey v.

20   O'Melveny & Myers, 200 F. 2d 420, 444-47 (9th Cir. 1953) ("We hold that all Federal Home

21   Loan Banks within the System are, and operate as, public agencies and instrumentalities of the

22   federal government."); Fed. Home Loan Bank of San Francisco v. Long Beach Fed. Sav. & Loan

23   Ass'n Title Service Co., 122 F. Supp. 401, 414, 462 (S.D. Cal. 1954) (holding that Federal

24   Loan Bank of San Francisco is "'an agency of the United States' which is 'expressly authorized

25   to sue by Act of Congress'" under 28 U.S.C. § 1345 and denying remand).

26           23.    Pursuant to 28 U.S.C. § 1345, "the district courts shall have original

27   jurisdiction of all civil actions, suits, or proceedings commenced by the United States, or by any

28   agency . . . thereof expressly authorized by Congress to sue by Act of Congress."

-7-

1     24.    As noted above, Congress authorized FHLB-SF to "sue and be sued" in the

2  federal courts.  <u>See</u> 12 U.S.C. § 1432(a).

3     25.    Accordingly this Court has original jurisdiction over this action pursuant to

4  28 U.S.C. § 1345 and this action may be removed to this Court pursuant to 28 U.S.C. § 1441(a)-

5  (b).

6                **JURISDICTION**

7     26.    This court has removal jurisdiction over this case pursuant to 12 U.S.C.

8  § 1432 and 28 U.S.C. §§ 1334(b), 1345, 1367, 1441, 1446, and 1452(a).

9            **INTRA-DISTRICT ASSIGNMENT**

10    27.    Pursuant to Local Rules 3-2(c) and 3-5(b), this matter should be assigned to

11  the San Francisco Division, because a substantial part of the alleged events or omissions in the

12  Complaint are alleged to have arisen in San Francisco County.  In particular, FHLB-SF alleges

13  that it is located in San Francisco County.  (Amended Complaint at ¶ 27.)

14         **OTHER PROCEDURAL REQUIREMENTS**

15    28.    This is not a core proceeding under 28 U.S.C. § 157(b) or Federal Rule of

16  Bankruptcy Procedure 9027(a)(1).  Removing Defendants do not consent to entry of final orders

17  or judgment by any bankruptcy judge.

18    29.    Pursuant to 28 U.S.C. 1446(d), Removing Defendants will serve a copy of

19  this Notice of Removal on counsel for FHLB-SF and will file a copy with the Superior Court of

20  California for the City and County of San Francisco.

21    30.    Removing Defendants sign this Notice of Removal pursuant to Rule 11 of

22  the Federal Rules of Civil Procedure and Bankruptcy Procedure 9011.

23    31.    All defendants in the State Court action consent to Removing Defendants'

24  removal of this action and join in this Notice of Removal.

25    //

26    //

27

28

1    WHEREFORE, Removing Defendants remove the above-entitled action from the

2   Superior Court of the State of California for the City and County of San Francisco to this Court to

3   for the reasons stated above, or for any other reasons the Court deems necessary and proper.

4   DATED:  July 12, 2010              WILLIAM F. SULLIVAN
5                                      HOWARD M. PRIVETTE
                                       EDWARD HAN
6                                      JOHN S. DURRANT
                                       PAUL, HASTINGS, JANOFSKY & WALKER LLP
7

8                                      By: _____
9                                           WILLIAM F. SULLIVAN

10                                     Attorneys for Defendants
                                       UBS Securities, LLC and Mortgage Asset Securitization
11                                     Transactions, Inc.

12

13   LEGAL_US_E # 88862724.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-

NOTICE OF REMOVAL

**EXHIBIT A**

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):*<br>ROBERT A. GOODIN, State Bar No. 061302<br>FRANCINE T. RADFORD, State Bar No. 168269<br>GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP<br>505 Sansome, Suite 900<br>San Francisco, California  941111<br>TELEPHONE NO.: (415) 392-7900  FAX NO.: (415) 398-4321<br>ATTORNEY FOR *(Name):*  Plaintiff Federal Home Loan Bank of SF | *FOR COURT USE ONLY*<br><br>**ENDORSED**<br>**FILED**<br>San Francisco County Superior Court<br><br>MAR 1 5 2010<br><br>**CLERK OF THE COURT**<br>BY: _____ **PARAM NATT**<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME: Civil Division

CASE NAME:  Federal Home Loan Bank of San Francisco v.
Deutsche Bank Securities, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | CGC-10-497839<br>JUDGE:<br>DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09) | (Cal. Rules of Court, rules 3.400-3.403)<br>[ ] Antitrust/Trade regulation (03) |
| Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort | [ ] Other collections (09)<br>[ ] Insurance coverage (18) | [ ] Construction defect (10)<br>[ ] Mass tort (40) |
| [ ] Asbestos (04)<br>[ ] Product liability (24) | [ ] Other contract (37)<br>**Real Property** | [X] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse<br>condemnation (14) | [ ] Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| Non-PI/PD/WD (Other) Tort | [ ] Wrongful eviction (33)<br>[ ] Other real property (26) | |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | **Enforcement of Judgment** |
| [ ] Civil rights (08) | [ ] Commercial (31) | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Residential (32) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Drugs (38) | [ ] RICO (27) |
| [ ] Intellectual property (19) | **Judicial Review** | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Writ of mandate (02) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

2. This case [X] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [X] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):* Five
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 12, 2010
ROBERT A. GOODIN, State Bar No. 061302
(TYPE OR PRINT NAME)                           ► *Robert A Goodin* (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|---|

**INSTRU____ONS ON HOW TO COMPLETE THE CO___.SHEET** **CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)—Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach—Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case—Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief from Late
      Claim
    Other Civil Petition

CM-010 [Rev. July 1, 2007]          **CIVIL CASE COVER SHEET**          Page 2 of 2

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>ROBERT A. GOODIN, State Bar No. 061302<br>FRANCINE T. RADFORD, State Bar No. 168269<br>GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP<br>505 Sansome, Suite 900<br>San Francisco, California   941111 | FOR COURT USE ONLY<br>**ENDORSED**<br>**F I L E D**<br>Superior Court of California<br>County of San Francisco |
|---|---|
| TELEPHONE NO.: (415) 392-7900   FAX NO. *(Optional):* (415) 398-4321<br>E-MAIL ADDRESS *(Optional):* rgoodin@goodinmacbride.com | MAR 15 2010 |
| ATTORNEY FOR *(Name):* Plaintiff Federal Home Loan Bank of SF | **CLERK OF THE COURT** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, California
BRANCH NAME: Civil Division

BY: _____ WESLEY RAMIREZ
Deputy Clerk

| PLAINTIFF/PETITIONER: FEDERAL HOME LOAN BANK OF SAN FRANCISCO | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: DEUTSCHE BANK SECURITIES INC., et al. | CGC-10-497839<br>JUDICIAL OFFICER: |

| **NOTICE OF RELATED CASE** | DEPT.: |
|---|---|

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a.  Title: Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et al.
   b.  Case number:
   c.  Court:  [X] same as above
              [ ] other state or federal court *(name and address):*

   d.  Department:
   e.  Case type:  [ ] limited civil   [X] unlimited civil   [ ] probate   [ ] family law   [ ] other *(specify):*

   f.  Filing date: March 12, 2010
   g.  Has this case been designated or determined as "complex?"   [X] Yes   [ ] No
   h.  Relationship of this case to the case referenced above *(check all that apply):*
       [X] involves the same parties and is based on the same or similar claims.
       [X] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
       [ ] involves claims against, title to, possession of, or damages to the same property.
       [X] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

           [ ] Additional explanation is attached in attachment 1h
   i.  Status of case:
       [X] pending
       [ ] dismissed   [ ] with   [ ] without prejudice
       [ ] disposed of by judgment

2. a.  Title:
   b.  Case number:
   c.  Court:  [ ] same as above
              [ ] other state or federal court *(name and address):*

   d.  Department:

Page 1 of 3

CM-015

| PLAINTIFF/PETITIONER: FEDERAL HOME LOAN BANK OF SAN FRANCISCO<br>DEFENDANT/RESPONDENT: DEUTSCHE BANK SECURITIES INC., et al. | CASE NUMBER: |
|---|---|

2. *(continued)*

  e. Case type: ☐ limited civil   ☐ unlimited civil   ☐ probate   ☐ family law   ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?"   ☐ Yes   ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 2h

  i. Status of case:

   ☐ pending

   ☐ dismissed   ☐ with   ☐ without prejudice

   ☐ disposed of by judgment

3. a. Title:

  b. Case number:

  c. Court: ☐ same as above

   ☐ other state or federal court *(name and address):*

  d. Department:

  e. Case type: ☐ limited civil   ☐ unlimited civil   ☐ probate   ☐ family law   ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?"   ☐ Yes   ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 3h

  i. Status of case:

   ☐ pending

   ☐ dismissed   ☐ with   ☐ without prejudice

   ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: March 12, 2010

Anne Hartman, Goodin MacBride
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

---

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 3.221(c))



**Superior Court of California
County of San Francisco**

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can save time.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR encourages participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR is flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1) Judicial Arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### *Description*

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called <u>judicial arbitration</u>. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through <u>private arbitration</u>. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

# MEDIATION

## Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

### Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

### Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by BASF pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $250 per party administration fee, parties select a specific mediator from the list of approved mediation providers or BASF will help them select an appropriate mediator for the matter. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at **www.sfbar.org/mediation** or you may call BASF at 415-982-1600.

## Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

## Cost

Generally, the cost of Private Mediation ranges from $100 per hour to $800 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $250 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If the Court assigns a matter to the ESP, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

*Cost*

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

* * * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO
400 McAllister Street, San Francisco, CA   94102-4514

| | |
|---|---|
| Plaintiff<br><br>v.<br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐   **Private Mediation**          ☐   **Mediation Services of BASF**   ☐   **Judicial Mediation**
☐   **Binding arbitration**                                              Judge _____
☐   **Non-binding judicial arbitration**                                 Judge _____
☐   **BASF Early Settlement Program**
☐   **Other ADR process (describe)** _____

Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____

_____

| | | |
|---|---|---|
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐   Plaintiff   ☐   Defendant   ☐   Cross-defendant | | Dated: _____ |
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐   Plaintiff   ☐   Defendant   ☐   Cross-defendant | | Dated: _____ |
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐   Plaintiff   ☐   Defendant   ☐   Cross-defendant | | Dated: _____ |

☐   *Additional signature(s) attached*

ADR-2  3/06          **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:  FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT<br>*(Check one):*  ☐ **UNLIMITED CASE**  ☐ **LIMITED CASE**<br>(Amount demanded  (Amount demanded is $25,000<br>exceeds $25,000)  or less) | CASE NUMBER: |
|---|---|

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:  Time:  Dept.:  Div.:  Room:

Address of court *(if different from the address above):*

☐ Notice of Intent to Appear by Telephone, by *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:

      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:

      (3) ☐ have had a default entered against them *(specify names)*:

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a. Type of case in  ☐ complaint  ☐ cross-complaint  *(Describe, including causes of action)*:

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-110 [Rev. January 1, 2009]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,<br>rules 3.720–3.730<br>www.courtinfo.ca.gov

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial.      *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐  days *(specify number):*
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.  Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐  All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐  The case has gone to an ADR process *(indicate status):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d. The party or parties are willing to participate in *(check all that apply):*
    (1) ☐ Mediation
    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
    (4) ☐ Binding judicial arbitration
    (5) ☐ Binding private arbitration
    (6) ☐ Neutral case evaluation
    (7) ☐ Other *(specify):*

e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**
☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**
a. ☐ Insurance carrier, if any, for party filing this statement *(name):*
b. Reservation of rights: ☐ Yes ☐ No
c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
☐ Bankruptcy ☐ Other *(specify):*
Status:

**14. Related cases, consolidation, and coordination**
a. ☐ There are companion, underlying, or related cases.
    (1) Name of case:
    (2) Name of court:
    (3) Case number:
    (4) Status:
    ☐ Additional cases are described in Attachment 14a.
b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**
☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**
☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

<div align="center">

Party                              Description                              Date

</div>

c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

21. Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY)

_____          ▶ _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY)

                                                   ☐ Additional signatures are attached.



# Superior Court of California
## County of San Francisco



HON. JAMES J. MCBRIDE
PRESIDING JUDGE

### Judicial Mediation Program

JENIFFER B. ALCANTARA
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Gail Dekreon
The Honorable Ernest H. Goldsmith
The Honorable Curtis Karnow
The Honorable Charlene P. Kiesselbach
The Honorable Tomar Mason
The Honorable Anne-Christine Massullo
The Honorable Ronald Quidachay

The Honorable A. James Robertson, II
The Honorable Jeffrey S. Ross
The Honorable Lillian Sing
The Honorable John K. Stewart
The Honorable Richard Ulmer
The Honorable Monica F. Wiley
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file the Stipulation to Alternative Dispute Resolution form indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated on the form but assignment to a particular judge is not guaranteed. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

02/2010 (ja)

MEDIATION S...



## MEDIATION SERVICES

---

PROCEDURES, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:

# www.sfbar.org/mediation

QUESTIONS?

## adr@sfbar.org or 415-982-1600

---

**EXPERIENCED MEDIATORS
AVAILABLE IN THE FOLLOWING AREAS**

Business
Civil Rights
Commercial
Construction
Contracts
Disability
Discrimination
Education
Employment/Workplace
Environmental
Family
Fee Disputes
Financial
Gay/Lesbian/Bisexual/Transgender Issues
Government
Insurance
Intellectual Property
Intra-Organizational
Labor
Landlord/Tenant
Land Use
Malpractice:
Legal-Medical-Professional
Partnership Dissolutions
Personal Injury
Probate/Trust
Products Liability
Real Estate
Securities
Taxation
Uninsured Motorist
Women's Issues
And more...

## What is BASF's Mediation Service?

Mediation is a voluntary, private dispute resolution process in which a trained mediator assists the parties in reaching an outcome that is mutually agreeable.

Mediation Services was established by The Bar Association of San Francisco (BASF) with extensive input from experienced mediators, litigators and judges. This traditional mediation service is an approved alternative to court ordered Arbitration or Early Settlement.

## How Does it Work?

BASF's Mediation Services works quickly, matching a qualified mediator to a case within days. The assignment process is flexible; experienced BASF staff can suggest a mediator, or you can request three biographies to choose from, or request a particular mediator from our Web site.

## How Much Does the Service Cost?

Mediators generously provide one hour of preparation and two hours of session time free of charge as a service to BASF and the community. To qualify for the pro-bono hours, parties must file the Consent to Mediate form with BASF. Hourly fees beyond those three hours vary depending on the mediator selected. BASF charges a small administrative fee, which pays for the costs of running the program.

## Who Can Use the Service?

The service can be utilized by anyone whether or not the dispute has been filed in a court. If a legal action is already underway, it can be used at any time during the litigation process and is not limited to San Francisco County litigants.

## Who Are the Mediators?

Experienced mediation professionals are available to assist in most areas of dispute, ranging from multi-party commercial matters to individuals in conflict. Each has been pre-approved pursuant to strict educational and experience requirements. In fact, our mediators average 15 years of mediation experience and 125 hours of formal mediation training.

## More Information

Our Web site - www.sfbar.org/mediation - provides photographs, short biographies and hourly rates of our mediators. You can search by name or by area of law.

If you don't see the area you need in our 30+ panels, just contact us at adr@sfbar.org; it is very likely we can match your need with one of our panelists.

WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600

CASE NUMBER: CGC-10-  '840  FEDERAL HOME LOAN BAI .,rOF SAN FRANCISCO VS. CI

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

|          |                              |
|----------|------------------------------|
| **DATE:**  | AUG-13-2010                |
| **TIME:**  | 9:00AM                     |
| **PLACE:** | **Department 212**         |
|          | **400 McAllister Street**    |
|          | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL.** (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

**See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges**

# SUMMONS
ON FIRST AMENDED COMPLAINT

## (CITACION JUDICIAL)

**SUM-100**

**DEFENDANTS**

**NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):*

DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB
STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS &
CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS
COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE
SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE
FIRST BOSTON LLC;

Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDATE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el s California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER *(Número del Caso):* |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, California 94102 | CGC-10-497839 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302          415-392-7900          415-398-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached.

DATE: JUN 1 0 2010     CLERK OF THE COURT     Clerk, by _____, Deputy
*(Fecha)*                                      *(Secretario)*   WESLEY RAMIREZ   *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (individual)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. Janaury 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

SF-C53

**SUM-200(A)**

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER:<br>CGC-10-497839 |
|---|---|

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff  ☒ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; MERRILL LYNCH PIERCE, FENNER & SMITH, INC.; WASHINGTON MUTUAL MORTGAGE SECURITIES CORP; WAMU CAPITAL CORP; AND DOES 1 - 50

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Legal
Solutions
& Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
| --- | --- |

1  GRAIS & ELLSWORTH LLP

2  DAVID J. GRAIS (pro hac vice)

3  KATHRYN C. ELLSWORTH (pro hac vice)

4  OWEN L. CYRULINK (pro hac vice)

5  70 East 55th Street

6  New York, New York 10022

7  Telephone:   (212) 755-0100

8  Facsimile:   (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, **not** line numbers):*

27  This page may be used with any Judicial Council form or any other paper filed with this court.  Page 3

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

Legal
Solutions
Plus

CRC 201, 501

SUPERIOR COURT OF CALIFORNIA

# SUMMONS
*(CITACION JUDICIAL)*

COUNTY OF SAN FRANCISCO

**SUM-100**

## DEFENDANTS
**NOTICE TO DEFENDANT:** *(AVISO AL DEMANDADO):*

DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB
STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS &
CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS
COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE
SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE
FIRST BOSTON LLC;
Additional Parties Attachment form is attached.

## YOU ARE BEING SUED BY PLAINTIFF:
*(LO ESTÁ DEMANDANDO EL DEMANDATE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

<div style="border:1px solid">
FOR COURT USE ONLY
<br>(SOLO PARA USO DE LA CORTE)
</div>

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el s California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: *(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, California 94102 | CASE NUMBER *(Número del Caso):*<br>CGC-10-497839 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302       415-392-7900       415-398-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached.

| DATE: JUN 09 2010 | CLERK OF THE COURT | Clerk, by | WESLEY RAMIREZ | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:

3. [ ] on behalf of *(specify)*:

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (individual)
          [ ] other *(specify)*:
4. [ ] by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
SF-C53

SUM-200(A)

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

### INSTRUCTIONS FOR USE

➤ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➤ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[ ] Plaintiff    [x] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; MERRILL LYNCH PIERCE, FENNER & SMITH, INC.; AND DOES 1 - 50

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Legal
Solutions
Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

1 | GRAIS & ELLSWORTH LLP

2 | DAVID J. GRAIS (pro hac vice)

3 | KATHRYN C. ELLSWORTH (pro hac vice)

4 | OWEN L. CYRULINK (pro hac vice)

5 | 70 East 55th Street

6 | New York, New York 10022

7 | Telephone:   (212) 755-0100

8 | Facsimile:   (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court. | Page  3

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

Legal
Solutions
& Plus

CRC 201, 501

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
2  ROBERT A. GOODIN, State Bar No. 061302
        rgoodin@goodinmacbride.com
3  FRANCINE T. RADFORD, State Bar No. 168269
        fradford@goodinmacbride.com
4  ANNE H. HARTMAN, State Bar No. 184556
        ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California  94111
6  Telephone:    (415) 392-7900
7  Facsimile:     (415) 398-4321

8  GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (pro hac application submitted herewith)
9  KATHRYN C. ELLSWORTH (pro hac app. submitted herewith)
   OWEN L. CYRULNIK (pro hac application submitted herewith)
10 LEANNE M. WILSON (pro hac application submitted herewith)
11 70 East 55th Street
   New York, New York 10022
12 Telephone:    (212) 755-0100
   Facsimile:     (212) 755-0052
13
14 Attorneys for Plaintiff
   Federal Home Loan Bank of San Francisco
15

