1      C.     On the third cause of action, the consideration that the Bank paid for each

2  certificate with interest thereon, less the amount of any income that the Bank has received

3  thereon, upon the Bank's tender of each certificate;

4      D.     On the fourth cause of action, the consideration that the Bank paid for each

5  certificate with interest thereon, less the amount of any income that the Bank has received

6  thereon, upon the Bank's tender of each certificate;

7      E.     On the fifth cause of action, damages in an amount to be determined at trial;

8      F.     On the sixth cause of action, the consideration that the Bank paid for each

9  certificate with interest thereon, less the amount of any income that the Bank has received

10  thereon, upon the Bank's tender of each certificate;

11      G.     All together with the costs of this action, the reasonable fees of the Bank's

12  attorneys in this action, and such other and further relief as the Court may deem just.

13  Dated: June 10, 2010

                       GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY, LLP

GRAIS & ELLSWORTH LLP

By _____
         Robert A. Goodin
Attorneys for Plaintiff
Federal Home Loan Bank of San Francisco

3428/001/X119863.v1

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-48-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

ERROR: ioerror
OFFENDING COMMAND: image

STACK:

-dictionary-
-savelevel-

1    GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
2    ROBERT A. GOODIN, State Bar No. 061302
         rgoodin@goodinmacbride.com
3    FRANCINE T. RADFORD, State Bar No. 168269
         fradford@goodinmacbride.com
4    ANNE H. HARTMAN, State Bar No. 184556
         ahartman@goodinmacbride.com
5    505 Sansome Street, Suite 900
     San Francisco, California 94111
6    Telephone:    (415) 392-7900
7    Facsimile:    (415) 398-4321

8    GRAIS & ELLSWORTH LLP
     DAVID J. GRAIS (*pro hac application submitted herewith*)
9    KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
     OWEN L. CYRULNIK (*pro hac application submitted herewith*)
10   70 East 55th Street
11   New York, New York 10022
     Telephone:    (212) 755-0100
12   Facsimile:    (212) 755-0052

13   Attorneys for Plaintiff
14   Federal Home Loan Bank of San Francisco

15           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16           IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

| 18  FEDERAL HOME LOAN BANK OF SAN | No.  CGC-10-497839 |
| 19  FRANCISCO, | **VOLUME 1 OF SCHEDULES OF** |
| 20          Plaintiff, | **FIRST AMENDED COMPLAINT** **(SCHEDULES 1 – 21)** |
| 21  v. | |
| 22  DEUTSCHE BANK SECURITIES INC.; | |
| 23  DEUTSCHE ALT-A SECURITIES, INC.; DB STRUCTURED PRODUCTS, INC.; | |
| 24  J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS & CO. INC.; | |
| 25  STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; | |
| 26  THE BEAR STEARNS COMPANIES, LLC, F/K/A THE BEAR STEARNS | |
| 27  COMPANIES, INC.; | |
| 28  COUNTRYWIDE SECURITIES | |

1  CORPORATION;
   CREDIT SUISSE SECURITIES (USA) LLC,
2  F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;
3  RBS SECURITIES, INC., F/K/A/
4  GREENWICH CAPITAL MARKETS, INC.;
   RBS ACCEPTANCE, INC., F/K/A
5  GREENWICH CAPITAL ACCEPTANCE,
   INC.;
6  RBS HOLDINGS USA, INC., F/K/A
7  GREENWICH CAPITAL HOLDINGS,
   INC.;
8  MORGAN STANLEY & CO.
   INCORPORATED;
9  UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
10 TRANSACTIONS, INC.;
11 MERRILL LYNCH, PIERCE, FENNER &
   SMITH, INC.;  WASHINGTON MUTUAL
12 MORTGAGE SECURITIES CORP.;
   WAMU CAPITAL CORP.; AND,
13 DOES 1-50,

14                   Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

1          SCHEDULE 1 TO THE AMENDED COMPLAINT

2          To the extent that this Schedule is incorporated by reference into allegations in the

3  complaint, those allegations are made against Defendant Deutsche.

4  **Item 43.       Details of trust and certificate(s).**

5          **(a)       Dealer that sold the certificate(s) to the Bank:** Deutsche.

6          **(b)       Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

7  Through Certificates, 2005-AR31 was a securitization in November 2005 of 3,543 mortgage

8  loans, in five groups. IndyMac Bank, F.S.B. originated or acquired all of the mortgage loans in

9  the collateral pool of this securitization. INDX 2005-AR31 Pros. Sup. S-41.

10         **(c)       Description of the certificate(s) that the Bank purchased:** Deutsche offered and

11 sold to the Bank a senior certificate in this securitization, in tranche 4-A-1, for which the Bank

12 paid $63,719,439 plus accrued interest on December 23, 2005.

13         **(d)       Ratings of the certificate(s) when the Bank purchased them:** Standard &

14 Poor's • AAA; Moody's • Aaa.

15         **(e)       Current ratings of the certificate(s):** Standard & Poor's • B-; Moody's •

16 Caa2.

17         **(f)       URL of prospectus supplement for this securitization:**

18 http://www.sec.gov/Archives/edgar/data/1090295/000095011705004535/a40876.txt.

19 **Item 51.       Untrue or misleading statements about the LTVs of the mortgage loans:**

20         (a)       "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100.00%

21 or less." INDX 2005-AR31 Pros. Sup. S-21.

22         (b)       In the section of the prospectus supplement entitled "The Mortgage Pool,"

23 Deutsche presented tables of statistics about the mortgage loans in the collateral pool. INDX

24 2005-AR31 Pros. Sup. S-23 to S-39. Each table focused on a certain characteristic of the loans

25 (for example, current principal balance) and divided the loans into categories based on that

26 characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01

27 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the

28 loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1  Mortgage Loans," divided the mortgage loans in group 1 into eight categories of original LTV

2  (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

3  misleading statements about the number of mortgage loans, the aggregate principal balance

4  outstanding, and the percent of aggregate principal balance outstanding in each of these

5  categories. INDX 2005-AR31 Pros. Sup. S-23.

6        (c)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

7  group 1 mortgage loans was approximately 71.90%." INDX 2005-AR31 Pros. Sup. S-23.

8        (d)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

9  Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

10  group 2 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

11  30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

12  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

13  principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-26.

14        (e)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

15  group 2 mortgage loans was approximately 72.11%." INDX 2005-AR31 Pros. Sup. S-26.

16        (f)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

17  Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

18  group 3 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

19  30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

20  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

21  principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-30.

22        (g)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

23  group 3 mortgage loans was approximately 74.94%." INDX 2005-AR31 Pros. Sup. S-30.

24        (h)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

25  Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

26  group 4 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

27  30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

28

-2-

1   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2   principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-33.

3        (i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

4   group 4 mortgage loans was approximately 69.54%." INDX 2005-AR31 Pros. Sup. S-33.

5        (j)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

6   Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in

7   group 5 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

8   30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

9   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

10  principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-36.

11       (k)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

12  group 5 mortgage loans was approximately 78.28%." INDX 2005-AR31 Pros. Sup. S-36.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 61.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 3,543 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,097 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,114 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $65,079,411 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 305 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,628,970 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 169 |
| Weighted-average LTV, as stated by Defendants (Group 4) | 69.54% |
| Weighted-average LTV, as determined by the model (Group 4) | 76.88% |

**Item 64.**      **Evidence from subsequent sales of refinanced properties:**

Of the 3,543 mortgage loans in the collateral pool, 1,407 were taken out to refinance, rather than to purchase, properties. For those 1,407 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,407 properties, 218 were subsequently sold for a total of approximately $73,471,208. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $96,283,500. Thus, those properties were sold for 76.3% of the value ascribed to them, a difference of 23.7%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Deutsche presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans."

-4-

This table divided the mortgage loans in group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-24.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Deutsche stated that 93.03% of the mortgage loans in group 1 were secured by a "Primary Home," 4.39% by an "Investment" property, and 2.58% by a "Second Home." INDX 2005-AR31 Pros. Sup. S-24.

(c)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-27.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Deutsche stated that 84.25% of the mortgage loans in group 2 were secured by a "Primary Home," 11.6% by an "Investment" property, and 4.14% by a "Second Home." INDX 2005-AR31 Pros. Sup. S-27.

(e)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in group 3 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR31 Pros. Sup. S-31.

(f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Deutsche stated that 87.71% of the mortgage loans in group 3 were secured by a "Primary Home," 7.12% by an "Investment" property, and 5.17% by a "Second Home." INDX 2005-AR31 Pros. Sup. S-31.

(g)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in group 4 into

-5-

1   the categories "Primary Home," "Investment," and "Second Home." The table made untrue and

2   misleading statements about the number of mortgage loans, the aggregate principal balance

3   outstanding, and the percent of aggregate principal balance outstanding in each of these

4   categories. INDX 2005-AR31 Pros. Sup. S-34.

5         (h)    In the "Occupancy Types for the Group 4 Mortgage Loans" table, Deutsche stated

6   that 88.32% of the mortgage loans in group 4 were secured by a "Primary Home," 4.04% by an

7   "Investment" property, and 7.64% by a "Second Home." INDX 2005-AR31 Pros. Sup. S-34.

8         (i)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy

9   Types for the Group 5 Mortgage Loans." This table divided the mortgage loans in group 5 into

10   the categories "Primary Home," "Investment," and "Second Home." The table made untrue and

11   misleading statements about the number of mortgage loans, the aggregate principal balance

12   outstanding, and the percent of aggregate principal balance outstanding in each of these

13   categories. INDX 2005-AR31 Pros. Sup. S-38.

14         (j)    In the "Occupancy Types for the Group 5 Mortgage Loans" table, Deutsche stated

15   that 81.41% of the mortgage loans in group 5 were secured by a "Primary Home," 13.31% by an

16   "Investment" property, and 5.28% by a "Second Home." INDX 2005-AR31 Pros. Sup. S-38.

17   **Item 95.**    **Details of properties that were stated to be owner-occupied, but were not:**

18
19       **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 268

20       **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 361

21
22       **(c)**    **Number of loans on which the owner of the property owned three or more properties:** 16

23
24       **(d)**    **Number of loans that went straight from current to foreclosure or ownership by lender:** 3

25       **(e)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 540

26

27

28

**Item 98.        Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 25 of the prospectus, Deutsche made statements about the underwriting guidelines of the originators. All of those statements are incorporated herein by reference. In particular, Deutsche stated that:

(a)        "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR31 Pros. 24.

(b)        "Most lenders offer a number of different underwriting programs. Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral." INDX 2005-AR31 Pros. 24-25.

On pages S-41 through S-43 of the prospectus supplement, Deutsche made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Deutsche stated that:

(a)        "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR31 Pros. Sup. S-42.

(b)        "IndyMac Bank's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value or the related mortgaged property." INDX 2005-AR31 Pros. S-42.

**Item 105.        Early payment defaults:**

**(a)        Number of the mortgage loans that suffered EPDs: 27**

**(b)        Percent of the mortgage loans that suffered EPDs: 0.8%**

**(c)        Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

-7-

**Item 106.**   **90+ days delinquencies:**

   **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,008

   **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 28.5%

   **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 107.**   **30+ days delinquencies in this securitization:**

   **(a)**   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 969

   **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 27.3%

   **(c)**   **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

   On pages S-3 and S-91 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificate issued in this securitization. Deutsche stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

   Deutsche also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's. . . and Aaa by Moody's Investors Service, Inc. ("Moody's")." INDX_2005-31 Pros. Sup. S-91.

**Item 117.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

   **(a)**   **Number of loans whose LTVs were materially understated:** 1,114

   **(b)**   **Number of loans that suffered EPDs:** 27

   **(c)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 540

   **(d)**   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,411

-8-

(e)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 39.8%

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1

### SCHEDULE 2 TO THE AMENDED COMPLAINT

2      To the extent that this Schedule is incorporated by reference into allegations in the

3  complaint, those allegations are made against Defendant Deutsche.

4  **Item 43.      Details of trust and certificate(s).**

5      **(a)      Dealer that sold the certificate(s) to the Bank:** Deutsche.

6      **(b)      Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

7  Through Certificates, Series 2005-AR16IP was a securitization in July 2005 of 1,708 mortgage

8  loans, in one group. IndyMac Bank, F.S.B. originated or acquired all of the mortgage loans in the

9  collateral pool of this securitization. INDX 2005-AR16IP Pros. Sup. S-26.

10      **(c)      Description of the certificate(s) that the Bank purchased:** Deutsche offered and

11  sold to the Bank a senior certificate in this securitization, in tranche A-2, for which the Bank paid

12  $146,400,000 plus accrued interest on July 11, 2005.

13      **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

14  Poor's • AAA; Moody's • Aaa.

15      **(e)      Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's •

16  B3.

17      **(f)      URL of prospectus supplement for this securitization:**

18  http://www.sec.gov/Archives/edgar/data/1090295/000112528205003691/b407648_424b5.txt.

19

20  **Item 51.      Untrue or misleading statements about the LTVs of the mortgage loans:**

21      In the prospectus supplement, Deutsche made the following statements about the LTVs of

22  the mortgage loans in the collateral pool of this securitization.

23      **(a)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of

24  100.00% or less."** INDX 2005-AR16IP Pros. Sup. S-20.

25      **(b)** In the section of the prospectus supplement entitled "The Mortgage Pool,"

26  Deutsche presented tables of statistics about the mortgage loans in the collateral pool. INDX

27  2005-AR16IP Pros. Sup. S-22 to S-24. Each table focused on a certain characteristic of the loans

28  (for example, current principal balance) and divided the loans into categories based on that

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1   characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01

2   to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the

3   loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the

4   Mortgage Loans," divided all of the loans in the collateral pool into 18 categories of original LTV

5   (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and

6   misleading statements about the number of mortgage loans, the aggregate principal balance

7   outstanding, and the percent of aggregate principal balance outstanding in each of these

8   categories. INDX 2005-AR16IP Pros. Sup. S-22.

9        (c)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

10   Mortgage Loans was approximately 69.44%." INDX 2005-AR16IP Pros. Sup. S-22.

11   **Item 61.       Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,708 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,052 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 450 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $50,830,623 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 225 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $22,748,622 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 46 |
| Weighted-average LTV, as stated by Defendants | 69.44% |
| Weighted-average LTV, as determined by the model | 78.6% |

21   **Item 87.       Untrue or misleading statements about owner-occupancy of the properties**
22                               **that secured the mortgage loans:**

23       In the prospectus supplement, Deutsche made the following statements about the

24   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

25   securitization.

26       (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

27   51, Deutsche presented a table entitled "Occupancy Types for the Mortgage Loans." This table

28                               -2-

divided all of the mortgage loans in the collateral pool into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR16IP Pros. Sup. S-23.

