1  18.46% by an "Investment" property, and 1.49% by a "Secondary Home." INDX 2007-AR21IP

2  Pros. Sup. S-57.

3       (e)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

4  "Occupancy Types for the Mortgage Loans in Aggregate Loan Group I." This table divided the

5  mortgage loans in Aggregate Loan Group I into the categories "Primary Home," "Investment,"

6  and "Secondary Home." The table made untrue and misleading statements about the number of

7  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

8  principal balance outstanding in each of these categories. INDX 2007-AR21IP Pros. Sup. S-67.

9       (f)    In the "Occupancy Types for the Mortgage Loans in Aggregate Loan Group I"

10  table, Credit Suisse stated that 85.15% of the mortgage loans in Aggregate Loan Group I were

11  secured by a "Primary Home," 12.15% by an "Investment" property, and 2.7% by a "Secondary

12  Home." INDX 2007-AR21IP Pros. Sup. S-67.

13       (g)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

14  "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

15  Loan Group 3 into the categories "Primary Home," "Investment," and "Secondary Home." The

16  table made untrue and misleading statements about the number of mortgage loans, the aggregate

17  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

18  of these categories. INDX 2007-AR21IP Pros. Sup. S-77.

19       (h)    In the "Occupancy Types for the Group 3 Mortgage Loans" table, Credit Suisse

20  stated that 92.03% of the mortgage loans in Loan Group 3 were secured by a "Primary Home,"

21  6.26% by an "Investment" property, and 1.71% by a "Secondary Home." INDX 2007-AR21IP

22  Pros. Sup. S-77.

23       (i)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

24  "Occupancy Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in

25  Loan Group 4 into the categories "Primary Home," "Investment," and "Secondary Home." The

26  table made untrue and misleading statements about the number of mortgage loans, the aggregate

27  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

28  of these categories. INDX 2007-AR21IP Pros. Sup. S-86.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1    (j)    In the "Occupancy Types for the Group 4 Mortgage Loans" table, Credit Suisse

2    stated that 89.61% of the mortgage loans in Loan Group 4 were secured by a "Primary Home,"

3    6.46% by an "Investment" property, and 3.94% by a "Secondary Home." INDX 2007-AR21IP

4    Pros. Sup. S-86.

5    (k)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

6    "Occupancy Types for the Group 5 Mortgage Loans." This table divided the mortgage loans in

7    Loan Group 5 into the categories "Primary Home," "Investment," and "Secondary Home." The

8    table made untrue and misleading statements about the number of mortgage loans, the aggregate

9    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

10   of these categories. INDX 2007-AR21IP Pros. Sup. S-96.

11   (l)    In the "Occupancy Types for the Group 5 Mortgage Loans" table, Credit Suisse

12   stated that 87.35% of the mortgage loans in Loan Group 5 were secured by a "Primary Home,"

13   6.72% by an "Investment" property, and 5.93% by a "Secondary Home." INDX 2007-AR21IP

14   Pros. Sup. S-96.

15   (m)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

16   "Occupancy Types for the Group 6 Mortgage Loans." This table divided the mortgage loans in

17   Loan Group 6 into the categories "Primary Home," "Investment," and "Secondary Home." The

18   table made untrue and misleading statements about the number of mortgage loans, the aggregate

19   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

20   of these categories. INDX 2007-AR21IP Pros. Sup. S-106.

21   (n)    In the "Occupancy Types for the Group 6 Mortgage Loans" table, Credit Suisse

22   stated that 87.97% of the mortgage loans in Loan Group 6 were secured by a "Primary Home,"

23   7.9% by an "Investment" property, and 4.13% by a "Secondary Home." INDX 2007-AR21IP

24   Pros. Sup. S-106.

25   (o)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

26   "Occupancy Types for the Group 7 Mortgage Loans." This table divided the mortgage loans in

27   Loan Group 7 into the categories "Primary Home," "Investment," and "Secondary Home." The

28   table made untrue and misleading statements about the number of mortgage loans, the aggregate

-11-

1   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2   of these categories. INDX 2007-AR21IP Pros. Sup. S-116.

3       (p)    In the "Occupancy Types for the Group 7 Mortgage Loans" table, Credit Suisse

4   stated that 84.57% of the mortgage loans in Loan Group 7 were secured by a "Primary Home,"

5   13.13% by an "Investment" property, and 2.3% by a "Secondary Home." INDX 2007-AR21IP

6   Pros. Sup. S-116.

7       (q)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

8   "Occupancy Types for the Group 8 Mortgage Loans." This table divided the mortgage loans in

9   Loan Group 8 into the categories "Primary Home," "Investment," and "Secondary Home." The

10  table made untrue and misleading statements about the number of mortgage loans, the aggregate

11  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

12  of these categories. INDX 2007-AR21IP Pros. Sup. S-125.

13      (r)    In the "Occupancy Types for the Group 8 Mortgage Loans" table, Credit Suisse

14  stated that 90.74% of the mortgage loans in Loan Group 8 were secured by a "Primary Home,"

15  7.07% by an "Investment" property, and 2.19% by a "Secondary Home." INDX 2007-AR21IP

16  Pros. Sup. S-125.

17      (s)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

18  "Occupancy Types for the Group 9 Mortgage Loans." This table divided the mortgage loans in

19  Loan Group 9 into the categories "Primary Home," "Investment," and "Secondary Home." The

20  table made untrue and misleading statements about the number of mortgage loans, the aggregate

21  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

22  of these categories. INDX 2007-AR21IP Pros. Sup. S-134.

23      (t)    In the "Occupancy Types for the Group 9 Mortgage Loans" table, Credit Suisse

24  stated that 88.78% of the mortgage loans in Loan Group 9 were secured by a "Primary Home,"

25  7.02% by an "Investment" property, and 4.19% by a "Secondary Home." INDX 2007-AR21IP

26  Pros. Sup. S-134.

27      (u)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

28  "Occupancy Types for the Group 10 Mortgage Loans." This table divided the mortgage loans in

-12-

1   Loan Group 10 into the categories "Primary Home," "Investment," and "Secondary Home." The

2   table made untrue and misleading statements about the number of mortgage loans, the aggregate

3   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

4   of these categories. INDX 2007-AR21IP Pros. Sup. S-143.

5        (v)    In the "Occupancy Types for the Group 10 Mortgage Loans" table, Credit Suisse

6   stated that 93.93% of the mortgage loans in Loan Group 10 were secured by a "Primary Home,"

7   4.24% by an "Investment" property, and 1.83% by a "Secondary Home." INDX 2007-AR21IP

8   Pros. Sup. S-143.

9        (w)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

10  "Occupancy Types for the Mortgage Loans in Aggregate Loan Group II." This table divided the

11  mortgage loans in Aggregate Loan Group II into the categories "Primary Home," "Investment,"

12  and "Secondary Home." The table made untrue and misleading statements about the number of

13  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

14  principal balance outstanding in each of these categories. INDX 2007-AR21IP Pros. Sup. S-155.

15       (x)    In the "Occupancy Types for the Mortgage Loans in Aggregate Loan Group II"

16  table, Credit Suisse stated that 89.51% of the mortgage loans in Aggregate Loan Group II were

17  secured by a "Primary Home," 7.27% by an "Investment" property, and 3.22% by a "Secondary

18  Home." INDX 2007-AR21IP Pros. Sup. S-155.

19  **Item 95.**    **Details of properties that were stated to be owner-occupied, but were not:**

20
21      **(a)**    **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 292**

22
23      **(b)**    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 512**

24      **(c)**    **Number of loans on which the owner of the property owned three or more properties: 47**

25
26      **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 711**

27

28

-13-

**Item 98.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-165 through S-167 of the prospectus supplement, Credit Suisse made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Credit Suisse stated that:

(a)     "[E]xceptions to underwriting standards are permitted in situations in which compensating factors exist." INDX 2007-AR21IP Pros. Sup. S-167.

(b)     "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." INDX 2007-AR21IP Pros. Sup. S-165.

**Item 105.**   **Early payment defaults:**

(a)     **Number of the mortgage loans that suffered EPDs:** 111

(b)     **Percent of the mortgage loans that suffered EPDs:** 2.7%

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.83%

**Item 107.**   **30+ days delinquencies in this securitization:**

(a)     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 1,037

(b)     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 25.7%

(c)     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-10 to S-12 and S-226 to S-227 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that the Bank's certificates were both rated AAA by Fitch Ratings and AAA by

-14-

1  Standard & Poor's Rating Services. These were the highest ratings available from these two

2  rating agencies.

3      Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that

4  they be assigned ratings not lower than the following by Standard & Poor's . . . and Fitch, Inc.

5  ("Fitch")." Credit Suisse listed the Bank's 1-A-1 certificate as rated AAA by Fitch Ratings and

6  AAA by Standard & Poor's. Credit Suisse also listed the Bank's 7-A-1 certificate as rated AAA

7  by Fitch Ratings and AAA by Standard & Poor's. INDX 2007 AR-21P Pros. Sup. S-226.

8  **Item 117.**   **Summary of loans about which the Defendants made untrue or misleading**
9          **statements:**

10  (a)   **Number of loans whose LTVs were materially understated: 1,182**

11  (b)   **Number of loans that suffered EPDs: 111**

12
13  (c)   **Number of loans in which the properties were stated to be owner-occupied but were not: 711**

14  (d)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,669**
15

16  (e)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 41.3%**

17

18

19

20

21

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1

**SCHEDULE 12 TO THE AMENDED COMPLAINT**

2      To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendant Credit Suisse.

4   **Item 43.      Details of trust and certificate(s).**

5

6      **(a)      Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

7      **(b)      Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

8   Through Certificates, Series 2007-AR19 was a securitization in July 2007 of 643 mortgage loans,

9   in three groups. The mortgage loans in the collateral pool of this securitization were originated or

10   acquired by IndyMac Bank, F.S.B. INDX 2007-AR19 Pros. Sup. S-5, S-28 and S-74.

11      **(c)      Description of the certificate(s) that the Bank purchased:** Description of the

12   certificates that the Bank purchased in this securitization: Credit Suisse offered and sold to the

13   Bank a senior certificate in this securitization, in tranche 2-A-1, for which the Bank paid

14   $122,405,337 plus accrued interest on July 30, 2007.

15      **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard &

16   Poor's • AAA; Moody's • AAA.

17      **(e)      Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's •

18   Caa2.

19      **(f)      URL of prospectus supplement for this securitization:**

20   http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

21      **(g)      Registration statement pursuant or traceable to which the certificate(s) were

22   issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

23   pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on

24   form S-3 on February 14, 2007. Annexed to the registration statement was a prospectus. The

25   prospectus was amended from time to time by prospectus supplements whenever a new series of

26   certificates was issued pursuant or traceable to that registration statement.

27

28

**Item 51.**        **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 1 was 76.21%. INDX 2007-AR19 Pros. Sup. S-6.

(b)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 2 was 73.73%. INDX 2007-AR19 Pros. Sup. S-6.

(c)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 3 was 75.83%. INDX 2007-AR19 Pros. Sup. S-6.

(d)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Groups 2 and 3 combined was 74.46%. INDX 2007-AR19 Pros. Sup. S-7.

(e)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in the aggregate was 74.95%. INDX 2007-AR19 Pros. Sup. S-7.

(f)     "With respect to approximately 18.47%, 9.93% and 81.24% of the group 1 mortgage loans, group 2 mortgage loans and group 3 mortgage loans, respectively, in each case by aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date . . . [t]he weighted average original loan-to-value ratios of such group 1 mortgage loans, group 2 mortgage loans and group 3 mortgage loans are approximately 78.54%, 75.61% and 75.62%, respectively . . . ." INDX 2007-AR19 Pros. Sup. S-20.

(g)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." INDX 2007-AR19 Pros. Sup. S-31.

(h)     In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool. INDX 2007-AR19 Pros. Sup. S-33 to S-72. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $50,000.01 to $100,000, $100,000.01 to $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans

-2-

in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 21 such tables in "The Mortgage Pool" section of the prospectus supplement for the loans in Loan Group 1. In each table, the number of categories into which the loans were divided ranged from one to 36. Thus, in "The Mortgage Pool" section, Credit Suisse made hundreds of statements about the original LTVs of the loans in Loan Group 1. INDX 2007-AR19 Pros. Sup. S-33 to S-41.

(i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 76.21%." INDX 2007-AR19 Pros. Sup. S-34.

(j)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Group 2. INDX 2007-AR19 Pros. Sup. S-42 to S-48.

(k)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 73.73%." INDX 2007-AR19 Pros. Sup. S-43.

(l)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Group 3. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Group 3. INDX 2007-AR19 Pros. Sup. S-49 to S-55.

(m)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 3 Mortgage Loans was approximately 75.83%." INDX 2007-AR19 Pros. Sup. S-50.

(n)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Groups 2 and 3, in the aggregate. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Groups 2 and 3 in the aggregate. INDX 2007-AR19 Pros. Sup. S-56 to S-62.

