GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ROBERT A. GOODIN, State Bar No. 061302
    rgoodin@goodinmacbride.com
FRANCINE T. RADFORD, State Bar No. 168269
    fradford@goodinmacbride.com
ANNE H. HARTMAN, State Bar No. 184556
    ahartman@goodinmacbride.com
505 Sansome Street, Suite 900
San Francisco, California 94111
Telephone:    (415) 392-7900
Facsimile:    (415) 398-4321

GRAIS & ELLSWORTH LLP
DAVID J. GRAIS (*pro hac application submitted herewith*)
KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
OWEN L. CYRULNIK (*pro hac application submitted herewith*)
70 East 55th Street
New York, New York 10022
Telephone:    (212) 755-0100
Facsimile:    (212) 755-0052

Attorneys for Plaintiff
Federal Home Loan Bank of San Francisco

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SAN FRANCISCO,<br><br>    Plaintiff,<br><br>v.<br><br>DEUTSCHE BANK SECURITIES INC.;<br>DEUTSCHE ALT-A SECURITIES, INC.;<br>DB STRUCTURED PRODUCTS, INC.;<br>J.P. MORGAN SECURITIES, INC., F/K/A<br>BEAR, STEARNS & CO. INC.;<br>STRUCTURED ASSET MORTGAGE<br>INVESTMENTS II, INC.;<br>THE BEAR STEARNS COMPANIES, LLC,<br>F/K/A THE BEAR STEARNS<br>COMPANIES, INC.;<br>COUNTRYWIDE SECURITIES | No. CGC-10-497839<br><br>**VOLUME 2 OF SCHEDULES OF<br>FIRST AMENDED COMPLAINT<br>(SCHEDULE 22)** |

1   CORPORATION;
    CREDIT SUISSE SECURITIES (USA) LLC,
2   F/K/A CREDIT SUISSE FIRST BOSTON
    LLC;
3   RBS SECURITIES, INC., F/K/A/
4   GREENWICH CAPITAL MARKETS, INC.;
    RBS ACCEPTANCE, INC., F/K/A
5   GREENWICH CAPITAL ACCEPTANCE,
    INC.;
6   RBS HOLDINGS USA, INC., F/K/A
7   GREENWICH CAPITAL HOLDINGS,
    INC.;
8   MORGAN STANLEY & CO.
    INCORPORATED;
9   UBS SECURITIES, LLC;
    MORTGAGE ASSET SECURITIZATION
10  TRANSACTIONS, INC.;
11  MERRILL LYNCH, PIERCE, FENNER &
    SMITH, INC.;
12  WASHINGTON MUTUAL MORTGAGE
    SECURITIES CORP.;
13  WAMU CAPITAL CORP.; AND,
    DOES 1-50,
14
15              Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28
                              -2-
    SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1            **SCHEDULE 22 TO THE AMENDED COMPLAINT**

2         To the extent that this Schedule is incorporated by reference into allegations in the

3 complaint, those allegations are made against Defendants UBS and MAST.

4   **Item [41].**      **Details of trust and certificate(s).**

5       **(a)**       **Dealer that sold the certificate(s) to the Bank:** UBS.

6       **(b)**       **Description of the trust:** MASTR Resecuritization Trust, Mortgage Pass Through

7 Certificates, Series 2007-1 was a re-securitization in October 2007. The assets of MASTR

8 Resecuritization Trust 2007-1 consisted of 23 mortgage pass through certificates in 20

9 securitizations (referred to as the "Underlying Securitizations"). The assets consisted of one

10 certificate in each of the following tranches:

11       tranche A-6 of MALT 2004-9;

12       tranche A-5 of CWALT 2005-32T1;

13       tranche 2-A2 of LMT 2005-1;

14       tranche 2-A-3 of RAST 2005-A15;

15       tranche 2-A-7 of RAST 2005-A15;

16       tranche 4-CB of WMALT 2006-3;

17       tranche A-6 of CWALT 2006-12CB;

18       tranche I-A8 of MLMI 2006-F1;

19       tranche 1-A-10 of CWALT 2006-22R;

20       tranche 2-A-1 of CWALT 2006-22R;

21       tranche 1-A-8 of CWALT 2006-23CB;

22       tranche 2-A-4 of MALT 2006-3;

23       tranche 1-A-2 of FHAMS 2006-FA4;

24       tranche IA-12 of CMALT 2006-A3;

25       tranche 2-A-15 of CWALT 2006-29T1;

26       tranche A-2 of RAST 2006-R2;

27       tranche A-6 of RAST 2006-A15;

28       tranche 2-A-1 of CWALT 2006-40T1;

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

<table>
<tbody>
<tr><td>1</td><td>tranche 1-A-11 of CWALT 2006-43CB;</td></tr>
<tr><td>2</td><td>tranche 1-A-4 of MALT 2007-1;</td></tr>
<tr><td>3</td><td>tranche 1-A-8 of CWALT 2007-3T1;</td></tr>
<tr><td>4</td><td>tranche 2-A-1 of RAST 2007-A5;</td></tr>
<tr><td>5</td><td>and tranche 2-A-4 of RAST 2007-A5.</td></tr>
</tbody>
</table>

6  MASTR Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2004-9 was

7  a securitization in August 2004 of 1,665 mortgage loans, in one group. UBS Real Estate

8  Securities Inc. acquired all of the loans in the collateral pool from Countrywide Home Loans,

9  Inc., GreenPoint Mortgage Funding, Inc., National City Mortgage Co., Wells Fargo Bank, N.A.

10  and various undisclosed originators. MALT 2004-9 Pros. Sup. S-7. Wells Fargo Bank, N.A.

11  originated 48.93% of all of the loans in the collateral pool. MALT 2004-9 Pros. Sup. S-31.

12  Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-32T1 was a

13  securitization in June 2005 of 633 mortgage loans,[1] in one group. Countrywide Home Loans, Inc.

14  originated or acquired all of the loans in the collateral pool. CWALT 2005-32T1 Pros. Sup. S-3,

15  S-12 and S-22.

16  Lehman Mortgage Trust, Mortgage Pass-Through Certificates, Series 2005-1 was a

17  securitization in October 2005 of 2,515 mortgage loans, in six pools, eight collateral groups, and

18  nine payment components. Lehman Brothers Bank, FSB and various undisclosed originators

19  originated all of the loans in the collateral pool. Lehman Brothers Bank, FSB originated

20  approximately 97.27% of the loans in the collateral pool. LMT 2005-1 Pros. Sup. S-4, S-48, and

21  S-55.

22  Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-

23  A15 was a securitization in December 2005 of 5,981 mortgage loans, in five groups. IndyMac

24  Bank, F.S.B. originated or acquired all of the loans in the collateral pool. RAST 2005-A15 Pros.

25  Sup. S-4 and S-18.

26

27  [1] CWALT 2005-32T1 was a prefunded securitization. On the closing date of the securitization there were 633 mortgage loans in the trust. After the closing date of the securitization, the trust purchased

28  an additional 41 mortgage loans.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Washington Mutual, Mortgage Pass-Through Certificates, WMALT Series 2006-3 was a

2   securitization in March 2006 of 1,780 mortgage loans, in five groups. GreenPoint Mortgage

3   Funding, Inc., New Century Mortgage Corp., MortgageIT, Inc., and various undisclosed

4   originators originated all of the loans in the collateral pool. GreenPoint Mortgage Funding, Inc.

5   originated 27% of the loans, New Century Mortgage Corp. originated 12.8%, and MortgageIT,

6   Inc. originated 12%. WMALT 2006-3 Pros. Sup. S-5 and S-25.

7   Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-12CB was a

8   securitization in March 2006 of 2,853 mortgage loans,[2] in one group. Countrywide Home Loans,

9   Inc. originated or acquired all of the loans in the collateral pool. CWALT 2006-12CB Pros. Sup.

10   S-39 and S-23.

11   Merrill Lynch Mortgage Investors Trust, Mortgage Loan Pass-Through Certificates,

12   Series 2006-F1 was a securitization in April 2006 of 455 mortgage loans, in one group. National

13   City Mortgage Co. originated all of the loans in the collateral pool. MLMI 2006-F1 Pros. Sup. S-

14   5 and S-19.

15   Alternative Loan Trust, Resecuritization Pass-Through Certificates, Series 2006-22R was

16   a re-securitization in May 2006 of 3,762 mortgage loans in Alternative Loan Trust, Mortgage

17   Pass-Through Certificates, Series 2006-11CB.

18   Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-23CB was a

19   securitization in June 2006 of 4,737 mortgage loans, in two groups. Countrywide Home Loans,

20   Inc. originated or acquired all of the loans in the collateral pool. CWALT 2006-23CB Pros. Sup.

21   S-30 and S-54.

22   MASTR Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-3 was

23   a securitization in June 2006 of 882 mortgage loans, in three groups. American Home Mortgage

24   Corp., Impac Funding Corporation, Wachovia Mortgage Corporation, and various undisclosed

25   originators originated all of the loans in the collateral pool. American Home Mortgage Corp.

26

27   [2] CWALT 2006-12CB was a prefunded securitization. On the closing date of the securitization
there were 2,853 mortgage loans in the trust. After the closing date of the securitization, the trust

28   purchased an additional 217 mortgage loans.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   originated 29.45% of the loans in the collateral pool, Impac Funding Corporation originated

2   15.81%, and Wachovia Mortgage Corporation originated 13.78%. MALT 2006-3 Pros. Sup. S-10

3   and S-32.

4        First Horizon Alternative Mortgage Securities Trust, Mortgage Pass-Through Certificates,

5   Series 2006-FA4 was a securitization in June 2006 of 1,656 mortgage loans, in two pools. First

6   Horizon Home Loan Corporation originated or acquired all of the loans in the collateral pool.

7   FHAMS 2006-FA4 Pros. Sup. S-7.

8        CitiMortgage Alternative Loan Trust, REMIC Pass-Through Certificates, Series 2006-A3

9   was a securitization in August 2006 of 1,186 mortgage loans, in two pools. CitiMortgage, Inc. or

10   its affiliates and various undisclosed originators originated or acquired all of the loans in the

11   collateral pool. CitiMortgage, Inc. and its affiliates originated 74.3% of the loans of which 74%

12   were in Pool I and 77.4% were in Pool II. CMALT 2006-A3 Pros. Sup. 10 and 29 to 30.

13        Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-29T1 was a

14   securitization in August 2006 of 1,083 mortgage loans,[3] in three groups. Countrywide Home

15   Loans, Inc. originated or acquired all of the mortgage loans in the collateral pool. CWALT 2006-

16   29T1 Pros. Sup. S-66.

17        Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2006-

18   R2 was a re-securitization in October 2006 and consists of a 74.9% percentage interest and a

19   74.64% percentage interest in the IndyMac MBS, Inc., Residential Asset Securitization Trust,

20   Mortgage Pass-Through Certificates, Series 2006-A1, Class 1-A-1 and Class 1-A-3 Certificates,

21   respectively.

22        Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2006-

23   A15 was a securitization in November 2006 of 786 mortgage loans, in one group. All of the

24   mortgage loans in the collateral pool were originated or acquired by IndyMac Bank, F.S.B. RAST

25   2006-A15 Pros. Sup. S-5 and S-28.

26   _____

27        [3] CWALT 2006-29T1 was a prefunded securitization. On the closing date of the securitization
     there were 1,083 mortgage loans in the trust. After the closing date of the securitization, the trust

28   purchased an additional 162 mortgage loans.

-6-

1    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-40T1 was a

2  securitization in November 2006 of 879 mortgage loans, in two groups. Countrywide Home

3  Loans, Inc. originated or acquired all of the loans in the collateral pool. CWALT 2006-40T1 Pros.

4  Sup. S-54.

5    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-43CB was a

6  securitization in December 2006 of 4,211 mortgage loans, in three groups. Countrywide Home

7  Loans, Inc. originated or acquired all of the loans in the collateral pool. CWALT 2006-43CB

8  Pros. Sup. S-71.

9    MASTR Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-1 was

10  a securitization in January 2007 of 656 mortgage loans, in three groups. Wachovia Mortgage

11  Company, Countrywide Home Loans, Inc., Wells Fargo Bank, N.A., and various undisclosed

12  originators originated or acquired all of the loans in the collateral pool. Wachovia Mortgage

13  Company originated 30.32%, Countrywide Home Loans, Inc. originated 26.89%, and Wells

14  Fargo Bank, N.A. originated 25.31%. MALT 2007-1 Pros. Sup. S-11 and S-36.

15    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-3T1 was a

16  securitization in February 2007 of 1,164 mortgage loans, in two groups. Countrywide Home

17  Loans, Inc. originated or acquired all of the loans in the collateral pool. CWALT 2007-3T1 Pros.

18  Sup. S-36.

19    Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2007-

20  A5 was a securitization in March 2007 of 1,275 mortgage loans, in two groups. IndyMac Bank,

21  F.S.B. originated or acquired all of the loans in the collateral pool. RAST 2007-A5 Pros. Sup. S-5

22  and S-30.

23    **(c)**    **Description of the certificate(s) that the Bank purchased:** UBS offered and sold

24  to the Bank a senior certificate in MASTR Resecuritization Trust 2007-1, in tranche A-1, for

25  which the Bank paid $444,485,538 plus accrued interest on October 30, 2007.

26    **(d)**    **Ratings of the certificate(s) when the Bank purchased them:** Moody's •  Aaa.

27    **(e)**    **Current ratings of the certificate(s):** Moody's •  B2.

28    **(f)**    **URL of prospectus supplements of underlying securitizations:**

-7-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    *MALT 2004-9,*

2    http://www.sec.gov/Archives/edgar/data/815018/000095013604002854/file001.htm; *CWALT*

3    *2005-32TI,*

4    http://www.sec.gov/Archives/edgar/data/1269518/000095012905006798/v10087e424b5.txt;

5    *LMT 2005-1,*

6    http://www.sec.gov/Archives/edgar/data/808851/000095013605006854/file001.htm; *RAST 2005-*

7    *A15,* http://www.sec.gov/Archives/edgar/data/1090295/000095011705004972/a41102.txt;

8    *WMALT 2006-3,*

9    http://www.sec.gov/Archives/edgar/data/1317069/000095011706001458/a41627.htm; *CWALT*

10    *2006-12CB,*

11    http://www.sec.gov/Archives/edgar/data/1269518/000095013606002668/file001.htm; *MLMI*

12    *2006-F1,*

13    http://www.sec.gov/Archives/edgar/data/809940/000095012306005271/y19900e424b5.txt;

14    *CWALT 2006-22R,*

15    http://www.sec.gov/Archives/edgar/data/1269518/000095012906006008/v20908b5e424b5.txt;

16    *CWALT 2006-23CB,*

17    http://www.sec.gov/Archives/edgar/data/1269518/000095012906006952/v21591b5e424b5.txt;

18    *MALT 2006-3,*

19    http://www.sec.gov/Archives/edgar/data/815018/000116231806000890/m606combined.htm;

20    *FHAMS 2006-FA4,*

21    http://www.sec.gov/Archives/edgar/data/1362921/000095011706002836/a42286.htm; *CMALT*

22    *2006-A3,* http://www.sec.gov/Archives/edgar/data/811785/000136153006000045/cmsicmalt200-

23    a3424b5.htm;

24    *CWALT 2006-29T1,*

25    http://www.sec.gov/Archives/edgar/data/1269518/000095012406005015/v23274b5e424b5.txt;

26    *RAST 2006-A1,*

27    http://www.sec.gov/Archives/edgar/data/1090295/000112528206006708/b415396_424b5.txt;

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-8-

1  *RAST 2006-A15,*

2  http://www.sec.gov/Archives/edgar/data/1090295/000112528206007558/b415899_424b5.txt;

3  *CWALT 2006-40T1,*

4  http://www.sec.gov/Archives/edgar/data/1269518/000095012406007251/v25499b5e424b5.txt;

5  *CWALT 2006 43CB,*

6  http://www.sec.gov/Archives/edgar/data/1269518/000095014807000008/v26026b5e424b5.txt;

7  *MALT 2007-1,*

8  http://www.sec.gov/Archives/edgar/data/815018/000116231807000119/combined.htm; *CWALT*

9  *2007-3T1,*

10  http://www.sec.gov/Archives/edgar/data/1269518/000114420407010646/v067211_424b5.htm;

11  and

12  *RAST 2007-A5,*

13  http://www.sec.gov/Archives/edgar/data/1090295/000089109207001233/e26600_424b5.txt.

14  **Item [49].      Untrue or misleading statements about the LTVs of the mortgage loans:**

15  *MALT 2004-9*

16          In the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made

17  the following statements about the LTVs of the mortgage loans in the collateral pool of that

18  securitization.

19          (a)      The original LTVs ranged from 16.99% to 100%, with a weighted-average original

20  LTV of 82.89%. MALT 2004-9 Pros. Sup. S-9.

21          (b)      "Approximately 50.93% of the Loans, by Cut-Off Date Pool Balance for all of the

22  Loans, had LTV Ratios at origination of greater than 80% . . . ." MALT 2004-9 Pros. Sup. S-28.

23          (c)      In Annex B of the prospectus supplement ("Mortgage Loan Statistical

24  Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

25  collateral pool. MALT 2004-9 Pros. Sup. B-1 to B-5. Each table focused on a certain

26  characteristic of the loans (for example, original principal balance) and divided the loans into

27  categories based on that characteristic (for example, loans with original principal balances of $1

28  to $25,000, $25,001 to $50,000, $50,001 to $75,000, etc.). Each table then presented various data

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-9-

1  about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios,"

2  divided the loans in the collateral pool into 11 categories of original LTV (for example, 50% or

3  less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements

4  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

5  of aggregate principal balance outstanding in each of these categories. MALT 2004-9 Pros. Sup.

