1    Pages S-66 through S-72 of the prospectus supplement for the CWALT 2006-29T1

2    Securitization presented statements about the underwriting guidelines of Countrywide Home

3    Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

4    prospectus supplement stated that:

5         (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

6    if compensating factors are demonstrated by a prospective borrower." CWALT 2006-29T1 Pros.

7    Sup. S-68.

8         (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

9    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

10   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-29T1

11   Pros. Sup. S-67.

12   *RAST 2006-R2*:

13        On pages S-35 through S-36 of the prospectus supplement for the RAST 2006-R2

14   Securitization, UBS and MALT made statements about the underwriting guidelines applied in the

15   origination of the mortgage loans in the collateral pool of that securitization. All of those

16   statements are incorporated herein by reference. In particular, the prospectus supplement stated

17   that:

18        (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the

19   borrower's credit standing and repayment ability, and the value and adequacy of the Property as

20   collateral." the RAST 2006-R2 Pros. Sup. 35.

21   *RAST 2006-A15*:

22        On pages S-38 through S-41 of the prospectus supplement for the RAST 2006-A15

23   Securitization, UBS made statements about the underwriting guidelines of IndyMac Bank, FSB.

24   All of those statements are incorporated herein by reference. In particular, the prospectus

25   supplement stated that:

26        (a)    "Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac

27   Bank according to IndyMac Bank's underwriting guidelines . . . or pursuant to an exception to

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-91-

1   those guidelines based on IndyMac Bank's procedures for approving such exceptions." RAST

2   2006-A15 Pros. Sup. S-38.

3         (b)    "Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-

4   underwritten and approved under an exception to those underwriting guidelines." RAST 2006-

5   A15 Pros. Sup. S-40.

6         (c)    "Exceptions to underwriting standards are permitted in situations in which

7   compensating factors exist." RAST 2006-A15 Pros. Sup. S-41.

8         (d)    "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

9   loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

10   the adequacy of the mortgaged property as collateral." RAST 2006-A15 Pros. Sup. S-39.

11   *CWALT 2006-40T1*:

12         Pages S-54 through S-60 of the prospectus supplement for the CWALT 2006-40T1

13   Securitization presented statements about the underwriting guidelines of Countrywide Home

14   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

15   prospectus supplement stated that:

16         (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

17   if compensating factors are demonstrated by a prospective borrower." CWALT 2006-40T1 Pros.

18   Sup. S-56.

19         (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

20   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

21   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-40T1

22   Pros. Sup. S-55.

23   *CWALT 2006-43CB*:

24         On pages S-71 through S-77 of the prospectus supplement for the CWALT 2006-43CB

25   Securitization, UBS made statements about the underwriting guidelines of Countrywide Home

26   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

27   prospectus supplement stated that:

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-92-

1   (a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2   if compensating factors are demonstrated by a prospective borrower." CWALT 2006-43CB Pros.

3   Sup. S-73.

4   (b)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of

5   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

6   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-43CB

7   Pros. Sup. S-72.

8   *MALT 2007-1*:

9   On pages S-41 through S-42 of the prospectus supplement for the MALT 2007-1

10  Securitization, UBS and MALT made statements about the underwriting guidelines applied in the

11  origination of the mortgage loans in the collateral pool of that securitization. All of those

12  statements are incorporated herein by reference. In particular, the prospectus supplement stated

13  that:

14  (a)   "[E]xceptions to the underwriting standards described in this prospectus

15  supplement. are made in the event that compensating factors are demonstrated by a prospective

16  borrower." MALT 2007-1 Pros. Sup. S-41.

17  (b)   "The adequacy of the mortgaged property as security for repayment of the related

18  Loan will generally have been determined by an appraisal in accordance with pre-established

19  appraisal procedure guidelines for appraisals established by or acceptable to the originator."

20  MALT 2007-1 Pros. Sup. S-42.

21  On pages S-43 through S-47 of the prospectus supplement for the MALT 2007-1

22  Securitization, UBS and MALT made statements about the underwriting guidelines of

23  Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In

24  particular, the prospectus supplement stated that:

25  (a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

26  if compensating factors are demonstrated by a prospective borrower." MALT 2007-1 Pros. Sup.

27  S-44.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-93-

1    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of
2    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment
3    ability and the value and adequacy of the mortgaged property as collateral." MALT 2007-1 Pros.
4    Sup. S-38 and S-43.

5    On pages S-48 through S-52 of the prospectus supplement for the MALT 2007-1
6    Securitization, UBS and MALT made statements about the underwriting guidelines of Wells
7    Fargo Bank, N.A. All of those statements are incorporated herein by reference. In particular, the
8    prospectus supplement stated that:

9    (c)    "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells
10   Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the
11   value and adequacy of the mortgaged property as collateral." MALT 2007-1 Pros. Sup. S-48
12   through S-49.

13   On pages S-52 through S-54 of the prospectus supplement for the MALT 2007-1
14   Securitization, UBS and MALT made statements about the underwriting guidelines of Wachovia
15   Mortgage Company. All of those statements are incorporated herein by reference. In particular,
16   the prospectus supplement stated that:

17   (a)    "Exception loans which are originated outside of stated guidelines are available to
18   customers with demonstrated Wachovia relationships and/or strong compensating factors."
19   MALT 2007-1 Pros. Sup. S-53.

20   (b)    "The borrower's capacity to repay, creditworthiness, source of funds for down
21   payment and the adequacy of the collateral securing the mortgage are evaluated per guidelines
22   stated within the Wachovia Mortgage Corporation online Products and Underwriting Manual."
23   MALT 2007-1 Pros. Sup. S-53.

24   *CWALT 2007-3T1*:

25   On pages S-36 through S-42 of the prospectus supplement for the CWALT 2007-3T1
26   Securitization, UBS made statements about the underwriting guidelines of Countrywide Home
27   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the
28   prospectus supplement stated that:

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    (a)   "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2  if compensating factors are demonstrated by a prospective borrower." CWALT 2007-3T1 Pros.

3  Sup. S-37.

4    (b)   "Countrywide Home Loans' underwriting standards are applied by or on behalf of

5  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

6  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-3T1

7  Pros. Sup. S-37.

8  *RAST 2007-A5*:

9    On pages S-52 through S-55 of the prospectus supplement for the RAST 2007-A5

10  Securitization, UBS made statements about the underwriting guidelines of IndyMac Bank, FSB.

11  All of those statements are incorporated herein by reference. In particular, the prospectus

12  supplement stated that:

13    (a)   "Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac

14  Bank according to IndyMac Bank's underwriting guidelines . . . regardless of whether such

15  mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to

16  those guidelines based on IndyMac Bank's procedures for approving such exceptions." RAST

17  2007-A5 Pros. Sup. S-52 to S-53.

18    (b)   "Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-

19  underwritten and approved under an exception to those underwriting guidelines." RAST 2007-A5

20  Pros. Sup. S-54.

21    (c)   "Exceptions to underwriting standards are permitted in situations in which

22  compensating factors exist." RAST 2007-A5 Pros. Sup. S-55.

23    (d)   "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

24  loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

25  the adequacy of the mortgaged property as collateral." RAST 2007-A5 Pros. Sup. S-53.

26  **Item [104].**   **Early payment defaults:**

27  *MALT 2004-9*:

28

-95-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a) **Number of the mortgage loans that suffered EPDs:** 21

(b) **Percent of the mortgage loans that suffered EPDs:** 1.3%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.14%

*CWALT 2005-32T1*:

(a) **Number of the mortgage loans that suffered EPDs:** 3

(b) **Percent of the mortgage loans that suffered EPDs:** 0.4%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

*RAST 2005-A15*:

(a) **Number of the mortgage loans that suffered EPDs:** 29

(b) **Percent of the mortgage loans that suffered EPDs:** 0.5%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

*WMALT 2006-3*:

(a) **Number of the mortgage loans that suffered EPDs:** 15

(b) **Percent of the mortgage loans that suffered EPDs:** 0.8%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*CWALT 2006-12CB*:

(a) **Number of the mortgage loans that suffered EPDs:** 12

(b) **Percent of the mortgage loans that suffered EPDs:** 0.4%

(c) **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*MLMI 2006-F1*:

(a)    **Number of the mortgage loans that suffered EPDs:** 2

(b)    **Percent of the mortgage loans that suffered EPDs:** 0.4%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*MALT 2006-3:*

(a)    **Number of the mortgage loans that suffered EPDs:** 8

(b)    **Percent of the mortgage loans that suffered EPDs:** 0.9%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*CMALT 2006-A3:*

(a)    **Number of the mortgage loans that suffered EPDs:** 8

(b)    **Percent of the mortgage loans that suffered EPDs:** 0.3%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*CWALT 2006-29T1:*

(a)    **Number of the mortgage loans that suffered EPDs:** 19

(b)    **Percent of the mortgage loans that suffered EPDs:** 1.5%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*RAST 2006-A15:*

(a)    **Number of the mortgage loans that suffered EPDs:** 19

(b)    **Percent of the mortgage loans that suffered EPDs:** 2.4%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

*CWALT 2006-40T1:*

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(a)   Number of the mortgage loans that suffered EPDs: 11

