1   LATHAM & WATKINS LLP
      Deepa V. Sood (Bar No. 224079)
2   505 Montgomery Street
    San Francisco, CA  94111-6538
3   Telephone:  (415) 391-0600
    Facsimile:  (415) 395-8095
4
    LATHAM & WATKINS LLP
5     Jamie L. Wine (Bar No. 181373)
    885 Third Avenue
6   New York, NY 10022-4834
    Telephone:  (212) 906-1200
7   Facsimile:  (212) 751-4864

8   Attorneys for Defendants Deutsche Bank
    Securities, Inc.; Deutsche Alt-A Securities,
9   Inc.; and DB Structured Products, Inc.

**ORIGINAL FILED**

JUL 1 2 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10              UNITED STATES DISTRICT COURT
11              NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
12  FEDERAL HOME LOAN BANK OF SAN        CASE NO. CV 10 - 3 0 3 9 5 C
    FRANCISCO,
13
                    Plaintiff,
14
        v.                                **DEFENDANTS DEUTSCHE BANK
15                                         SECURITIES, INC., DEUTSCHE ALT-A
    DEUTSCHE BANK SECURITIES, INC., et    SECURITIES, INC., AND DB
16  al.,                                  STRUCTURED PRODUCTS, INC.'S
                                          JOINDER IN NOTICE OF REMOVAL
17                  Defendants.           ACTION**
18
19          Defendants Deutsche Bank Securities, Inc. ("DBSI"), Deutsche Alt-A Securities,

20  Inc. ("Deutsche Alt-A"), and DB Structured Products, Inc. ("DBSP," and, together with DBSI

21  and Deutsche Alt-A, the "Joining Defendants"), hereby consent to and join in Defendant UBS

22  Securities, LLC's Notice of Removal to this Court of the state court action described in the said

23  Notice of Removal.  As additional grounds for removal, the Joining Defendants state as follows:

24          1.      This Court has removal jurisdiction over this case pursuant to 28 U.S.C.

25  §§ 1334(b), 1367, 1441, 1446, and 1452.

26          2.      On or about March 15, 2010, Plaintiff Federal Home Loan Bank of San

27
28  Francisco ("Plaintiff") filed a Summons and Complaint captioned <u>Federal Home Loan Bank of</u>

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
NEW YORK

San Francisco v. Deutsche Bank Securities, Inc., et al., Case No. CGC-10-497839, in the Superior Court of California, San Francisco (the "State Court Action").

3.     On May 11, 2010, upon application by Plaintiff, the Superior Court extended Plaintiff's time to serve the Complaint on the defendants to June 11, 2010 (the "Scheduling Order"). The Scheduling Order is attached hereto as Exhibit A

4.     On or about June 10, 2010, Plaintiff filed a First Amended Complaint (the "FAC") in the State Court Action. Pursuant to 28 U.S.C. § 1446(a), copies of the Summons, Complaint, and the FAC filed in the State Court Action are attached hereto as Exhibit B.

5.     On or about June 10, 2010, Plaintiff served a copy of the Summons and FAC on the Joining Defendants. Copies of the services of process are attached hereto as Exhibit C. This Joinder In Notice Of Removal Action is filed within thirty (30) days of the Joining Defendants' receipt of the Summons and FAC, and it is, therefore, timely pursuant to 28 U.S.C. § 1446(b).

6.     On or about June 11, 2010, Plaintiff served on Defendants an Application for Approval of Complex Litigation Designation (the "Application"). Aside from the Application, the Scheduling Order, the FAC and a Notice of Related Case, filed March 15, 2010, no other process, pleading, or order has been served on the Defendants in this action.

7.     No defendant has pled, answered or otherwise appeared in the State Court Action.

8.     Plaintiff alleges that it acquired from DBSI four (4) mortgage pass-through certificates (collectively, the "Certificates"). The Certificates were offered pursuant to Registration Statements filed with the United States Securities and Exchange Commission and a Prospectus Supplements incorporated therein.

9.     Plaintiff further alleges that the Prospectus Supplements and related documents it purportedly received from DBSI contained materially false and misleading statements concerning the mortgage loans underling the Certificates and the underwriting guidelines of the loan originators. See FAC at Schedules 1-4.

10.     With regard to one (1) of the Certificates purchased by Plaintiff – DBALT 2007-AR2 (the "DBALT Certificate") – the loan originators from which the mortgage loans were purchased included American Home Mortgage ("AHM") and Alliance Bancorp ("Alliance"). AHM and Alliance originated mortgage loans that comprise the collateral pool for the DBALT Certificate. See FAC at Schedule 4, Item 43(b).

11.     On August 6, 2007, AHM filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, In re American Home Mortgage Holdings, Inc., Case No. 07-11047, et seq. (the "AHM Bankruptcy Proceedings"). The AHM Bankruptcy Proceedings currently are pending before United States Bankruptcy Judge Christopher Sontchi.

12.     Likewise, on July 13, 2007, Alliance filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, In re Alliance Bancorp, Case No. 07-10942 (the "Alliance Bankruptcy Proceeding"). The Alliance Bankruptcy Proceeding currently is pending before United States Bankruptcy Judge Christopher Sontchi.

13.     Pursuant to agreements containing certain indemnification provisions for the benefit of the Joining Defendants, among others, and pursuant to statutory and common law, AHM and Alliance owe the Joining Defendants indemnification and/or contribution for any claims arising out of actual or alleged material misstatements or omissions by AHM and Alliance about the mortgage loans at issue.

14.     DBSP and DBSI have asserted and reserved their rights to indemnification and contribution from AHM in a Proof of Claim filed in the AHM Bankruptcy Proceedings dated January 11, 2008.

15.     Likewise, DBSP has asserted and reserved its rights to indemnification and contribution from Alliance in a Proof of Claim filed in the Alliance Bankruptcy Proceeding dated March 31, 2008.

16.     This action relates to AHM's and Alliance's bankruptcy rights in light of the Joining Defendants' rights to indemnification and contribution from AHM and Alliance in the event a judgment is entered against the Joining Defendants with respect to the DBALT Certificate in this action and as a result of any costs and expenses incurred by the Joining Defendants to defend against this action.  Consequently, the outcome of this action will have a direct effect on the AHM and Alliance bankruptcy estates.

17.     Accordingly, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b), and this action may be removed to this Court by the Joining Defendants pursuant to 28 U.S.C. § 1452(a).

18.     This is not a core proceeding under 28 U.S.C. § 157(b).  The Joining Defendants do not consent to entry of final orders or judgment by any bankruptcy judge.

Dated:  July 12, 2010

Respectfully submitted,

Deepa V. Sood (Bar No. 224079)
LATHAM & WATKINS LLP
505 Montgomery Street
San Francisco, CA  94111-6538
Telephone:  (415) 391-0600
Facsimile:  (415) 395-8095

*Attorneys for Defendants Deutsche Bank Securities, Inc.,; Deutsche Alt-A Securities, Inc. and DB Structured Products*

1

2   *Of Counsel*:

3   Jamie L. Wine (Bar. No. 181373)
    LATHAM & WATKINS LLP
4   885 Third Avenue
    New York, NY 10022-4834
5   Telephone:  (212) 906-2904
    Facsimile:  (212) 751-4864

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT A

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2      rgoodin@goodinmacbride.com
   FRANCINE T. RADFORD, State Bar No. 168269
3      fradford@goodinmacbride.com
   ANNE H. HARTMAN, State Bar No. 184556
4      ahartman@goodinmacbride.com
   505 Sansome Street, Suite 900
5  San Francisco, California 94111
   Telephone:    (415) 392-7900
6  Facsimile:    (415) 398-4321

7  GRAIS & ELLSWORTH LLP
   DAVID J. GRAIS (*pro hac application to be submitted*)
8      dgrais@graisellsworth.com
   KATHRYN C. ELLSWORTH (*pro hac app. to be submitted*)
9      kellsworth@graisellsworth.com
   OWEN L. CYRULNIK (*pro hac application to be submitted*)
10     ocyrulnik@graisellsworth.com
   70 East 55th Street
11 New York, New York 10022
   Telephone:    (212) 755-3550
12 Facsimile:    (212) 755-0052

13 Attorneys for Plaintiff
   Federal Home Loan Bank of San Francisco

14

15         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16         IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

18 FEDERAL HOME LOAN BANK OF SAN           No. CGC-10-497839
   FRANCISCO,
19                                         [PROPOSED] ORDER GRANTING
              Plaintiff,                   APPLICATION FOR EXTENSION OF
20                                         TIME TO SERVE SUMMONS AND
   v.                                      COMPLAINT *to 6-11-10*
21
   DEUTSCHE BANK SECURITIES INC., et       Date of Filing:    March 15, 2010
22 al.,                                    Trial Date:        Not yet set

23            Defendants.

24

25

26

27

28

FILED
San Francisco County Superior Court

MAY 11 2010

CLERK OF THE COURT
BY:
          Deputy Clerk

**ORDER FOR EXTENSION OF TIME TO SERVE SUMMONS AND COMPLAINT**

1    Upon the application of Plaintiff the Federal Home Loan Bank of San Francisco,

2  and good cause appearing, IT IS HEREBY ORDERED that the time for plaintiff to serve the

3  summons and complaint in this action shall be extended to June 11, 2010.