16         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

17         IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

18

19 FEDERAL HOME LOAN BANK OF SAN        No.  CGC-10-497839
   FRANCISCO,
20                                      FIRST AMENDED COMPLAINT FOR
                Plaintiff,              RESCISSION AND DAMAGES FOR:
21
22      v.                             (1) VIOLATIONS OF §§ 25401 AND
                                           25501 OF THE CALIFORNIA
23 DEUTSCHE BANK SECURITIES INC.;          CORPORATE SECURITIES ACT;
   DEUTSCHE ALT-A SECURITIES, INC.;
24 DB STRUCTURED PRODUCTS, INC.;       (2) VIOLATIONS OF §§ 11 AND 15 OF
   J.P. MORGAN SECURITIES, INC., F/K/A     THE SECURITIES ACT OF 1933;
25 BEAR, STEARNS & CO. INC.;
   STRUCTURED ASSET MORTGAGE         (3) VIOLATIONS OF §§ 12(a)(2) AND
26 INVESTMENTS II, INC.;                  15 OF THE SECURITIES ACT OF
27 THE BEAR STEARNS COMPANIES, LLC,       1933;
   F/K/A THE BEAR STEARNS
28 COMPANIES, INC.;                   (4) VIOLATIONS OF §§ 1572 AND 1710

FIRST AMENDED COMPLAINT (DEUTSCHE 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| 1 | COUNTRYWIDE SECURITIES CORPORATION; |
| 2 | CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON |
| 3 | LLC; |
| 4 | RBS SECURITIES, INC., F/K/A/ GREENWICH CAPITAL MARKETS, INC.; |
| 5 | RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, |
| 6 | INC.; |
| 7 | RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, |
| 8 | INC.; MORGAN STANLEY & CO. |
| 9 | INCORPORATED; UBS SECURITIES, LLC; |
| 10 | MORTGAGE ASSET SECURITIZATION |
| 11 | TRANSACTIONS, INC.; MERRILL LYNCH, PIERCE, FENNER & |
| 12 | SMITH, INC.; WAMU CAPITAL CORP.; |
| 13 | WASHINGTON MUTUAL MORTGAGE SECURITIES CORP.; AND, |
| 14 | DOES 1-50, |
| 15 | Defendants. |

OF THE CALIFORNIA CIVIL CODE (NEGLIGENT MISREPRESENTATION); and

(5) RESCISSION OF CONTRACTS UNDER § 1689 ET SEQ. OF THE CALIFORNIA CIVIL CODE

Plaintiff, FEDERAL HOME LOAN BANK OF SAN FRANCISCO (referred to in this Complaint as **the Bank**) complains of defendants and for causes of action alleges as follows:

## NATURE OF THIS ACTION

1.     This is an action for rescission and damages as a result of the violation by the Defendants of the California Corporate Securities Act, the California Civil Code, the federal Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or issued to the Bank 41 certificates in 38 securitization trusts backed by residential mortgage loans. The Bank paid more than $5.9 billion for those certificates. When they offered and then sold these certificates to the Bank, the Defendants made numerous statements to the Bank about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue as to material facts. Moreover, the Defendants omitted to state many

-2-

material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the Loan-to-Value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans departed from their own standards in doing so.

2.      Defendants made such untrue or misleading statements about at least the following numbers of the loans in each of the 38 securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 1,411 | 3,543 | 39.8% |
| 2 | 641 | 1,708 | 37.5% |
| 3 | 1,069 | 2,680 | 39.9% |
| 4 | 1,785 | 2,894 | 61.7% |
| 5 | 676 | 1,719 | 39.3% |
| 6 | 513 | 1,890 | 27.1% |
| 7 | 2,347 | 3,565 | 65.8% |
| 8 | 826 | 1,367 | 60.4% |
| 9 | 279 | 1,269 | 22.0% |
| 10 | 202 | 965 | 20.9% |
| 11 | 1,669 | 4,037 | 41.3% |
| 12 | 323 | 643 | 50.2% |
| 13 | 1,415 | 2,925 | 48.4% |
| 14 | 828 | 1,421 | 58.3% |
| 15 | 418 | 916 | 45.6% |
| 16 | 595 | 1,231 | 48.3% |
| 17 | 998 | 2,003 | 49.8% |
| 18 | 1,852 | 2,736 | 67.7% |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-3-

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 19 | 2,515 | 5,119 | 49.1% |
| 20 | 1,043 | 2,758 | 37.8% |
| 21 | 817 | 2,141 | 38.2% |
| 22 | 15,859 | 38,159 | 41.6% |
| 23 | 3,223 | 4,944 | 65.2% |
| 24 | 1,145 | 2,929 | 39.1% |
| 25 | 737 | 2,351 | 31.3% |
| 26 | 494 | 3,346 | 14.8% |
| 27 | 268 | 952 | 28.2% |
| 28 | 396 | 1,505 | 26.3% |
| 29 | 1,190 | 2,852 | 41.7% |
| 30 | 830 | 2,629 | 31.6% |
| 31 | 583 | 1,871 | 31.2% |
| 32 | 663 | 1,201 | 55.2% |
| 33 | 729 | 1,337 | 54.5% |
| 34 | 1,253 | 2,723 | 46.0% |
| 35 | 986 | 2,713 | 36.3% |
| 36 | 4,669 | 7,191 | 64.9% |
| 37 | 1,321 | 3,220 | 41.0% |
| 38 | 859 | 1,780 | 48.3% |

The Bank is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[1]

---

[1] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-4-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

3.      The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, the Bank is entitled to rescind its purchase of the certificates or to be paid damages for its losses on the certificates.

4.      Nine securities dealers sold these certificates to the Bank. The nine dealers are Defendants Deutsche Bank Securities Inc. (which sold to the Bank certificates in four securitization trusts, which are referred to in this Complaint as Securitizations Nos. 1 through 4), Bear Stearns & Co. Inc. (four securitizations, Nos. 5 through 8), Countrywide Securities Corporation (one securitization, No. 9), Credit Suisse Securities (USA) LLC (seven securitizations, Nos. 10 through 16), Greenwich Capital Markets, Inc. (three securitizations, Nos. 17 through 19), Morgan Stanley & Co. Incorporated (two securitizations, Nos. 20 and 21), UBS Securities, LLC (seven securitizations, Nos. 22 through 28), Merrill Lynch, Pierce, Fenner & Smith, Inc. (five securitizations, Nos. 29 through 33), and WaMu Capital Corp. (five securitizations, Nos. 34 through 38). The other Defendants named in this Complaint are liable to the Bank because they were the issuers of some of those certificates or because they controlled one of those issuers.

## PARTIES

5.      Plaintiff is a bank created by the Federal Home Loan Bank Act. The headquarters of the Bank are in the City and County of San Francisco. Under its Organization Certificate, the Bank is to operate in Federal Home Loan Bank District 11, which comprises the States of Arizona, California, and Nevada. The Bank does operate in each of those three States.

6.      Defendant Deutsche Bank Securities Inc. (referred to as **Deutsche**) is a corporation organized under the laws of Delaware. Deutsche sold the Bank four of the certificates.

7.      Defendant Deutsche Alt-A Securities, Inc. (referred to as **Deutsche Alt-A**) is a corporation organized under the laws of Delaware. Deutsche Alt-A was the issuer of one of the certificates that Deutsche sold to the Bank.

8.      Defendant **DB Structured Products, Inc.** is a corporation organized under the laws of Delaware. The Bank is informed and believes, and based thereon alleges, that Deutsche

-5-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Alt-A exists for no purpose other than to receive and deposit loans into the trusts. During the

2   relevant time period, DB Structured Products, Inc. controlled Deutsche Alt-A. Under Section 15

3   of the Securities Act, 15 U.S.C. § 77o, DB Structured Products, Inc. therefore is liable to the

4   Bank jointly and severally with, and to the same extent as, Deutsche Alt-A.

5       9.      Defendant J.P. Morgan Securities, Inc. (formerly known as Bear, Stearns & Co.

6   Inc. and referred to as **Bear Stearns**) is a corporation organized under the laws of Delaware. Bear

7   Stearns sold the Bank four of the certificates.

8       10.     Defendant Structured Asset Mortgage Investments II, Inc. (referred to as **SAMI II**)

9   is a corporation organized under the laws of Delaware. SAMI II was the issuer of three of the

10  certificates that Bear Stearns sold to the Bank.

11      11.     Defendant The Bear Stearns Companies, LLC (formerly known as and referred to

12  as **The Bear Stearns Companies, Inc.**) is a limited liability company organized under the laws

13  of Delaware. The Bank is informed and believes, and based thereon alleges, that SAMI II exists

14  for no purpose other than to receive and deposit loans into the trusts. During the relevant time

15  period, The Bear Stearns Companies, Inc. controlled SAMI II. Under Section 15 of the Securities

16  Act, 15 U.S.C. § 77o, The Bear Stearns Companies, Inc. therefore is liable to the Bank jointly and

17  severally with, and to the same extent as, SAMI II.

18      12.     Defendant Countrywide Securities Corporation (referred to as **Countrywide**) is a

19  corporation organized under the laws of California. Countrywide sold the Bank two of the

20  certificates.

21      13.     Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse

22  First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under

23  the laws of Delaware. Credit Suisse sold the Bank eight of the certificates.

24      14.     Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets,

25  Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of

26  Delaware. Greenwich Capital sold the Bank three of the certificates.

27      15.     Defendant RBS Acceptance, Inc. (formerly known as Greenwich Capital

28  Acceptance, Inc. and referred to as **Greenwich Capital Acceptance**) is a corporation organized

-6-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   under the laws of Delaware. Greenwich Capital Acceptance was the issuer of the three certificates
2   that Greenwich Capital sold to the Bank.

3       16.     Defendant RBS Holdings USA, Inc. (formerly known as and referred to as
4   **Greenwich Capital Holdings, Inc.**) is a corporation organized under the laws of Delaware. The
5   Bank is informed and believes, and based thereon alleges, that Greenwich Capital Acceptance
6   exists for no purpose other than to receive and deposit loans into the trusts. During the relevant
7   time period, Greenwich Capital Holdings, Inc. controlled Greenwich Capital Acceptance. Under
8   Section 15 of the Securities Act, 15 U.S.C. § 77o, Greenwich Capital Holdings, Inc. therefore is
9   liable to the Bank jointly and severally with, and to the same extent as, Greenwich Capital
10  Acceptance.