     (b)     In the "Occupancy Types for the Mortgage Loans" table, Deutsche stated that 88.94% of the mortgage loans in the collateral pool were secured by a "Primary Home," 8.73% by an "Investment" property, and 2.33% by a "Second Home." INDX 2005-AR16IP Pros. Sup. S-23.

**Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

     **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 107

     **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 203

     **(c)**     **Number of loans on which the owner of the property owned three or more properties:** 22

     **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 272

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 25 prospectus, Deutsche made statements about the underwriting guidelines of the originators. All of those statements are incorporated herein by reference. In particular, Deutsche stated that:

     (a)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR16IP Pros. 24.

     (b)     "Most lenders offer a number of different underwriting programs. Some programs place more emphasis on a borrower's credit standing and repayment ability while others

-3-

1  emphasize the value and adequacy of the mortgaged property as collateral." INDX 2005-AR16IP

2  Pros. 24-25.

3  On pages S-26 through S-28 prospectus supplement, Deutsche made statements about the

4  underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein

5  by reference. In particular, Deutsche stated that:

6  (a)  "Exceptions to these underwriting standards are permitted where compensating

7  factors are present . . . ." INDX 2005-AR16IP Pros. Sup. S-27.

8  (b)  "IndyMac Bank's underwriting standards for conventionally underwritten

9  mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

10  mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

11  the value or the related mortgaged property." INDX 2005-AR16IP Pros. Sup S-27.

12  **Item 105.**    **Early payment defaults:**

13
14  **(a)    Number of the mortgage loans that suffered EPDs: 4**

15  **(b)    Percent of the mortgage loans that suffered EPDs:** 0.2%

16  **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
17            made at the same time as the loans in the collateral pool that experienced
            EPDs:** 0.18%

18
19  **Item 106.**    **90+ days delinquencies:**

20  **(a)    Number of the mortgage loans that suffered 90+ days delinquencies:** 263
21
22  **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies:** 15.4%

23  **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
            made at the same time as the loans in the collateral pool that suffered 90+
24          days delinquencies:** 16.5%

25  **Item 107.**    **30+ days delinquencies in this securitization:**

26  **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31,
27          2010:** 251

28

-4-

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 14.7%

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-68 to S-69 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificate issued in this securitization. Deutsche stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Deutsche also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. ("Moody's")." INDX 2005-AR16IP Pros. Sup. S-68.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    (a)    **Number of loans whose LTVs were materially understated:** 450

    (b)    **Number of loans that suffered EPDs:** 4

    (c)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 272

    (d)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 641

    (e)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 37.5%

1

## SCHEDULE 3 TO THE AMENDED COMPLAINT

2      To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendants Deutsche.

4   **Item 43.      Details of trust and certificate(s).**

5      **(a)      Dealer that sold the certificate(s) to the Bank:** Deutsche.

6      **(b)      Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

7   Through Certificates, Series 2005-AR13 was a securitization in June 2005 of 2,680 mortgage

8   loans, in five groups. IndyMac Bank, F.S.B. originated or acquired all of the mortgage loans in

9   the collateral pool of this securitization INDX 2005-AR13 Pros. Sup. S-36.

10     **(c)      Description of the certificate(s) that the Bank purchased:** Deutsche offered and

11  sold to the Bank a senior certificate in this securitization, in tranche 5-A-1, for which the Bank

12  paid $79,066,077 plus accrued interest on June 30, 2005.

13     **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

14  Poor's •   AAA; Moody's •   Aaa.

15     **(e)      Current ratings of the certificate(s):** Standard & Poor's •   AAA; Moody's •

16  Caa2.

17     **(f)      URL of prospectus supplement for this securitization:**

18  http://www.sec.gov/Archives/edgar/data/1090295/000095011705002678/a40083.txt.

19  **Item 51.      Untrue or misleading statements about the LTVs of the mortgage loans:**

20     In the prospectus supplement, Deutsche made the following statements about the LTVs of

21  the borrowers whose mortgage loans were in the collateral pool of this securitization.

22     (a)      The weighted average original LTV of the mortgage loans in group 1 was 79.39%.

23  INDX 2005-AR13 Pros. Sup. S-11.

24     (b)      The weighted average original LTV of the mortgage loans in group 2 was 78.87%.

25     (c)      The weighted average original LTV of the mortgage loans in group 3 was 78.97%.

26  INDX 2005-AR13 Pros. Sup. S-11.

27     (d)      The weighted average original LTV of the mortgage loans in group 4 was 78.04%.

28  INDX 2005-AR13 Pros. Sup. S-11.

1        (e)      The weighted average original LTV of the mortgage loans in group 5 was 78.25%.

2    INDX 2005-AR13 Pros. Sup. S-11.

3        (f)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

4    less." INDX 2005-AR13 Pros. Sup. S-18.

5        (g)      In the section of the prospectus supplement entitled "The Mortgage Pool,"

6    Deutsche presented tables of statistics about the mortgage loans in the collateral pool. INDX

7    2005-AR13 Pros. Sup. S-19 to S-34. Each table focused on a certain characteristic of the loans

8    (for example, current principal balance) and divided the loans into categories based on that

9    characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01

10    to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the

11    loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1

12    Mortgage Loans," divided the loans in group 1 into nine categories of original LTV (for example,

13    10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading

14    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

15    the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-

16    AR13 Pros. Sup. S-19.

17        (h)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

18    group 1 mortgage loans was approximately 78.05%." INDX 2005-AR13 Pros. Sup. S-19.

19        (i)      In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

20    Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

21    group 2 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%,

22    60.01% to 70%, etc.). The table made untrue and misleading statements about the number of

23    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

24    principal balance outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-22.

25        (j)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

26    group 2 mortgage loans was approximately 76.18%." INDX 2005-AR13 Pros. Sup. S-22.

27        (k)      In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

28    Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

-2-

1   group 3 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%,

2   60.01% to 70%, etc.). The table made untrue and misleading statements about the number of

3   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

4   principal balance outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-25.

5       (l)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

6   group 3 mortgage loans was approximately 82.20%." INDX 2005-AR13 Pros. Sup. S-25.

7       (m)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

8   Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

9   group 4 into 10 categories of original LTV (for example, 0.01% to 10%, 10.01% to 20%, 20.01%

10  to 30%, etc.). The table made untrue and misleading statements about the number of mortgage

11  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

12  outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-28.

13      (n)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

14  group 4 mortgage loans was approximately 74.80%." INDX 2005-AR13 Pros. Sup. S-28.

15      (o)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Original

16  Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in

17  group 5 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

18  40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

19  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

20  principal balance outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-32.

21      (p)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

22  group 5 mortgage loans was approximately 73.95%." INDX 2005-AR13 Pros. Sup. S-32.

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 61.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,680 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,671 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 791 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $47,943,408 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 278 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $18,698,149 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 125 |
| Weighted-average LTV, as stated by Defendants (Nonconforming Group 5) | 73.95% |
| Weighted-average LTV, as determined by the model (Nonconforming Group 5) | 83.3% |

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Deutsche presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-20.

(b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, Deutsche stated that 89.25% of the mortgage loans in group 1 were secured by a "Primary Home," 6.11% by an "Investment" property, and 4.64% by a "Second Home." INDX 2005-AR13 Pros. Sup. S-20.

-4-

1       (c)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy

2    Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into

3    the categories "Primary Home," "Investment," and "Second Home." The table made untrue and

4    misleading statements about the number of mortgage loans, the aggregate principal balance

5    outstanding, and the percent of aggregate principal balance outstanding in each of these

6    categories. INDX 2005-AR13 Pros. Sup. S-23.

7       (d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Deutsche stated

8    that 91.84% of the mortgage loans in group 2 were secured by a "Primary Home," 5.03% by an

9    "Investment" property, and 3.13% by a "Second Home." INDX 2005-AR13 Pros. Sup. S-23.

10      (e)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy

11    Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in group 3 into

12    the categories "Primary Home," "Investment," and "Second Home." The table made untrue and

13    misleading statements about the number of mortgage loans, the aggregate principal balance

14    outstanding, and the percent of aggregate principal balance outstanding in each of these

15    categories. INDX 2005-AR13 Pros. Sup. S-26.

16      (f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Deutsche stated

17    that 76.69% of the mortgage loans in group 3 were secured by a "Primary Home," 15.99% by an

18    "Investment" property, and 7.32% by a "Second Home." INDX 2005-AR13 Pros. Sup. S-26.

19      (g)     In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy

20    Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in group 4 into

21    the categories "Primary Home," "Investment" and "Second Home." The table made untrue and

22    misleading statements about the number of mortgage loans, the aggregate principal balance

23    outstanding, and the percent of aggregate principal balance outstanding in each of these

24    categories. INDX 2005-AR13 Pros. Sup. S-30.

25      (h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, Deutsche stated

26    that 89% of the mortgage loans in group 4 were secured by a "Primary Home," 7.19% by an

27    "Investment" property, and 3.81% by a "Second Home." INDX 2005-AR13 Pros. Sup. S-30.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

(i)    In "The Mortgage Pool" section, Deutsche presented a table entitled "Occupancy Types for the Group 5 Mortgage Loans." This table divided the mortgage loans in group 5 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR13 Pros. Sup. S-33.

(j)    In the "Occupancy Types for the Group 5 Mortgage Loans" table, Deutsche stated that 87.62% of the mortgage loans in group 5 were secured by a "Primary Home," 10.29% by an "Investment" property, and 2.09% by a "Second Home." INDX 2005-AR13 Pros. Sup. S-33.

**Item 95.**    **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 218

    **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 320

    **(c)**    **Number of loans on which the owner of the property owned three or more properties:** 16

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 463

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages 24 through 25 of the prospectus supplement, Deutsche made statements about the underwriting guidelines of the originators. All of those statements are incorporated herein by reference. In particular, Deutsche stated that:

(a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR13 Pros. 24.

(b)    "Most lenders offer a number of different underwriting programs. Some programs place more emphasis on a borrower's credit standing and repayment ability while others

-6-

1    emphasize the value and adequacy of the mortgaged property as collateral." INDX 2005-AR13

2    Pros. 24-25.

3        On pages S-36 through S-38 of the prospectus supplement, Deutsche made statements

4    about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

5    incorporated herein by reference. In particular, Deutsche stated that:

6        (a)    "Exceptions to these underwriting standards are permitted where compensating

7    factors are present . . . ." INDX 2005-AR13 Pros. Sup. S-37.

8        (b)    "IndyMac Bank's underwriting standards for conventionally underwritten

9    mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

10    mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

11    the value or the related mortgaged property." INDX 2005-AR16IP Pros. Sup S-37.

12    **Item 105.**      **Early payment defaults:**

13

14        **(a)**      **Number of the mortgage loans that suffered EPDs:** 12

15        **(b)**      **Percent of the mortgage loans that suffered EPDs:** 0.4%

16        **(c)**      **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

17                 **made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

18

19    **Item 106.**      **90+ days delinquencies:**

20        **(a)**      **Number of the mortgage loans that suffered 90+ days delinquencies:** 553

21        **(b)**      **Percent of the mortgage loans that suffered 90+ days delinquencies:** 20.6%

22        **(c)**      **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**

23                 **made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

24

25    **Item 107.**      **30+ days delinquencies in this securitization:**

26        **(a)**      **Number of the mortgage loans that were 30+ days delinquent on March 31,**

27                 **2010:** 535

28

-7-

    **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 20.0%

    **(c)**      **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**      **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-78 of the prospectus supplement, Deutsche made statements about the ratings assigned to the certificate issued in this securitization. Deutsche stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Deutsche also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's. . . and Aaa by Moody's Investors Service, Inc. ("Moody's")." INDX_2005-AR13 Pros. Sup. S-78.

**Item 117.**      **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**      **Number of loans whose LTVs were materially understated:** 791

    **(b)**      **Number of loans that suffered EPDs:** 12

    **(c)**      **Number of loans in which the properties were stated to be owner-occupied but were not:** 463

    **(d)**      **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,069

    **(e)**      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 39.9%

-8-

**SCHEDULE 4 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Deutsche, Deutsche Alt-A and DB Structured Products, Inc.

**Item 43.        Details of trust and certificate(s).**

   **(a)        Dealer that sold the certificate(s) to the Bank:** Deutsche.

   **(b)        Description of the trust:** Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-AR2 was a securitization in February 2007 of 2,894 mortgage loans, in one group. The mortgage loans were originated by American Home Mortgage Corp, Mortgage IT, Inc., GreenPoint Mortgage Funding, Inc., Plaza Home Mortgage, Alliance Banc Corp., and other originators. American Home Mortgage Corp. originated 38.69%, Mortgage IT, Inc. originated 32.29%, GreenPoint Mortgage Funding, Inc. originated 6.87%, Plaza Home Mortgage originated 3.46%, and Alliance Banc Corp. originated 3.29% of the mortgage loans in the collateral pool. DBALT 2007-AR2 Pros. Sup. S-1, S-35, and S-39.

   **(c)        Description of the certificate(s) that the Bank purchased:** Deutsche offered and sold to the Bank a senior certificate in this securitization, tranche A-1, for which the Bank paid $114,960,000 on February 28, 2007.

   **(d)        Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

   **(e)        Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's • Caa1.

   **(f)        URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1199474/000116231807000242/combined.htm.

   **(g)        Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by Deutsche Alt-A Securities, Inc. with the SEC on form S-3 on May 1, 2006. Annexed to the registration statement was a prospectus. The

1  prospectus was amended from time to time by prospectus supplements whenever a new series of

2  certificates was issued pursuant or traceable to that registration statement.

3  **Item 51.       Untrue or misleading statements about the LTVs of the mortgage loans:**

4         In the prospectus supplement, Deutsche and Deutsche Alt-A made the following

5  statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

6         (a)      The original LTVs of the mortgage loans in the collateral pool ranged from 7.88%

7  to 100%, with a weighted average of 75.95%. DBALT 2007-AR2 Pros. Sup. S-4.

8         (b)      The original LTVs of the mortgage loans in the collateral pool with an

9  approximate LTV of less than or equal to 80% was 97.84%.

10        (c)      The original LTVs of the mortgage loans in the collateral pool with an

11 approximate LTV of greater than 80% but less than or equal to 100% was 2.16%. DBALT 2007-

12 AR2 Pros. Sup. S-25.

13        (d)      In the section of the prospectus supplement entitled "Description of the Mortgage

14 Pool," Deutsche and Deutsche Alt-A presented tables of statistics about all of the mortgage loans

15 in the collateral pool ("Tabular Characteristics of the Mortgage Loans"). DBALT 2007-AR2

16 Pros. Sup. S-27 to S-36. Each table focused on a certain characteristic of the loans (for example,

17 principal balance) and divided the loans into categories based on that characteristic (for example,

18 loans with principal balances of less than or equal to $50,000, $50,001 to $100,000, $100,001 to

19 $150,000, etc.). Each table then presented various data about the loans in each category. One of

20 the tables, entitled "Original Loan-to-Value Ratios of the Mortgage Loans," divided all of the

21 loans in the collateral pool into 11 categories of LTV (for example, less than or equal to 50%,

22 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about

23 the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

24 aggregate principal balance outstanding in each of these categories. DBALT 2007-AR2 Pros.