(o)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 and Group 3 Mortgage Loans was approximately 74.46%." INDX 2007-AR19 Pros. Sup. S-57.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1      (p)     In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

2   about the Aggregate Mortgage Loans. In these tables, Credit Suisse similarly made hundreds of

3   statements about the original LTVs of all of the loans in the collateral pool. INDX 2007-AR19

4   Pros. Sup. S-63 to S-72.

5      (q)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

6   Mortgage Loans was approximately 74.95%." INDX 2007-AR19 Pros. Sup. S-64.

7   **Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 643 |
| Number of properties on which there was enough information for the model to determine a true market value | 334 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 258 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $36,860,000 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 19 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,308,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 85 |
| Weighted-average LTV, as stated by Defendants | 75.0% |
| Weighted-average LTV, as determined by the model | 94.0% |

**Item 64.**    **Evidence from subsequent sales of refinanced properties:**

Of the 643 mortgage loans in the collateral pool, 463 were taken out to refinance, rather

than to purchase, properties. For those 463 loans, the value (denominator) in the LTV was an

appraised value rather than a sale price. Of those 463 properties, 23 were subsequently sold for a

total of approximately $10,246,798. The total value ascribed to those same properties in the LTV

data reported in the prospectus supplements and other documents sent to the Bank was

$16,334,000. Thus, those properties were sold for 62.7% of the value ascribed to them, a

difference of 37.3%. This difference cannot be accounted for by declines in house prices in the

areas in which those properties were located.

-4-

**Item 81.**      **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [*sic*] Appraisal Practice." INDX 2007-AR19 Pros. Sup. S-76.

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Credit Suisse presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in Loan Group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2007-AR19 Pros. Sup. S-38.

(b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse stated that 88.68% of the mortgage loans in Loan Group 1 were secured by a "Primary Home," 9.66% by an "Investment" property, and 1.66% by a "Second Home." INDX 2007-AR19 Pros. Sup. S-38.

(c)      In "The Mortgage Pool" section, Credit Suisse presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in Loan Group 2 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate

1 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2 of these categories. INDX 2007-AR19 Pros. Sup. S-45.

3       (d)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse

4 stated that 75.22% of the mortgage loans in Loan Group 2 were secured by a "Primary Home,"

5 19.6% by an "Investment" property, and 5.18% by a "Second Home." INDX 2007-AR19 Pros.

6 Sup. S-45.

7       (e)    In "The Mortgage Pool" section, Credit Suisse presented a table entitled

8 "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

9 Loan Group 3 into the categories "Primary Home," "Investment," and "Second Home." The table

10 made untrue and misleading statements about the number of mortgage loans, the aggregate

11 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

12 of these categories. INDX 2007-AR19 Pros. Sup. S-52.

13       (f)    In the "Occupancy Types for the Group 3 Mortgage Loans" table, Credit Suisse

14 stated that 91.62% of the mortgage loans in Loan Group 3 were secured by a "Primary Home,"

15 7.21% by an "Investment" property, and 1.17% by a "Second Home." INDX 2007-AR19 Pros.

16 Sup. S-52.

17       (g)    In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

18 "Occupancy Types for the Group 2 and Group 3 Mortgage Loans." This table divided the

19 mortgage loans in Loan Groups 2 and 3, in the aggregate, into the categories "Primary Home,"

20 "Investment," and "Second Home." The table made untrue and misleading statements about the

21 number of mortgage loans, the aggregate principal balance outstanding, and the percent of

22 aggregate principal balance outstanding in each of these categories. INDX 2007-AR19 Pros. Sup.

23 S-59.

24       (h)    In the "Occupancy Types for the Group 2 and Group 3 Mortgage Loans" table,

25 Credit Suisse stated that 80.92% of the mortgage loans in Loan Groups 2 and 3 were secured by a

26 "Primary Home," 15.29% by an "Investment" property, and 3.79% by a "Second Home." INDX

27 2007-AR19 Pros. Sup. S-59.

28

1      (i)     In "The Mortgage Pool" section, Credit Suisse presented a similar table entitled

2   "Occupancy Types for the Mortgage Loans." This table divided the mortgage loans in the

3   aggregate into the categories "Primary Home," "Investment," and "Second Home." The table

4   made untrue and misleading statements about the number of mortgage loans, the aggregate

5   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

6   of these categories. INDX 2007-AR19 Pros. Sup. S-68.

7      (j)     In the "Occupancy Types for the Mortgage Loans" table, Credit Suisse stated that

8   83.1% of the mortgage loans in the aggregate were secured by a "Primary Home," 13.71% by an

9   "Investment" property, and 3.19% by a "Second Home." INDX 2007-AR19 Pros. Sup. S-68.

10  **Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

11     **(a)**     **Number of loans on which the owner of the property instructed tax**
12             **authorities to send property tax bills to him or her at a different address: 40**

13     **(b)**     **Number of loans on which the owner of the property could have, but did not,**
           **designate the property as his or her homestead: 77**

14
15     **(c)**     **Number of loans on which the owner of the property owned three or more**
           **properties: 6**

16     **(d)**     **Eliminating duplicates, number of loans about which one or more of**
17            **statements (a) through (c) is true: 109**

18  **Item 98.**      **Untrue or misleading statements about the underwriting standards of the**
           **originators of the mortgage loans:**
19

20      On pages S-75 through S-77 of the prospectus supplement, Credit Suisse made statements

21  about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

22  incorporated herein by reference. In particular, Credit Suisse stated that:

23     (a)     "[E]xceptions to underwriting standards are permitted in situations in which
24  compensating factors exist." INDX 2007-AR19 Pros. Sup. S-77.

25     (b)     "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

26  loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

27  the adequacy of the mortgaged property as collateral." INDX 2007-AR19 Pros. Sup. S-75.

28

-7-

**Item 105.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs:** 17

    **(b)**     **Percent of the mortgage loans that suffered EPDs:** 2.6%

    **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.83%

**Item 106.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 290

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 45.1%

    **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

**Item 107.**     **30+ days delinquencies in this securitization:**

    **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 265

    **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 41.2%

    **(c)**     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-8 to S-11 and S-226 to S-227 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that the Bank's certificate was rated Aaa by Moody's Ratings and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Credit Suisse also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's and Moody's Investors Service, Inc. ("Moody's")." INDX 2007 AR-19 Pros. Sup. S-8.

-8-

1    Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that

2    they be assigned ratings not lower than the following by Standard & Poor's . . . and Moody's

3    Investors Service, Inc. . . ." Credit Suisse listed the Bank's certificate as rated AAA by Standard

4    and Poor's and Aaa by Moody's. INDX 2007 AR-19 Pros. Sup.

**Item 117.**      **Summary of loans about which the Defendants made untrue or misleading**
                   **statements:**

(a)      **Number of loans whose LTVs were materially understated:** 258

(b)      **Number of loans that suffered EPDs:** 17

(c)      **Number of loans in which the properties were stated to be owner-occupied**
         **but were not:** 109

(d)      **Eliminating duplicates, number of loans about which the Defendants made**
         **untrue or misleading statements:** 323

(e)      **Eliminating duplicates, percent of loans about which the Defendants made**
         **untrue or misleading statements:** 50.2%

-9-

1

### SCHEDULE 13 TO THE AMENDED COMPLAINT

2    To the extent that this Schedule is incorporated by reference into allegations in the

3  complaint, those allegations are made against Defendant Credit Suisse.

4  **Item 43.**    **Details of trust and certificate(s).**

5

6      **(a)**    **Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

7      **(b)**    **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

8  Through Certificates, Series 2007-AR5 was a securitization in March 2007 of 2,925 mortgage

9  loans, in four groups. The mortgage loans in the collateral pool of this securitization were

10  originated or acquired by IndyMac Bank, F.S.B. INDX 2007-AR5 Pros. Sup. S-8, S-30 and S-69.

11     **(c)**    **Description of the certificate(s) that the Bank purchased:** Description of the

12  certificates that the Bank purchased in this securitization: Credit Suisse offered and sold to the

13  Bank a senior certificate in this securitization, in tranche 2-A-1, for which the Bank paid

14  $122,405,337 plus accrued interest on July 30, 2007.

15     **(d)**    **Ratings of the certificate(s) when the Bank purchased them:** Standard &

16  Poor's • AAA; Moody's • Aaa.

17     **(e)**    **Current ratings of the certificate(s):** Standard & Poor's • CCC; Moody's •

18  Caa2.

19     **(f)**    **URL of prospectus supplement for this securitization:**

20  http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

21     **(g)**    **Registration statement pursuant or traceable to which the certificate(s) were**

22  **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

23  pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on

24  form S-3 on February 14, 2007. Annexed to the registration statement was a prospectus. The

25  prospectus was amended from time to time by prospectus supplements whenever a new series of

26  certificates was issued pursuant or traceable to that registration statement.

27

28

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 51.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 1 was 78.41%. INDX 2007-AR5 Pros. Sup. S-9.

(b)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 2 was 74.88%. INDX 2007-AR5 Pros. Sup. S-9.

(c)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 3 was 74.11%. INDX 2007-AR5 Pros. Sup. S-9.

(d)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 4 was 74.44%. INDX 2007-AR5 Pros. Sup. S-124.

(e)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Aggregate Loan Group I was 75.71%. INDX 2007-AR5 Pros. Sup. S-10.

(f)     "With respect to approximately 55.03%, 60.85% and 37.78% of the group 1 mortgage loans, group 2 mortgage loans and group 3 mortgage loans, respectively, in each case by aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date . . . [t]he weighted average original loan-to-value ratios of such group 1 mortgage loans, group 2 mortgage loans and group 3 mortgage loans are approximately 78.93%, 77.96% and 75.50%, respectively . . . ." INDX 2007-AR5 Pros. Sup. S-23.

(g)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." INDX 2007-AR5 Pros. Sup. S-33.

(h)     In a section of the prospectus supplement entitled "The Mortgage Loans," Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool. INDX 2007-AR5 Pros. Sup. S-35 to S-67. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the

-2-

loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 21 such tables in "The Mortgage Pool" section for the loans in Loan Group 1. In each table, the number of categories into which the loans were divided ranged from one to 44. Thus, in "The Mortgage Pool" section, Credit Suisse made hundreds of statements about the original LTVs of the loans in Loan Group 1. INDX 2007-AR5 Pros. Sup. S-35 to S-42.

(i)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 78.41%." INDX 2007-AR5 Pros. Sup. S-36.

(j)     In "The Mortgage Loans" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Group 2. INDX 2007-AR5 Pros. Sup. S-43 to S-50.

(k)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 74.88%." INDX 2007-AR5 Pros. Sup. S-44.

(l)     In "The Mortgage Loans" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Group 3. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Group 3. INDX 2007-AR5 Pros. Sup. S-51 to S-58.

(m)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 3 Mortgage Loans was approximately 74.11%." INDX 2007-AR5 Pros. Sup. S-52.

(n)     In "The Mortgage Loans" section, Credit Suisse presented similar tables of statistics about the mortgage loans in Loan Group 4. In these tables, Credit Suisse similarly made hundreds of statements about the original LTVs of the loans in Loan Group 4. INDX 2007-AR5 Pros. Sup. S-149 to S-156.

(o)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 74.44%." INDX 2007-AR5 Pros. Sup. S-150.

(p)     In "The Mortgage Loans" section, Credit Suisse presented similar tables of statistics about the Aggregate Mortgage Loans in the collateral pool. In these tables, Credit Suisse

similarly made hundreds of statements about the original LTVs of all of the loans in the collateral pool. INDX 2007-AR5 Pros. Sup. S-59 to S-67.

(q)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 75.71%." INDX 2007-AR5 Pros. Sup. S-61.

**Item 61.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,925 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,738 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,201 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $124,916,254 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 161 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,299,520 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 274 |
| Weighted-average LTV, as stated by Defendants | 75.7% |
| Weighted-average LTV, as determined by the model | 89.5% |

**Item 64.      Evidence from subsequent sales of refinanced properties:**

Of the 2,925 mortgage loans in the collateral pool, 1,504 were taken out to refinance, rather than to purchase, properties. For those 1,504 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,504 properties, 134 were subsequently sold for a total of approximately $47,949,736. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $83,319,500. Thus, those properties were sold for 57.5% of the value ascribed to them, a difference of 42.5%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

-4-

**Item 81.        Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [*sic*] Appraisal Practice." INDX 2007-AR5 Pros. Sup. S-71.

**Item 87.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        In "The Mortgage Loans" section of the prospectus supplement described in Item 51, Credit Suisse presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in Loan Group 1 into the categories "Primary Home," "Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2007-AR5 Pros. Sup. S-39.

(b)        In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse stated that 80.18% of the mortgage loans in Loan Group 1 were secured by a "Primary Home," 13.66% by an "Investment" property, and 6.15% by a "Secondary Home." INDX 2007-AR5 Pros. Sup. S-39.

(c)        In "The Mortgage Loans" section, Credit Suisse presented a similar table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in Loan Group 2 into the categories "Primary Home," "Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate

-5-

1    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2    of these categories. INDX 2007-AR5 Pros. Sup. S-47.

3         (d)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse

4    stated that 87.91% of the mortgage loans in Loan Group 2 were secured by a "Primary Home,"

5    7.39% by an "Investment" property, and 4.7% by a "Secondary Home." INDX 2007-AR5 Pros.

6    Sup. S-47.

7         (e)    In "The Mortgage Loans" section, Credit Suisse presented a similar table entitled

8    "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

9    Loan Group 3 into the categories "Primary Home," "Investment," and "Secondary Home." The

10   table made untrue and misleading statements about the number of mortgage loans, the aggregate

11   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

12   of these categories. INDX 2007-AR5 Pros. Sup. S-55.