6  B-2.

7       (d)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Loans in

8  the aggregate, by Cut-Off Date Pool Balance of the Loans in the aggregate, was approximately

9  82.89%." MALT 2004-9 Pros. Sup. B-2.

10  *CWALT 2005-32T1*

11       The prospectus supplement for the CWALT 2005-32T1 Securitization presented the

12  following statements about the LTVs of the mortgage loans in the collateral pool of that

13  securitization.

14       (a)    "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than

15  95.00%." CWALT 2005-32T1 Pros. Sup. S-13.

16       (b)    "The Mortgage Pool" section of the prospectus supplement presented tables of

17  statistics about the mortgage loans in the collateral pool. CWALT 2005-32T1 Pros. Sup. S-15 to

18  S-19. Each table focused on a certain characteristic of the loans (for example, current mortgage

19  loan principal balance) and divided the loans into categories based on that characteristic (for

20  example, loans with current principal balances of $250,000.01 to $300,000, $350,000.01 to

21  $400,000, $400,000.01 to $450,000, etc.). Each table then presented various data about the loans

22  in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio."

23  There were 10 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In

24  each table, the number of categories into which the loans were divided ranged from three to 20.

25  Thus, "The Mortgage Pool" section presented hundreds of statements about the original LTVs of

26  the loans in the collateral pool. CWALT 2005-32T1 Pros. Sup. S-13 to S-19.

27       (c)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

28  of the Initial Mortgage Loans is approximately 74.04%." CWALT 2005-32T1 Pros. Sup. S-17.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*LMT 2005-1*

The prospectus supplement for the LMT 2005-1 Securitization presented the following statements about the LTVs of the mortgage loans in the collateral pool of that securitization.

(a)     The original LTVs of the mortgage loans in Pool 1 ranged from 15.56% to 80% with a weighted-average original LTV of 63.99%. LMT 2005-1 Pros. Sup. S-6.

(b)     The original LTVs of the mortgage loans in Pool 2 ranged from 24.07% to 87.57% with a weighted-average original LTV of 64.69%. LMT 2005-1 Pros. Sup. S-6.

(c)     The original LTVs of the mortgage loans in Pool 3 ranged from 17.67% to 100% with a weighted-average original LTV of 79.5%. LMT 2005-1 Pros. Sup. S-7.

(d)     The original LTVs of the mortgage loans in Pool 4 ranged from 27.79% to 91.85% with a weighted-average original LTV of 68.42%. LMT 2005-1 Pros. Sup. S-7.

(e)     The original LTVs of the mortgage loans in Pool 5 ranged from 18.82% to 95% with a weighted-average original LTV of 72.82%. LMT 2005-1 Pros. Sup. S-8.

(f)     The original LTVs of the mortgage loans in Pool 6 ranged from 14.36% to 90% with a weighted-average original LTV of 58.86%. LMT 2005-1 Pros. Sup. S-8.

(g)     The original LTVs of the mortgage loans in Collateral Group P ranged from 14.36% to 95% with a weighted-average original LTV of 62.63%. LMT 2005-1 Pros. Sup. S-10.

(h)     The original LTVs of the mortgage loans in Collateral Group 1 ranged from 15.56% to 80% with a weighted-average original LTV of 63.98%. LMT 2005-1 Pros. Sup. S-10.

(i)     The original LTVs of the mortgage loans in Collateral Group 2 ranged from 24.07% to 87.57% with a weighted-average original LTV 64.75%. LMT 2005-1 Pros. Sup. S-11.

(j)     The original LTVs of the mortgage loans in Collateral Group 3 ranged from 17.67% to 100% with a weighted-average original LTV of 79.5%. LMT 2005-1 Pros. Sup. S-11.

(k)     The original LTVs of the mortgage loans in Collateral Group 4 ranged from 27.79% to 91.85% with a weighted-average original LTV of 68.42%. LMT 2005-1 Pros. Sup. S-12.

(l)     The original LTVs of the mortgage loans in Collateral Group 5 ranged from 18.82% to 95% with a weighted-average original LTV of 72.82%. LMT 2005-1 Pros. Sup. S-12.

-11-

1     (m)    The original LTVs of the mortgage loans in Collateral Group 6 ranged from

2    14.36% to 90% with a weighted-average original LTV of 55.74%. LMT 2005-1 Pros. Sup. S-13.

3     (n)    The original LTVs of the mortgage loans in Collateral Group 7 ranged from

4    17.21% to 90% with a weighted-average original LTV of 61.34%. LMT 2005-1 Pros. Sup. S-13.

5     (o)    The original LTVs of the mortgage loans in the Pool AX(1) payment component

6    ranged from 15.56% to 80% with a weighted-average original LTV of 63.07%. LMT 2005-1

7    Pros. Sup. S-50.

8     (p)    The original LTVs of the mortgage loans in the Pool PAX(1) payment component

9    ranged from 17.65% to 80% with a weighted-average original LTV of 64.7%. LMT 2005-1 Pros.

10    Sup. S-50.

11     (q)    The original LTVs of the mortgage loans in the Pool AX(2) payment component

12    ranged from 26.67% to 86.96% with a weighted-average original LTV of 66.63%. LMT 2005-1

13    Pros. Sup. S-50.

14     (r)    The original LTVs of the mortgage loans in the Pool PAX(2) payment component

15    ranged from 37.93% to 87.57% with a weighted-average original LTV of 67.28%. LMT 2005-1

16    Pros. Sup. S-51.

17     (s)    The original LTVs of the mortgage loans in the Pool AX(4) payment component

18    ranged from 27.79% to 91.85% with a weighted-average original LTV of 66.81%. LMT 2005-1

19    Pros. Sup. S-51.

20     (t)    The original LTVs of the mortgage loans in the Pool PAX(4) payment component

21    ranged from 32.31% to 87.32% with a weighted-average original LTV of 72.71%. LMT 2005-1

22    Pros. Sup. S-51.

23     (u)    The original LTVs of the mortgage loans in the Pool AX(5) payment component

24    ranged from 18.82% to 95% with a weighted-average original LTV of 72.74%. LMT 2005-1

25    Pros. Sup. S-52.

26     (v)    The original LTVs of the mortgage loans in the Pool AX(6) payment component

27    ranged from 14.36% to 90% with a weighted-average original LTV of 57.98%. LMT 2005-1

28    Pros. Sup. S-52.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-12-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1      (w)    The original LTVs of the mortgage loans in the Pool PAX(6) payment component

2  ranged from 26.53% to 80% with a weighted-average original LTV of 61.11%. LMT 2005-1

3  Pros. Sup. S-52.

4      (x)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

5  Loans") presented tables of statistics about the mortgage loans in the collateral pool. LMT 2005-1

6  Pros. Sup. S-B-1 to S-B-26. Each table focused on a certain characteristic of the loans (for

7  example, cut-off date scheduled principal balance) and divided the loans into categories based on

8  that characteristic (for example, loans with scheduled principal balances of $0.01 to $50,000,

9  $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data

10  about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios –

11  Collateral Group P," divided the mortgage loans in Collateral Group P into nine categories of

12  original LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table

13  made untrue and misleading statements about the number of mortgage loans, the aggregate

14  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

15  of these categories. LMT 2005-1 Pros. Sup. S-B-2.

16      (y)    "The weighted average original loan-to-value ratio [of the mortgage loans in

17  Collateral Group P] is approximately 62.63%." LMT 2005-1 Pros. Sup. S-B-2.

18      (z)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

19  Loans"), presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 1." This

20  table divided the mortgage loans in Collateral Group 1 into seven categories of original LTV (for

21  example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and

22  misleading statements about the number of mortgage loans, the aggregate principal balance

23  outstanding, and the percent of aggregate principal balance outstanding in each of these

24  categories. LMT 2005-1 Pros. Sup. S-B-5.

25      (aa)   "The weighted average original loan-to-value ratio [of the mortgage loans in

26  Collateral Group 1] is approximately 63.98%." LMT 2005-1 Pros. Sup. S-B-5.

27      (bb)   Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

28  Loans"), presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 2." This

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-13-

1    table divided the mortgage loans in Collateral Group 2 into seven categories of original LTV (for

2    example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

3    misleading statements about the number of mortgage loans, the aggregate principal balance

4    outstanding, and the percent of aggregate principal balance outstanding in each of these

5    categories. LMT 2005-1 Pros. Sup. S-B-8.

6            (cc)    "The weighted average original loan-to-value ratio [of the mortgage loans in

7    Collateral Group 2] is approximately 64.75%." LMT 2005-1 Pros. Sup. S-B-8.

8            (dd)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

9    Loans"), presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 3." This

10   table divided the mortgage loans in Collateral Group 3 into eight categories of original LTV (for

11   example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and

12   misleading statements about the number of mortgage loans, the aggregate principal balance

13   outstanding, and the percent of aggregate principal balance outstanding in each of these

14   categories. LMT 2005-1 Pros. Sup. S-B-11.

15           (ee)    "The weighted average original loan-to-value ratio [of the mortgage loans in

16   Collateral Group 3] is approximately 79.50%." LMT 2005-1 Pros. Sup. S-B-11.

17           (ff)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

18   Loans"), presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 4." This

19   table divided the mortgage loans in Collateral Group 4 into eight categories of original LTV (for

20   example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

21   misleading statements about the number of mortgage loans, the aggregate principal balance

22   outstanding, and the percent of aggregate principal balance outstanding in each of these

23   categories. LMT 2005-1 Pros. Sup. S-B-14.

24           (gg)    "The weighted average original loan-to-value ratio [of the mortgage loans in

25   Collateral Group 4] is approximately 68.42%." LMT 2005-1 Pros. Sup. S-B-14.

26           (hh)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

27   Loans"), presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 5." This

28   table divided the mortgage loans in Collateral Group 5 into nine categories of original LTV (for

-14-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and

2   misleading statements about the number of mortgage loans, the aggregate principal balance

3   outstanding, and the percent of aggregate principal balance outstanding in each of these

4   categories. LMT 2005-1 Pros. Sup. S-B-17.

5        (ii)    "The weighted average original loan-to-value ratio [of the mortgage loans in

6   Collateral Group 5] is approximately 72.82%." LMT 2005-1 Pros. Sup. S-B-17.

7        (jj)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

8   Loans") presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 6." This

9   table divided the mortgage loans in Collateral Group 6 into eight categories of original LTV (for

10   example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and

11   misleading statements about the number of mortgage loans, the aggregate principal balance

12   outstanding, and the percent of aggregate principal balance outstanding in each of these

13   categories. LMT 2005-1 Pros. Sup. S-B-20.

14        (kk)    "The weighted average original loan-to-value ratio [of the mortgage loans in

15   Collateral Group 6] is approximately 55.74%." LMT 2005-1 Pros. Sup. S-B-20.

16        (ll)    Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage

17   Loans") presented a table entitled "Original Loan-to-Value Ratios – Collateral Group 7." This

18   table divided the mortgage loans in Collateral Group 7 into eight categories of original LTV (for

19   example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and

20   misleading statements about the number of mortgage loans, the aggregate principal balance

21   outstanding, and the percent of aggregate principal balance outstanding in each of these

22   categories. LMT 2005-1 Pros. Sup. S-B-23.

23        (mm)    "The weighted average original loan-to-value ratio [of the mortgage loans in

24   Collateral Group 7] is approximately 61.34%." LMT 2005-1 Pros. Sup. S-B-23.

25   *RAST 2005-A15*

26        The prospectus supplement for the RAST 2005-A15 Securitization presented the

27   following statements about the LTVs of the mortgage loans in the collateral pool of that

28   securitization.

-15-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1      (a)     Of the mortgage loans in Loan Group 1, 25.8% had a weighted-average LTV of

2    68.67%. RAST 2005-A15 Pros. Sup. S-13.

3      (b)     Of the mortgage loans in Loan Group 2, 32.17% had a weighted-average LTV of

4    72.35%. RAST 2005-A15 Pros. Sup. S-13.

5      (c)     Of the mortgage loans in Loan Group 3, 11.01% had a weighted-average LTV of

6    66.87%. RAST 2005-A15 Pros. Sup. S-13.

7      (d)     Of the mortgage loans in Loan Group 4, 13.23% had a weighted-average LTV of

8    75.29%. RAST 2005-A15 Pros. Sup. S-13.

9      (e)     Of the mortgage loans in Loan Group 5, 17.79% had a weighted-average LTV of

10   72.01%. RAST 2005-A15 Pros. Sup. S-13.

11      (f)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

12   less." RAST 2005-A15 Pros. Sup. S-20.

13      (g)     "The Mortgage Pool" section of the prospectus supplement presented tables of

14   statistics about the mortgage loans in the collateral pool. RAST 2005-A15 Pros. Sup. S-18 to S-

15   36. Each table focused on a certain characteristic of the loans (for example, current principal

16   balance) and divided the loans into categories based on that characteristic (for example, loans

17   with current principal balances of $40,000.01 to $60,000, $60,000.01 to $80,000, $80,000.01 to

18   $100,000, etc.). Each table then presented various data about the loans in each category. One of

19   the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the

20   loans in Group 1 into 10 categories of original LTV (for example, 15.09% to 50%, 50.01% to

21   55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number

22   of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

23   principal balance outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-22.

24      (h)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

25   group 1 mortgage loans was approximately 68.67%." RAST 2005-A15 Pros. Sup. S-22.

26      (i)     "The Mortgage Pool" section presented a table entitled "Original Loan-to-Value

27   Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in Group 2 into

28   11 categories of original LTV (for example, 11.08% to 50%, 50.01% to 55%, 55.01% to 60%,

-16-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   etc.). The table made untrue and misleading statements about the number of mortgage loans, the

2   aggregate principal balance outstanding, and the percent of aggregate principal balance

3   outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-25.

4       (j)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

5   group 2 mortgage loans was approximately 72.34%." RAST 2005-A15 Pros. Sup. S-25.

6       (k)    "The Mortgage Pool" section presented a table entitled "Original Loan-to-Value

7   Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in Group 3 into

8   11 categories of original LTV (for example, 17.21% to 50%, 50.01% to 55%, 55.01% to 60%,

9   etc.). The table made untrue and misleading statements about the number of mortgage loans, the

10  aggregate principal balance outstanding, and the percent of aggregate principal balance

11  outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-28.

12      (l)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

13  group 3 mortgage loans was approximately 66.88%." RAST 2005-A15 Pros. Sup. S-28.

14      (m)    "The Mortgage Pool" section presented a table entitled "Original Loan-to-Value

15  Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in Group 4 into

16  11 categories of original LTV (for example, 14.94% to 50%, 50.01% to 55%, 55.01% to 60%,

17  etc.). The table made untrue and misleading statements about the number of mortgage loans, the

18  aggregate principal balance outstanding, and the percent of aggregate principal balance

19  outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-31.

20      (n)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

21  group 4 mortgage loans was approximately 75.29%." RAST 2005-A15 Pros. Sup. S-31.

22      (o)    "The Mortgage Pool" section presented a table entitled "Original Loan-to-Value

23  Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in Group 5 into

24  10 categories of original LTV (for example, 30.56% to 50%, 50.01% to 55%, 55.01% to 60%,

25  etc.). The table made untrue and misleading statements about the number of mortgage loans, the

26  aggregate principal balance outstanding, and the percent of aggregate principal balance

27  outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-34.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-17-

(p)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the group 5 mortgage loans was approximately 72.02%." RAST 2005-A15 Pros. Sup. S-34.

*WMALT 2006-3*

The prospectus supplement for the WMALT 2006-3 Securitization presented the following statements about the LTVs of the mortgage loans in the collateral pool of that securitization.

(a)     As of the cut-off date, 1% of the loans in Loan Group 1 had an LTV in excess of 80%. WMALT 2006-3 Pros. Sup. S-41.

(b)     As of the cut-off date, 2.1% of the loans in Loan Group 2 had an LTV in excess of 80%. WMALT 2006-3 Pros. Sup. S-42.

(c)     As of the cut-off date, 0.9% of the loans in Loan Group 3 had an LTV in excess of 80%. WMALT 2006-3 Pros. Sup. S-42.

(d)     As of the cut-off date, 8.1% of the loans in Loan Group 4 had an LTV in excess of 80%. WMALT 2006-3 Pros. Sup. S-42.

(e)     As of the cut-off date, 2.4% of the loans in Loan Group 5 had an LTV in excess of 80%. WMALT 2006-3 Pros. Sup. S-42.

(f)     Appendix B of the prospectus supplement presented tables of statistics about the mortgage loans in the collateral pool. WMALT 2006-3 Pros. Sup. S-90 to S-104. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original principal balances of $400,001 to $450,000, $450,001 to $500,000, $500,001 to $550,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Current Loan-to-Value Ratios of the Group 1 Loans," divided the mortgage loans in Loan Group 1 into five categories of current LTV (for example, 60% or less, 60.01% to 70%, 70.01% to 75%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. WMALT 2006-3 Pros. Sup. S-90.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-18-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (g)    "At origination, the weighted average loan-to-value ratio of the group 1 loans was

2    approximately 71.3%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the

3    group 1 loans was approximately 71.3%." WMALT 2006-3 Pros. Sup. S-90.

4    (h)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 1

5    loans originated under a reduced or no documentation program was approximately 71.8%."

6    WMALT 2006-3 Pros. Sup. S-91.

7    (i)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 1

8    loans originated under a no ratio program was approximately 61.9%." WMALT 2006-3 Pros.

9    Sup. S-91.

10    (j)    Appendix B presented a table entitled "Current Loan-to-Value Ratios of the Group

11    2 Loans." This table divided the mortgage loans in Loan Group 2 into six categories of current

12    LTV (for example, 60% or less, 60.01% to 70%, 70.01% to 75%, etc.). The table made untrue and

13    misleading statements about the number of mortgage loans, the aggregate principal balance

14    outstanding, and the percent of aggregate principal balance outstanding in each of these

15    categories. WMALT 2006-3 Pros. Sup. S-93.