(b)   Percent of the mortgage loans that suffered EPDs: 1.3%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2006-43CB*:

(a)   Number of the mortgage loans that suffered EPDs: 38

(b)   Percent of the mortgage loans that suffered EPDs: 0.9%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2007-3T1*:

(a)   Number of the mortgage loans that suffered EPDs: 19

(b)   Percent of the mortgage loans that suffered EPDs: 1.6%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%

*RAST 2007-A5*:

(a)   Number of the mortgage loans that suffered EPDs: 14

(b)   Percent of the mortgage loans that suffered EPDs: 1.1%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%

Item [105].   90+ days delinquencies:

*MALT 2004-9*:

(a)   Number of the mortgage loans that suffered 90+ days delinquencies: 219

(b)   Percent of the mortgage loans that suffered 90+ days delinquencies: 13.2%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 7.2%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   *CWALT 2005-32T1:*

2       (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 150

3       (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 22.3%

4       (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
5           made at the same time as the loans in the collateral pool that suffered 90+
        days delinquencies:** 16.5%

6   *RAST 2005-A15:*
7

8       (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,329

9       (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 22.2%

10      (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
11          made at the same time as the loans in the collateral pool that suffered 90+
        days delinquencies:** 16.5%

12  *CWALT 2006-29T1:*

13      (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 439

14      (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 35.3%

15      (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
16          made at the same time as the loans in the collateral pool that suffered 90+
        days delinquencies:** 32.7%

17

18  *RAST 2006-A15:*

19      (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 286

20      (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 36.4%

21      (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
22          made at the same time as the loans in the collateral pool that suffered 90+
        days delinquencies:** 32.7%

23  *CWALT 2006-40T1:*

24      (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 340

25      (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 38.7%

26      (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans
27          made at the same time as the loans in the collateral pool that suffered 90+
        days delinquencies:** 32.7%

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

*CWALT 2007-3T1*:

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 427

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 36.7%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

*RAST 2007-A5*:

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 425

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 33.3%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

**Item [106].**    **30+ days delinquencies in this securitization:**

*CWALT 2005-32T1*:

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 158

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 23.4%

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

*LMT 2005-1*:

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 364

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 14.5%

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

*RAST 2005-A15*:

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 1,303

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 21.8%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*WMALT 2006-3:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 499

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 28.0%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2006-12CB:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 770

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 25.1%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2006-23CB:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,172

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 24.7%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*MALT 2006-3:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 205

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 23.2%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

*FHAMS 2006-FA4:*

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 281**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 17.0%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

*CWALT 2006-29T1:*

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 438**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 35.2%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

*RAST 2006-A15:*

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 259**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 33.0%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

*CWALT 2006-40T1:*

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 363**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 41.3%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

*CWALT 2006-43CB:*

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,101**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 26.1%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*MALT 2007-1:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 102

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.5%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2007-3T1:*

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 430

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 36.9%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*RAST 2007-A5*:

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 416

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 32.6%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item [110].    Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages iii, iv, 4, and 53 of the private placement memorandum, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

UBS and MAST also stated: "It is a condition to the issuance of the [Bank's certificate that it] be rated at least "Aaa" by Moody's ..." MARS 2007-1 Priv. Place. Mem. iv, 4 and 53.

**Item [120].** **Summary of loans about which the Defendants made untrue or misleading statements:**

*MALT 2004-9:*

**(a)** **Number of loans whose LTVs were materially understated: 308**

**(b)** **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 56**

**(c)** **Number of loans that suffered EPDs: 21**

**(d)** **Number of loans in which the properties were stated to be owner-occupied but were not: 269**

**(e)** **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 570**

**(f)** **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 34.2%**

*CWALT 2005-32T1:*

**(a)** **Number of loans whose LTVs were materially understated: 229**

**(b)** **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 79**

**(c)** **Number of loans that suffered EPDs: 3**

**(d)** **Number of loans in which the properties were stated to be owner-occupied but were not: 125**

**(e)** **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 343**

**(f)** **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 54.2%**

*LMT 2005-1:*

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a)   Number of loans whose LTVs were materially understated: 778

(b)   Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 243

(c)   Number of loans in which the properties were stated to be owner-occupied but were not: 444

(d)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,249

(e)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 49.7%

*RAST 2005-A15*:

(a)   Number of loans whose LTVs were materially understated: 1,372

(b)   Number of loans that suffered EPDs: 29

(c)   Number of loans in which the properties were stated to be owner-occupied but were not: 743

(d)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,861

(e)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 31.1%

*WMALT 2006-3*:

(a)   Number of loans whose LTVs were materially understated: 612

(b)   Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 95

(c)   Number of loans that suffered EPDs: 15

(d)   Number of loans in which the properties were stated to be owner-occupied but were not: 325

(e)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 857

(f)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.1%

-105-

*CWALT 2006-12CB:*

    (a)    **Number of loans whose LTVs were materially understated: 880**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 151**

    (c)    **Number of loans that suffered EPDs: 12**

    (d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 463**

    (e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,228**

    (f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 43.0%**

*MLMI 2006-F1:*

    (a)    **Number of loans whose LTVs were materially understated: 140**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 41**

    (c)    **Number of loans that suffered EPDs: 2**

    (d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 116**

    (e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 241**

    (f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 53.0%**

*CWALT 2006-23CB:*

    (a)    **Number of loans whose LTVs were materially understated: 1,420**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 233**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 774

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,071

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 43.7%

*MALT 2006-3:*

(a)     Number of loans whose LTVs were materially understated: 237

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 57

(c)     Number of loans that suffered EPDs: 8

(d)     Number of loans in which the properties were stated to be owner-occupied but were not: 109

(e)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 340

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 38.5%

*FHAMS 2006-FA4:*

(a)     Number of loans whose LTVs were materially understated: 458

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 484

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 230

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 903

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 54.5%

*CMALT 2006-A3:*

-107-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(a)   **Number of loans whose LTVs were materially understated:** 428

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 451

(c)   **Number of loans that suffered EPDs:** 8

(d)   **Number of loans in which the properties were stated to be owner-occupied but were not:** 218

(e)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 786

*CWALT 2006-29T1:*

(a)   **Number of loans whose LTVs were materially understated:** 492

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 93

(c)   **Number of loans that suffered EPDs:** 19

(d)   **Number of loans in which the properties were stated to be owner-occupied but were not:** 259

(e)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 693

(f)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 64.0%

*RAST 2006-A15:*

(a)   **Number of loans whose LTVs were materially understated:** 346

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 47

(c)   **Number of loans that suffered EPDs:** 19

(d)   **Number of loans in which the properties were stated to be owner-occupied but were not:** 167

(e)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 469

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-108-

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 59.7%

*CWALT 2006-40T1:*

(a)     Number of loans whose LTVs were materially understated: 383

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 97

(c)     Number of loans that suffered EPDs: 11

(d)     Number of loans in which the properties were stated to be owner-occupied but were not: 195

(e)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 523

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 59.5%

*CWALT 2006-43CB:*

(a)     Number of loans whose LTVs were materially understated: 1,499

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 160

(c)     Number of loans that suffered EPDs: 38

(d)     Number of loans in which the properties were stated to be owner-occupied but were not: 733

(e)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,040

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.4%

*MALT 2007-1:*

(a)     Number of loans whose LTVs were materially understated: 211

-109-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

(b)  **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 70**

(c)  **Number of loans in which the properties were stated to be owner-occupied but were not: 119**

(d)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 321**

(e)  **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.9%**

*CWALT 2007-3T1*:

(a)  **Number of loans whose LTVs were materially understated: 500**

(b)  **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 90**

(c)  **Number of loans that suffered EPDs: 19**

(d)  **Number of loans in which the properties were stated to be owner-occupied but were not: 274**

(e)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 686**

(f)  **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 58.9%**

*RAST 2007-A5*:

(a)  **Number of loans whose LTVs were materially understated: 522**

(b)  **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 74**

(c)  **Number of loans that suffered EPDs: 14**

(d)  **Number of loans in which the properties were stated to be owner-occupied but were not: 223**

(e)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 678**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1

    (f)      **Eliminating duplicates, percent of loans about which the Defendants made**

2

                   **untrue or misleading statements: 53.2%**

3

4

3428/001/X119862.v1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ROBERT A. GOODIN, State Bar No. 061302
   rgoodin@goodinmacbride.com
FRANCINE T. RADFORD, State Bar No. 168269
   fradford@goodinmacbride.com
ANNE H. HARTMAN, State Bar No. 184556
   ahartman@goodinmacbride.com
505 Sansome Street, Suite 900
San Francisco, California 94111
Telephone:    (415) 392-7900
Facsimile:    (415) 398-4321

GRAIS & ELLSWORTH LLP
DAVID J. GRAIS (*pro hac application submitted herewith*)
KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
OWEN L. CYRULNIK (*pro hac application submitted herewith*)
70 East 55th Street
New York, New York 10022
Telephone:    (212) 755-0100
Facsimile:    (212) 755-0052