4

5  Dated:  5/11/10

6

7                                                    *Arlene T. Borick*

8                                                      ARLENE T. BORICK
                                                      Judge Pro Tempore

9  3428/001/X118652.v1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

**ORDER FOR EXTENSION OF TIME TO SERVE SUMMONS AND COMPLAINT**

# EXHIBIT B

# Exhibit B



SUPERIOR COURT OF CALIFORNIA     **SUMMONS**     COUNTY OF SAN FRANCISCO
*(CITACION JUDICIAL)*

SUM-100

**DEFENDANTS**

NOTICE TO ~~DEFENDANT~~: *(AVISO AL DEMANDADO):*

DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS & CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE FIRST BOSTON LLC;

Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDATE)*

FEDERAL HOME LOAN BANK OF SAN FRANCISCO

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is: *(El nombre y dirección de la corte es):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, California 94102

CASE NUMBER *(Número del Caso):*
CGC-10-497839

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302     415-392-7900     415-398-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California 94111
Additional Counsel listed on Additional Page form attached

WESLEY RAMIRE7

DATE: JUN 0 9 2010     **CLERK OF THE COURT**     Clerk, by _____ , Deputy
*(Fecha)*                               *(Secretario)*                           *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*     Deutsche Bank Securities, Inc.

under:   ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
         ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
         ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (individual)
         ☐ other *(specify):*
4. ☐ by personal delivery on *(date):* 6/11/10

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. January 1, 2004)

**SUMMONS**

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465
SF-C53

SUM-200(A)

| SHORT TITLE:  Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER:<br>CGC-10-497839 |
|---|---|

### INSTRUCTIONS FOR USE

➔  This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔  If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box.  Use a separate page for each type of party.):

☐ Plaintiff      ☒ Defendant      ☐ Cross-Complainant      ☐ Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; MERRILL LYNCH PIERCE, FENNER & SMITH, INC.; AND DOES 1 - 50

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

Legal
Solutions
Ⓒ Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

1 | GRAIS & ELLSWORTH LLP

2 | DAVID J. GRAIS (pro hac vice)

3 | KATHRYN C. ELLSWORTH (pro hac vice)

4 | OWEN L. CYRULINK (pro hac vice)

5 | 70 East 55th Street

6 | New York, New York 10022

7 | Telephone:   (212) 755-0100

8 | Facsimile:   (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court.   Page ___3___

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper


Legal
Solutions
& Plus

CRC 201, 601

SUPERIOR COURT OF CALIFORNIA   **SUMMONS**   COUNTY OF SAN FRANCISCO
*(CITACION JUDICIAL)*

SUM-100

**DEFENDANTS**

NOTICE TO ~~DEFENDANT~~: *(AVISO AL DEMANDADO):*

DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB
STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS &
CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS
COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE
SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC, F/K/A  CREDIT SUISSE
FIRST BOSTON LLC;
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDATE)*
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*
*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el s California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is: *(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, California 94102

CASE NUMBER *(Número del Caso):*
CGC-10-497839

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ROBERT A. GOODIN, SBN 061302        415-392-7900        415-398-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California  94111
Additional Counsel listed on Additional Page form attached

DATE: JUN 0 9 2010                CLERK OF THE COURT        WESLEY RAMIREZ
*(Fecha)*                          Clerk, by _____, Deputy
                                   *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

*[SEAL]*

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* DB Structured Products, Inc.

under:  ☒ CCP 416.10 (corporation)           ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (individual)
        ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

SF-C53

SUM-200(A)

| SHORT TITLE:  Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[  ] Plaintiff   [ X ] Defendant   [  ] Cross-Complainant   [  ] Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; MERRILL LYNCH PIERCE, FENNER & SMITH, INC.; AND DOES 1 - 50

Page _____ of _____

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Legal
Solutions
Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

1  GRAIS & ELLSWORTH LLP

2  DAVID J. GRAIS (pro hac vice)

3  KATHRYN C. ELLSWORTH (pro hac vice)

4  OWEN L. CYRULINK (pro hac vice)

5  70 East 55th Street

6  New York, New York 10022

7  Telephone:  (212) 755-0100

8  Facsimile:  (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers)*:

27  This page may be used with any Judicial Council form or any other paper filed with this court.    Page ___3___

Form Approved by the
Judicial Council of California
MC-020 (New January 1, 1987)
Optional Form

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

Legal
Solutions
Plus

CRC 201, 501

SUPERIOR COURT OF CALIFORNIA

**SUMMONS**
(CITACION JUDICIAL)

COUNTY OF SAN FRANCISCO

SUM-100

**DEFENDANTS**
NOTICE TO DEFENDANT: (AVISO AL DEMANDADO):

DEUTSCHE BANK SECURITIES INC.; DEUTSCHE ALT-A SECURITIES, INC.; DB
STRUCTURED PRODUCTS, INC.; J.P. MORGAN SECURITIES, INC., F/K/A BEAR, STEARNS &
CO. INC.; STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC.; THE BEAR STEARNS
COMPANIES, LLC, F/K/A THE BEAR STEARNS COMPANIES, INC.; COUNTRYWIDE
SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC, F/K/A CREDIT SUISSE
FIRST BOSTON LLC;
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
(LO ESTÁ DEMANDANDO EL DEMANDATE)
FEDERAL HOME LOAN BANK OF SAN FRANCISCO

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted puede usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| The name and address of the court is: (El nombre y dirección de la corte es): | CASE NUMBER: (Número del Caso): |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO 400 McAllister Street San Francisco, California 94102 | CGC-10-497839 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
ROBERT A. GOODIN, SBN 061302        415-392-7900        415-398-4321 fax
FRANCINE T. RADFORD, SBN 168269/ANNE H. HARTMAN, SBN 184556
GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
505 Sansome Street, Suite 900, San Francisco, California  94111
Additional Counsel listed on Additional Page form attached

DATE: JUN 0 9 2010        CLERK OF THE COURT        Clerk, by                        , Deputy
(Fecha)                    (Secretario)                WESLEY RAMIREZ        (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [xx] on behalf of (specify): Deutsche Alt-A Securities, Inc.

under: [xx] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
       [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
       [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (individual)
       [ ] other (specify):
4. [ ] by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Page 1 of 1
Code of Civil Procedure §§ 412.20, 465
SP-C53

SUM-200(A)

| SHORT TITLE:  Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff      ☒ Defendant      ☐ Cross-Complainant      ☐ Cross-Defendant

RBS SECURITIES, INC., F/K/A GREENWICH CAPITAL MARKETS, INC.; RBS ACCEPTANCE, INC., F/K/A GREENWICH CAPITAL ACCEPTANCE, INC.; RBS HOLDINGS USA, INC., F/K/A GREENWICH CAPITAL HOLDINGS, INC.; MORGAN STANLEY & CO. INCORPORATED; UBS SECURITIES, LLC; MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; MERRILL LYNCH PIERCE, FENNER & SMITH, INC.; AND DOES 1 - 50

Page ___ of ___

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Legal
Solutions
◈ Plus

| SHORT TITLE: Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al. | CASE NUMBER: CGC-10-497839 |
|---|---|

1 | GRAIS & ELLSWORTH LLP

2 | DAVID J. GRAIS (pro hac vice)

3 | KATHRYN C. ELLSWORTH (pro hac vice)

4 | OWEN L. CYRULINK (pro hac vice)

5 | 70 East 55th Street

6 | New York, New York 10022

7 | Telephone: (212) 755-0100

8 | Facsimile: (212) 755-0052

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court.    Page 3

1   GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
2   ROBERT A. GOODIN, State Bar No. 061302
        rgoodin@goodinmacbride.com
3   FRANCINE T. RADFORD, State Bar No. 168269
        fradford@goodinmacbride.com
4   ANNE H. HARTMAN, State Bar No. 184556
        ahartman@goodinmacbride.com
5   505 Sansome Street, Suite 900
    San Francisco, California  94111
6   Telephone:    (415) 392-7900
7   Facsimile:    (415) 398-4321

8   GRAIS & ELLSWORTH LLP
9   DAVID J. GRAIS (*pro hac application submitted herewith*)
    KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
10  OWEN L. CYRULNIK (*pro hac application submitted herewith*)
    LEANNE M. WILSON (*pro hac application submitted herewith*)
11  70 East 55th Street
    New York, New York 10022
12  Telephone:    (212) 755-0100
    Facsimile:    (212) 755-0052
13

14  Attorneys for Plaintiff
    Federal Home Loan Bank of San Francisco
15

16              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

17              IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

18

19  FEDERAL HOME LOAN BANK OF SAN          No.  CGC-10-497839
    FRANCISCO,
20                                         **FIRST AMENDED COMPLAINT FOR
                   Plaintiff,              RESCISSION AND DAMAGES FOR:**
21
    v.
22                                         **(1) VIOLATIONS OF §§ 25401 AND
    DEUTSCHE BANK SECURITIES INC.;             25501 OF THE CALIFORNIA
23  DEUTSCHE ALT-A SECURITIES INC.;            CORPORATE SECURITIES ACT;**
    DB STRUCTURED PRODUCTS, INC.;
24  J.P. MORGAN SECURITIES, INC., F/K/A    **(2) VIOLATIONS OF §§ 11 AND 15 OF
    BEAR, STEARNS & CO. INC.;                  THE SECURITIES ACT OF 1933;**
25  STRUCTURED ASSET MORTGAGE
    INVESTMENTS II, INC.;                  **(3) VIOLATIONS OF §§ 12(a)(2) AND
26  THE BEAR STEARNS COMPANIES, LLC,           15 OF THE SECURITIES ACT OF
    F/K/A THE BEAR STEARNS                     1933;**
27  COMPANIES, INC.;
28                                         **(4) VIOLATIONS OF §§ 1572 AND 1710**