11      17.     Defendant Morgan Stanley & Co. Incorporated (referred to as **Morgan Stanley**) is
12  a corporation organized under the laws of Delaware. Morgan Stanley sold the Bank two of the
13  certificates.

14      18.     Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company
15  organized under the laws of Delaware. UBS sold the Bank seven of the certificates.

16      19.     Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)
17  is a corporation organized under the laws of Delaware. MAST was the issuer of three of the
18  certificates that UBS sold to the Bank.

19      20.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (referred to as **Merrill**
20  **Lynch**) is a corporation organized under the laws of Delaware. Merrill Lynch sold the Bank six
21  of the certificates.

22      21.     Defendant WaMu Capital Corp. (referred to as **WaMu Capital**) is a corporation
23  organized under the laws of Washington. WaMu Capital sold the Bank five of the certificates.

24      22.     Defendant Washington Mutual Mortgage Securities Corp. (referred to as **WaMu**
25  **Mortgage**) is a corporation organized under the laws of Delaware. WaMu Mortgage was the
26  issuer of the five certificates that WaMu Capital sold to the Bank.

27      23.     The Bank is ignorant of the true names and capacities of Defendants sued herein as
28  Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. The Bank will

-7-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  amend this Complaint to allege the true names and capacities of these Defendants when

2  ascertained. The Bank is informed and believes that each of the fictitiously named Defendants

3  is responsible in some manner for the occurrences alleged herein and proximately caused the

4  Bank's damages.

5              **JURISDICTION AND VENUE**

6       24.     This action is an unlimited civil case within the meaning of California Code of

7  Civil Procedure section 88, in that, *inter alia*, the amount in controversy (as defined in California

8  Code of Civil Procedure section 85(a)) exceeds twenty five thousand dollars ($25,000). This

9  Court has subject-matter jurisdiction of the Bank's causes of action for rescission under Sections

10 25401 and 25501 of the California Corporate Securities Act, damages for negligent

11 misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a)

12 of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over the Bank's

13 causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k,

14 77l(a)(2), and 77o.

15      25.     Under Section 22(a) of the Securities Act, "no case arising under this title and

16 brought in any State court of competent jurisdiction shall be removed to any court of the United

17 States." Because its activities are not localized in one state, the Bank is not a citizen of any state

18 under 28 U.S.C. § 1332(c), so the Federal courts have no jurisdiction of this action under 28

19 U.S.C. § 1332(a). This action is not removable to Federal court.

20      26.     Deutsche, DB Structured Products, Inc., Bear Stearns, Countrywide, Credit Suisse,

21 Greenwich Capital, Morgan Stanley, UBS, and Merrill Lynch are subject to personal jurisdiction

22 in California because each of them is registered to do business, and does business, in California.

23 All of the Defendants are subject to personal jurisdiction in California because they offered and

24 sold or controlled persons that offered and sold the certificates to the Bank "in California" within

25 the meaning of Section 25008 of the California Corporate Securities Act.

26      27.     Venue is proper in this County because, among other reasons, the Defendants

27 offered and sold the certificates to the Bank in this County and because the violations of law

28

-8-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  alleged in this Complaint, including the making of material untrue or misleading statements,
2  occurred in this County.

3  <center>**SECURITIZATION OF MORTGAGE LOANS**</center>

4      28.    The securities that the Defendants sold the Bank are so-called **residential**
5  **mortgage-backed** securities, or **RMBS**, created in a process known as **securitization**.
6  Securitization begins with loans on which the borrowers are to make payments, usually monthly.
7  The entity that makes the loans is known as the **originator** of the loans. The process by which the
8  originator decides whether to make particular loans is known as the **underwriting** of loans. The
9  purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit
10  standing to repay them and only against sufficient collateral. In the loan underwriting process, the
11  originator applies its **underwriting standards**.

12     29.    In general, residential mortgage lenders may hold some of the mortgage loans they
13  originate in their own portfolio and may sell other mortgage loans they originate into
14  securitizations.

15     30.    In a securitization, a large number of loans, usually of a similar type, are grouped
16  into a **collateral pool**. The originator of those loans sells them (and, with them, the right to
17  receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The
18  trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors
19  such as the Bank. Each certificate entitles its holder to an agreed part of the cash flow from the
20  loans in the collateral pool.

21     31.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part
22  of the overall monthly cash flow from the loans in the collateral pool.

23     32.    In a more complex securitization, the cash flow is divided into different parts,
24  usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into
25  different **classes**, each with different rights. Each class of certificates is entitled to the cash flow
26  in the tranche corresponding to that class.

27     33.    One way in which the cash flow is divided — and the rights of different classes of
28  certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The

<center>-9-</center>

<center>**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**</center>

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   most **senior** class of certificates usually is entitled to be paid in full before the next most senior

2   class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool

3   are allocated first to the most **subordinate** class of certificates, then to the class above that, and so

4   on. The interest rate on each class of certificates is usually proportional to the amount of risk that

5   that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of

6   interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as

7   the **waterfall**.

8        34.    The risk of a particular class of certificate is a function of both the riskiness of the

9   loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying

10   loans are quite risky, the senior classes of certificates may bear so little of that risk that they may

11   be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest

12   quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky

13   loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a

14   senior class of $50 million and a subordinate class of $50 million. Even though the underlying

15   loans are quite risky, the senior class of certificates would be paid in full as long as the $100

16   million of loans produced payments of at least $50 million plus interest, that is, unless the loss

17   rate on those loans exceeded 50%, fully 10 times the historical average.

18        35.    All of the certificates referred to in this Complaint were senior certificates that

19   were rated triple-A when the Bank purchased them.

20                             \*

21        36.    Each securitization has a **sponsor**, the prime mover of the securitization.

22   Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the

23   collateral pool usually contains loans made by the originator that is sponsoring the securitization.

24   Other times, the sponsor may be an investment bank, which purchases loans from one or more

25   originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The

26   sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which

27   then transfers title to the loans to the trust.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-10-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

37.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

\*

38.     **Securities dealers**, like nine of the Defendants, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

39.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file also includes notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

40.     Potential investors in certificates are not given access to loan files. Instead, the securities dealers that underwrite the sale of the certificates in a securitization are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans, which has been compiled into a database known as a **loan tape**. The securities dealers use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the dealers are required to file with the Securities and Exchange Commission.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-11-

41.     As alleged in detail below, the information that the Defendants presented to the Bank about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

### TOLLING OF THE STATUTE OF LIMITATIONS

42.     The Bank is a putative member of the proposed classes in *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, PLC*, United States District Court for the Southern District of New York, No. 08-cv-05093, filed on May 14, 2008; *Massachusetts Bricklayers & Masons Trust Funds v. Deutsche Alt-A Securities, Inc.*, United States District Court for the Eastern District of New York, No. 08-cv-3178, filed on June 27, 2008; *New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding Trust 2006-AR1*, United States District Court for the Southern District of New York, No. 08-cv-08093, filed on August 20, 2008; and *In Re IndyMac Mortgage Backed Securities Litigation*, United States District Court for the Southern District of New York, No. 09-cv-04583, filed on May 14, 2009, the pendency of which actions has tolled the running of the statute of limitations on the causes of action alleged in this Complaint.

### THE SALES OF THE CERTIFICATES

43.     The Defendants sold to the Bank 41 certificates in Securitizations Nos. 1 through 38. Details of each trust and each certificate are stated in Item 43 of Schedules 1 through 38 of this Complaint, which correspond to Securitizations Nos. 1 through 38. The Bank incorporates into this paragraph 43, and alleges as though fully set forth in this paragraph, the contents of Item 43 of the schedules.

### DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

44.     In connection with their offers and sales of the certificates to the Bank, each of the nine dealer Defendants sent numerous documents to the Bank at its office in San Francisco. For each certificate, these documents included a term sheet (or its equivalent), the prospectus supplement for the certificates that was filed with the SEC, drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of

-12-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  the securitization. In each of these documents, each dealer made statements of material fact about

2  the certificate that it offered and sold to the Bank.[2] A true copy of the prospectus supplement for

3  each securitization is available from the Securities and Exchange Commission's website.[3]

4       45.    Many of the statements of material fact that each dealer made in these documents

5  were untrue or misleading. These untrue or misleading statements included the following.

6  **I.**    **Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the**

7      **Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

8      **A.**    **LTVs**

9          **1.**    **The materiality of LTVs**

10       46.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of

11  the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

12  when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000

13  has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of

14  the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in

15  the collateral pool of a securitization are therefore one of the most crucial measures of the risk of

16  certificates sold in that securitization. LTV is a primary determinant of the likelihood of default.

17  The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less

18  likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby

19  give the owner an incentive to stop making mortgage payments and abandon the property, a so-

20  called strategic default. LTV is also a primary determinant of the severity of losses for those loans

21  that do default. The lower the LTV, the lower the severity of losses on those loans that do default.

22  Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the

23  proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

24

25      [2] Two of the certificates that the Bank purchased were certificates in re-securitizations of existing certificates of mortgage-backed securities. In connection with the sale of those two certificates, the dealers

26  sent to the Bank a private placement memorandum for the re-securitization and prospectus supplements filed with the SEC for the underlying securitizations. Details of the re-securitizations are included in their

27  respective schedules.

28      [3] A URL for each prospectus supplement is included in Item 43 of each schedule.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-13-

47.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans and the associated certificates. Prepayment patterns affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

48.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that the Bank purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

49.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an error in value of any given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

50.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and,

-14-

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    thus, are essential to the decision of a reasonable investor whether to purchase any such

2    certificate.

3            **2.      Untrue or misleading statements about the LTVs of the mortgage**
             **loans in the collateral pools of these securitizations**
4

5            51.    In the prospectus supplements and other documents they sent to the Bank, the

6    Defendants made material untrue or misleading statements about the LTVs of the mortgage loans

7    in the collateral pools of these securitizations. Each such statement is identified in Item 51 of the

8    schedules of this Complaint. The Bank incorporates into this paragraph 51, and alleges as though

9    fully set forth in this paragraph, the contents of Item 51 of the schedules.

10           52.    The mortgage loans in the collateral pools of these securitizations were divided

11   into groups. Payments on the certificates that the Bank purchased were to be made primarily from

12   the cash flows from the loans in the particular groups that were designated to support the Bank's

13   certificates. Because of the structure of the securitizations, however, in most cases the credit

14   quality of the loans in the other groups in the securitizations also was material to the risk of the

15   certificates that the Bank purchased.