25 Sup. S-30.

26

27

28

-2-

**Item 61.       Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,894 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,135 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,432 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $110,848,806 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 204 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,675,878 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 232 |
| Weighted-average LTV, as stated by Defendants | 75.95% |
| Weighted-average LTV, as determined by the model | 88.7% |

**Item 64.       Evidence from subsequent sales of refinanced properties:**

Of the 2,894 mortgage loans in the collateral pool, 1,185 were taken out to refinance, rather than to purchase, properties. For those 1,185 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,185 properties, 227 were subsequently sold for a total of approximately $71,957,354. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $114,304,590. Thus, those properties were sold for 63.0% of the value ascribed to them, a difference of 37.0%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.       Undisclosed additional liens:**

**(a)       Minimum number of properties with additional liens:** 115

**(b)       Total reduction in equity from additional liens:** $13,330,964

**(c)       Weighted-average reduction in equity from additional liens:** 84.8%

**Item 81.       Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Deutsche and Deutsche Alt-A made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool

originated by American Home Mortgage Corp.: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." DBALT 2007-AR2 Pros. Sup. S-41.

In the prospectus supplement, Deutsche and Deutsche Alt-A made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool that were originated by MortgageIT, Inc. "Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." DBALT 2007-AR2 Pros. Sup. S-42.

**Item 87.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Deutsche and Deutsche Alt-A made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In the "Tabular Characteristics of the Mortgage Loans" section of the prospectus supplement, described in Item 51, Deutsche and Deutsche Alt-A presented a table entitled "Occupancy Status of the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. DBALT 2007-AR2 Pros. Sup. S-32.

(b)     In the "Occupancy Status of the Mortgage Loans" table, Deutsche and Deutsche Alt-A stated that 84.12% of all of the mortgage loans in the collateral pool were secured by a

-4-

1   "Primary" home, 10.5% by an "Investment" property, and 5.39% by a "Second Home." DBALT

2   2007-AR2 Pros. Sup. S-32.

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

    **(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 225

    **(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 397

    **(c)     Number of loans on which the owner of the property owned three or more properties:** 28

    **(d)     Number of loans that went straight from current to foreclosure or ownership by lender:** 2

    **(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 565

**Item 98.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-39 through S-41 of the prospectus supplement, Deutsche and Deutsche Alt-A made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, Deutsche and Deutsche Alt-A stated that:

    (a)     "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." DBALT 2007-AR2 Pros. Sup. S-41.

    (b)     "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." DBALT 2007-AR2 Pros. Sup. 29.

On pages S-41 through S-44 of the prospectus supplement, Deutsche and Deutsche Alt-A made statements about the underwriting guidelines of MortgageIT, Inc. All of those statements are incorporated herein by reference. In particular, Deutsche and Deutsche Alt-A stated that:

-5-

(a) "[E]xceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis[.]" DBALT 2007-AR2 Pros. Sup. S-44.

(b) "MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." DBALT 2007-AR2 Pros. Sup. 30.

**Item 105.   Early payment defaults:**

   **(a)   Number of the mortgage loans that suffered EPDs: 164**

   **(b)   Percent of the mortgage loans that suffered EPDs: 5.7%**

   **(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%**

**Item 107.   30+ days delinquencies in this securitization:**

   **(a)   Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,585**

   **(b)   Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 54.8%**

   **(c)   Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 114.   Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-5 to S-6 and S-125 to S-126 of the prospectus supplement, Deutsche and Deutsche Alt-A made statements about the ratings assigned to the certificates issued in this securitization. Deutsche and Deutsche Alt-A stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Deutsche and Deutsche Alt-A also stated: "It is a condition to the issuance of the certificates that the Senior Certificates and Mezzanine Certificates receive at least the following ratings from Standard & Poor's Ratings Services. . . and Moody's Investors Service, Inc. ("Moody's")." DBALT 2007-AR2 Pros. Sup. S-125.

-6-

1

2

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

3

(a)    **Number of loans whose LTVs were materially understated:** 1,432

4

(b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 115

5

6

(c)    **Number of loans that suffered EPDs:** 164

7

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 565

8

9

(e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1.785

10

11

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 61.7%

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SCHEDULE 5 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Bear Stearns and SAMI II.

**Item 43.     Details of trust and certificate(s).**

**(a)     Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

**(b)     Description of the trust:** Structured Asset Mortgage Investments II Trust, Mortgage Pass-Through Certificates, Series 2005-AR3 was a securitization in June 2005 of 1,719 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by SouthStar Funding, LLC and Opteum Financial Services, LLC, together, Metrocities Mortgage LLC, First Horizon Home Loan Corporation, Just Mortgage, Inc., and other originators of less than 10% of the loans. SouthStar Funding, LLC and Opteum Financial Services, LLC together originated 28.1%, Metrocities Mortgage LLC originated 21.67%, First Horizon Home Loan Corporation originated 17.16%, and Just Mortgage, Inc. originated 12.37% of the mortgage loans in the collateral pool. SAMI 2005 AR3 Pros. Sup. S-7 and S-50.

SouthStar Funding, LLC and Opteum Financial Services, LLC together originated 34.24%, First Horizon Home Loan Corporation originated 22.79%, Just Mortgage, Inc. originated 16.43%, and Metrocities Mortgage LLC originated 5.35% of the mortgage loans in group I (from which the Bank's certificate was to be paid). SAMI 2005 AR3 Pros. Sup. S-7 and S-50.

Metrocities Mortgage LLC originated 71.4% and SouthStar Funding, LLC and Opteum Financial Services, LLC together originated 9.39% of the mortgage loans in group II. SAMI 2005 AR3 Pros. Sup. S-7 and S-50.

**(c)     Description of the certificate(s) that the Bank purchased:** Bear Stearns offered and sold to the Bank a senior certificate in this securitization, in tranche I-A-2, for which the Bank paid $78,548,000 plus accrued interest on June 30, 2005.

**(d)     Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

**(e)     Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's • B3.

1     **(f)     URL of prospectus supplement for this securitization:**

2     http://www.sec.gov/Archives/edgar/data/1243106/000091142005000270/d1061775.txt.

3     **Item 51.     Untrue or misleading statements about the LTVs of the mortgage loans:**

4          In the prospectus supplement, Bear Stearns and SAMI II made the following statements

5     about the LTVs of the mortgage loans in the collateral pool of this securitization.

6          (a)     The weighted-average original LTV of the mortgage loans in group I was 75.5%.

7     SAMI 2005-AR3 Pros. Sup. S-9 and A-9.

8          (b)     The weighted-average original LTV of the mortgage loans in group II was

9     73.68%. SAMI 2005-AR3 Pros. Sup. S-9 and A-15.

10         (c)     In Schedule A of the prospectus supplement ("Certain Characteristics of the

11    Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

12    loans in the collateral pool. SAMI 2005-AR3 Pros. Sup. A-1 to A-19. Each table focused on a

13    certain characteristic of the loans (for example, scheduled principal balance) and divided the

14    loans into categories based on that characteristic (for example, loans with scheduled principal

15    balances of $0 to $100,000, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then

16    presented various data about the loans in each category. One of the tables, entitled "Original

17    Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date," divided all of the loans in

18    the collateral pool into 12 categories of LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

19    to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

20    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

21    outstanding in each of these categories. SAMI 2005-AR3 Pros. Sup. A-3.

22         (d)     The weighted-average original LTV of all of the mortgage loans in the collateral

23    pool was 75.05%. SAMI 2005-AR3 Pros. Sup. S-38.

24         (e)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

25    Loan-to-Value Ratios of the Mortgage Loans in Group I." This table divided the mortgage loans

26    in group I into 12 categories of original LTV (for example, 0% to 30%, 30.01% to 40%, 40.01%

27    to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

2  outstanding in each of these categories. SAMI 2005-AR3 Pros. Sup. A-9.

3        (f)     The weighted average original LTV of the loans in group I was 75.5%. SAMI

4  2005-AR3 Pros. Sup. A-9.

5        (g)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

6  Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group II." This table

7  divided the mortgage loans in Group II into 11 categories of LTV (for example, 0% to 30%,

8  40.01% to 50%, 50.01% to 55%, etc.). The table made untrue and misleading statements about

9  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

10  aggregate principal balance outstanding in each of these categories. SAMI 2005-AR3 Pros. Sup.

11  A-15.

12        (h)     The weighted-average original LTV of the loans in Group II was 73.68%. SAMI

13  2005-AR3 Pros. Sup. A-15.

14  **Item 61.**     **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,719 |
| Number of properties on which there was enough information for the model to determine a true market value | 967 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 508 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $42,523,918 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 142 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,254,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 105 |
| Weighted-average LTV, as stated by Defendants | 75.05% |
| Weighted-average LTV, as determined by the model | 86.0% |

**Item 81.**     **Untrue or misleading statements about compliance with USPAP:**

     In the prospectus supplement, Bear Stearns and SAMI II made the following statement

about the appraisals of the properties originated by First Horizon Home Loan Corporation: "All

appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice

-3-

1    adopted by the Appraisal Standard Board of the Appraisal Foundation." SAMI 2005-AR3 Pros.

2    Sup. S-52.

3    **Item 87.       Untrue or misleading statements about owner-occupancy of the properties**

4    **                that secured the mortgage loans:**

5            In the prospectus supplement, Bear Stearns and SAMI II made the following statements

6    about the occupancy status of the properties that secured the mortgage loans in the collateral pool

7    of this securitization.

8            (a)      In Schedule A of the prospectus supplement, described in Item 51, Bear Stearns

9    and SAMI II presented a table entitled "Occupancy Status of Mortgaged Properties." This table

10   divided all of the mortgage loans in the collateral pool into the categories "Owner Occupied,"

11   "Investor," and "Second Home." The table made untrue and misleading statements about the

12   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

13   aggregate principal balance outstanding in each of these categories. SAMI 2005-AR3 Pros. Sup.

14   A-4.

15           (b)      In the "Occupancy Status of Mortgaged Properties" table, Bear Stearns and SAMI

16   II stated that 88.18% of all of the mortgage loans in the collateral pool were secured by an

17   "Owner Occupied" property, 7.67% by an "Investor" property, and 4.15% by a "Second Home."

18   SAMI 2005-AR3 Pros. Sup. A-4.

19           (c)      In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

20   Status of Mortgaged Properties in Group I." This table divided the mortgage loans in Group I into

21   the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and

22   misleading statements about the number of mortgage loans, the aggregate principal balance

23   outstanding, and the percent of aggregate principal balance outstanding in each of these

24   categories. SAMI 2005-AR3 Pros. Sup. A-10.

25           (d)      In the "Occupancy Status of Mortgaged Properties in Group I" table, Bear Stearns

26   and SAMI II stated that 89.59% of the mortgage loans in the Group I were secured by an "Owner

27

28

-4-

1    Occupied" property, 6.68% by an "Investor" property, and 3.74% by a "Second Home." SAMI

2    2005-AR3 Pros. Sup. A-10.

3        (e)    In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

4    Status of Mortgaged Properties in Group II." This table divided the mortgage loans in Group II

5    into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue

6    and misleading statements about the number of mortgage loans, the aggregate principal balance

7    outstanding, and the percent of aggregate principal balance outstanding in each of these

8    categories. SAMI 2005-AR3 Pros. Sup. A-16.

9        (f)    In the "Occupancy Status of Mortgaged Properties in Group I" table, Bear Stearns

10   and SAMI II stated that 83.89% of the mortgage loans in group II were secured by an "Owner

11   Occupied" property, 10.71% by an "Investor" property, and 5.4% by a "Second Home." SAMI

12   2005-AR3 Pros. Sup. A-16.

13   **Item 95.**    **Details of properties that were stated to be owner-occupied, but were not:**

14       **(a)**    **Number of loans on which the owner of the property instructed tax**
15           **authorities to send property tax bills to him or her at a different address: 104**

16       **(b)**    **Number of loans on which the owner of the property could have, but did not,**
17           **designate the property as his or her homestead: 223**

18       **(c)**    **Number of loans on which the owner of the property owned three or more**
        **properties: 22**

19       **(d)**    **Eliminating duplicates, number of loans about which one or more of**
20           **statements (a) through (c) is true: 290**

21   **Item 98.**    **Untrue or misleading statements about the underwriting standards of the**
22           **originators of the mortgage loans:**

23       On pages S-50 through S-52, Bear Stearns and SAMI II made statements about the

24   underwriting guidelines of First Horizon Home Loan Corporation. All of those statements are

25   incorporated herein by reference. In particular, Bear Stearns and SAMI II stated that:

26       (a)    "Exceptions to the First Horizon Underwriting Guidelines are permitted where

27   compensating factors are present." SAMI 2005-AR3 Pros. Sup. S-51.

28

-5-

1      (b)    "The First Horizon Underwriting Guidelines are applied to evaluate the

2 prospective borrower's credit standing and repayment ability and the value and adequacy of the

3 mortgaged property as collateral." SAMI 2005-AR3 Pros. Sup. S-50.

4      On pages S-52 through S-54, Bear Stearns and SAMI II made statements about the

5 underwriting guidelines of SouthStar Funding, LLC and Opteum Financial Services, LLC. All of

6 those statements are incorporated herein by reference. In particular, Bear Stearns and SAMI II

7 stated that:

8      (a)    "SouthStar Underwriting Guidelines are applied to evaluate an applicant's credit

9 standing, financial condition, and repayment ability, as well as the value and adequacy of the

10 mortgaged property as collateral for any loan made by SouthStar." SAMI 2005-AR3 Pros. Sup. S-

11 53.

12      (b)    "In evaluating the applicant's ability and willingness to repay the proposed loan,

13 SouthStar reviews the applicant's credit history and outstanding debts, as reported on the credit

14 report. If an existing mortgage or other significant debt is listed on the loan application is not

15 adequately reported on the credit report, SouthStar may request a written or oral verification of

16 the balance and payment history of such debt from the servicer of such debt." SAMI 2005-AR3

17 Pros. Sup. S-53.

18      (c)    "In general, it is SouthStar's belief that the DTI ratio is only one of several factors,

19 such as loan-to-value ("LTV"), credit history and reserves that should be considered in making a

20 determination of an applicant's ability to repay the proposed loan." SAMI 2005-AR3 Pros. Sup.