13        (f)    In the "Occupancy Types for the Group 3 Mortgage Loans" table, Credit Suisse

14   stated that 88.29% of the mortgage loans in Aggregate Loan Group 3 were secured by a "Primary

15   Home," 6.47% by an "Investment" property, and 5.24% by a "Secondary Home." INDX 2007-

16   AR5 Pros. Sup. S-55.

17        (g)    In "The Mortgage Loans" section, Credit Suisse presented a similar table entitled

18   "Occupancy Types for the Group 4 Mortgage Loans." This table divided the mortgage loans in

19   Loan Group 4 into the categories "Primary Home," "Investment," and "Secondary Home." The

20   table made untrue and misleading statements about the number of mortgage loans, the aggregate

21   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

22   of these categories. INDX 2007-AR5 Pros. Sup. S-153.

23        (h)    In the "Occupancy Types for the Group 4 Mortgage Loans" table, Credit Suisse

24   stated that 83.86% of the mortgage loans in Aggregate Loan Group were secured by a "Primary

25   Home," 11.78% by an "Investment" property, and 4.36% by a "Secondary Home." INDX 2007-

26   AR5 Pros. Sup. S-153.

27        (i)    In "The Mortgage Loans" section, Credit Suisse presented a similar table entitled

28   "Occupancy Types for the Mortgage Loans." This table divided the mortgage loans in the

-6-

1    collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." The

2    table made untrue and misleading statements about the number of mortgage loans, the aggregate

3    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

4    of these categories. INDX 2007-AR5 Pros. Sup. S-64.

5            (j)       In the "Occupancy Types for the Mortgage Loans" table, Credit Suisse stated that

6    85.94% of the mortgage loans in the collateral pool were secured by a "Primary Home," 8.92%

7    by an "Investment" property, and 5.15% by a "Secondary Home." INDX 2007-AR5 Pros. Sup.

8    S-64.

9    **Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

10
11         **(a)**      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 160

12         **(b)**      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 403

13
14         **(c)**      **Number of loans on which the owner of the property owned three or more properties:** 26

15
16         **(d)**      **Number of loans that went straight from current to foreclosure or ownership by lender:** 2

17         **(e)**      **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 517

18
19    **Item 98.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

20
21        On pages S-70 through S-72 of the prospectus supplement, Credit Suisse made statements

22    about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

23    incorporated herein by reference. In particular, Credit Suisse stated that:

24           (a)      "Exceptions to underwriting standards are permitted in situations in which

25    compensating factors exist." INDX 2007-AR5 Pros. Sup. S-72.

26           (b)      "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

27    loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

28    the adequacy of the mortgaged property as collateral." INDX 2007-AR5 Pros. Sup. S-70.

**Item 105.**     **Early payment defaults:**

 **(a)**     **Number of the mortgage loans that suffered EPDs:** 75

 **(b)**     **Percent of the mortgage loans that suffered EPDs:** 2.6%

 **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.83%

**Item 106.**     **90+ days delinquencies:**

 **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,528

 **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 52.2%

 **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

**Item 107.**     **30+ days delinquencies in this securitization:**

 **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 1,437

 **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 49.1%

 **(c)**     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-11 and S-121 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that the Bank's certificate was rated Aaa by Moody's Ratings and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Credit Suisse also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and Moody's Investors Service, Inc. ("Moody's")." INDX 2007 AR-5 Pros. Sup. S-11.

Credit Suisse also stated: "It is a condition to the issuance of the Offered Certificates that they be assigned ratings not lower than the following by Standard & Poor's . . . and Moody's

-8-

1   Investors Service, Inc. . . ." Credit Suisse listed the Bank's certificate as rated AAA by Standard

2   and Poor's and Aaa by Moody's. INDX 2007 AR-19 Pros. Sup. 21.

**Item 117.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**   **Number of loans whose LTVs were materially understated:** 1,201

    **(b)**   **Number of loans that suffered EPDs:** 75

    **(c)**   **Number of loans in which the properties were stated to be owner-occupied but were not:** 517

    **(d)**   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,415

    **(e)**   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 71.5%

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SCHEDULE 14 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Credit Suisse.

**Item 43.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

(b)      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-AR41 was a securitization in December 2006 of 1,421 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. INDX 2006-AR41 Pros. Sup. S-7, S-32 and S-45.

(c)      **Description of the certificate(s) that the Bank purchased:** Credit Suisse offered and sold to the Bank a senior certificate in this securitization, in tranche A-1, for which the Bank paid $100,000,000 plus accrued interest on December 28, 2006.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's •   AAA; Moody's •   AAA.

(e)      **Current ratings of the certificate(s):** Standard & Poor's •   CCC; Moody's • Caa2.

(f)      **URL of prospectus supplement for this securitization:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-AR41 was a securitization in December 2006 of 1,421 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. INDX 2006-AR41 Pros. Sup. S-7, S-32 and S-45.

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 51.          Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in the collateral pool was 77.78%. INDX 2006-AR41 Pros. Sup. S-8.

(b)     "At the time or origination approximately 64.70% of the mortgage loans by cut-off date pool principal balance . . . [had a] weighted average loan-to-value ratio . . . and . . . [of] approximately 78.94% . . . ." INDX 2006-AR41 Pros. Sup. S-25.

(c)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95% or less." INDX 2006-AR41 Pros. Sup. S-34.

(d)     In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool of this securitization. INDX 2006-AR41 Pros. Sup. S-36 to S-43. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 21 such tables in "The Mortgage Pool" section. In each table, the number of categories into which the loans were divided ranged from three to 45. Thus, in "The Mortgage Pool" section, Credit Suisse made hundreds of statements about the LTVs of the loans in the collateral pool. INDX 2006-AR41 Pros. Sup. S-36 to S-43.

(e)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 77.78%." INDX 2006-AR41 Pros. Sup. S-37.

-2-

**Item 61.       Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,421 |
| Number of properties on which there was enough information for the model to determine a true market value | 991 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 674 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $51,777,938 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 90 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,863,561 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 146 |
| Weighted-average LTV, as stated by Defendants | 77.8% |
| Weighted-average LTV, as determined by the model | 90.6% |

**Item 64.       Evidence from subsequent sales of refinanced properties:**

Of the 1,421 mortgage loans in the collateral pool, 487 were taken out to refinance, rather than to purchase, properties. For those 487 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 487 properties, 112 were subsequently sold for a total of approximately $35,405,536. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $56,597,200. Thus, those properties were sold for 62.6% of the value ascribed to them, a difference of 37.4%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 81.       Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." INDX 2006-AR41 Pros. Sup. S-47.

-3-

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement described in Item 51, Credit Suisse presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2006-AR41 Pros. Sup. S-40.

(b)      In the "Occupancy Types for the Mortgage Loans" table, Credit Suisse stated that 83.92% of the mortgage loans in the collateral pool were secured by a "Primary Home," 11.55% by an "Investment" property, and 4.52% by a "Secondary Home." INDX 2006-AR41 Pros. Sup. S-40.

**Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 103**

(b)      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 196**

(c)      **Number of loans on which the owner of the property owned three or more properties: 8**

(d)      **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 265**

-4-

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-46 through S-49 of the prospectus supplement, Credit Suisse made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Credit Suisse stated that:

(a)    "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." INDX 2006-AR41 Pros. Sup. S-48.

(b)    "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." INDX 2006-AR41 Pros. Sup. S-46.

**Item 105.**    **Early payment defaults:**

(a)    **Number of the mortgage loans that suffered EPDs: 100**

(b)    **Percent of the mortgage loans that suffered EPDs: 7.0%**

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%**

**Item 106.**    **90+ days delinquencies:**

(a)    **Number of the mortgage loans that suffered 90+ days delinquencies: 893**

(b)    **Percent of the mortgage loans that suffered 90+ days delinquencies: 62.8%**

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 32.7%**

**Item 107.**    **30+ days delinquencies in this securitization:**

(a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 805**

(b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 56.7%**

(c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

-5-

**Item 114.**      **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-8 to S-11 and S-226 to S-227 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that the Bank's certificate was rated Aaa by Moody's and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Credit Suisse also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's and Moody's Investors Service, Inc. ("Moody's")." INDX 2007 AR-19 Pros. Sup. S-8.

Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that they be assigned ratings not lower than the following by Standard & Poor's . . . and Moody's Investors Service, Inc. . . ." Credit Suisse listed the Bank's certificate as rated AAA by Standard and Poor's and Aaa by Moody's. INDX 2007 AR-19 Pros. Sup. 125.

**Item 117.**      **Summary of loans about which the Defendants made untrue or misleading statements:**

   (a)      **Number of loans whose LTVs were materially understated:** 674

   (b)      **Number of loans that suffered EPDs:** 100

   (c)      **Number of loans in which the properties were stated to be owner-occupied but were not:** 265

   (d)      **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 828

   (e)      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 58.3%

-6-

1    **SCHEDULE 15 TO THE AMENDED COMPLAINT**

2         To the extent that this Schedule is incorporated by reference into allegations in the

3    complaint, those allegations are made against Defendant Credit Suisse.

4    **Item 43.        Details of trust and certificate(s).**

5         **(a)        Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

6         **(b)        Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

7    Through Certificates, Series 2006-AR33 was a securitization in November 2006 of 916 mortgage

8    loans, in four groups. The mortgage loans in the collateral pool of this securitization were

9    originated or acquired by IndyMac Bank, F.S.B. INDX 2006-AR33 Pros. Sup. S-5, S-27 and

10   S-69.

11        **(c)        Description of the certificate(s) that the Bank purchased:** Credit Suisse offered

12   and sold to the Bank a senior certificate in this securitization, in tranche 4-A-1, for which the

13   Bank paid $145,915,880 plus accrued interest on November 30, 2006.

14        **(d)        Ratings of the certificate(s) when the Bank purchased them:** Standard &

15   Poor's •  AAA; Moody's •  AAA.

16        **(e)        Current ratings of the certificate(s):** Standard & Poor's •  CCC; Moody's •

17   Caa2.

18        **(f)        URL of prospectus supplement for this securitization:**

19   http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

20        **(g)        Registration statement pursuant or traceable to which the certificate(s) were**

21   **issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

22   pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on

23   form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The

24   prospectus was amended from time to time by prospectus supplements whenever a new series of

25   certificates was issued pursuant or traceable to that registration statement.

26   **Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

27        In the prospectus supplement, Credit Suisse made the following statements about the

28   LTVs of the mortgage loans in the collateral pool of this securitization.

1    (a)    As of the cut-off date, the weighted-average original LTV of the mortgage loans in
2  Loan Group 1 was 65.09%. INDX 2006-AR33 Pros. Sup. S-6.

3    (b)    As of the cut-off date, the weighted-average original LTV of the mortgage loans in
4  Loan Group 2 was 67.6%. INDX 2006-AR33 Pros. Sup. S-6.

5    (c)    As of the cut-off date, the weighted-average original LTV of the mortgage loans in
6  Loan Group 3 was 70.28%. INDX 2006-AR33 Pros. Sup. S-6.

7    (d)    As of the cut-off date, the weighted-average original LTV of the mortgage loans in
8  Aggregate Loan Group I was 67.19%. INDX 2006-AR33 Pros. Sup. S-7.

9    (e)    As of the cut-off date, the weighted-average original LTV of the mortgage loans in
10  Loan Group 4 was 70.49%. INDX 2006-AR33 Pros. Sup. S-7.

11    (f)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or
12  less." INDX 2006-AR33 Pros. Sup. S-30.

13    (g)    In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse
14  presented tables of statistics about the mortgage loans in the collateral pool. INDX 2006-AR33
15  Pros. Sup. S-32 to S-67. Each table focused on a certain characteristic of the loans (for example,
16  current principal balance) and divided the loans into categories based on that characteristic (for
17  example, loans with current principal balances of $50,000.01 to $100,000, $100,000.01 to
18  $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans
19  in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There
20  were 21 such tables in "The Mortgage Pool" section for the loans in Loan Group 1. In each table,
21  the number of categories into which the loans were divided ranged from one to 25. Thus, in "The
22  Mortgage Pool" section, Credit Suisse made hundreds of statements about the LTVs of the loans
23  in Loan Group 1. INDX 2006-AR33 Pros. Sup. S-32 to S-38.

24    (h)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the
25  Group 1 Mortgage Loans was approximately 65.09%." INDX 2006-AR33 Pros. Sup. S-33.

26    (i)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics
27  about the mortgage loans in Loan Group 2. In these tables, Credit Suisse similarly made hundreds

28

-2-

1    of statements about the LTVs of the loans in Loan Group 2. INDX 2006-AR33 Pros. Sup. S-39 to

2    S-45.

3         (j)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

4    Group 2 Mortgage Loans was approximately 67.60%." INDX 2006-AR33 Pros. Sup. S-40.

5         (k)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

6    about the mortgage loans in Loan Group 3. In these tables, Credit Suisse similarly made hundreds

7    of statements about the LTVs of the loans in Loan Group 3. INDX 2006-AR33 Pros. Sup. S-46 to

8    S-52.

9         (l)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

10   Group 3 Mortgage Loans was approximately 70.28%." INDX 2006-AR33 Pros. Sup. S-47.

11        (m)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

12   about the mortgage loans in Aggregate Loan Group I. In these tables, Credit Suisse similarly

13   made hundreds of statements about the LTVs of the loans in Aggregate Loan Group I. INDX

14   2006-AR33 Pros. Sup. S-53 to S-60.