16    (k)    "At origination, the weighted average loan-to-value ratio of the group 2 loans was

17    approximately 74.9%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the

18    group 2 loans was approximately 74.9%." WMALT 2006-3 Pros. Sup. S-93.

19    (l)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 2

20    loans originated under a reduced or no documentation program was approximately 75.5%."

21    WMALT 2006-3 Pros. Sup. S-94.

22    (m)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 2

23    loans originated under a no ratio program was approximately 69.2%." WMALT 2006-3 Pros.

24    Sup. S-94.

25    (n)    Appendix B presented a table entitled "Current Loan-to-Value Ratios of the Group

26    3 Loans." This table divided the mortgage loans in Loan Group 3 into six categories of current

27    LTV (for example, 60% or less, 60.01% to 70%, 70.01% to 75%, etc.). The table made untrue and

28    misleading statements about the number of mortgage loans, the aggregate principal balance

-19-

1   outstanding, and the percent of aggregate principal balance outstanding in each of these

2   categories. WMALT 2006-3 Pros. Sup. S-96.

3      (o)   "At origination, the weighted average loan-to-value ratio of the group 3 loans was

4   approximately 73.0%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the

5   group 3 loans was approximately 72.9%." WMALT 2006-3 Pros. Sup. S-96.

6      (p)   "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 3

7   loans originated under a reduced or no documentation program was approximately 71.3%."

8   WMALT 2006-3 Pros. Sup. S-97.

9      (q)   "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 3

10   loans originated under a no ratio program was approximately 73.4%." WMALT 2006-3 Pros.

11   Sup. S-97.

12      (r)   Appendix B presented a table entitled "Current Loan-to-Value Ratios of the Group

13   4 Loans." This table divided the mortgage loans in Loan Group 4 into eight categories of current

14   LTV (for example, 60% or less, 60.01% to 70%, 70.01% to 75%, etc.). The table made untrue and

15   misleading statements about the number of mortgage loans, the aggregate principal balance

16   outstanding, and the percent of aggregate principal balance outstanding in each of these

17   categories. WMALT 2006-3 Pros. Sup. S-99.

18      (s)   "At origination, the weighted average loan-to-value ratio of the group 4 loans was

19   approximately 77.3%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the

20   group 4 loans was approximately 77.2%." WMALT 2006-3 Pros. Sup. S-99.

21      (t)   "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 4

22   loans originated under a reduced or no documentation program was approximately 76.7%."

23   WMALT 2006-3 Pros. Sup. S-100.

24      (u)   "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 4

25   loans originated under a no ratio program was approximately 78.1%." WMALT 2006-3 Pros.

26   Sup. S-100.

27      (v)   Appendix B presented a table entitled "Current Loan-to-Value Ratios of the Group

28   5 Loans." This table divided the mortgage loans in Loan Group 5 into seven categories of current

-20-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  LTV (for example, 60% or less, 60.01% to 70%, 70.01% to 75%, etc.). The table made untrue and

2  misleading statements about the number of mortgage loans, the aggregate principal balance

3  outstanding, and the percent of aggregate principal balance outstanding in each of these

4  categories. WMALT 2006-3 Pros. Sup. S-102.

5      (w)    "At origination, the weighted average loan-to-value ratio of the group 5 loans was

6  approximately 65.3%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the

7  group 5 loans was approximately 64.6%." WMALT 2006-3 Pros. Sup. S-102.

8      (x)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 5

9  loans originated under a reduced or no documentation program was approximately 64.3%."

10  WMALT 2006-3 Pros. Sup. S-103.

11      (y)    "As of the Cut-off Date, the weighted average loan-to-value ratio of the group 5

12  loans originated under a no ratio program was approximately 60.0%." WMALT 2006-3 Pros.

13  Sup. S-103.

14      In the prospectus supplement for the CWALT 2006-12CB Securitization, UBS made the

15  following statements about the LTVs of the mortgage loans in the collateral pool of that

16  securitization.

17      (a)    As of the initial cut-off date, the weighted-average original LTV of the initial

18  mortgage loans in the collateral pool was 73.69%. CWALT 2006-12CB Pros. Sup. S-4.

19      (b)    "Except for one Initial Mortgage Loan, no Initial Mortgage Loan had a Loan-to-

20  Value Ratio at origination of more than 95.00%." CWALT 2006-12CB Pros. Sup. S-25.

21      (c)    In "The Mortgage Pool" section of the prospectus supplement, UBS presented

22  tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain

23  characteristic of the loans (for example, current mortgage loan principal balance) and divided the

24  loans into categories based on that characteristic (for example, loans with current principal

25  balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table

26  then presented various data about the loans in each category. Among these data was the

27  "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage

28  Pool" section for all of the loans in the collateral pool. In each table, the number of categories into

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-21-

1   which the loans were divided ranged from three to 37. Thus, in "The Mortgage Pool" section,

2   UBS made hundreds of statements about the original LTVs of the loans in the collateral pool.

3   CWALT 2006-12CB Pros. Sup. S-23 to S-35.

4       (d)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

5   of the Initial Mortgage Loans was approximately 73.69%." CWALT 2006-12CB Pros. Sup. S-31.

6   *MLMI 2006-F1*

7       The prospectus supplement for the MLMI 2006-F1 Securitization presented the following

8   statements about the LTVs of the mortgage loans in the collateral pool of that securitization.

9       (a)    "The weighted average Original Loan-to-Value Ratio [of the mortgage loans] as of

10  the Cut-off Date was approximately 69.68%." MLMI 2006-F1 Pros. Sup. S-19.

11      (b)    "The weighted average Original Loan-to-Value Ratio at origination of the

12  Mortgage Loans was approximately 69.68%, and no Mortgage Loan had an Original Loan-to-

13  Value Ratio at origination exceeding 90.00%." MLMI 2006-F1 Pros. Sup. S-20.

14      (c)    Annex II of the prospectus supplement ("Mortgage Loan Tables") presented tables

15  of statistics about the mortgage loans in the collateral pool. MLMI 2006-F1 Pros. Sup. II-1 to II-

16  5. Each table focused on a certain characteristic of the loans (for example, cut-off date stated

17  principal balance) and divided the loans into categories based on that characteristic (for example,

18  loans with cut-off date stated principal balances of $0.01 to $100,000, $100,000.01 to $200,000,

19  $200,000.01 to $300,000, etc.). Each table then presented various data about the loans in each

20  category. One of the tables, entitled "Original Loan-to-Value Ratios" divided the mortgage loans

21  in the collateral pool into 10 categories of original LTV (for example, 10.01% to 20%, 20.01% to

22  30%, 30.01% to 40%, etc.). The table made untrue and misleading statements about the number

23  of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

24  principal balance outstanding in each of these categories. MLMI 2006-F1 Pros. Sup. II-2.

25  *CWALT 2006-23CB*

26      The prospectus supplement for the CWALT 2006-23CB Securitization presented the

27  following statements about the LTVs of the mortgage loans in the collateral pool of that

28  securitization.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-22-

(a)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 1 was 71.84%. CWALT 2006-23CB Pros. Sup. S-5.

(b)     As of the cut-off date, the weighted-average original LTV of the mortgage loans in Loan Group 2 was 75.03%. CWALT 2006-23CB Pros. Sup. S-5.

(c)     "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 97.00%." CWALT 2006-23CB Pros. Sup. S-32.

(d)     "The Mortgage Pool" section of the prospectus supplement presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-23CB Pros. Sup. S-30 to S-52. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, 50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the loans in Loan Group 1. In each table, the number of categories into which the loans were divided ranged from three to 65. Thus, "The Mortgage Pool" section presented hundreds of statements about the original LTVs of the loans in Loan Group 1. CWALT 2006-23CB Pros. Sup. S-35 to S-43.

(e)     "As of the cut-off date, the weighted-average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 71.84%." CWALT 2006-23CB Pros. Sup. S-39.

(f)     "The Mortgage Pool" section presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, the prospectus supplement similarly presented hundreds of statements about the original LTVs of the loans in Loan Group 2. CWALT 2006-23CB Pros. Sup. S-44 to S-52.

(g)     "As of the cut-off date, the weighted-average original Loan-to-Value Ratio of the mortgage loans in loan group 2 was approximately 75.03%." CWALT 2006-23CB Pros. Sup. S-48.

*MALT 2006-3*

-23-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST made

2    the following statements about the LTVs of the mortgage loans in the collateral pool of that

3    securitization.

4    (a)    The original LTVs of the mortgage loans in the aggregate ranged from 5.58% to

5    100%, with a weighted average original LTV of 70.92%. MALT 2006-3 Pros. Sup. S-14.

6    (b)    The original LTVs of the mortgage loans in Pool 1 ranged from 24.55% to 100%,

7    with a weighted average original LTV of 72.15%. MALT 2006-3 Pros. Sup. S-14.

8    (c)    The original LTVs of the mortgage loans in Collateral Group 1 ranged from

9    24.55% to 100%, with a weighted average original LTV of 69.83%. MALT 2006-3 Pros. Sup. S-

10   15.

11   (d)    The original LTVs of the mortgage loans in Collateral Group 2 ranged from

12   24.55% to 100%, with a weighted average original LTV of 74.08%. MALT 2006-3 Pros. Sup. S-

13   16.

14   (e)    The original LTVs of the mortgage loans in Collateral Group 3 ranged from 5.58%

15   to 100%, with a weighted average original LTV of 60.45%. MALT 2006-3 Pros. Sup. S-16.

16   (f)    "Approximately 4.88% of the loans by cut-off date pool balance of the loans had

17   loan to value ratios at origination in excess of 80%." MALT 2006-3 Pros. Sup. S-24.

18   (g)    "Approximately 4.88% of the Loans, by Cut-Off Date Pool Balance for all of the

19   Loan Groups, had LTV Ratios at origination of greater than 80% . . . ." MALT 2006-3 Pros. Sup.

20   S-31.

21   (h)    "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans

22   is 5.58% to 100.00%, and approximately 4.88% of the Loans by Cut-off Date Pool Balance of the

23   Loans had Loan-to-Value Ratios at origination in excess of 80%." MALT 2006-3 Pros. Sup. S-

24   81.

25   (i)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical

26   Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

27   collateral pool. MALT 2006-3 Pros. Sup. A-1 to A-27. Each table focused on a certain

28   characteristic of the loans (for example, current principal balance) and divided the loans into

-24-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    categories based on that characteristic (for example, loans with current principal balances of

2    $25,000.01 to $50,000, $50,000.01 to $75,000, $75,000.01 to $100,000, etc.). Each table then

3    presented various data about the loans in each category. One of the tables, entitled "Original LTV

4    Ratios," divided the loans in Collateral Group 1 into 11 categories of original LTV (for example,

5    50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading

6    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

7    the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3

8    Pros. Sup. A-2.

9         (j)    "The weighted average original LTV Ratio of the Collateral Group 1 Loans, by

10   Cut-Off Date Pool Balance of the Collateral Group 1 Loans, was approximately 69.83%." MALT

11   2006-3 Pros. Sup. A-2.

12        (k)    In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

13   another table entitled "Original LTV Ratios." This table divided the mortgage loans in Collateral

14   Group 2 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to

15   60%, etc.). The table made untrue and misleading statements about the number of mortgage

16   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

17   outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-7.

18        (l)    "The weighted average original LTV Ratio of the Collateral Group 2 Loans, by

19   Cut-Off Date Pool Balance of the Collateral Group 2 Loans, was approximately 74.08%." MALT

20   2006-3 Pros. Sup. A-7.

21        (m)    In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

22   another table entitled "Original LTV Ratios." This table divided the mortgage loans in Pool 1 into

23   11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.).

24   The table made untrue and misleading statements about the number of mortgage loans, the

25   aggregate principal balance outstanding, and the percent of aggregate principal balance

26   outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-13.

27        (n)    "The weighted average original LTV Ratio of the Pool 1 Loans, by Cut-Off Date

28   Pool Balance of the Pool 1 Loans, was approximately 72.15%." MALT 2006-3 Pros. Sup. A-13.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-25-

1    (o)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

2    another table entitled "Original LTV Ratios." This table divided the mortgage loans in Collateral

3    Group 3 into eight categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01%

4    to 60%, etc.). The table made untrue and misleading statements about the number of mortgage

5    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

6    outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-18.

7    (p)     "The weighted average original LTV Ratio of the Collateral Group 3 Loans, by

8    Cut-Off Date Pool Balance of the Collateral Group 3 Loans, was approximately 60.45%." MALT

9    2006-3 Pros. Sup. A-18.

10   (q)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

11   another table entitled "Original LTV Ratios." This table divided all of the Loans in the Aggregate

12   into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

13   etc.). The table made untrue and misleading statements about the number of mortgage loans, the

14   aggregate principal balance outstanding, and the percent of aggregate principal balance

15   outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-24.

16   (r)     "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool

17   Balance of the Loans, was approximately 70.92%." MALT 2006-3 Pros. Sup. A-24.

18   *FHAMS 2006-FA4*

19   In the prospectus supplement for the FHAMS 2006-FA4 Securitization, UBS made the

20   following statements about the LTVs of the mortgage loans in the collateral pool of that

21   securitization.

22   (a)     The original LTVs of the mortgage loans in Pool I ranged from 8.67% to 95%,

23   with a weighted average original LTV of 70.69%. FHAMS 2006-FA4 Pros. Sup. S-8.

24   (b)     The original LTVs of the mortgage loans in Pool II ranged from 3.84% to 90%,

25   with a weighted average original LTV of 56.29%. FHAMS 2006-FA4 Pros. Sup. S-8.

26   (c)     "No mortgage loan has a loan-to-value ratio at origination of more than 95%."

27   FHAMS 2006-FA4 Pros. Sup. S-29.

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (d)     In Annexes I, II, and III of the prospectus supplement, UBS presented tables of

2   statistics about the mortgage loans in the collateral pool. FHAMS 2006-FA4 Pros. Sup. I-1 to I-2,

3   II-1 to II-2, and III-1 to III-2. Each table focused on a certain characteristic of the loans (for

4   example, current mortgage loan principal balance) and divided the loans into categories based on

5   that characteristic (for example, loans with current principal balances of less than $250,001,

6   $250,001 to $300,000, $300,001 to $350,000, etc.). Each table then presented various data about

7   the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the

8   Mortgage Loans in Pool I," divided the loans in Pool I into 10 categories of original LTV (for

9   example, 50% or below, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

10  misleading statements about the number of mortgage loans, the aggregate principal balance

11  outstanding, and the percent of aggregate principal balance outstanding in each of these

12  categories. FHAMS 2006-FA4 Pros. Sup. I-1.

13  (e)     "The weighted average original loan-to-value ratio of the mortgage loans in Pool I

14  is expected to be approximately 70.69%." FHAMS 2006-FA4 Pros. Sup. I-1.

15  (f)     In Annex II, UBS presented a table entitled "Original Loan-to-Value Ratios for the

16  Mortgage Loans in Pool II." This table divided the mortgage loans in Pool II into eight categories

17  of original LTV (for example, 50% and below, 50.01% to 55%, 55.01% to 60%, etc.). The table

18  made untrue and misleading statements about the number of mortgage loans, the aggregate

19  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

20  of these categories. FHAMS 2006-FA4 Pros. Sup. II-1.

21  (g)     "The weighted average original loan-to-value ratio of the mortgage loans in Pool II

22  is expected to be approximately 56.29%." FHAMS 2006-FA4 Pros. Sup. II-1.

23  (h)     In Annex III, UBS presented a table entitled "Original Loan-to-Value Ratios for

24  the Mortgage Loans in Aggregate Pool." This table divided all of the mortgage loans in the

25  collateral pool into 10 categories of original LTV (for example, 50% and below, 50.01% to 55%,

26  55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

27  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

28  principal balance outstanding in each of these categories. FHAMS 2006-FA4 Pros. Sup. III-1.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-27-

1    (i)    "The weighted average original loan-to-value ratio of the mortgage loans in Pool I

2 and Pool II is expected to be approximately 69.23%." FHAMS 2006-FA4 Pros. Sup. III-1.

3 *CMALT 2006-A3*

4    In the prospectus supplement for the CMALT 2006-A3 Securitization, UBS made the

5 following statements about the LTVs of the mortgage loans in the collateral pool of that

6 securitization.

7    (a)    1.28% of the mortgage loans in Pool I had an LTV at origination greater than 80%,

8 with a weighted average of 70.43%. CMALT 2006-A3 Pros. Sup. 9.

9    (b)    1.34% of the mortgage loans in Pool II had an LTV at origination greater than

10 80%, with a weighted average of 53.96%. CMALT 2006-A3 Pros. Sup. 9.

11    (c)    1.29% of the combined mortgage loans in the collateral pool, had an LTV at

12 origination greater than 80%, with a weighted average of 69.13%. CMALT 2006-A3 Pros. Sup. 9.

13    (d)    None of the mortgage loans in the combined collateral pool had an LTV at

14 origination greater than 90%. CMALT 2006-A3 Pros. Sup. 9.

15    (e)    In the Appendix to the prospectus supplement ("Detailed description of the

16 mortgage loans"), UBS presented tables of statistics about the mortgage loans in the collateral

17 pool. Each table focused on a certain characteristic of the loans (for example, size of loans) and

18 divided the loans into categories based on that characteristic (for example, loans with principal

19 balances of $149,000 and under, $150,000 to $199,999, $200,000 to $249,999, etc.). Each table

20 then presented various data about the loans in each category. One of the tables, entitled

21 "Distribution by loan-to-value at origination," divided the loans in Pool I, Pool II, and the

22 combined loans in the collateral pool into five categories of LTV (for example, 65% and below,

23 65.001% to 75%, 75.001% to 80%, etc.). The table made untrue and misleading statements about

24 the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

25 aggregate principal balance outstanding in each of these categories. CMALT 2006-A3 Pros. Sup.