Attorneys for Plaintiff
Federal Home Loan Bank of San Francisco

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SAN FRANCISCO, | No. CGC-10-497839 |
| Plaintiff, | **VOLUME 3 OF SCHEDULES OF FIRST AMENDED COMPLAINT (SCHEDULES 23-38)** |
| v. | |
| DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS & CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE SECURITIES | |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1  CORPORATION;
   CREDIT SUISSE SECURITIES (USA) LLC,
2  F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;
3  RBS SECURITIES, INC., F/K/A/
4  GREENWICH CAPITAL MARKETS, INC.;
   RBS ACCEPTANCE, INC., F/K/A
5  GREENWICH CAPITAL ACCEPTANCE,
   INC.;
6  RBS HOLDINGS USA, INC., F/K/A
7  GREENWICH CAPITAL HOLDINGS,
   INC.;
8  MORGAN STANLEY & CO.
   INCORPORATED;
9  UBS SECURITIES, LLC;
   MORTGAGE ASSET SECURITIZATION
10 TRANSACTIONS, INC.;
11 MERRILL LYNCH, PIERCE, FENNER &
   SMITH, INC.;
12 WASHINGTON MUTUAL MORTGAGE
   SECURITIES CORP.;
13 WAMU CAPITAL CORP.; AND,
   DOES 1-50,
14
15             Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    -2-
─────────────────────────────────────────
SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SCHEDULE 23 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the amended complaint, those allegations are made against Defendants UBS and MAST.

**Item 43.**       **Details of trust and certificate(s).**

(a)       **Dealer that sold the certificate(s) to the Bank:** UBS

(b)       **Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage Pass-Through Certificates, Series 2007-1 was a securitization in January 2007 of 4,944 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corp. and IndyMac Bank F.S.B. American Home Mortgage Corp. originated 78.27% of the loans in Loan Group I, and IndyMac Bank F.S.B. originated 16.16%. IndyMac Bank F.S.B. originated all of the loans in Loan Group II. MARM 2007-1 Pros. Sup. S-13 and S-55.

(c)       **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche I-2A1, for which the Bank paid $499,921,875 plus accrued interest on January 16, 2007.

(d)       **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e)       **Current ratings of the certificate(s):** Standard & Poor's • BBB; Moody's • B3.

(f)       **URL of prospectus supplement for this securitization:** A copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/815018/000116231807000075/m0087combined.htm.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1  **Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

2         In the prospectus supplement, UBS and MAST made the following statements about the

3  LTVs of the mortgage loans in the collateral pool of this securitization.

4         (a)     The original LTVs of the mortgage loans in Loan Group I ranged from 14.29% to

5  100%, with a weighted average of 76.03%. MARM 2007-1 Pros. Sup. S-18.

6

7         (b)     The original LTVs of the mortgage loans in Loan Subgroup I-1 ranged from

8  14.29% to 100%, with a weighted average of 76.54%. MARM 2007-1 Pros. Sup. S-18.

9         (c)     The original LTVs of the mortgage loans in Loan Subgroup I-2 ranged from

10  14.36% to 100%, with a weighted average of 75.89%. MARM 2007-1 Pros. Sup. S-19.

11         (d)     The original LTVs of the mortgage loans in Loan Group II ranged from 18.12% to

12  95%, with a weighted average of 70.91%. MARM 2007-1 Pros. Sup. S-19.

13

14         (e)     "Approximately 18.40% of the group I loans (by aggregate principal balance as of

15  the cut-off date) had loan-to-value ratios in excess of 80.00%, but no more than 100.00% at

16  origination. Approximately 0.61% of the group II loans (by aggregate principal balance as of the

17  cut-off date) had loan-to-value ratios in excess of 80.00%, but no more than 95.00% at

18  origination." MARM 2007-1 Pros. Sup. S-41.

19         (f)     "Approximately 18.40% of the Group I Loans and approximately 0.61% of the

20  Group II Loans, by Cut-Off Date Pool Balance of the Loans, had LTV Ratios at origination of

21  greater than 80%. . . ." MARM 2007-1 Pros. Sup. S-49.

22

23         (g)     "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans

24  is approximately 14.29% to 100.00% and approximately 16.82% of the Loans by aggregate

25  Stated Principal Balance of the Loans as of the Cut-Off Date, had Loan-to-Value Ratios at

26  origination in excess of 80%." MARM 2007-1 Pros. Sup. S-150.

27

28

-2-

1     (h)    In Annex II of the prospectus supplement ("Mortgage Loan Statistical

2  Information"), UBS and MAST presented tables of statistics about the mortgage loans in the

3  collateral pool. MARM 2007-1 Pros. Sup. II-1 to II-23. Each table focused on a certain

4  characteristic of the loans (for example, current principal balance) and divided the loans into

5  categories based on that characteristic (for example, current principal balances of $50,000 or less,

6  $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data

7  about the loans in each category. One of the tables, entitled "Original Loan-to Value Ratios,"

8  divided the loans in Subgroup I-1 into 11 categories of original LTV (for example, 50% or less,

9  50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about

10  the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

11  aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-

12  3.

13     (i)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the

14  Subgroup I-1 Loans, by Cut-Off Date Pool Balance of the Subgroup I-1 Loans, was

15  approximately 76.54%." MARM 2007-1 Pros. Sup. II-3.

16     (j)    In Annex II, UBS and MAST presented another table entitled "Original Loan-to-

17  Value Ratios." This table divided the loans in Subgroup I-2 into 11 categories of original LTV

18  (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

19  misleading statements about the number of mortgage loans, the aggregate principal balance

20  outstanding, and the percent of aggregate principal balance outstanding in each of these

21  categories. MARM 2007-1 Pros. Sup. II-10.

22     (k)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the

23  Subgroup I-2 Loans, by Cut-Off Date Pool Balance of the Subgroup I-2 Loans, was

24  approximately 75.89%." MARM 2007-1 Pros. Sup. II-10.

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    (l)    In Annex II, UBS and MAST presented another table entitled "Original Loan-to-

2   Value Ratios." This table divided the Group I Loans into 11 categories of original LTV (for

3   example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

4   misleading statements about the number of mortgage loans, the aggregate principal balance

5   outstanding, and the percent of aggregate principal balance outstanding in each of these

6   categories. MARM 2007-1 Pros. Sup. II-16.

7

8    (m)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group I

9   Loans, by Cut-Off Date Pool Balance of the Group I Loans, was approximately 76.03%." MARM

10  2007-1 Pros. Sup. II-16.

11   (n)    In Annex II, UBS and MAST presented another  table entitled "Original Loan-to-

12  Value Ratios." This table divided the Group II Loans into 10 categories of original LTV (for

13  example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and

14  misleading statements about the number of mortgage loans, the aggregate principal balance

15  outstanding, and the percent of aggregate principal balance outstanding in each of these

16  categories. MARM 2007-1 Pros. Sup. II-21.

17

18   (o)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group II

19  Loans, by Cut-Off Date Pool Balance of the Group II Loans, was approximately 70.91%".

20  MARM 2007-1 Pros. Sup. II-21.

21

22  **Item 61.    Details of the results of the AVM analysis:**

23

| | |
|---|---|
| Number of loans | 4,944 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,590 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 2,649 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $310,369,229 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 281 |

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

| | |
|---|---|
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,295,455 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 986 |
| Weighted-average LTV, as stated by Defendants (group II) | 70.91% |
| Weighted-average LTV, as determined by the model (group II) | 86.29% |

**Item 64.       Evidence from subsequent sales of refinanced properties:**

Of the 4,944 mortgage loans in the collateral pool, 3,641 were taken out to refinance, rather than to purchase, properties. For those 3,641 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 3,641 properties, 718 were subsequently sold for a total of approximately $269,972,353. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $441,761,456. Thus, those properties were sold for 61.1% of the value ascribed to them, a difference of 38.9%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.       Undisclosed additional liens:**

      **(a)       Minimum number of properties with additional liens: 395**

      **(b)       Total reduction in equity from additional liens: $48,741,267**

      **(c)       Weighted-average reduction in equity from additional liens: 61.0%**

**Item 81.       Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of all of the properties that secured the mortgage loans in the collateral pool of this securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." MARM 2007-1 Pros. Sup. S-57.

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans originated by American Home

Mortgage Corp.: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." MARM 2007-1 Pros. Sup. S-59.

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans originated by IndyMac F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." MARM 2007-1 Pros. Sup. S-61.

**Item 87.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In Annex II of the prospectus supplement , described in Item 51, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Subgroup I-1 into the categories "Primary," "Investment," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-4.

(b)     In the "Occupancy Status" table, UBS and MAST stated that 55.7% of the loans in Subgroup I-1 were secured by a "Primary" residence, 33.72% by an "Investment" property, and 10.58% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-4.

(c)     In Annex II, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Subgroup I-2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage

-6-

1   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

2   outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-10.

3       (d)     In the "Occupancy Status" table, UBS and MAST stated that 86.9% of the loans in

4   Subgroup I-2 were secured by a "Primary" residence, 7.96% by an "Investment" property, and

5   5.15% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-10.

6

7       (e)     In Annex II, UBS and MAST presented another table entitled "Occupancy Status."