FILED
Superior Court of California
County of San Francisco

JUN 1 0 2010

CLERK OF THE COURT
BY: _____
                Deputy Clerk

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  COUNTRYWIDE SECURITIES
2  CORPORATION;
   CREDIT SUISSE SECURITIES (USA) LLC,
3  F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;
4  RBS SECURITIES, INC., F/K/A/
   GREENWICH CAPITAL MARKETS, INC.;
5  RBS ACCEPTANCE, INC., F/K/A
   GREENWICH CAPITAL ACCEPTANCE,
6  INC.;
   RBS HOLDINGS USA, INC., F/K/A
7  GREENWICH CAPITAL HOLDINGS,
   INC.;
8  MORGAN STANLEY & CO.
   INCORPORATED;
9  UBS SECURITIES, LLC;
10 MORTGAGE ASSET SECURITIZATION
   TRANSACTIONS, INC.;
11 MERRILL LYNCH, PIERCE, FENNER &
12 SMITH, INC.;
   WAMU CAPITAL CORP.;
13 WASHINGTON MUTUAL MORTGAGE
   SECURITIES CORP.; AND,
14 DOES 1-50,

15
        Defendants.
16

OF THE CALIFORNIA CIVIL
CODE (NEGLIGENT
MISREPRESENTATION); and

(5) RESCISSION OF CONTRACTS
UNDER § 1689 ET SEQ. OF THE
CALIFORNIA CIVIL CODE

17

18      Plaintiff, FEDERAL HOME LOAN BANK OF SAN FRANCISCO (referred to in

19 this Complaint as **the Bank**) complains of defendants and for causes of action alleges as follows:

20                          **NATURE OF THIS ACTION**

21      1.      This is an action for rescission and damages as a result of the violation by the

22 Defendants of the California Corporate Securities Act, the California Civil Code, the federal

23 Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or

24 issued to the Bank 41 certificates in 38 securitization trusts backed by residential mortgage loans.

25 The Bank paid more than $5.9 billion for those certificates. When they offered and then sold

26 these certificates to the Bank, the Defendants made numerous statements to the Bank about the

27 certificates and the credit quality of the mortgage loans that backed them. Many of those

28 statements were untrue as to material facts. Moreover, the Defendants omitted to state many

-2-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the Loan-to-Value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans departed from their own standards in doing so.

2.    Defendants made such untrue or misleading statements about at least the following numbers of the loans in each of the 38 securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 1,411 | 3,543 | 39.8% |
| 2 | 641 | 1,708 | 37.5% |
| 3 | 1,069 | 2,680 | 39.9% |
| 4 | 1,785 | 2,894 | 61.7% |
| 5 | 676 | 1,719 | 39.3% |
| 6 | 513 | 1,890 | 27.1% |
| 7 | 2,347 | 3,565 | 65.8% |
| 8 | 826 | 1,367 | 60.4% |
| 9 | 279 | 1,269 | 22.0% |
| 10 | 202 | 965 | 20.9% |
| 11 | 1,669 | 4,037 | 41.3% |
| 12 | 323 | 643 | 50.2% |
| 13 | 1,415 | 2,925 | 48.4% |
| 14 | 828 | 1,421 | 58.3% |
| 15 | 418 | 916 | 45.6% |
| 16 | 595 | 1,231 | 48.3% |
| 17 | 998 | 2,003 | 49.8% |
| 18 | 1,852 | 2,736 | 67.7% |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-3-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Number of Loans about which *Defendants Made* Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about which *Defendants Made* Material Untrue or Misleading Statements |
|---|---|---|---|
| 19 | 2,515 | 5,119 | 49.1% |
| 20 | 1,043 | 2,758 | 37.8% |
| 21 | 817 | 2,141 | 38.2% |
| 22 | 15,859 | 38,159 | 41.6% |
| 23 | 3,223 | 4,944 | 65.2% |
| 24 | 1,145 | 2,929 | 39.1% |
| 25 | 737 | 2,351 | 31.3% |
| 26 | 494 | 3,346 | 14.8% |
| 27 | 268 | 952 | 28.2% |
| 28 | 396 | 1,505 | 26.3% |
| 29 | 1,190 | 2,852 | 41.7% |
| 30 | 830 | 2,629 | 31.6% |
| 31 | 583 | 1,871 | 31.2% |
| 32 | 663 | 1,201 | 55.2% |
| 33 | 729 | 1,337 | 54.5% |
| 34 | 1,253 | 2,723 | 46.0% |
| 35 | 986 | 2,713 | 36.3% |
| 36 | 4,669 | 7,191 | 64.9% |
| 37 | 1,321 | 3,220 | 41.0% |
| 38 | 859 | 1,780 | 48.3% |

The Bank is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[1]

---

[1] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-4-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.      The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, the Bank is entitled to rescind its purchase of the certificates or to be paid damages for its losses on the certificates.

4.      Nine securities dealers sold these certificates to the Bank. The nine dealers are Defendants Deutsche Bank Securities Inc. (which sold to the Bank certificates in four securitization trusts, which are referred to in this Complaint as Securitizations Nos. 1 through 4), Bear Stearns & Co. Inc. (four securitizations, Nos. 5 through 8), Countrywide Securities Corporation (one securitization, No. 9), Credit Suisse Securities (USA) LLC (seven securitizations, Nos. 10 through 16), Greenwich Capital Markets, Inc. (three securitizations, Nos. 17 through 19), Morgan Stanley & Co. Incorporated (two securitizations, Nos. 20 and 21), UBS Securities, LLC (seven securitizations, Nos. 22 through 28), Merrill Lynch, Pierce, Fenner & Smith, Inc. (five securitizations, Nos. 29 through 33), and WaMu Capital Corp. (five securitizations, Nos. 34 through 38). The other Defendants named in this Complaint are liable to the Bank because they were the issuers of some of those certificates or because they controlled one of those issuers.

## PARTIES

5.      Plaintiff is a bank created by the Federal Home Loan Bank Act. The headquarters of the Bank are in the City and County of San Francisco. Under its Organization Certificate, the Bank is to operate in Federal Home Loan Bank District 11, which comprises the States of Arizona, California, and Nevada. The Bank does operate in each of those three States.

6.      Defendant Deutsche Bank Securities Inc. (referred to as **Deutsche**) is a corporation organized under the laws of Delaware. Deutsche sold the Bank four of the certificates.

7.      Defendant Deutsche Alt-A Securities, Inc. (referred to as **Deutsche Alt-A**) is a corporation organized under the laws of Delaware. Deutsche Alt-A was the issuer of one of the certificates that Deutsche sold to the Bank.

8.      Defendant **DB Structured Products, Inc.** is a corporation organized under the laws of Delaware. The Bank is informed and believes, and based thereon alleges, that Deutsche

-5-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

1   Alt-A exists for no purpose other than *to receive and deposit* loans into the trusts. During the

2   relevant time period, DB Structured Products, Inc. controlled Deutsche Alt-A. Under Section 15

3   of the Securities Act, 15 U.S.C. § 77o, DB Structured Products, Inc. therefore is liable to the

4   Bank jointly and severally with, and to the same extent as, Deutsche Alt-A.

5         9.     Defendant J.P. Morgan Securities, Inc. (formerly known as Bear, Stearns & Co.

6   Inc. and referred to as **Bear Stearns**) is a corporation organized under the laws of Delaware. Bear

7   Stearns sold the Bank four of the certificates.

8         10.    Defendant Structured Asset Mortgage Investments II, Inc. (referred to as **SAMI II**)

9   is a corporation organized under the laws of Delaware. SAMI II was the issuer of three of the

10   certificates that Bear Stearns sold to the Bank.

11         11.    Defendant The Bear Stearns Companies, LLC (formerly known as and referred to

12   as **The Bear Stearns Companies, Inc.**) is a limited liability company organized under the laws

13   of Delaware. The Bank is informed and believes, and based thereon alleges, that SAMI II exists

14   for no purpose other than to receive and deposit loans into the trusts. During the relevant time

15   period, The Bear Stearns Companies, Inc. controlled SAMI II. Under Section 15 of the Securities

16   Act, 15 U.S.C. § 77o, The Bear Stearns Companies, Inc. therefore is liable to the Bank jointly and

17   severally with, and to the same extent as, SAMI II.

18         12.    Defendant Countrywide Securities Corporation (referred to as **Countrywide**) is a

19   corporation organized under the laws of California. Countrywide sold the Bank two of the

20   certificates.

21         13.    Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse

22   First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under

23   the laws of Delaware. Credit Suisse sold the Bank eight of the certificates.

24         14.    Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets,

25   Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of

26   Delaware. Greenwich Capital sold the Bank three of the certificates.

27         15.    Defendant RBS Acceptance, Inc. (formerly known as Greenwich Capital

28   Acceptance, Inc. and referred to as **Greenwich Capital Acceptance**) is a corporation organized

-6-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    under the laws of Delaware. Greenwich Capital Acceptance was the issuer of the three certificates

2    that Greenwich Capital sold to the Bank.

3        16.    Defendant RBS Holdings USA, Inc. (formerly known as and referred to as

4    **Greenwich Capital Holdings, Inc.**) is a corporation organized under the laws of Delaware. The

5    Bank is informed and believes, and based thereon alleges, that Greenwich Capital Acceptance

6    exists for no purpose other than to receive and deposit loans into the trusts. During the relevant

7    time period, Greenwich Capital Holdings, Inc. controlled Greenwich Capital Acceptance. Under

8    Section 15 of the Securities Act, 15 U.S.C. § 77o, Greenwich Capital Holdings, Inc. therefore is

9    liable to the Bank jointly and severally with, and to the same extent as, Greenwich Capital

10   Acceptance.

11       17.    Defendant Morgan Stanley & Co. Incorporated (referred to as **Morgan Stanley**) is

12   a corporation organized under the laws of Delaware. Morgan Stanley sold the Bank two of the

13   certificates.