16           53.    The Defendants made these statements as statements of fact. The Bank is informed

17   and believes, and based thereon alleges, that Defendants intended that these statements be

18   understood as statements of fact. The Bank did understand the statements about the LTVs as

19   statements of fact. The Bank had no access to appraisal reports or other documents or information

20   from which it could verify the LTVs of the mortgage loans other than the statements that the

21   Defendants made about those LTVs.

22           **3.      These statements were untrue because the stated LTVs of many of**
             **those mortgage loans were lower than their actual LTVs.**
23

24           54.    The stated LTVs of many of the mortgage loans in each securitization were

25   significantly lower than the true LTVs because the denominators (that is, the value of the

26   properties that secured those loans) that were used to determine the disclosed LTVs were

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-15-

1    overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus

2    supplements were also, therefore, untrue and misleading.

3         a.    **Use of an automated valuation model demonstrates that**
              **Defendants' statements about LTVs were based on overstated**
4             **valuations of the properties in the collateral pools.**

5         55.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

6    possible to determine the true market value of a certain property as of a selected date. An AVM is

7    based on objective criteria like the condition of the property and the actual sale prices of

8    comparable properties in the same locale shortly before the specified date and is more consistent,

9    independent, and objective than other methods of appraisal. AVMs have been in widespread use

10   for many years. The AVM on which these allegations are based incorporates a database of 500

11   million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

12   than 99% of the population, in the United States. Independent testing services have determined

13   that this AVM is the most accurate of all such models.

14        56.    On many of the properties that secured the mortgage loans, the model reported that

15   LTVs were understated. In particular, the model reported that the denominator (that is, the

16   appraised value of the property as stated in the loan tape) that was used to determine the disclosed

17   LTV was 105% or more of the true market value as determined by the model as of the time the

18   loan was originated. The model reported that the denominator that was used to determine the

19   disclosed LTV was 95% or less of the true market value on a much smaller number of properties.

20   Thus, the number of properties on which the value was overstated exceeded by far the number on

21   which the value was understated, and the aggregate amount overstated exceeded by far the

22   aggregate amount understated.

23        57.    To take an example, in Securitization No. 1, there were 3,543 mortgage loans in

24   the collateral pool. There was sufficient information for the model to determine the value of the

25   properties that secured 2,097 of those loans. On 1,114 of those 2,097 properties, the model

26

27       [4] References in this Complaint and the schedules to the denominator in the LTVs are to the
     appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage
28   loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

                                        -16-
                   **FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   reported that the denominator that was used to determine the disclosed LTV was 105% or more of

2   the true market value and the amount by which the stated values of those properties exceeded

3   their true market values in the aggregate was $65,079,411. The model reported that the

4   denominator that was used to determine the disclosed LTV was 95% or less of true market value

5   on only 305 properties, and the amount by which the true market values of those properties

6   exceeded the values reported in the denominator was $20,628,970. Thus, the number of properties

7   on which the value was overstated exceeded by more than three times the number on which the

8   value was understated, and the aggregate amount overstated was more than three times the

9   aggregate amount understated.

10       58.    On one of the loans in Securitization No. 1, the amount of the loan was $302,000

11  and the stated value of the property was $450,000, resulting in a stated LTV of 67.1%. The

12  model, however, determined that the true value of the property was $309,000, resulting in a true

13  LTV of 97.7%. Thus, the stated value was higher than the true value by 45.6%, and the stated

14  LTV was lower than the true LTV by 45.6%. Both of these were huge discrepancies that were

15  material to the credit quality of the loan.

16       59.    The overstated values of 1,114 properties made virtually every statement by

17  Defendants about the LTVs of the mortgage loans untrue or misleading. For example, Defendants

18  stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 169 of

19  the 2,097 properties valued by the model had LTVs of over 100%. Defendants also stated that the

20  weighted average LTV of the loans in the loan group from which the Bank's bonds were to be

21  paid was 69.54%. In fact, among the loans in that group that the AVM was able to value, the

22  weighted average LTV was 76.88%. These differences were material for the reasons stated above.

23       60.    The results of the valuations by the automated model in this example are

24  summarized in the following table.

25  / / /

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-17-

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

| | |
|---|---|
| Number of loans | 3,543 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,097 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,114 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $65,079,411 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 305 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,628,970 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 169 |
| Weighted-average LTV, as stated by Defendants (group 4) | 69.54% |
| Weighted-average LTV, as determined by the model (group 4) | 76.88% |

61.     The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 61 of the schedules of this Complaint. The Bank incorporates into this paragraph 61, and alleges as though fully set forth in this paragraph, the contents of Item 61 of the schedules.

**b.     Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

62.     Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the only basis for determining the value of the property because there is no sale price in a refinancing. A substantial number of those properties have since been sold. In nearly all the pools, those properties were sold for much less than the value ascribed to them in the LTV data reported in the prospectus supplements and other documents that the Defendants sent to the Bank. The differences cannot be explained by the declines in house prices in the areas in which those properties were located. Analysis of indices that track home prices in various geographic areas shows that the differences between the values ascribed to these properties and the prices at which the properties were sold are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and

-18-

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

1    the corresponding sale). Thus, the large differences show that the values ascribed to those

2    properties, and to all properties in the collateral pools, in the LTV data reported in the prospectus

3    supplements and other documents that the Defendants sent to the Bank were too high, that the

4    resulting LTVs were too low, and thus that the statements in the prospectus supplements and

5    other documents sent to the Bank about the LTVs were untrue or misleading.

6         63.    To return to the example of Securitization No. 1, of the 3,543 mortgage loans in

7    the collateral pool, 1,407 were taken out to refinance, rather than to purchase, properties. For

8    those 1,407 loans, the value (denominator) in the LTV was an appraised value rather than a sale

9    price. Of those 1,407 properties, 218 were subsequently sold for a total of approximately

10   $73,471,208. The total value ascribed to those same properties in the LTV data reported in the

11   prospectus supplements and other documents sent to the Bank was $96,283,500. Thus, those

12   properties were sold for 76.3% of the value ascribed to them, a difference of 23.7%. This

13   difference is significantly greater than would have been predicted by the declines in house prices

14   in the areas in which those properties were located.

15        64.    The results of this analysis for the securitizations are stated in Item 64 of the

16   schedules of this Complaint. The Bank incorporates into this paragraph 64, and alleges as though

17   fully set forth in this paragraph, the contents of Item 64 of the schedules.

18              **4.    These statements were misleading because the Defendants omitted to
                state that there were additional liens on a material number of the
19              properties that secured the mortgage loans in the collateral pools.**

20        65.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

21   likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

22   less likely that a decline in the value of the property will wipe out the owner's equity and thereby

23   give the owner an incentive to stop making mortgage payments and abandon the property.

24   Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

25   predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the

26   severity of loss on those loans that do default. The power of LTV to predict defaults,

27   prepayments, and severities is a major reason why reasonable investors consider the LTVs of

28

-19-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   mortgage loans important to the decision whether to purchase a certificate in the securitization of

2   those loans.

3        66.    The predictive power of the LTV of a mortgage loan is much reduced if there are

4   additional liens on the same property. Additional liens reduce the owner's equity in the property

5   and thereby increase the owner's incentive to stop making mortgage payments and abandon the

6   property if the value of the property falls below the combined amount of all of the liens on the

7   property (a strategic default). Additional liens also exacerbate delinquencies and defaults because

8   they complicate the servicing of mortgage loans and the management of delinquencies and

9   defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also

10   with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may

11   want to grant a borrower forbearance while the borrower is unemployed and allow him or her to

12   add missed payments to the principal of the loan and to resume payments when he or she is

13   employed again. But the servicer of the second-lien mortgage may refuse such forbearance and

14   initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

15        67.    According to land records, many of the properties that secured mortgage loans in

16   the collateral pool of each securitization were subject to liens in addition to the lien of the

17   mortgage in the pool at the time of the closing of these securitizations.[5] In 17 of the

18   securitizations, the Defendants failed to disclose any of these additional liens in the prospectus

19   supplements and other documents they sent to the Bank. These additional liens reduced the equity

20   of the owners of the properties subject to them, and thereby increased the risk that those owners

21   would default in payment of the mortgage loan in the pool.

22        68.    To take an example, of the 2,894 properties that secured the mortgage loans in

23   Securitization No. 4, at least 115 were subject to undisclosed liens in addition to the lien of the

24   mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'

25   equity in those properties by a weighted average of 84.8% and by an aggregate amount of

26   $13,330,964.

27    

28    

---

[5] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

-20-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

69.     On one of the loans, the original balance of the mortgage loan was $464,000, the represented value of the property was $580,000, the owner's ostensible equity was $116,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $85,931. Thus, the owner's true equity was only $30,069, 74.1% less than the equity implied by the disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed additional liens were precisely equal to the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

70.     Similar numbers of additional undisclosed liens were found in each securitization where the defendants did not disclose the existence of additional liens. Details of the undisclosed additional liens in each securitization are stated in Item 70 of the schedules of this Complaint. The Bank incorporates into this paragraph 70, and alleges as though fully set forth in this paragraph, the contents of Item 70 of the schedules. The Bank is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the schedules.

71.     Because the Defendants did not disclose the existence or the amounts of these additional liens, all statements that they made about the LTVs of the mortgage loans were misleading.

**B.     Appraisals**

72.     As discussed above in paragraph 49, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

73.     In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to

-21-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close

2   was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was

3   equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid"

4   meant ensuring that the appraised value was high enough to enable the proposed loan to comply

5   with the lender's requirements for LTV.)

6        74.    This upward bias in appraisals caused the denominators that were used to

7   determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore

8   to be understated. The statements that the Defendants made about the LTVs of the mortgage loans

9   in the collateral pools were misleading because they omitted to state that the appraisals of a

10  material number of the properties that secured those loans were biased upwards. In addition, the

11  Defendants stated that the appraisals conformed to the Uniform Standards of Professional

12  Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or

13  to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP).