21 S-53.

22      On pages S-54 through S-57, Bear Stearns and SAMI II made statements about the

23 underwriting guidelines of Metrocities Mortgage LLC. All of those statements are incorporated

24 herein by reference. In particular, Bear Stearns and SAMI II stated that:

25      (a)    "Exceptions to Metrocities' underwriting guidelines may be made if compensating

26 factors are demonstrated by a prospective borrower." SAMI 2005-AR3 Pros. Sup. S-55.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1    (b)   "Underwriting standards are applied by Metrocities to evaluate the prospective

2    borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

3    property as collateral." SAMI 2005-AR3 Pros. Sup. S-55.

4         On pages S-58 through S-60 of the prospectus supplement, Bear Stearns made statements

5    about the underwriting guidelines of Just Mortgage, Inc. All of those statements are incorporated

6    herein by reference. In particular, Bear Stearns stated that:

7    (a)   "Exceptions to Just Mortgage's underwriting guidelines may be made if

8    compensating factors are demonstrated by a prospective borrower." SAMI 2005-AR3 Pros. Sup.

9    S-58.

10   (b)   "Underwriting standards are applied by Just Mortgage to evaluate the prospective

11   borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

12   property as collateral." SAMI 2005-AR3 Pros. Sup. S-58.

13   **Item 105.   Early payment defaults:**

14   **(a)   Number of the mortgage loans that suffered EPDs: 9**

15   **(b)   Percent of the mortgage loans that suffered EPDs: 0.5%**

16   **(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
17   made at the same time as the loans in the collateral pool that experienced
     EPDs: 0.18%**

18   **Item 106.   90+ days delinquencies:**

19   **(a)   Number of the mortgage loans that suffered 90+ days delinquencies: 366**

20
21   **(b)   Percent of the mortgage loans that suffered 90+ days delinquencies: 21.3%**

22   **(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
     made at the same time as the loans in the collateral pool that suffered 90+
23   days delinquencies: 16.5%**

24   **Item 107.   30+ days delinquencies in this securitization:**

25   **(a)   Number of the mortgage loans that were 30+ days delinquent on March 31,
     2010: 301**

26
27   **(b)   Percent of the mortgage loans that were 30+ days delinquent on March 31,
     2010: 17.5%**

28

-7-

1        (c)      **Percent of all mortgage loans in the United States that were 30+ days**
                  **delinquent on March 31, 2010:** 14.7%

2

3    **Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

4         On pages S-5 to S-6, S-21 and S-131 of the prospectus supplement, Bear Stearns made

5    statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns

6    stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

7    Standard & Poor's Rating Services. These were the highest ratings available from these two

8    rating agencies.

9         Bear Stearns also stated: "It is a condition to the issuance of each class of offered

10   certificates that it receives at least the ratings set forth below from S&P and Moody's." Ratings

11   for Class I-A-2, from which the Bank's certificate was drawn, listed as: Standard and Poor's •

12   AAA; Moody's•  Aaa. SAMI 2005-AR3 S-131.

13   **Item 117.**     **Summary of loans about which the Defendants made untrue or misleading**
                     **statements:**

14

15       (a)      **Number of loans whose LTVs were materially understated:** 508

16       (b)      **Number of loans that suffered EPDs:** 9

17       (c)      **Number of loans in which the properties were stated to be owner-occupied**
18                **but were not:** 290

19       (d)      **Eliminating duplicates, number of loans about which the Defendants made**
20                **untrue or misleading statements:** 676

21       (e)      **Eliminating duplicates, percent of loans about which the Defendants made**
             **untrue or misleading statements:** 39.3%

22

23

24

25

26

27

28

-8-

## SCHEDULE 6 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Bear Stearns

**Item 43.**     **Details of trust and certificate(s).**

    **(a)**     **Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

    **(b)**     **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR3 was a securitization in February 2005 of 1,890 mortgage loans, in five groups. IndyMac Bank, F.S.B. originated or acquired the mortgage loans in the collateral pool of this securitization. INDX 2005-AR3 Pros. Sup. S-38.

    **(c)**     **Description of the certificate(s) that the Bank purchased:** Bear Stearns offered and sold to the Bank a senior certificate in this securitization, in tranche 3-A-1, for which the Bank paid $164,929,355 plus accrued interest on February 28, 2005.

    **(d)**     **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

    **(e)**     **Current ratings of the certificate(s):** Standard & Poor's • A+; Moody's • Caa1.

    **(f)**     **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000095013605001098/file001.htm.

**Item 51.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

    (a)     "With respect to approximately 55.09%, 48.95%, 46.49%, 28.18% and 35.15% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans, group 4 mortgage loans and group 5 mortgage loans (in each case, based on the aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement.

1     (b)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of

2     100% or less." INDX 2005-AR3 Pros. Sup. S-17.

3     (c)     In the section of the prospectus supplement entitled "The Mortgage Pool," Bear

4     Stearns presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-

5     AR3 Pros. Sup. S-18 to S-36. Each table focused on a certain characteristic of the loans (for

6     example, current principal balance) and divided the loans into categories based on that

7     characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01

8     to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the

9     loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1

10    Mortgage Loans," divided the mortgage loans in group 1 into eight categories of original LTV

11    (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

12    misleading statements about the number of mortgage loans, the aggregate principal balance

13    outstanding, and the percent of aggregate principal balance outstanding in each of these

14    categories. INDX 2005-AR3 Pros. Sup. S-18.

15    (d)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

16    group 1 mortgage loans was approximately 78.79%." INDX 2005-AR3 Pros. Sup. S-18.

17    (e)     In "The Mortgage Pool" section, Bear Stearns presented a table entitled "Original

18    Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

19    group 2 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%,

20    60.01% to 70%, etc.). The table made untrue and misleading statements about the number of

21    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

22    principal balance outstanding in each of these categories. INDX 2005-AR3 Pros. Sup. S-22.

23    (f)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

24    group 2 mortgage loans was approximately 74.99%." INDX 2005-AR3 Pros. Sup. S-22.

25    (g)     In "The Mortgage Pool" section, Bear Stearns presented a table entitled "Original

26    Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

27    group 3 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

28    30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

-2-

1    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2    principal balance outstanding in each of these categories. INDX 2005-AR3 Pros. Sup. S-26.

3        (h)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

4    group 3 mortgage loans was approximately 76.52%." INDX 2005-AR3 Pros. Sup. S-26.

5        (i)      In "The Mortgage Pool" section of the prospectus supplement, Bear Stearns

6    presented a table entitled "Original Loan-to-Value Ratios for the Group 4 Mortgage Loans." This

7    table divided the mortgage loans in group 4 into eight categories of original LTV (for example,

8    10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading

9    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

10    the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-

11    AR3 Pros. Sup. S-30.

12        (j)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

13    group 4 mortgage loans was approximately 71.30%." INDX 2005-AR3 Pros. Sup. S-30.

14        (k)      In "The Mortgage Pool" section, Bear Stearns presented a table entitled "Original

15    Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in

16    group 5 into six categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

17    50.01% to 60%, etc.). The table made untrue and misleading statements about the number of

18    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

19    principal balance outstanding in each of these categories. INDX 2005-AR3 Pros. Sup. S-34.

20        (l)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

21    group 5 mortgage loans was approximately 71.14%." INDX 2005-AR3 Pros. Sup. S-34.

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 61.      Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 1,890 |
| Number of properties on which there was enough information for the model to determine a true market value | 895 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 409 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $22,814,040 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 174 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,761,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 65 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 76.52% |
| Weighted-average LTV, as determined by the model (Group 3) | 83.86% |

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Bear Stearns presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR3 Pros. Sup. S-19.

(b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, Bear Stearns stated that 87.49% of the mortgage loans in group 1 were secured by a "Primary Home," 9.16% by an "Investment" property, and 3.35% by a "Second Home." INDX 2005-AR3 Pros. Sup. S-19.

(c)      In "The Mortgage Pool" section, Bear Stearns presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in

-4-

1   group 2 into the categories "Primary Home," "Investment" and "Second Home." The table made

2   untrue and misleading statements about the number of mortgage loans, the aggregate principal

3   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

4   categories. INDX 2005-AR3 Pros. Sup. S-23.

5        (d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Bear Stearns

6   stated that 85.86% of the mortgage loans in group 2 were secured by a "Primary Home," 10.88%

7   by an "Investment" property, and 3.26% by a "Second Home." INDX 2005-AR3 Pros. Sup. S-23.

8        (e)     In "The Mortgage Pool" section, Bear Stearns presented a table entitled

9   "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

10  group 3 into the categories "Primary Home," "Investment," and "Second Home." The table made

11  untrue and misleading statements about the number of mortgage loans, the aggregate principal

12  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

13  categories. INDX 2005-AR3 Pros. Sup. S-27.

14       (f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Bear Stearns

15  stated that 83.8% of the mortgage loans in group 3 were secured by a "Primary Home," 12.72%

16  by an "Investment" property, and 3.48% by a "Second Home." INDX 2005-AR3 Pros. Sup. S-27.

17       (g)     In "The Mortgage Pool" section, Bear Stearns presented a table entitled

18  "Occupancy Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in

19  group 4 into the categories "Primary Home," "Investment" and "Second Home." The table made

20  untrue and misleading statements about the number of mortgage loans, the aggregate principal

21  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

22  categories. INDX 2005-AR3 Pros. Sup. S-31.

23       (h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, Bear Stearns

24  stated that 75.14% of the mortgage loans in group 4 were secured by a "Primary Home," 21.59%

25  by an "Investment" property, and 3.27% by a "Second Home." INDX 2005-AR3 Pros. Sup. S-31.

26       (i)     In "The Mortgage Pool" section, Bear Stearns presented a table entitled

27  "Occupancy Types for the Group 5 Mortgage Loans." This table divided the mortgage loans in

28  group 5 into the categories "Primary Home," "Investment," and "Second Home." The table made

-5-

1  untrue and misleading statements about the number of mortgage loans, the aggregate principal

2  balance outstanding, and the percent of aggregate principal balance outstanding in each of these

3  categories. INDX 2005-AR3 Pros. Sup. S-35.

4        (j)    In the "Occupancy Types for the Group 5 Mortgage Loans" table, Bear Stearns

5  stated that 91.39% of the mortgage loans in group 5 were secured by a "Primary Home," 8.24%

6  by an "Investment" property, and 0.37% by a "Second Home." INDX 2005-AR3 Pros. Sup. S-35.

7  **Item 95.**    **Details of properties that were stated to be owner-occupied, but were not:**

8      **(a)**    **Number of loans on which the owner of the property instructed tax**
9                **authorities to send property tax bills to him or her at a different address:** 84

10     **(b)**    **Number of loans on which the owner of the property could have, but did not,**
              **designate the property as his or her homestead:** 149

11

12     **(c)**    **Number of loans on which the owner of the property owned three or more**
              **properties:** 6

13     **(d)**    **Eliminating duplicates, number of loans about which one or more of**
              **statements (a) through (c) is true:** 203

14

15 **Item 98.**    **Untrue or misleading statements about the underwriting standards of the**
          **originators of the mortgage loans:**

16

17       On pages S-38 through S-40 of the prospectus supplement, Bear Stearns made statements

18 about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

19 incorporated herein by reference. In particular, Bear Stearns stated that:

20     (a)    "Exceptions to these underwriting standards are permitted where compensating

21 factors are present . . . ." INDX 2005-AR3 Pros. Sup. S-39.

22     (b)    "IndyMac Bank's underwriting standards for conventionally underwritten

23 mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

24 mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

25 the value of the related mortgaged property." INDX 2005-AR3 Pros. Sup. S-39.

26 **Item 106.**    **90+ days delinquencies:**

27     **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 276

28     **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 14.6%

-6-

(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

**Item 107.**    30+ days delinquencies in this securitization:

(a)    Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 250

(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 13.2%

(c)    Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 114.**    Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-3 and S-80 to S-81 of the prospectus supplement, Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies. Bear Stearns also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. ("MOODY'S")." INDX 2005-AR3 Pros. Sup. S-80.

**Item 117.**    Summary of loans about which the Defendants made untrue or misleading statements:

(a)    Number of loans whose LTVs were materially understated: 409

(b)    Number of loans in which the properties were stated to be owner-occupied but were not: 203

(c)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 513

(d)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 27.1%

-7-

**SCHEDULE 7 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Bear Stearns, SAMI II and The Bear Stearns Companies, Inc.

**Item 43.   Details of trust and certificate(s).**

**(a)   Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

**(b)   Description of the trust:** Bear Stearns Mortgage Funding Trust, Mortgage Pass-Through Certificates, Series 2007-AR3 was a securitization in March 2007 of 3,565 mortgage loans, in two groups.

The mortgage loans in the collateral pool of this securitization were originated or acquired by EMC Mortgage Corporation, Impac Funding Corporation, Bear Stearns Residential Mortgage Corporation, Aegis Mortgage Corporation, SouthStar Funding, LLC, and other originators, none of which originated more than 10% of the loans in the collateral pool.

EMC Mortgage Corporation originated or acquired 64.01%, Bear Stearns Residential Mortgage Corporation originated 23.04%, and SouthStar Funding, LLC originated 9.71% of the mortgage loans in group I. BSMF 2007-AR3 Pros. Sup. S-4and S-32.

EMC Mortgage Corporation originated or acquired 41.63%, Impac Funding Corporation originated or acquired 14.77%, Bear Stearns Residential Mortgage Corporation originated 14.52%, Aegis Mortgage Corporation originated 10.52%, and SouthStar Funding, LLC originated 8.85% of the mortgage loans in sub-group II-1 (from which the Bank's certificate was to be paid). BSMF 2007-AR3 Pros. Sup. S-4 and S-32.

EMC Mortgage Corporation originated or acquired 41.49%, Bear Stearns Residential Mortgage Corporation originated 16.49%, SouthStar Funding, LLC originated 15.59%, Impac Funding Corporation originated 13.56%, and Aegis Mortgage Corporation originated 6.72% of the mortgage loans in sub-group II-2 (the mortgage loans in Group II with principal balances that would not exceed the limits established by Freddie Mac in connection with Freddie Mac's mortgage loan purchase program). BSMF 2007-AR3 Pros. Sup. S-4, S-25, and S-32.

1    EMC Mortgage Corporation acquired 48.18% of the mortgage loans in the collateral pool

2  "from various sellers and were originated generally in accordance with [EMC Mortgage

3  Corporation's] underwriting guidelines[.]" BSMF 2007-AR3 Pros. Sup. S-32.

4    **(c)    Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

5  and sold to the Bank a senior certificate in this securitization, in tranche II-1A-1, for which the

6  Bank paid $282,778,000 plus accrued interest on March 30, 2007.

7    **(d)    Ratings of the certificate(s) when the Bank purchased them:** Standard &

8  Poor's • AAA; Moody's • Aaa.

9    **(e)    Current ratings of the certificate(s):** Standard & Poor's • B-; Moody's •

10  Caa1.

11    **(f)    URL of prospectus supplement for this securitization:**

12  http://www.sec.gov/Archives/edgar/data/1243106/000106823807000458/bsmf2007-

13  ar3_424b5.htm.