15        (n)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

16   Mortgage Loans in Aggregate Loan Group I was approximately 67.19%." INDX 2006-AR33

17   Pros. Sup. S-54.

18        (o)    In "The Mortgage Pool" section, Credit Suisse presented similar tables of statistics

19   about the mortgage loans in Loan Group 4. In these tables, Credit Suisse similarly made hundreds

20   of statements about the LTVs of the loans in Loan Group 4. INDX 2006-AR33 Pros. Sup. S-61 to

21   S-67.

22        (p)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

23   Group 4 Mortgage Loans was approximately 70.49%." INDX 2006-AR33 Pros. Sup. S-62.

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 61.** **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 916 |
| Number of properties on which there was enough information for the model to determine a true market value | 528 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 323 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $49,346,293 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 49 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,059,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 41 |
| Weighted-average LTV, as stated by Defendants (Group 4) | 70.49% |
| Weighted-average LTV, as determined by the model (Group 4) | 83.0% |

**Item 64.** **Evidence from subsequent sales of refinanced properties:**

Of the 916 mortgage loans in the collateral pool, 632 were taken out to refinance, rather than to purchase, properties. For those 632 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 632 properties, 26 were subsequently sold for a total of approximately $15,535,899. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $23,329,000. Thus, those properties were sold for 66.6% of the value ascribed to them, a difference of 33.4%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.** **Undisclosed additional liens:**

    **(a)** **Minimum number of properties with additional liens:** 26

    **(b)** **Total reduction in equity from additional liens:** $3,805,028

    **(c)** **Weighted-average reduction in equity from additional liens:** 47.9%

**Item 81.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac

-4-

1   Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is

2   generally made of the subject property in accordance with the Uniform Standards of Profession

3   [*sic*] Appraisal Practice." INDX 2006-AR33 Pros. Sup. S-71.

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties**
4   **that secured the mortgage loans:**

6   In the prospectus supplement, Credit Suisse made the following statements about the

7   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

8   securitization.

9   (a)     In "The Mortgage Pool" section of the prospectus supplement described in Item

10  51, Credit Suisse presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans."

11  This table divided the mortgage loans in Loan Group 1 into the categories "Primary Home,"

12  "Investment," and "Secondary Home." The table made untrue and misleading statements about

13  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

14  aggregate principal balance outstanding in each of these categories. INDX 2006-AR33 Pros. Sup.

15  S-35.

16  (b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse

17  stated that 92.95% of the mortgage loans in Loan Group 1 were secured by a "Primary Home,"

18  6.01% by an "Investment" property, and 1.04% by a "Secondary Home." INDX 2006-AR33 Pros.

19  Sup. S-35.

20  (c)     In "The Mortgage Pool" section, Credit Suisse presented a table entitled

21  "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in

22  Loan Group 2 into the categories "Primary Home," "Investment," and "Secondary Home." The

23  table made untrue and misleading statements about the number of mortgage loans, the aggregate

24  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

25  of these categories. INDX 2006-AR33 Pros. Sup. S-42.

26  (d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse

27  stated that 82.63% of the mortgage loans in Loan Group 2 were secured by a "Primary Home,"

28

-5-

1  14.46% by an "Investment" property, and 2.91% by a "Secondary Home." INDX 2006-AR33

2  Pros. Sup. S-42.

3      (e)    In "The Mortgage Pool" section, Credit Suisse presented a table entitled

4  "Occupancy Types for the Group 3 Mortgage Loans." This table divided the mortgage loans in

5  Loan Group 3 into the categories "Primary Home," "Investment," and "Secondary Home." The

6  table made untrue and misleading statements about the number of mortgage loans, the aggregate

7  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

8  of these categories. INDX 2006-AR33 Pros. Sup. S-49.

9      (f)    In the "Occupancy Types for the Group 3 Mortgage Loans" table, Credit Suisse

10  stated that 96.12% of the mortgage loans in Loan Group 3 were secured by a "Primary Home,"

11  2.91% by an "Investment" property, and 0.98% by a "Secondary Home." INDX 2006-AR33 Pros.

12  Sup. S-49.

13      (g)    In "The Mortgage Pool" section, Credit Suisse presented a table entitled

14  "Occupancy Types for the Mortgage Loans in Aggregate Loan Group I." This table divided the

15  mortgage loans in Aggregate Loan Group I into the categories "Primary Home," "Investment,"

16  and "Secondary Home." The table made untrue and misleading statements about the number of

17  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

18  principal balance outstanding in each of these categories. INDX 2006-AR33 Pros. Sup. S-57.

19      (h)    In the "Occupancy Types for the Mortgage Loans in Aggregate Loan Group I"

20  table, Credit Suisse stated that 89.84% of the mortgage loans in Aggregate Loan Group I were

21  secured by a "Primary Home," 8.44% by an "Investment" property, and 1.72% by a "Secondary

22  Home." INDX 2007-AR21IP Pros. Sup. S-57.

23      (i)    In "The Mortgage Pool" section of the prospectus supplement, Credit Suisse

24  presented a table entitled "Occupancy Types for the Group 4 Mortgage Loans." This table divided

25  the mortgage loans in Loan Group 4 into the categories "Primary Home," "Investment," and

26  "Secondary Home." The table made untrue and misleading statements about the number of

27  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

28  principal balance outstanding in each of these categories. INDX 2006-AR33 Pros. Sup. S-64.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1    (j)  In the "Occupancy Types for the Group 4 Mortgage Loans" table, Credit Suisse

2 stated that 84.79% of the mortgage loans in Loan Group 4 were secured by a "Primary Home,"

3 12.49% by an "Investment" property, and 2.73% by a "Secondary Home." INDX 2006-AR33

4 Pros. Sup. S-64.

**Item 95.**  **Details of properties that were stated to be owner-occupied, but were not:**

  **(a)**  **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 42

  **(b)**  **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 100

  **(c)**  **Number of loans on which the owner of the property owned three or more properties:** 14

  **(d)**  **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 142

**Item 98.**  **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

   On pages S-70 through S-73 of the prospectus supplement, Credit Suisse made statements

about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

incorporated herein by reference. In particular, Credit Suisse stated that:

  (a)  "Exceptions to underwriting standards are permitted in situations in which

compensating factors exist." INDX 2006-AR33 Pros. Sup. S-72.

  (b)  "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

the adequacy of the mortgaged property as collateral." INDX 2006-AR33 Pros. Sup. S-70.

**Item 107.**  **30+ days delinquencies in this securitization:**

  **(a)**  **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 173

  **(b)**  **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 18.9%

  **(c)**  **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

-7-

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-8 to S-11 and S-226 to S-227 of the prospectus supplement, Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. Credit Suisse stated that the Bank's certificate was rated Aaa by Moody's and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Credit Suisse also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's and Moody's Investors Service, Inc. ("Moody's")." INDX 2007 AR-19 Pros. Sup. S-8.

Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that they be assigned ratings not lower than the following by Standard & Poor's . . . and Moody's Investors Service, Inc. ("Moody's")." Credit Suisse listed the Bank's certificate as rated AAA by Standard and Poor's and Aaa by Moody's. INDX 2007 AR-19 Pros. Sup. 125.

**Item 117.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)     **Number of loans whose LTVs were materially understated:** 323

(b)     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 26

(c)     **Number of loans in which the properties were stated to be owner-occupied but were not:** 142

(d)     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 418

(e)     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 45.6%

-8-

## SCHEDULE 16 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Credit Suisse.

**Item 43.** **Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Credit Suisse.

(b) **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-R1 was a re-securitization in July 2006. The assets of IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-R1 consisted primarily of a mortgage pass through certificate in tranche 2-A-2-1 of IndyMac INDX Mortgage Loan Trust, Mortgage Pass Through Certificates, Series 2005-AR25 (referred to as the **Underlying Securitization**).

IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR25 was a securitization in October 2005 of 1,231 mortgage loans, in two groups. IndyMac Bank, F.S.B. originated or acquired the mortgage loans in the collateral pool of the Underlying Securitization. INDX 2006-R1 Pros. Sup. S-27.

In connection with its offer and sale of this certificate to the Bank, Credit Suisse sent numerous documents to the Bank at its office in San Francisco County. These documents included both the prospectus supplement filed with the SEC for this securitization and the prospectus supplement filed with the SEC for the Underlying Securitization.

(c) **Description of the certificate(s) that the Bank purchased:** Credit Suisse offered and sold to the Bank a senior certificate in IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2006-R1, in tranche A-1, for which the Bank paid $169,999,432 plus accrued interest on July 31, 2006.

(d) **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's — AAA; Moody's — Aaa.

(e) **Current ratings of the certificate(s):** Standard & Poor's ∘ AAA; Moody's ∘ Baa2.

**(f)    URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000112528206004534/b414098_424b5.txt.

**(g)    Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 51.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplements for this securitization and the Underlying Securitization, Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of the Underlying Securitization.

As of the reference date, the mortgage loans in loan group 1 of the Underlying Securitization had a weighted average original LTV of 71.01%. INDX 2006-R1 Pros. Sup. S-7.

(a)    As of the reference date, the mortgage loans in loan group 2 of the Underlying Securitization had a weighted average original LTV of 70.69%. INDX 2006-R1 Pros. Sup. S-7.

(b)    In Appendix I of the prospectus supplement for this securitization ("Mortgage Loan Characteristics of the Underlying Group 1 Mortgage Loans and the Underlying Group 2 Mortgage Loans as of the Reference Date"), Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool of the Underlying Securitization. INDX 2006-R1 Pros. Sup. S-53 to S-66. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 19 such tables in Appendix I for the mortgage loans in loan group 1 of the Underlying Securitization. In each table, the number of categories into which the loans were divided ranged from one to 37. Thus, in

-2-

1    Appendix I, Credit Suisse made hundreds of statements about the LTVs of the loans in loan group

2    1. INDX 2006-R1 Pros. Sup. S-53 to S-59.

3          (c)     "As of the Reference Date, the weighted average original Loan-to-Value Ratio of

4    the Underlying Group 1 Mortgage Loans was approximately 71.01%." INDX 2006-R1 Pros. Sup.

5    S-54.

6          (d)     In Appendix I of the prospectus supplement for this securitization, Credit Suisse

7    presented similar tables of statistics about the mortgage loans in loan group 2 of the Underlying

8    Securitization. In these tables, Credit Suisse similarly made hundreds of statements about the

9    LTVs of the loans in loan group 2. INDX 2006-R1 Pros. Sup. S-60 to S-66.

10         (e)     "As of the Reference Date, the weighted average original Loan-to-Value Ratio of

11    the Underlying Group 2 Mortgage Loans was approximately 70.69%." INDX 2006-R1 Pros. Sup.

12    S-61.

13         (f)     "With respect to approximately 37.92% and 35.11% of the group 1 mortgage loans

14    and group 2 mortgage loans (in each case, based on the aggregate stated principal balance of the

15    mortgage loans in the related loan group as of the cut-off date), respectively . . . [t]he weighted

16    average loan-to-value ratio of such mortgage loans is approximately 71.16% and 70.99%, with

17    respect to such group 1 mortgage loans and group 2 mortgage loans, respectively . . . ." INDX

18    2005-AR25 Pros. Sup. S-11.

19         (g)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100.00%

20    or less." INDX 2005-AR25 Pros. Sup. S-17.

21         (h)     In "The Mortgage Pool" section of the prospectus supplement for the Underlying

22    Securitization, Credit Suisse presented tables of statistics about the mortgage loans in the

23    collateral pool of the Underlying Securitization. INDX 2005-AR25 Pros. Sup. S-19 to S-24. Each

24    table focused on a certain characteristic of the loans (for example, current principal balance) and

25    divided the loans into categories based on that characteristic (for example, loans with current

26    principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.).

27    Each table then presented various data about the loans in each category. One of the tables, entitled

28    "Original Loan-to-Value Ratio for the Group 1 Mortgage Loans" divided the mortgage loans in

-3-

1  loan group 1 of the Underlying Securitization into 9 categories of original LTV (for example,

2  10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading

3  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

4  the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-

5  AR25 Pros. Sup. S-19.

6       (i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

7  group 1 mortgage loans was approximately 71.16%." INDX 2005-AR25 Pros. Sup. S-19.

8       (j)    In "The Mortgage Pool" section of the prospectus supplement for the Underlying

9  Securitization, Credit Suisse presented a table entitled "Original Loan-to-Value Ratio for the

10  Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2 of the

11  Underlying Securitization into 8 categories of original LTV (for example, 20.01% to 30%,

12  30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about

13  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

14  aggregate principal balance outstanding in each of these categories. INDX 2005-AR25 Pros. Sup.

15  S-22.

16       (k)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

17  group 2 mortgage loans was approximately 70.99%." INDX 2005-AR25 Pros. Sup. S-22.