26 36.

27    (f)    In the Appendix ("Detailed description of the mortgage loans"), UBS presented

28 another table entitled "Distribution by FICO scores and loan to-value ratios at origination." This

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-28-

1    table divided the mortgage loans in Pool I into six categories of FICO scores (for example, less

2    than 620, 620 to 649, 650 to 699, etc.). The table also divided each FICO score category into six

3    ranges of LTV (for example, 65% and below, 65.001% to 75%, 75.001% to 80%, etc.). For each

4    FICO score category, the table stated the percentage of loans in that category. In addition, this

5    table also stated the percentage of the loans in Pool I that fell into each LTV range. Thus, in the

6    "Distribution by FICO scores and loan to-value ratios at origination" table, UBS made several

7    statements about the LTVs at origination of the loans in Pool I. CMALT 2006-A3 Pros. Sup. 37.

8        (g)    The "Distribution by FICO scores and loan to-value ratios at origination" table

9    presented similar statistics about the mortgage loans in Pool II. Thus, in the "Distribution by

10   FICO scores and loan to-value ratios at origination," UBS similarly made several statements

11   about the LTVs at origination of the loans in Pool II. CMALT 2006-A3 Pros. Sup. 37.

12   *CWALT 2006-29T1*

13       The prospectus supplement for the CWALT 2006-29T1 Securitization presented the

14   following statements about the LTVs of the mortgage loans in the collateral pool of that

15   securitization.

16       (a)    As of the initial cut-off date, the weighted-average original LTV of the mortgage

17   loans in loan group 1 was 73.98%. CWALT 2006-29T1 Pros. Sup. S-6.

18       (b)    As of the initial cut-off date, the weighted-average original LTV of the mortgage

19   loans in loan group 2 was 74.68%. CWALT 2006-29T1 Pros. Sup. S-6.

20       (c)    As of the initial cut-off date, the weighted-average original LTV of the mortgage

21   loans in loan group 3 was 75.1%. CWALT 2006-29T1 Pros. Sup. S-6.

22       (d)    "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at

23   origination or on the closing date of more than 100.00%." CWALT 2006-29T1 Pros. Sup. S-37.

24       (e)    "The Mortgage Pool" section of the prospectus supplement presented tables of

25   statistics about the mortgage loans in the collateral pool. CWALT 2006-29T1 Pros. Sup. S-35 to

26   S-62. Each table focused on a certain characteristic of the loans (for example, current mortgage

27   loan principal balance) and divided the loans into categories based on that characteristic (for

28   example, loans with current principal balances of $400,000.01 to $450,000, $450,000.01 to

-29-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans

2   in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio."

3   There were 12 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each

4   table, the number of categories into which the loans were divided ranged from two to 14. Thus,

5   "The Mortgage Pool" section presented many statements about the original LTVs of the loans in

6   loan group 1. CWALT 2006-29T1 Pros. Sup. S-40 to S-47.

7          (f)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

8   of the Initial Mortgage Loans in loan group 1 was approximately 73.98%." CWALT 2006-29T1

9   Pros. Sup. S-43.

10          (g)     "The Mortgage Pool" section also presented tables of statistics about the mortgage

11   loans in loan group 2. Thus, the prospectus supplement similarly presented many statements

12   about the original LTVs of the loans in loan group 2. CWALT 2006-29T1 Pros. Sup. S-48 to S-

13   55.

14          (h)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

15   of the Initial Mortgage Loans in loan group 2 was approximately 74.68%." CWALT 2006-29T1

16   Pros. Sup. S-51.

17          (i)     "The Mortgage Pool" section also presented similar tables of statistics about the

18   loans in loan group 3. In these tables, the prospectus supplement similarly presented many

19   statements about the original LTVs of the loans in loan group 3. CWALT 2006-29T1 Pros. Sup.

20   S-56 to S-62.

21          (j)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio

22   of the Initial Mortgage Loans in loan group 3 was approximately 75.10%." CWALT 2006-29T1

23   Pros. Sup. S-58.

24   *RAST 2006-A15*

25          In the prospectus supplement for the RAST 2006-A15 Securitization, UBS made the

26   following statements about the LTVs of the mortgage loans in the collateral pool of that

27   securitization.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-30-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    (a)    As of the cut-off date, the mortgage loans in the collateral pool had a weighted-

2    average original LTV of 73%. RAST 2006-A15 Pros. Sup. S-6.

3    (b)    "With respect to approximately 40.26% of the mortgage loans, by cut-off date pool

4    principal balance, at the time of origination of the first lien mortgage loan, the originator of the

5    mortgage loan also originated a second lien mortgage loan that will not be included in the issuing

6    entity and is not reflected in the loan-to-value ratio tables included in this prospectus supplement.

7    The weighted average loan-to-value ratio of such mortgage loans is approximately 76.62% . . . ."

8    RAST 2006-A15 Pros. Sup. S-23.

9    (c)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

10   less." RAST 2006-A15 Pros. Sup. S-29.

11   (d)    In "The Mortgage Pool" section of the prospectus supplement, UBS presented

12   tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain

13   characteristic of the mortgage loans (for example, current principal balance) and divided the loans

14   into categories based on that characteristic (for example, loans with current principal balances of

15   $50,000.01 to $100,000, $400,000.01 to $450,000, $450,000.01 to $500,000, etc.). Each table

16   then presented various data about the mortgage loans in each category. Among these data was the

17   "Weighted Average Loan-to-Value Ratio." There were 15 such tables in "The Mortgage Pool"

18   section for the loans in the collateral pool. In each table, the number of categories into which the

19   loans were divided ranged from one to 42. Thus, in "The Mortgage Pool" section, UBS made

20   hundreds of statements about the LTVs of the loans in the collateral pool. RAST 2006-A15 Pros.

21   Sup. S-31 to S-36.

22   (e)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

23   Mortgage Loans was approximately 73.00%." RAST 2006-A15 Pros. Sup. S-32.

24   *CWALT 2006-40T1*

25   The prospectus supplement for the CWALT 2006-40T1 Securitization presented the

26   following statements about the LTVs of the mortgage loans in the collateral pool of that

27   securitization.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-31-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    (a)  As of the cut-off date, the mortgage loans in loan group 1 had a weighted-average

2 original LTV of 72.15%. CWALT 2006-40T1 Pros. Sup. S-5.

3    (b)  As of the cut-off date, the mortgage loans in loan group 2 had a weighted-average

4 original LTV of 74.07%. CWALT 2006-40T1 Pros. Sup. S-5.

5    (c)  "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or

6 on the closing date of more than 100.00%." CWALT 2006-40T1 Pros. Sup. S-33.

7    (d)  "The Mortgage Pool" section of the prospectus supplement presented tables of

8 statistics about the mortgage loans in the collateral pool. CWALT 2006-40T1 Pros. Sup. S-31 to

9 S-52. Each table focused on a certain characteristic of the loans (for example, current mortgage

10 loan principal balance) and divided the loans into categories based on that characteristic (for

11 example, loans with current principal balances of $400,000.01 to $450,000, $450,000.01 to

12 $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans

13 in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio."

14 There were 13 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each

15 table, the number of categories into which the loans were divided ranged from two to 14. Thus,

16 "The Mortgage Pool" section presented hundreds of statements about the original LTVs of the

17 loans in loan group 1. CWALT 2006-40T1 Pros. Sup. S-36 to S-43.

18    (e)  "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

19 mortgage loans in loan group 1 was approximately 72.15%." CWALT 2006-40T1 Pros. Sup. S-

20 38.

21    (f)  "The Mortgage Pool" section presented similar tables of statistics about the

22 mortgage loans in loan group 2. In these tables, the prospectus supplement similarly presented

23 hundreds of statements about the original LTVs of the loans in loan group 2. CWALT 2006-40T1

24 Pros. Sup. S-44 to S-52.

25    (g)  "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

26 mortgage loans in loan group 2 was approximately 74.07%." CWALT 2006-40T1 Pros. Sup. S-

27 47.

28 *CWALT 2006-43CB*

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-32-

1    In the prospectus supplement for the CWALT 2006-43CB Securitization, UBS made the

2  following statements about the LTVs of the mortgage loans in the collateral pool of that

3  securitization.

4    (a)    As of the cut-off date, the mortgage loans in loan group 1 had a weighted-average

5  original LTV of 67.02%. CWALT 2006-43CB Pros. Sup. S-5.

6    (b)    As of the cut-off date, the mortgage loans in loan group 2 had a weighted-average

7  original LTV of 62.18%. CWALT 2006-43CB Pros. Sup. S-5.

8    (c)    As of the cut-off date, the mortgage loans in loan group 3 had a weighted-average

9  original LTV of 77.58%. CWALT 2006-43CB Pros. Sup. S-6.

10    (d)    "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or

11  on the closing date of more than 100.00%." CWALT 2006-43CB Pros. Sup. S-35.

12    (e)    In "The Mortgage Pool" section of the prospectus supplement, UBS presented

13  tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-43CB Pros. Sup.

14  S-38 to S-69. Each table focused on a certain characteristic of the loans (for example, current

15  mortgage loan principal balance) and divided the loans into categories based on that characteristic

16  (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000,

17  $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each

18  category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There

19  were 13 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table,

20  the number of categories into which the loans were divided ranged from three to 112. Thus, in

21  "The Mortgage Pool" section, UBS made hundreds of statements about the original LTVs of the

22  loans in loan group 1. CWALT 2006-43CB Pros. Sup. S-38 to S-49.

23    (f)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

24  mortgage loans in loan group 1 was approximately 67.02%." CWALT 2006-43CB Pros. Sup. S-

25  44.

26    (g)    In the "The Mortgage Pool" section, UBS presented similar tables of statistics

27  about the mortgage loans in loan group 2. In these tables, UBS similarly made hundreds of

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-33-

1   statements about the original LTVs of the loans in loan group 2. CWALT 2006-43CB Pros. Sup.

2   S-50 to S-59.

3       (h)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

4   mortgage loans in loan group 2 was approximately 62.18%." CWALT 2006-43CB Pros. Sup. S-

5   54.

6       (i)    In "The Mortgage Pool" section, UBS presented similar tables of statistics about

7   the mortgage loans in loan group 3. In these tables, UBS similarly made hundreds of statements

8   about the original LTV of the loans in loan group 3. CWALT 2006-43CB Pros. Sup. S-60 to S-

9   69.

10       (j)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

11   mortgage loans in loan group 3 was approximately 77.58%." CWALT 2006-43CB Pros. Sup. S-

12   64.

13   *MALT 2007-1*

14       In the prospectus supplement for the MALT 2007-1 Securitization, UBS and MAST made

15   the following statements about the LTVs of the mortgage loans in the collateral pool of that

16   securitization.

17       (a)    The original LTV of the all of the mortgage loans in the collateral pool ranged

18   from 16.44% to 95% with a weighted average original LTV of 69.19%. MALT 2007-1 Pros. Sup.

19   S-15.

20       (b)    The original LTV of the mortgage loans in Pool 1 ranged from 16.44% to 95%,

21   with a weighted average original LTV of 70.8%. MALT 2007-1 Pros. Sup. S-16.

22       (c)    The original LTV of the mortgage loans in Collateral Group 1 ranged from

23   16.44% to 95%, with a weighted average original LTV of 69.97%. MALT 2007-1 Pros. Sup. S-

24   16.

25       (d)    The original LTV of the mortgage loans in Collateral Group 2 ranged from

26   16.44% to 95%, with a weighted average original LTV of 71.63%. MALT 2007-1 Pros. Sup. S-

27   17.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-34-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1      (e)      The original LTV of the mortgage loans in Collateral Group 3 ranged from

2  18.21% to 90% with a weighted average original LTV of 64.75%. MALT 2007-1 Pros. Sup. S-17.

3      (f)      "Approximately 4.77% of the loans by cut-off date pool balance of the loans had

4  loan to value ratios at origination in excess of 80%." MALT 2007-1 Pros. Sup. S-28.

5      (g)      "Approximately 4.77% of the Loans, by Cut-Off Date Pool Balance for all of the

6  Loan Groups had LTV Ratios at origination of greater than 80% . . . ." MALT 2007-1 Pros. Sup.

7  S-35.

8      (h)      "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans

9  is 16.44% to 95.00%, and approximately 4.77% of the Loans by Cut-off Date Pool Balance of the

10  Loans had Loan-to-Value Ratios at origination in excess of 80%." MALT 2007-1 Pros. Sup. S-

11  105.

12      (i)      In Annex A of the prospectus supplement ("Mortgage Loan Statistical

13  Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

14  collateral pool. MALT 2007-1 Pros. Sup. A-1 to A-29. Each table focused on a certain

15  characteristic of the loans (for example, current principal balance) and divided the loans into

16  categories based on that characteristic (for example, loans with current principal balances of

17  $50,000.01 to $75,000, $75,000.01 to $100,000, $100,000.01 to $125,000, etc.). Each table then

18  presented various data about the loans in each category. One of the tables, entitled "Original LTV

19  Ratios," divided the loans in Collateral Group 1 into 10 categories of original LTV (for example,

20  50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading

21  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

22  the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1

23  Pros. Sup. A-2.

24      (j)      "The weighted average original LTV Ratio of the Collateral Group 1 Loans, by

25  Cut-Off Date Pool Balance of the Collateral Group 1 Loans, was approximately 69.97%." MALT

26  2007-1 Pros. Sup. A-2.

27      (k)      In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

28  another table entitled "Original LTV Ratios." This table divided the loans in Collateral Group 2

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-35-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

2   etc.). The table made untrue and misleading statements about the number of mortgage loans, the

3   aggregate principal balance outstanding, and the percent of aggregate principal balance

4   outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-9.

5          (l)      "The weighted average original LTV Ratio of the Collateral Group 2 Loans, by

6   Cut-Off Date Pool Balance of the Collateral Group 2 Loans, was approximately 71.63%." MALT

7   2007-1 Pros. Sup. A-9.

8          (m)      In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

9   another table entitled "Original LTV Ratios." This table divided the mortgage loans in Pool 1 into

10  10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.).

11  The table made untrue and misleading statements about the number of mortgage loans, the

12  aggregate principal balance outstanding, and the percent of aggregate principal balance

13  outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-15.

14         (n)      "The weighted average original LTV Ratio of the Pool 1 Loans, by Cut-Off Date

15  Pool Balance of the Pool 1 Loans, was approximately 70.80%." MALT 2007-1 Pros. Sup. A-15.

16         (o)      In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

17  another table entitled "Original LTV Ratios." This table divided the loans in Collateral Group 3

18  into eight categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

19  etc.). The table made untrue and misleading statements about the number of mortgage loans, the

20  aggregate principal balance outstanding, and the percent of aggregate principal balance

21  outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-20.

22         (p)      "The weighted average original LTV Ratio of the Collateral Group 3 Loans, by

23  Cut-Off Date Pool Balance of the Collateral Group 3 Loans, was approximately 64.75%." MALT

24  2007-1 Pros. Sup. A-20.

25         (q)      In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

26  another table entitled "Original LTV Ratios." This table divided all of the mortgage loans in the

27  collateral pool into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%,

28  55.01% to 60%, etc.). The table made untrue and misleading statements about the number of

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-36-

1   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

2   principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-25.

3        (r)    "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool

4   Balance of the Loans, was approximately 69.19%." MALT 2007-1 Pros. Sup. A-25.

5   *CWALT 2007-3T1*

6        In the prospectus supplement for the CWALT 2007-3T1 Securitization, UBS made the

7   following statements about the LTVs of the mortgage loans in the collateral pool of that

8   securitization.

9        (a)    As of the cut-off date, the mortgage loans in loan group 1 had a weighted-average

10   original LTV of 73.41%. CWALT 2007-3T1 Pros. Sup. S-5.

11        (b)    As of the cut-off date, the mortgage loans in loan group 2 had a weighted-average

12   original LTV of 70.91%. CWALT 2007-3T1 Pros. Sup. S-5.

13        (c)    "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination or

14   on the closing date of more than 100.00%." CWALT 2007-3T1 Pros. Sup. S-32.

15        (d)    In Annex A of the prospectus supplement ("The Mortgage Pool"), UBS presented

16   tables of statistics about the mortgage loans in the collateral pool. CWALT 2007-3T1 Pros. Sup.

17   A-1 to A-18. Each table focused on a certain characteristic of the loans (for example, current

18   mortgage loan principal balance) and divided the loans into categories based on that characteristic

19   (for example, loans with current principal balances of $400,000.01 to $450,000, $450,000.01 to

20   $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans

21   in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio."

22   There were 13 such tables in Annex A for the loans in loan group 1. In each table, the number of

23   categories into which the loans were divided ranged from two to 25. Thus, in Annex A, UBS

24   made hundreds of statements about the original LTVs of the loans in loan group 1. CWALT

25   2007-3T1 Pros. Sup. A-1 to A-9.

26        (e)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

27   mortgage loans in loan group 1 was approximately 73.41%." CWALT 2007-3T1 Pros. Sup. A-4.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-37-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (f)    In Annex A ("The Mortgage Pool"), UBS presented similar tables of statistics

2    about the mortgage loans in loan group 2. In these tables, UBS similarly made hundreds of

3    statements about the original LTVs of the loans in loan group 2. CWALT 2007-3T1 Pros. Sup. A-

4    10 to A-18.

5    (g)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the

6    mortgage loans in loan group 2 was approximately 70.91%." CWALT 2007-3T1 Pros. Sup. A-13.

7    *RAST 2007-A5*

8    In the prospectus supplement for the RAST 2007-A5 Securitization, UBS made the

9    following statements about the LTVs of the mortgage loans in the collateral pool of that

10   securitization.