8   The table divided the loans in Group I into the categories "Primary," "Investor," and

9   "Secondary." The table made untrue and misleading statements about the number of mortgage

10  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

11  outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-16.

12

13      (f)     In the "Occupancy Status" table, UBS and MAST stated that 80.01% of the loans

14  in Group I were secured by a "Primary" residence, 13.64% by an "Investor" property, and 6.35%

15  by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-16.

16      (g)     In Annex II, UBS and MAST presented another table entitled "Occupancy Status."

17  The table divided the loans in Group II into the categories "Primary," "Investor," and

18  "Secondary." The table made untrue and misleading statements about the number of mortgage

19  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

20  outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-21.

21

22      (h)     In the "Occupancy Status" table, UBS and MAST stated that 84.42% of the loans

23  in Group II were secured by a "Primary" residence, 12.98% by an "Investor" property, and 2.6%

24  by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-21.

25  **Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

26      **(a)**     **Number of loans on which the owner of the property instructed tax**
              **authorities to send property tax bills to him or her at a different address: 417**

27

28

-7-

(b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 701

(c)     **Number of loans on which the owner of the property owned three or more properties:** 77

(d)     **Number of loans that went straight from current to foreclosure or ownership by lender:** 3

(e)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 1,006

**Item 98.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-56 through S-62 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)     "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." MARM 2007-1 Pros. Sup. S-57.

On pages S-58 to S-59 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)     "Exceptions to the underwriting standards may be permitted where compensating factors are present." MARM 2007-1 Pros. Sup. S-58.

(b)     "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." MARM 2007-1 Pros. Sup. S-59.

(c)     "When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility." MARM 2007-1 Pros Sup. S-28.

On pages S-60 to S-62, UBS and MAST made statements about the underwriting guidelines of IndyMac Bank F.S.B. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)    "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." MARM 2007-1 Pros. Sup. S-62.

(b)    "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the adequacy of the mortgaged property as collateral." MARM 2007-1 Pros. Sup. S-29.

**Item 106.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 1,872**

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 37.9%**

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%**

**Item 107.**    **30+ days delinquencies in this securitization:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,746**

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 35.3%**

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

-9-

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 to S-8 and S-173 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated: "It is a condition to the issuance of the offered certificates that they receive the ratings set forth … on page S-7 in this prospectus supplement." MARM 2007-1 Pros. Sup. S-173.

**Item 117.**     **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated: 2,649**

    **(b)**     **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 395**

    **(c)**     **Number of loans in which the properties were stated to be owner-occupied but were not: 1,006**

    **(d)**     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 3,223**

    **(e)**     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 65.2%**

-10-

## SCHEDULE 24 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants UBS and MAST.

**Item 43.       Details of trust and certificate(s).**

(a)       **Dealer that sold the certificate(s) to the Bank:** UBS

(b)       **Description of the trust:** MASTR Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-2 was a securitization in March 2006 of 2,929 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corp., SunTrust Mortgage, Inc., and an undisclosed originator. American Home Mortgage Corp. originated 56.9% of all of the loans in the collateral pool, and SunTrust Mortgage, Inc. originated 40.08%. MALT 2006-2 Pros. Sup. S-30.

(c)       **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid $140,111,484 plus accrued interest on March 30, 2006.

(d)       **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

(e)       **Current ratings of the certificate(s):**

Standard & Poor's •   CCC; Moody's •   Ba3.

(f)       **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1355021/000116231806000324/m284_424b5.htm.

**Item 51.       Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The original LTVs of all of the loans in the collateral pool ranged from 18.75% to 100%, with a weighted average of 74.23%. MALT 2006-2 Pros. Sup. S-13.

(b)     The original LTVs of the collateral group 1 Loans ranged from 18.75% to 100%, with a weighted average of 72.57%. MALT 2006-2 Pros. Sup. S-13.

(c)     The original LTVs of the collateral group 2 Loans ranged from 18.75% to 100%, with a weighted average of 75.74%. MALT 2006-2 Pros. Sup. S-14.

(d)     "Approximately 2.74% of the loans by cut-off date pool balance of the loans had loan to value ratios at origination in excess of 80%." MALT 2006-2 Pros. Sup. S-23.

(e)     "Approximately 2.74% of the Loans, by Cut-Off Date Pool Balance for all of the Loan Groups, had LTV Ratios at origination of greater than 80% . . . ." MALT 2006-2 Pros. Sup. S-29.

(f)     "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans is 18.75% to 100% and approximately 2.74% of the Loans by Cut-off Date Pool Balance of the Loans, had Loan-to-Value Ratios at origination in excess of 80%." MALT 2006-2 Pros. Sup. S-76.

(g)     In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), UBS and MAST presented tables of statistics about the mortgage loans in the collateral pool. MALT 2006-2 Pros. Sup. A-1 to A-16. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $25,001 to $50,000, $50,000 to $75,000, $75,001 to $100,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original LTV Ratios," divided the loans in collateral group 1 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

-- 2 --

number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-2.

(h) "The weighted average original LTV Ratio of the Collateral Group 1 Loans, by Cut-Off Date Pool Balance of the Collateral Group 1 Loans, was approximately 72.57%." MALT 2006-2 Pros. Sup. A-2.

(i) In Annex A, UBS and MAST presented another table entitled "Original LTV Ratios." This table divided the loans in collateral group 2 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-7.

(j) "The weighted average original LTV Ratio of the Collateral Group 2 Loans, by Cut-Off Date Pool Balance of the Collateral Group 2 Loans, was approximately 75.74%." MALT 2006-2 Pros. Sup. A-7.

(k) In Annex A, UBS and MAST presented another table entitled "Original LTV Ratios." This table divided all of the loans in the collateral pool into 11 categories of original LTVs (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-12.

(l) "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool Balance of the Loans, was approximately 74.23%." MALT 2006-2 Pros. Sup. A-12.

-- 3 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 61.**       **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,929 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,410 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 875 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $51,716,376 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 186 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,089,673 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 160 |
| Weighted-average LTV, as stated by Defendants | 74.23% |
| Weighted-average LTV, as determined by the model | 86.7% |

**Item 64.**       **Evidence from subsequent sales of refinanced properties:**

Of the 2,929 mortgage loans in the collateral pool, 1,072 were taken out to refinance, rather than to purchase, properties. For those 1,072 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,072 properties, 156 were subsequently sold for a total of approximately $40,658,067. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $55,511,700. Thus, those properties were sold for 73.2% of the value ascribed to them, a difference of 26.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.**       **Undisclosed additional liens:**

(a)       **Minimum number of properties with additional liens:** 95

(b)       **Total reduction in equity from additional liens:** $6,964,719

(c)       **Weighted-average reduction in equity from additional liens:** 72.2%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    **Item 81.        Untrue or misleading statements about compliance with USPAP:**

2             In the prospectus supplement, UBS and MAST made the following statement about the

3    appraisals of the properties that secured the mortgage loans in the collateral pool of this

4    securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal

5    Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. . . ." MALT

6
7    2006-2 Pros. Sup. S-33.

8             In the prospectus supplement, UBS and MAST made the following statement about the

9    appraisals of the properties that were originated by American Home Mortgage Corp.: "Every

10   American Home Loan is secured by a property that has been appraised by a licensed appraiser in

11   accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal

12   Foundation." MALT 2006-2 Pros. Sup. S-35.

13
     **Item 87.        Untrue or misleading statements about owner-occupancy of the properties
14                        that secured the mortgage loans:**

15            In the prospectus supplement, UBS and MAST made the following statements about the

16   occupancy status of the properties that secured the mortgage loans in the collateral pool of this

17   securitization.
18
19            (a)        In Annex A of the prospectus supplement, described in Item 51, UBS and MAST

20   presented a table entitled "Occupancy Status." The table divided the mortgage loans in collateral

21   group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and

22   misleading statements about the number of mortgage loans, the aggregate principal balance

23   outstanding, and the percent of aggregate principal balance outstanding in each of these

24   categories. MALT 2006-2 Pros. Sup. A-3.
25
26            (b)        In the "Occupancy Status" table, UBS and MAST stated that 75.16% of the

27   mortgage loans in collateral group 1 were secured by a "Primary" residence, 21.17% by an

28   "Investor" property, and 3.67% by a "Secondary" residence. MALT 2006-2 Pros. Sup. A-3.

(c)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." The table divided the mortgage loans in collateral group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-8.

(d)     In the "Occupancy Status" table, UBS and MAST stated that 60.86% of the mortgage loans in collateral group 2 were secured by a "Primary" residence, 32.42% by an "Investor" property, and 6.71% by a 'Secondary" residence MALT 2006-2 Pros. Sup. A-8.

(e)     In Annex A, UBS and MAST presented another table entitled "Occupancy Status." The table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-14.

(f)     In the "Occupancy Status" table, UBS and MAST stated that 67.68% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 27.06% by an "Investor" property, and 5.26% by a 'Secondary" residence MALT 2006-2 Pros. Sup. A-14.