14       18.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company

15   organized under the laws of Delaware. UBS sold the Bank seven of the certificates.

16       19.    Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)

17   is a corporation organized under the laws of Delaware. MAST was the issuer of three of the

18   certificates that UBS sold to the Bank.

19       20.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (referred to as **Merrill**

20   **Lynch**) is a corporation organized under the laws of Delaware. Merrill Lynch sold the Bank six

21   of the certificates.

22       21.    Defendant WaMu Capital Corp. (referred to as **WaMu Capital**) is a corporation

23   organized under the laws of Washington. WaMu Capital sold the Bank five of the certificates.

24       22.    Defendant Washington Mutual Mortgage Securities Corp. (referred to as **WaMu**

25   **Mortgage**) is a corporation organized under the laws of Delaware. WaMu Mortgage was the

26   issuer of the five certificates that WaMu Capital sold to the Bank.

27       23.    The Bank is ignorant of the true names and capacities of Defendants sued herein as

28   Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. The Bank will

-7-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   amend this Complaint to allege the true names and capacities of these Defendants when

2   ascertained. The Bank is informed and believes that each of the fictitiously named Defendants

3   is responsible in some manner for the occurrences alleged herein and proximately caused the

4   Bank's damages.

### JURISDICTION AND VENUE

6       24.    This action is an unlimited civil case within the meaning of California Code of

7   Civil Procedure section 88, in that, *inter alia*, the amount in controversy (as defined in California

8   Code of Civil Procedure section 85(a)) exceeds twenty five thousand dollars ($25,000). This

9   Court has subject-matter jurisdiction of the Bank's causes of action for rescission under Sections

10   25401 and 25501 of the California Corporate Securities Act, damages for negligent

11   misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a)

12   of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over the Bank's

13   causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k,

14   77l(a)(2), and 77o.

15       25.    Under Section 22(a) of the Securities Act, "no case arising under this title and

16   brought in any State court of competent jurisdiction shall be removed to any court of the United

17   States." Because its activities are not localized in one state, the Bank is not a citizen of any state

18   under 28 U.S.C. § 1332(c), so the Federal courts have no jurisdiction of this action under 28

19   U.S.C. § 1332(a). This action is not removable to Federal court.

20       26.    Deutsche, DB Structured Products, Inc., Bear Stearns, Countrywide, Credit Suisse,

21   Greenwich Capital, Morgan Stanley, UBS, and Merrill Lynch are subject to personal jurisdiction

22   in California because each of them is registered to do business, and does business, in California.

23   All of the Defendants are subject to personal jurisdiction in California because they offered and

24   sold or controlled persons that offered and sold the certificates to the Bank "in California" within

25   the meaning of Section 25008 of the California Corporate Securities Act.

26       27.    Venue is proper in this County because, among other reasons, the Defendants

27   offered and sold the certificates to the Bank in this County and because the violations of law

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-8-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

1    alleged in this Complaint, including the making of material untrue or misleading statements,

2    occurred in this County.

3    ## SECURITIZATION OF MORTGAGE LOANS

4         28.    The securities that the Defendants sold the Bank are so-called **residential**

5    **mortgage-backed** securities, or **RMBS**, created in a process known as **securitization**.

6    Securitization begins with loans on which the borrowers are to make payments, usually monthly.

7    The entity that makes the loans is known as the **originator** of the loans. The process by which the

8    originator decides whether to make particular loans is known as the **underwriting** of loans. The

9    purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit

10    standing to repay them and only against sufficient collateral. In the loan underwriting process, the

11    originator applies its **underwriting standards**.

12         29.    In general, residential mortgage lenders may hold some of the mortgage loans they

13    originate in their own portfolio and may sell other mortgage loans they originate into

14    securitizations.

15         30.    In a securitization, a large number of loans, usually of a similar type, are grouped

16    into a **collateral pool**. The originator of those loans sells them (and, with them, the right to

17    receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The

18    trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors

19    such as the Bank. Each certificate entitles its holder to an agreed part of the cash flow from the

20    loans in the collateral pool.

21         31.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part

22    of the overall monthly cash flow from the loans in the collateral pool.

23         32.    In a more complex securitization, the cash flow is divided into different parts,

24    usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into

25    different **classes**, each with different rights. Each class of certificates is entitled to the cash flow

26    in the tranche corresponding to that class.

27         33.    One way in which the cash flow is divided — and the rights of different classes of

28    certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The

-9-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

34.     The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the senior classes of certificates may bear so little of that risk that they may be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully 10 times the historical average.

35.     All of the certificates referred to in this Complaint were senior certificates that were rated triple-A when the Bank purchased them.

\*

36.     Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-10-

**FIRST AMENDED COMPLAINT (DEUTSCHE 497839)**

37.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

*

38.     **Securities dealers**, like nine of the Defendants, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

39.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file also includes notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

40.     Potential investors in certificates are not given access to loan files. Instead, the securities dealers that underwrite the sale of the certificates in a securitization are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans, which has been compiled into a database known as a **loan tape**. The securities dealers use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement,** a disclosure document that the dealers are required to file with the Securities and Exchange Commission.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-11-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

41. As alleged in detail below, the information that the Defendants presented to the Bank about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## TOLLING OF THE STATUTE OF LIMITATIONS

42. The Bank is a putative member of the proposed classes in *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland Group, PLC*, United States District Court for the Southern District of New York, No. 08-cv-05093, filed on May 14, 2008; *Massachusetts Bricklayers & Masons Trust Funds v. Deutsche Alt-A Securities, Inc.*, United States District Court for the Eastern District of New York, No. 08-cv-3178, filed on June 27, 2008; *New Jersey Carpenters Health Fund v. Bear Stearns Mortgage Funding Trust 2006-ARl*, United States District Court for the Southern District of New York, No. 08-cv-08093, filed on August 20, 2008; and *In Re IndyMac Mortgage Backed Securities Litigation*, United States District Court for the Southern District of New York, No. 09-cv-04583, filed on May 14, 2009, the pendency of which actions has tolled the running of the statute of limitations on the causes of action alleged in this Complaint.

## THE SALES OF THE CERTIFICATES

43. The Defendants sold to the Bank 41 certificates in Securitizations Nos. 1 through 38. Details of each trust and each certificate are stated in Item 43 of Schedules 1 through 38 of this Complaint, which correspond to Securitizations Nos. 1 through 38. The Bank incorporates into this paragraph 43, and alleges as though fully set forth in this paragraph, the contents of Item 43 of the schedules.

## DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

44. In connection with their offers and sales of the certificates to the Bank, each of the nine dealer Defendants sent numerous documents to the Bank at its office in San Francisco. For each certificate, these documents included a term sheet (or its equivalent), the prospectus supplement for the certificates that was filed with the SEC, drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of

-12-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

the securitization. In each of these documents, each dealer made statements of material fact about the certificate that it offered and sold to the Bank.[2] A true copy of the prospectus supplement for each securitization is available from the Securities and Exchange Commission's website.[3]

45.     Many of the statements of material fact that each dealer made in these documents were untrue or misleading. These untrue or misleading statements included the following.

## I.     Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools

### A.     LTVs

#### 1.     The materiality of LTVs

46.     The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV is also a primary determinant of the severity of losses for those loans that do default. The lower the LTV, the lower the severity of losses on those loans that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

---

[2] Two of the certificates that the Bank purchased were certificates in re-securitizations of existing certificates of mortgage-backed securities. In connection with the sale of those two certificates, the dealers sent to the Bank a private placement memorandum for the re-securitization and prospectus supplements filed with the SEC for the underlying securitizations. Details of the re-securitizations are included in their respective schedules.

[3] A URL for each prospectus supplement is included in Item 43 of each schedule.

-13-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans and the associated certificates. Prepayment patterns affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

48.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that the Bank purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

49.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an error in value of any given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

50.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and,

-14-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    thus, are essential to the decision of a reasonable investor whether to purchase any such

2    certificate.

3            **2.    Untrue or misleading statements about the LTVs of the mortgage**

4                    **loans in the collateral pools of these securitizations**

5        51.    In the prospectus supplements and other documents they sent to the Bank, the

6    Defendants made material untrue or misleading statements about the LTVs of the mortgage loans

7    in the collateral pools of these securitizations. Each such statement is identified in Item 51 of the

8    schedules of this Complaint. The Bank incorporates into this paragraph 51, and alleges as though

9    fully set forth in this paragraph, the contents of Item 51 of the schedules.

10       52.    The mortgage loans in the collateral pools of these securitizations were divided

11   into groups. Payments on the certificates that the Bank purchased were to be made primarily from

12   the cash flows from the loans in the particular groups that were designated to support the Bank's

13   certificates. Because of the structure of the securitizations, however, in most cases the credit

14   quality of the loans in the other groups in the securitizations also was material to the risk of the

15   certificates that the Bank purchased.

16       53.    The Defendants made these statements as statements of fact. The Bank is informed

17   and believes, and based thereon alleges, that Defendants intended that these statements be

18   understood as statements of fact. The Bank did understand the statements about the LTVs as

19   statements of fact. The Bank had no access to appraisal reports or other documents or information

20   from which it could verify the LTVs of the mortgage loans other than the statements that the

21   Defendants made about those LTVs.

22           **3.    These statements were untrue because the stated LTVs of many of**

23                   **those mortgage loans were lower than their actual LTVs.**

24       54.    The stated LTVs of many of the mortgage loans in each securitization were

25   significantly lower than the true LTVs because the denominators (that is, the value of the

26   properties that secured those loans) that were used to determine the disclosed LTVs were

27

28

-15-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus

2   supplements were also, therefore, untrue and misleading.