14  Those statements were false because upwardly biased appraisals do not conform to USPAP.

        1.    **These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

15

16

17

18

19       75.    Defendants omitted to state that brokers and loan officers pressured appraisers by

20  threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by

21  refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many

22  forms, including the following:

23         •   the withholding of business if the appraisers refused to inflate values,

24         •   the withholding of business if the appraisers refused to guarantee a predetermined value,

25

26         •   the withholding of business if the appraisers refused to ignore deficiencies in the property,

27         •   refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-22-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

76.    The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 62 through 64 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 55 through 61, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 3.7 | 3.2 |
| 2 | 2 | 2.2 |
| 3 | 2.8 | 2.6 |
| 4 | 7 | 8.1 |
| 5 | 3.6 | 4.6 |
| 6 | 2.4 | 1.7 |
| 7 | 14.3 | 16.7 |
| 8 | 10.3 | 12.8 |
| 9 | 2.2 | 1.5 |
| 10 | 2.3 | 2.1 |
| 11 | 4.3 | 4.5 |
| 12 | 13.6 | 16.0 |
| 13 | 7.5 | 7.7 |
| 14 | 7.5 | 7.5 |
| 15 | 6.6 | 8.1 |
| 16 | 3.1 | 3.1 |
| 17 | 1.6 | 1.6 |
| 18 | 13.1 | 17.5 |

-23-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 19 | 6.2 | 7.1 |
| 20 | 2 | 1.7 |
| 21 | 3.5 | 3.6 |
| 22 | 4.4 | 5.6 |
| 23 | 9.4 | 12.3 |
| 24 | 4.7 | 5.7 |
| 25 | 2.8 | 2.3 |
| 26 | 2.6 | 1.7 |
| 27 | 2 | 1.3 |
| 28 | 1.7 | 1.2 |
| 29 | 3.1 | 2.6 |
| 30 | 2.5 | 1.6 |
| 31 | 2.7 | 2.2 |
| 32 | 15.2 | 10.7 |
| 33 | 13.2 | 17 |
| 34 | 2 | 1.4 |
| 35 | 2.9 | 2.4 |
| 36 | 2.4 | 3.0 |
| 37 | 3.1 | 3.7 |
| 38 | 4.2 | 5.0 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

77.     The Bank is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-24-

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

**2.      The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

78.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

79.     USPAP includes the following provisions:

(a)     Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

(b)     Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

(c)     Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.      the reporting of a predetermined result (*e.g.*, opinion of value);

2.      a direction in assignment results that favors the cause of the client;

3.      the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

80.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-25-

1    ____"; "If this property will not appraise for at least ____, stop and call us immediately"; etc.

2    About such conditions, Advisory Opinion 19 states:

3             Certain types of conditions are unacceptable in any assignment
         because performing an assignment under such conditions violates
4        USPAP. Specifically, an assignment condition is unacceptable
         when it:
5
6        •   precludes an appraiser's impartiality. Because such a
             condition destroys the objectivity and independence
7            required for the development and communication of
             credible results;
8
9        •   limits the scope of work to such a degree that the
             assignment results are not credible, given the intended use
             of the assignment; or
10
11       •   limits the content of a report in a way that results in the
             report being misleading.

12       81.    In the prospectus supplements and other documents they sent to the Bank, the

13   Defendants made statements that the appraisals of properties that secured the mortgage loans in

14   the collateral pools were made in compliance with USPAP or with the appraisal standards of

15   Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such

16   statement are stated in Item 81 of the schedules of this Complaint. The Bank incorporates into this

17   paragraph 81, and alleges as though fully set forth in this paragraph, the contents of Item 81 of the

18   schedules.

19       82.    The Bank is informed and believes, and based thereon alleges, that a material

20   number of mortgage loans in the collateral pools had appraisals conducted that deviated from

21   USPAP.

22       83.    Each of these statements referred to in paragraph 81 was untrue because the

23   appraisals of a material number of the properties referred to in each such statement did not

24   conform to USPAP.

25                                              *

26       84.    By each of the untrue and misleading statements referred to in paragraphs 51 and

27   81 above, the Defendants materially understated the risk of the certificates that they offered and

28   sold to the Bank.

-26-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

II.   **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

A.   **The materiality of occupancy status**

85.     Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

86.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

B.   **Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

87.     In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 3,543 mortgage loans in the collateral pool, 2,931 were secured by primary residences and 612 were not. Details of each such statement in each securitization are stated in Item 87 of the schedules of this Complaint. The Bank incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the schedules.

88.     These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans not secured by primary residences was lower

-27-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

2    occupancy status of a significant number of the properties that secured the mortgage loans in the

3    collateral pools was misstated because of fraud.

**C.    Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

6    89.    Because they are less risky than other mortgage loans, mortgage loans on primary

7    residences usually have more favorable terms, including lower interest rates and more lenient

8    underwriting standards, than mortgage loans on second homes and investment properties.

9    Applicants for loans on second homes and investment properties therefore have an incentive to

10   state that the property will be their primary residence even when it will not. The Bank is informed

11   and believes, and based thereon alleges, that borrowers many nonconforming securitized loans

12   did so.

13   90.    A significant number of the properties in the collateral pool of each securitization

14   that were stated to be primary residences actually were not. Moreover, the Bank is informed and

15   believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

16   loan files of many more of the mortgage loans in the collateral pool.

17   91.    With respect to some of the properties that were stated to be primary residences,

18   the borrower instructed local tax authorities to send the bills for the taxes on the property to the

19   borrower at an address other than the property itself. This is strong evidence that the mortgaged

20   property was not the borrower's primary residence.

21   92.    In some states and counties, owners of a property are able to designate whether

22   that property is his or her "homestead," which may reduce the taxes on that property or exempt

23   the property from assets available to satisfy the owner's creditors, or both. An owner may

24   designate only one property, which he or she must occupy, as his or her homestead. The fact that

25   an owner in one of these jurisdictions does not designate a property as his or her homestead when

26   he or she can do so is strong evidence that the property was not his or her primary residence. With

27   respect to some of the properties that were stated to be primary residences, the owner could have

28

-28-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   but did not designate the property as his or her homestead. That omission is strong evidence that

2   the property was not the borrower's primary residence.

3       93.     With respect to some of the properties that were stated to be primary residences,

4   the borrower owned three or more properties. Thus it was reasonably likely that the borrower did

5   not live in the property that was stated to be owner-occupied.

6       94.     When a borrower who lives in a mortgaged property falls behind in his or her

7   payments, it is normally many months before foreclosure ensues, during which time the borrower

8   tries to become current in his or her payments or to modify the mortgage so as not to lose his or

9   her home. During this time, the borrower becomes progressively more delinquent (30 days past

10  due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight

11  from being current to either foreclosure or ownership by the lender, it is usually because the

12  borrower did not live in the property and so made no effort to remain in it, but instead abandoned

13  the property to the lender soon after he or she became unable to make the payments. In many of

14  the securitizations, there were mortgage loans in the collateral pools that were secured by

15  properties that were stated to be primary residences and that went straight from current to

16  foreclosure or ownership by the lender. It is more likely than not that the properties that secured

17  these mortgage loans were actually not primary residences.

18      95.     In Securitization No. 1, 268 owners of properties that were stated to be primary

19  residences instructed local tax authorities to send the bills for the taxes on that property to them at

20  a different address; 361 owners of properties that were stated to be primary residences could

21  have, but did not, designate that property as their homestead; 16 owners of properties that were

22  stated to be primary residences owned three or more properties; and three properties that were

23  stated to be primary residences went straight from less than 90 days of delinquency to

24  foreclosure. Eliminating duplicates, 540 properties that were stated to be primary residences

25  actually were not, for one or more of these reasons. Thus, of the 2,931 properties that were stated

26  to be primary residences, 540 actually were not, and the number of properties that were not

27  primary residences was not 612, as the defendants stated, but actually 1,152, a material

28  difference. The numbers of such loans in the collateral pool of each securitization are stated in

-29-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Item 95 of the schedules of this Complaint. The Bank incorporates into this paragraph 95, and

2   alleges as though fully set forth in this paragraph, the contents of Item 95 of the schedules.

3                                             *

4        96.     By each of the untrue and misleading statements referred to in paragraph 87, the

5   Defendants materially understated the risk of the certificates that they offered and sold to the

6   Bank.

7   **III.**    **Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

8

9        **A.**    **The materiality of underwriting standards and the extent of an originator's departures from them**

10       97.     Originators of mortgage loans have written standards by which they underwrite

11   applications for loans. An important purpose of underwriting is to ensure that the originator

12   makes mortgage loans only in compliance with those standards and that its underwriting decisions

13   are properly documented. An even more fundamental purpose of underwriting mortgage loans is

14   to ensure that loans are made only to borrowers with credit standing and financial resources to

15   repay the loans and only against collateral with value, condition, and marketability sufficient to

16   secure the loans. An originator's underwriting standards, and the extent to which the originator

17   departs from its standards, are important indicators of the risk of mortgage loans made by that

18   originator and of certificates sold in a securitization in which mortgage loans made by that

19   originator are part of the collateral pool. A reasonable investor considers the underwriting

20   standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

21   to which each originator departs from its standards, important to the decision whether to purchase

22   a certificate in that securitization.

23        **B.**    **Untrue or misleading statements about the underwriting standards of originators of the mortgage loans in the collateral pools and about the extent to which those originators departed from their standards**

24

25          **1.**    **The untrue or misleading statements**

26       98.     In the prospectus supplements and other documents they sent to the Bank, the

27   Defendants made statements about the underwriting standards of the originators of the mortgage

28   loans in the collateral pool. Details of each such statement are stated in Item 98 of the schedules

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  of this Complaint. They included statements that the originators made mortgage loans in

2  compliance with their underwriting standards and made exceptions to those standards only when

3  compensating factors were present. The Bank incorporates into this paragraph 98, and alleges as

4  though fully set forth in this paragraph, the contents of Item 98 of the schedules.

5      99.    The Bank is informed and believes, and based thereon alleges, that these

6  statements were untrue or misleading because the Defendants omitted to state that: (a) the

7  originators were departing extensively from those underwriting standards; (b) the originators were

8  making extensive exceptions to those underwriting standards when no compensating factors were

9  present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those

10 underwriting standards; (d) the originators were making mortgage loans that borrowers could not

11 repay; and (e) the originators were failing frequently to follow quality-assurance practices

12 necessary to detect and prevent fraud intended to circumvent their underwriting standards.