14    **(g)    Registration statement pursuant or traceable to which the certificate(s) were**

15  **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

16  pursuant or traceable to a registration statement filed by SAMI II with the SEC on form S-3 on

17  March 10, 2006. Annexed to the registration statement was a prospectus. The prospectus was

18  amended from time to time by prospectus supplements whenever a new series of certificates was

19  issued pursuant or traceable to that registration statement.

20  **Item 51.    Untrue or misleading statements about the LTVs of the mortgage loans:**

21    In the prospectus supplement, Bear Stearns and SAMI II made the following statements

22  about the LTVs of the borrowers whose mortgage loans were in the collateral pool of this

23  securitization.

24    (a)    The weighted-average original LTV of the mortgage loans in group I was 77.74%.

25  BSMF 2007-AR3 Pros. Sup. S-6 and A-1.

26    (b)    The weighted-average original LTV of the mortgage loans in sub-group II-1 was

27  78.12%. BSMF 2007-AR3 Pros. Sup. S-6 and A-5.

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1       (c)     The weighted-average original LTV of the mortgage loans in sub-group II-2 was

2   74.87%. BSMF 2007-AR3 Pros. Sup. S-6 and A-9.

3       (d)     The weighted-average original LTV of all of the mortgage loans in group II

4   (aggregate) was 77.19%. BSMF 2007-AR3 Pros. Sup. S-7 and A-14.

5       (e)     In Schedule A of the prospectus supplement ("Certain Characteristics of the

6   Mortgage Loans"), Bear Stearns and SAMI II presented tables of statistics about the mortgage

7   loans in the collateral pool. BSMF 2007-AR3 Pros. Sup. A-1 to A-16. Each table focused on a

8   certain characteristic of the loans (for example, current principal balance) and divided the loans

9   into categories based on that characteristic (for example, loans with current principal balances of

10   $1 to $100,000, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented

11   various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value

12   Ratios of the Mortgage Loans as of the Cut Off Date in Group 1" divided the mortgage loans in

13   group I into 12 categories of original LTV (for example, 0.01% to 30%, 30.01% to 40%, 40.01%

14   to 50%, etc.). The table made untrue and misleading statements about the number of mortgage

15   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

16   outstanding in each of these categories. BSMF 2007-AR3 Pros. Sup. A-1.

17       (f)     The weighted average original LTV of the mortgage loans in group I was 77.74%.

18   BSMF 2007-AR3 Pros. Sup. A-1.

19       (g)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

20   Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group II-1." This table

21   divided the mortgage loans in sub-group II-1 into 12 categories of original LTV (for example,

22   0.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading

23   statements about the number of mortgage loans, the aggregate principal balance outstanding, and

24   the percent of aggregate principal balance outstanding in each of these categories. BSMF 2007-

25   AR3 Pros. Sup. A-5.

26       (h)     The weighted average original LTV of the mortgage loans in sub-group II-1 was

27   78.12%. BSMF 2007-AR3 Pros. Sup. A-5.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1        (i)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

2 Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group II-2." This table

3 divided the mortgage loans in sub-group II-2 into nine categories of original LTV (for example,

4 0.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading

5 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

6 the percent of aggregate principal balance outstanding in each of these categories. BSMF 2007-

7 AR3 Pros. Sup. A-9.

8        (j)     The weighted average original LTV of the loans in sub-group II-2 was 74.87%.

9 BSMF 2007-AR3 Pros. Sup. A-9.

10        (k)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

11 Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group II." This table

12 divided the mortgage loans in group II into 12 categories of original LTV (for example, 0.01% to

13 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements

14 about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

15 of aggregate principal balance outstanding in each of these categories. BSMF 2007-AR3 Pros.

16 Sup. A-14.

17        (l)     The weighted average original LTV of the mortgage loans in group II was 77.19%.

18 BSMF 2007-AR3 Pros. Sup. A-14.

19 **Item 61.**     **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 3,565 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,595 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,983 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $172,778,892 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 139 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,360,475 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 465 |

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

| | |
|---|---|
| Weighted-average LTV, as stated by Defendants (Group 2) | 77.19% |
| Weighted-average LTV, as determined by the model (Group 2) | 90.2% |

**Item 64.** **Evidence from subsequent sales of refinanced properties:**

Of the 3,565 mortgage loans in the collateral pool, 2,033 were taken out to refinance, rather than to purchase, properties. For those 2,033 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 2,033 properties, 420 were subsequently sold for a total of approximately $116,474,115. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $220,107,900. Thus, those properties were sold for 52.9% of the value ascribed to them, a difference of 47.1%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.** **Undisclosed additional liens:**

    **(a)** **Minimum number of properties with additional liens:** 106

    **(b)** **Total reduction in equity from additional liens:** $9,911,309

    **(c)** **Weighted-average reduction in equity from additional liens:** 67.7%

**Item 81.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by EMC Mortgage Corporation: "All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation." BSMF 2007-AR3 Pros. Sup. S-35.

**Item 87.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

-5-

1        (a)     In Schedule A of the prospectus supplement, described in Item 51, Bear Stearns

2  and SAMI II presented a table entitled "Occupancy Status of Mortgaged Properties in Group I."

3  This table divided the mortgage loans in group I into the categories "Owner Occupied,"

4  "Investor," and "Second Home." The table made untrue and misleading statements about the

5  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

6  aggregate principal balance outstanding in each of these categories. BSMF 2007-AR3 Pros. Sup.

7  A-2.

8        (b)     In the "Occupancy Status of Mortgaged Properties in Group I" table, Bear Stearns

9  and SAMI II stated that 89.11% of the mortgage loans in group I were secured by an "Owner

10  Occupied" property, 5.81% by an "Investor" property, and 5.09% by a "Second Home." BSMF

11  2007-AR3 Pros. Sup. A-2.

12        (c)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

13  Status of Mortgaged Properties in Group II-1." This table divided the mortgage loans in group II-

14  1 into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue

15  and misleading statements about the number of mortgage loans, the aggregate principal balance

16  outstanding, and the percent of aggregate principal balance outstanding in each of these

17  categories. BSMF 2007-AR3 Pros. Sup. A-6.

18        (d)     In the "Occupancy Status of Mortgaged Properties in Group II-1" table, Bear

19  Stearns and SAMI II stated that 96.86% of the mortgage loans in sub-group II-1 were secured by

20  an "Owner Occupied" property, 1.94% by an "Investor" property, and 1.2% by a "Second

21  Home." BSMF 2007-AR3 Pros. Sup. A-6.

22        (e)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

23  Status of Mortgaged Properties in Group II-2." This table divided the mortgage loans in group II-

24  2 into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue

25  and misleading statements about the number of mortgage loans, the aggregate principal balance

26  outstanding, and the percent of aggregate principal balance outstanding in each of these

27  categories. BSMF 2007-AR3 Pros. Sup. A-11.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1      (f)     In the "Occupancy Status of Mortgaged Properties in Group II-2" table, Bear

2   Stearns and SAMI II stated that 84.3% of the mortgage loans in sub-group II-2 were secured by

3   an "Owner Occupied" property, 11.55% by an "Investor" property, and 4.15% by a "Second

4   Home." BSMF 2007-AR3 Pros. Sup. A-11.

5      (g)     In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy

6   Status of Mortgaged Properties in Group II." This table divided the mortgage loans in group II

7   into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue

8   and misleading statements about the number of mortgage loans, the aggregate principal balance

9   outstanding, and the percent of aggregate principal balance outstanding in each of these

10   categories. BSMF 2007-AR3 Pros. Sup. A-15.

11      (h)     In the "Occupancy Status of Mortgaged Properties in Group II" table, Bear Stearns

12   and SAMI II stated that 93.27% of the mortgage loans in group II were secured by an "Owner

13   Occupied" property, 4.68% by an "Investor" property, and 2.04% by a "Second Home." BSMF

14   2007-AR3 Pros. Sup. A-15.

15   **Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

16      **(a)**     **Number of loans on which the owner of the property instructed tax**
            **authorities to send property tax bills to him or her at a different address: 280**
17

18      **(b)**     **Number of loans on which the owner of the property could have, but did not,**
            **designate the property as his or her homestead: 622**
19

20      **(c)**     **Number of loans on which the owner of the property owned three or more**
            **properties: 42**

21      **(d)**     **Number of loans that went straight from current to foreclosure or ownership**
            **by lender: 2**
22

23      **(e)**     **Eliminating duplicates, number of loans about which one or more of**
            **statements (a) through (d) is true: 809**
24

25   **Item 98.**     **Untrue or misleading statements about the underwriting standards of the**
            **originators of the mortgage loans:**

26

27      On pages S-33 through S-36 of the prospectus supplement, Bear Stearns and SAMI II

28   made statements about the underwriting guidelines of EMC Mortgage Corporation All of those

-7-

1   statements are incorporated herein by reference. In particular, Bear Stearns and SAMI II stated

2   that:

3        (a)    "Exceptions to the underwriting standards are permitted where compensating

4   factors are present . . . ." BSMF 2007-AR3 Pros. Sup. S-33. Another of these statements was that,

5   for mortgage loans that EMC Mortgage Corporation originated or acquired: "Exceptions to the

6   underwriting guidelines are permitted when the seller's performance supports such action and the

7   variance request is approved by credit management." BSMF 2007-AR3 Pros. Sup. S-33.

8        (b)    "Such underwriting standards are applied to evaluate the prospective borrower's

9   credit standing and repayment ability and the value and adequacy of the mortgaged property as

10  collateral." BSMF 2007-AR3 Pros. Sup. S-25.

11       On pages S-36 through S-40 of the prospectus supplement, Bear Stearns and SAMI II

12  made statements about the underwriting guidelines of Bear Stearns Residential Mortgage

13  Corporation. All of those statements are incorporated herein by reference. In particular, Bear

14  Stearns and SAMI II stated that:

15       (a)    "Exceptions to the BSRM Underwriting Guidelines are considered with reasonable

16  compensating factors compensating factors on a case-by-case basis and at the sole discretion of

17  senior management." BSMF 2007-AR3 Pros. Sup. S-37.

18       (b)    "The BSRM Alt-A Underwriting Guidelines are intended to ensure that (i) the loan

19  terms relate to the borrower's willingness and ability to repay and (ii) the value and marketability

20  of the property are acceptable. Both the Bear Stearns Option ARM loans originated by BSRM

21  and the 5 Yr. Bear Stearns Secure Option ARM loans are originated pursuant to the BSRM Alt-A

22  Underwriting Guidelines." BSMF 2007-AR3 Pros. Supp. S-27.

23       (c)    "During the underwriting process, BSRM calculates and verifies the loan

24  applicant's sources of income (except documentation types, which do not require such

25  information to be stated or independently verified), reviews the credit history of the applicant,

26  calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and

27  reviews the mortgaged property for compliance with the BSRM Underwriting Guidelines."

28  BSMF 2007-AR3 Pros. Supp. S-27.

(d)     "When exception loans are reviewed, all loan elements are examined as a whole to determine the level of risk associated with approving the loan including appraisal, credit report, employment, compensating factors and borrower's willingness and ability to repay the loan." BSMF 2007-AR3 Pros. Supp. S-28.

**Item 105.     Early payment defaults:**

    **(a)     Number of the mortgage loans that suffered EPDs:** 129

    **(b)     Percent of the mortgage loans that suffered EPDs:** 3.6%

    **(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.83%

**Item 106.     90+ days delinquencies:**

    **(a)     Number of the mortgage loans that suffered 90+ days delinquencies:** 2,224

    **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:** 62.4%

    **(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

**Item 107.     30+ days delinquencies in this securitization:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 2,018

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 56.6%

    **(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.     Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-2 to S-3, S-12, and S-126 to S-127 of the prospectus supplement, Bear Stearns and SAMI II made statements about the ratings assigned to the certificates issued in this securitization. Bear Stearns and SAMI II stated that the Bank's certificate was rated Aaa by

-9-

1    Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the

2    highest ratings available from these two rating agencies.

3        Bear Stearns and SAMI II also stated: "It is a condition to the issuance of the certificates

4    that the offered certificates receive the following ratings from Standard & Poor's Rating Services

5    . . . Moody's Investors Service, Inc." The corresponding chart listed Class II-1A-1 (from which

6    the Bank's certificate was drawn) as rated Aaa by Moody's and AAA by Standard & Poor's.

7    BSMF 2007-AR3 Pros. Sup. S-12.

8    **Item 117.**       **Summary of loans about which the Defendants made untrue or misleading**

9                        **statements:**

10       **(a)**       **Number of loans whose LTVs were materially understated: 1,983**

11       **(b)**       **Number of loans in which the owner's equity was reduced by 5% or more by**

12                     **undisclosed additional liens: 106**

13       **(c)**       **Number of loans that suffered EPDs: 129**

14       **(d)**       **Number of loans in which the properties were stated to be owner-occupied**

15                     **but were not: 809**

16       **(e)**       **Eliminating duplicates, number of loans about which the Defendants made**

                       **untrue or misleading statements: 2,347**

17       **(f)**       **Eliminating duplicates, percent of loans about which the Defendants made**

18                     **untrue or misleading statements: 65.8%**

19

20

21

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1  **SCHEDULE 8 TO THE AMENDED COMPLAINT**

2  To the extent that this Schedule is incorporated by reference into allegations in the

3  complaint, those allegations are made against Defendants Bear Stearns, SAMI II and The Bear

4  Stearns Companies, Inc.

5  **Item 43.  Details of trust and certificate(s).**

6  **(a)  Dealer that sold the certificate(s) to the Bank:** Bear Stearns.

7  **(b)  Description of the trust:** Structured Asset Mortgage Investments II Trust,

8  Mortgage Pass-Through Certificates, Series 2007-AR2 was a securitization in February 2007 of

9  1,367 mortgage loans, in two groups. The mortgage loans in the collateral pool of this

10  securitization were originated by Impac Funding Corporation, SouthStar Funding, LLC, EMC

11  Mortgage Corporation, Bank of America, N.A., and other originators which originated less than

12  10% of the mortgage loans in any group. Impac Funding Corporation originated 46.18%,

13  SouthStar Funding, LLC originated 23.5%, and EMC Mortgage Corporation originated 13.27%

14  of the mortgage loans in group I (from which the Bank's certificate was to be paid). Bank of

15  America, N.A. originated all of the mortgage loans in group II. SAMI 2007-AR2 Pros. Sup. S-10

16  and S-50.

17  **(c)  Description of the certificate(s) that the Bank purchased:** Bear Stearns offered

18  and sold to the Bank a senior certificate in this securitization, in tranche I-A-1, for which the

19  Bank paid $83,000,000 plus accrued interest on February 28, 2007.

20  **(d)  Ratings of the certificate(s) when the Bank purchased them:** Standard &

21  Poor's • AAA; Moody's • Aaa.

22  **(e)  Current ratings of the certificate(s):** Standard & Poor's • BB; Moody's • B1.