18  **Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,231 |
| Number of properties on which there was enough information for the model to determine a true market value | 809 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 425 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $41,633,496 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 136 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,231,710 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 63 |

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

| | |
|---|---|
| Weighted-average LTV, as stated by Defendants (as presented in INDX 2006-R1 for loan group 1) | 71.01% |
| Weighted-average LTV, as stated by Defendants (as presented in INDX 2005-AR25 for loan group 1) | 71.16% |
| Weighted-average LTV, as determined by the model (loan group 1) | 78.55% |
| Weighted-average LTV, as stated by Defendants (as presented in INDX 2006-R1 for loan group 2) | 70.69% |
| Weighted-average LTV, as stated by Defendants (as presented in INDX 2005-AR25 for loan group 2) | 70.99% |
| Weighted-average LTV, as determined by the model (loan group 2) | 81.90% |

**Item 64.      Evidence from subsequent sales of refinanced properties:**

Of the 1,231 mortgage loans in the collateral pool, 698 were taken out to refinance, rather than to purchase, properties. For those 698 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 698 properties, 111 were subsequently sold for a total of approximately $54,192,483. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $68,471,800. Thus, those properties were sold for 79.1% of the value ascribed to them, a difference of 20.9%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.      Undisclosed additional liens:**

   **(a)      Minimum number of properties with additional liens: 49**

   **(b)      Total reduction in equity from additional liens: $7,739,073**

   **(c)      Weighted-average reduction in equity from additional liens: 64.8%**

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplements for this securitization and the Underlying Securitization, Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of the Underlying Securitization.

In Appendix I of the prospectus supplement for this securitization, described in Item 51, Credit Suisse presented a table entitled "Occupancy Types for the Underlying Group 1 Mortgage

-5-

1   Loans." This table divided the mortgage loans in loan group 1 of the Underlying Securitization

2   into the categories "Owner Occupied," "Investment," and "Secondary Home." The table made

3   untrue and misleading statements about the number of mortgage loans, the aggregate principal

4   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

5   categories. INDX 2006-R1 Pros. Sup. S-57.

6          In the "Occupancy Types for the Underlying Group 1 Mortgage Loans" table, Credit

7   Suisse stated that 79.21% of the mortgage loans in loan group 1 of the Underlying Securitization

8   were secured by an "Owner Occupied" property, 16.03% by an "Investment" property, and 4.76%

9   by a "Secondary Home." INDX 2006-R1 Pros. Sup. S-57.

10          In Appendix I of the prospectus supplement for this securitization, Credit Suisse presented

11   a table entitled "Occupancy Types for the Underlying Group 2 Mortgage Loans." This table

12   divided the mortgage loans in loan group 2 of the Underlying Securitization into the categories

13   "Owner Occupied," "Investment," and "Secondary Home." The table made untrue and

14   misleading statements about the number of mortgage loans, the aggregate principal balance

15   outstanding, and the percent of aggregate principal balance outstanding in each of these

16   categories. INDX 2006-R1 Pros. Sup. S-63.

17          In the "Occupancy Types for the Underlying Group 2 Mortgage Loans" table, Credit

18   Suisse stated that 90.09% of the mortgage loans in loan group 2 of the Underlying Securitization

19   were secured by an "Owner Occupied" property, 6.84% by an "Investment" property, and 3.07%

20   by a "Secondary Home." INDX 2006-R1 Pros. Sup. S-63.

21          In "The Mortgage Pool" section of the prospectus supplement for the Underlying

22   Securitization, described in Item 51, Credit Suisse presented a table entitled "Occupancy Types

23   for the Group 1 Mortgage Loans." This table divided the mortgage loans in loan group 1 of the

24   Underlying Securitization into the categories "Primary Home," "Investment," and "Second

25   Home." The table made untrue and misleading statements about the number of mortgage loans,

26   the aggregate principal balance outstanding, and the percent of aggregate principal balance

27   outstanding in each of these categories. INDX 2005-AR25 Pros. Sup. S-20.

28

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

In the "Occupancy Types for the Group 1 Mortgage Loans" table, Credit Suisse stated that 78.39% of the mortgage loans in loan group 1 of the Underlying Securitization were secured by a "Primary Home," 16.41% by an "Investment" property, and 5.2% by a "Second Home." INDX 2005-AR25 Pros. Sup. S-20.

In "The Mortgage Pool" section, Credit Suisse presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2 of the Underlying Securitization into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR25 Pros. Sup. S-23.

In the "Occupancy Types for the Group 2 Mortgage Loans" table, Credit Suisse stated that 90.22% of the mortgage loans in loan group 2 of the Underlying Securitization were secured by a "Primary Home," 6.92% by an "Investment" property, and 2.86% by a "Second Home." INDX 2005-AR25 Pros. Sup. S-23.

**Item 95.    Details of properties that were stated to be owner-occupied, but were not:**

    **(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 95

    **(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 153

    **(c)    Number of loans on which the owner of the property owned three or more properties:** 17

    **(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 229

**Item 98.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-28 of the prospectus supplement for the Underlying Securitization, Credit Suisse made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Credit Suisse stated that:

-7-

1     "Exceptions to these underwriting standards are permitted where compensating factors are

2 present . . . ." INDX 2005-AR25 Pros. Sup. S-27.

3 **Item 105.**     **Early payment defaults:**

4     **(a)**     **Number of the mortgage loans that suffered EPDs:** 6

5     **(b)**     **Percent of the mortgage loans that suffered EPDs:** 0.5%

6     **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
7             **made at the same time as the loans in the collateral pool that experienced**
            **EPDs:** 0.18%

8 **Item 106.**     **90+ days delinquencies:**

9
10     **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 286

11     **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 23.2%

12     **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans**
            **made at the same time as the loans in the collateral pool that suffered 90+**
13             **days delinquencies:** 16.5%

14 **Item 107.**     **30+ days delinquencies in this securitization:**

15     **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31,**
            **2010:** 283

16
17     **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on March 31,**
            **2010:** 23.0%

18     **(c)**     **Percent of all mortgage loans in the United States that were 30+ days**
            **delinquent on March 31, 2010:** 14.7%
19

20 **Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

21     On pages S-8 and S-50 of the prospectus supplement for this securitization, Credit Suisse

22 made statements about the ratings assigned to the certificate issued in this securitization. Credit

23 Suisse stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and

24 AAA Standard & Poor's Rating Services. These were the highest ratings available from these two

25 rating agencies.

26     Credit Suisse also stated: "It is a condition to the issuance of the [Bank's certificate] that

27 [it] be rated [AAA] by Standard & Poor's ... and ... Aaa by Moody's Investors Services, Inc."

28 INDX 2006-R1 Pros. Sup. S-50.

-8-

**Item 117.**   Summary of loans about which the Defendants made untrue or misleading statements:

    **(a)**   Number of loans whose LTVs were materially understated: 425

    **(b)**   Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 49

    **(c)**   Number of loans that suffered EPDs: 6

    **(d)**   Number of loans in which the properties were stated to be owner-occupied but were not: 229

    **(e)**   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 595

    **(f)**   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.3%

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1

**SCHEDULE 17 TO THE AMENDED COMPLAINT**

2      To the extent that this Schedule is incorporated by reference into allegations in the

3   complaint, those allegations are made against Defendants Greenwich Capital and Greenwich

4   Capital Acceptance.

5   **Item 43.      Details of trust and certificate(s).**

6

   (a)      **Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

7
       (b)      **Description of the trust:** Harbor View Mortgage Loan Trust, Mortgage Pass-

8
   Through Certificates, Series 2004-7 was a securitization in October 2004 of 2,003 mortgage

9
   loans, in four groups. The mortgage loans in the collateral pool of this securitization were

10
   originated by Countrywide Home Loans, Inc., IndyMac Bank, F.S.B., GreenPoint Mortgage

11
   Funding, Inc., Sierra Pacific Mortgage, Inc., Downey Savings and Loan Association, F.A., Paul

12
   Financial, LLC, Mellon Trust of New England, N.A., American Mortgage Express Corp., Luxury

13
   Mortgage Corp., and E-Loan, Inc. HVMLT 2004-7 Pros. Sup. S-4, S-26, and S-76.

14
       Countrywide Home Loans, Inc. originated 24.41% of the loans in the collateral pool,

15
   IndyMac Bank, F.S.B. originated 23.51%, GreenPoint Mortgage Funding, Inc. originated

16
   16.31%, Sierra Pacific Mortgage, Inc. originated 14.91%, and Downey Savings and Loan

17
   Association, F.A. originated 11.86%. HVMLT 2004-7 Pros. Sup. S-4, S-26, and S-76.

18
       (c)      **Description of the certificate(s) that the Bank purchased:** Greenwich Capital

19
   offered and sold to the Bank a senior certificate in this securitization, in tranche 3-A-1, for which

20
   the Bank paid $101,031,250 plus accrued interest on October 5, 2004.

21
       (d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard &

22
   Poor's • AAA; Moody's • Aaa.

23
       (e)      **Current ratings of the certificate(s):** Standard & Poor's • AAA; Moody's •

24
   A2.

25
       (f)      **URL of prospectus supplement for this securitization:**

26
   http://www.sec.gov/Archives/edgar/data/826219/000112528204004862/b401318_424b5.txt.

27

28

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "Approximately 5.06% of all of the mortgage loans, and approximately 6.46%, 5.27%, 1.13% and 8.85% of the group 1, group 2, group 3 and group 4 mortgage loans, respectively, have original loan-to-value ratios in excess of 80.00%." HVMLT 2004-7 Pros. Sup. S-28.

(b)      In "The Mortgage Loan Groups" section of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance presented tables of statistics about the mortgage loans in the collateral pool. HVMLT 2004-7 Pros. Sup. S-30 to S-74. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with a current principal balance of $30,887.78 to $100,000, $100,000.01 to $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the mortgage loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios of the Mortgage Loans," divided the loans into 10 categories of original LTV (for example, 6.54% to 50%, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup. S-33.

(c)      "The weighted average original loan-to-value ratio of the mortgage loans was approximately 75.57% as of the cut-off date." HVMLT 2004-7 Pros. Sup. S-33.

(d)      In "The Mortgage Loan Groups" section of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance presented a table entitled "Original Loan-to-Value Ratios of the Group 1 Mortgage Loans." This table divided the loans in Group 1 into 10 categories of original LTV (for example, 30.30% to 50%, 50.01% to 55%, 55.01 to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the

-11-

1    aggregate principal balance outstanding, and the percent of aggregate principal balance

2    outstanding in each of these categories. HVMLT 2004-7 Pros. Sup. S-43.

3        (e)    "The weighted average original loan-to-value ratio of the group 1 mortgage loans

4    was approximately 72.64% as of the cut-off date." HVMLT 2004-7 Pros. Sup. S-43.

5        (f)    In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

6    Capital Acceptance presented a table entitled "Original Loan-to-Value Ratios of the Group 2

7    Mortgage Loans." This table divided the loans in Group 2 into 10 categories of original LTV (for

8    example, 7.56% to 50%, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

9    misleading statements about the number of mortgage loans, the aggregate principal balance

10   outstanding, and the percent of aggregate principal balance outstanding in each of these

11   categories. HVMLT 2004-7 Pros. Sup. S-52.

12       (g)    "The weighted average original loan-to-value ratio of the group 2 mortgage loans

13   was approximately 76.68% as of the cut-off date." HVMLT 2004-7 Pros. Sup. S-52.

14       (h)    In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

15   Capital Acceptance presented a table entitled "Original Loan-to-Value Ratios of the Group 3

16   Mortgage Loans." This table divided the loans in Group 3 into 10 categories of original LTV (for

17   example, 20.93% to 50%, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

18   misleading statements about the number of mortgage loans, the aggregate principal balance

19   outstanding, and the percent of aggregate principal balance outstanding in each of these

20   categories. HVMLT 2004-7 Pros. Sup. S-60.

21       (i)    "The weighted average original loan-to-value ratio of the group 3 mortgage loans

22   was approximately 73.38% as of the cut-off date." HVMLT 2004-7 Pros. Sup. S-60.

23       (j)    In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

24   Capital Acceptance presented a table entitled "Original Loan-to-Value Ratios of the Group 4

25   Mortgage Loans." This table divided the loans in Group 4 into 10 categories of original LTV (for

26   example, 6.54% to 50%, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

27   misleading statements about the number of mortgage loans, the aggregate principal balance

28

-12-

outstanding, and the percent of aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup. S-69.

(k)  "The weighted average original loan-to-value ratio of the group 4 mortgage loans was approximately 76.16% as of the cut-off date." HVMLT 2004-7 Pros. Sup. S-69.

**Item 61.  Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,003 |
| Number of properties on which there was enough information for the model to determine a true market value | 956 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 420 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $30,357,554 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 256 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,120,307 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 73 |
| Weighted-average LTV, as stated by Defendants | 75.6% |
| Weighted-average LTV, as determined by the model | 85.2% |

**Item 70.  Undisclosed additional liens:**

(a)  **Minimum number of properties with additional liens: 753**

(b)  **Total reduction in equity from additional liens: $49,420,343**

(d)  **Weighted-average reduction in equity from additional liens: 68.7%**

**Item 81.  Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statement about the appraisals of the properties that secured the mortgage loans originated by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." HVMLT 2004-7 Pros. Sup. S-81.

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statement about the appraisals of the properties that secured the mortgage loans originated by Downey Savings & Loan Association, F.A.: "All appraisals are required to

-13-

1   conform to Fannie Mae or Freddie Mac appraisal standards then in effect." HVMLT 2004-7 Pros.

2   Sup. S-90.

3   **Item 87.        Untrue or misleading statements about owner-occupancy of the properties**

4   **that secured the mortgage loans:**

5       In the prospectus supplement, Countrywide made the following statements about the

6   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

7   securitization.