11   (a)    As of the cut-off date, the mortgage loans in loan group 1 had a weighted-average

12   original LTV of 75.66%. RAST 2007-A5 Pros. Sup. S-6.

13   (b)    As of the cut-off date, the mortgage loans in loan group 2 had a weighted-average

14   original LTV of 71.44%. RAST 2007-A5 Pros. Sup. S-6.

15   (c)    As of the cut-off date, all of the mortgage loans in the collateral pool had a

16   weighted-average original LTV of 72.62%. RAST 2007-A5 Pros. Sup. S-6.

17   (d)    "With respect to approximately 49.96% and 33.05% of the group 1 mortgage loans

18   and group 2 mortgage loans, respectively, in each case by aggregate stated principal balance of

19   the mortgage loans in the related loan group as of the cut-off date, at the time of origination of the

20   first lien mortgage loan, the originator of the mortgage loan also originated a second lien

21   mortgage loan that will not be included in the issuing entity and is not reflected in the loan-to-

22   value ratio tables included in this prospectus supplement. The weighted average loan-to-value

23   ratios of such group 1 mortgage loans and group 2 mortgage loans are approximately 77.31% and

24   75.50%, respectively . . . ." RAST 2007-A5 Pros. Sup. S-24 to S-25.

25   (e)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95.00%

26   or less." RAST 2007-A5 Pros. Sup. S-31.

27   (f)    In "The Mortgage Pool" section, UBS presented tables of statistics about the

28   mortgage loans in the collateral pool. RAST 2007-A5 Pros. Sup. S-30 to S-50. Each table focused

-38-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1  on a certain characteristic of the mortgage loans (for example, current principal balance) and

2  divided the loans into categories based on that characteristic (for example, loans with current

3  principal balances of $50,000.01 to $100,000, $100,000.01 to $150,000, $150,000.01 to

4  $200,000, etc.). Each table then presented various data about the mortgage loans in each category.

5  Among these data was the "Weighted Average Loan-to-Value Ratio." There were 15 such tables

6  in "The Mortgage Pool" section for the loans in loan group 1. In each table, the number of

7  categories into which the loans were divided ranged from one to 34. Thus, in "The Mortgage

8  Pool" section, UBS made hundreds of statements about the LTVs of the loans in loan group 1.

9  RAST 2007-A5 Pros. Sup. S-33 to S-37.

10      (g)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

11  group 1 mortgage loans was approximately 75.66%." RAST 2007-A5 Pros. Sup. S-34.

12      (h)    In "The Mortgage Pool" section, UBS presented similar tables of statistics about

13  the mortgage loans in loan group 2. In these tables, UBS similarly made hundreds of statements

14  about the original LTVs of the loans in loan group 2. RAST 2007-A5 Pros. Sup. S-38 to S-43.

15      (i)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

16  group 2 mortgage loans was approximately 71.44%." RAST 2007-A5 Pros. Sup. S-39.

17      (j)    In "The Mortgage Pool" section, UBS presented similar tables of statistics about

18  the all of the mortgage loans in the collateral pool. In these tables, UBS similarly made hundreds

19  of statements about the original LTVs of all of the loans in the collateral pool. RAST 2007-A5

20  Pros. Sup. S-44 to S-50.

21      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

22  Mortgage Loans was approximately 72.62%." RAST 2007-A5 Pros. Sup. S-45.

23  **Item [57].**    **Details of the results of the AVM analysis:**

24  *MALT 2004-9*

| Number of loans | 1,665 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 616 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 308 |

-39-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $15,133,911 |
|---|---|
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 137 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,149,874 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 138 |
| Weighted-average LTV, as stated by Defendants | 82.9% |
| Weighted-average LTV, as determined by the model | 94.6% |

*CWALT 2005-32T1*

| Number of loans | 674 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 388 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 229 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $34,949,000 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 50 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,448,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 66 |
| Weighted-average LTV, as stated by Defendants (Total Pool) | 74.0% |
| Weighted-average LTV, as determined by the model (Total Pool) | 89.0% |

*LMT 2005-1*

| Number of loans | 2,515 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 1,584 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 778 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $95,945,423 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 268 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,780,542 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 81 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 64.7% |
| Weighted-average LTV, as determined by the model | 76.0% |

-40-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*RAST 2005-A15*

| | |
|---|---:|
| Number of loans | 5,981 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,562 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,372 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $100,304,875 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 435 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $35,329,635 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 208 |
| Weighted-average LTV, as stated by Defendants (Pool 2) | 64.7% |
| Weighted-average LTV, as determined by the model | 80.7% |

*WMALT 2006-3*

| | |
|---|---:|
| Number of loans | 1,780 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,025 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 612 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $50,914,755 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 147 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,998,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 113 |
| Weighted-average LTV, as stated by Defendants (Loan Group 4) | 77.2% |
| Weighted-average LTV, as determined by the model | 84.3% |

*CWALT 2006-12CB*

| | |
|---|---:|
| Number of loans | 3,070 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,457 |
| Number of loans on which the stated value was 105% or more of the | 880 |

-41-

| | |
|---|---|
| true market value as reported by the model | |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $46,513,456 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 181 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,580,970 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 126 |
| Weighted-average LTV, as stated by Defendants | 73.7% |
| Weighted-average LTV, as determined by the model | 81.0% |

*MLMI 2006-F1*

| | |
|---|---|
| Number of loans | 455 |
| Number of properties on which there was enough information for the model to determine a true market value | 252 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 140 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $19,703,446 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 32 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,010,800 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 17 |
| Weighted-average LTV, as stated by Defendants | 69.7% |
| Weighted-average LTV, as determined by the model | 79.8% |

*CWALT 2006-23CB*

| | |
|---|---|
| Number of loans | 4,737 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,477 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,420 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $81,350,184 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 337 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $17,549,841 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| Number of loans with LTVs over 100%, as determined by the model | 235 |
| Weighted-average LTV, as stated by Defendants (Loan Group 1) | 71.8% |
| Weighted-average LTV, as determined by the model | 81.2% |

*MALT 2006-3*

| | |
|---|---|
| Number of loans | 882 |
| Number of properties on which there was enough information for the model to determine a true market value | 400 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 237 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $25,072,479 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 53 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,278,400 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 42 |
| Weighted-average LTV, as stated by Defendants | 70.9% |
| Weighted-average LTV, as determined by the model | 85.9% |

*FHAMS 2006-FA4*

| | |
|---|---|
| Number of loans | 1,656 |
| Number of properties on which there was enough information for the model to determine a true market value | 839 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 458 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $30,254,214 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 143 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,425,750 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 64 |
| Weighted-average LTV, as stated by Defendants | 69.2% |
| Weighted-average LTV, as determined by the model | 79.0% |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

*CMALT 2006-A3*

| | |
|---|---|
| Number of loans | 1,186 |
| Number of properties on which there was enough information for the model to determine a true market value | 737 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 428 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $36,394,300 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 96 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,826,767 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 51 |
| Weighted-average LTV, as stated by Defendants | 69.1% |
| Weighted-average LTV, as determined by the model | 79.2% |

*CWALT 2006-29T1*

| | |
|---|---|
| Number of loans | 1,245 |
| Number of properties on which there was enough information for the model to determine a true market value | 722 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 492 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $86,928,667 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 59 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,958,010 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 129 |
| Weighted-average LTV, as stated by Defendants (loan group 2) | 74.7% |
| Weighted-average LTV, as determined by the model | 91.5% |

*RAST 2006-A15*

| | |
|---|---|
| Number of loans | 786 |
| Number of properties on which there was enough information for the model to determine a true market value | 477 |
| Number of loans on which the stated value was 105% or more of the | 346 |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| true market value as reported by the model | |
|---|---|
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $50,173,310 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 45 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,871,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 64 |
| Weighted-average LTV, as stated by Defendants | 73.0% |
| Weighted-average LTV, as determined by the model | 87.2% |

*CWALT 2006-40T1*

| Number of loans | 879 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 535 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 383 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $71,858,073 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 42 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,879,696 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 114 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 74.1% |
| Weighted-average LTV, as determined by the model | 92.2% |

*CWALT 2006-43CB*

| Number of loans | 4,211 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 2,317 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,499 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $96,906,525 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 295 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $17,361,224 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 235 |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

| | |
|---|---|
| Weighted-average LTV, as stated by Defendants (Group 1) | 67.0% |
| Weighted-average LTV, as determined by the model | 77.6% |

*MALT 2007-1*

| | |
|---|---|
| Number of loans | 656 |
| Number of properties on which there was enough information for the model to determine a true market value | 350 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 211 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $32,974,517 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 40 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,340,200 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 41 |
| Weighted-average LTV, as stated by Defendants | 69.2% |
| Weighted-average LTV, as determined by the model | 85.8% |

*CWALT 2007-3T1*

| | |
|---|---|
| Number of loans | 1,164 |
| Number of properties on which there was enough information for the model to determine a true market value | 659 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 500 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $99,439,430 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 54 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,414,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 153 |
| Weighted-average LTV, as stated by Defendants (loan group 1) | 73.4% |
| Weighted-average LTV, as determined by the model | 94.6% |

*RAST 2007-A5*

| | |
|---|---|
| Number of loans | 1,275 |
| Number of properties on which there was enough information for the | 711 |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-46-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

| | |
|---|---:|
| model to determine a true market value | |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 522 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $98,166,589 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 56 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,990,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 137 |
| Weighted-average LTV, as stated by Defendants | 72.6% |
| Weighted-average LTV, as determined by the model | 90.6% |

**Item [60].      Evidence from subsequent sales of refinanced properties:**

*CWALT 2005-32T1*

Of the 674 mortgage loans in the collateral pool, 387 were taken out to refinance, rather than to purchase, properties. For those 387 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 387 properties, 43 were subsequently sold for a total of approximately $30,450,604. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $37,571,000. Thus, those properties were sold for 81.0% of the value ascribed to them, a difference of 19.0%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

*RAST 2005-A15*

Of the 5,981 mortgage loans in the collateral pool, 3,807 were taken out to refinance, rather than to purchase, properties. For those 3,807 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 3,807 properties, 293 were subsequently sold for a total of approximately $89,647,706. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $117,036,006. Thus, those properties were sold for 76.6% of the value ascribed to them, a

-47-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    difference of 23.4%. This difference cannot be accounted for by declines in house prices in the

2    areas in which those properties were located.

3    *WMALT 2006-3*

4        Of the 1,780 mortgage loans in the collateral pool, 1,028 were taken out to refinance,

5    rather than to purchase, properties. For those 1,028 loans, the value (denominator) in the LTV

6    was an appraised value rather than a sale price. Of those 1,028 properties, 142 were subsequently

7    sold for a total of approximately $45,206,841. The total value ascribed to those same properties in

8    the LTV data reported in the prospectus supplements and other documents sent to the Bank was

9    $62,268,500. Thus, those properties were sold for 72.6% of the value ascribed to them, a

10    difference of 27.4%. This difference cannot be accounted for by declines in house prices in the

11    areas in which those properties were located.

12    *CWALT 2006-12CB*

13        Of the 3,070 mortgage loans in the collateral pool, 1,192 were taken out to refinance,

14    rather than to purchase, properties. For those 1,192 loans, the value (denominator) in the LTV

15    was an appraised value rather than a sale price. Of those 1,192 properties, 118 were subsequently

16    sold for a total of approximately $31,284,769. The total value ascribed to those same properties in

17    the LTV data reported in the prospectus supplements and other documents sent to the Bank was

18    $40,762,000. Thus, those properties were sold for 76.7% of the value ascribed to them, a

19    difference of 23.3%. This difference cannot be accounted for by declines in house prices in the

20    areas in which those properties were located.

21    *MLMI 2006-F1*

22        Of the 455 mortgage loans in the collateral pool, 262 were taken out to refinance, rather

23    than to purchase, properties. For those 262 loans, the value (denominator) in the LTV was an

24    appraised value rather than a sale price. Of those 262 properties, 29 were subsequently sold for a

25    total of approximately $16,191,731. The total value ascribed to those same properties in the LTV

26    data reported in the prospectus supplements and other documents sent to the Bank was

27    $20,235,000. Thus, those properties were sold for 80.0% of the value ascribed to them, a

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-48-

1  difference of 20.0%. This difference cannot be accounted for by declines in house prices in the

2  areas in which those properties were located.

3  *CWALT 2006-23CB*

4     Of the 4,737 mortgage loans in the collateral pool, 2,040 were taken out to refinance,

5  rather than to purchase, properties. For those 2,040 loans, the value (denominator) in the LTV

6  was an appraised value rather than a sale price. Of those 2,040 properties, 187 were subsequently

7  sold for a total of approximately $50,075,675. The total value ascribed to those same properties in

8  the LTV data reported in the prospectus supplements and other documents sent to the Bank was

9  $63,085,150. Thus, those properties were sold for 79.4% of the value ascribed to them, a

10  difference of 20.6%. This difference cannot be accounted for by declines in house prices in the

11  areas in which those properties were located.

12  *MALT 2006-3*

13     Of the 882 mortgage loans in the collateral pool, 477 were taken out to refinance, rather

14  than to purchase, properties. For those 477 loans, the value (denominator) in the LTV was an

15  appraised value rather than a sale price. Of those 477 properties, 50 were subsequently sold for a

16  total of approximately $14,707,271. The total value ascribed to those same properties in the LTV

17  data reported in the prospectus supplements and other documents sent to the Bank was

18  $21,966,007. Thus, those properties were sold for 67.0% of the value ascribed to them, a

19  difference of 33.0%. This difference cannot be accounted for by declines in house prices in the

20  areas in which those properties were located.

21  *FHAMS 2006-FA4*

22     Of the 1,656 mortgage loans in the collateral pool, 778 were taken out to refinance, rather

23  than to purchase, properties. For those 778 loans, the value (denominator) in the LTV was an

24  appraised value rather than a sale price. Of those 778 properties, 87 were subsequently sold for a

25  total of approximately $23,431,758. The total value ascribed to those same properties in the LTV

26  data reported in the prospectus supplements and other documents sent to the Bank was

27  $31,052,400. Thus, those properties were sold for 75.5% of the value ascribed to them, a

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  difference of 24.5%. This difference cannot be accounted for by declines in house prices in the

2  areas in which those properties were located.

3  *RAST 2006-A15*

4      Of the 786 mortgage loans in the collateral pool, 478 were taken out to refinance, rather

5  than to purchase, properties. For those 478 loans, the value (denominator) in the LTV was an

6  appraised value rather than a sale price. Of those 478 properties, 70 were subsequently sold for a

7  total of approximately $40,167,981. The total value ascribed to those same properties in the LTV

8  data reported in the prospectus supplements and other documents sent to the Bank was

9  $57,872,000. Thus, those properties were sold for 69.4% of the value ascribed to them, a

10 difference of 30.6%. This difference cannot be accounted for by declines in house prices in the

11 areas in which those properties were located.

12 *CWALT 2006-40T1*

13     Of the 879 mortgage loans in the collateral pool, 512 were taken out to refinance, rather

14 than to purchase, properties. For those 512 loans, the value (denominator) in the LTV was an

15 appraised value rather than a sale price. Of those 512 properties, 58 were subsequently sold for a

16 total of approximately $39,886,950. The total value ascribed to those same properties in the LTV

17 data reported in the prospectus supplements and other documents sent to the Bank was

18 $57,712,500. Thus, those properties were sold for 69.1% of the value ascribed to them, a

19 difference of 30.9%. This difference cannot be accounted for by declines in house prices in the

20 areas in which those properties were located.

21 *CWALT 2006-43CB*

22     Of the 4,211 mortgage loans in the collateral pool, 2,583 were taken out to refinance,

23 rather than to purchase, properties. For those 2,583 loans, the value (denominator) in the LTV

24 was an appraised value rather than a sale price. Of those 2,583 properties, 201 were subsequently

25 sold for a total of approximately $50,527,718. The total value ascribed to those same properties in

26 the LTV data reported in the prospectus supplements and other documents sent to the Bank was

27 $72,802,428. Thus, those properties were sold for 69.4% of the value ascribed to them, a

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    difference of 30.6%. This difference cannot be accounted for by declines in house prices in the

2    areas in which those properties were located.

3    *MALT 2007-1*

4         Of the 656 mortgage loans in the collateral pool, 311 were taken out to refinance, rather

5    than to purchase, properties. For those 311 loans, the value (denominator) in the LTV was an

6    appraised value rather than a sale price. Of those 311 properties, 19 were subsequently sold for a

7    total of approximately $16,682,431. The total value ascribed to those same properties in the LTV

8    data reported in the prospectus supplements and other documents sent to the Bank was

9    $19,133,000. Thus, those properties were sold for 87.2% of the value ascribed to them, a

10   difference of 12.8%. This difference cannot be accounted for by declines in house prices in the

11   areas in which those properties were located.

12   *CWALT 2007-3T1*

13        Of the 1,164 mortgage loans in the collateral pool, 717 were taken out to refinance, rather

14   than to purchase, properties. For those 717 loans, the value (denominator) in the LTV was an

15   appraised value rather than a sale price. Of those 717 properties, 63 were subsequently sold for a

16   total of approximately $39,089,809. The total value ascribed to those same properties in the LTV

17   data reported in the prospectus supplements and other documents sent to the Bank was

18   $59,313,900. Thus, those properties were sold for 65.9% of the value ascribed to them, a

19   difference of 34.1%. This difference cannot be accounted for by declines in house prices in the

20   areas in which those properties were located.