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

**(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 165**

**(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 219**

**(c)     Number of loans on which the owner of the property owned three or more properties: 18**

**(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 6**

**(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 333**

-- 6 --

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-37 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)     "[E]xceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower." MALT 2006-2 Pros. Sup.S-32.

On pages S-33 through S-35 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)     "Exceptions to the underwriting standards may be permitted where compensating factors are present." MALT 2006-2 Pros. Sup.S-34.

(b)     "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception[.]" MALT 2006-2 Pros. Sup.S-35.

On pages S-36 through S-37, UBS and MAST made statements about the underwriting guidelines of SunTrust Mortgage, Inc. All of those statements are incorporated herein by reference.

**Item 105.**     **Early payment defaults:**

(a)     **Number of the mortgage loans that suffered EPDs: 76**

(b)     **Percent of the mortgage loans that suffered EPDs: 2.6%**

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%**

-- 7 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 106.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,034

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 35.3%

    **(c)**     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 32.7%

**Item 107.**     **30+ days delinquencies in this securitization:**

    **(a)**     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 995

    **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 34.0%

    **(c)**     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 and S-92 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated: "It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth … on page S-7 of this prospectus supplement." MALT 2006-2 Pros. Sup. S-92.

1  **Item 117.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

2

3    (a)   **Number of loans whose LTVs were materially understated:** 875

4    (b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 95

5

6    (c)   **Number of loans that suffered EPDs:** 76

7    (d)   **Number of loans in which the properties were stated to be owner-occupied but were not:** 333

8

9    (e)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 1,145

10   (f)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 39.1%

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SCHEDULE 25 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)      **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A11CB was a securitization in September 2005 of 2,351 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. RAST 2005-A11 Pros. Sup. S-17.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid $172,000,000 plus accrued interest on September 30, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

(e)      **Current ratings of the certificate(s):**

Standard & Poor's •   AAA; Moody's •   Ba3.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095011705003845/a40596.txt.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "With respect to approximately 28.92% of the group 1 mortgage loans and 26.45% of the group 2 mortgage loans, respectively, in each case by the cut-off date principal balance of

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

the mortgage loans in that loan group, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such group 1 mortgage loans and group 2 mortgage loans are approximately 76.59% and 78.76%, respectively . . . ." RAST 2005-A11 Pros. Sup. S-12 to S-13.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2005-A11 Pros. Sup. S-18.

(c)    In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A11 Pros. Sup. S-20 to S-25. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the group 1 loans into 18 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-11 Pros. Sup. S-20.

(d)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 71.22%." RAST 2005-A11 Pros. Sup. S-20.

(e)    In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the loans in group 2 into 17 categories of original LTV (for example, 15.01% to 20%, 20.01% to 25%, 25.01% to 30%, etc.).

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A11 Pros. Sup. S-23.

(f)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 73.67%." RAST 2005-A11 Pros. Sup. S-23.

**Item 61.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,351 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,034 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 549 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $27,225,594 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 197 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,691,939 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 97 |
| Weighted-average LTV, as stated by Defendants (group 1) | 71.22% |
| Weighted-average LTV, as determined by the model (group 1) | 85.7% |

**Item 64.     Evidence from subsequent sales of refinanced properties:**

Of the 2,351 mortgage loans in the collateral pool, 1,517 were taken out to refinance, rather than to purchase, properties. For those 1,517 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,517 properties, 119 were subsequently sold for a total of approximately $31,122,455. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $37,218,000. Thus, those properties were sold for 83.6% of the value ascribed to them, a difference of 16.4%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

-3-

**Item 87.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

In "The Mortgage Pool" section of the prospectus supplement, described in Item 51,  UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in group 1 into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of loans, the aggregate principal balance outstanding, and the percentage which that aggregate principal balance represented of the total aggregate principal balance outstanding in group 1. RAST 2005-A11 Pros. Sup. S-22.

(a)       In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that 89.82% of the mortgage loans in group 1 were secured by a "Primary" residence, 7.96% by an "Investment" property, and 2.11% by a "Second Home." RAST 2005-A11 Pros. Sup. S-22.

(b)       In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A11 Pros. Sup. S-24.

(c)       In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that 78.58% of the mortgage loans in group 2 were secured by a "Primary" residence, 17.93% by an "Investment" property, and 3.49% by a "Second Home." RAST 2005-A11 Pros. Sup. S-24.

**Item 95.       Details of properties that were stated to be owner-occupied, but were not:**

(a)       **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 141**

-4-

| | (b) | **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 189 |

| | (c) | **Number of loans on which the owner of the property owned three or more properties:** 14 |

| | (d) | **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 284 |

**Item 98.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-27 through S-29 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

(a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A11 Pros. Sup. S-27.

(b)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2005-A11 Pros. Sup. S-24.

(c)     "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." RAST 2005-A11 Pros. Sup. S-25.

**Item 105.**     **Early payment defaults:**

| | (a) | **Number of the mortgage loans that suffered EPDs:** 16 |

| | (b) | **Percent of the mortgage loans that suffered EPDs:** 0.7% |

| | (c) | **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18% |

**Item 106.**     **90+ days delinquencies:**

| | (a) | **Number of the mortgage loans that suffered 90+ days delinquencies:** 428 |

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 18.2%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 107.**    **30+ days delinquencies in this securitization:**

(a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 432

(b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 18.4%

(c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-4 and S-79 to S-80 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and . . . Aaa by Moody's Investors Service, Inc. . . . ." RAST 2005-A11 Pros. Sup. S-79.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated:** 549

(b)    **Number of loans that suffered EPDs:** 16

(c)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 284

(d)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 737

(e)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 31.3%

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

## SCHEDULE 26 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the

complaint, those allegations are made against Defendant UBS.

**Item 43.**      **Details of trust and certificate(s).**

    **(a)**      **Dealer that sold the certificate(s) to the Bank:** UBS.

    **(b)**      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-

Through Certificates, Series 2005-AR10 was a securitization in May of 2005 of 3,346 mortgage

loans in one pool. The mortgage loans in the collateral pool of this securitization were originated

by IndyMac Bank, F.S.B. INDX 2005-AR10  Pros. Sup. S-4.

    **(c)**      **Description of the certificate(s) that the Bank purchased:**

UBS offered and sold to the Bank a senior certificate in this securitization, in class A-2,

for which the Bank paid $180,000,000 plus accrued interest on May 6, 2005.

    **(d)**      **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

    **(e)**      **Current ratings of the certificate(s):**

Standard & Poor's •   CCC; Moody's •   B2.

    **(f)**      **URL of prospectus supplement for this securitization:** A true copy of the

prospectus supplement for this securitization is available at

http://www.sec.gov/Archives/edgar/data/1090295/000112528205002358/b406474_424b5.txt.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the

mortgage loans in the collateral pool of this securitization.

    (a)      "With respect to approximately 16.68% of the mortgage loans (based on the

aggregate stated principal balance of the mortgage loans as of the cut-off date) at the time of

origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 74.94% . . . ." INDX 2005-AR10 Pros. Sup. S-14.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95.58% or less." INDX 2005-AR10 Pros. Sup. S-19.

(c)    In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-A10 Pros. Sup. S 20 to S-22. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Mortgage Loans," divided the loans in the collateral pool into 18 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-A10 Pros. Sup. S-20.

(d)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 70.98%." INDX 2005-AR10 Pros. Sup. S-20.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 61.**      **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 3,346 |
| Number of properties on which there was enough information for the model to determine a true market value | 765 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 385 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $26,256,300 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 149 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,202,300 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 54 |
| Weighted-average LTV, as stated by Defendants | 70.89% |
| Weighted-average LTV, as determined by the model | 81.3% |

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." The table divided the mortgage loans into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR10 Pros. Sup. S-21.

(b)      In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 93.53% of the mortgage loans were secured by a "Primary Home," 4.91% by an "Investment" property, and 1.56% by a "Second Home." INDX 2005-AR10 Pros. Sup. S-21.

**Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 99**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(b)    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 158

(c)    **Number of loans on which the owner of the property owned three or more properties:** 17

(d)    **Number of loans that went straight from current to foreclosure or ownership by lender:** 1

(e)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true:** 221

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-24 through S-26 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

(a)    "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR10 Pros. Sup. S-25.

(b)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR10 Pros. Sup. S-25.

(c)    "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR10 Pros. Sup. S-25.

**Item 106.**    **90+ days delinquencies:**

(a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 530

(b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 15.8%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

-4-

**Item 107.   30+ days delinquencies in this securitization:**

    **(a)   Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 481

    **(b)   Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 14.4%

    **(c)   Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.   Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-64 to S-65 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR10 Pros. Sup. S-64.

**Item 117.   Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)   Number of loans whose LTVs were materially understated:** 385

    **(b)   Number of loans in which the properties were stated to be owner-occupied but were not:** 221

    **(c)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 494

    **(d)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 14.8%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1

## SCHEDULE 27 TO THE AMENDED COMPLAINT

2

To the extent that this Schedule is incorporated by reference into allegations in the

3

complaint, those allegations are made against Defendant UBS.