3             a.     **Use of an automated valuation model demonstrates that**

4                       **Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

5       55.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

6   possible to determine the true market value of a certain property as of a selected date. An AVM is

7   based on objective criteria like the condition of the property and the actual sale prices of

8   comparable properties in the same locale shortly before the specified date and is more consistent,

9   independent, and objective than other methods of appraisal. AVMs have been in widespread use

10  for many years. The AVM on which these allegations are based incorporates a database of 500

11  million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

12  than 99% of the population, in the United States. Independent testing services have determined

13  that this AVM is the most accurate of all such models.

14      56.    On many of the properties that secured the mortgage loans, the model reported that

15  LTVs were understated. In particular, the model reported that the denominator (that is, the

16  appraised value of the property as stated in the loan tape) that was used to determine the disclosed

17  LTV was 105% or more of the true market value as determined by the model as of the time the

18  loan was originated. The model reported that the denominator that was used to determine the

19  disclosed LTV was 95% or less of the true market value on a much smaller number of properties.

20  Thus, the number of properties on which the value was overstated exceeded by far the number on

21  which the value was understated, and the aggregate amount overstated exceeded by far the

22  aggregate amount understated.

23      57.    To take an example, in Securitization No. 1, there were 3,543 mortgage loans in

24  the collateral pool. There was sufficient information for the model to determine the value of the

25  properties that secured 2,097 of those loans. On 1,114 of those 2,097 properties, the model

26

27      [4] References in this Complaint and the schedules to the denominator in the LTVs are to the appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage

28  loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  reported that the denominator that was used to determine the disclosed LTV was 105% or more of

2  the true market value and the amount by which the stated values of those properties exceeded

3  their true market values in the aggregate was $65,079,411. The model reported that the

4  denominator that was used to determine the disclosed LTV was 95% or less of true market value

5  on only 305 properties, and the amount by which the true market values of those properties

6  exceeded the values reported in the denominator was $20,628,970. Thus, the number of properties

7  on which the value was overstated exceeded by more than three times the number on which the

8  value was understated, and the aggregate amount overstated was more than three times the

9  aggregate amount understated.

10       58.     On one of the loans in Securitization No. 1, the amount of the loan was $302,000

11  and the stated value of the property was $450,000, resulting in a stated LTV of 67.1%. The

12  model, however, determined that the true value of the property was $309,000, resulting in a true

13  LTV of 97.7%. Thus, the stated value was higher than the true value by 45.6%, and the stated

14  LTV was lower than the true LTV by 45.6%. Both of these were huge discrepancies that were

15  material to the credit quality of the loan.

16       59.     The overstated values of 1,114 properties made virtually every statement by

17  Defendants about the LTVs of the mortgage loans untrue or misleading. For example, Defendants

18  stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 169 of

19  the 2,097 properties valued by the model had LTVs of over 100%. Defendants also stated that the

20  weighted average LTV of the loans in the loan group from which the Bank's bonds were to be

21  paid was 69.54%. In fact, among the loans in that group that the AVM was able to value, the

22  weighted average LTV was 76.88%. These differences were material for the reasons stated above.

23       60.     The results of the valuations by the automated model in this example are

24  summarized in the following table.

25  ///

26

27

28

-17-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

| Number of loans | 3,543 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 2,097 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,114 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $65,079,411 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 305 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,628,970 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 169 |
| Weighted-average LTV, as stated by Defendants (group 4) | 69.54% |
| Weighted-average LTV, as determined by the model (group 4) | 76.88% |

61.     The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 61 of the schedules of this Complaint. The Bank incorporates into this paragraph 61, and alleges as though fully set forth in this paragraph, the contents of Item 61 of the schedules.

**b.      Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

62.     Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the only basis for determining the value of the property because there is no sale price in a refinancing. A substantial number of those properties have since been sold. In nearly all the pools, those properties were sold for much less than the value ascribed to them in the LTV data reported in the prospectus supplements and other documents that the Defendants sent to the Bank. The differences cannot be explained by the declines in house prices in the areas in which those properties were located. Analysis of indices that track home prices in various geographic areas shows that the differences between the values ascribed to these properties and the prices at which the properties were sold are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and

-18-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  the corresponding sale). Thus, the large differences show that the values ascribed to those

2  properties, and to all properties in the collateral pools, in the LTV data reported in the prospectus

3  supplements and other documents that the Defendants sent to the Bank were too high, that the

4  *resulting LTVs were too low, and thus that the statements in the prospectus* supplements and

5  other documents sent to the Bank about the LTVs were untrue or misleading.

6        63.    To return to the example of Securitization No. 1, of the 3,543 mortgage loans in

7  the collateral pool, 1,407 were taken out to refinance, rather than to purchase, properties. For

8  those 1,407 loans, the value (denominator) in the LTV was an appraised value rather than a sale

9  price. Of those 1,407 properties, 218 were subsequently sold for a total of approximately

10  $73,471,208. The total value ascribed to those same properties in the LTV data reported in the

11  prospectus supplements and other documents sent to the Bank was $96,283,500. Thus, those

12  properties were sold for 76.3% of the value ascribed to them, a difference of 23.7%. This

13  difference is significantly greater than would have been predicted by the declines in house prices

14  in the areas in which those properties were located.

15        64.    The results of this analysis for the securitizations are stated in Item 64 of the

16  schedules of this Complaint. The Bank incorporates into this paragraph 64, and alleges as though

17  *fully set forth in this paragraph, the contents of Item 64 of the schedules.*

18        **4.    These statements were misleading because the Defendants omitted to**

19             **state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

20        65.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

21  likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

22  less likely that a decline in the value of the property will wipe out the owner's equity and thereby

23  give the owner an incentive to stop making mortgage payments and abandon the property.

24  Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

25  predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the

26  severity of loss on those loans that do default. The power of LTV to predict defaults,

27  prepayments, and severities is a major reason why reasonable investors consider the LTVs of

28

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

1  mortgage loans important to the decision whether to purchase a certificate in the securitization of

2  those loans.

3      66.    The predictive power of the LTV of a mortgage loan is much reduced if there are

4  additional liens on the same property. Additional liens reduce the owner's equity in the property

5  *and thereby increase the owner's incentive to stop making mortgage payments and abandon the*

6  property if the value of the property falls below the combined amount of all of the liens on the

7  property (a strategic default). Additional liens also exacerbate delinquencies and defaults because

8  they complicate the servicing of mortgage loans and the management of delinquencies and

9  defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also

10  with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may

11  want to grant a borrower forbearance while the borrower is unemployed and allow him or her to

12  *add missed payments to the principal of the loan and to resume payments when he or she is*

13  employed again. But the servicer of the second-lien mortgage may refuse such forbearance and

14  initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

15      67.    According to land records, many of the properties that secured mortgage loans in

16  the collateral pool of each securitization were subject to liens in addition to the lien of the

17  mortgage in the pool at the time of the closing of these securitizations.[5] In 17 of the

18  securitizations, the Defendants failed to disclose any of these additional liens in the prospectus

19  *supplements and other documents they sent to the Bank.* These additional liens reduced the equity

20  of the owners of the properties subject to them, and thereby increased the risk that those owners

21  would default in payment of the mortgage loan in the pool.

22      68.    To take an example, of the 2,894 properties that secured the mortgage loans in

23  Securitization No. 4, at least 115 were subject to undisclosed liens in addition to the lien of the

24  mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'

25  equity in those properties by a weighted average of 84.8% and by an aggregate amount of

26  $13,330,964.

[5] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

-20-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

69.     On one of the loans, the original balance of the mortgage loan was $464,000, the represented value of the property was $580,000, the owner's ostensible equity was $116,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $85,931. Thus, the owner's true equity was only $30,069, 74.1% less than the equity implied by the disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed additional liens were precisely equal to the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

70.     Similar numbers of additional undisclosed liens were found in each securitization where the defendants did not disclose the existence of additional liens. Details of the undisclosed additional liens in each securitization are stated in Item 70 of the schedules of this Complaint. The Bank incorporates into this paragraph 70, and alleges as though fully set forth in this paragraph, the contents of Item 70 of the schedules. The Bank is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the schedules.

71.     Because the Defendants did not disclose the existence or the amounts of these additional liens, all statements that they made about the LTVs of the mortgage loans were misleading.