13      2.    **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading**

14

15

16      a.    **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

17      100.   The Bank is informed and believes, and based thereon alleges, before and during

18 the time of these securitizations, many originators of mortgage loans relaxed their actual lending

19 practices for loans they sold into securitizations, even though their stated underwriting standards

20 may have remained unchanged. As a result of this relaxation, securitized mortgage loans made

21 between 2004 and the dates of these securitizations have experienced high rates of delinquency

22 and default.

23      101.   Based on an extensive empirical study of mortgage loans made and sold into

24 securitizations during this period, economists at the University of Michigan and elsewhere found

25 that the high rates of delinquency and default were caused not so much by any deterioration in

26 credit characteristics of the loans that were expressly embodied in underwriting standards and

27 disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed

28 to investors.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-31-

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

102.    What these economists found about recent securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator IndyMac Bank, F.S.B. as an example, Figure 1 shows the rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by IndyMac Bank, F.S.B. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator departed from its underwriting standards in making the loan, often by failing to detect fraud in the application. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by IndyMac Bank, F.S.B. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.

///

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-32-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**



Figure 1: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination

103.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

///

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-33-

**Figure 2: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV**

60+ Delinquent @ 6 months (left scale)
WA FICO at Origination (right scale)
WA LTV at Origination (far right scale)
850
750
650
550
450
350
100%
80%
60%
40%
20%
0%
Weighted-Average FICO and LTV
2004:Q1
2004:Q2
2004:Q3
2004:Q4
2005:Q1
2005:Q2
2005:Q3
2005:Q4
2006:Q1
2006:Q2
2006:Q3
2006:Q4
2007:Q1
2007:Q2
2007:Q3
2007:Q4
Calendar Quarter of Loan Origination

104. Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
|---|---|
| A | Bank of America N.A. |
| B | Bear Stearns Residential Funding & EMC Mortgage Corp. |
| C | Countrywide Home Loans, Inc. |
| D | Greenpoint Mortgage Funding |
| E | IndyMac Bank, F.S.B. |
| F | National City Mortgage Co. |

The Bank incorporates into this paragraph 104, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

**b.    The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

105.    As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in the collateral pools of these securitization experienced very high rates of EPDs, some much higher than the rate of EPDs suffered by all securitized prime, non-agency (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs, and the percent of all securitized prime (including Alt-A) mortgage loans made at the same time that suffered EPDs, are stated in Item 105 of the schedules of this Complaint. The Bank incorporates into this paragraph 105, and alleges as though fully set forth in this paragraph, the contents of Item 105 of the schedules.

106.    A higher-than-normal rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure, some much higher than the rate of such delinquencies suffered by all securitized prime (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies, and the percent of all securitized prime (including Alt-A) mortgage loans made at the same time that suffered such delinquencies, are stated in Item 106 of the schedules of this Complaint. The Bank incorporates into this paragraph 106, and alleges as though fully set forth in this paragraph, the contents of Item 106 of the schedules.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-35-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    107.    A second common measure of delinquency is the number of loans on which the

2    borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have

3    experienced very high rates of delinquencies by this measure, some as high as 56.7% of the loans

4    in some pools as of March 31, 2010. By contrast, only 14.7% of all mortgage loans made in the

5    United States (including millions of loans of lower ostensible credit quality) were 30 or more

6    days delinquent on the same date. This much higher-than-normal rate of delinquencies is strong

7    evidence that the originators of those loans may have departed extensively from their

8    underwriting standards when making those loans. The number and percent of the loans in each

9    pool that were 30 or more days delinquent on March 31, 2010, are stated in Item 107 of the

10   schedules of this Complaint. The Bank incorporates into this paragraph 107, and alleges as

11   though fully set forth in this paragraph, the contents of Item 107 of the schedules.

<div align="center">

**c.    Governmental investigations also concluded that the largest originator in these securitizations departed from its underwriting standards.**

</div>

14   108.    In addition to the statistical data cited above, governmental investigations also

15   concluded that IndyMac Bank, F.S.B. (which originated 61% of all the loans in the collateral

16   pools of these securitizations), made extensive, undisclosed departures from its stated

17   underwriting standards.

18   109.    The Office of the Inspector General of the U.S. Treasury Department and the

19   Center for Responsible Lending, a nonprofit, nonpartisan research and policy organization, both

20   conducted investigations into the underwriting practices at IndyMac Bank, F.S.B. Both issued

21   reports that concluded that IndyMac made loans to many borrowers who could not afford to make

22   their payments.

23   110.    The Inspector General wrote that IndyMac conducted "little, if any, review of

24   borrower qualifications, including income, assets, and employment." IndyMac obtained signed

25   requests by borrowers to the Internal Revenue Service for copies of past tax returns, but IndyMac

26   seldom forwarded the signed requests on to the IRS. Indeed, the Inspector General reported that

27   former IndyMac underwriters said that "stated income" loans (loans that require no

28

<div align="center">

-36-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

</div>

1   documentation of the borrowers' income) "allowed outside mortgage brokers and in-house sales

2   staffers to inflate applicants' incomes and make them look like better credit risks."

3       111.   Similarly, the Center for Responsible Lending reported that it "uncovered

4   substantial evidence that IndyMac and its parent, IndyMac Bancorp, engaged in unsound and

5   abusive lending during the mortgage boom, routinely making loans without regard to borrowers'

6   ability to repay." Former employees of IndyMac "describe an atmosphere where . . . IndyMac

7   pushed through loans with fudged or falsified information or simply lowered standards so

8   dramatically that shaky loans were easy to approve." One former IndyMac underwriter stated that

9   she "would reject a loan and the insanity would begin. It would go to upper management and the

10  next thing you know it's going to closing."

11      112.   The Inspector General also "found weaknesses with property appraisals obtained

12  to support the collateral on the loans." There were "instances where IndyMac officials accepted

13  appraisals that were not in compliance with the Uniform Standard of Professional Appraisal

14  Practice (USPAP)" and "instances where IndyMac obtained multiple appraisals on a property that

15  had vastly different values," but "[t]here was no evidence to support, or explain why different

16  values were determined." A separate investigation by the Office of Thrift Supervision (OTS)

17  similarly concluded that "OTS identified serious issues with IndyMac's appraisals" and found

18  "that the borrowers, rather than the mortgage originator, were paying the appraisers directly,

19  which did not ensure appraiser independence."

20                                                *

21      113.   By each of the untrue and misleading statements referred to in paragraph 98 above,

22  the Defendants materially understated the risk of the certificates that they offered and sold to the

23  Bank. Moreover, the Bank is informed and believes, and based thereon alleges, that discovery

24  will yield additional evidence that the originators departed extensively from their underwriting

25  guidelines when making the mortgage loans in the collateral pools of these securitizations.

26

27

28

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**IV.    The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements about the Ratings of the Bank's Certificates Untrue and Misleading.**

114.    In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the rating of each certificate by Moody's Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or more of those agencies rated each such certificate triple-A, the highest rating available from either agency. Details of each such statement are stated in Item 114 of the schedules of this Complaint. The Bank incorporates into this paragraph 114, and alleges as though fully set forth in this paragraph, the contents of Item 114 of the schedules.

115.    The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including the Bank, have investment policies that require a certain minimum rating for all investments. The policy of the Bank was to purchase only certificates that were rated triple-A.

116.    These statements by the Defendants about the ratings of the certificates they sold to the Bank were misleading because the Defendants omitted to state that the ratings did not take into account all the material untrue or misleading statements about specific mortgage loans in the collateral pool. These include:

(a)    loans in which the LTVs were materially understated;

(b)    loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have made undisclosed departures from the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be owner-occupied, but were not.

117.    In Securitization No. 1, there were 1,114 loans whose LTVs were materially understated, 27 loans that suffered EPDs, and 540 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 1,411 loans (or 39.8% of the loans in the collateral pool) about which the defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 117 of

-38-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the schedules of this Complaint. The Bank incorporates into this paragraph 117, and alleges as

2   though fully set forth in this paragraph, the contents of Item 117 of the schedules.

3       118.    The Bank is informed and believes, and based thereon alleges, that loan files and

4   other documents available only through discovery will prove that those statements were untrue or

5   misleading with respect to many more loans as well.

6       119.    By these untrue and misleading statements, the Defendants materially understated

7   the risk of the certificates that they offered and sold to the Bank. Moreover, the Bank is informed

8   and believes, and based thereon alleges, that the Defendants materially understated the risk of the

9   certificates that they offered and sold to the Bank.

10  ### FIRST CAUSE OF ACTION

11  ### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
12  ### (California Corporations Code §§ 25401, 25501)

13      120.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Deutsche | Securitizations Nos. 1 through 4 |
| Bear Stearns | Securitizations Nos. 5, 7, and 8 |
| Credit Suisse | Securitizations Nos. 11 through 16 |
| Greenwich Capital | Securitizations Nos. 18 and 19 |
| Morgan Stanley | Securitizations Nos. 20 and 21 |
| UBS | Securitizations Nos. 22 through 27 |
| Merrill Lynch | Securitizations Nos. 29 through 33 |
| WaMu Capital | Securitizations Nos. 34 through 38 |

21      121.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

22  through 119.

23      122.    In doing the acts alleged in the sale to the Bank of the certificates in the

24  securitizations referred to above, the Defendants named above violated Sections 25401 and 25501

25  of the California Corporations Code by offering or selling securities in this State by means of

26  written communications that included untrue statements of material fact or omitted to state

27  material facts necessary in order to make the statements made, in light of the circumstances under

28  which they were made, not misleading.

-39-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    123.    This action is brought within two years after the discovery of the untrue and

2  misleading statements in the prospectus supplements and other documents that the Defendants

3  sent to the Bank, and within five years of the Bank's purchase of these certificates, or within any

4  applicable period as tolled by the pendency of the class actions referred to above or others.

5  Despite having exercised reasonable diligence, the Bank did not and could not reasonably have

6  discovered earlier the untrue and misleading statements in the prospectus supplements and other

7  documents.