23  **(f)  URL of prospectus supplement for this securitization:**

24  http://www.sec.gov/Archives/edgar/data/1390660/000091142007000177/d238308097.txt

25  **(g)  Registration statement pursuant or traceable to which the certificate(s) were**

26  **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

27  pursuant or traceable to a registration statement filed by SAMI II with the SEC on form S-3 on

28  March 10, 2006. Annexed to the registration statement was a prospectus. The prospectus was

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1    amended from time to time by prospectus supplements whenever a new series of certificates was

2    issued pursuant or traceable to that registration statement.

3    **Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

4        In the prospectus supplement, Bear Stearns and SAMI II made the following statements

5    about the LTVs of the mortgage loans in the collateral pool of this securitization.

6        (a)      The weighted-average original LTV of the mortgage loans in group I was 77.25%.

7    SAMI 2007-AR2 Pros. Sup. S-12 and A-2.

8        (b)      The weighted-average original LTV of the mortgage loans in group II was

9    66.55%. SAMI 2007-AR2 Pros. Sup. S-12 and A-7.

10        (c)      In Schedule A of the prospectus supplement, described in Item 51, Bear Stearns

11    and SAMI II presented tables of statistics about the mortgage loans in the collateral pool. SAMI

12    2007-AR2 Pros. Sup. A-1 to A-10. Each table focused on a certain characteristic of the loans (for

13    example, principal balance) and divided the loans into categories based on that characteristic (for

14    example, loans with principal balances of $0 to $100,000, $100,001 to $200,000, $200,001 to

15    $300,000, etc.). Each table then presented various data about the loans in each category. One of

16    the tables, entitled "Original Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date

17    in Group I," divided the mortgage loans in group I into 10 categories of original LTV (for

18    example, 0% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

19    misleading statements about the number of mortgage loans, the aggregate principal balance

20    outstanding, and the percent of aggregate principal balance outstanding in each of these

21    categories. SAMI 2007-AR2 Pros. Sup. A-2.

22        (d)      The weighted-average original LTV of the mortgage loans in group I was 77.25%.

23    SAMI 2007-AR2 Pros. Sup. A-2.

24        (e)      In Schedule A, Bear Stearns and SAMI II presented a table entitled "Original

25    Loan-to-Value Ratios of the Mortgage Loans as of the Cut Off Date in Group II." This table

26    divided the mortgage loans in group II into 12 categories of original LTV (for example, 0% to

27    30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements

28    about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

-2-

1   of aggregate principal balance outstanding in each of these categories. SAMI 2007-AR2 Pros.

2   Sup. A-7.

3   **Item 61.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,367 |
| Number of properties on which there was enough information for the model to determine a true market value | 947 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 677 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $78,834,731 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 66 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,170,221 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 115 |
| Weighted-average LTV, as stated by Defendants (Group 1) | 77.25% |
| Weighted-average LTV, as determined by the model (Group 1) | 89.90% |

**Item 64.      Evidence from subsequent sales of refinanced properties:**

Of the 1,367 mortgage loans in the collateral pool, 725 were taken out to refinance, rather than to purchase, properties. For those 725 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 725 properties, 95 were subsequently sold for a total of approximately $36,583,410. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $54,901,300. Thus, those properties were sold for 66.6% of the value ascribed to them, a difference of 33.4%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.      Undisclosed additional liens:**

(a)     **Minimum number of properties with additional liens: 73**

(b)     **Total reduction in equity from additional liens: $5,797,912**

(c)     **Weighted-average reduction in equity from additional liens: 60.4%**

-3-

**Item 81.      Untrue or misleading statements about compliance with USPAP:**

On pages S-50 through S-52 of the prospectus supplement, Bear Stearns and SAMI II made the following statement about the appraisals of the properties that secured the mortgage loans in group I originated by Impac Funding Corporation: "[E]ach appraiser must . . . . subscribe to a code of ethics that is at least as strict as the code of the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers." SAMI 2007-AR2 Pros. Sup. S-51.

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Bear Stearns and SAMI II made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Schedule A of the prospectus supplement, described in Item 51, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgaged Properties in Group I." This table divided the mortgage loans in group I into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. SAMI 2007-AR2 Pros. Sup. A-3.

(b)      In the "Occupancy Status of Mortgaged Properties in Group I" table, Bear Stearns and SAMI II stated that 93.71% of the mortgage loans in group I were secured by an "Owner Occupied" property, 4.68% by an "Investor" property, and 1.62% by a "Second Home." SAMI 2007-AR2 Pros. Sup. A-3.

(c)      In Schedule A, Bear Stearns and SAMI II presented a table entitled "Occupancy Status of Mortgaged Properties in Group II." This table divided the mortgage loans in group II into the categories "Owner Occupied," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance

-4-

outstanding, and the percent of aggregate principal balance outstanding in each of these categories. SAMI 2007-AR2 Pros. Sup. A-8.

(d)    In the "Occupancy Status of Mortgaged Properties in Group II" table, Bear Stearns and SAMI II stated that 82.01% of the mortgage loans in group II were secured by an "Owner Occupied" property, 11.01% by an "Investor" property, and 6.99% by a "Second Home." SAMI 2007-AR2 Pros. Sup. A-8.

**Item 95.    Details of properties that were stated to be owner-occupied, but were not:**

**(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 100**

**(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 205**

**(c)    Number of loans on which the owner of the property owned three or more properties: 20**

**(d)    Number of loans that went straight from current to foreclosure or ownership by lender: 1**

**(e)    Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 276**

**Item 98.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-50 through S-61 of the prospectus supplement, Bear Stearns and SAMI II made statements about the underwriting guidelines of Impac Funding Corporation. All of those statements are incorporated herein by reference. In particular, Bear Stearns and SAMI II stated that:

(a)    "On a case by case basis, Impac Funding may determine that the prospective mortgagor warrants an exception outside the standard program guidelines. An exception may be allowed if the loan application reflects certain compensating factors . . . ." SAMI 2007-AR2 Pros. Sup. S-51.

(b)    "The underwriting guidelines utilized in the Progressive Series Program, as developed by Impac Funding, are intended to assess the borrower's ability and willingness to

-5-

1  repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as

2  collateral for the mortgage loan." SAMI 2007-AR2 Pros. Sup. S-52.

3      On pages S-61 through S-63 of the prospectus supplement, Bear Stearns and SAMI II

4  made statements about the underwriting guidelines of SouthStar Funding, LLC. All of those

5  statements are incorporated herein by reference. In particular, Bear Stearns and SAMI II stated

6  that:

7      (a)     "SouthStar's Underwriting Guidelines are applied to evaluate an applicant's credit

8  standing, financial condition, and repayment ability, as well as the value and adequacy of the

9  mortgaged property as collateral for any loan made by SouthStar." SAMI 2007-AR2 Pros. Sup. S-

10  61.

11      (b)     "SouthStar also evaluates the applicant's income to determine its stability,

12  probability of continuation, and adequacy to service the proposed SouthStar debt payment."

13  SAMI 2007-AR2 Pros. Sup. S-60.

14      (c)     "In evaluating the applicant's ability and willingness to repay the proposed loan,

15  SouthStar reviews the applicant's credit history and outstanding debts, as reported on the credit

16  report. If an existing mortgage or other significant debt is listed on the loan application is not

17  adequately reported on the credit report, SouthStar may request a written or oral verification of

18  the balance and payment history of such debt from the servicer of such debt." SAMI 2007-AR1

19  Pros. Sup. S-61.

20      (d)     "In general, it is SouthStar's belief that the DTI ratio is only one of several factors,

21  such as loan-to-value ("LTV"), credit history and reserves that should be considered in making a

22  determination of an applicant's ability to repay the proposed loan." SAMI 2007-AR1 Pros. Sup.

23  S-62.

24      On pages S-64 through S-72 of the prospectus supplement, Bear Stearns and SAMI II

25  made statements about the underwriting guidelines of Bank of America, N.A. In particular, Bear

26  Stearns and SAMI II stated that:

27      (a)     "The underwriting standards used by mortgage loan originators are intended to

28  evaluate the mortgagor's credit standing and repayment ability and the value and adequacy of the

-6-

mortgaged property as collateral. The underwriting standards used by originators other than Bank of America, unless such other originators use standards materially similar to Bank of America's underwriting standards, will be described in the applicable prospectus supplement. The following paragraphs describe Bank of America's underwriting standards." SAMI 2007-AR2 Pros. Sup. S-64.

(b)     "Regardless of the channel in which the loan was originated, a mortgage application is completed containing information that assists in evaluating the mortgagor's credit standing, capacity to repay the loan and adequacy of the mortgaged property as collateral for the loan." SAMI 2007-AR2 Pros. Sup. S-65.

(c)     "These underwriting standards applied by Bank of America in originating or acquiring mortgage loans are intended to evaluate the applicants' repayment ability, credit standing, and the adequacy of the mortgage property as collateral for the mortgage loan." SAMI 2007-AR2 Pros. Sup. S-66.

**Item 105.     Early payment defaults:**

    **(a)     Number of the mortgage loans that suffered EPDs: 30**

    **(b)     Percent of the mortgage loans that suffered EPDs: 2.2%**

    **(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%**

**Item 107.     30+ days delinquencies in this securitization:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 575**

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 42.1%**

    **(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 114.     Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 to S-9, S-21, and S-142 to S-143 of the prospectus supplement, Bear Stearns and SAMI II made statements about the ratings assigned to the certificates issued in this

-7-

securitization. Bear Stearns and SAMI II stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Bear Stearns and SAMI II also stated: "It is a condition to the issuance of the certificates that the offered certificates receive the following ratings from Standard & Poor's Rating Services . . . Moody's Investors Service, Inc. The corresponding chart listed Class I-1A-1 (from which the Bank's certificate was drawn) as rated Aaa by Moody's and AAA by Standard & Poor's. SAMI 2007-AR2 Pros. Sup. S-21.

**Item 117.     Summary of loans about which the Defendants made untrue or misleading statements:**

(a)     **Number of loans whose LTVs were materially understated: 677**

(b)     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 73**

(c)     **Number of loans that suffered EPDs: 30**

(d)     **Number of loans in which the properties were stated to be owner-occupied but were not: 276**

(e)     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 826**

(f)     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 60.4%**

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**SCHEDULE 9 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Countrywide.

**Item 43.**     **Details of trust and certificate(s).**

   **(a)**     **Dealer that sold the certificate(s) to the Bank:** Countrywide.

   **(b)**     **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2004-AR15 was a securitization in December 2004 of 1,269 mortgage loans, in six groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. INDX 2004-AR15 Pros. Sup. S-4 and S-14.

   **(c)**     **Description of the certificate(s) that the Bank purchased:** Countrywide offered and sold to the Bank two senior certificates in this securitization, in tranche 4-A-1 and tranche 5-A-1, for which the Bank paid $76,807,100 and $48,411,960 plus accrued interest, respectively, on December 29, 2004.

   **(d)**     **Ratings of the certificate(s) when the Bank purchased them:** Class 4-A-1 Certificate: Standard & Poor's • AAA; Moody's • Aaa. Class 5-A-1 Certificate: Standard & Poor's • AAA; Moody's • Aaa.

   **(e)**     **Current ratings of the certificate(s):** Class 4-A-1 Certificate: Standard & Poor's • BBB-; Moody's • A3. Class 5-A-1 Certificate: Standard & Poor's • AAA; Moody's • A2.

   **(f)**     **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

**Item 51.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Countrywide made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

   (a)     "With respect to approximately 53.02%, 56.98%, 52.61%, 37.15%, 26.16% and 27.30% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans, group 4 mortgage loans, group 5 mortgage loans and group 6 mortgage loans (in each case, based on the aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off

1    date), respectively, . . . [t]he weighted average loan-to-value ratio of such mortgage loans is

2    approximately 78.82%, 79.86%, 79.76%, 77.83%, 76.99% and 71.69% . . . respectively . . . ."

3    INDX 2004-AR15 Pros. Sup. S-10 to S-11.

4        (b)   "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95% or

5    less." INDX 2004-AR15 Pros. Sup. S-17.

6        (c)   In "The Mortgage Pool" section of the prospectus supplement, Countrywide

7    presented tables of statistics about the mortgage loans in the collateral pool. INDX 2004-AR15

8    Pros. Sup. S-18 to S-35. Each table focused on a certain characteristic of the mortgage loans (for

9    example, current principal balance) and divided the loans into categories based on that

10   characteristic (for example, loans with a current principal balance of $0.01 to $50,000,

11   $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data

12   about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for

13   the Group 1 Mortgage Loans," divided the loans in Loan Group 1 into 10 categories of original

14   LTV (for example, 0.01% to 50%, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue

15   and misleading statements about the number of mortgage loans, the aggregate principal balance

16   outstanding, and the percent of aggregate principal balance outstanding in each of these

17   categories. INDX 2004-AR15 Pros. Sup. S-18.

18       (d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

19   Group 1 Mortgage Loans was approximately 77.14%." INDX 2004-AR15 Pros. Sup. S-18.

20       (e)   In "The Mortgage Pool" section, Countrywide presented a table entitled "Original

21   Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

22   Loan Group 2 into nine categories of original LTV (for example, 50.01% to 55%, 55.01% to

23   60%, 60.01% to 65%, etc). The table made untrue and misleading statements about the number of

24   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

25   principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-21.

26       (f)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

27   Group 2 Mortgage Loans was approximately 79.37%." INDX 2004-AR15 Pros. Sup. S-21.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1       (g)     In "The Mortgage Pool" section, Countrywide presented a table entitled "Original

2    Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

3    Loan Group 3 into nine categories of original LTV (for example, 0.01% to 50%, 50.01% to 55%,

4    55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

5    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

6    principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-24.

7       (h)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

8    Group 3 Mortgage Loans was approximately 78.41%." INDX 2004-AR15 Pros. Sup. S-24.

9       (i)     In "The Mortgage Pool" section, Countrywide presented a table entitled "Original

10    Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

11    Loan Group 4 into 10 categories of original LTV (for example, 0.01% to 50%, 50.01% to 55%,

12    55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

13    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

14    principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-27.

15       (j)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

16    Group 4 Mortgage Loans was approximately 74.16%." INDX 2004-AR15 Pros. Sup. S-27.

17       (k)     In "The Mortgage Pool" section, Countrywide presented a table entitled "Original

18    Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in

19    Loan Group 5 into eight categories of original LTV (for example, 0.01% to 50%, 50.01% to 55%,

20    55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

21    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

22    principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-30.

23       (l)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

24    Group 5 Mortgage Loans was approximately 71.53%." INDX 2004-AR15 Pros. Sup. S-30.

25       (m)     In "The Mortgage Pool" section, Countrywide presented a table entitled "Original

26    Loan-to-Value Ratios for the Group 6 Mortgage Loans." This table divided the mortgage loans in

27    Loan Group 6 into seven categories of original LTV (for example, 0.01% to 50%, 50.01% to

28    55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number

-3-

1   of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2   principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-33.

3       (n)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

4   Group 6 Mortgage Loans was approximately 68.64%." INDX 2004-AR15 Pros. Sup. S-33.

5   **Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,269 |
| Number of properties on which there was enough information for the model to determine a true market value | 421 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 181 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $10,557,200 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 84 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,117,100 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 33 |
| Weighted-average LTV, as stated by Defendants (Group 4) | 74.2% |
| Weighted-average LTV, as stated by Defendants (Group 5) | 71.5% |
| Weighted-average LTV, as determined by the model (Group 4) | 86.4% |
| Weighted-average LTV, as determined by the model (Group 5) | 78.7% |

**Item 70.**    **Undisclosed additional liens:**

    **(a)**    **Minimum number of properties with additional liens: 26**

    **(b)**    **Total reduction in equity from additional liens: $2,622,916**

    **(c)**    **Weighted-average reduction in equity from additional liens: 99.8%**

**Item 87.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

    In the prospectus supplement, Countrywide made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

-4-

1

2       (a)     In "The Mortgage Pool" section of the prospectus supplement described in Item

51, Countrywide presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans."

3

4   This table divided the mortgage loans in Loan Group 1 into the categories "Owner Occupied,"

5   "Investment," and "Second Home." The table made untrue and misleading statements about the

6   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

7   aggregate principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup.

8   S-19.

9

10      (b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Countrywide

11  stated that 92.57% of the mortgage loans in Loan Group 1 were secured by an "Owner Occupied"

12  residence, 5.99% by an "Investment" property, and 1.44% by a "Second Home." INDX 2004-

13  AR15 Pros. Sup. S-19.

14      (c)     In "The Mortgage Pool" section, Countrywide presented a table entitled

15  "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in

16  Loan Group 2 into the categories "Owner Occupied," "Investment," and "Second Home." The

17  table made untrue and misleading statements about the number of mortgage loans, the aggregate

18  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

19  of these categories. INDX 2004-AR15 Pros. Sup. S-22.

20      (d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Countrywide

21  stated that 84.43% of the mortgage loans in Loan Group 2 were secured by an "Owner Occupied"

22  residence, 13.31% by an "Investment" property, and 2.26% by a "Second Home." INDX 2004-

23  AR15 Pros. Sup. S-22.

24      (e)     In "The Mortgage Pool" section, Countrywide presented a table entitled

25  "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

26  Loan Group 3 into the categories "Owner Occupied," "Investment," and "Second Home." The

27  table made untrue and misleading statements about the number of mortgage loans, the aggregate

28

-5-

1  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2  of these categories. INDX 2004-AR15 Pros. Sup. S-25.

3       (f)    In the "Occupancy Types for the Group 3 Mortgage Loans" table, Countrywide

4  stated that 85.97% of the mortgage loans in Loan Group 3 were secured by an "Owner Occupied"

5  residence, 10.47% by an "Investment" property, and 3.56% by a "Second Home." INDX 2004-

6  AR15 Pros. Sup. S-25.

7       (g)    In "The Mortgage Pool" section, Countrywide presented a table entitled

8  "Occupancy Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in

9  Loan Group 4 into the categories "Owner Occupied," "Investment," and "Second Home." The

10  table made untrue and misleading statements about the number of mortgage loans, the aggregate

11  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

12  of these categories. INDX 2004-AR15 Pros. Sup. S-28.

13       (h)    In the "Occupancy Types for the Group 4 Mortgage Loans" table, Countrywide

14  stated that 81.32% of the mortgage loans in Loan Group 4 were secured by an "Owner Occupied"

15  residence, 15.42% by an "Investment" property, and 3.27% by a "Second Home." INDX 2004-

16  AR15 Pros. Sup. S-28.

17       (i)    In "The Mortgage Pool" section, Countrywide presented a table entitled

18  "Occupancy Types for the Group 5 Mortgage Loans." This table divided the mortgage loans in

19  Loan Group 5 into the categories "Owner Occupied," "Investment," and "Second Home." The

20  table made untrue and misleading statements about the number of mortgage loans, the aggregate

21  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

22  of these categories. INDX 2004-AR15 Pros. Sup. S-31.

23       (j)    In the "Occupancy Types for the Group 5 Mortgage Loans" table, Countrywide

24  stated that 81.85% of the mortgage loans in Loan Group 5 were secured by an "Owner Occupied"

25  residence, 17.24% by an "Investment" property, and 0.91% by a "Second Home." INDX 2004-

26  AR15 Pros. Sup. S-31.

27       (k)    In "The Mortgage Pool" section, Countrywide presented a table entitled

28  "Occupancy Types for the Group 6 Mortgage Loans." This table divided the mortgage loans in

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

Loan Group 6 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2004-AR15 Pros. Sup. S-34.

(l)     In the "Occupancy Types for the Group 6 Mortgage Loans" table, Countrywide stated that 78.11% of the mortgage loans in Loan Group 6 were secured by an "Owner Occupied" residence, 18.43% by an "Investment" property, and 3.46% by a "Second Home." INDX 2004-AR15 Pros. Sup. S-34.

**Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

**(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 54

**(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 82

**(c)**     **Number of loans on which the owner of the property owned three or more properties:** 5

**(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 119

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-37 through S-39 of the prospectus supplement, Countrywide made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Countrywide stated that:

(a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2004-AR15 Pros. Sup. S-38.

(b)     "IndyMac Bank's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property." INDX 2004-AR15 Pros. Sup. S-38.

-7-

**Item 106.**     **90+ days delinquencies:**

(a)     **Number of the mortgage loans that suffered 90+ days delinquencies:** 188

(b)     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 14.8%

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 7.2%

**Item 107.**     **30+ days delinquencies in this securitization:**

(a)     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 156

(b)     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 12.3%

(c)     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 to S-4 and S-77 to S-78 of the prospectus supplement, Countrywide made statements about the ratings assigned to the certificates issued in this securitization. Countrywide stated that the Bank's 4-A-1 certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. Countrywide also stated that the Bank's 5-A-1 certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Countrywide also stated: "It is a condition to the issuance of the . . . Class 4-A-1 [and] Class 5-A-1 . . . Certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . ." INDX 2004-AR15 Pros. Sup. 77.

**Item 117.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)     **Number of loans whose LTVs were materially understated:** 181

(b)     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 26

-8-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 119

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 279

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 22.0%

-9-

1          **SCHEDULE 10 TO THE AMENDED COMPLAINT**

2          To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendant Credit Suisse.

4    **Item 43.          Details of trust and certificate(s).**

5          **(a)          Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

6          **(b)          Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

7    Through Certificates, Series 2004-AR13 was a securitization in November 2004 of 965 mortgage

8    loans, in two groups. The mortgage loans in the collateral pool of this securitization were

9    originated or acquired by IndyMac Bank, F.S.B. INDX 2004-AR13 Pros. Sup. S-4 and S-14.

10         **(c)          Description of the certificate(s) that the Bank purchased:** Description of the

11   certificates that the Bank purchased in this securitization: Credit Suisse offered and sold to the

12   Bank a senior certificate in this securitization, in tranche 2-A-2, for which the Bank paid

13   $49,863,694 plus accrued interest, on November 30, 2004.

14         **(d)          Ratings of the certificate(s) when the Bank purchased them:** Standard &

15   Poor's •   AAA; Moody's •   Aaa.

16         **(e)          Current ratings of the certificate(s):** Standard & Poor's •   A+; Moody's •   A3.

17         **(f)          URL of prospectus supplement for this securitization:**

18   http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

19   **Item 51.          Untrue or misleading statements about the LTVs of the mortgage loans:**

20         In the prospectus supplement, Credit Suisse made the following statements about the

21   LTVs of the mortgage loans in the collateral pool of this securitization.

22         (a)          "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

23   less." INDX 2004-AR13 Pros. Sup. S-16.

24         (b)          "With respect to approximately 50.75% of the Group 1 Mortgage Loans and

25   approximately 44.24% of the Group 2 Mortgage Loans (in each case, based on the aggregate

26   Stated Principal Balance of the Mortgage Loans in the related loan group as of the Cut-off Date) .

27   . . [t]he weighted average Loan-to-Value Ratio of such Mortgage Loans is approximately 79.06%,

28

1  with respect to such Group 1 Mortgage Loans and approximately 78.50%, with respect to such

2  Group 2 Mortgage Loans . . . ." INDX 2004-AR13 Pros. Sup. S-16 to S-17.

3       (c)   In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse

4  presented tables of statistics about the mortgage loans in the collateral pool. INDX 2004-AR13

5  Pros. Sup. S-18 to S-25. Each table focused on a certain characteristic of the loans (for example,

6  current principal balance) and divided the loans into categories based on that characteristic (for

7  example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000,

8  $100,000.01 to $150,000, etc.). One of the tables, entitled "Original Loan-to-Value Ratios for the

9  Group 1 Mortgage Loans," divided the loans in Loan Group 1 into eight categories of original

10  LTV (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue

11  and misleading statements about the number of mortgage loans, the aggregate principal balance

12  outstanding, and the percent of aggregate principal balance outstanding in each of these

13  categories. INDX 2004-AR13 Pros. Sup. S-18.

14       (d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

15  Group 1 Mortgage Loans was approximately 77.274%." INDX 2004-AR13 Pros. Sup. S-18.

16       (e)   In "The Mortgage Pool" section, Credit Suisse presented a table entitled "Original

17  Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the loans in Loan

18  Group 2 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

19  40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

20  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

21  principal balance outstanding in each of these categories. INDX 2004-AR13 Pros. Sup. S-22.

22       (f)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

23  Group 2 Mortgage Loans was approximately 76.211%." INDX 2004-AR13 Pros. Sup. S-22.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 61.       Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 965 |
| Number of properties on which there was enough information for the model to determine a true market value | 302 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 127 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $6,178,000 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 56 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,996,780 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 31 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 76.2% |
| Weighted-average LTV, as determined by the model (Group 2) | 85.2% |

**Item 70.       Undisclosed additional liens:**

    **(a)       Minimum number of properties with additional liens:** 10

    **(b)       Total reduction in equity from additional liens:** $617,200

    **(c)       Weighted-average reduction in equity from additional liens:** 89.1%

**Item 87.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

    In the prospectus supplement, Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)       In "The Mortgage Pool" section of the prospectus supplement described in Item 51, Credit Suisse presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in Loan Group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2004-AR13 Pros. Sup. S-19.

-3-

1        (b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse

2   stated that 89.39% of the mortgage loans in Loan Group 1 were secured by a "Primary Home,"

3   9.33% by an "Investment" property, and 1.28% by a "Second Home." INDX 2004-AR13 Pros.

4   Sup. S-19.

5        (c)      In "The Mortgage Pool" section, Credit Suisse presented a table entitled

6   "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in

7   Loan Group 2 into the categories "Primary Home," "Investment," and "Second Home." The table

8   made untrue and misleading statements about the number of mortgage loans, the aggregate

9   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

10  of these categories. INDX 2004-AR13 Pros. Sup. S-23.

11       In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse stated that

12  83.79% of the mortgage loans in Loan Group 2 were secured by a "Primary Home," 12.5% by an

13  "Investment" property, and 3.72% by a "Second Home." INDX 2004-AR13 Pros. Sup. S-23.

14  **Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

15       **(a)     Number of loans on which the owner of the property instructed tax
                  authorities to send property tax bills to him or her at a different address: 33**
16

17       **(b)     Number of loans on which the owner of the property could have, but did not,
                  designate the property as his or her homestead: 74**
18

19       **(c)     Number of loans on which the owner of the property owned three or more
                  properties: 0**
20

21       **(d)     Eliminating duplicates, number of loans about which one or more of
                  statements (a) through (c) is true: 90**

22

23  **Item 98.     Untrue or misleading statements about the underwriting standards of the
                  originators of the mortgage loans:**

24

25       On pages S-27 through S-29 of the prospectus supplement, Credit Suisse made statements

26  about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

27  incorporated herein by reference. In particular, Credit Suisse stated that:

28

-4-

1    (a)    "Exceptions to these underwriting standards are permitted where compensating

2    factors are present . . . ." INDX 2004-AR13 Pros. Sup. S-28.

3    (b)    "IndyMac Bank's underwriting standards for conventionally underwritten

4    mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

5    mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

6    the value of the related mortgaged property." INDX 2004-AR13 Pros. Sup. S-28.

7    **Item 105.    Early payment defaults:**

8        **(a)    Number of the mortgage loans that suffered EPDs: 3**

9        **(b)    Percent of the mortgage loans that suffered EPDs: 0.3%**

10        **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
11        made at the same time as the loans in the collateral pool that experienced
        EPDs: 0.14%**

12    **Item 106.    90+ days delinquencies:**

13        **(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 126**

14
15        **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 13.1%**

16        **(c)    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
        made at the same time as the loans in the collateral pool that suffered 90+
17        days delinquencies: 7.2%**

18    **Item 107.    30+ days delinquencies in this securitization:**

19        **(a)    Number of the mortgage loans that were 30+ days delinquent on March 31,
20        2010: 115**

21        **(b)    Percent of the mortgage loans that were 30+ days delinquent on March 31,
        2010: 11.9%**

22
23        **(c)    Percent of all mortgage loans in the United States that were 30+ days
        delinquent on March 31, 2010: 14.7%**

24    **Item 114.    Statements about the ratings of the certificate(s) that the Bank purchased:**

25    On pages S-3 and S-65 to S-66 of the prospectus supplement, Credit Suisse made

26    statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse

27    stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

28

-5-

Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Credit Suisse also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . ." INDX 2004 AR-13 Pros. Sup. S-65 to S-66.

**Item 117.    Summary of loans about which the Defendants made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated: 127**

(b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 10**

(c)    **Number of loans that suffered EPDs: 3**

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 90**

(e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 202**

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 20.9%**

1

## SCHEDULE 11 TO THE AMENDED COMPLAINT

2   To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendant Credit Suisse.

4   **Item 43.      Details of trust and certificate(s).**

5

6   **(a)      Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

7   **(b)      Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

Through Certificates, Series 2007-AR21IP was a securitization in November 2007 of 4,037

8   mortgage loans, in 10 groups. The mortgage loans in the collateral pool of this securitization were

9   originated or acquired by IndyMac Bank, F.S.B. INDX 2007-AR21IP Pros. Sup. S-5 and S-35.

10  **(c)      Description of the certificate(s) that the Bank purchased:** Credit Suisse offered

11  and sold to the Bank two senior certificates in this securitization, in tranches 1-A-1 and 7-A-1, for

12  which the Bank paid $136,209,478 and $130,564,521, respectively, plus accrued interest, on

13  November 30, 2007.

14  **(d)      Ratings of the certificate(s) when the Bank purchased them:** Certificate 1-A-1:

15  Standard & Poor's •   AAA; Fitch •   AAA. Certificate 7-A-1: Standard & Poor's •   AAA; Fitch

16  •   AAA.

17  **(e)      Current ratings of the certificate(s):** 1-A-1 Certificate: Standard & Poor's •

18  BBB; Fitch •   BB. 7-A-1 Certificate: Standard & Poor's •   CCC; Fitch •   C.

19  **(f)      URL of prospectus supplement for this securitization:**

20  http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

21  **(g)      Registration statement pursuant or traceable to which the certificate(s) were**

22  **issued:** Certificates in this trust, including the certificates that the Bank purchased, were issued

23  pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on

24  form S-3 on February 14, 2007. Annexed to the registration statement was a prospectus. The

25  prospectus was amended from time to time by prospectus supplements whenever a new series of

26  certificates was issued pursuant or traceable to that registration statement.

27

28

**Item 51.       Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 1 was 69.33% and the weighted-average current LTV was 63.77%. INDX 2007-AR21IP Pros. Sup. S-6.

(b)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 2 was 71.53% and the weighted-average current LTV was 65.79%. INDX 2007-AR21IP Pros. Sup. S-6.

(c)       As of the cut-off date, the weighted average original LTV of the mortgage loans in Aggregate Loan Group I was 70.12% and the weighted-average current LTV was 64.5%. INDX 2007-AR21IP Pros. Sup. S-7.

(d)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 3 was 70.57%. INDX 2007-AR21IP Pros. Sup. S-7.

(e)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 4 was 70.6%. INDX 2007-AR21IP Pros. Sup. S-7.

(f)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 5 was 70.59%. INDX 2007-AR21IP Pros. Sup. S-7.

(g)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 6 was 74.34%. INDX 2007-AR21IP Pros. Sup. S-8.

(h)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 7 was 75.18%. INDX 2007-AR21IP Pros. Sup. S-8.

(i)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 8 was 70.7%. INDX 2007-AR21IP Pros. Sup. S-8.

(j)       As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 9 was 67.96%. INDX 2007-AR21IP Pros. Sup. S-9.

1      (k)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in

2  Loan Group 10 was 68.72%. INDX 2007-AR21IP Pros. Sup. S-9.

3      (l)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in

4  Aggregate Loan Group II was 71.2%. INDX 2007-AR21IP Pros. Sup. S-9.

5      (m)    As of the cut-off date, 18.05% of the mortgage loans in Loan Group 1 had a

6  weighted-average original LTV of 71.68%. INDX 2007-AR21IP Pros. Sup. S-26.

7      (n)     As of the cut-off date, 36.71% of the mortgage loans in Loan Group 2 had a

8  weighted-average original LTV of 74.9%. INDX 2007-AR21IP Pros. Sup. S-26.

9      (o)     As of the cut-off date, 40.88% of the mortgage loans in Loan Group 3 had a

10  weighted-average original LTV of 73.32%. INDX 2007-AR21IP Pros. Sup. S-26.

11      (p)     As of the cut-off date, 35.24% of the mortgage loans in Loan Group 4 had a

12  weighted-average original LTV of 73.04%. INDX 2007-AR21IP Pros. Sup. S-26.

13      (q)     As of the cut-off date, 41.21% of the mortgage loans in Loan Group 5 had a

14  weighted-average original LTV of 72.64%. INDX 2007-AR21IP Pros. Sup. S-26.

15      (r)     As of the cut-off date, 46.36% of the mortgage loans in Loan Group 6 had a

16  weighted-average original LTV of 77.35%. INDX 2007-AR21IP Pros. Sup. S-26.

17      (s)     As of the cut-off date, 32.97% of the mortgage loans in Loan Group 7 had a

18  weighted-average original LTV of 77.39%. INDX 2007-AR21IP Pros. Sup. S-26.

19      (t)     As of the cut-off date, 28.39% of the mortgage loans in Loan Group 8 had a

20  weighted-average original LTV of 73.6%. INDX 2007-AR21IP Pros. Sup. S-26.

21      (u)     As of the cut-off date, 26.03% of the mortgage loans in Loan Group 9 had a

22  weighted-average original LTV of 71.67%. INDX 2007-AR21IP Pros. Sup. S-26.

23      (v)     As of the cut-off date, 30.07% of the mortgage loans in Loan Group 10 had a

24  weighted-average original LTV of 72.35%. INDX 2007-AR21IP Pros. Sup. S-26.

25      (w)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

26  less." INDX 2007-AR21IP Pros. Sup. S-41.

27      (x)     As of the cut-off date, 69.35% of the mortgage loans in Loan Group 1 had an

28  original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

-3-

1    (y)    As of the cut-off date, 79.99% of the mortgage loans in Loan Group 2 had an

2    original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

3    (z)    As of the cut-off date, 35.33% of the mortgage loans in Loan Group 3 had an

4    original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

5    (aa)    As of the cut-off date, 21.97% of the mortgage loans in Loan Group 4 had an

6    original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

7    (bb)    As of the cut-off date, 33.27% of the mortgage loans in Loan Group 5 had an

8    original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

9    (cc)    As of the cut-off date, 44.82% of the mortgage loans in Loan Group 6 had an

10   original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

11   (dd)    As of the cut-off date, 0.73% of the mortgage loans in Loan Group 7 had an

12   original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

13   (ee)    As of the cut-off date, none of the mortgage loans in Loan Group 8 had an original

14   LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

15   (ff)    As of the cut-off date, 30.28% of the mortgage loans in Loan Group 9 had an

16   original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

17   (gg)    As of the cut-off date, 61.64% of the mortgage loans in Loan Group 10 had an

18   original LTV greater than 80%. INDX 2007-AR21IP Pros. Sup. S-41.

19   (hh)    In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse

20   presented tables of statistics about the mortgage loans in the collateral pool. INDX 2007-AR21IP

21   Pros. Sup. S-42 to S-162. Each table focused on a certain characteristic of the loans (for example,

22   current principal balance) and divided the loans into categories based on that characteristic (for

23   example, loans with current principal balances of $50,000.01 to $100,000, $100,000.01 to

24   $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans

25   in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio"

26   and the "Weighted Average Current Loan-to-Value Ratio." There were 24 such tables in "The

27   Mortgage Pool" section for the loans in Loan Group 1. In each table, the number of categories

28   into which the loans were divided ranged from one to 33. Thus, in "The Mortgage Pool" section,

-4-

1  Credit Suisse made hundreds of statements about the original LTVs and the current LTVs of the

2  loans in Loan Group 1. INDX 2007-AR21IP Pros. Sup. S-42 to S-52.

3      (ii)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

4  the Group 1 Mortgage Loans was approximately 69.33%." INDX 2007-AR21IP Pros. Sup. S-44.

5      (jj)   "As of the Cutoff [*sic*] Date, the weighted average current Loan-to-Value Ratio of

6  the Group 1 Mortgage Loans was approximately 63.77%." INDX 2007-AR21IP Pros. Sup. S-44.

7      (kk)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

8  about the mortgage loans in Loan Group 2. In these tables, Credit Suisse similarly made hundreds

9  of statements about the original LTVs and the current LTVs of the loans in Loan Group 2. INDX

10  2007-AR21IP Pros. Sup. S-53 to S-61.

11      (ll)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

12  the Group 2 Mortgage Loans was approximately 71.53%." INDX 2007-AR21IP Pros. Sup. S-54.

13      (mm)   "As of the Cutoff [*sic*] Date, the weighted average current Loan-to-Value Ratio of

14  the Group 2 Mortgage Loans was approximately 65.79%." INDX 2007-AR21IP Pros. Sup. S-54.

15      (nn)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

16  about the mortgage loans in Aggregate Loan Group I. In these tables, Credit Suisse similarly

17  made hundreds of statements about the original LTVs and the current LTVs of the loans in

18  Aggregate Loan Group I. INDX 2007-AR21IP Pros. Sup. S-62 to S-71.

19      (oo)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

20  the Mortgage Loans in Aggregate Loan Group I was approximately 70.12%." INDX 2007-

21  AR21IP Pros. Sup. S-63.

22      (pp)   "As of the Cutoff [*sic*] Date, the weighted average current Loan-to-Value Ratio of

23  the Mortgage Loans in Aggregate Loan Group I was approximately 64.50%." INDX 2007-

24  AR21IP Pros. Sup. S-63.

25      (qq)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

26  about the mortgage loans in Loan Group 3. In these tables, Credit Suisse similarly made hundreds

27  of statements about the original LTVs of the loans in Loan Group 3. INDX 2007-AR21IP Pros.

28  Sup. S-72 to S-81.

-5-

1     (rr)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

2     the Group 3 Mortgage Loans was approximately 70.57%." INDX 2007-AR21IP Pros. Sup. S-73.

3     (ss)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

4     about the mortgage loans in Loan Group 4. In these tables, Credit Suisse similarly made hundreds

5     of statements about the original LTVs of the loans in Loan Group 4. INDX 2007-AR21IP Pros.

6     Sup. S-82 to S-90.

7     (tt)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

8     the Group 4 Mortgage Loans was approximately 70.6%." INDX 2007-AR21IP Pros. Sup. S-83.

9     (uu)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

10    about the mortgage loans in Loan Group 5. In these tables, Credit Suisse similarly made hundreds

11    of statements about the original LTVs of the loans in Loan Group 5. INDX 2007-AR21IP Pros.

12    Sup. S-91 to S-101.

13    (vv)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

14    the Group 5 Mortgage Loans was approximately 70.59%." INDX 2007-AR21IP Pros. Sup. S-92.

15    (ww)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

16    about the mortgage loans in Loan Group 6. In these tables, Credit Suisse similarly made hundreds

17    of statements about the original LTVs of the loans in Loan Group 6. INDX 2007-AR21IP Pros.

18    Sup. S-102 to S-110.

19    (xx)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

20    the Group 6 Mortgage Loans was approximately 74.34%." INDX 2007-AR21IP Pros. Sup.

21    S-103.

22    (yy)   In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

23    about the mortgage loans in Loan Group 7. In these tables, Credit Suisse similarly made hundreds

24    of statements about the original LTVs of the loans in Loan Group 7. INDX 2007-AR21IP Pros.

25    Sup. S-111 to S-121.

26    (zz)   "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

27    the Group 7 Mortgage Loans was approximately 75.18%." INDX 2007-AR21IP Pros. Sup.

28    S-112.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1      (aaa)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

2    about the mortgage loans in Loan Group 8. In these tables, Credit Suisse similarly made hundreds

3    of statements about the original LTVs of the loans in Loan Group 8. INDX 2007-AR21IP Pros.

4    Sup. S-122 to S-130.

5      (bbb)    "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

6    the Group 8 Mortgage Loans was approximately 70.70%." INDX 2007-AR21IP Pros. Sup.

7    S-123.

8      (ccc)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

9    about the mortgage loans in Loan Group 9. In these tables, Credit Suisse similarly made hundreds

10    of statements about the original LTVs of the loans in Loan Group 9. INDX 2007-AR21IP Pros.

11    Sup. S-131 to S-139.

12      (ddd)    "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

13    the Group 9 Mortgage Loans was approximately 67.96%." INDX 2007-AR21IP Pros. Sup.

14    S-132.

15      (eee)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

16    about the mortgage loans in Loan Group 10. In these tables, Credit Suisse similarly made

17    hundreds of statements about the original LTVs of the loans in Loan Group 10. INDX 2007-

18    AR21IP Pros. Sup. S-140 to S-148.

19      (fff)    "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

20    the Group 10 Mortgage Loans was approximately 68.72%." INDX 2007-AR21IP Pros. Sup.

21    S-141.

22      (ggg)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

23    about the mortgage loans in Aggregate Loan Group II. In these tables, Credit Suisse similarly

24    made hundreds of statements about the original LTVs of the loans in Aggregate Loan Group II.

25    INDX 2007-AR21IP Pros. Sup. S-149 to S-162.

26      (hhh)    "As of the Cutoff [*sic*] Date, the weighted average original Loan-to-Value Ratio of

27    the Mortgage Loans in Aggregate Loan Group II was approximately 71.20%." INDX 2007-

28    AR21IP Pros. Sup. S-151.

-7-

**Item 61.     Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 4,037 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,048 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,182 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $161,062,573 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 278 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $35,934,893 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 241 |
| Weighted-average LTV, as stated by Defendants (Group 1) | 69.3% |
| Weighted-average LTV, as stated by Defendants (Group 7) | 75.2% |
| Weighted-average LTV, as determined by the model (Group 1) | 81.8% |
| Weighted-average LTV, as determined by the model (Group 7) | 92.7% |

**Item 64.     Evidence from subsequent sales of refinanced properties:**

Of the 4,037 mortgage loans in the collateral pool, 2,176 were taken out to refinance, rather than to purchase, properties. For those 2,176 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 2,176 properties, 186 were subsequently sold for a total of approximately $100,206,797. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $140,660,505. Thus, those properties were sold for 71.2% of the value ascribed to them, a difference of 28.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 81.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is

-8-

1   generally made of the subject property in accordance with the Uniform Standards of Profession

2   [*sic*] Appraisal Practice." INDX 2007-AR21IP Pros. Sup. S-166.

3   **Item 87.**    **Untrue or misleading statements about owner-occupancy of the properties**
4                     **that secured the mortgage loans:**

5       In the prospectus supplement, Credit Suisse made the following statements about the

6   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

7   securitization.

8       (a)    In "The Mortgage Pool" section of the prospectus supplement described in Item

9   51, Credit Suisse presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans."

10   This table divided the mortgage loans in Loan Group 1 into the categories "Primary Home,"

11   "Investment," and "Secondary Home." The table made untrue and misleading statements about

12   the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

13   aggregate principal balance outstanding in each of these categories. INDX 2007-AR21IP Pros.

14   Sup. S-48.

15       (b)    In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse

16   stated that 88.01% of the mortgage loans in Loan Group 1, were secured by a "Primary Home,"

17   8.6% by an "Investment" property, and 3.38% by a "Secondary Home." INDX 2007-AR21IP

18   Pros. Sup. S-48.

19       (c)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

20   "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in

21   Loan Group 2 into the categories "Primary Home," "Investment," and "Secondary Home." The

22   table made untrue and misleading statements about the number of mortgage loans, the aggregate

23   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

24   of these categories. INDX 2007-AR21IP Pros. Sup. S-57.

25       (d)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse

26   stated that 80.06% of the mortgage loans in Loan Group 2 were secured by a "Primary Home,"

27

28