8       (a)     In "The Mortgage Loan Groups" section of the prospectus supplement described in

9   Item 51, Greenwich Capital and Greenwich Capital Acceptance presented a table entitled "Stated

10  Occupancy Status of the Mortgage Loans." This table divided all the loans into the categories

11  "Primary," "Investor," and "Second Home." The table made untrue and misleading statements

12  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

13  of aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup.

14  S-31.

15      (b)     In the "Stated Occupancy Status of the Mortgage Loans" table, Greenwich Capital

16  and Greenwich Capital Acceptance stated that 84.37% of the mortgage loans in the collateral pool

17  were secured by a "Primary" residence, 11.06% by an "Investor" property, and 4.57% by a

18  "Second Home." HVMLT 2004-7 Pros. Sup. S-31.

19      (c)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

20  Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 1 Mortgage

21  Loans." This table divided the mortgage loans in Group 1 into the categories "Primary,"

22  "Investor," and "Second Home." The table made untrue and misleading statements about the

23  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

24  aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup.

25  S-41.

26      (d)     In the "Stated Occupancy Status of the Group 1 Mortgage Loans" table,

27  Greenwich Capital and Greenwich Capital Acceptance stated that 92.23% of the mortgage loans

28

-14-

1  in Group 1 were secured by a "Primary" residence, 3.29% by an "Investor" property, and 4.48%

2  by a "Second Home." HVMLT 2004-7 Pros. Sup. S-41.

3  (e)  In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

4  Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 2 Mortgage

5  Loans." This table divided the mortgage loans in Group 2 into the categories "Primary,"

6  "Investor," and "Second Home." The table made untrue and misleading statements about the

7  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

8  aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup.

9  S-50.

10  (f)  In the "Stated Occupancy Status of the Group 2 Mortgage Loans" table,

11  Greenwich Capital and Greenwich Capital Acceptance stated that 80.87% of the mortgage loans

12  in Group 2 were secured by a "Primary" residence, 13.32% by an "Investor" property, and 5.8%

13  by a "Second Home." HVMLT 2004-7 Pros. Sup. S-50.

14  (g)  In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

15  Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 3 Mortgage

16  Loans." This table divided the mortgage loans in Group 3 into the categories "Primary,"

17  "Investor," and "Second Home." The table made untrue and misleading statements about the

18  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

19  aggregate principal balance outstanding in each of these categories. HVMLT 2004-7 Pros. Sup.

20  S-59.

21  (h)  In the "Stated Occupancy Status of the Group 3 Mortgage Loans" table,

22  Greenwich Capital and Greenwich Capital Acceptance stated that 96.76% of the mortgage loans

23  in Group 3 were secured by a "Primary" residence, 1.74% by an "Investor" property, and 1.5% by

24  a "Second Home." HVMLT 2004-7 Pros. Sup. S-59.

25  (i)  In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

26  Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 4 Mortgage

27  Loans." This table divided the mortgage loans in Group 4 into the categories "Primary,"

28  "Investor," and "Second Home." The table made untrue and misleading statements about the

-15-

1  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

2  aggregate principal balance outstanding in each of these categories.. HVMLT 2004-7 Pros. Sup.

3  S-68.

4        (j)     In the "Stated Occupancy Status of the Group 4 Mortgage Loans" table,

5  Greenwich Capital and Greenwich Capital Acceptance stated that 76.03% of the mortgage loans

6  in Group 4 were secured by a "Primary" residence, 19.27% by an "Investor" property, and 4.7%

7  by a "Second Home." HVMLT 2004-7 Pros. Sup. S-68.

**Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 98

    **(b)**     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 147

    **(c)**     **Number of loans on which the owner of the property owned three or more properties:** 11

    **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 207

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

      On pages S-78 through S-82 of the prospectus supplement, Greenwich Capital and

Greenwich Capital Acceptance made statements about the underwriting guidelines of

Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In

particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

     (a)     "Exceptions to Countrywide's underwriting guidelines may be made if

compensating factors are demonstrated by a prospective borrower." HVMLT 2004-7 Pros. Sup.

S-80.

     (b)     "Countrywide's underwriting standards are applied by or on behalf of

Countrywide to evaluate the prospective borrower's credit standing and repayment ability and the

value and adequacy of the mortgaged property as collateral." HVMLT 2004-7 Pros. Sup. S-79.

-16-

On pages S-83 through S-85 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

(a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." HVMLT 2004-7 Pros. Sup. S-84. Another of those statements was that: "[E]xceptions to standard underwriting guidelines are permitted where compensating factors are present . . . ." HVMLT 2004-7 Pros. Sup. S-84.

(b)     "These underwriting standards, including any negotiated modifications to them, are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." HVMLT 2004-7 Pros. Sup. S-84.

On page S-86 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the underwriting guidelines of GreenPoint Mortgage Funding, Inc. All of those statements are incorporated herein by reference. In particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

(a)     "Exceptions to the GreenPoint Underwriting Guidelines are permitted where compensating factors are present." HVMLT 2004-7 Pros. Sup. S-86.

(b)     "Generally, the GreenPoint Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." HVMLT 2004-7 Pros. Sup. S-86.

On pages S-86 through S-88 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the underwriting guidelines of Sierra Pacific Mortgage, Inc. All of those statements are incorporated herein by reference. In particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

-17-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

(a)   "Sierra Pacific's underwriting standards are applied to evaluate the prospective borrower's credit standing and willingness and ability to repay along with the value and adequacy of the mortgaged property as collateral." HVMLT 2004-7 Pros. Sup. S-87.

On pages S-88 through S-91 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the underwriting guidelines of Downey Savings and Loan Association, F.A. All of those statements are incorporated herein by reference. HVMLT 2004-7 Pros. Sup. S-88 to 91. In particular, Greenwich Capital and Greenwich Capital Acceptance stated that:

(a)   "Exceptions to Downey's underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." HVMLT 2004-7 Pros. Sup. S-89.

(b)   "Financial information in the loan file must be analyzed to ensure that there are sufficient assets and financial resources to repay the loan." HVMLT 2004-7 Pros. Sup. S-88.

(c)   "Downey's underwriting standards are applied by or on behalf of Downey to evaluate the prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." HVMLT 2004-7 Pros. Sup. S-89.

**Item 105.**   **Early payment defaults:**

    **(a)**   **Number of the mortgage loans that suffered EPDs: 6**

    **(b)**   **Percent of the mortgage loans that suffered EPDs: 0.3%**

    **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.14%**

**Item 106.**   **90+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies: 164**

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies: 8.2%**

    **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 7.2%**

-18-

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-10 to S-11 and S-154 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the ratings assigned to the certificates issued in this securitization. Greenwich Capital and Greenwich Capital Acceptance stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the issuance of the offered certificates that the certificates initially have the following ratings from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services." Greenwich Capital and Greenwich Capital Acceptance listed the Bank's certificate as rated Aaa by Moody's and AAA by Standard & Poor's. HVMLT 2004-7 Pros. Sup. S-10.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the issuance of the offered certificates that the senior certificates be rated "Aaa" by Moody's Investors Service, Inc. ("Moody's") and "AAA" by Standard & Poor's Ratings Services." HVMLT 2004-7 Pros. Sup. S-154.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated:** 420

(b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 753

(c)    **Number of loans that suffered EPDs:** 6

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 207

(e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 998

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 49.8%

-19-

## SCHEDULE 18 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants Greenwich Capital, Greenwich Capital Acceptance, and Greenwich Capital Holdings, Inc.

**Item 43.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

(b)      **Description of the trust:** Harbor View Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-5 was a securitization in July 2007 of 2,736 mortgage loans,[1] in one pool. The mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corp. HVMLT 2007-5 Pros. Sup. S-3 and S-22.

(c)      **Description of the certificate(s) that the Bank purchased:** Greenwich Capital offered and sold to the Bank a senior certificate in this securitization, in tranche A-1A, for which the Bank paid $200,000,000 plus accrued interest on July 12, 2007.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's •   AAA; Moody's •   Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's •   CCC; Moody's • Ba1.

(f)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/826219/000114420407036797/v081095_424b5.htm.

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by Greenwich Capital Acceptance, Inc. with the SEC on form S-3 on March 23, 2007. Annexed to the registration statement was a prospectus.

---

[1] HVMLT-2007-5 was a prefunded securitization. On the closing date of the securitization there were 2,736 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 154 mortgage loans.

The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 51.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The original LTVs of the initial mortgage loans in the collateral pool ranged from 7.39% to 102.15% with an average or weighted average of 78.6%. HVMLT 2007-5 Pros. Sup. S-5.

(b)     "As of the initial cut-off date, approximately 36.40% of all of the initial mortgage loans have original loan-to-value ratios in excess of 80% . . . ." HVMLT 2007-5 Pros. Sup. S-24.

(c)     In Annex B of the prospectus supplement ("Certain Characteristics of the Initial Mortgage Loans"), Greenwich Capital and Greenwich Capital Acceptance presented tables of statistics about the mortgage loans in the collateral pool. HVMLT 2007-5 Pros. Sup. B-1 to B-12. Each table focused on a certain characteristic of the loans (for example, stated principal balance) and divided the loans into categories based on that characteristic (for example, loans with stated principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value [Ratio]." There were 23 such tables in Annex B for the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from one to 42. Thus, in Annex B, Greenwich Capital and Greenwich Capital Acceptance made hundreds of statements about the original LTVs of the loans in the collateral pool. HVMLT 2007-5 Pros. Sup. B-1 to B-12.

(d)     "The weighted average original loan-to-value ratio of the initial mortgage loans was approximately 78.60% as of the cut-off date." HVMLT 2007-5 Pros. Sup. B-6.

-2-

**Item 61.        Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,890 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,050 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,638 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $165,274,472 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 125 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,461,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 1 |
| Number of loans with LTVs over 100%, as determined by the model | 865 |
| Weighted-average LTV, as stated by Defendants | 78.6% |
| Weighted-average LTV, as determined by the model | 100.1% |

**Item 64.        Evidence from subsequent sales of refinanced properties:**

Of the 2,890 mortgage loans in the collateral pool, 2,225 were taken out to refinance, rather than to purchase, properties. For those 2,225 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 2,225 properties, 355 were subsequently sold for a total of approximately $95,352,689. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $180,920,800. Thus, those properties were sold for 52.7% of the value ascribed to them, a difference of 47.3%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 81.        Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of this securitization: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal of the Appraisal Foundation." HVMLT 2004-7 Pros. Sup. S-31.

-3-

1   **Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties**
2                     **that secured the mortgage loans:**

3       In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance

4 made the following statements about the occupancy status of the properties that secured the

5 mortgage loans in the collateral pool of this securitization.

6       In Annex B of the prospectus supplement, described in Item 51, Greenwich Capital and

7 Greenwich Capital Acceptance presented a table entitled "Stated Occupancy Status of the Initial

8 Mortgage Loans." This table divided the mortgage loans into the categories "Primary,"

9 "Investor," and "Second Home." The table made untrue and misleading statements about the

10 number of mortgage loans, the aggregate principal balance outstanding, and the percent of

11 aggregate principal balance outstanding in each of these categories. HVMLT 2007-5 Pros. Sup.

12 B-3.

13       In the "Stated Occupancy Status of the Initial Mortgage Loans" table, Greenwich Capital

14 and Greenwich Capital Acceptance stated that 82.84% of the mortgage loans in the collateral pool

15 were secured by a "Primary" residence, 12.84% by an "Investor" property, and 4.31% by a

16 "Second Home." HVMLT 2007-5 Pros. Sup. B-3.

17   **Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

18         **(a)**     **Number of loans on which the owner of the property instructed tax**
19               **authorities to send property tax bills to him or her at a different address:** 251

20         **(b)**     **Number of loans on which the owner of the property could have, but did not,**
21               **designate the property as his or her homestead:** 369

22         **(c)**     **Number of loans on which the owner of the property owned three or more**
                **properties:** 47

23         **(d)**     **Number of loans that went straight from current to foreclosure or ownership**
24               **by lender:** 4

25         **(e)**     **Eliminating duplicates, number of loans about which one or more of**
                **statements (a) through (d) is true:** 557

26

27

28

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-29 through S-31 of the prospectus supplement, Greenwich Capital made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, Greenwich Capital stated that:

(a)     "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." HVMLT 2007-5 Pros. Sup. S-31.

(b)     "When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan." HVMLT 2007-5 Pros. Sup. S-30.

**Item 105.**     **Early payment defaults:**

(a)     **Number of the mortgage loans that suffered EPDs: 48**

(b)     **Percent of the mortgage loans that suffered EPDs: 1.7%**

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%**

**Item 106.**     **90+ days delinquencies:**

(a)     **Number of the mortgage loans that suffered 90+ days delinquencies: 1,161**

(b)     **Percent of the mortgage loans that suffered 90+ days delinquencies: 40.2%**

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%**

**Item 107.**     **30+ days delinquencies in this securitization:**

(a)     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,136**

(b)     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 39.3%**

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.** **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-1, S-11, and S-89 of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made statements about the ratings assigned to the certificates issued in this securitization. Greenwich Capital and Greenwich Capital Acceptance stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the issuance of the certificates that the offered certificates initially have the ratings from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services Inc. . . . set forth in . . . this prospectus supplement." HVMLT 2007-5 Pros. Sup. S-11.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the issuance of the offered certificates that they have the applicable rating or ratings by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services . . . indicated . . . in the table on page S-1." HVMLT 2007-5 Pros. Sup. S-89.

**Item 117.** **Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 1,638

(b) **Number of loans that suffered EPDs:** 48

(c) **Number of loans in which the properties were stated to be owner-occupied but were not:** 557

(d) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,852

(e) **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 67.7%

-6-

1

## SCHEDULE 19 TO THE AMENDED COMPLAINT

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendants Greenwich Capital, Greenwich Capital

4

Acceptance, and Greenwich Capital Holdings, Inc.

5

**Item 43.**      **Details of trust and certificate(s).**

6

   **(a)**      **Dealer that sold the certificate(s) to the Bank:** Greenwich Capital.

7

   **(b)**      **Description of the trust:** Harborview Mortgage Loan Trust, Mortgage Loan Pass-

8

Through Certificates, Series 2006-7 was a securitization in August 2006 of 5,119 mortgage loans,

9

in two groups. The mortgage loans in the collateral pool of this securitization were originated by

10

American Home Mortgage Corp. HVMLT 2006-7 Pros. Sup. S-3 and S-24.

11

   **(c)**      **Description of the certificate(s) that the Bank purchased:** Greenwich Capital

12

offered and sold to the Bank a senior certificate in this securitization, in tranche 2A-1A, for which

13

the Bank paid $248,677,711 plus accrued interest on July 26, 2007.

14

   **(d)**      **Ratings of the certificate(s) when the Bank purchased them:** Standard &

15

Poor's •   AAA; Moody's •   Aaa.

16

   **(e)**      **Current ratings of the certificate(s):** Standard & Poor's •   CCC; Moody's •

17

Caa1.

18

   **(f)**      **URL of prospectus supplement for this securitization:**

19

http://www.sec.gov/Archives/edgar/data/826219/000114420407036797/v081095_424b5.htm.

20

   **(g)**      **Registration statement pursuant or traceable to which the certificate(s) were**

21

**issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued

22

pursuant or traceable to a registration statement filed by Greenwich Capital Acceptance with the

23

SEC on form S-3 on March 31, 2006. Annexed to the registration statement was a prospectus.

24

The prospectus was amended from time to time by prospectus supplements whenever a new

25

series of certificates was issued pursuant or traceable to that registration statement.

26

27

28

**Item 51.**        **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        The original LTVs of the total mortgage loans in the collateral pool ranged from 7.76% to 100% with an average or weighted average of 75.27%. HVMLT 2006-7 Pros. Sup. S-4.

(b)        The original effective LTV of the total mortgage loans in the collateral pool ranged from 7.76% to 80% with a weighted average of 64.86%. HVMLT 2006-7 Pros. Sup. S-4.

(c)        The original LTVs of the mortgage loans in Group 1 ranged from 7.76% to 100% with an average or weighted average of 75.47%. HVMLT 2006-7 Pros. Sup. S-5.

(d)        The effective original LTVs of the mortgage loans in Group 1 ranged from 7.76% to 80% with a weighted average of 64.37%. HVMLT 2006-7 Pros. Sup. S-5.

(e)        The original LTVs of the mortgage loans in Group 2 ranged from 17.23% to 100% with an average or weighted average of 75.14%. HVMLT 2006-7 Pros. Sup. S-5.

(f)        The effective original LTVs of the mortgage loans in Group 2 ranged from 17.23% to 80% an average or weighted average of 65.17%. HVMLT 2006-7 Pros. Sup. S-5.

(g)        "Approximately 51.02% of all of the mortgage loans, and approximately 55.08% and 48.35% of the group 1 and group 2 mortgage loans, respectively, are mortgage loans having original loan-to-value ratios of 75.00% to 80.00% . . . ." HVMLT 2006-7 Pros. Sup. S-18.

(h)        "As of the cut-off date, approximately 14.35% of all of the mortgage loans, and approximately 14.55% and 14.21% of the group 1 and group 2 mortgage loans, respectively, have original loan-to-value ratios in excess of 80% . . . ." HVMLT 2006-7 Pros. Sup. S-26.

(i)        In "The Mortgage Loan Groups" section of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance presented tables of statistics about the mortgage loans in the collateral pool. HVMLT 2006-7 Pros. Sup. S-30 to S-67. Each table focused on a certain characteristic of the loans (for example, stated principal balance) and divided the loans into categories based on that characteristic (for example, loans with stated principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented

-2-

1     various data about the loans in each category. There were 29 such tables "The Mortgage Loan

2     Groups" section for all of the loans in the collateral pool. In each table, the number of categories

3     into which the loans were divided ranged from two to 46. Thus, in "The Mortgage Loan Groups"

4     section of the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance

5     made hundreds of statements about the original LTVs of the loans in the collateral pool. HVMLT

6     2006-7 Pros. Sup. S-30 to S-41.

7           (j)     "The weighted average original loan-to-value ratio of the mortgage loans was

8     approximately 75.27% as of the cut-off date." HVMLT 2006-7 Pros. Sup. S-35.

9           (k)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

10     Capital Acceptance presented a table entitled "Original Effective Loan-to-Value Ratios of the

11     Mortgage Loans." This table divided the mortgage loans in the collateral pool into eight

12     categories of original effective LTV (for example, 0.01% to 49.99%, 50% to 54.99%, 55% to

13     59.99%, etc.). The table made untrue and misleading statements about the number of mortgage

14     loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

15     outstanding in each of these categories. HVMLT 2006-7 Pros. Sup. S-35.

16           (l)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

17     Capital Acceptance presented similar tables of statistics about the mortgage loans in Group 1. In

18     these tables, Greenwich Capital and Greenwich Capital Acceptance similarly made hundreds of

19     statements about the original LTVs of the mortgage loans in Group 1. HVMLT 2006-7 Pros. Sup.

20     S-43 to S-54.

21           (m)     "The weighted average original loan-to-value ratio of the group 1 mortgage loans

22     was approximately 75.47% as of the cut-off date." HVMLT 2006-7 Pros. Sup. S-48.

23           (n)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

24     Capital Acceptance presented a table entitled "Original Effective Loan-to-Value Ratios of the

25     Group 1 Mortgage Loans." This table divided the mortgage loans in Group 1 into eight categories

26     of original effective LTV (for example, 0.01% to 49.99%, 50% to 54.99%, 55% to 59.99%, etc.).

27     The table made untrue and misleading statements about the number of mortgage loans, the

28

1   aggregate principal balance outstanding, and the percent of aggregate principal balance

2   outstanding in each of these categories. HVMLT 2006-7 Pros. Sup. S-48.

3       (o)   In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

4   Capital Acceptance presented similar tables of statistics about the mortgage loans in Group 2. In

5   these tables, Greenwich Capital and Greenwich Capital Acceptance similarly made hundreds of

6   statements about the original LTVs of the loans in Group 2. HVMLT 2006-7 Pros. Sup. S-56 to

7   S-67.

8       (p)   "The weighted average original loan-to-value ratio of the group 2 mortgage loans

9   was approximately 75.14% as of the cut-off date." HVMLT 2006-7 Pros. Sup. S-61.

10      (q)   In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

11  Capital Acceptance presented a table entitled "Original Effective Loan-to-Value Ratios of the

12  Group 2 Mortgage Loans." This table divided the mortgage loans in Group 2 into eight categories

13  of original effective LTV (for example, 0.01% to 49.99%, 50% to 54.99%, 55% to 59.99%, etc.).

14  The table made untrue and misleading statements about the number of mortgage loans, the

15  aggregate principal balance outstanding, and the percent of aggregate principal balance

16  outstanding in each of these categories. HVMLT 2006-7 Pros. Sup. S-61.

17  **Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 5,119 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,062 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 2,067 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $218,003,204 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 334 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $30,525,084 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 632 |
| Weighted-average LTV, as stated by Defendants | 75.3% |
| Weighted-average LTV, as determined by the model | 91.3% |

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

**Item 64.**      **Evidence from subsequent sales of refinanced properties:**

Of the 5,119 mortgage loans in the collateral pool, 3,700 were taken out to refinance, rather than to purchase, properties. For those 3,700 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 3,700 properties, 639 were subsequently sold for a total of approximately $242,901,778. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $392,750,706. Thus, those properties were sold for 61.8% of the value ascribed to them, a difference of 38.2%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 81.**      **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of this securitization: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal of the Appraisal Foundation." HVMLT 2004-7 Pros. Sup. S-71.

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Greenwich Capital and Greenwich Capital Acceptance made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Loan Groups" section of the prospectus supplement described in Item 51, Greenwich Capital and Greenwich Capital Acceptance presented a table entitled "Stated Occupancy Status of the Mortgage Loans." This table divided the all the loans in the collateral pool into the categories "Primary," "Investor," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance

-5-

1   outstanding, and the percent of aggregate principal balance outstanding in each of these

2   categories. HVMLT 2006-7 Pros. Sup. S-31.

3          (b)     In the "Stated Occupancy Status of the Mortgage Loans" table, Greenwich Capital

4   and Greenwich Capital Acceptance stated that 77.97% of the mortgage loans in the collateral

5   pool, by stated principal balance as of the cut-off date, were secured by a "Primary" residence,

6   15.83% by an "Investor" property, and 6.21% by a "Second Home." HVMLT 2006-7 Pros. Sup.

7   S-31.

8          (c)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

9   Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 1 Mortgage

10  Loans." This table divided the mortgage loans in Group 1 into the categories "Primary,"

11  "Investor," and "Second Home." The table made untrue and misleading statements about the

12  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

13  aggregate principal balance outstanding in each of these categories. HVMLT 2006-7 Pros. Sup.

14  S-44.

15         (d)     In the "Stated Occupancy Status of the Group 1 Mortgage Loans" table,

16  Greenwich Capital and Greenwich Capital Acceptance stated that 65.46% of the mortgage loans

17  in Group 1 were secured by a "Primary" residence, 26.7% by an "Investor" property, and 7.84%

18  by a "Second Home." HVMLT 2006-7 Pros. Sup. S-44.

19         (e)     In "The Mortgage Loan Groups" section, Greenwich Capital and Greenwich

20  Capital Acceptance presented a table entitled "Stated Occupancy Status of the Group 2 Mortgage

21  Loans." This table divided the mortgage loans in Group 2 into the categories "Primary,"

22  "Investor," and "Second Home." The table made untrue and misleading statements about the

23  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

24  aggregate principal balance outstanding in each of these categories. HVMLT 2006-7 Pros. Sup.

25  S-57.

26         (f)     In the "Stated Occupancy Status of the Group 2 Mortgage Loans" table,

27  Greenwich Capital and Greenwich Capital Acceptance stated that 86.23% of the mortgage loans

28

1    in Group 2 were secured by a "Primary" residence, 8.65% by an "Investor" property, and 5.12%

2    by a "Second Home." HVMLT 2006-7 Pros. Sup. S-57.

3    **Item 95.**       **Details of properties that were stated to be owner-occupied, but were not:**

4        **(a)**       **Number of loans on which the owner of the property instructed tax**
5                   **authorities to send property tax bills to him or her at a different address:** 625

6        **(b)**       **Number of loans on which the owner of the property could have, but did not,**
               **designate the property as his or her homestead:** 541

7
8        **(c)**       **Number of loans on which the owner of the property owned three or more**
               **properties:** 140

9        **(d)**       **Number of loans that went straight from current to foreclosure or ownership**
10                  **by lender:** 6

11       **(e)**       **Eliminating duplicates, number of loans about which one or more of**
               **statements (a) through (d) is true:** 982

12
13   **Item 98.**       **Untrue or misleading statements about the underwriting standards of the**
               **originators of the mortgage loans:**

14       On pages S-70 through S-72 of the prospectus supplement, Greenwich Capital made

15   statements about the underwriting guidelines of American Home Mortgage Corp. All of those

16   statements are incorporated herein by reference. In particular, Greenwich Capital stated that:

17       (a)       "[E]xceptions to American Home's underwriting guidelines are allowed if

18   sufficient compensating factors exist to offset any additional risk due to the exception." HVMLT

19   2006-7 Pros. Sup. S-72.

20       (b)       "When evaluating the ratio of all monthly debt payments to the borrower's

21   monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

22   frequency of credit usage and its impact on the borrower's ability to repay the loan." HVMLT

23   2006-7 Pros. Sup. S-71.

24   **Item 106.**       **90+ days delinquencies:**

25       **(a)**       **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,685

26       **(b)**       **Percent of the mortgage loans that suffered 90+ days delinquencies:** 32.9%

27

28

-7-

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
made at the same time as the loans in the collateral pool that suffered 90+
days delinquencies: 32.7%

**Item 107.**     30+ days delinquencies in this securitization:

(a)     Number of the mortgage loans that were 30+ days delinquent on March 31,
2010: 1,589

(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31,
2010: 31.0%

(c)     Percent of all mortgage loans in the United States that were 30+ days
delinquent on March 31, 2010: 14.7%

**Item 114.**     Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-1, S-12, and S-144 to S-145 of the prospectus supplement, Greenwich Capital
and Greenwich Capital Acceptance made statements about the ratings assigned to the certificates
issued in this securitization. Greenwich Capital and Greenwich Capital Acceptance stated that the
Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard &
Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the
issuance of the certificates that the offered certificates initially have the ratings from Moody's
Investors Service, Inc. and Standard & Poor's Ratings Services Inc. . . . set forth in . . . this
prospectus supplement." HVMLT 2006-7 Pros. Sup. S-12.

Greenwich Capital and Greenwich Capital Acceptance also stated: "It is a condition to the
issuance of the offered certificates that they have the applicable rating or ratings by Moody's
Investors Service, Inc. . . . and Standard & Poor's Ratings Services . . . indicated . . . in the table
on page S-1." HVMLT 2006-7 Pros. Sup. S-144.

**Item 117.**     Summary of loans about which the Defendants made untrue or misleading
statements:

(a)     Number of loans whose LTVs were materially understated: 2,067

(b)     Number of loans in which the properties were stated to be owner-occupied
but were not: 982

-8-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c)     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 2,515

(d)     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 49.4%

-9-

**SCHEDULE 20 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Morgan Stanley.

**Item 43.**    **Details of trust and certificate(s).**

    **(a)**    **Dealer that sold the certificate(s) to the Bank:** Morgan Stanley

    **(b)**    **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A6CB was a securitization in May 2005 of 2,758 mortgage loans, in one group. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. RAST 2005-A6CB Pros. Sup. S-4 and S-13.

    **(c)**    **Description of the certificate(s) that the Bank purchased:** Morgan Stanley offered and sold to the Bank a senior certificate in this securitization, in tranche A-2, for which the Bank paid $201,240,400 plus accrued interest on May 31, 2005.

    **(d)**    **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

    **(e)**    **Current ratings of the certificate(s):** Standard & Poor's • BB; Moody's • Caa1.

    **(f)**    **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

**Item 51.**    **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

    **(a)**    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2005-A6CB Pros. Sup. S-14.

    **(b)**    In "The Mortgage Pool" section of the prospectus supplement, Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A6CB Pros. Sup. S-16 to S-18. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000,

1    $100,000.01 to $150,000, etc.). Each table then presented various data about the mortgage loans

2    in each category. In "The Mortgage Pool" section, Morgan Stanley presented a table entitled

3    "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided the loans in the

4    collateral pool into 19 categories of original LTV (for example, 10% or less, 10.01% to 15%,

5    15.01% to 20%, etc.). The table made untrue and misleading statements about the number of

6    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

7    principal balance outstanding in each of these categories. RAST 2005-A6CB Pros. Sup. S-16.

8         (c)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

9    Mortgage Loans was approximately 69.03%." RAST 2005-A6CB Pros. Sup. S-16.

10   **Item 61.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,758 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,431 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 660 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $32,092,492 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 325 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,094,300 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 86 |
| Weighted-average LTV, as stated by Defendants | 69.0% |
| Weighted-average LTV, as determined by the model | 75.4% |

21   **Item 70.    Undisclosed additional liens:**

22        **(a)    Minimum number of properties with additional liens: 133**

23        **(b)    Total reduction in equity from additional liens: $10,172,152**

24        **(c)    Weighted-average reduction in equity from additional liens: 77.3%**

-2-

**Item 87.   Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

In "The Mortgage Pool" section of the prospectus supplement described in Item 51, Morgan Stanley presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A6CB Pros. Sup. S-17.

In the "Occupancy Types for the Mortgage Loans" table, Morgan Stanley stated that 84.93% of the mortgage loans were secured by a "Primary" residence, 12.25% by an "Investment" property, and 2.82% by a "Second Home." RAST 2005-A6CB Pros. Sup. S-17.

**Item 95.   Details of properties that were stated to be owner-occupied, but were not:**

(a)   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 190**

(b)   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 242**

(c)   **Number of loans on which the owner of the property owned three or more properties: 19**

(d)   **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

(e)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 400**

-3-

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-20 through S-22 of the prospectus supplement, Morgan Stanley made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Morgan Stanley stated that:

(a)    "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A6CB Pros. Sup. S-20.

(b)    "IndyMac Bank's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property." RAST 2005-A6CB Pros. Sup. S-20.

**Item 105.**    **Early payment defaults:**

(a)    **Number of the mortgage loans that suffered EPDs:** 12

(b)    **Percent of the mortgage loans that suffered EPDs:** 0.4%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-61 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Moody's Investors Service, Inc. ("Moody's") and by Standard & Poor's." Morgan Stanley listed the Bank's certificate as rating Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. RAST 2005-A6CB Pros. Sup. S-3.

-4-

Morgan Stanley also stated: "It is a condition to the issuance of the classes of senior certificates that they be rated AAA by Standard & Poor's. . . It is a condition to the issuance of the classes of senior certificates. . . that they be rated Aaa by Moody's Investors Service, Inc. . . ." RAST 2005-A6CB Pros. Sup. S-61.

**Item 117.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated: 660**

    **(b)**     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 133**

    **(c)**     **Number of loans that suffered EPDs: 12**

    **(d)**     **Number of loans in which the properties were stated to be owner-occupied but were not: 400**

    **(e)**     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,043**

    **(f)**     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 37.8%**

**SCHEDULE 21 TO THE AMENDED COMPLAINT**

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Morgan Stanley.

**Item 43.** **Details of trust and certificate(s).**

(a) **Dealer that sold the certificate(s) to the Bank:** Morgan Stanley.

(b) **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2006-A1 was a securitization in February of 2006 of 2,141 mortgage loans, in three groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. RAST 2006-A1 Pros. Sup. S-3, S-27, and S-30.

(c) **Description of the certificate(s) that the Bank purchased:** Morgan Stanley offered and sold to the Bank a senior certificate in this securitization, in tranche 3-A-1, for which the Bank paid $74,742,188 plus accrued interest on February 28, 2006.

(d) **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa; Fitch • AAA.

(e) **Current ratings of the certificate(s):** Standard & Poor's • BB+; Moody's • Bb; Fitch • AAA.

(f) **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1090295/000112528204006550/b403120_424b5.txt.

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on August 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 51.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

1    (a)    The weighted-average original LTV of the mortgage loans in Group 1 was 71.1%.

2    RAST 2006-A1 Pros. Sup. S-4.

3    (b)    The weighted-average original LTV of the mortgage loans in Group 2 was

4    64.82%. RAST 2006-A1 Pros. Sup. S-4.

5    (c)    The weighted-average original LTV of the mortgage loans in Group 3 was 69.3%.

6    RAST 2006-A1 Pros. Sup. S-4.

7    (d)    "With respect to approximately 28.73% of the group 1 mortgage loans, 21.39% of

8    the group 2 mortgage loans and 26.37% of the group 3 mortgage loans, in each case by the cut-off

9    date principal balance of the mortgage loans in the related loan group . . . [t]he weighted average

10   loan-to-value ratio of such group 1 mortgage loans, group 2 mortgage loans and group 3

11   mortgage loans are approximately 74.81%, 73.29% and 77.88%, respectively . . . ." RAST 2006-

12   A1 Pros. Sup. S-23.

13   (e)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

14   less." RAST 2006-A1 Pros. Sup. S-29.

15   (f)    In Schedule 1 of the prospectus supplement ("Mortgage Loan Tables"), Morgan

16   Stanley presented tables of statistics about the mortgage loans in the collateral pool. RAST 2006-

17   A1 Pros. Sup. S-101 to S-108. Each table focused on a certain characteristic of the mortgage

18   loans (for example, current principal balance) and divided the mortgage loans into categories

19   based on that characteristic (for example, loans with current principal balances of $400,000.01 to

20   $500,000, $500,000.01 to $600,000, $600,000.01 to $700,000, etc.). Each table then presented

21   various data about the mortgage loans in each category. In Schedule 1, Morgan Stanley presented

22   a table entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans." This table

23   divided the loans in Loan Group 1 into 14 categories of original LTV (for example, less than

24   30.01%, 30.01% to 35%, 35.01% to 40%, etc.). The table made untrue and misleading statements

25   about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

26   of aggregate principal balance outstanding in each of these categories. RAST 2006-A1 Pros. Sup.

27   S-101.

28

-7-

1    (g)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

2    group 1 mortgage loans was approximately 71.10%." RAST 2006-A1 Pros. Sup. S-101.

3    (h)    In Schedule 1, Morgan Stanley presented a table entitled "Original Loan-to-Value

4    Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in Loan Group 2

5    into 15 categories of original LTV (for example, less than 30.01%, 30.01% to 35%, 35.01% to

6    40%, etc.). The table made untrue and misleading statements about the number of mortgage

7    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

8    outstanding in each of these categories. RAST 2006-A1 Pros. Sup. S-104.

9    (i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

10    group 2 mortgage loans was approximately 64.82%." RAST 2006-A1 Pros. Sup. S-104.

11    (j)    In Schedule 1, Morgan Stanley presented a table entitled "Original Loan-to-Value

12    Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in Loan Group 3

13    into 15 categories of original LTV (for example, less than 30.01%, 30.01% to 35%, 35.01% to

14    40%, etc.). The table made untrue and misleading statements about the number of mortgage

15    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

16    outstanding in each of these categories. RAST 2006-A1 Pros. Sup. S-106.

17    (k)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

18    group 3 mortgage loans was approximately 69.30%." RAST 2006-A1 Pros. Sup. S-106.

19    **Item 61.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,141 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,010 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 569 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $59,508,400 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 161 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,585,935 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 97 |

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*

| | |
|---|---|
| Weighted-average LTV, as stated by Defendants (Group 3) | 69.3% |
| Weighted-average LTV, as determined by the model (Group 3) | 76.8% |

**Item 64.       Evidence from subsequent sales of refinanced properties:**

Of the 2,141 mortgage loans in the collateral pool, 1,409 were taken out to refinance, rather than to purchase, properties. For those 1,409 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,409 properties, 100 were subsequently sold for a total of approximately $48,727,896. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $61,053,500. Thus, those properties were sold for 79.8% of the value ascribed to them, a difference of 20.2%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.       Undisclosed additional liens:**

   **(a)       Minimum number of properties with additional liens:** 96

   **(b)       Total reduction in equity from additional liens:** $10,767,117

   **(c)       Weighted-average reduction in equity from additional liens:** 61.4%

**Item 81.       Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [*sic*] Appraisal Practice." RAST 2006-A1 Pros. Sup. S-33.

**Item 87.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

-9-

1    (a)    In Schedule 1 of the prospectus supplement described in Item 51, Morgan Stanley

2 presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided

3 the mortgage loans in Loan Group 1 into the categories "Primary," "Investment," and "Second

4 Home." The table made untrue and misleading statements about the number of mortgage loans,

5 the aggregate principal balance outstanding, and the percent of aggregate principal balance

6 outstanding in each of these categories. RAST 2006-A1 Pros. Sup. S-102.

7    (b)    In the "Occupancy Types for the Group 1 Mortgage Loans" table, Morgan Stanley

8 stated that 88.89% of the mortgage loans in Loan Group 1 were secured by a "Primary"

9 residence, 6.52% by an "Investment" property, and 4.59% by a "Second Home." RAST 2006-A1

10 Pros. Sup. S-102.

11    (c)    In Schedule 1, Morgan Stanley presented a table entitled "Occupancy Types for

12 the Group 2 Mortgage Loans." This table divided the mortgage loans in Loan Group 2 into the

13 categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

14 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

15 the percent of aggregate principal balance outstanding in each of these categories. RAST 2006-

16 A1 Pros. Sup. S-105.

17    (d)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Morgan Stanley

18 stated that 90.63% of the mortgage loans in Loan Group 2 were secured by a "Primary"

19 residence, 7.25% by an "Investment" property, and 2.12% by a "Second Home." RAST 2006-A1

20 Pros. Sup. S-105.

21    (e)    In Schedule 1, Morgan Stanley presented a table entitled "Occupancy Types for

22 the Group 3 Mortgage Loans." This table divided the mortgage loans in Loan Group 3 into the

23 categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

24 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

25 the percent of aggregate principal balance outstanding in each of these categories. RAST 2006-

26 A1 Pros. Sup. S-107.

27    (f)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Morgan Stanley

28 stated that 84.02% of the mortgage loans in Loan Group 2 were secured by a "Primary"

-10-

residence, 13.06% by an "Investment" property, and 2.92% by a "Second Home." RAST 2006-A1 Pros. Sup. S-107.

**Item 95.**   **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 121**

    **(b)**   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 204**

    **(c)**   **Number of loans on which the owner of the property owned three or more properties: 23**

    **(d)**   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 301**

**Item 98.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-34 of the prospectus supplement, Morgan Stanley made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Morgan Stanley stated that:

    (a)   "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." RAST 2006-A1 Pros. Sup. S-34.

    (b)   "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2006-A1 Pros. Sup. S-32.

**Item 105.**   **Early payment defaults:**

    **(a)**   **Number of the mortgage loans that suffered EPDs: 15**

    **(b)**   **Percent of the mortgage loans that suffered EPDs: 0.7%**

    **(c)**   **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%**

**Item 107.**   **30+ days delinquencies in this securitization:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 473**

(b) **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 22.1%

(c) **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.      Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-5 to S-6 and S-99 to S-100 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and Moody's Investors Service, Inc. . . . ." RAST 2006-A1 Pros. Sup. S-6.

Morgan Stanley also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and it is a condition to the issuance of the senior certificates . . . that they be rated Aaa by Moody's Investors Service, Inc." RAST 2006-A1 Pros. Sup. S-99.

**Item 117.      Summary of loans about which the Defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated:** 569

(b) **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 96

(c) **Number of loans that suffered EPDs:** 15

(d) **Number of loans in which the properties were stated to be owner-occupied but were not:** 301

(e) **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 817

-12-

1

    (f)      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 38.2%

2

3428/001/X119856.v1

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT *(Deutsche, 497839)*