21   *RAST 2007-A5*

22        Of the 1,275 mortgage loans in the collateral pool, 863 were taken out to refinance, rather

23   than to purchase, properties. For those 863 loans, the value (denominator) in the LTV was an

24   appraised value rather than a sale price. Of those 863 properties, 61 were subsequently sold for a

25   total of approximately $35,817,368. The total value ascribed to those same properties in the LTV

26   data reported in the prospectus supplements and other documents sent to the Bank was

27   $58,495,500. Thus, those properties were sold for 61.2% of the value ascribed to them, a

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-51-

1  difference of 38.8%. This difference cannot be accounted for by declines in house prices in the

2  areas in which those properties were located.

3  **Item [67].     Undisclosed additional liens:**

4  *MALT 2004-9*

5      **(a)     Minimum number of properties with additional liens: 56**

6      **(b)     Total reduction in equity from additional liens: $2,781,443**

7      **(c)     Weighted-average reduction in equity from additional liens: 88.0%**

8  *CWALT 2005-32T1*

9      **(a)     Minimum number of properties with additional liens: 79**

10     **(b)     Total reduction in equity from additional liens: $8,835,067**

11     **(c)     Weighted-average reduction in equity from additional liens: 62.0%**

12 *LMT 2005-1*

13     **(a)     Minimum number of properties with additional liens: 243**

14     **(b)     Total reduction in equity from additional liens: $24,681,790**

15     **(c)     Weighted-average reduction in equity from additional liens: 4%**

16 *WMALT 2006-3*

17     **(a)     Minimum number of properties with additional liens: 95**

18     **(b)     Total reduction in equity from additional liens: $9,217,445**

19     **(c)     Weighted-average reduction in equity from additional liens: 5%**

20 *CWALT 2006-12CB*

21     **(d)     Minimum number of properties with additional liens: 151**

22     **(e)     Total reduction in equity from additional liens: $8,284,418**

23     **(f)     Weighted-average reduction in equity from additional liens: 82.2%**

24 *MLMI 2006-F1*

25     **(a)     Minimum number of properties with additional liens: 41**

26     **(b)     Total reduction in equity from additional liens: $5,782,280**

27     **(c)     Weighted-average reduction in equity from additional liens: 62.7%**

28 *CWALT 2006-23CB*

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (a)    Minimum number of properties with additional liens: 233

2    (b)    Total reduction in equity from additional liens: $13,960,974

3    (c)    Weighted-average reduction in equity from additional liens: 78.4%

4  *MALT 2006-3*

5    (a)    Minimum number of properties with additional liens: 57

6    (b)    Total reduction in equity from additional liens: $7,577,632

7    (c)    Weighted-average reduction in equity from additional liens: 9%

8  *FHAMS 2006-FA4*

9    (a)    Minimum number of properties with additional liens: 484

10    (b)    Total reduction in equity from additional liens: $28,528,169

11    (c)    Weighted-average reduction in equity from additional liens: 81.4%

12  *CMALT 2006-A3*

13    (a)    Minimum number of properties with additional liens: 451

14    (b)    Total reduction in equity from additional liens: $33,257,191

15    (c)    Weighted-average reduction in equity from additional liens: 75.7%

16  *CWALT 2006-29T1*

17    (a)    Minimum number of properties with additional liens: 93

18    (b)    Total reduction in equity from additional liens: $12,832,718

19    (c)    Weighted-average reduction in equity from additional liens: 5%

20  *RAST 2006-A15*

21    (a)    Minimum number of properties with additional liens: 47

22    (b)    Total reduction in equity from additional liens: $6,671,829

23    (c)    Weighted-average reduction in equity from additional liens: 59.3%

24  *CWALT 2006-40T1*

25    (a)    Minimum number of properties with additional liens: 97

26    (b)    Total reduction in equity from additional liens: $17,411,266

27    (c)    Weighted-average reduction in equity from additional liens: 69.9%

28  *CWALT 2006-43CB*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-53-

(a)     **Minimum number of properties with additional liens:** 160

(b)     **Total reduction in equity from additional liens:** $11,630,758

(c)     **Weighted-average reduction in equity from additional liens:** 7%

*MALT 2007-1*

(a)     **Minimum number of properties with additional liens:** 70

(b)     **Total reduction in equity from additional liens:** $10,516,898

(c)     **Weighted-average reduction in equity from additional liens:** 79.2%

*CWALT 2007-3T1*

(a)     **Minimum number of properties with additional liens:** 90

(b)     **Total reduction in equity from additional liens:** $16,098,706

(c)     **Weighted-average reduction in equity from additional liens:** 65.5%

*RAST 2007-A5*

(a)     **Minimum number of properties with additional liens:** 74

(b)     **Total reduction in equity from additional liens:** $9,879,714

(c)     **Weighted-average reduction in equity from additional liens:** 60.4%


**Item [80].     Untrue or misleading statements about compliance with USPAP:**

*MALT 2004-9*:

In the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of that securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." MALT 2004-9 Pros. Sup. S-30.

*CWALT 2005-32T1*:

The prospectus supplement for the CWALT 2005-32T1 Securitization included the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-32T1 Pros. Sup. S-24.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *LMT 2005-1*:

2       The prospectus supplement for the LMT 2005-1 Securitization included the following

3  statement about the appraisals of the properties that secured the mortgage loans in the collateral

4  pool of that securitization: ". . . Underwriting Guidelines are applied in accordance with a

5  procedure that generally requires . . . an appraisal of the mortgaged property . . . that conform[s]

6  to Fannie Mae and Freddie Mac standards . . . ." LMT 2005-1 Pros. Sup. S-55 and S-56.

7  *WMALT 2006-3*:

8       The prospectus supplement for the WMALT 2006-3 Securitization presented the

9  following statement about the appraisals of the properties that secured the mortgage loans in the

10 collateral pool of that securitization: "At origination, all appraisals are required to conform to the

11 Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board

12 of the Appraisal Foundation . . . ." WMALT 2006-3 Pros. Sup. S-23.

13 *CWALT 2006-12CB*:

14      The prospectus supplement for the CWALT 2006-12CB Securitization included the

15 following statement about the appraisals of the properties that secured the mortgage loans in the

16 collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

17 Freddie Mac appraisal standards then in effect." CWALT 2006-12CB Pros. Sup. S-40.

18 *CWALT 2006-22R*:

19      The prospectus supplement for the CWALT 2006-22R Securitization included the

20 following statement about the appraisals of the properties that secured the mortgage loans in the

21 collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

22 Freddie Mac appraisal standards then in effect." CWALT 2006-22R Pros. Sup. A-S-61.

23 *CWALT 2006-23CB*:

24      The prospectus supplement for the CWALT 2006-23CB Securitization included the

25 following statement about the appraisals of the properties that secured the mortgage loans in the

26 collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

27 Freddie Mac appraisal standards then in effect." CWALT 2006-23CB Pros. Sup. S-56.

28 *MALT 2006-3*:

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-55-

1    In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST made

2    the following statement about the appraisals of the properties that secured the majority of the

3    mortgage loans in the collateral pool of that securitization: "All appraisals conform to the

4    Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board

5    of the Appraisal Foundation . . . ." MALT 2006-3 Pros. Sup. S-34.

6    In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST also

7    made the following statement about the appraisals of the properties that secured 29.45% of the

8    mortgage loans originated by American Home Mortgage Corp.: "Every American Home Loan is

9    secured by a property that has been appraised by a licensed appraiser in accordance with the

10   Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." MALT

11   2006-3 Pros. Sup. S-36.

12   *FHAMS 2006-FA4*:

13   In the prospectus supplement for the FHAMS 2006-FA4 Securitization, UBS made the

14   following statement about the appraisals of the properties that secured the mortgage loans in the

15   collateral pool of that securitization: "All appraisals are required to conform to the Uniform

16   Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the

17   Appraisal Foundation." FHAMS 2006-FA4 Pros. Sup. S-32.

18   *CWALT 2006-29T1*:

19   The prospectus supplement for the CWALT 2006-29T1 Securitization included the

20   following statement about the appraisals of the properties that secured the mortgage loans in the

21   collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

22   Freddie Mac appraisal standards then in effect." CWALT 2006-29T1 Pros. Sup. S-68.

23   *RAST 2006-R2*:

24   In the prospectus supplement for the RAST 2006-R2 Securitization, Morgan Stanley made

25   the following statement about the appraisals of the properties that secured the mortgage loans in

26   the collateral pool of that securitization: "To determine the adequacy of the property to be used as

27   collateral, an appraisal is generally made of the subject property in accordance with the Uniform

28   Standards of Profession [sic] Appraisal Practice." RAST 2006-R2 Pros. Sup. S-33.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *RAST 2006-A15*:

2      In the prospectus supplement for the RAST 2006-A15 Securitization, Countrywide

3  Securities made the following statement about the appraisals of the properties that secured the

4  mortgage loans in the collateral pool of that securitization: "To determine the adequacy of the

5  property to be used as collateral, an appraisal is generally made of the subject property in

6  accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A15

7  Pros. Sup. S-40.

8  *CWALT 2006-40T1*:

9      The prospectus supplement for the CWALT 2006-40T1 Securitization included the

10  following statement about the appraisals of the properties that secured the mortgage loans in the

11  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

12  Freddie Mac appraisal standards then in effect." CWALT 2006-40T1 Pros. Sup. S-56.

13  *CWALT 2006-43CB*:

14      The prospectus supplement for the CWALT 2006-43CB Securitization included the

15  following statement about the appraisals of the properties that secured the mortgage loans in the

16  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

17  Freddie Mac appraisal standards then in effect." CWALT 2006-43CB Pros. Sup. S-73.

18  *MALT 2007-1*:

19      In the prospectus supplement for the MALT 2007-1 Securitization, UBS and MAST made

20  the following statement about the appraisals of the properties that secured the mortgage loans in

21  the collateral pool of the MALT 2006-3 Securitization: "All appraisals conform to the Uniform

22  Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the

23  Appraisal Foundation. . . ." MALT 2007-1 Pros. Sup. S-42.

24  *CWALT 2007-3T1*:

25      The prospectus supplement for the CWALT 2007-3T1 Securitization included the

26  following statement about the appraisals of the properties that secured the mortgage loans in the

27  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

28  Freddie Mac appraisal standards then in effect." CWALT 2007-3T1 Pros. Sup. S-37.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-57-

*RAST 2007-A5*:

In the prospectus supplement for the RAST 2007-A5 Securitization, UBS made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of that securitization: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2007-A5 Pros. Sup. S-54.

**Item [86].     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

*MALT 2004-9*:

In the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)      In Annex B of the prospectus supplement ("Mortgage Loan Statistical Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2004-9 Pros. Sup. B-3.

(b)     In the "Occupancy Status" table, UBS and MAST stated that 93.11% of the mortgage loans in the collateral group were secured by a "Primary" residence, 2.33% by an "Investor" property, and 4.56% by a "Secondary" property. MALT 2004-9 Pros. Sup. B-3.

*CWALT 2005-32T1*:

The prospectus supplement for the CWALT 2005-32T1 Securitization presented the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     "The Mortgage Pool" section of the prospectus supplement, described in Item *B*, presented a table entitled "Occupancy Types." This table divided the mortgage loans in the

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-58-

collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-32T1 Pros. Sup. S-19.

(b)     The "Occupancy Types" table stated that 87.1% of the mortgage loans in the collateral group were secured by a "Primary Residence," 9.16% by an "Investment Property," and 3.74% by a "Secondary Residence." CWALT 2005-32T1 Pros. Sup. S-19.

*LMT 2005-1:*

The prospectus supplement for the LMT 2005-1 Securitization presented the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage Loans"), described in Item *B*, presented a table entitled "Occupancy Status – Collateral Group P." This table divided the mortgage loans in Collateral Group P into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-4.

(b)     The "Occupancy Status – Collateral Group P" table stated that 91.26% of the mortgage loans in Collateral Group P were secured by a "Primary Home," 5.7% by an "Investment" property, and 3.04% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-4.

(c)     Annex B ("Certain Characteristics of the Mortgage Loans") presented a similar table entitled "Occupancy Status – Collateral Group 1." This table divided the mortgage loans in Collateral Group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-7.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-59-

1   (d) The "Occupancy Status – Collateral Group 1" table stated that 90.5% of the

2 mortgage loans in Collateral Group 1 were secured by a "Primary Home," 7.5% by an

3 "Investment" property, and 2.01% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-7.

4   (e) Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

5 entitled "Occupancy Status – Collateral Group 2." This table divided the mortgage loans in

6 Collateral Group 2 into the categories "Primary Home," "Investment," and "Second Home." The

7 table made untrue and misleading statements about the number of mortgage loans, the aggregate

8 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

9 of these categories. LMT 2005-1 Pros. Sup. S-B-10.

10   (f) The "Occupancy Status – Collateral Group 2" table stated that 91.19% of the

11 mortgage loans in Collateral Group 2 were secured by a "Primary Home," 6.01% by an

12 "Investment" property, and 2.8% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-10.

13   (g) Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

14 entitled "Occupancy Status – Collateral Group 3." This table stated that 100% of the mortgage

15 loans in Collateral Group 3 were secured by a "Primary Home." LMT 2005-1 Pros. Sup. S-B-13.

16   (h) Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

17 entitled "Occupancy Status – Collateral Group 4." This table divided the mortgage loans in

18 Collateral Group 4 into the categories "Primary Home," "Investment," and "Second Home." The

19 table made untrue and misleading statements about the number of mortgage loans, the aggregate

20 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

21 of these categories. LMT 2005-1 Pros. Sup. S-B-16.

22   (i) The "Occupancy Status – Collateral Group 4" table stated that 90.54% of the

23 mortgage loans in Collateral Group 4, were secured by a "Primary Home," 4.82% by an

24 "Investment" property, and 4.64% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-16.

25   (j) Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

26 entitled "Occupancy Status – Collateral Group 6." This table divided the mortgage loans in

27 Collateral Group 6 into the categories "Primary Home," "Investment," and "Second Home." The

28 table made untrue and misleading statements about the number of mortgage loans, the aggregate

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-60-

1   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

2   of these categories. LMT 2005-1 Pros. Sup. S-B-22.

3       (k)    The "Occupancy Status – Collateral Group 6" table stated that 85.38% of the

4   mortgage loans in Collateral Group 6 were secured by a "Primary Home," 8.67% by an

5   "Investment" property, and 5.94% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-22.

6       (l)    Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

7   entitled "Occupancy Status – Collateral Group 7." This table divided the mortgage loans in

8   Collateral Group 7 into the categories "Primary Home," "Investment," and "Second Home." The

9   table made untrue and misleading statements about the number of mortgage loans, the aggregate

10  principal balance outstanding, and the percent of aggregate principal balance outstanding in each

11  of these categories. LMT 2005-1 Pros. Sup. S-B-26.

12      (m)    The "Occupancy Status – Collateral Group 7" table stated that 84.55% of the

13  mortgage loans in Collateral Group 7 were secured by a "Primary Home," 10.65% by an

14  "Investment" property, and 4.8% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-26.

15  *RAST 2005-A15:*

16      The prospectus supplement for the RAST 2005-A15 Securitization presented the

17  following statements about the occupancy status of the properties that secured the mortgage loans

18  in the collateral pool of that securitization.

19      (a)    "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

20  presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided

21  the mortgage loans in loan group 1 into the categories "Primary," "Investment," and "Second

22  Home." The table made untrue and misleading statements about the number of mortgage loans,

23  the aggregate principal balance outstanding, and the percent of aggregate principal balance

24  outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-24.

25      (b)    The "Occupancy Types for the Group 1 Mortgage Loans" table stated that 92.13%

26  of the mortgage loans in loan group 1 were secured by a "Primary" residence, 5.91% by an

27  "Investment" property, and 1.96% by a "Second Home." RAST 2005-A15 Pros. Sup. S-24.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-61-

1    (c)    "The Mortgage Pool" section presented a similar table entitled "Occupancy Types

2  for the Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2 into the

3  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

4  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

5  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

6  A15 Pros. Sup. S-27.

7    (d)    The "Occupancy Types for the Group 2 Mortgage Loans" table stated that 83.7%

8  of the mortgage loans in loan group 2 were secured by a "Primary" residence, 12.45% by an

9  "Investment" property, and 3.85% by a "Second Home." RAST 2005-A15 Pros. Sup. S-27.

10    (e)    "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

11  the Group 3 Mortgage Loans." This table divided the mortgage loans in loan group 3 into the

12  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

13  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

14  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

15  A15 Pros. Sup. S-30.

16    (f)    The "Occupancy Types for the Group 3 Mortgage Loans" table stated that 84.86%

17  of the mortgage loans in loan group 3 were secured by a "Primary" residence, 11.78% by an

18  "Investment" property, and 3.36% by a "Second Home." RAST 2005-A15 Pros. Sup. S-30.

19    (g)    "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

20  the Group 4 Mortgage Loans." This table divided the mortgage loans in loan group 4 into the

21  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

22  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

23  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

24  A15 Pros. Sup. S-33.

25    (h)    The "Occupancy Types for the Group 4 Mortgage Loans" table stated that 71.63%

26  of the mortgage loans in loan group 4 were secured by a "Primary" residence, 23.94% by an

27  "Investment" property, and 4.43% by a "Second Home." RAST 2005-A15 Pros. Sup. S-33.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-62-

1      (i)     "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

2 the Group 5 Mortgage Loans." This table divided the mortgage loans in loan group 5 into the

3 categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

4 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

5 the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

6 A15 Pros. Sup. S-36.

7      (j)     The "Occupancy Types for the Group 5 Mortgage Loans" table stated that 91.28%

8 of the mortgage loans in loan group 5 were secured by a "Primary" residence, 5.91% by an

9 "Investment" property, and 2.81% by a "Second Home." RAST 2005-A15 Pros. Sup. S-36.

10 *WMALT 2006-3*:

11      The prospectus supplement for the WMALT 2006-3 Securitization presented the

12 following statements about the occupancy status of the properties that secured the mortgage loans

13 in the collateral pool of that securitization.

14      (a)     Appendix B of the prospectus supplement, described in Item *B*, presented a

15 table entitled "Occupancy Status of the Group 1 Loans" This table divided the mortgage loans in

16 loan group 1 into the categories "Owner-Occupied," "Non-Owner Occupied," and "Owner

17 Occupied—2nd Home." The table made untrue and misleading statements about the number of

18 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

19 principal balance outstanding in each of these categories. WMALT 2006-3 Pros. Sup. S-92.

20      (b)     The "Occupancy Status of the Group 1 Loans" table stated that 94.83% of the

21 mortgage loans in loan group 1 were secured by an "Owner Occupied" property, 1.79% by a

22 "Non-Owner Occupied" property, and 3.37% by an "Owner Occupied—2nd Home." WMALT

23 2006-3 Pros. Sup. S-92.

24      (c)     Appendix B presented a similar table entitled "Occupancy Status of the Group 2

25 Loans" This table divided the mortgage loans in loan group 2 into the categories "Owner-

26 Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

27 and misleading statements about the number of mortgage loans, the aggregate principal balance

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-63-

1   outstanding, and the percent of aggregate principal balance outstanding in each of these

2   categories. WMALT 2006-3 Pros. Sup. S-94.

3        (d)     The "Occupancy Status of the Group 2 Loans" table stated that 84.46% of the

4   mortgage loans in loan group 2 were secured by an "Owner Occupied" property, 8.98% by a

5   "Non-Owner Occupied" property, and 4.56% by an "Owner Occupied—2nd Home." WMALT

6   2006-3 Pros. Sup. S-94.

7        (e)     Appendix B also presented a table entitled "Occupancy Status of the Group 3

8   Loans" This table divided the mortgage loans in loan group 3 into the categories "Owner-

9   Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

10  and misleading statements about the number of mortgage loans, the aggregate principal balance

11  outstanding, and the percent of aggregate principal balance outstanding in each of these

12  categories. WMALT 2006-3 Pros. Sup. S-97.

13       (f)     The "Occupancy Status of the Group 3 Loans" table stated that 86.44% of the

14  mortgage loans in loan group 3 were secured by an "Owner Occupied" property, 11.69% by a

15  "Non-Owner Occupied" property, and 1.87% by an "Owner Occupied—2nd Home" property.

16  WMALT 2006-3 Pros. Sup. S-97.

17       (g)     Appendix B also presented a table entitled "Occupancy Status of the Group 4

18  Loans" This table divided the mortgage loans in loan group 4 into the categories "Owner-

19  Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

20  and misleading statements about the number of mortgage loans, the aggregate principal balance

21  outstanding, and the percent of aggregate principal balance outstanding in each of these

22  categories. WMALT 2006-3 Pros. Sup. S-100.

23       (h)     The "Occupancy Status of the Group 4 Loans" table stated that 92.47% of the

24  mortgage loans in loan group 4 were secured by an "Owner Occupied" property, 7.11% by an

25  "Non-Owner Occupied" property, and 0.42% by an "Owner Occupied—2nd Home" property.

26  WMALT 2006-3 Pros. Sup. S-100.

27       (i)     Appendix B presented a table entitled "Occupancy Status of the Group 5 Loans"

28  This table divided the mortgage loans in loan group 5 into the categories "Owner-Occupied,"

-64-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue and

2    misleading statements about the number of mortgage loans, the aggregate principal balance

3    outstanding, and the percent of aggregate principal balance outstanding in each of these

4    categories. WMALT 2006-3 Pros. Sup. S-103.

5         (j)    The "Occupancy Status of the Group 5 Loans" table stated that 76.91% of the

6    mortgage loans in loan group 5 were secured by an "Owner Occupied" property, 21.34% by an

7    "Non-Owner Occupied" property, and 1.75% by an "Owner Occupied—2nd Home" property.

8    WMALT 2006-3 Pros. Sup. S-103.

9    *CWALT 2006-12CB*:

10         In the prospectus supplement for the CWALT 2006-12CB Securitization, UBS made the

11   following statements about the occupancy status of the properties that secured the mortgage loans

12   in the collateral pool of that securitization.

13        (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

14   *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage loans in

15   the collateral pool into the categories "Primary Residence," "Investment Property," and

16   "Secondary Residence." The table made untrue and misleading statements about the number of

17   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

18   principal balance outstanding in each of these categories. CWALT 2006-12CB Pros. Sup. S-33.

19        (b)    In the "Occupancy Types" table, UBS stated that 88.39% of the mortgage loans in

20   the collateral group were secured by a "Primary Residence," 7.53% by an "Investment Property,"

21   and 4.08% by a "Secondary Residence." CWALT 2006-12CB Pros. Sup. S-33.

22   *MLMI 2006-F1*:

23         The prospectus supplement for the MLMI 2006-F1 Securitization presented the following

24   statements about the occupancy status of the properties that secured the mortgage loans in the

25   collateral pool of that securitization.

26        (a)    Annex II of the prospectus supplement, described in Item *B*, presented a table

27   entitled "Occupancy Type." This table divided the mortgage loans in the collateral pool into the

28   categories "Primary" and "Secondary Home." The table made untrue and misleading statements

-65-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

2     of aggregate principal balance outstanding in each of these categories. MLMI 2006-F1 Pros. Sup.

3     II-5.

4            (b)     The "Occupancy Type" table stated that 96.75% of the mortgage loans in the

5     collateral group were secured by a "Primary" residence and 3.25% by a "Second Home." MLMI

6     2006-F1 Pros. Sup. II-5.

7     *CWALT 2006-23CB:*

8            The prospectus supplement for the CWALT 2006-23CB Securitization presented the

9     following statements about the occupancy status of the properties that secured the mortgage loans

10    in the collateral pool of that securitization.

11           (a)     "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

12    presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

13    group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

14    Residence." The table made untrue and misleading statements about the number of mortgage

15    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

16    outstanding in each of these categories. CWALT 2006-23CB Pros. Sup. S-41.

17           (b)     The "Occupancy Types" table stated that 90.96% of the mortgage loans in loan

18    group 1 were secured by a "Primary Residence," 5.12% by an "Investment Property," and 3.92%

19    by a "Secondary Residence." CWALT 2006-23CB Pros. Sup. S-41.

20           (c)     "The Mortgage Pool" section presented another table entitled "Occupancy Types."

21    This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

22    "Investment Property," and "Secondary Residence." The table made untrue and misleading

23    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

24    the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

25    23CB Pros. Sup. S-51.

26           (d)     The "Occupancy Types" table stated that 82.59% of the mortgage loans in loan

27    group 2 were secured by a "Primary Residence," 10.96% by an "Investment Property," and

28    6.44% by a "Secondary Residence." CWALT 2006-23CB Pros. Sup. S-51.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-66-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*MALT 2006-3*:

In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-3.

(b)     In the "Occupancy Status" table, UBS and MAST stated that 85.96% of the mortgage loans in Collateral Group 1 were secured by a "Primary" residence, 10.75% by an "Investor" property, and 3.29% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-3.

(c)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-8.

(d)     In the "Occupancy Status" table, UBS and MAST stated that 78.07% of the mortgage loans in Collateral Group 2 were secured by a "Primary" residence, 12.48% by an "Investor" property, and 9.45% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-8.

(e)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Pool 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and

-67-

1   the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3

2   Pros. Sup. A-14.

3          (f)     In the "Occupancy Status" table, UBS and MAST stated that 81.65% of the

4   mortgage loans in Pool 1 were secured by a "Primary" residence, 11.7% by an "Investor"

5   property, and 6.66% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-14.

6          (g)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

7   another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral

8   Group 3 into the categories "Primary," "Investor," and "Secondary." The table made untrue and

9   misleading statements about the number of mortgage loans, the aggregate principal balance

10  outstanding, and the percent of aggregate principal balance outstanding in each of these

11  categories. MALT 2006-3 Pros. Sup. A-19.

12         (h)     In the "Occupancy Status" table, UBS and MAST stated that 67.79% of the

13  mortgage loans in Collateral Group 3 were secured by a "Primary" residence, 28.54% by an

14  "Investor" property, and 3.67% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-19.

15         (i)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

16  another table entitled "Occupancy Status." This table divided all of the mortgage loans in the

17  collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue

18  and misleading statements about the number of mortgage loans, the aggregate principal balance

19  outstanding, and the percent of aggregate principal balance outstanding in each of these

20  categories. MALT 2006-3 Pros. Sup. A-25.

21         (j)     In the "Occupancy Status" table, UBS and MAST stated that 80.19% of all of the

22  mortgage loans in the collateral pool were secured by a "Primary" residence, 13.47% by an

23  "Investor" property, and 6.34% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-25.

24  *FHAMS 2006-FA4*:

25         In the prospectus supplement for the FHAMS 2006-FA4 Securitization, UBS made the

26  following statements about the occupancy status of the properties that secured the mortgage loans

27  in the collateral pool of that securitization.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-68-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   (a)   In Annex I of the prospectus supplement, described in Item *B*, UBS presented a

2   table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided the

3   mortgage loans in Pool I into the categories "Primary Residence," "Investor Property," and

4   "Secondary Residence." The table made untrue and misleading statements about the number of

5   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

6   principal balance outstanding in each of these categories. FHAMS 2006-FA4 Pros. Sup. I-2.

7   (b)   In the "Occupancy Types for the Mortgage Loans in Pool I" table, UBS stated that

8   73.82% of the mortgage loans in Pool I were secured by a "Primary Residence," 20.46% by an

9   "Investor Property," and 5.72% by a "Secondary Residence." FHAMS 2006-FA4 Pros. Sup. I-2.

10   (c)   In Annex II, described in Item *B*, UBS presented a table entitled "Occupancy

11   Types for the Mortgage Loans in Pool II." This table divided the mortgage loans in Pool II into

12   the categories "Primary Residence," "Investor Property," and "Secondary Residence." The table

13   made untrue and misleading statements about the number of mortgage loans, the aggregate

14   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

15   of these categories. FHAMS 2006-FA4 Pros. Sup. II-2.

16   (d)   In the "Occupancy Types for the Mortgage Loans in Pool II" table, UBS stated

17   that 61.9% of the mortgage loans in Pool II were secured by a "Primary Residence," 28.82% by

18   an "Investor Property," and 9.28% by a "Secondary Residence." FHAMS 2006-FA4 Pros. Sup.

19   II-2.

20   (e)   In Annex III, described in Item *B*, UBS presented a table entitled "Occupancy

21   Types for the Mortgage Loans in [Aggregate Pool]." This table divided the mortgage loans in the

22   collateral pool into the categories "Primary Residence," "Investor Property," and "Secondary

23   Residence." The table made untrue and misleading statements about the number of mortgage

24   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

25   outstanding in each of these categories. FHAMS 2006-FA4 Pros. Sup. III-2.

26   (f)   In the "Occupancy Types for the Mortgage Loans in [Aggregate Pool]" table, UBS

27   stated that 72.61% of the mortgage loans in the aggregate pool were secured by a "Primary

28

-69-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    Residence," 21.31% by an "Investor Property," and 6.08% by a "Secondary Residence." FHAMS

2    2006-FA4 Pros. Sup. III-2.

3    *CMALT 2006-A3:*

4        The prospectus supplement for the CMALT 2006-A3 Securitization presented the

5    following statements about the occupancy status of the properties that secured the mortgage loans

6    in the collateral pool of that securitization.

7        (a)     87.71% of the mortgage loans in Pool I were secured by a primary residence and

8    8.3% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

9        (b)     81.99% of the mortgage loans in Pool II were secured by a primary residence and

10    12.56% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

11        (c)     87.26% of the combined mortgage loans in the collateral pool were secured by a

12    primary residence and 8.64% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

13    *CWALT 2006-29T1:*

14        The prospectus supplement for the CWALT 2006-29T1 Securitization presented the

15    following statements about the occupancy status of the properties that secured the mortgage loans

16    in the collateral pool of that securitization.

17        (a)     "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

18    presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

19    group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

20    Residence." The table made untrue and misleading statements about the number of mortgage

21    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

22    outstanding in each of these categories. CWALT 2006-29T1 Pros. Sup. S-45.

23        (b)     The "Occupancy Types" table stated that 92.9% of the mortgage loans in loan

24    group 1 were secured by a "Primary Residence," 1.31% by an "Investment Property," and 5.79%

25    by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-45.

26        (c)     "The Mortgage Pool" section presented another table entitled "Occupancy Types."

27    This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

28    "Investment Property," and "Secondary Residence." The table made untrue and misleading

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-70-

1 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

2 the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

3 29T1 Pros. Sup. S-53.

4      (d)    The "Occupancy Types" table stated that 88.29% of the mortgage loans in loan

5 group 2 were secured by a "Primary Residence," 4.51% by an "Investment Property," and 7.2%

6 by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-53.

7      (e)    "The Mortgage Pool" section presented another table entitled "Occupancy Types."

8 This table divided the mortgage loans in loan group 3 into the categories "Primary Residence,"

9 "Investment Property," and "Secondary Residence." The table made untrue and misleading

10 statements about the number of mortgage loans, the aggregate principal balance outstanding, and

11 the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

12 29T1 Pros. Sup. S-60.

13      (f)    The "Occupancy Types" table stated that 84.32% of the mortgage loans in loan

14 group 3 were secured by a "Primary Residence," 9.35% by an "Investment Property," and 6.33%

15 by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-60.

16 *RAST 2006-A15*:

17      In the prospectus supplement for the RAST 2006-A15 Securitization, UBS made the

18 following statements about the occupancy status of the properties that secured the mortgage loans

19 in the collateral pool of that securitization.

20      (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

21 *B*, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." This table

22 divided the mortgage loans in the collateral pool into the categories "Owner Occupied,"

23 "Investment," and "Second Home." The table made untrue and misleading statements about the

24 number of mortgage loans, the aggregate principal balance outstanding, and the percent of

25 aggregate principal balance outstanding in each of these categories. RAST 2006-A15 Pros. Sup.

26 S-35.

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-71-

1    (b)    In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 89.1% of

2  the mortgage loans in the collateral pool were secured by an "Owner Occupied" property, 7.26%

3  by an "Investment" property, and 3.64% by a "Second Home." RAST 2006-A15 Pros. Sup. S-35.

4  *CWALT 2006-40T1:*

5    The prospectus supplement for the CWALT 2006-40T1 Securitization presented the

6  following statements about the occupancy status of the properties that secured the mortgage loans

7  in the collateral pool of that securitization.

8    (a)    "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

9  presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

10  group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

11  Residence." The table made untrue and misleading statements about the number of mortgage

12  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

13  outstanding in each of these categories. CWALT 2006-40T1 Pros. Sup. S-41.

14    (b)    The "Occupancy Types" table stated that 86.21% of the mortgage loans in loan

15  group 1 were secured by a "Primary Residence," 6.37% by an "Investment Property," and 7.43%

16  by a "Secondary Residence." CWALT 2006-40T1 Pros. Sup. S-41.

17    (c)    "The Mortgage Pool" section presented another table entitled "Occupancy Types."

18  This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

19  "Investment Property," and "Secondary Residence." The table made untrue and misleading

20  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

21  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

22  40T1 Pros. Sup. S-50.

23    (d)    The "Occupancy Types" table stated that 82.73% of the mortgage loans in loan

24  group 2 were secured by a "Primary Residence," 11% by an "Investment Property," and 6.27%

25  by a "Secondary Residence." CWALT 2006-40T1 Pros. Sup. S-50.

26  *CWALT 2006-43CB:*

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    In the prospectus supplement for the CWALT 2006-43CB Securitization, UBS made the

2    following statements about the occupancy status of the properties that secured the mortgage loans

3    in the collateral pool of that securitization.

4        (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

5    *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage loans in

6    loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

7    Residence." The table made untrue and misleading statements about the number of mortgage

8    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

9    outstanding in each of these categories. CWALT 2006-43CB Pros. Sup. S-47.

10       (b)    In the "Occupancy Types" table, UBS stated that 85.43% of the mortgage loans in

11   loan group 1 were secured by a "Primary Residence," 9.72% by an "Investment Property," and

12   4.85% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-47.

13       (c)    In "The Mortgage Pool" section, UBS presented another table entitled "Occupancy

14   Types." This table divided the mortgage loans in loan group 2 into the categories "Primary

15   Residence," "Investment Property," and "Secondary Residence." The table made untrue and

16   misleading statements about the number of mortgage loans, the aggregate principal balance

17   outstanding, and the percent of aggregate principal balance outstanding in each of these

18   categories. CWALT 2006-43CB Pros. Sup. S-57.

19       (d)    In the "Occupancy Types" table, UBS stated that 81.56% of the mortgage loans in

20   loan group 2 were secured by a "Primary Residence," 9.98% by an "Investment Property," and

21   8.46% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-57.

22       (e)    In "The Mortgage Pool" section, UBS presented another table entitled "Occupancy

23   Types." This table divided the mortgage loans in loan group 3 into the categories "Primary

24   Residence," "Investment Property," and "Secondary Residence." The table made untrue and

25   misleading statements about the number of mortgage loans, the aggregate principal balance

26   outstanding, and the percent of aggregate principal balance outstanding in each of these

27   categories. CWALT 2006-43CB Pros. Sup. S-67.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-73-

1    (f)    In the "Occupancy Types" table, UBS stated that 67.97% of the mortgage loans in

2    loan group 3 were secured by a "Primary Residence," 26.86% by an "Investment Property," and

3    5.16% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-67.

4    *MALT 2007-1*:

5    In the prospectus supplement for the MALT 2007-1 Securitization, UBS and MAST made

6    the following statements about the occupancy status of the properties that secured the mortgage

7    loans in the collateral pool of that securitization.

8    (a)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical

9    Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy

10    Status." This table divided the mortgage loans in Collateral Group 1 into the categories

11    "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about

12    the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

13    aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-

14    4.

15    (b)    In the "Occupancy Status" table, UBS and MAST stated that 92.71% of the

16    mortgage loans in Collateral Group 1 were secured by a "Primary" residence, 0.28% by an

17    "Investor" property, and 7.01% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-4.

18    (c)    In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

19    another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral

20    Group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and

21    misleading statements about the number of mortgage loans, the aggregate principal balance

22    outstanding, and the percent of aggregate principal balance outstanding in each of these

23    categories. MALT 2007-1 Pros. Sup. A-10.

24    (d)    In the "Occupancy Status" table, UBS and MAST stated that 79.16% of the

25    mortgage loans in Collateral Group 2 were secured by a "Primary" residence, 10.46% by an

26    "Investor" property, and 10.39% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-10.

27    (e)    In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

28    another table entitled "Occupancy Status." This table divided the mortgage loans in Pool 1 into

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-74-

the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-16.

(f)     In the "Occupancy Status" table, UBS and MAST stated that 85.96% of the mortgage loans in Pool 1 were secured by a "Primary" residence, 5.35% by an "Investor" property, and 8.69% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-16.

(g)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 3 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-21.

(h)     In the "Occupancy Status" table, UBS and MAST stated that 83.49% of the mortgage loans in Collateral Group 3 were secured by a "Primary" residence, 5.41% by an "Investor" property, and 11.1% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-21.

(i)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-27.

(j)     In the "Occupancy Status" table, UBS and MAST stated that 85.3% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 5.36% by an "Investor" property, and 9.34% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-27.

*CWALT 2007-3T1:*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    In the prospectus supplement for the CWALT 2007-3T1 Securitization, UBS made the

2    following statements about the occupancy status of the properties that secured the mortgage loans

3    in the collateral pool of that securitization.

4         (a)    In Annex A of the prospectus supplement ("The Mortgage Pool"), described in

5    Item *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage

6    loans in loan group 1 into the categories "Primary Residence," "Investment Property," and

7    "Secondary Residence." The table made untrue and misleading statements about the number of

8    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

9    principal balance outstanding in each of these categories. CWALT 2007-3T1 Pros. Sup. A-7.

10        (b)    In the "Occupancy Types" table, UBS stated that 85.93% of the mortgage loans in

11   loan group 1 were secured by a "Primary Residence," 8.29% by an "Investment Property," and

12   5.78% by a "Secondary Residence." CWALT 2007-3T1 Pros. Sup. A-7.

13        (c)    In Annex A, UBS presented another table entitled "Occupancy Types." This table

14   divided the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment

15   Property," and "Secondary Residence." The table made untrue and misleading statements about

16   the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

17   aggregate principal balance outstanding in each of these categories. CWALT 2007-3T1 Pros. Sup.

18   A-17.

19        (d)    In the "Occupancy Types" table, UBS stated that 86.36% of the mortgage loans in

20   loan group 2 were secured by a "Primary Residence," 2.66% by an "Investment Property," and

21   10.98% by a "Secondary Residence." CWALT 2007-3T1 Pros. Sup. A-17.

22   *RAST 2007-A5*:

23        In the prospectus supplement for the RAST 2007-A5 Securitization, UBS made the

24   following statements about the occupancy status of the properties that secured the mortgage loans

25   in the collateral pool of that securitization.

26        (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

27   *B*, UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This

28   table divided the mortgage loans in loan group 1 into the categories "Owner Occupied,"

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-76-

"Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2007-A5 Pros. Sup. S-36.

(b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that 88.63% of the mortgage loans in loan group 1 were secured by an "Owner Occupied" property, 8.12% by an "Investment" property, and 3.25% by a "Second Home." RAST 2007-A5 Pros. Sup. S-36.

(c)      In "The Mortgage Pool" section, UBS also presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2007-A5 Pros. Sup. S-42.

(d)      In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that 90.22% of the mortgage loans in loan group 2 were secured by an "Owner Occupied" property, 5.19% by an "Investment" property, and 4.58% by a "Second Home." RAST 2007-A5 Pros. Sup. S-42.

(e)      In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2007-A5 Pros. Sup. S-49.

(f)      In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 89.78% of the mortgage loans in the collateral pool were secured by an "Owner Occupied" property, 6.01% by an "Investment" property, and 4.21% by a "Second Home." RAST 2007-A5 Pros. Sup. S-49.

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**Item [94].**     Details of properties that were stated to be owner-occupied, but were not:

*MALT 2004-9*:

    **(a)**     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 150

    **(b)**     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 168

    **(c)**     Number of loans on which the owner of the property owned three or more properties: 5

    **(d)**     Number of loans that went straight from current to foreclosure or ownership by lender: 1

    **(e)**     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 269

*CWALT 2005-32T1*:

    **(a)**     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 49

    **(b)**     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 91

    **(c)**     Number of loans on which the owner of the property owned three or more properties: 6

    **(d)**     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 125

*LMT 2005-1*:

    **(a)**     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 180

    **(b)**     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 288

    **(c)**     Number of loans on which the owner of the property owned three or more properties: 37

    **(d)**     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 444

*RAST 2005-A15*:

-78-

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 327

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 502

(c)     Number of loans on which the owner of the property owned three or more properties: 40

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 743

*WMALT 2006-3:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 151

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 205

(c)     Number of loans on which the owner of the property owned three or more properties: 17

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 325

*CWALT 2006-12CB:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 214

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 290

(c)     Number of loans on which the owner of the property owned three or more properties: 32

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 463

*MLMI 2006-F1:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 39

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 78

(c)   Number of loans on which the owner of the property owned three or more properties: 14

(d)   Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 116

*CWALT 2006-23CB:*

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 361

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 503

(c)   Number of loans on which the owner of the property owned three or more properties: 25

(d)   Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)   Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 774

*MALT 2006-3:*

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 41

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 72

(c)   Number of loans on which the owner of the property owned three or more properties: 7

(d)   Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 109

*FHAMS 2006-FA4:*

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 112

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 144

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c)   Number of loans on which the owner of the property owned three or more properties: 6

(d)   Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)   Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 230

CMALT 2006-A3:

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 85

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 135

(c)   Number of loans on which the owner of the property owned three or more properties: 20

(d)   Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 218

CWALT 2006-29T1:

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 96

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 166

(c)   Number of loans on which the owner of the property owned three or more properties: 32

(d)   Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)   Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 259

RAST 2006-A15:

(a)   Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 51

(b)   Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 116

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c) Number of loans on which the owner of the property owned three or more properties: 18

(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 167

*CWALT 2006-40T1:*

(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 64

(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 134

(c) Number of loans on which the owner of the property owned three or more properties: 27

(d) Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e) Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 195

*CWALT 2006-43CB:*

(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 340

(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 462

(c) Number of loans on which the owner of the property owned three or more properties: 40

(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 733

*MALT 2007-1:*

(a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 46

(b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 82

(c) Number of loans on which the owner of the property owned three or more properties: 8

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 119**

*CWALT 2007-3T1*:

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 101**

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 176**

(c) **Number of loans on which the owner of the property owned three or more properties: 31**

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 274**

*RAST 2007-A5*:

(a) **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 71**

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 148**

(c) **Number of loans on which the owner of the property owned three or more properties: 26**

(d) **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

(e) **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 223**

**Item [97].** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

*MALT 2004-9*:

On pages S-29 through S-31 of the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made statements about the underwriting guidelines applied in the origination or acquisition of the mortgage loans in the collateral pool of that securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-83-

1   (a) "[E]xceptions to the underwriting standards described in this prospectus

2 supplement are made in the event that compensating factors are demonstrated by a prospective

3 borrower." MALT 2004-9 Pros. Sup. S-29.

4   (b) "The adequacy of the mortgaged property as security for repayment of the related

5 Loan will generally have been determined by an appraisal in accordance with pre-established

6 appraisal procedure guidelines for appraisals established by or acceptable to the originator."

7 MALT 2004-9 Pros. Sup. S-30.

8   On pages S-31 through S-35 of the prospectus supplement, UBS and MAST made

9 statements about the underwriting guidelines of Wells Fargo Bank, N.A. All of those statements

10 are incorporated herein by reference. In particular, UBS and MAST stated that:

11   (a) "The WFB Underwriting Guidelines evaluate the applicant's credit standing and

12 ability to repay the loan, as well as the value and adequacy of the mortgaged property as

13 collateral." MALT 2004-9 Pros. Sup. S-32.

14 *CWALT 2005-32T1:*

15   Pages S-22 through S-27 of the prospectus supplement for the CWALT 2005-32T1

16 Securitization presented statements about the underwriting guidelines of Countrywide Home

17 Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

18 prospectus supplement stated that:

19   (a) "Countrywide Home Loans may waive some documentation requirements for

20 mortgage loans originated under the Preferred Processing Program." CWALT 2005-32T1 Pros.

21 Sup. S-23.

22   (b) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

23 if compensating factors are demonstrated by a prospective borrower." CWALT 2005-32T1 Pros.

24 Sup. S-23.

25   *(c)* "Countrywide Home Loans' underwriting standards are applied by or on behalf of

26 Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

27 ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-32T1

28 Pros. Sup. S-23.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*LMT 2005-1:*

Pages S-56 through S-57 of the prospectus supplement for the LMT 2005-1 Securitization presented statements about the underwriting guidelines of the originators of the loans other than Lehman Brothers Bank, FSB. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

(a)     "On a case[-]by-case basis, the Originators may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception." LMT 2005-1 Pros. Sup. S-56.

(b)     "The General Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the borrower's credit standing and repayment ability." LMT 2005-1 Pros. Sup. S-56.

Pages S-55 through S-56 of the prospectus supplement for the LMT 2005-1 Securitization presented statements about the underwriting guidelines of Lehman Brothers Bank, FSB. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

(a)     "On a case-by-case basis, Lehman Bank or Aurora, as applicable, may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception." LMT 2005-1 Pros. Sup. S-55.

(b)     "Lehman Bank's Underwriting Guidelines are intended to evaluate the value and adequacy of the mortgaged property as collateral and to consider the borrower's credit standing and repayment ability." LMT 2005-1 Pros. Sup. S-55.

*RAST 2005-A15:*

Pages S-38 through S-39 of the prospectus supplement for the RAST 2005-A15 Securitization presented statements about the underwriting guidelines of IndyMac Bank, FSB. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

-85-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1     (a)    "Exceptions to these underwriting standards are permitted where compensating

2    factors are present . . . ." RAST 2005-A15 Pros. Sup. S-38.

3     (b)    "IndyMac Bank's underwriting standards for conventionally underwritten

4    mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

5    mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

6    the value of the related mortgaged property." RAST 2005-A15 Pros. Sup. S-38.

7    *WMALT 2006-3:*

8    Pages S-22 through S-25 of the prospectus supplement for the WMALT 2006-3

9    Securitization presented statements about the underwriting guidelines applied in the origination of

10    all of the mortgage loans in the collateral pool of that securitization. All of those statements are

11    incorporated herein by reference. In particular, the prospectus supplement stated that:

12     (a)    "Exceptions to the underwriting standards . . . may be made on a case-by-case

13    basis if compensating factors are present." WMALT 2006-3 Pros. Sup. S-24.

14     (b)    "The sponsor's underwriting standards and Washington Mutual Bank's

15    underwriting guidelines generally are intended to evaluate the prospective borrower's credit

16    standing and repayment ability and the value and adequacy of the mortgaged property as

17    collateral." WMALT 2006-3 Pros. Sup. S-22.

18     (c)    "Under all documentation programs other than the no ratio programs and the no

19    documentation programs, in evaluating a prospective borrower's ability to repay a mortgage loan,

20    the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes

21    and other monthly housing expenses to the borrower's gross income (referred to as the "housing-

22    to-income ratio" or "front end ratio") and the ratio of the borrower's total monthly debt (including

23    non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio"

24    or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors,

25    such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of

26    other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors

27    are present." WMALT 2006-3 Pros. Sup. S-23.

28    *CWALT 2006-12CB:*

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-86-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1      On pages S-39 through S-44 of the prospectus supplement for the CWALT 2006-12CB

2  Securitization UBS made statements about the underwriting guidelines of Countrywide Home

3  Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

4  prospectus supplement stated that:

5      (a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

6  if compensating factors are demonstrated by a prospective borrower." CWALT 2006-12CB Pros.

7  Sup. S-40.

8      (b)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of

9  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

10  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-12CB

11  Pros. Sup. S-39.

12  *MLMI 2006-F1*:

13      Pages S-22 through S-23 of the prospectus supplement for the MLMI 2006-F1

14  Securitization presented statements about the underwriting guidelines of National City Mortgage

15  Co. All of those statements are incorporated herein by reference. In particular, the prospectus

16  supplement stated that:

17      (a)   "Exceptions to the underwriting standards are permitted where compensating

18  factors are present." MLMI 2006-F1 Pros. Sup. S-22.

19      (b)   "The originator's underwriting standards are applied to evaluate the prospective

20  borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

21  property as collateral." MLMI 2006-F1 Pros. Sup. S-22.

22  *CWALT 2006-22R*:

23      On page A-25 of the prospectus supplement for the CWALT 2006-22R Securitization,

24  UBS and MALT made statements about the underwriting guidelines applied in the origination of

25  the mortgage loans in the collateral pool of that securitization. All of those statements are

26  incorporated herein by reference. In particular, the prospectus supplement stated that:

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the

2    borrower's credit standing and repayment ability, and the value and adequacy of the Property as

3    collateral." CWALT 2006-22R Pros. Sup. A-25.

4    Pages A-S-59 through A-S-65 of the prospectus supplement for the CWALT 2006-22R

5    Securitization presented statements about the underwriting guidelines of Countrywide Home

6    Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

7    prospectus supplement stated that:

8    (a)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

9    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

10    ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-22R

11    Pros. Sup. A-S-60.

12    *CWALT 2006-23CB*:

13    Pages S-54 through S-60 of the prospectus supplement for the CWALT 2006-23CB

14    Securitization presented statements about the underwriting guidelines of Countrywide Home

15    Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

16    prospectus supplement stated that:

17    (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

18    if compensating factors are demonstrated by a prospective borrower." CWALT 2006-23CB Pros.

19    Sup. S-55.

20    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

21    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

22    ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-23CB

23    Pros. Sup. S-55.

24    *MALT 2006-3*:

25    On pages S-33 through S-35 of the prospectus supplement for the MALT 2006-3

26    Securitization, UBS and MALT made statements about the underwriting guidelines applied in the

27    origination of the mortgage loans in the collateral pool of that securitization. All of those

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-88-

1   statements are incorporated herein by reference. In particular, the prospectus supplement stated

2   that:

3       (a)     "[E]xceptions to the underwriting standards . . . are made in the event that

4   compensating factors are demonstrated by a prospective borrower." MALT 2006-3 Pros. Sup. S-

5   33.

6       (b)     "The adequacy of the mortgaged property as security for repayment of the related

7   Loan will generally have been determined by an appraisal in accordance with pre-established

8   appraisal procedure guidelines for appraisals established by or acceptable to the originator."

9   MALT 2006-3 Pros. Sup. S-34.

10      On pages S-35 through S-37 of the prospectus supplement for the MALT 2006-3

11  Securitization, UBS and MALT made statements about the underwriting guidelines of American

12  Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular,

13  the prospectus supplement stated that:

14      (a)     "Exceptions to the underwriting standards may be permitted where compensating

15  factors are present." MALT 2006-3 Pros. Sup. S-35.

16      (b)     "[E]xceptions to American Home's underwriting guidelines are allowed if

17  sufficient compensating factors exist to offset any additional risk due to the exception." MALT

18  2006-3 Pros. Sup. S-37.

19      (c)     "When evaluating the ratio of all monthly debt payments to the borrower's

20  monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

21  frequency of credit usage and its impact on the borrower's ability to repay the loan." MALT

22  2006-3 Pros. Sup. S-36.

23  *FHAMS 2006-FA4:*

24      On page 13 of the prospectus, and pages S-30 through S-33 of the prospectus supplement

25  for the FHAMS 2006-FA4 Securitization, UBS made statements about the underwriting

26  guidelines of First Horizon Home Loan Corporation,. All of those statements are incorporated

27  herein by reference. In particular, the prospectus supplement stated that:

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-89-

(a)      "On a case by case basis, the related seller may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under its applicable underwriting risk category guidelines warrants an underwriting exception." FHAMS 2006-FA4 Pros. 13.

(b)      "Exceptions to the First Horizon Underwriting Guidelines are permitted where compensating factors are present." FHAMS 2006-FA4 Pros. Sup. S-30.

(c)      "First Horizon's Underwriting standards are intended to evaluate the prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed property as collateral." FHAMS 2006-FA4 Pros. Sup. S-35.

*CMALT 2006-A3:*

On pages 85 through 89 of the prospectus for the CMALT 2006-A3 Securitization, UBS made statements about the underwriting guidelines of CitiMortgage, Inc. and its affiliates. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

(a)      "The credit scoring system assesses a prospective borrower's ability and willingness to repay a mortgage loan based upon predetermined mortgage loan characteristics and credit risk factors." CMALT 2006-A3 Pros. Sup. 86.

(b)      "CitiMortgage will fully or partly credit score or re-underwrite the third-party loans to determine whether the original underwriting process adequately assessed the borrower's ability to repay and the adequacy of the property as collateral, based on Citi-Mortgage's underwriting standards." CMALT 2006-A3 Pros. Sup. 89.

UBS also stated in the prospectus supplement of the CMALT 2006-A3 securitization that, of the originators of the 25.7% of the mortgage loans in the collateral pool not originated by CitiMortgage, Inc. and its affiliates, "These organizations originated the mortgage loans under guidelines that are substantially in accordance with CitiMortgage's guidelines for its own originators." CMALT 2006-A3 Pros. Sup. 29 to 30.

*CWALT 2006-29T1:*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-90-