4

**Item 43.        Details of trust and certificate(s).**

5

     **(a)        Dealer that sold the certificate(s) to the Bank:** UBS.

6

7

     **(b)        Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-

8

Through Certificates, Series 2005-A4 was a securitization in March 2005 of 952 mortgage

9

loans, in one pool. The mortgage loans in the collateral pool of this securitization were

10

originated by IndyMac Bank, F.S.B. RAST 2005-A4 Pros. Sup. S-3.

11

     **(c)        Description of the certificate(s) that the Bank purchased:** UBS offered and sold

12

to the Bank a senior certificate in this securitization, in class A-1, for which the Bank paid

13

$149,718,750 plus accrued interest on June 10, 2005.

14

     **(d)        Ratings of the certificate(s) when the Bank purchased them:** Standard &

15

16

Poor's •  AAA; Fitch •  AAA.

17

     **(e)        Current ratings of the certificate(s):** Standard & Poor's •  CCC; Fitch •  CCC.

18

     **(f)        URL of prospectus supplement for this securitization:** A true copy of the

19

prospectus supplement for this securitization is available at

20

http://www.sec.gov/Archives/edgar/data/1090295/000095013605001814/file001.htm.

21

**Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

22

23

In the prospectus supplement, UBS made the following statements about the LTVs of the

24

mortgage loans in the collateral pool of this securitization

25

     (a)        "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

26

less." RAST 2005-A4 Pros. Sup. S-15.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A4 Pros. Sup. S-17 to S-19. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Mortgage Loans," divided the loans into 17 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A4 Pros. Sup. S-17.

(c)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 69.57%." RAST 2005-A4 Pros. Sup. S-17.

**Item 61.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 952 |
| Number of properties on which there was enough information for the model to determine a true market value | 360 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 166 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $7,707,209 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 85 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,065,707 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 20 |
| Weighted-average LTV, as stated by Defendants | 69.57 |
| Weighted-average LTV, as determined by the model | 73.8% |

**Item 70.     Undisclosed additional liens:**

**(a)     Minimum number of properties with additional liens:** 30

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**(b)**      Total reduction in equity from additional liens: $2,072,963

**(c)**      Weighted-average reduction in equity from additional liens: 76.0%

**Item 87.**      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

**(a)**      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." The table divided the mortgage loans into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A4 Pros. Sup. S-18.

**(b)**      In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 84.69% of the mortgage loans were secured by a "Primary" residence, 12.79% by an "Investment" property, and 2.52% by a "Second Home." RAST 2005-A4 Pros. Sup. S-18.

**Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

**(a)**      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 46**

**(b)**      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 73**

**(c)**      **Number of loans on which the owner of the property owned three or more properties: 5**

**(d)**      **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

**(e)**      **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 104**

**Item 98.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-21 through S-23 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

(a)      "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A4 Pros. Sup. S-21.

(b)      "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2005-A4 Pros. Supp. S-25.

(c)      "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." RAST 2005-A4 Pros. Sup. S-25.

**Item 105.**      **Early payment defaults:**

(a)      **Number of the mortgage loans that suffered EPDs: 3**

(b)      **Percent of the mortgage loans that suffered EPDs:** 0.3%

(c)      **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.18%

**Item 107.**      **30+ days delinquencies in this securitization:**

(a)      **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 119

(b)      **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 12.5%

(c)      **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

-4-

**Item 114.    Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-62 to S-63 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated AAA by each of Standard & Poor's Rating Services and Fitch Ratings. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and AAA by Fitch . . . ." RAST 2005-A4 Pros. Sup. S-62.

**Item 117.    Summary of loans about which the Defendant made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated:** 166

(b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 30

(c)    **Number of loans that suffered EPDs:** 3

(d)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 104

(e)    **Eliminating duplicates, number of loans about which the Defendant made untrue or misleading statements:** 268

(f)    **Eliminating duplicates, percent of loans about which the Defendant made untrue or misleading statements:** 28.2%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

## SCHEDULE 28 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)      **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2004-IP2 was a securitization in December 2004 of 1,505 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. RAST 2004-IP2 Pros. Sup. S-4.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in class 2-A-2, for which the Bank paid $121,344,001 plus accrued interest on December 17, 2004.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's •   AAA; Moody's •   Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's •   AAA; Moody's • Aa2.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013604004430/file001.htm.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization

(a)      "With respect to approximately 29.14%, 28.68%, 37.04% and 30.78% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans

1  (in each case, based on the aggregate stated principal balance of the mortgage loans in the related

2  loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage

3  loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not

4  be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this

5  prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is

6  approximately 76.89%, 75.42%, 77.04% and 74.83%, with respect to such group 1 mortgage

7  loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans, respectively .

8  . . ." RAST 2004-IP2 Pros. Sup. S-10 to S-11.

9

10      (b)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95% or

11  less." RAST 2004-IP2 Pros. Sup. S-16.

12

13      (c)      In the section of the prospectus supplement entitled "The Mortgage Pool," UBS

14  presented tables of statistics about the mortgage loans in the collateral pool. RAST 2004-IP2

15  Pros. Sup. S-18 to S-31. Each table focused on a certain characteristic of the loans (for example,

16  current principal balance) and divided the loans into categories based on that characteristic (for

17  example, current mortgage loan principal balances of $50,000 or less, $50,000.01 to $100,000,

18  $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each

19  category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage

20  Loans," divided the loans in group 1 into 10 categories of original LTV (for example, 50% or

21  less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements

22  about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

23  of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup.

24  S-18.

25

26      (d)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

27  Group 1 Mortgage Loans was approximately 76.85%." RAST 2004-IP2 Pros. Sup. S-18.

28

-2-

1    (e)    In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-

2    Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2

3    into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

4    etc.). The table made untrue and misleading statements about the number of mortgage loans, the

5    aggregate principal balance outstanding, and the percent of aggregate principal balance

6    outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-22.

7

8    (f)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

9    Group 2 Mortgage Loans was approximately 72.70%." RAST 2004-IP2 Pros. Sup. S-22.

10    (g)    In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-

11    Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in group 3

12    into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

13    etc.). The table made untrue and misleading statements about the number of mortgage loans, the

14    aggregate principal balance outstanding, and the percent of aggregate principal balance

15    outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-26.

16

17    (h)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

18    Group 3 Mortgage Loans was approximately 75.50%." RAST 2004-IP2 Pros. Sup. S-26.

19    (i)    In the prospectus supplement, UBS presented a table entitled "Original Loan-to-

20    Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in group 4

21    into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%,

22    etc.). The table made untrue and misleading statements about the number of mortgage loans, the

23    aggregate principal balance outstanding, and the percent of aggregate principal balance

24    outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-29.

25

26

27

28

-3-

**Item 61.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 1,505 |
| Number of properties on which there was enough information for the model to determine a true market value | 625 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 257 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $18,519,445 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 150 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,925,200 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 42 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 72.7% |
| Weighted-average LTV, as determined by the model (Group 2) | 80.94% |

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-19.

(b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that 80.42% of the mortgage loans in group 1 were secured by an "Owner Occupied" property, 14.81% by an "Investment" property, and 4.77% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-19.

-4-

1    (c)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy

2  Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in group 2 into the

3  categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and

4  misleading statements about the number of mortgage loans, the aggregate principal balance

5  outstanding, and the percent of aggregate principal balance outstanding in each of these

6  categories. RAST 2004-IP2 Pros. Sup. S-23.

7

8    (d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that

9  87.96% of the mortgage loans in group 2 were secured by an "Owner Occupied" property, 8.69%

10  by an "Investment" property, and 3.35% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-23.

11    (e)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy

12  Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the

13  categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and

14  misleading statements about the number of mortgage loans, the aggregate principal balance

15  outstanding, and the percent of aggregate principal balance outstanding in each of these

16  categories. RAST 2004-IP2 Pros. Sup. S-27.

17

18    (f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, UBS stated that

19  79.38% of the mortgage loans in group 3 were secured by an "Owner Occupied" property,

20  15.24% by an "Investment" property, and 5.37% by a "Second Home." RAST 2004-IP2 Pros.

21  Sup. S-27.

22

23    (g)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy

24  Types for the Group 4 Primary Mortgage Loans." The table divided the mortgage loans in group

25  4 into the categories "Home," "Investment," and "Second Home." The table made untrue and

26  misleading statements about the number of mortgage loans, the aggregate principal balance

27

28

-5-

outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-30.

(h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, UBS stated that 86.04% of the group 4 mortgage loans were secured by a "Primary Home," 11.38% by an "Investment" property, and 2.58% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-30.

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

    **(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 81

    **(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead:** 139

    **(c)     Number of loans on which the owner of the property owned three or more properties:** 10

    **(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 202

**Item 98.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-35 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

    (a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2004-IP2 Pros. Sup. S-34.

    (b)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2004-IP2 Pros. Sup. S-25.

    (c)     "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as

collateral. The most comprehensive of the programs emphasize both." RAST 2004-IP2 Pros. Sup. 25.

**Item 105.**    **Early payment defaults:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 8

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.5%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.14%

**Item 106.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 88

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 5.8%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 7.2%

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-71 to S-72 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the [Bank's certificate] that [it] be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." RAST 2004-IP2 Pros. Sup. S-71.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated:** 257

    **(b)**    **Number of loans that suffered EPDs:** 8

-7-

1

(c)     Number of loans in which the properties were stated to be owner-occupied
but were not: 202

2

(d)     Eliminating duplicates, number of loans about which the Defendants made
untrue or misleading statements: 396

3

4

(e)     Eliminating duplicates, percent of loans about which the Defendants made
untrue or misleading statements: 26.3%

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-8-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SCHEDULE 29 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**　　**Details of trust and certificate(s).**

**(a)**　　**Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

**(b)**　　**Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR21 was a securitization in August 2005 of 2,852 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR21 Pros. Sup. S-4.

**(c)**　　**Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank two senior certificates in this securitization, in class 3-A-1 and 4-A-1, for which the Bank paid $132,752,013 and $107,977,980, plus accrued interest, respectively, on August 30, 2005.

**(d)**　　**Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA for each of the Bank's certificates; Moody's • Aaa for each of the Bank's certificates.

**(e)**　　**Current ratings of the certificate(s):** Standard & Poor's • CCC for the Bank's certificate in class 3-A-1 and B- for the Banks certificate in class 4-A-1; Moody's • Caa2 for each of the Bank's certificates.

1.　　**(f)**　　**URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013605005578/file001.htm.

---

1   **Item 51.**          **Untrue or misleading statements about the LTVs of the mortgage loans:**

2          In the prospectus supplement, Merrill Lynch made the following statements about the

3   LTVs of the mortgage loans in the collateral pool of this securitization.

4          (a)      "With respect to approximately 59.62%, 59.01%, 43.99% and 34.85% of the group

5   1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans

6   (in each case, based on the aggregate stated principal balance of the mortgage loans in the related

7   loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage

8   loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not

9   be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this

10   prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is

11   approximately 78.25%, 79.02%, 77.06% and 77.32%, with respect to such group 1 mortgage

12   loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans, respectively

13   . . ." INDX 2005-AR21 Pros. Sup. S-10.

14

15          (b)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100.00%

16   or less." INDX 2005-AR21 Pros. Sup. S-17.

17

18          (c)      In the section of the prospectus supplement entitled "The Mortgage Pool," Merrill

19   Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-

20   AR21 Pros. Sup. S-18 to S-31. Each table focused on a certain characteristic of the loans (for

21   example, current principal balance) and divided the loans into categories based on that

22   characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to

23   $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans

24   in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1

25   Mortgage Loans," divided the loans in group 1 into eight categories of original LTV (for

26   example, 10.01% to 20%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

27

28

-2-

1  misleading statements about the number of mortgage loans, the aggregate principal balance

2  outstanding, and the percent of aggregate principal balance outstanding in each of these

3  categories. INDX 2005-AR21 Pros. Sup. S-18.

4          (d)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

5  group 1 mortgage loans was approximately 75.28%." INDX 2005-AR21 Pros. Sup. S-18.

6

7          (e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

8  Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

9  group 2 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

10  30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

11  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

12  principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-21.

13

14          (f)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

15  group 2 mortgage loans was approximately 75.59%." INDX 2005-AR21 Pros. Sup. S-21.

16          (g)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

17  Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

18  group 3 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

19  40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

20  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

21  principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-25.

22

23          (h)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

24  group 3 mortgage loans was approximately 72.90%." INDX 2005-AR21 Pros. Sup. S-25.

25          (i)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

26  Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

27  group 4 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-28.

(j)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the group 4 mortgage loans was approximately 72.44%." INDX 2005-AR21 Pros. Sup. S-28.

**Item 61.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,852 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,839 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 928 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $54,645,880 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 295 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,662,528 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 137 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 72.90% |
| Weighted-average LTV, as determined by the model | 82.04% |
| Weighted-average LTV, as stated by Defendants (Group 4) | 72.44% |
| Weighted-average LTV, as determined by the model | 80.91% |

**Item 87.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section, of the prospectus supplement, described in Item 51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-19.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch stated that 89.29% of the group 1 mortgage loans were secured by a "Primary Home," 5.54% by an "Investment" property, and 5.17% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-19.

(c)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in Group 2 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-23.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch stated that 85.51% of the group 2 mortgage loans were secured by a "Primary Home," 10% by an "Investment" property, and 4.49% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-23.

(e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-26.

(f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Merrill Lynch stated that 91.62% of the group 3 mortgage loans were secured by a "Primary Home," 4.26% by an "Investment" property, and 4.12% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-26.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1       (g)   In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

2   "Occupancy Types for the Group 4 Mortgage Loans." The table divided the mortgage loans in

3   group 4 into the categories "Primary Home," "Investment," and "Second Home." The table made

4   untrue and misleading statements about the number of mortgage loans, the aggregate principal

5   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

6   categories. INDX 2005-AR21 Pros. Sup. S-30.

7

8       (h)   In the "Occupancy Types for the Group 4 Mortgage Loans" table, Merrill Lynch

9   stated that 86.83% of the group 4 mortgage loans were secured by a "Primary Home," 8.65% by

10  an "Investment" property, and 4.52% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-30.

11  **Item 95.**   **Details of properties that were stated to be owner-occupied, but were not:**

12      **(a)**   **Number of loans on which the owner of the property instructed tax**
13          **authorities to send property tax bills to him or her at a different address:** 207

14      **(b)**   **Number of loans on which the owner of the property could have, but did not,**
15          **designate the property as his or her homestead:** 336

16      **(c)**   **Number of loans on which the owner of the property owned three or more**
        **properties:** 32

17      **(d)**   **Number of loans that went straight from current to foreclosure or ownership**
18          **by lender:** 2

19      **(e)**   **Eliminating duplicates, number of loans about which one or more of**
20          **statements (a) through (d) is true:** 481

21  **Item 98.**   **Untrue or misleading statements about the underwriting standards of the**
    **originators of the mortgage loans:**

22  On pages S-33 through S-35 of the prospectus supplement, Merrill Lynch made

23  statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

24  incorporated herein by reference. In particular, Merrill Lynch stated that:

25

26      (a)   "Exceptions to these underwriting standards are permitted where compensating

27  factors are present . . . ." INDX 2005-AR21 Pros. Sup. S-34.

28

                       -6-

(b)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR21 Pros. Sup. S-24.

(c)     "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR21 Pros. Sup. S-25.

**Item 105.     Early payment defaults:**

    **(a)     Number of the mortgage loans that suffered EPDs: 16**

    **(b)     Percent of the mortgage loans that suffered EPDs: 0.6%**

    **(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 106.     90+ days delinquencies:**

    **(a)     Number of the mortgage loans that suffered 90+ days delinquencies: 663**

    **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 23.2%**

    **(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 107.     30+ days delinquencies in this securitization:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 646**

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 22.7%**

    **(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

1   **Item 114.    Statements about the ratings of the certificate(s) that the Bank purchased:**

2         On pages S-3 and S-64 to S-65 of the prospectus supplement, Merrill Lynch made

3   statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch

4   stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

5   Standard & Poor's Rating Services. These were the highest ratings available from these two

6   rating agencies.

7

8         Merrill Lynch also stated: "It is a condition to the issuance of the senior certificates that

9   they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ."

10  INDX 2005-AR21 Pros. Sup. S-64.

11  **Item 117.    Summary of loans about which the Defendants made untrue or misleading**
12  **statements:**

13      (a)    **Number of loans whose LTVs were materially understated: 928**
14
15      (b)    **Number of loans that suffered EPDs: 16**

16      (c)    **Number of loans in which the properties were stated to be owner-occupied**
        **but were not: 481**
17
18      (d)    **Eliminating duplicates, number of loans about which the Defendants made**
        **untrue or misleading statements: 1,190**
19
        (e)    **Eliminating duplicates, percent of loans about which the Defendants made**
20             **untrue or misleading statements: 41.7%**

21

22

23

24

25

26

27

28

-8-

## SCHEDULE 30 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.      Details of trust and certificate(s).**

    **(a)      Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

    **(b)      Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR7 was a securitization in April 2005 of 2,629 mortgage loans, in seven groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR7 S-4.

    **(c)      Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 3-A-2, for which the Bank paid $64,950,425 plus accrued interest on April 29, 2005.

    **(d)      Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

    **(e)      Current ratings of the certificate(s):** Standard & Poor's • B; Moody's • Caa2.

    **(f)      URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095011705001640/a39679.txt.

**Item 51.      Untrue or misleading statements about the LTVs of the mortgage loans:**

    (a)      At origination, 61.57% of the loans in group 1 were originated along with a second lien mortgage loan. The LTV of those loans was 79.35%. INDX 2005-AR7 Pros. Sup. S-11.

    (b)      At origination, 61.62% of the loans in group 2 were originated along with a second lien mortgage loan. The LTV of those loans was 77.44%. INDX 2005-AR7 Pros. Sup. S-11.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c)     At origination, 46% of the loans in group 3 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.5%. INDX 2005-AR7 Pros. Sup. S-11.

(d)     At origination, 55.97% of the loans in group 4 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.21%. INDX 2005-AR7 Pros. Sup. S-11.

(e)     At origination, 37.66% of the loans in group 5 were originated along with a second-lien mortgage loan. The LTV of those loans was 74.49%. INDX 2005-AR7 Pros. Sup. S-11.

(f)     At origination, 55.17% of the loans in group 6 were originated along with a second-lien mortgage loan. The LTV of those loans was 79.58%. INDX 2005-AR7 Pros. Sup. S-11.

(g)     At origination, 56.28% of the loans in group 7 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.57%. INDX 2005-AR7 Pros. Sup. S-11.

(h)     "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." INDX 2005-AR7 Pros. Sup. S-18.

(i)     In the section of the prospectus supplement entitled "The Mortgage Pool," Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-AR7 Pros. Sup. S-20 to S-41. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, range of current mortgage loan principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the mortgage loans in group 1 into eight

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.)

2    The table made untrue and misleading statements about the number of mortgage loans, the

3    aggregate principal balance outstanding, and the percent of aggregate principal balance

4    outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-20.

5

6        (j)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

7    Group 1 Mortgage Loans was approximately 77.90%." INDX 2005-AR7 Pros. Sup. S-20.

8        (k)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

9    Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

10    group 2 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%,

11    60.01% to 70%, etc.). The table made untrue and misleading statements about the number of

12    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

13    principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-23.

14

15        (l)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

16    Group 2 Mortgage Loans was approximately 76.04%." INDX 2005-AR7 Pros. Sup. S-23.

17        (m)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

18    Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

19    group 3 into 10 categories of original LTV (for example, 0.01% to 10%, 10.01% to 20%, 20.01%

20    to 30%, etc.). The table made untrue and misleading statements about the number of mortgage

21    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

22    outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-26.

23

24        (n)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

25    Group 3 Mortgage Loans was approximately 75.46%." INDX 2005-AR7 Pros. Sup. S-26.

26        (o)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

27    Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

28

-3-

group 4 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-30.

(p)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 4 Mortgage Loans was approximately 73.26%." INDX 2005-AR7 Pros. Sup. S-30.

(q)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in Group 5 into eight categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-33.

(r)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 5 Mortgage Loans was approximately 70.84%." INDX 2005-AR7 Pros. Sup. S-33.

(s)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 6 Mortgage Loans." This table divided the mortgage loans in group 6 into seven categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-36.

(t)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 6 Mortgage Loans was approximately 77.92%." INDX 2005-AR7 Pros. Sup. S-36.

(u)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 7 Mortgage Loans." This table divided the mortgage loans in

-4-

Group 7 into seven categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-39.

(v)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 7 Mortgage Loans was approximately 75.49%." INDX 2005-AR7 Pros. Sup. S-39.

**Item 61.      Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,629 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,338 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 618 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $31,982,360 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 247 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,395,316 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 99 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 75.46% |
| Weighted-average LTV, as determined by the model (Group 3) | 83.6% |

**Item 87.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the

-5-

1    number of mortgage loans, the aggregate principal balance outstanding, and the percent of

2    aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup.

3    S-21.

4        (b)    In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch

5    stated that 89.72% of the mortgage loans in group 1 were secured by an "Owner Occupied"

6    property, 7.95% by an "Investment" property, and 2.33% by a "Second Home." INDX 2005-AR7

7

8    Pros. Sup. S-21.

9        (c)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

10   "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in

11   group 2 into the categories "Owner Occupied," "Investment," and "Second Home." The table

12   made untrue and misleading statements about the number of mortgage loans, the aggregate

13   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

14   of these categories. INDX 2005-AR7 Pros. Sup. S-24.

15

16       (d)    In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch

17   stated that 91.87% of the mortgage loans in group 2 were secured by an "Owner Occupied"

18   property, 6.46% by an "Investment" property, and 1.67% by a "Second Home." INDX 2005-AR7

19   Pros. Sup. S-24.

20

21       (e)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

22   "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in

23   group 3 into the categories "Owner Occupied," "Investment," and "Second Home." The table

24   made untrue and misleading statements about the number of mortgage loans, the aggregate

25   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

26   of these categories. INDX 2005-AR7 Pros. Sup. S-28.

27

28

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1      (f)     In "The Mortgage Pool" section, Merrill Lynch stated that 89.1% of the mortgage

2 loans in group 3 were secured by an "Owner Occupied" property, 6.9% by an "Investment"

3 property, and 4% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-28.

4      (g)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

5 "Occupancy Types for the Group 4 Mortgage Loans." The table divided the mortgage loans in

6 group 4 into the categories "Owner Occupied," "Investment," and "Second Home." The table

7 made untrue and misleading statements about the number of mortgage loans, the aggregate

8 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

9 of these categories. INDX 2005-AR7 Pros. Sup. S-31.

10     (h)    In the "Occupancy Types for the Group 4 Mortgage Loans" table, Merrill Lynch

11 stated that 90.9% of the mortgage loans in Group 4 were secured by an "Owner Occupied"

12 property, 6.65% by an "Investment" property, and 2.45% by a "Second Home." INDX 2005-AR7

13 Pros. Sup. S-31.

14     (i)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

15 "Occupancy Types for the Group 5 Mortgage Loans." The table divided the mortgage loans in

16 group 5 into the categories "Owner Occupied," "Investment," and "Second Home." The table

17 made untrue and misleading statements about the number of mortgage loans, the aggregate

18 principal balance outstanding, and the percent of aggregate principal balance outstanding in each

19 of these categories. INDX 2005-AR7 Pros. Sup. S-34.

20     (j)     In the "Occupancy Types for the Group 5 Mortgage Loans" table, Merrill Lynch

21 stated that 85.94% of the mortgage loans in group 5 were secured by an "Owner Occupied"

22 property, 12.16% by an "Investment" property, and 1.91% by a "Second Home." INDX 2005-

23 AR7 Pros. Sup. S-34.

-7-

1

(k)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

2

"Occupancy Types for the Group 6 Mortgage Loans." The table divided the mortgage loans in

3

group 6 into the categories "Owner Occupied," "Investment," and "Second Home." The table

4

made untrue and misleading statements about the number of mortgage loans, the aggregate

5

principal balance outstanding, and the percent of aggregate principal balance outstanding in each

6

of these categories. INDX 2005-AR7 Pros. Sup. S-37.

7

8

(l)     In the "Occupancy Types for the Group 6 Mortgage Loans" table, Merrill Lynch

9

stated that 88.04% of the mortgage loans in group 6 were secured by an "Owner Occupied"

10

property, 7.58% by an "Investment" property, and 4.38% by a "Second Home." INDX 2005-AR7

11

Pros. Sup. S-37.

12

(m)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled

13

"Occupancy Types for the Group 7 Mortgage Loans." The table divided the mortgage loans in

14

group 7 into the categories "Owner Occupied," "Investment," and "Second Home." The table

15

made untrue and misleading statements about the number of mortgage loans, the aggregate

16

principal balance outstanding, and the percent of aggregate principal balance outstanding in each

17

of these categories. INDX 2005-AR7 Pros. Sup. S-40.

18

19

(n)     In the "Occupancy Types for the Group 7 Mortgage Loans" table, Merrill Lynch

20

stated that 86.37% of the mortgage loans in group 7 were secured by an "Owner Occupied"

21

property, 12.48% by an "Investment" property, and 1.15% by a "Second Home." INDX 2005-

22

AR7 Pros. Sup. S-40.

23

24

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

25

(a)     **Number of loans on which the owner of the property instructed tax
authorities to send property tax bills to him or her at a different address: 174**

26

27

(b)     **Number of loans on which the owner of the property could have, but did not,
designate the property as his or her homestead: 252**

28

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

    (c)    **Number of loans on which the owner of the property owned three or more properties: 11**

    (d)    **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

    (e)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 360**

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-43 through S-45 of the prospectus supplement, Merrill Lynch made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Merrill Lynch stated that:

    (a)    "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR7 Pros. Sup. S-44.

    (b)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR7 Pros. 25.

    (c)    "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR7 Pros. 25.

**Item 105.**    **Early payment defaults:**

    (a)    **Number of the mortgage loans that suffered EPDs: 9**

    (b)    **Percent of the mortgage loans that suffered EPDs: 0.3%**

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 106.**    **90+ days delinquencies:**

    (a)    **Number of the mortgage loans that suffered 90+ days delinquencies: 531**

    (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies: 20.2%**

-9-

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 16.5%

**Item 107.**    **30+ days delinquencies in this securitization:**

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 507

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 19.3%

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-87 to S-88 of the prospectus supplement, Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Merrill Lynch also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR7 Pros. Sup. S-87.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    (a)    **Number of loans whose LTVs were materially understated:** 618

    (b)    **Number of loans that suffered EPDs:** 9

    (c)    **Number of loans in which the properties were stated to be owner-occupied but were not:** 360

    (d)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements:** 830

    (e)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements:** 31.6%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

## SCHEDULE 31 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR5 was a securitization in March 2005 of 1,871 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR5 Pros. Sup. S-4.

(c)      **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 2-A-1, for which the Bank paid $143,958,886 plus accrued interest on March 30, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's • A-; Moody's • Caa2.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013605001805/file001.htm.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)