**B.     Appraisals**

72.     As discussed above in paragraph 49, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

73.     In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to

-21-

enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

74.     This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the Defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

1.     **These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

75.     Defendants omitted to state that brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values,

- the withholding of business if the appraisers refused to guarantee a predetermined value,

- the withholding of business if the appraisers refused to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

-22-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

76.  The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 62 through 64 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 55 through 61, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 3.7 | 3.2 |
| 2 | 2 | 2.2 |
| 3 | 2.8 | 2.6 |
| 4 | 7 | 8.1 |
| 5 | 3.6 | 4.6 |
| 6 | 2.4 | 1.7 |
| 7 | 14.3 | 16.7 |
| 8 | 10.3 | 12.8 |
| 9 | 2.2 | 1.5 |
| 10 | 2.3 | 2.1 |
| 11 | 4.3 | 4.5 |
| 12 | 13.6 | 16.0 |
| 13 | 7.5 | 7.7 |
| 14 | 7.5 | 7.5 |
| 15 | 6.6 | 8.1 |
| 16 | 3.1 | 3.1 |
| 17 | 1.6 | 1.6 |
| 18 | 13.1 | 17.5 |

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 19 | 6.2 | 7.1 |
| 20 | 2 | 1.7 |
| 21 | 3.5 | 3.6 |
| 22 | 4.4 | 5.6 |
| 23 | 9.4 | 12.3 |
| 24 | 4.7 | 5.7 |
| 25 | 2.8 | 2.3 |
| 26 | 2.6 | 1.7 |
| 27 | 2 | 1.3 |
| 28 | 1.7 | 1.2 |
| 29 | 3.1 | 2.6 |
| 30 | 2.5 | 1.6 |
| 31 | 2.7 | 2.2 |
| 32 | 15.2 | 10.7 |
| 33 | 13.2 | 17 |
| 34 | 2 | 1.4 |
| 35 | 2.9 | 2.4 |
| 36 | 2.4 | 3.0 |
| 37 | 3.1 | 3.7 |
| 38 | 4.2 | 5.0 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

77.    The Bank is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-24-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**2.    The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

78.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

79.    USPAP includes the following provisions:

(a)    Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

(b)    Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

(c)    Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favors the cause of the client;

3.    the amount of a value opinion;

4.    the attainment of a stipulated result; or

5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

80.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

-25-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  ____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc.

2  About such conditions, Advisory Opinion 19 states:

3      *Certain types of conditions are unacceptable in any assignment*

4  *because performing an assignment under such conditions violates USPAP. Specifically, an assignment condition is unacceptable*

5  *when it:*

6     • precludes an appraiser's impartiality. Because such a condition destroys the objectivity and independence

7      required for the development and communication of credible results;

8     • limits the scope of work to such a degree that the assignment results are not credible, given the intended use

9      of the assignment; or

10     • limits the content of a report in a way that results in the report being misleading.

11

12      81.    In the prospectus supplements and other documents they sent to the Bank, the

13  Defendants made statements that the appraisals of properties that secured the mortgage loans in

14  the collateral pools were made in compliance with USPAP or with the appraisal standards of

15  Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such

16  statement are stated in Item 81 of the schedules of this Complaint. The Bank incorporates into this

17  paragraph 81, and alleges as though fully set forth in this paragraph, the contents of Item 81 of the

18  schedules.

19      82.    The Bank is informed and believes, and based thereon alleges, that a material

20  number of mortgage loans in the collateral pools had appraisals conducted that deviated from

21  USPAP.

22      83.    Each of these statements referred to in paragraph 81 was untrue because the

23  appraisals of a material number of the properties referred to in each such statement did not

24  conform to USPAP.

25                *

26      84.    By each of the untrue and misleading statements referred to in paragraphs 51 and

27  81 above, the Defendants materially understated the risk of the certificates that they offered and

28  sold to the Bank.

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**II.** **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

    **A.** **The materiality of occupancy status**

85. Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

86. Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

    **B.** **Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

87. In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 3,543 mortgage loans in the collateral pool, 2,931 were secured by primary residences and 612 were not. Details of each such statement in each securitization are stated in Item 87 of the schedules of this Complaint. The Bank incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the schedules.

88. These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans not secured by primary residences was lower

-27-

than the actual number of loans in that category; or (iii) the Defendants omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pools was misstated because of fraud.

**C. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

89. Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. The Bank is informed and believes, and based thereon alleges, that borrowers many nonconforming securitized loans did so.

90. A significant number of the properties in the collateral pool of each securitization that were stated to be primary residences actually were not. Moreover, the Bank is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pool.

91. With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

92. In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-28-

1    but did not designate the property as his or her homestead. That omission is strong evidence that

2    the property was not the borrower's primary residence.

3          93.    With respect to some of the properties that were stated to be primary residences,

4    the borrower owned three or more properties. Thus it was reasonably likely that the borrower did

5    not live in the property that was stated to be owner-occupied.

6          94.    When a borrower who lives in a mortgaged property falls behind in his or her

7    payments, it is normally many months before foreclosure ensues, during which time the borrower

8    tries to become current in his or her payments or to modify the mortgage so as not to lose his or

9    her home. During this time, the borrower becomes progressively more delinquent (30 days past

10   due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight

11   from being current to either foreclosure or ownership by the lender, it is usually because the

12   borrower did not live in the property and so made no effort to remain in it, but instead abandoned

13   the property to the lender soon after he or she became unable to make the payments. In many of

14   the securitizations, there were mortgage loans in the collateral pools that were secured by

15   properties that were stated to be primary residences and that went straight from current to

16   foreclosure or ownership by the lender. It is more likely than not that the properties that secured

17   these mortgage loans were actually not primary residences.

18         95.    In Securitization No. 1, 268 owners of properties that were stated to be primary

19   residences instructed local tax authorities to send the bills for the taxes on that property to them at

20   a different address; 361 owners of properties that were stated to be primary residences could

21   have, but did not, designate that property as their homestead; 16 owners of properties that were

22   stated to be primary residences owned three or more properties; and three properties that were

23   stated to be primary residences went straight from less than 90 days of delinquency to

24   foreclosure. Eliminating duplicates, 540 properties that were stated to be primary residences

25   actually were not, for one or more of these reasons. Thus, of the 2,931 properties that were stated

26   to be primary residences, 540 actually were not, and the number of properties that were not

27   primary residences was not 612, as the defendants stated, but actually 1,152, a material

28   difference. The numbers of such loans in the collateral pool of each securitization are stated in

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-29-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

1   Item 95 of the schedules of this Complaint. The Bank incorporates into this paragraph 95, and

2   alleges as though fully set forth in this paragraph, the contents of Item 95 of the schedules.

3                                                  *

4          96.     By each of the untrue and misleading statements referred to in paragraph 87, the

5   Defendants materially understated the risk of the certificates that they offered and sold to the

6   Bank.

7   **III.   Untrue or Misleading Statements About the Underwriting Standards of the
           Originators of the Mortgage Loans in the Collateral Pools**
8
         **A.     The materiality of underwriting standards and the extent of an originator's
9                 departures from them**

10         97.     Originators of mortgage loans have written standards by which they underwrite

11  applications for loans. An important purpose of underwriting is to ensure that the originator

12  makes mortgage loans only in compliance with those standards and that its underwriting decisions

13  are properly documented. An even more fundamental purpose of underwriting mortgage loans is

14  to ensure that loans are made only to borrowers with credit standing and financial resources to

15  repay the loans and only against collateral with value, condition, and marketability sufficient to

16  secure the loans. An originator's underwriting standards, and the extent to which the originator

17  departs from its standards, are important indicators of the risk of mortgage loans made by that

18  originator and of certificates sold in a securitization in which mortgage loans made by that

19  originator are part of the collateral pool. A reasonable investor considers the underwriting

20  standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

21  to which each originator departs from its standards, important to the decision whether to purchase

22  a certificate in that securitization.

23       **B.     Untrue or misleading statements about the underwriting standards of
                  originators of the mortgage loans in the collateral pools and about the extent
24                to which those originators departed from their standards**

25               **1.     The untrue or misleading statements**

26         98.     In the prospectus supplements and other documents they sent to the Bank, the

27  Defendants made statements about the underwriting standards of the originators of the mortgage

28  loans in the collateral pool. Details of each such statement are stated in Item 98 of the schedules

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                                            -30-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. The Bank incorporates into this paragraph 98, and alleges as though fully set forth in this paragraph, the contents of Item 98 of the schedules.

99.     The Bank is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the Defendants omitted to state that: (a) the originators were departing extensively from those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

2.     **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading**

a.     **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

100.    The Bank is informed and believes, and based thereon alleges, before and during the time of these securitizations, many originators of mortgage loans relaxed their actual lending practices for loans they sold into securitizations, even though their stated underwriting standards may have remained unchanged. As a result of this relaxation, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

101.    Based on an extensive empirical study of mortgage loans made and sold into securitizations during this period, economists at the University of Michigan and elsewhere found that the high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-31-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

102.    What these economists found about recent securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator IndyMac Bank, F.S.B. as an example, Figure 1 shows the rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by IndyMac Bank, F.S.B. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator departed from its underwriting standards in making the loan, often by failing to detect fraud in the application. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by IndyMac Bank, F.S.B. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.

///

-32-





Figure 1: Percent of Loans Originated by IndyMac or Its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination

103.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

///

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**





Figure 2: Percent of Loans Originated by IndyMac or Its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

104.   Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
| --- | --- |
| A | Bank of America N.A. |
| B | Bear Stearns Residential Funding & EMC Mortgage Corp. |
| C | Countrywide Home Loans, Inc. |
| D | Greenpoint Mortgage Funding |
| E | IndyMac Bank, F.S.B. |
| F | National City Mortgage Co. |

The Bank incorporates into this paragraph 104, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

-34-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

    **b.** **The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

  105. As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in the collateral pools of these securitization experienced very high rates of EPDs, some much higher than the rate of EPDs suffered by all securitized prime, non-agency (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs, and the percent of all securitized prime (including Alt-A) mortgage loans made at the same time that suffered EPDs, are stated in Item 105 of the schedules of this Complaint. The Bank incorporates into this paragraph 105, and alleges as though fully set forth in this paragraph, the contents of Item 105 of the schedules.

  106. A higher-than-normal rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure, some much higher than the rate of such delinquencies suffered by all securitized prime (including Alt-A) mortgage loans made in the United States during the same time in which those loans were made. This much higher-than-normal rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies, and the percent of all securitized prime (including Alt-A) mortgage loans made at the same time that suffered such delinquencies, are stated in Item 106 of the schedules of this Complaint. The Bank incorporates into this paragraph 106, and alleges as though fully set forth in this paragraph, the contents of Item 106 of the schedules.

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

107.     A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure, some as high as 56.7% of the loans in some pools as of March 31, 2010. By contrast, only 14.7% of all mortgage loans made in the United States (including millions of loans of lower ostensible credit quality) were 30 or more days delinquent on the same date. This much higher-than-normal rate of delinquencies is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on March 31, 2010, are stated in Item 107 of the schedules of this Complaint. The Bank incorporates into this paragraph 107, and alleges as though fully set forth in this paragraph, the contents of Item 107 of the schedules.

        c.      **Governmental investigations also concluded that the largest originator in these securitizations departed from its underwriting standards.**

108.     In addition to the statistical data cited above, governmental investigations also concluded that IndyMac Bank, F.S.B. (which originated 61% of all the loans in the collateral pools of these securitizations), made extensive, undisclosed departures from its stated underwriting standards.

109.     The Office of the Inspector General of the U.S. Treasury Department and the Center for Responsible Lending, a nonprofit, nonpartisan research and policy organization, both conducted investigations into the underwriting practices at IndyMac Bank, F.S.B. Both issued reports that concluded that IndyMac made loans to many borrowers who could not afford to make their payments.

110.     The Inspector General wrote that IndyMac conducted "little, if any, review of borrower qualifications, including income, assets, and employment." IndyMac obtained signed requests by borrowers to the Internal Revenue Service for copies of past tax returns, but IndyMac seldom forwarded the signed requests on to the IRS. Indeed, the Inspector General reported that former IndyMac underwriters said that "stated income" loans (loans that require no

-36-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   documentation of the borrowers' income) "allowed outside mortgage brokers and in-house sales

2   staffers to inflate applicants' incomes and make them look like better credit risks."

3       111.   Similarly, the Center for Responsible Lending reported that it "uncovered

4   substantial evidence that IndyMac and its parent, IndyMac Bancorp, engaged in unsound and

5   abusive lending during the mortgage boom, routinely making loans without regard to borrowers'

6   ability to repay." Former employees of IndyMac "describe an atmosphere where . . . IndyMac

7   pushed through loans with fudged or falsified information or simply lowered standards so

8   dramatically that shaky loans were easy to approve." One former IndyMac underwriter stated that

9   she "would reject a loan and the insanity would begin. It would go to upper management and the

10  next thing you know it's going to closing."

11      112.   The Inspector General also "found weaknesses with property appraisals obtained

12  to support the collateral on the loans." There were "instances where IndyMac officials accepted

13  appraisals that were not in compliance with the Uniform Standard of Professional Appraisal

14  Practice (USPAP)" and "instances where IndyMac obtained multiple appraisals on a property that

15  had vastly different values," but "[t]here was no evidence to support, or explain why different

16  values were determined." A separate investigation by the Office of Thrift Supervision (OTS)

17  similarly concluded that "OTS identified serious issues with IndyMac's appraisals" and found

18  "that the borrowers, rather than the mortgage originator, were paying the appraisers directly,

19  which did not ensure appraiser independence."

20                                          *

21      113.   By each of the untrue and misleading statements referred to in paragraph 98 above,

22  the Defendants materially understated the risk of the certificates that they offered and sold to the

23  Bank. Moreover, the Bank is informed and believes, and based thereon alleges, that discovery

24  will yield additional evidence that the originators departed extensively from their underwriting

25  guidelines when making the mortgage loans in the collateral pools of these securitizations.

26

27

28

-37-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**IV.    The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements about the Ratings of the Bank's Certificates Untrue and Misleading.**

114.    In the prospectus supplements and other documents they sent to the Bank, the Defendants made statements about the rating of each certificate by Moody's Investors Service, Standard & Poor's Rating Service, and *Fitch Ratings*. They stated that one or more of those agencies rated each such certificate triple-A, the highest rating available from either agency. Details of each such statement are stated in Item 114 of the schedules of this Complaint. The Bank incorporates into this paragraph 114, and alleges as though fully set forth in this paragraph, the contents of Item 114 of the schedules.

115.    The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including the Bank, have investment policies that require a certain minimum rating for all investments. The policy of the Bank was to purchase only certificates that were rated triple-A.

116.    These statements by the Defendants about the ratings of the certificates they sold to the Bank were misleading because the Defendants omitted to state that the ratings did not take into account all the material untrue or misleading statements about specific mortgage loans in the collateral pool. These include:

(a)    loans in which the LTVs were materially understated;

(b)    loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have made undisclosed departures from the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be *owner-occupied, but were not.*

117.    In Securitization No. 1, there were 1,114 loans whose LTVs were materially understated, 27 loans that suffered EPDs, and 540 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 1,411 loans (or 39.8% of the loans in the collateral pool) about which the defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 117 of

-38-

1    the schedules of this Complaint. The Bank incorporates into this paragraph 117, and alleges as

2    though fully set forth in this paragraph, the contents of Item 117 of the schedules.

3         118.   The Bank is informed and believes, and based thereon alleges, that loan files and

4    other documents available only through discovery will prove that those statements were untrue or

5    misleading with respect to many more loans as well.

6         119.   By these untrue and misleading statements, the Defendants materially understated

7    the risk of the certificates that they offered and sold to the Bank. Moreover, the Bank is informed

8    and believes, and based thereon alleges, that the Defendants materially understated the risk of the

9    certificates that they offered and sold to the Bank.

## FIRST CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
#### (California Corporations Code §§ 25401, 25501)

13        120.   This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Deutsche | Securitizations Nos. 1 through 4 |
| Bear Stearns | Securitizations Nos. 5, 7, and 8 |
| Credit Suisse | Securitizations Nos. 11 through 16 |
| Greenwich Capital | Securitizations Nos. 18 and 19 |
| Morgan Stanley | Securitizations Nos. 20 and 21 |
| UBS | Securitizations Nos. 22 through 27 |
| Merrill Lynch | Securitizations Nos. 29 through 33 |
| WaMu Capital | Securitizations Nos. 34 through 38 |

21        121.   The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1

22   through 119.

23        122.   In doing the acts alleged in the sale to the Bank of the certificates in the

24   securitizations referred to above, the Defendants named above violated Sections 25401 and 25501

25   of the California Corporations Code by offering or selling securities in this State by means of

26   written communications that included untrue statements of material fact or omitted to state

27   material facts necessary in order to make the statements made, in light of the circumstances under

28   which they were made, not misleading.

-39-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

123.    This action is brought within two years after the discovery of the untrue and misleading statements in the prospectus supplements and other documents that the Defendants sent to the Bank, and within five years of the Bank's purchase of these certificates, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other documents.

124.    Under California Corporations Code §§ 25401 and 25501, the Bank is entitled to recover the consideration that it paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date on which it recovers the purchase price, minus the amount of income it has received on the certificate. Pursuant to § 25501 and in anticipation of the remedies thereunder, the Bank hereby offers to tender each certificate.

## SECOND CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN REGISTRATION STATEMENTS
### (Section 11 of the Securities Act of 1933)

125.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitizations: |
| --- | --- |
| Deutsche | Securitization No. 4 |
| Deutsche Alt-A | Securitization No. 4 |
| Bear Stearns | Securitizations Nos. 7 and 8 |
| SAMI II | Securitizations Nos. 7 and 8 |
| Credit Suisse | Securitizations Nos. 11 through 16 |
| Greenwich Capital | Securitizations Nos. 18 and 19 |
| Greenwich Capital Acceptance | Securitizations Nos. 18 and 19 |
| Morgan Stanley | Securitization No. 21 |
| Merrill Lynch | Securitizations Nos. 32 and 33 |

-40-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

126.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 124.

127.    In doing the acts alleged, the Defendants named above violated Section 11 of the Securities Act of 1933 in connection with the sale to the Bank of the certificates in the securitizations referred to above.

128.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 43 of the schedules.

129.    Deutsche Alt-A, SAMI II, and Greenwich Capital Acceptance are depositors of the securitizations listed above and therefore are the issuers of the certificates in those securitizations. *Deutsche, Bear Stearns, Credit Suisse, Greenwich Capital, Morgan Stanley, and Merrill Lynch* acted as underwriters of the certificates listed above.

130.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

131.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 44 through 119.

132.    The Bank expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

-41-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

133. The Bank did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

134. *The Bank has suffered a loss on each of these certificates.*

135. The Bank is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### THIRD CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
(Section 12(a)(2) of the Securities Act of 1933)

136. This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitizations:* |
| --- | --- |
| **Deutsche** | **Securitization No. 4** |
| **Deutsche Alt-A** | **Securitization No. 4** |
| **Bear Stearns** | **Securitizations Nos. 7 and 8** |
| **SAMI II** | **Securitizations Nos. 7 and 8** |
| **Credit Suisse** | **Securitizations Nos. 11 through 16** |
| **Greenwich Capital** | **Securitizations Nos. 18 and 19** |
| **Greenwich Capital Acceptance** | **Securitizations Nos. 18 and 19** |
| **Morgan Stanley** | **Securitization No. 21** |
| **Merrill Lynch** | **Securitizations Nos. 32 and 33** |

137. The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 135.

138. In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

139. This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to the Bank, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, the Bank did not and could not reasonably have discovered earlier the untrue and misleading statements in

-42-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

1    the prospectus supplements and other written offering materials and oral communications that the

2    dealers sent to the Bank.

3        140.    Deutsche Alt-A, SAMI II, and Greenwich Capital Acceptance are depositors of the

4    securitizations listed above and therefore are the issuers of the certificates in those securitizations.

5    In connection with the offer and sale of these certificates to the Bank, the issuers also made all of

6    the statements of material fact about these certificates that were in the prospectus supplements

7    and other written offering materials and oral communications that that the dealers sent to the

8    Bank.

9        141.    *The Bank expressly excludes from this cause of action any allegation that could be*

10   *construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely*

11   *on claims of strict liability or negligence under the Securities Act of 1933.*

12       142.    The Defendants named above solicited the Bank to purchase these certificates, and

13   sold the certificates to the Bank, by means of the prospectus supplements and other written

14   offering materials and oral communications.

15       143.    The prospectus supplements and other written offering materials and oral

16   communications that the dealers sent to the Bank contained untrue statements of material fact and

17   omitted to state material facts necessary in order to make the statements, in the light of the

18   circumstances under which they were made, not misleading.

19       144.    The Bank did not know when it purchased these certificates that the statements in

20   the prospectus supplements and other written offering materials and oral communications that the

21   dealers sent to the Bank were untrue or misleading.

22       145.    The Bank has suffered a loss on each of these certificates.

23       146.    The Bank is entitled to recover the consideration that it paid for each of these

24   certificates, plus interest at the legal rate from the date of purchase to the date on which it

25   recovers the purchase price, minus the amount of income it has received on each certificate.

26   Pursuant to Section 12(a)(2) and in anticipation of the remedies thereunder, the Bank hereby

27   offers to tender each certificate.

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-43-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
(Section 15 of the Securities Act of 1933)

147.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitizations: |
| --- | --- |
| DB Structured Products, Inc. | Securitization No. 4 |
| The Bear Stearns Companies, Inc. | Securitizations Nos. 7 and 8 |
| Greenwich Capital Holdings, Inc. | Securitizations Nos. 18 and 19 |

148.    The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 146.

149.    The Defendants named above are liable because, in doing the acts alleged, persons they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to the Bank of the certificates in the securitizations referred to above.

150.    DB Structured Products, Inc. by or through stock ownership, agency, or otherwise, controlled Deutsche Alt-A within the meaning of Section 15 of the Securities Act of 1933.

151.    The Bear Stearns Companies, Inc. by or through stock ownership, agency, or otherwise, controlled SAMI II within the meaning of Section 15 of the Securities Act of 1933.

152.    Greenwich Capital Holdings, Inc. by or through stock ownership, agency, or otherwise, controlled Greenwich Capital Acceptance within the meaning of Section 15 of the Securities Act of 1933.

153.    In doing the acts alleged, each controlled person named in paragraphs 150 through 152 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 146.

154.    Each Defendant named above is therefore jointly and severally liable with and to the same extent as the person it controlled.

-44-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
#### (California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

155.   This cause of action is alleged against the following defendants:

| Against Defendant: | In connection with Securitizations: |
|---|---|
| Deutsche | Securitizations Nos. 1 through 4 |
| Deutsche Alt-A | Securitization No. 4 |
| Bear Stearns | Securitizations Nos. 5 through 8 |
| SAMI II | Securitizations Nos. 5, 7, and 8 |
| Countrywide | Securitizations No. 9 |
| Credit Suisse | Securitizations Nos. 10 through 16 |
| Greenwich Capital | Securitizations Nos. 17 through 19 |
| Greenwich Capital Acceptance | Securitizations Nos. 17 through 19 |
| Morgan Stanley | Securitizations Nos. 20 and 21 |
| UBS | Securitizations Nos. 22 through 28 |
| MAST | Securitizations Nos. 22 through 24 |
| Merrill Lynch | Securitizations Nos. 29 through 33 |
| WaMu Capital | Securitizations Nos. 34 through 38 |
| WaMu Mortgage | Securitizations Nos. 34 through 38 |

156.   The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 154.

157.   As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

158.   In making the representations referred to above, the Defendants intended to induce the Bank to rely on those representations in making its decision to purchase these certificates in these securitizations.

159.   When the Defendants made these representations, they had no reasonable ground for believing them to be true. The Bank is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants inspected those files, they would have learned that the information they gave the Bank contained untrue or misleading statements. In addition, the Bank

-45-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    is informed and believes, and based thereon alleges, that Defendants hired one or more "due-

2    diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied

3    with the representations and warranties made about those loans, and these contractors reported to

4    the Defendants that a material number of the loans in the collateral pools were different from the

5    descriptions of those loans in the prospectus supplements. Thus, the Bank is informed and

6    believes, and based thereon alleges, that Defendants had access to information that either did

7    make the Defendants aware, or should have made them aware had they heeded that information,

8    that the representations they made to the Bank contained material untrue or misleading statements

9    about the mortgage loans in the collateral pools.

10        160.    When it purchased these certificates, the Bank did not know about the untrue and

11    misleading statements alleged herein.

12        161.    The Bank reasonably and justifiably relied on the representations described above

13    in analyzing and deciding to purchase these certificates. Had the Defendants not made these false

14    and misleading representations, the Bank would not have purchased these certificates.

15        162.    As a direct and proximate result of the negligent misrepresentations by the

16    Defendants, the Bank was damaged in an amount to be proved at trial.

17                        <u>**SIXTH CAUSE OF ACTION**</u>

18                    **RESCISSION OF CONTRACT**
19            **(California Civil Code §§ 1689 and 1710, and Common Law)**

20        163.    This cause of action is alleged against the following defendants:

21

| Against Defendant: | In connection with Securitizations: |
|---|---|
22
| Deutsche | Securitizations Nos. 1 through 4 |
23
| Bear Stearns | Securitizations Nos. 5 through 8 |
| Countrywide | Securitization No. 9 |
24
| Credit Suisse | Securitizations Nos. 10 through 16 |
| Greenwich Capital | Securitizations Nos. 17 through 19 |
25
| Morgan Stanley | Securitizations Nos. 20 and 21 |
26
| UBS | Securitizations Nos. 22 through 28 |
| Merrill Lynch | Securitizations Nos. 29 through 33 |
27
| WaMu Capital | Securitizations Nos. 34 through 38 |

28

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

164. The Bank hereby incorporates by reference, as though fully set forth, paragraphs 1 through 162.

165. The Bank purchased each certificate pursuant to a contract in writing between the Bank and the dealer from which it purchased that certificate. Each contract stated the consideration that the Bank paid each dealer for each certificate.

166. In making each contract to purchase the certificates, the Bank relied on the truth of the statements that the Defendants named above made in the prospectus supplements and other offering materials. Because those statements were untrue or misleading, the Bank was mistaken about its basic assumptions underlying its purchase of each certificate, and this mistake had a material adverse effect on the agreed-upon exchange represented by the Bank's purchase of each certificate. Because the Defendants named above were responsible to provide accurate information in the prospectus supplements, the Bank did not assume, nor does it bear, the risk of the fundamental mistake underlying its decision to purchase these certificates.

167. The Defendants named above obtained the consent of the Bank to the contracts to purchase the certificates by means of their assertion, as facts, of that which was not true, when those Defendants had no reasonable ground for believing those assertions to be true.

168. Pursuant to California Civil Code. § 1689 *et seq.*, the Bank is entitled to rescind, and does hereby demand the rescission of, each contract for the sale and purchase of these certificates. The Bank offers to restore all benefits that it has received under those contracts and is entitled to recover all consideration that it paid under them.

### PRAYER FOR RELIEF

WHEREFORE, the Bank respectfully demands judgment as follows:

A. On the first cause of action, the consideration that the Bank paid for each certificate with interest thereon, less the amount of any income that the Bank has received thereon, upon the Bank's tender of each certificate;

B. On the second cause of action, damages in an amount to be determined at trial;

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-47-

C.   On the third cause of action, the consideration that the Bank paid for each certificate with interest thereon, less the amount of any income that the Bank has received thereon, upon the Bank's tender of each certificate;

D.   On the fourth cause of action, the consideration that the Bank paid for each certificate with interest thereon, less the amount of any income that the Bank has received thereon, upon the Bank's tender of each certificate;

E.   On the fifth cause of action, damages in an amount to be determined at trial;

F.   On the sixth cause of action, the consideration that the Bank paid for each certificate with interest thereon, less the amount of any income that the Bank has received thereon, upon the Bank's tender of each certificate;

G.   All together with the costs of this action, the reasonable fees of the Bank's attorneys in this action, and such other and further relief as the Court may deem just.

Dated: June 10, 2010

          GOODIN, MACBRIDE, SQUERI,
          DAY & LAMPREY, LLP

          GRAIS & ELLSWORTH LLP

          By _____
              Robert A. Goodin
          Attorneys for Plaintiff
          Federal Home Loan Bank of San Francisco

3428/001/X119863.v1

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-48-

**FIRST AMENDED COMPLAINT (*DEUTSCHE* 497839)**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## EXHIBIT A TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bank of America N.A. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

EXHIBIT A TO THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT B TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Bear Stearns Residential Mortgage Corp., EMC Mortgage Corp., or their Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-2-

EXHIBIT B TO THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

# EXHIBIT C TO THE AMENDED COMPLAINT



**Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination**



**Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV**

-3-

EXHIBIT C TO THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

# EXHIBIT D TO THE AMENDED COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO



Figure 1: Percent of Loans Originated by Greenpoint Mortgage Funding or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Greenpoint Mortgage Funding or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-4-

EXHIBIT D TO THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT E TO THE AMENDED COMPLAINT



Figure 1: Percent of Loans Originated by IndyMac or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by IndyMac or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-5-

EXHIBIT E TO THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)