8    124.    Under California Corporations Code §§ 25401 and 25501, the Bank is entitled to

9  recover the consideration that it paid for each of these certificates, plus interest at the legal rate

10 from the date of purchase to the date on which it recovers the purchase price, minus the amount of

11 income it has received on the certificate. Pursuant to § 25501 and in anticipation of the remedies

12 thereunder, the Bank hereby offers to tender each certificate.

### SECOND CAUSE OF ACTION

**UNTRUE OR MISLEADING STATEMENTS
IN REGISTRATION STATEMENTS
(Section 11 of the Securities Act of 1933)**

    125.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Deutsche | Securitization No. 4 |
| Deutsche Alt-A | Securitization No. 4 |
| Bear Stearns | Securitizations Nos. 7 and 8 |
| SAMI II | Securitizations Nos. 7 and 8 |
| Credit Suisse | Securitizations Nos. 11 through 16 |
| Greenwich Capital | Securitizations Nos. 18 and 19 |
| Greenwich Capital Acceptance | Securitizations Nos. 18 and 19 |
| Morgan Stanley | Securitization No. 21 |
| Merrill Lynch | Securitizations Nos. 32 and 33 |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-40-

126.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 124.

127.    In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in connection with the sale to the Bank of the certificates in the securitizations referred to above.

128.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 43 of the schedules.

129.    Deutsche Alt-A, SAMI II, and Greenwich Capital Acceptance are depositors of the securitizations listed above and therefore are the issuers of the certificates in those securitizations. Deutsche, Bear Stearns, Credit Suisse, Greenwich Capital, Morgan Stanley, and Merrill Lynch acted as underwriters of the certificates listed above.

130.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

131.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 44 through 119.

132.    The Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

133.    The Bank did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

134.    The Bank has suffered a loss on each of these certificates.

135.    The Bank is entitled to recover damages as described in 15 U.S.C. § 77k(e).

## THIRD CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
### (Section 12(a)(2) of the Securities Act of 1933)

136.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Deutsche | Securitization No. 4 |
| Deutsche Alt-A | Securitization No. 4 |
| Bear Stearns | Securitizations Nos. 7 and 8 |
| SAMI II | Securitizations Nos. 7 and 8 |
| Credit Suisse | Securitizations Nos. 11 through 16 |
| Greenwich Capital | Securitizations Nos. 18 and 19 |
| Greenwich Capital Acceptance | Securitizations Nos. 18 and 19 |
| Morgan Stanley | Securitization No. 21 |
| Merrill Lynch | Securitizations Nos. 32 and 33 |

137.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 135.

138.    In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

139.    This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to the Bank, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in

-42-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the prospectus supplements and other written offering materials and oral communications that the

2   dealers sent to the Bank.

3        140.    Deutsche Alt-A, SAMI II, and Greenwich Capital Acceptance are depositors of the

4   securitizations listed above and therefore are the issuers of the certificates in those securitizations.

5   In connection with the offer and sale of these certificates to the Bank, the issuers also made all of

6   the statements of material fact about these certificates that were in the prospectus supplements

7   and other written offering materials and oral communications that that the dealers sent to the

8   Bank.

9        141.    The Bank expressly excludes from this cause of action any allegation that could be

10  construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

11  on claims of strict liability or negligence under the Securities Act of 1933.

12       142.    The Defendants named above solicited the Bank to purchase these certificates, and

13  sold the certificates to the Bank, by means of the prospectus supplements and other written

14  offering materials and oral communications.

15       143.    The prospectus supplements and other written offering materials and oral

16  communications that the dealers sent to the Bank contained untrue statements of material fact and

17  omitted to state material facts necessary in order to make the statements, in the light of the

18  circumstances under which they were made, not misleading.

19       144.    The Bank did not know when it purchased these certificates that the statements in

20  the prospectus supplements and other written offering materials and oral communications that the

21  dealers sent to the Bank were untrue or misleading.

22       145.    The Bank has suffered a loss on each of these certificates.

23       146.    The Bank is entitled to recover the consideration that it paid for each of these

24  certificates, plus interest at the legal rate from the date of purchase to the date on which it

25  recovers the purchase price, minus the amount of income it has received on each certificate.

26  Pursuant to Section 12(a)(2) and in anticipation of the remedies thereunder, the Bank hereby

27  offers to tender each certificate.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-43-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

## FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
### (Section 15 of the Securities Act of 1933)

147.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| **DB Structured Products, Inc.** | **Securitization No. 4** |
| **The Bear Stearns Companies, Inc.** | **Securitizations Nos. 7 and 8** |
| **Greenwich Capital Holdings, Inc.** | **Securitizations Nos. 18 and 19** |

148.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 146.

149.    The Defendants named above are liable because, in doing the acts alleged, persons they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

150.    DB Structured Products, Inc. by or through stock ownership, agency, or otherwise, controlled Deutsche Alt-A within the meaning of Section 15 of the Securities Act of 1933.

151.    The Bear Stearns Companies, Inc. by or through stock ownership, agency, or otherwise, controlled SAMI II within the meaning of Section 15 of the Securities Act of 1933.

152.    Greenwich Capital Holdings, Inc. by or through stock ownership, agency, or otherwise, controlled Greenwich Capital Acceptance within the meaning of Section 15 of the Securities Act of 1933.

153.    In doing the acts alleged, each controlled person named in paragraphs 150 through 152 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 146.

154.    Each Defendant named above is therefore jointly and severally liable with and to the same extent as the person it controlled.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

155.   This cause of action is alleged against the following defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
|---|---|
| Deutsche | Securitizations Nos. 1 through 4 |
| Deutsche Alt-A | Securitization No. 4 |
| Bear Stearns | Securitizations Nos. 5 through 8 |
| SAMI II | Securitizations Nos. 5, 7, and 8 |
| Countrywide | Securitizations No. 9 |
| Credit Suisse | Securitizations Nos. 10 through 16 |
| Greenwich Capital | Securitizations Nos. 17 through 19 |
| Greenwich Capital Acceptance | Securitizations Nos. 17 through 19 |
| Morgan Stanley | Securitizations Nos. 20 and 21 |
| UBS | Securitizations Nos. 22 through 28 |
| MAST | Securitizations Nos. 22 through 24 |
| Merrill Lynch | Securitizations Nos. 29 through 33 |
| WaMu Capital | Securitizations Nos. 34 through 38 |
| WaMu Mortgage | Securitizations Nos. 34 through 38 |

156.   The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 154.

157.   As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

158.   In making the representations referred to above, the Defendants intended to induce the Bank to rely on those representations in making its decision to purchase these certificates in these securitizations.

159.   When the Defendants made these representations, they had no reasonable ground for believing them to be true. The Bank is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants inspected those files, they would have learned that the information they gave the Bank contained untrue or misleading statements. In addition, the Bank

-45-

1    is informed and believes, and based thereon alleges, that Defendants hired one or more "due-

2    diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied

3    with the representations and warranties made about those loans, and these contractors reported to

4    the Defendants that a material number of the loans in the collateral pools were different from the

5    descriptions of those loans in the prospectus supplements. Thus, the Bank is informed and

6    believes, and based thereon alleges, that Defendants had access to information that either did

7    make the Defendants aware, or should have made them aware had they heeded that information,

8    that the representations they made to the Bank contained material untrue or misleading statements

9    about the mortgage loans in the collateral pools.

10       160.    When it purchased these certificates, the Bank did not know about the untrue and

11   misleading statements alleged herein.

12       161.    The Bank reasonably and justifiably relied on the representations described above

13   in analyzing and deciding to purchase these certificates. Had the Defendants not made these false

14   and misleading representations, the Bank would not have purchased these certificates.

15       162.    As a direct and proximate result of the negligent misrepresentations by the

16   Defendants, the Bank was damaged in an amount to be proved at trial.

17                          **SIXTH CAUSE OF ACTION**

18                          **RESCISSION OF CONTRACT**
                 **(California Civil Code §§ 1689 and 1710, and Common Law)**
19

20       163.    This cause of action is alleged against the following defendants:

21

| *Against Defendant:* | *In connection with Securitizations:* |
| --- | --- |
| Deutsche | **Securitizations Nos. 1 through 4** |
| Bear Stearns | **Securitizations Nos. 5 through 8** |
| Countrywide | **Securitization No. 9** |
| Credit Suisse | **Securitizations Nos. 10 through 16** |
| Greenwich Capital | **Securitizations Nos. 17 through 19** |
| Morgan Stanley | **Securitizations Nos. 20 and 21** |
| UBS | **Securitizations Nos. 22 through 28** |
| Merrill Lynch | **Securitizations Nos. 29 through 33** |
| WaMu Capital | **Securitizations Nos. 34 through 38** |

28

-46-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    164.   The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

2  through 162.

3    165.   The Bank purchased each certificate pursuant to a contract in writing between the

4  Bank and the dealer from which it purchased that certificate. Each contract stated the

5  consideration that the Bank paid each dealer for each certificate.

6    166.   In making each contract to purchase the certificates, the Bank relied on the truth of

7  the statements that the Defendants named above made in the prospectus supplements and other

8  offering materials. Because those statements were untrue or misleading, the Bank was mistaken

9  about its basic assumptions underlying its purchase of each certificate, and this mistake had a

10  material adverse effect on the agreed-upon exchange represented by the Bank's purchase of each

11  certificate. Because the Defendants named above were responsible to provide accurate

12  information in the prospectus supplements, the Bank did not assume, nor does it bear, the risk of

13  the fundamental mistake underlying its decision to purchase these certificates.

14    167.   The Defendants named above obtained the consent of the Bank to the contracts to

15  purchase the certificates by means of their assertion, as facts, of that which was not true, when

16  those Defendants had no reasonable ground for believing those assertions to be true.

17    168.   Pursuant to California Civil Code. § 1689 *et seq.*, the Bank is entitled to rescind,

18  and does hereby demand the rescission of, each contract for the sale and purchase of these

19  certificates. The Bank offers to restore all benefits that it has received under those contracts and is

20  entitled to recover all consideration that it paid under them.

21               **PRAYER FOR RELIEF**

22    WHEREFORE, the Bank respectfully demands judgment as follows:

23    A.   On the first cause of action, the consideration that the Bank paid for each

24  certificate with interest thereon, less the amount of any income that the Bank has received

25  thereon, upon the Bank's tender of each certificate;

26    B.   On the second cause of action, damages in an amount to be determined at trial;

27

28

-47-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO