| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $15,133,911 |
|---|---|
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 137 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,149,874 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 138 |
| Weighted-average LTV, as stated by Defendants | 82.9% |
| Weighted-average LTV, as determined by the model | 94.6% |

*CWALT 2005-32T1*

| Number of loans | 674 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 388 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 229 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $34,949,000 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 50 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,448,500 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 66 |
| Weighted-average LTV, as stated by Defendants (Total Pool) | 74.0% |
| Weighted-average LTV, as determined by the model (Total Pool) | 89.0% |

*LMT 2005-1*

| Number of loans | 2,515 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 1,584 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 778 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $95,945,423 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 268 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,780,542 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 81 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 64.7% |
| Weighted-average LTV, as determined by the model | 76.0% |

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*RAST 2005-A15*

| | |
|---|---|
| Number of loans | 5,981 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,562 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,372 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $100,304,875 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 435 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $35,329,635 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 208 |
| Weighted-average LTV, as stated by Defendants (Pool 2) | 64.7% |
| Weighted-average LTV, as determined by the model | 80.7% |

*WMALT 2006-3*

| | |
|---|---|
| Number of loans | 1,780 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,025 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 612 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $50,914,755 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 147 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,998,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 113 |
| Weighted-average LTV, as stated by Defendants (Loan Group 4) | 77.2% |
| Weighted-average LTV, as determined by the model | 84.3% |

*CWALT 2006-12CB*

| | |
|---|---|
| Number of loans | 3,070 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,457 |
| Number of loans on which the stated value was 105% or more of the | 880 |

-41-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| true market value as reported by the model | |
|---|---|
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $46,513,456 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 181 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $10,580,970 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 126 |
| Weighted-average LTV, as stated by Defendants | 73.7% |
| Weighted-average LTV, as determined by the model | 81.0% |

*MLMI 2006-F1*

| Number of loans | 455 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 252 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 140 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $19,703,446 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 32 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,010,800 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 17 |
| Weighted-average LTV, as stated by Defendants | 69.7% |
| Weighted-average LTV, as determined by the model | 79.8% |

*CWALT 2006-23CB*

| Number of loans | 4,737 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 2,477 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,420 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $81,350,184 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 337 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $17,549,841 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |

-42-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

| | |
|---|---|
| Number of loans with LTVs over 100%, as determined by the model | 235 |
| Weighted-average LTV, as stated by Defendants (Loan Group 1) | 71.8% |
| Weighted-average LTV, as determined by the model | 81.2% |

*MALT 2006-3*

| | |
|---|---|
| Number of loans | 882 |
| Number of properties on which there was enough information for the model to determine a true market value | 400 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 237 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $25,072,479 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 53 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,278,400 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 42 |
| Weighted-average LTV, as stated by Defendants | 70.9% |
| Weighted-average LTV, as determined by the model | 85.9% |

*FHAMS 2006-FA4*

| | |
|---|---|
| Number of loans | 1,656 |
| Number of properties on which there was enough information for the model to determine a true market value | 839 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 458 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $30,254,214 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 143 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,425,750 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 64 |
| Weighted-average LTV, as stated by Defendants | 69.2% |
| Weighted-average LTV, as determined by the model | 79.0% |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-43-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

*CMALT 2006-A3*

| Number of loans | 1,186 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 737 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 428 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $36,394,300 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 96 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,826,767 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 51 |
| Weighted-average LTV, as stated by Defendants | 69.1% |
| Weighted-average LTV, as determined by the model | 79.2% |

*CWALT 2006-29T1*

| Number of loans | 1,245 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 722 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 492 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $86,928,667 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 59 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,958,010 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 129 |
| Weighted-average LTV, as stated by Defendants (loan group 2) | 74.7% |
| Weighted-average LTV, as determined by the model | 91.5% |

*RAST 2006-A15*

| Number of loans | 786 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 477 |
| Number of loans on which the stated value was 105% or more of the | 346 |

-44-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| true market value as reported by the model | |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $50,173,310 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 45 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,871,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 64 |
| Weighted-average LTV, as stated by Defendants | 73.0% |
| Weighted-average LTV, as determined by the model | 87.2% |

*CWALT 2006-40T1*

| | |
|---|---|
| Number of loans | 879 |
| Number of properties on which there was enough information for the model to determine a true market value | 535 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 383 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $71,858,073 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 42 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $5,879,696 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 114 |
| Weighted-average LTV, as stated by *Defendants* (Group 2) | 74.1% |
| Weighted-average LTV, as determined by the model | 92.2% |

*CWALT 2006-43CB*

| | |
|---|---|
| Number of loans | 4,211 |
| Number of properties on which there was enough information for the model to determine a true market value | 2,317 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 1,499 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $96,906,525 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 295 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $17,361,224 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 235 |

-45-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

| | |
|---|---|
| Weighted-average LTV, as stated by Defendants (Group 1) | 67.0% |
| Weighted-average LTV, as determined by the model | 77.6% |

*MALT 2007-1*

| | |
|---|---|
| Number of loans | 656 |
| Number of properties on which there was enough information for the model to determine a true market value | 350 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 211 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $32,974,517 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 40 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,340,200 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 41 |
| Weighted-average LTV, as stated by Defendants | 69.2% |
| Weighted-average LTV, as determined by the model | 85.8% |

*CWALT 2007-3T1*

| | |
|---|---|
| Number of loans | 1,164 |
| Number of properties on which there was enough information for the model to determine a true market value | 659 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 500 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $99,439,430 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 54 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,414,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 153 |
| Weighted-average LTV, as stated by Defendants (loan group 1) | 73.4% |
| Weighted-average LTV, as determined by the model | 94.6% |

*RAST 2007-A5*

| | |
|---|---|
| Number of loans | 1,275 |
| Number of properties on which there was enough information for the | 711 |

-46-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| model to determine a true market value | |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 522 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $98,166,589 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 56 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,990,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 137 |
| Weighted-average LTV, as stated by Defendants | 72.6% |
| Weighted-average LTV, as determined by the model | 90.6% |

**Item [60].      Evidence from subsequent sales of refinanced properties:**

*CWALT 2005-32T1*

Of the 674 mortgage loans in the collateral pool, 387 were taken out to refinance, rather than to purchase, properties. For those 387 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 387 properties, 43 were subsequently sold for a total of approximately $30,450,604. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $37,571,000. Thus, those properties were sold for 81.0% of the value ascribed to them, a difference of 19.0%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

*RAST 2005-A15*

Of the 5,981 mortgage loans in the collateral pool, 3,807 were taken out to refinance, rather than to purchase, properties. For those 3,807 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 3,807 properties, 293 were subsequently sold for a total of approximately $89,647,706. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $117,036,006. Thus, those properties were sold for 76.6% of the value ascribed to them, a

-47-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    difference of 23.4%. This difference cannot be accounted for by declines in house prices in the

2    areas in which those properties were located.

3    *WMALT 2006-3*

4         Of the 1,780 mortgage loans in the collateral pool, 1,028 were taken out to refinance,

5    rather than to purchase, properties. For those 1,028 loans, the value (denominator) in the LTV

6    was an appraised value rather than a sale price. Of those 1,028 properties, 142 were subsequently

7    sold for a total of approximately $45,206,841. The total value ascribed to those same properties in

8    the LTV data reported in the prospectus supplements and other documents sent to the Bank was

9    $62,268,500. Thus, those properties were sold for 72.6% of the value ascribed to them, a

10   difference of 27.4%. This difference cannot be accounted for by declines in house prices in the

11   areas in which those properties were located.

12   *CWALT 2006-12CB*

13        Of the 3,070 mortgage loans in the collateral pool, 1,192 were taken out to refinance,

14   rather than to purchase, properties. For those 1,192 loans, the value (denominator) in the LTV

15   was an appraised value rather than a sale price. Of those 1,192 properties, 118 were subsequently

16   sold for a total of approximately $31,284,769. The total value ascribed to those same properties in

17   the LTV data reported in the prospectus supplements and other documents sent to the Bank was

18   $40,762,000. Thus, those properties were sold for 76.7% of the value ascribed to them, a

19   difference of 23.3%. This difference cannot be accounted for by declines in house prices in the

20   areas in which those properties were located.

21   *MLMI 2006-F1*

22        Of the 455 mortgage loans in the collateral pool, 262 were taken out to refinance, rather

23   than to purchase, properties. For those 262 loans, the value (denominator) in the LTV was an

24   appraised value rather than a sale price. Of those 262 properties, 29 were subsequently sold for a

25   total of approximately $16,191,731. The total value ascribed to those same properties in the LTV

26   data reported in the prospectus supplements and other documents sent to the Bank was

27   $20,235,000. Thus, those properties were sold for 80.0% of the value ascribed to them, a

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-48-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    difference of 20.0%. This difference cannot be accounted for by declines in house prices in the

2    areas in which those properties were located.

3    *CWALT 2006-23CB*

4         Of the 4,737 mortgage loans in the collateral pool, 2,040 were taken out to refinance,

5    rather than to purchase, properties. For those 2,040 loans, the value (denominator) in the LTV

6    was an appraised value rather than a sale price. Of those 2,040 properties, 187 were subsequently

7    sold for a total of approximately $50,075,675. The total value ascribed to those same properties in

8    the LTV data reported in the prospectus supplements and other documents sent to the Bank was

9    $63,085,150. Thus, those properties were sold for 79.4% of the value ascribed to them, a

10   difference of 20.6%. This difference cannot be accounted for by declines in house prices in the

11   areas in which those properties were located.

12   *MALT 2006-3*

13        Of the 882 mortgage loans in the collateral pool, 477 were taken out to refinance, rather

14   than to purchase, properties. For those 477 loans, the value (denominator) in the LTV was an

15   appraised value rather than a sale price. Of those 477 properties, 50 were subsequently sold for a

16   total of approximately $14,707,271. The total value ascribed to those same properties in the LTV

17   data reported in the prospectus supplements and other documents sent to the Bank was

18   $21,966,007. Thus, those properties were sold for 67.0% of the value ascribed to them, a

19   difference of 33.0%. This difference cannot be accounted for by declines in house prices in the

20   areas in which those properties were located.

21   *FHAMS 2006-FA4*

22        Of the 1,656 mortgage loans in the collateral pool, 778 were taken out to refinance, rather

23   than to purchase, properties. For those 778 loans, the value (denominator) in the LTV was an

24   appraised value rather than a sale price. Of those 778 properties, 87 were subsequently sold for a

25   total of approximately $23,431,758. The total value ascribed to those same properties in the LTV

26   data reported in the prospectus supplements and other documents sent to the Bank was

27   $31,052,400. Thus, those properties were sold for 75.5% of the value ascribed to them, a

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-49-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   difference of 24.5%. This difference cannot be accounted for by declines in house prices in the

2   areas in which those properties were located.

3   *RAST 2006-A15*

4       Of the 786 mortgage loans in the collateral pool, 478 were taken out to refinance, rather

5   than to purchase, properties. For those 478 loans, the value (denominator) in the LTV was an

6   appraised value rather than a sale price. Of those 478 properties, 70 were subsequently sold for a

7   total of approximately $40,167,981. The total value ascribed to those same properties in the LTV

8   data reported in the prospectus supplements and other documents sent to the Bank was

9   $57,872,000. Thus, those properties were sold for 69.4% of the value ascribed to them, a

10   difference of 30.6%. This difference cannot be accounted for by declines in house prices in the

11   areas in which those properties were located.

12   *CWALT 2006-40T1*

13       Of the 879 mortgage loans in the collateral pool, 512 were taken out to refinance, rather

14   than to purchase, properties. For those 512 loans, the value (denominator) in the LTV was an

15   appraised value rather than a sale price. Of those 512 properties, 58 were subsequently sold for a

16   total of approximately $39,886,950. The total value ascribed to those same properties in the LTV

17   data reported in the prospectus supplements and other documents sent to the Bank was

18   $57,712,500. Thus, those properties were sold for 69.1% of the value ascribed to them, a

19   difference of 30.9%. This difference cannot be accounted for by declines in house prices in the

20   areas in which those properties were located.

21   *CWALT 2006-43CB*

22       Of the 4,211 mortgage loans in the collateral pool, 2,583 were taken out to refinance,

23   rather than to purchase, properties. For those 2,583 loans, the value (denominator) in the LTV

24   was an appraised value rather than a sale price. Of those 2,583 properties, 201 were subsequently

25   sold for a total of approximately $50,527,718. The total value ascribed to those same properties in

26   the LTV data reported in the prospectus supplements and other documents sent to the Bank was

27   $72,802,428. Thus, those properties were sold for 69.4% of the value ascribed to them, a

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-50-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    difference of 30.6%. This difference cannot be accounted for by declines in house prices in the

2    areas in which those properties were located.

3    *MALT 2007-1*

4          Of the 656 mortgage loans in the collateral pool, 311 were taken out to refinance, rather

5    than to purchase, properties. For those 311 loans, the value (denominator) in the LTV was an

6    appraised value rather than a sale price. Of those 311 properties, 19 were subsequently sold for a

7    total of approximately $16,682,431. The total value ascribed to those same properties in the LTV

8    data reported in the prospectus supplements and other documents sent to the Bank was

9    $19,133,000. Thus, those properties were sold for 87.2% of the value ascribed to them, a

10   difference of 12.8%. This difference cannot be accounted for by declines in house prices in the

11   areas in which those properties were located.

12   *CWALT 2007-3T1*

13         Of the 1,164 mortgage loans in the collateral pool, 717 were taken out to refinance, rather

14   than to purchase, properties. For those 717 loans, the value (denominator) in the LTV was an

15   appraised value rather than a sale price. Of those 717 properties, 63 were subsequently sold for a

16   total of approximately $39,089,809. The total value ascribed to those same properties in the LTV

17   data reported in the prospectus supplements and other documents sent to the Bank was

18   $59,313,900. Thus, those properties were sold for 65.9% of the value ascribed to them, a

19   difference of 34.1%. This difference cannot be accounted for by declines in house prices in the

20   areas in which those properties were located.

21   *RAST 2007-A5*

22         Of the 1,275 mortgage loans in the collateral pool, 863 were taken out to refinance, rather

23   than to purchase, properties. For those 863 loans, the value (denominator) in the LTV was an

24   appraised value rather than a sale price. Of those 863 properties, 61 were subsequently sold for a

25   total of approximately $35,817,368. The total value ascribed to those same properties in the LTV

26   data reported in the prospectus supplements and other documents sent to the Bank was

27   $58,495,500. Thus, those properties were sold for 61.2% of the value ascribed to them, a

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-51-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   difference of 38.8%. This difference cannot be accounted for by declines in house prices in the

2   areas in which those properties were located.

3   **Item [67].      Undisclosed additional liens:**

4   *MALT 2004-9*

5          **(a)**      Minimum number of properties with additional liens: 56

6          **(b)**      Total reduction in equity from additional liens: $2,781,443

7          **(c)**      Weighted-average reduction in equity from additional liens: 88.0%

8   *CWALT 2005-32T1*

9          **(a)**      Minimum number of properties with additional liens: 79

10         **(b)**      Total reduction in equity from additional liens: $8,835,067

11         **(c)**      Weighted-average reduction in equity from additional liens: 62.0%

12  *LMT 2005-1*

13         **(a)**      Minimum number of properties with additional liens: 243

14         **(b)**      Total reduction in equity from additional liens: $24,681,790

15         **(c)**      Weighted-average reduction in equity from additional liens: 4%

16  *WMALT 2006-3*

17         **(a)**      Minimum number of properties with additional liens: 95

18         **(b)**      Total reduction in equity from additional liens: $9,217,445

19         **(c)**      Weighted-average reduction in equity from additional liens: 5%

20  *CWALT 2006-12CB*

21         **(d)**      Minimum number of properties with additional liens: 151

22         **(e)**      Total reduction in equity from additional liens: $8,284,418

23         **(f)**      Weighted-average reduction in equity from additional liens: 82.2%

24  *MLMI 2006-F1*

25         **(a)**      Minimum number of properties with additional liens: 41

26         **(b)**      Total reduction in equity from additional liens: $5,782,280

27         **(c)**      Weighted-average reduction in equity from additional liens: 62.7%

28  *CWALT 2006-23CB*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-52-

(a)    Minimum number of properties with additional liens: 233

(b)    Total reduction in equity from additional liens: $13,960,974

(c)    Weighted-average reduction in equity from additional liens: 78.4%

*MALT 2006-3*

(a)    Minimum number of properties with additional liens: 57

(b)    Total reduction in equity from additional liens: $7,577,632

(c)    Weighted-average reduction in equity from additional liens: 9%

*FHAMS 2006-FA4*

(a)    Minimum number of properties with additional liens: 484

(b)    Total reduction in equity from additional liens: $28,528,169

(c)    Weighted-average reduction in equity from additional liens: 81.4%

*CMALT 2006-A3*

(a)    Minimum number of properties with additional liens: 451

(b)    Total reduction in equity from additional liens: $33,257,191

(c)    Weighted-average reduction in equity from additional liens: 75.7%

*CWALT 2006-29T1*

(a)    Minimum number of properties with additional liens: 93

(b)    Total reduction in equity from additional liens: $12,832,718

(c)    Weighted-average reduction in equity from additional liens: 5%

*RAST 2006-A15*

(a)    Minimum number of properties with additional liens: 47

(b)    Total reduction in equity from additional liens: $6,671,829

(c)    Weighted-average reduction in equity from additional liens: 59.3%

*CWALT 2006-40T1*

(a)    Minimum number of properties with additional liens: 97

(b)    Total reduction in equity from additional liens: $17,411,266

(c)    Weighted-average reduction in equity from additional liens: 69.9%

*CWALT 2006-43CB*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-53-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1       (a)     Minimum number of properties with additional liens: 160

2       (b)     Total reduction in equity from additional liens: $11,630,758

3       (c)     Weighted-average reduction in equity from additional liens: 7%

4   *MALT 2007-1*

5       (a)     Minimum number of properties with additional liens: 70

6       (b)     Total reduction in equity from additional liens: $10,516,898

7       (c)     Weighted-average reduction in equity from additional liens: 79.2%

8   *CWALT 2007-3T1*

9       (a)     Minimum number of properties with additional liens: 90

10      (b)     Total reduction in equity from additional liens: $16,098,706

11      (c)     Weighted-average reduction in equity from additional liens: 65.5%

12  *RAST 2007-A5*

13      (a)     Minimum number of properties with additional liens: 74

14      (b)     Total reduction in equity from additional liens: $9,879,714

15      (c)     Weighted-average reduction in equity from additional liens: 60.4%

16

17  **Item [80].**     **Untrue or misleading statements about compliance with USPAP:**

18  *MALT 2004-9:*

19      In the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made

20  the following statement about the appraisals of the properties that secured the mortgage loans in

21  the collateral pool of that securitization: "All appraisals conform to the Uniform Standards of

22  Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal

23  Foundation . . . ." MALT 2004-9 Pros. Sup. S-30.

24  *CWALT 2005-32T1:*

25      The prospectus supplement for the CWALT 2005-32T1 Securitization included the

26  following statement about the appraisals of the properties that secured the mortgage loans in the

27  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

28  Freddie Mac appraisal standards then in effect." CWALT 2005-32T1 Pros. Sup. S-24.

-54-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *LMT 2005-1:*

2      The prospectus supplement for the LMT 2005-1 Securitization included the following

3  statement about the appraisals of the properties that secured the mortgage loans in the collateral

4  pool of that securitization: ". . . Underwriting Guidelines are applied in accordance with a

5  procedure that generally requires . . . an appraisal of the mortgaged property . . . that conform[s]

6  to Fannie Mae and Freddie Mac standards . . . ." LMT 2005-1 Pros. Sup. S-55 and S-56.

7  *WMALT 2006-3:*

8      The prospectus supplement for the WMALT 2006-3 Securitization presented the

9  following statement about the appraisals of the properties that secured the mortgage loans in the

10  collateral pool of that securitization: "At origination, all appraisals are required to conform to the

11  Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board

12  of the Appraisal Foundation . . . ." WMALT 2006-3 Pros. Sup. S-23.

13  *CWALT 2006-12CB:*

14      The prospectus supplement for the CWALT 2006-12CB Securitization included the

15  following statement about the appraisals of the properties that secured the mortgage loans in the

16  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

17  Freddie Mac appraisal standards then in effect." CWALT 2006-12CB Pros. Sup. S-40.

18  *CWALT 2006-22R:*

19      The prospectus supplement for the CWALT 2006-22R Securitization included the

20  following statement about the appraisals of the properties that secured the mortgage loans in the

21  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

22  Freddie Mac appraisal standards then in effect." CWALT 2006-22R Pros. Sup. A-S-61.

23  *CWALT 2006-23CB:*

24      The prospectus supplement for the CWALT 2006-23CB Securitization included the

25  following statement about the appraisals of the properties that secured the mortgage loans in the

26  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

27  Freddie Mac appraisal standards then in effect." CWALT 2006-23CB Pros. Sup. S-56.

28  *MALT 2006-3:*

-55-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST made

2    the following statement about the appraisals of the properties that secured the majority of the

3    mortgage loans in the collateral pool of that securitization: "All appraisals conform to the

4    Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board

5    of the Appraisal Foundation . . . ." MALT 2006-3 Pros. Sup. S-34.

6    In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST also

7    made the following statement about the appraisals of the properties that secured 29.45% of the

8    mortgage loans originated by American Home Mortgage Corp.: "Every American Home Loan is

9    secured by a property that has been appraised by a licensed appraiser in accordance with the

10   Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." MALT

11   2006-3 Pros. Sup. S-36.

12   *FHAMS 2006-FA4*:

13   In the prospectus supplement for the FHAMS 2006-FA4 Securitization, UBS made the

14   following statement about the appraisals of the properties that secured the mortgage loans in the

15   collateral pool of that securitization: "All appraisals are required to conform to the Uniform

16   Standards of Professional Appraisal Practice adopted by the Appraisal Qualifications Board of the

17   Appraisal Foundation." FHAMS 2006-FA4 Pros. Sup. S-32.

18   *CWALT 2006-29T1*:

19   The prospectus supplement for the CWALT 2006-29T1 Securitization included the

20   following statement about the appraisals of the properties that secured the mortgage loans in the

21   collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

22   Freddie Mac appraisal standards then in effect." CWALT 2006-29T1 Pros. Sup. S-68.

23   *RAST 2006-R2*:

24   In the prospectus supplement for the RAST 2006-R2 Securitization, Morgan Stanley made

25   the following statement about the appraisals of the properties that secured the mortgage loans in

26   the collateral pool of that securitization: "To determine the adequacy of the property to be used as

27   collateral, an appraisal is generally made of the subject property in accordance with the Uniform

28   Standards of Profession [sic] Appraisal Practice." RAST 2006-R2 Pros. Sup. S-33.

-56-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *RAST 2006-A15*:

2      In the prospectus supplement for the RAST 2006-A15 Securitization, Countrywide

3  Securities made the following statement about the appraisals of the properties that secured the

4  mortgage loans in the collateral pool of that securitization: "To determine the adequacy of the

5  property to be used as collateral, an appraisal is generally made of the subject property in

6  accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A15

7  Pros. Sup. S-40.

8  *CWALT 2006-40T1*:

9      The prospectus supplement for the CWALT 2006-40T1 Securitization included the

10  following statement about the appraisals of the properties that secured the mortgage loans in the

11  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

12  Freddie Mac appraisal standards then in effect." CWALT 2006-40T1 Pros. Sup. S-56.

13  *CWALT 2006-43CB*:

14      The prospectus supplement for the CWALT 2006-43CB Securitization included the

15  following statement about the appraisals of the properties that secured the mortgage loans in the

16  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

17  Freddie Mac appraisal standards then in effect." CWALT 2006-43CB Pros. Sup. S-73.

18  *MALT 2007-1*:

19      In the prospectus supplement for the MALT 2007-1 Securitization, UBS and MAST made

20  the following statement about the appraisals of the properties that secured the mortgage loans in

21  the collateral pool of the MALT 2006-3 Securitization: "All appraisals conform to the Uniform

22  Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the

23  Appraisal Foundation. . . ." MALT 2007-1 Pros. Sup. S-42.

24  *CWALT 2007-3T1*:

25      The prospectus supplement for the CWALT 2007-3T1 Securitization included the

26  following statement about the appraisals of the properties that secured the mortgage loans in the

27  collateral pool of that securitization: "All appraisals are required to conform to Fannie Mae or

28  Freddie Mac appraisal standards then in effect." CWALT 2007-3T1 Pros. Sup. S-37.

-57-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*RAST 2007-A5:*

In the prospectus supplement for the RAST 2007-A5 Securitization, UBS made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of that securitization: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2007-A5 Pros. Sup. S-54.

**Item [86].** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

*MALT 2004-9:*

In the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a) In Annex B of the prospectus supplement ("Mortgage Loan Statistical Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2004-9 Pros. Sup. B-3.

(b) In the "Occupancy Status" table, UBS and MAST stated that 93.11% of the mortgage loans in the collateral group were secured by a "Primary" residence, 2.33% by an "Investor" property, and 4.56% by a "Secondary" property. MALT 2004-9 Pros. Sup. B-3.

*CWALT 2005-32T1:*

The prospectus supplement for the CWALT 2005-32T1 Securitization presented the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a) "The Mortgage Pool" section of the prospectus supplement, described in Item *B*, presented a table entitled "Occupancy Types." This table divided the mortgage loans in the

-58-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. CWALT 2005-32T1 Pros. Sup. S-19.

(b)     The "Occupancy Types" table stated that 87.1% of the mortgage loans in the collateral group were secured by a "Primary Residence," 9.16% by an "Investment Property," and 3.74% by a "Secondary Residence." CWALT 2005-32T1 Pros. Sup. S-19.

*LMT 2005-1:*

The prospectus supplement for the LMT 2005-1 Securitization presented the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     Annex B of the prospectus supplement ("Certain Characteristics of the Mortgage Loans"), described in Item *B*, presented a table entitled "Occupancy Status – Collateral Group P." This table divided the mortgage loans in Collateral Group P into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-4.

(b)     The "Occupancy Status – Collateral Group P" table stated that 91.26% of the mortgage loans in Collateral Group P were secured by a "Primary Home," 5.7% by an "Investment" property, and 3.04% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-4.

(c)     Annex B ("Certain Characteristics of the Mortgage Loans") presented a similar table entitled "Occupancy Status – Collateral Group 1." This table divided the mortgage loans in Collateral Group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-7.

-59-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (d)     The "Occupancy Status – Collateral Group 1" table stated that 90.5% of the

2    mortgage loans in Collateral Group 1 were secured by a "Primary Home," 7.5% by an

3    "Investment" property, and 2.01% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-7.

4    (e)     Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

5    entitled "Occupancy Status – Collateral Group 2." This table divided the mortgage loans in

6    Collateral Group 2 into the categories "Primary Home," "Investment," and "Second Home." The

7    table made untrue and misleading statements about the number of mortgage loans, the aggregate

8    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

9    of these categories. LMT 2005-1 Pros. Sup. S-B-10.

10    (f)     The "Occupancy Status – Collateral Group 2" table stated that 91.19% of the

11    mortgage loans in Collateral Group 2 were secured by a "Primary Home," 6.01% by an

12    "Investment" property, and 2.8% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-10.

13    (g)     Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

14    entitled "Occupancy Status – Collateral Group 3." This table stated that 100% of the mortgage

15    loans in Collateral Group 3 were secured by a "Primary Home." LMT 2005-1 Pros. Sup. S-B-13.

16    (h)     Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

17    entitled "Occupancy Status – Collateral Group 4." This table divided the mortgage loans in

18    Collateral Group 4 into the categories "Primary Home," "Investment," and "Second Home." The

19    table made untrue and misleading statements about the number of mortgage loans, the aggregate

20    principal balance outstanding, and the percent of aggregate principal balance outstanding in each

21    of these categories. LMT 2005-1 Pros. Sup. S-B-16.

22    (i)     The "Occupancy Status – Collateral Group 4" table stated that 90.54% of the

23    mortgage loans in Collateral Group 4, were secured by a "Primary Home," 4.82% by an

24    "Investment" property, and 4.64% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-16.

25    (j)     Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table

26    entitled "Occupancy Status – Collateral Group 6." This table divided the mortgage loans in

27    Collateral Group 6 into the categories "Primary Home," "Investment," and "Second Home." The

28    table made untrue and misleading statements about the number of mortgage loans, the aggregate

-60-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-22.

(k)     The "Occupancy Status – Collateral Group 6" table stated that 85.38% of the mortgage loans in Collateral Group 6 were secured by a "Primary Home," 8.67% by an "Investment" property, and 5.94% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-22.

(l)     Annex B ("Certain Characteristics of the Mortgage Loans") also presented a table entitled "Occupancy Status – Collateral Group 7." This table divided the mortgage loans in Collateral Group 7 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. LMT 2005-1 Pros. Sup. S-B-26.

(m)     The "Occupancy Status – Collateral Group 7" table stated that 84.55% of the mortgage loans in Collateral Group 7 were secured by a "Primary Home," 10.65% by an "Investment" property, and 4.8% by a "Second Home." LMT 2005-1 Pros. Sup. S-B-26.

*RAST 2005-A15*:

The prospectus supplement for the RAST 2005-A15 Securitization presented the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     "The Mortgage Pool" section of the prospectus supplement, described in Item *B*, presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in loan group 1 into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A15 Pros. Sup. S-24.

(b)     The "Occupancy Types for the Group 1 Mortgage Loans" table stated that 92.13% of the mortgage loans in loan group 1 were secured by a "Primary" residence, 5.91% by an "Investment" property, and 1.96% by a "Second Home." RAST 2005-A15 Pros. Sup. S-24.

-61-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  (c)  "The Mortgage Pool" section presented a similar table entitled "Occupancy Types

2  for the Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2 into the

3  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

4  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

5  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

6  A15 Pros. Sup. S-27.

7  (d)  The "Occupancy Types for the Group 2 Mortgage Loans" table stated that 83.7%

8  of the mortgage loans in loan group 2 were secured by a "Primary" residence, 12.45% by an

9  "Investment" property, and 3.85% by a "Second Home." RAST 2005-A15 Pros. Sup. S-27.

10  (e)  "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

11  the Group 3 Mortgage Loans." This table divided the mortgage loans in loan group 3 into the

12  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

13  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

14  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

15  A15 Pros. Sup. S-30.

16  (f)  The "Occupancy Types for the Group 3 Mortgage Loans" table stated that 84.86%

17  of the mortgage loans in loan group 3 were secured by a "Primary" residence, 11.78% by an

18  "Investment" property, and 3.36% by a "Second Home." RAST 2005-A15 Pros. Sup. S-30.

19  (g)  "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

20  the Group 4 Mortgage Loans." This table divided the mortgage loans in loan group 4 into the

21  categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

22  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

23  the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

24  A15 Pros. Sup. S-33.

25  (h)  The "Occupancy Types for the Group 4 Mortgage Loans" table stated that 71.63%

26  of the mortgage loans in loan group 4 were secured by a "Primary" residence, 23.94% by an

27  "Investment" property, and 4.43% by a "Second Home." RAST 2005-A15 Pros. Sup. S-33.

28

-62-

1        (i)    "The Mortgage Pool" section also presented a table entitled "Occupancy Types for

2    the Group 5 Mortgage Loans." This table divided the mortgage loans in loan group 5 into the

3    categories "Primary," "Investment," and "Second Home." The table made untrue and misleading

4    statements about the number of mortgage loans, the aggregate principal balance outstanding, and

5    the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-

6    A15 Pros. Sup. S-36.

7        (j)    The "Occupancy Types for the Group 5 Mortgage Loans" table stated that 91.28%

8    of the mortgage loans in loan group 5 were secured by a "Primary" residence, 5.91% by an

9    "Investment" property, and 2.81% by a "Second Home." RAST 2005-A15 Pros. Sup. S-36.

10   *WMALT 2006-3:*

11       The prospectus supplement for the WMALT 2006-3 Securitization presented the

12   following statements about the occupancy status of the properties that secured the mortgage loans

13   in the collateral pool of that securitization.

14       (a)    Appendix B of the prospectus supplement, described in Item *B*, presented a

15   table entitled "Occupancy Status of the Group 1 Loans" This table divided the mortgage loans in

16   loan group 1 into the categories "Owner-Occupied," "Non-Owner Occupied," and "Owner

17   Occupied—2nd Home." The table made untrue and misleading statements about the number of

18   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

19   principal balance outstanding in each of these categories. WMALT 2006-3 Pros. Sup. S-92.

20       (b)    The "Occupancy Status of the Group 1 Loans" table stated that 94.83% of the

21   mortgage loans in loan group 1 were secured by an "Owner Occupied" property, 1.79% by a

22   "Non-Owner Occupied" property, and 3.37% by an "Owner Occupied—2nd Home." WMALT

23   2006-3 Pros. Sup. S-92.

24       (c)    Appendix B presented a similar table entitled "Occupancy Status of the Group 2

25   Loans" This table divided the mortgage loans in loan group 2 into the categories "Owner-

26   Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

27   and misleading statements about the number of mortgage loans, the aggregate principal balance

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-63-

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    outstanding, and the percent of aggregate principal balance outstanding in each of these

2    categories. WMALT 2006-3 Pros. Sup. S-94.

3         (d)    The "Occupancy Status of the Group 2 Loans" table stated that 84.46% of the

4    mortgage loans in loan group 2 were secured by an "Owner Occupied" property, 8.98% by a

5    "Non-Owner Occupied" property, and 4.56% by an "Owner Occupied—2nd Home." WMALT

6    2006-3 Pros. Sup. S-94.

7         (e)    Appendix B also presented a table entitled "Occupancy Status of the Group 3

8    Loans" This table divided the mortgage loans in loan group 3 into the categories "Owner-

9    Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

10   and misleading statements about the number of mortgage loans, the aggregate principal balance

11   outstanding, and the percent of aggregate principal balance outstanding in each of these

12   categories. WMALT 2006-3 Pros. Sup. S-97.

13        (f)    The "Occupancy Status of the Group 3 Loans" table stated that 86.44% of the

14   mortgage loans in loan group 3 were secured by an "Owner Occupied" property, 11.69% by a

15   "Non-Owner Occupied" property, and 1.87% by an "Owner Occupied—2nd Home" property.

16   WMALT 2006-3 Pros. Sup. S-97.

17        (g)    Appendix B also presented a table entitled "Occupancy Status of the Group 4

18   Loans" This table divided the mortgage loans in loan group 4 into the categories "Owner-

19   Occupied," "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue

20   and misleading statements about the number of mortgage loans, the aggregate principal balance

21   outstanding, and the percent of aggregate principal balance outstanding in each of these

22   categories. WMALT 2006-3 Pros. Sup. S-100.

23        (h)    The "Occupancy Status of the Group 4 Loans" table stated that 92.47% of the

24   mortgage loans in loan group 4 were secured by an "Owner Occupied" property, 7.11% by an

25   "Non-Owner Occupied" property, and 0.42% by an "Owner Occupied—2nd Home" property.

26   WMALT 2006-3 Pros. Sup. S-100.

27        (i)    Appendix B presented a table entitled "Occupancy Status of the Group 5 Loans"

28   This table divided the mortgage loans in loan group 5 into the categories "Owner-Occupied,"

-64-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    "Non-Owner Occupied," and "Owner Occupied—2nd Home." The table made untrue and

2    misleading statements about the number of mortgage loans, the aggregate principal balance

3    outstanding, and the percent of aggregate principal balance outstanding in each of these

4    categories. WMALT 2006-3 Pros. Sup. S-103.

5          (j)      The "Occupancy Status of the Group 5 Loans" table stated that 76.91% of the

6    mortgage loans in loan group 5 were secured by an "Owner Occupied" property, 21.34% by an

7    "Non-Owner Occupied" property, and 1.75% by an "Owner Occupied—2nd Home" property.

8    WMALT 2006-3 Pros. Sup. S-103.

9    *CWALT 2006-12CB:*

10         In the prospectus supplement for the CWALT 2006-12CB Securitization, UBS made the

11   following statements about the occupancy status of the properties that secured the mortgage loans

12   in the collateral pool of that securitization.

13         (a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item

14   *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage loans in

15   the collateral pool into the categories "Primary Residence," "Investment Property," and

16   "Secondary Residence." The table made untrue and misleading statements about the number of

17   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

18   principal balance outstanding in each of these categories. CWALT 2006-12CB Pros. Sup. S-33.

19         (b)      In the "Occupancy Types" table, UBS stated that 88.39% of the mortgage loans in

20   the collateral group were secured by a "Primary Residence," 7.53% by an "Investment Property,"

21   and 4.08% by a "Secondary Residence." CWALT 2006-12CB Pros. Sup. S-33.

22   *MLMI 2006-F1:*

23         The prospectus supplement for the MLMI 2006-F1 Securitization presented the following

24   statements about the occupancy status of the properties that secured the mortgage loans in the

25   collateral pool of that securitization.

26         (a)      Annex II of the prospectus supplement, described in Item *B*, presented a table

27   entitled "Occupancy Type." This table divided the mortgage loans in the collateral pool into the

28   categories "Primary" and "Secondary Home." The table made untrue and misleading statements

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-65-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   about the number of mortgage loans, the aggregate principal balance outstanding, and the percent

2   of aggregate principal balance outstanding in each of these categories. MLMI 2006-F1 Pros. Sup.

3   II-5.

4       (b)   The "Occupancy Type" table stated that 96.75% of the mortgage loans in the

5   collateral group were secured by a "Primary" residence and 3.25% by a "Second Home." MLMI

6   2006-F1 Pros. Sup. II-5.

7   *CWALT 2006-23CB:*

8       The prospectus supplement for the CWALT 2006-23CB Securitization presented the

9   following statements about the occupancy status of the properties that secured the mortgage loans

10  in the collateral pool of that securitization.

11      (a)   "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

12  presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

13  group 1 info the categories "Primary Residence," "Investment Property," and "Secondary

14  Residence." The table made untrue and misleading statements about the number of mortgage

15  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

16  outstanding in each of these categories. CWALT 2006-23CB Pros. Sup. S-41.

17      (b)   The "Occupancy Types" table stated that 90.96% of the mortgage loans in loan

18  group 1 were secured by a "Primary Residence," 5.12% by an "Investment Property," and 3.92%

19  by a "Secondary Residence." CWALT 2006-23CB Pros. Sup. S-41.

20      (c)   "The Mortgage Pool" section presented another table entitled "Occupancy Types."

21  This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

22  "Investment Property," and "Secondary Residence." The table made untrue and misleading

23  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

24  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

25  23CB Pros. Sup. S-51.

26      (d)   The "Occupancy Types" table stated that 82.59% of the mortgage loans in loan

27  group 2 were secured by a "Primary Residence," 10.96% by an "Investment Property," and

28  6.44% by a "Secondary Residence." CWALT 2006-23CB Pros. Sup. S-51.

-66-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*MALT 2006-3:*

In the prospectus supplement for the MALT 2006-3 Securitization, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-3.

(b)     In the "Occupancy Status" table, UBS and MAST stated that 85.96% of the mortgage loans in Collateral Group 1 were secured by a "Primary" residence, 10.75% by an "Investor" property, and 3.29% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-3.

(c)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3 Pros. Sup. A-8.

(d)     In the "Occupancy Status" table, UBS and MAST stated that 78.07% of the mortgage loans in Collateral Group 2 were secured by a "Primary" residence, 12.48% by an "Investor" property, and 9.45% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-8.

(e)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Pool 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-67-

1   the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-3

2   Pros. Sup. A-14.

3     (f)  In the "Occupancy Status" table, UBS and MAST stated that 81.65% of the

4   mortgage loans in Pool 1 were secured by a "Primary" residence, 11.7% by an "Investor"

5   property, and 6.66% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-14.

6     (g)  In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

7   another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral

8   Group 3 into the categories "Primary," "Investor," and "Secondary." The table made untrue and

9   misleading statements about the number of mortgage loans, the aggregate principal balance

10  outstanding, and the percent of aggregate principal balance outstanding in each of these

11  categories. MALT 2006-3 Pros. Sup. A-19.

12    (h)  In the "Occupancy Status" table, UBS and MAST stated that 67.79% of the

13  mortgage loans in Collateral Group 3 were secured by a "Primary" residence, 28.54% by an

14  "Investor" property, and 3.67% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-19.

15    (i)  In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented

16  another table entitled "Occupancy Status." This table divided all of the mortgage loans in the

17  collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue

18  and misleading statements about the number of mortgage loans, the aggregate principal balance

19  outstanding, and the percent of aggregate principal balance outstanding in each of these

20  categories. MALT 2006-3 Pros. Sup. A-25.

21    (j)  In the "Occupancy Status" table, UBS and MAST stated that 80.19% of all of the

22  mortgage loans in the collateral pool were secured by a "Primary" residence, 13.47% by an

23  "Investor" property, and 6.34% by a "Secondary" property. MALT 2006-3 Pros. Sup. A-25.

24  *FHAMS 2006-FA4:*

25    In the prospectus supplement for the FHAMS 2006-FA4 Securitization, UBS made the

26  following statements about the occupancy status of the properties that secured the mortgage loans

27  in the collateral pool of that securitization.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-68-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1        (a)     In Annex I of the prospectus supplement, described in Item *B*, UBS presented a

2    table entitled "Occupancy Types for the Mortgage Loans in Pool I." This table divided the

3    mortgage loans in Pool I into the categories "Primary Residence," "Investor Property," and

4    "Secondary Residence." The table made untrue and misleading statements about the number of

5    mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

6    principal balance outstanding in each of these categories. FHAMS 2006-FA4 Pros. Sup. I-2.

7        (b)     In the "Occupancy Types for the Mortgage Loans in Pool I" table, UBS stated that

8    73.82% of the mortgage loans in Pool I were secured by a "Primary Residence," 20.46% by an

9    "Investor Property," and 5.72% by a "Secondary Residence." FHAMS 2006-FA4 Pros. Sup. I-2.

10       (c)     In Annex II, described in Item *B*, UBS presented a table entitled "Occupancy

11   Types for the Mortgage Loans in Pool II." This table divided the mortgage loans in Pool II into

12   the categories "Primary Residence," "Investor Property," and "Secondary Residence." The table

13   made untrue and misleading statements about the number of mortgage loans, the aggregate

14   principal balance outstanding, and the percent of aggregate principal balance outstanding in each

15   of these categories. FHAMS 2006-FA4 Pros. Sup. II-2.

16       (d)     In the "Occupancy Types for the Mortgage Loans in Pool II" table, UBS stated

17   that 61.9% of the mortgage loans in Pool II were secured by a "Primary Residence," 28.82% by

18   an "Investor Property," and 9.28% by a "Secondary Residence." FHAMS 2006-FA4 Pros. Sup.

19   II-2.

20       (e)     In Annex III, described in Item *B*, UBS presented a table entitled "Occupancy

21   Types for the Mortgage Loans in [Aggregate Pool]." This table divided the mortgage loans in the

22   collateral pool into the categories "Primary Residence," "Investor Property," and "Secondary

23   Residence." The table made untrue and misleading statements about the number of mortgage

24   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

25   outstanding in each of these categories. FHAMS 2006-FA4 Pros. Sup. III-2.

26       (f)     In the "Occupancy Types for the Mortgage Loans in [Aggregate Pool]" table, UBS

27   stated that 72.61% of the mortgage loans in the aggregate pool were secured by a "Primary

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-69-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    Residence," 21.31% by an "Investor Property," and 6.08% by a "Secondary Residence." FHAMS

2    2006-FA4 Pros. Sup. III-2.

3    *CMALT 2006-A3*:

4         The prospectus supplement for the CMALT 2006-A3 Securitization presented the

5    following statements about the occupancy status of the properties that secured the mortgage loans

6    in the collateral pool of that securitization.

7         (a)    87.71% of the mortgage loans in Pool I were secured by a primary residence and

8    8.3% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

9         (b)    81.99% of the mortgage loans in Pool II were secured by a primary residence and

10   12.56% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

11        (c)    87.26% of the combined mortgage loans in the collateral pool were secured by a

12   primary residence and 8.64% by an investment property. CMALT 2006-A3 Pros. Sup. 9.

13   *CWALT 2006-29T1*:

14        The prospectus supplement for the CWALT 2006-29T1 Securitization presented the

15   following statements about the occupancy status of the properties that secured the mortgage loans

16   in the collateral pool of that securitization.

17        (a)    "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

18   presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

19   group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

20   Residence." The table made untrue and misleading statements about the number of mortgage

21   loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

22   outstanding in each of these categories. CWALT 2006-29T1 Pros. Sup. S-45.

23        (b)    The "Occupancy Types" table stated that 92.9% of the mortgage loans in loan

24   group 1 were secured by a "Primary Residence," 1.31% by an "Investment Property," and 5.79%

25   by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-45.

26        (c)    "The Mortgage Pool" section presented another table entitled "Occupancy Types."

27   This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

28   "Investment Property," and "Secondary Residence." The table made untrue and misleading

-70-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   statements about the number of mortgage loans, the aggregate principal balance outstanding, and

2   the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

3   29T1 Pros. Sup. S-53.

4          (d)      The "Occupancy Types" table stated that 88.29% of the mortgage loans in loan

5   group 2 were secured by a "Primary Residence," 4.51% by an "Investment Property," and 7.2%

6   by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-53.

7          (e)      "The Mortgage Pool" section presented another table entitled "Occupancy Types."

8   This table divided the mortgage loans in loan group 3 into the categories "Primary Residence,"

9   "Investment Property," and "Secondary Residence." The table made untrue and misleading

10  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

11  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

12  29T1 Pros. Sup. S-60.

13         (f)      The "Occupancy Types" table stated that 84.32% of the mortgage loans in loan

14  group 3 were secured by a "Primary Residence," 9.35% by an "Investment Property," and 6.33%

15  by a "Secondary Residence." CWALT 2006-29T1 Pros. Sup. S-60.

16  *RAST 2006-A15:*

17         In the prospectus supplement for the RAST 2006-A15 Securitization, UBS made the

18  following statements about the occupancy status of the properties that secured the mortgage loans

19  in the collateral pool of that securitization.

20         (a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item

21  *B*, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." This table

22  divided the mortgage loans in the collateral pool into the categories "Owner Occupied,"

23  "Investment," and "Second Home." The table made untrue and misleading statements about the

24  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

25  aggregate principal balance outstanding in each of these categories. RAST 2006-A15 Pros. Sup.

26  S-35.

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-71-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    (b)    In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 89.1% of

2   the mortgage loans in the collateral pool were secured by an "Owner Occupied" property, 7.26%

3   by an "Investment" property, and 3.64% by a "Second Home." RAST 2006-A15 Pros. Sup. S-35.

4   *CWALT 2006-40T1*:

5        The prospectus supplement for the CWALT 2006-40T1 Securitization presented the

6   following statements about the occupancy status of the properties that secured the mortgage loans

7   in the collateral pool of that securitization.

8        (a)    "The Mortgage Pool" section of the prospectus supplement, described in Item *B*,

9   presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan

10  group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

11  Residence." The table made untrue and misleading statements about the number of mortgage

12  loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

13  outstanding in each of these categories. CWALT 2006-40T1 Pros. Sup. S-41.

14       (b)    The "Occupancy Types" table stated that 86.21% of the mortgage loans in loan

15  group 1 were secured by a "Primary Residence," 6.37% by an "Investment Property," and 7.43%

16  by a "Secondary Residence." CWALT 2006-40T1 Pros. Sup. S-41.

17       (c)    "The Mortgage Pool" section presented another table entitled "Occupancy Types."

18  This table divided the mortgage loans in loan group 2 into the categories "Primary Residence,"

19  "Investment Property," and "Secondary Residence." The table made untrue and misleading

20  statements about the number of mortgage loans, the aggregate principal balance outstanding, and

21  the percent of aggregate principal balance outstanding in each of these categories. CWALT 2006-

22  40T1 Pros. Sup. S-50.

23       (d)    The "Occupancy Types" table stated that 82.73% of the mortgage loans in loan

24  group 2 were secured by a "Primary Residence," 11% by an "Investment Property," and 6.27%

25  by a "Secondary Residence." CWALT 2006-40T1 Pros. Sup. S-50.

26  *CWALT 2006-43CB*:

27

28

-72-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     In the prospectus supplement for the CWALT 2006-43CB Securitization, UBS made the

2    following statements about the occupancy status of the properties that secured the mortgage loans

3    in the collateral pool of that securitization.

4        (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

5    *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage loans in

6    loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary

7    Residence." The table made untrue and misleading statements about the number of mortgage

8    loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance

9    outstanding in each of these categories. CWALT 2006-43CB Pros. Sup. S-47.

10        (b)    In the "Occupancy Types" table, UBS stated that 85.43% of the mortgage loans in

11    loan group 1 were secured by a "Primary Residence," 9.72% by an "Investment Property," and

12    4.85% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-47.

13        (c)    In "The Mortgage Pool" section, UBS presented another table entitled "Occupancy

14    Types." This table divided the mortgage loans in loan group 2 into the categories "Primary

15    Residence," "Investment Property," and "Secondary Residence." The table made untrue and

16    misleading statements about the number of mortgage loans, the aggregate principal balance

17    outstanding, and the percent of aggregate principal balance outstanding in each of these

18    categories. CWALT 2006-43CB Pros. Sup. S-57.

19        (d)    In the "Occupancy Types" table, UBS stated that 81.56% of the mortgage loans in

20    loan group 2 were secured by a "Primary Residence," 9.98% by an "Investment Property," and

21    8.46% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-57.

22        (e)    In "The Mortgage Pool" section, UBS presented another table entitled "Occupancy

23    Types." This table divided the mortgage loans in loan group 3 into the categories "Primary

24    Residence," "Investment Property," and "Secondary Residence." The table made untrue and

25    misleading statements about the number of mortgage loans, the aggregate principal balance

26    outstanding, and the percent of aggregate principal balance outstanding in each of these

27    categories. CWALT 2006-43CB Pros. Sup. S-67.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP<br>ATTORNEYS AT LAW<br>SAN FRANCISCO

-73-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(f)     In the "Occupancy Types" table, UBS stated that 67.97% of the mortgage loans in loan group 3 were secured by a "Primary Residence," 26.86% by an "Investment Property," and 5.16% by a "Secondary Residence." CWALT 2006-43CB Pros. Sup. S-67.

*MALT 2007-1:*

In the prospectus supplement for the MALT 2007-1 Securitization, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of that securitization.

(a)     In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), described in Item *B*, UBS and MAST presented a table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-4.

(b)     In the "Occupancy Status" table, UBS and MAST stated that 92.71% of the mortgage loans in Collateral Group 1 were secured by a "Primary" residence, 0.28% by an "Investor" property, and 7.01% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-4.

(c)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-10.

(d)     In the "Occupancy Status" table, UBS and MAST stated that 79.16% of the mortgage loans in Collateral Group 2 were secured by a "Primary" residence, 10.46% by an "Investor" property, and 10.39% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-10.

(e)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Pool 1 into

-74-

the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-16.

(f)     In the "Occupancy Status" table, UBS and MAST stated that 85.96% of the mortgage loans in Pool 1 were secured by a "Primary" residence, 5.35% by an "Investor" property, and 8.69% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-16.

(g)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided the mortgage loans in Collateral Group 3 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-21.

(h)     In the "Occupancy Status" table, UBS and MAST stated that 83.49% of the mortgage loans in Collateral Group 3 were secured by a "Primary" residence, 5.41% by an "Investor" property, and 11.1% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-21.

(i)     In Annex A ("Mortgage Loan Statistical Information"), UBS and MAST presented another table entitled "Occupancy Status." This table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2007-1 Pros. Sup. A-27.

(j)     In the "Occupancy Status" table, UBS and MAST stated that 85.3% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 5.36% by an "Investor" property, and 9.34% by a "Secondary" property. MALT 2007-1 Pros. Sup. A-27.

*CWALT 2007-3T1:*

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-75-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    In the prospectus supplement for the CWALT 2007-3T1 Securitization, UBS made the

2 following statements about the occupancy status of the properties that secured the mortgage loans

3 in the collateral pool of that securitization.

4    (a)    In Annex A of the prospectus supplement ("The Mortgage Pool"), described in

5 Item *B*, UBS presented a table entitled "Occupancy Types." This table divided the mortgage

6 loans in loan group 1 into the categories "Primary Residence," "Investment Property," and

7 "Secondary Residence." The table made untrue and misleading statements about the number of

8 mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

9 principal balance outstanding in each of these categories. CWALT 2007-3T1 Pros. Sup. A-7.

10    (b)    In the "Occupancy Types" table, UBS stated that 85.93% of the mortgage loans in

11 loan group 1 were secured by a "Primary Residence," 8.29% by an "Investment Property," and

12 5.78% by a "Secondary Residence." CWALT 2007-3T1 Pros. Sup. A-7.

13    (c)    In Annex A, UBS presented another table entitled "Occupancy Types." This table

14 divided the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment

15 Property," and "Secondary Residence." The table made untrue and misleading statements about

16 the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

17 aggregate principal balance outstanding in each of these categories. CWALT 2007-3T1 Pros. Sup.

18 A-17.

19    (d)    In the "Occupancy Types" table, UBS stated that 86.36% of the mortgage loans in

20 loan group 2 were secured by a "Primary Residence," 2.66% by an "Investment Property," and

21 10.98% by a "Secondary Residence." CWALT 2007-3T1 Pros. Sup. A-17.

22 *RAST 2007-A5*:

23    In the prospectus supplement for the RAST 2007-A5 Securitization, UBS made the

24 following statements about the occupancy status of the properties that secured the mortgage loans

25 in the collateral pool of that securitization.

26    (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

27 *B*, UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This

28 table divided the mortgage loans in loan group 1 into the categories "Owner Occupied,"

-76-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   "Investment," and "Second Home." The table made untrue and misleading statements about the

2   number of mortgage loans, the aggregate principal balance outstanding, and the percent of

3   aggregate principal balance outstanding in each of these categories. RAST 2007-A5 Pros. Sup. S-

4   36.

5          (b)      In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that

6   88.63% of the mortgage loans in loan group 1 were secured by an "Owner Occupied" property,

7   8.12% by an "Investment" property, and 3.25% by a "Second Home." RAST 2007-A5 Pros. Sup.

8   S-36.

9          (c)      In "The Mortgage Pool" section, UBS also presented a table entitled "Occupancy

10  Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in loan group 2

11  into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue

12  and misleading statements about the number of mortgage loans, the aggregate principal balance

13  outstanding, and the percent of aggregate principal balance outstanding in each of these

14  categories. RAST 2007-A5 Pros. Sup. S-42.

15         (d)      In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that

16  90.22% of the mortgage loans in loan group 2 were secured by an "Owner Occupied" property,

17  5.19% by an "Investment" property, and 4.58% by a "Second Home." RAST 2007-A5 Pros. Sup.

18  S-42.

19         (e)      In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy

20  Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool

21  into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue

22  and misleading statements about the number of mortgage loans, the aggregate principal balance

23  outstanding, and the percent of aggregate principal balance outstanding in each of these

24  categories. RAST 2007-A5 Pros. Sup. S-49.

25         (f)      In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 89.78%

26  of the mortgage loans in the collateral pool were secured by an "Owner Occupied" property,

27  6.01% by an "Investment" property, and 4.21% by a "Second Home." RAST 2007-A5 Pros. Sup.

28  S-49.

-77-

**Item [94].**     **Details of properties that were stated to be owner-occupied, but were not:**

*MALT 2004-9:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 150

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 168

    (c)    Number of loans on which the owner of the property owned three or more properties: 5

    (d)    Number of loans that went straight from current to foreclosure or ownership by lender: 1

    (e)    Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 269

*CWALT 2005-32T1:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 49

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 91

    (c)    Number of loans on which the owner of the property owned three or more properties: 6

    (d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 125

*LMT 2005-1:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 180

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 288

    (c)    Number of loans on which the owner of the property owned three or more properties: 37

    (d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 444

*RAST 2005-A15:*

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-78-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 327

(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 502

(c)    Number of loans on which the owner of the property owned three or more properties: 40

(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 743

*WMALT 2006-3:*

(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 151

(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 205

(c)    Number of loans on which the owner of the property owned three or more properties: 17

(d)    Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)    Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 325

*CWALT 2006-12CB:*

(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 214

(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 290

(c)    Number of loans on which the owner of the property owned three or more properties: 32

(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 463

*MLMI 2006-F1:*

(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 39

-79-

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 78

    (c)    Number of loans on which the owner of the property owned three or more properties: 14

    (d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 116

*CWALT 2006-23CB:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 361

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 503

    (c)    Number of loans on which the owner of the property owned three or more properties: 25

    (d)    Number of loans that went straight from current to foreclosure or ownership by lender: 1

    (e)    Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 774

*MALT 2006-3:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 41

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 72

    (c)    Number of loans on which the owner of the property owned three or more properties: 7

    (d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 109

*FHAMS 2006-FA4:*

    (a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 112

    (b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 144

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c)      Number of loans on which the owner of the property owned three or more properties: 6

(d)      Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)      Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 230

*CMALT 2006-A3:*

(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 85

(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 135

(c)      Number of loans on which the owner of the property owned three or more properties: 20

(d)      Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 218

*CWALT 2006-29T1:*

(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 96

(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 166

(c)      Number of loans on which the owner of the property owned three or more properties: 32

(d)      Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)      Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 259

*RAST 2006-A15:*

(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 51

(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 116

-81-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c)     Number of loans on which the owner of the property owned three or more properties: 18

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 167

*CWALT 2006-40T1:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 64

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 134

(c)     Number of loans on which the owner of the property owned three or more properties: 27

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 195

*CWALT 2006-43CB:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 340

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 462

(c)     Number of loans on which the owner of the property owned three or more properties: 40

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 733

*MALT 2007-1:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 46

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 82

(c)     Number of loans on which the owner of the property owned three or more properties: 8

-82-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 119

*CWALT 2007-3T1:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 101

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 176

(c)     Number of loans on which the owner of the property owned three or more properties: 31

(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 274

*RAST 2007-A5:*

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 71

(b)     Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 148

(c)     Number of loans on which the owner of the property owned three or more properties: 26

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 223

**Item [97].**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

*MALT 2004-9:*

On pages S-29 through S-31 of the prospectus supplement for the MALT 2004-9 Securitization, UBS and MAST made statements about the underwriting guidelines applied in the origination or acquisition of the mortgage loans in the collateral pool of that securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

-83-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (a)    "[E]xceptions to the underwriting standards described in this prospectus

2    supplement are made in the event that compensating factors are demonstrated by a prospective

3    borrower." MALT 2004-9 Pros. Sup. S-29.

4    (b)    "The adequacy of the mortgaged property as security for repayment of the related

5    Loan will generally have been determined by an appraisal in accordance with pre-established

6    appraisal procedure guidelines for appraisals established by or acceptable to the originator."

7    MALT 2004-9 Pros. Sup. S-30.

8          On pages S-31 through S-35 of the prospectus supplement, UBS and MAST made

9    statements about the underwriting guidelines of Wells Fargo Bank, N.A. All of those statements

10   are incorporated herein by reference. In particular, UBS and MAST stated that:

11   (a)    "The WFB Underwriting Guidelines evaluate the applicant's credit standing and

12   ability to repay the loan, as well as the value and adequacy of the mortgaged property as

13   collateral." MALT 2004-9 Pros. Sup. S-32.

14   *CWALT 2005-32T1:*

15         Pages S-22 through S-27 of the prospectus supplement for the CWALT 2005-32T1

16   Securitization presented statements about the underwriting guidelines of Countrywide Home

17   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

18   prospectus supplement stated that:

19   (a)    "Countrywide Home Loans may waive some documentation requirements for

20   mortgage loans originated under the Preferred Processing Program." CWALT 2005-32T1 Pros.

21   Sup. S-23.

22   (b)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

23   if compensating factors are demonstrated by a prospective borrower." CWALT 2005-32T1 Pros.

24   Sup. S-23.

25   *(c)*    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

26   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

27   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-32T1

28   Pros. Sup. S-23.

-84-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    *LMT 2005-1:*

2         Pages S-56 through S-57 of the prospectus supplement for the LMT 2005-1 Securitization

3    presented statements about the underwriting guidelines of the originators of the loans other than

4    Lehman Brothers Bank, FSB. All of those statements are incorporated herein by reference. In

5    particular, the prospectus supplement stated that:

6         (a)    "On a case[-]by-case basis, the Originators may determine that, based upon

7    compensating factors, a prospective borrower not strictly qualifying under the applicable

8    underwriting guidelines warrants an underwriting exception." LMT 2005-1 Pros. Sup. S-56.

9         (b)    "The General Underwriting Guidelines are intended to evaluate the value and

10   adequacy of the mortgaged property as collateral and to consider the borrower's credit standing

11   and repayment ability." LMT 2005-1 Pros. Sup. S-56.

12        Pages S-55 through S-56 of the prospectus supplement for the LMT 2005-1 Securitization

13   presented statements about the underwriting guidelines of Lehman Brothers Bank, FSB. All of

14   those statements are incorporated herein by reference. In particular, the prospectus supplement

15   stated that:

16        (a)    "On a case-by-case basis, Lehman Bank or Aurora, as applicable, may determine

17   that, based upon compensating factors, a prospective borrower not strictly qualifying under the

18   applicable underwriting guidelines warrants an underwriting exception." LMT 2005-1 Pros. Sup.

19   S-55.

20        (b)    "Lehman Bank's Underwriting Guidelines are intended to evaluate the value and

21   adequacy of the mortgaged property as collateral and to consider the borrower's credit standing

22   and repayment ability." LMT 2005-1 Pros. Sup. S-55.

23   *RAST 2005-A15:*

24        Pages S-38 through S-39 of the prospectus supplement for the RAST 2005-A15

25   Securitization presented statements about the underwriting guidelines of IndyMac Bank, FSB. All

26   of those statements are incorporated herein by reference. In particular, the prospectus supplement

27   stated that:

28

-85-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1      (a)     "Exceptions to these underwriting standards are permitted where compensating

2  factors are present . . . ." RAST 2005-A15 Pros. Sup. S-38.

3      (b)     "IndyMac Bank's underwriting standards for conventionally underwritten

4  mortgage loans are based on traditional underwriting factors, including the creditworthiness of the

5  mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and

6  the value of the related mortgaged property." RAST 2005-A15 Pros. Sup. S-38.

7  *WMALT 2006-3:*

8      Pages S-22 through S-25 of the prospectus supplement for the WMALT 2006-3

9  Securitization presented statements about the underwriting guidelines applied in the origination of

10  all of the mortgage loans in the collateral pool of that securitization. All of those statements are

11  incorporated herein by reference. In particular, the prospectus supplement stated that:

12      (a)     "Exceptions to the underwriting standards . . . may be made on a case-by-case

13  basis if compensating factors are present." WMALT 2006-3 Pros. Sup. S-24.

14      (b)     "The sponsor's underwriting standards and Washington Mutual Bank's

15  underwriting guidelines generally are intended to evaluate the prospective borrower's credit

16  standing and repayment ability and the value and adequacy of the mortgaged property as

17  collateral." WMALT 2006-3 Pros. Sup. S-22.

18      (c)     "Under all documentation programs other than the no ratio programs and the no

19  documentation programs, in evaluating a prospective borrower's ability to repay a mortgage loan,

20  the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes

21  and other monthly housing expenses to the borrower's gross income (referred to as the "housing-

22  to-income ratio" or "front end ratio") and the ratio of the borrower's total monthly debt (including

23  non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio"

24  or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors,

25  such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of

26  other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors

27  are present." WMALT 2006-3 Pros. Sup. S-23.

28  *CWALT 2006-12CB:*

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1        On pages S-39 through S-44 of the prospectus supplement for the CWALT 2006-12CB

2    Securitization UBS made statements about the underwriting guidelines of Countrywide Home

3    Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

4    prospectus supplement stated that:

5        (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

6    if compensating factors are demonstrated by a prospective borrower." CWALT 2006-12CB Pros.

7    Sup. S-40.

8        (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

9    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

10   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-12CB

11   Pros. Sup. S-39.

12   *MLMI 2006-F1:*

13       Pages S-22 through S-23 of the prospectus supplement for the MLMI 2006-F1

14   Securitization presented statements about the underwriting guidelines of National City Mortgage

15   Co. All of those statements are incorporated herein by reference. In particular, the prospectus

16   supplement stated that:

17       (a)    "Exceptions to the underwriting standards are permitted where compensating

18   factors are present." MLMI 2006-F1 Pros. Sup. S-22.

19       (b)    "The originator's underwriting standards are applied to evaluate the prospective

20   borrower's credit standing and repayment ability and the value and adequacy of the mortgaged

21   property as collateral." MLMI 2006-F1 Pros. Sup. S-22.

22   *CWALT 2006-22R:*

23       On page A-25 of the prospectus supplement for the CWALT 2006-22R Securitization,

24   UBS and MALT made statements about the underwriting guidelines applied in the origination of

25   the mortgage loans in the collateral pool of that securitization. All of those statements are

26   incorporated herein by reference. In particular, the prospectus supplement stated that:

27

28

-87-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(a) "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the Property as collateral." CWALT 2006-22R Pros. Sup. A-25.

Pages A-S-59 through A-S-65 of the prospectus supplement for the CWALT 2006-22R Securitization presented statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

(a) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-22R Pros. Sup. A-S-60.

*CWALT 2006-23CB*:

Pages S-54 through S-60 of the prospectus supplement for the CWALT 2006-23CB Securitization presented statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In particular, the prospectus supplement stated that:

(a) "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-23CB Pros. Sup. S-55.

(b) "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-23CB Pros. Sup. S-55.

*MALT 2006-3*:

On pages S-33 through S-35 of the prospectus supplement for the MALT 2006-3 Securitization, UBS and MALT made statements about the underwriting guidelines applied in the origination of the mortgage loans in the collateral pool of that securitization. All of those

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-88-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   statements are incorporated herein by reference. In particular, the prospectus supplement stated

2   that:

3       (a)    "[E]xceptions to the underwriting standards . . . are made in the event that

4   compensating factors are demonstrated by a prospective borrower." MALT 2006-3 Pros. Sup. S-

5   33.

6       (b)    "The adequacy of the mortgaged property as security for repayment of the related

7   Loan will generally have been determined by an appraisal in accordance with pre-established

8   appraisal procedure guidelines for appraisals established by or acceptable to the originator."

9   MALT 2006-3 Pros. Sup. S-34.

10      On pages S-35 through S-37 of the prospectus supplement for the MALT 2006-3

11  Securitization, UBS and MALT made statements about the underwriting guidelines of American

12  Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular,

13  the prospectus supplement stated that:

14      (a)    "Exceptions to the underwriting standards may be permitted where compensating

15  factors are present." MALT 2006-3 Pros. Sup. S-35.

16      (b)    "[E]xceptions to American Home's underwriting guidelines are allowed if

17  sufficient compensating factors exist to offset any additional risk due to the exception." MALT

18  2006-3 Pros. Sup. S-37.

19      (c)    "When evaluating the ratio of all monthly debt payments to the borrower's

20  monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

21  frequency of credit usage and its impact on the borrower's ability to repay the loan." MALT

22  2006-3 Pros. Sup. S-36.

23  *FHAMS 2006-FA4*:

24      On page 13 of the prospectus, and pages S-30 through S-33 of the prospectus supplement

25  for the FHAMS 2006-FA4 Securitization, UBS made statements about the underwriting

26  guidelines of First Horizon Home Loan Corporation,. All of those statements are incorporated

27  herein by reference. In particular, the prospectus supplement stated that:

28

-89-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (a)    "On a case by case basis, the related seller may determine that, based upon

2    compensating factors, a prospective borrower not strictly qualifying under its applicable

3    underwriting risk category guidelines warrants an underwriting exception." FHAMS 2006-FA4

4    Pros. 13.

5    (b)    "Exceptions to the First Horizon Underwriting Guidelines are permitted where

6    compensating factors are present." FHAMS 2006-FA4 Pros. Sup. S-30.

7    (c)    "First Horizon's Underwriting standards are intended to evaluate the prospective

8    mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed

9    property as collateral." FHAMS 2006-FA4 Pros. Sup. S-35.

10   *CMALT 2006-A3:*

11        On pages 85 through 89 of the prospectus for the CMALT 2006-A3 Securitization, UBS

12   made statements about the underwriting guidelines of CitiMortgage, Inc. and its affiliates. All of

13   those statements are incorporated herein by reference. In particular, the prospectus supplement

14   stated that:

15   (a)    "The credit scoring system assesses a prospective borrower's ability and

16   willingness to repay a mortgage loan based upon predetermined mortgage loan characteristics and

17   credit risk factors." CMALT 2006-A3 Pros. Sup. 86.

18   (b)    "CitiMortgage will fully or partly credit score or re-underwrite the third-party

19   loans to determine whether the original underwriting process adequately assessed the borrower's

20   ability to repay and the adequacy of the property as collateral, based on Citi-Mortgage's

21   underwriting standards." CMALT 2006-A3 Pros. Sup. 89.

22        UBS also stated in the prospectus supplement of the CMALT 2006-A3 securitization that,

23   of the originators of the 25.7% of the mortgage loans in the collateral pool not originated by

24   CitiMortgage, Inc. and its affiliates, "These organizations originated the mortgage loans under

25   guidelines that are substantially in accordance with CitiMortgage's guidelines for its own

26   originators." CMALT 2006-A3 Pros. Sup. 29 to 30.

27   *CWALT 2006-29T1:*

28

-90-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1          Pages S-66 through S-72 of the prospectus supplement for the CWALT 2006-29T1

2   Securitization presented statements about the underwriting guidelines of Countrywide Home

3   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

4   prospectus supplement stated that:

5          (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

6   if compensating factors are demonstrated by a prospective borrower." CWALT 2006-29T1 Pros.

7   Sup. S-68.

8          (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

9   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

10  ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-29T1

11  Pros. Sup. S-67.

12  *RAST 2006-R2:*

13         On pages S-35 through S-36 of the prospectus supplement for the RAST 2006-R2

14  Securitization, UBS and MALT made statements about the underwriting guidelines applied in the

15  origination of the mortgage loans in the collateral pool of that securitization. All of those

16  statements are incorporated herein by reference. In particular, the prospectus supplement stated

17  that:

18         (a)    "Underwriting standards are applied by or on behalf of a lender to evaluate the

19  borrower's credit standing and repayment ability, and the value and adequacy of the Property as

20  collateral." the RAST 2006-R2 Pros. Sup. 35.

21  *RAST 2006-A15:*

22         On pages S-38 through S-41 of the prospectus supplement for the RAST 2006-A15

23  Securitization, UBS made statements about the underwriting guidelines of IndyMac Bank, FSB.

24  All of those statements are incorporated herein by reference. In particular, the prospectus

25  supplement stated that:

26         (a)    "Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac

27  Bank according to IndyMac Bank's underwriting guidelines . . . or pursuant to an exception to

28

1   those guidelines based on IndyMac Bank's procedures for approving such exceptions." RAST

2   2006-A15 Pros. Sup. S-38.

3          (b)     "Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-

4   underwritten and approved under an exception to those underwriting guidelines." RAST 2006-

5   A15 Pros. Sup. S-40.

6          (c)     "Exceptions to underwriting standards are permitted in situations in which

7   compensating factors exist." RAST 2006-A15 Pros. Sup. S-41.

8          (d)     "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

9   loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

10   the adequacy of the mortgaged property as collateral." RAST 2006-A15 Pros. Sup. S-39.

11   *CWALT 2006-40T1:*

12          Pages S-54 through S-60 of the prospectus supplement for the CWALT 2006-40T1

13   Securitization presented statements about the underwriting guidelines of Countrywide Home

14   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

15   prospectus supplement stated that:

16          (a)     "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

17   if compensating factors are demonstrated by a prospective borrower." CWALT 2006-40T1 Pros.

18   Sup. S-56.

19          (b)     "Countrywide Home Loans' underwriting standards are applied by or on behalf of

20   Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

21   ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-40T1

22   Pros. Sup. S-55.

23   *CWALT 2006-43CB:*

24          On pages S-71 through S-77 of the prospectus supplement for the CWALT 2006-43CB

25   Securitization, UBS made statements about the underwriting guidelines of Countrywide Home

26   Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

27   prospectus supplement stated that:

28

-92-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2 if compensating factors are demonstrated by a prospective borrower." CWALT 2006-43CB Pros.

3 Sup. S-73.

4    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

5 Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

6 ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-43CB

7 Pros. Sup. S-72.

8 *MALT 2007-1:*

9    On pages S-41 through S-42 of the prospectus supplement for the MALT 2007-1

10 Securitization, UBS and MALT made statements about the underwriting guidelines applied in the

11 origination of the mortgage loans in the collateral pool of that securitization. All of those

12 statements are incorporated herein by reference. In particular, the prospectus supplement stated

13 that:

14    (a)    "[E]xceptions to the underwriting standards described in this prospectus

15 supplement. are made in the event that compensating factors are demonstrated by a prospective

16 borrower." MALT 2007-1 Pros. Sup. S-41.

17    (b)    "The adequacy of the mortgaged property as security for repayment of the related

18 Loan will generally have been determined by an appraisal in accordance with pre-established

19 appraisal procedure guidelines for appraisals established by or acceptable to the originator."

20 MALT 2007-1 Pros. Sup. S-42.

21    On pages S-43 through S-47 of the prospectus supplement for the MALT 2007-1

22 Securitization, UBS and MALT made statements about the underwriting guidelines of

23 Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference. In

24 particular, the prospectus supplement stated that:

25    (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

26 if compensating factors are demonstrated by a prospective borrower." MALT 2007-1 Pros. Sup.

27 S-44.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-93-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

2  Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

3  ability and the value and adequacy of the mortgaged property as collateral." MALT 2007-1 Pros.

4  Sup. S-38 and S-43.

5        On pages S-48 through S-52 of the prospectus supplement for the MALT 2007-1

6  Securitization, UBS and MALT made statements about the underwriting guidelines of Wells

7  Fargo Bank, N.A. All of those statements are incorporated herein by reference. In particular, the

8  prospectus supplement stated that:

9    (c)    "Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells

10  Fargo Bank to evaluate the applicant's credit standing and ability to repay the loan, as well as the

11  value and adequacy of the mortgaged property as collateral." MALT 2007-1 Pros. Sup. S-48

12  through S-49.

13        On pages S-52 through S-54 of the prospectus supplement for the MALT 2007-1

14  Securitization, UBS and MALT made statements about the underwriting guidelines of Wachovia

15  Mortgage Company. All of those statements are incorporated herein by reference. In particular,

16  the prospectus supplement stated that:

17    (a)    "Exception loans which are originated outside of stated guidelines are available to

18  customers with demonstrated Wachovia relationships and/or strong compensating factors."

19  MALT 2007-1 Pros. Sup. S-53.

20    (b)    "The borrower's capacity to repay, creditworthiness, source of funds for down

21  payment and the adequacy of the collateral securing the mortgage are evaluated per guidelines

22  stated within the Wachovia Mortgage Corporation online Products and Underwriting Manual."

23  MALT 2007-1 Pros. Sup. S-53.

24  *CWALT 2007-3T1:*

25        On pages S-36 through S-42 of the prospectus supplement for the CWALT 2007-3T1

26  Securitization, UBS made statements about the underwriting guidelines of Countrywide Home

27  Loans, Inc. All of those statements are incorporated herein by reference. In particular, the

28  prospectus supplement stated that:

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-94-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1    (a)    "Exceptions to Countrywide Home Loans' underwriting guidelines may be made

2    if compensating factors are demonstrated by a prospective borrower." CWALT 2007-3T1 Pros.

3    Sup. S-37.

4    (b)    "Countrywide Home Loans' underwriting standards are applied by or on behalf of

5    Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment

6    ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-3T1

7    Pros. Sup. S-37.

8    *RAST 2007-A5:*

9    On pages S-52 through S-55 of the prospectus supplement for the RAST 2007-A5

10    Securitization, UBS made statements about the underwriting guidelines of IndyMac Bank, FSB.

11    All of those statements are incorporated herein by reference. In particular, the prospectus

12    supplement stated that:

13    (a)    "Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac

14    Bank according to IndyMac Bank's underwriting guidelines . . . regardless of whether such

15    mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to

16    those guidelines based on IndyMac Bank's procedures for approving such exceptions." RAST

17    2007-A5 Pros. Sup. S-52 to S-53.

18    (b)    "Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-

19    underwritten and approved under an exception to those underwriting guidelines." RAST 2007-A5

20    Pros. Sup. S-54.

21    (c)    "Exceptions to underwriting standards are permitted in situations in which

22    compensating factors exist." RAST 2007-A5 Pros. Sup. S-55.

23    (d)    "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage

24    loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and

25    the adequacy of the mortgaged property as collateral." RAST 2007-A5 Pros. Sup. S-53.

26    **Item [104].    Early payment defaults:**

27    *MALT 2004-9:*

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-95-

(a)   Number of the mortgage loans that suffered EPDs: 21

(b)   Percent of the mortgage loans that suffered EPDs: 1.3%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.14%

*CWALT 2005-32T1:*

(a)   Number of the mortgage loans that suffered EPDs: 3

(b)   Percent of the mortgage loans that suffered EPDs: 0.4%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

*RAST 2005-A15:*

(a)   Number of the mortgage loans that suffered EPDs: 29

(b)   Percent of the mortgage loans that suffered EPDs: 0.5%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

*WMALT 2006-3:*

(a)   Number of the mortgage loans that suffered EPDs: 15

(b)   Percent of the mortgage loans that suffered EPDs: 0.8%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2006-12CB:*

(a)   Number of the mortgage loans that suffered EPDs: 12

(b)   Percent of the mortgage loans that suffered EPDs: 0.4%

(c)   Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*MLMI 2006-F1:*

-96-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a)     Number of the mortgage loans that suffered EPDs: 2

(b)     Percent of the mortgage loans that suffered EPDs: 0.4%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*MALT 2006-3:*

(a)     Number of the mortgage loans that suffered EPDs: 8

(b)     Percent of the mortgage loans that suffered EPDs: 0.9%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CMALT 2006-A3:*

(a)     Number of the mortgage loans that suffered EPDs: 8

(b)     Percent of the mortgage loans that suffered EPDs: 0.3%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2006-29T1:*

(a)     Number of the mortgage loans that suffered EPDs: 19

(b)     Percent of the mortgage loans that suffered EPDs: 1.5%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*RAST 2006-A15:*

(a)     Number of the mortgage loans that suffered EPDs: 19

(b)     Percent of the mortgage loans that suffered EPDs: 2.4%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2006-40T1:*

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a)     Number of the mortgage loans that suffered EPDs: 11

(b)     Percent of the mortgage loans that suffered EPDs: 1.3%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2006-43CB:*

(a)     Number of the mortgage loans that suffered EPDs: 38

(b)     Percent of the mortgage loans that suffered EPDs: 0.9%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.44%

*CWALT 2007-3T1:*

(a)     Number of the mortgage loans that suffered EPDs: 19

(b)     Percent of the mortgage loans that suffered EPDs: 1.6%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%

*RAST 2007-A5:*

(a)     Number of the mortgage loans that suffered EPDs: 14

(b)     Percent of the mortgage loans that suffered EPDs: 1.1%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%

**Item [105].**     90+ days delinquencies:

*MALT 2004-9:*

(a)     Number of the mortgage loans that suffered 90+ days delinquencies: 219

(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 13.2%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 7.2%

-98-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*CWALT 2005-32T1:*

    **(a)**    Number of the mortgage loans that suffered 90+ days delinquencies: 150

    **(b)**    Percent of the mortgage loans that suffered 90+ days delinquencies: 22.3%

    **(c)**    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

*RAST 2005-A15:*

    **(a)**    Number of the mortgage loans that suffered 90+ days delinquencies: 1,329

    **(b)**    Percent of the mortgage loans that suffered 90+ days delinquencies: 22.2%

    **(c)**    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

*CWALT 2006-29T1:*

    **(a)**    Number of the mortgage loans that suffered 90+ days delinquencies: 439

    **(b)**    Percent of the mortgage loans that suffered 90+ days delinquencies: 35.3%

    **(c)**    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 32.7%

*RAST 2006-A15:*

    **(a)**    Number of the mortgage loans that suffered 90+ days delinquencies: 286

    **(b)**    Percent of the mortgage loans that suffered 90+ days delinquencies: 36.4%

    **(c)**    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 32.7%

*CWALT 2006-40T1:*

    **(a)**    Number of the mortgage loans that suffered 90+ days delinquencies: 340

    **(b)**    Percent of the mortgage loans that suffered 90+ days delinquencies: 38.7%

    **(c)**    Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 32.7%

-99-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*CWALT 2007-3T1:*

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 427

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 36.7%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

*RAST 2007-A5:*

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 425

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 33.3%

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies:** 33.9%

**Item [106].**    **30+ days delinquencies in this securitization:**

*CWALT 2005-32T1:*

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 158

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 23.4%

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

*LMT 2005-1:*

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 364

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 14.5%

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010:** 14.7%

*RAST 2005-A15:*

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010:** 1,303

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 21.8%

(c)      Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*WMALT 2006-3:*

(a)      Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 499

(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 28.0%

(c)      Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2006-12CB:*

(a)      Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 770

(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 25.1%

(c)      Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2006-23CB:*

(a)      Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,172

(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 24.7%

(c)      Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*MALT 2006-3:*

(a)      Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 205

(b)      Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 23.2%

(c)      Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  *FHAMS 2006-FA4:*

2
3      (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 281**

4      (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 17.0%**

5
6      (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

7  *CWALT 2006-29T1:*

8
9      (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 438**

10      (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 35.2%**

11
12      (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

13
14  *RAST 2006-A15:*

15      (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 259**

16      (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 33.0%**

17
18      (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

19  *CWALT 2006-40T1:*

20
21      (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 363**

22      (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 41.3%**

23
24      (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

25  *CWALT 2006-43CB:*

26
27      (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,101**

28

-102-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

     **(b)**     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 26.1%

     **(c)**     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*MALT 2007-1:*

     **(a)**     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 102

     **(b)**     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 15.5%

     **(c)**     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*CWALT 2007-3T1:*

     **(a)**     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 430

     **(b)**     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 36.9%

     **(c)**     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

*RAST 2007-A5:*

     **(a)**     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 416

     **(b)**     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 32.6%

     **(c)**     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item [110].**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages iii, iv, 4, and 53 of the private placement memorandum, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc.

-103-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

1    UBS and MAST also stated: "It is a condition to the issuance of the [Bank's certificate

2    that it] be rated at least "Aaa" by Moody's ..." MARS 2007-1 Priv. Place. Mem. iv, 4 and 53.

3    **Item [120].     Summary of loans about which the Defendants made untrue or misleading**

4    **statements:**

5    *MALT 2004-9:*

6

7    (a)     **Number of loans whose LTVs were materially understated: 308**

8    (b)     **Number of loans in which the owner's equity was reduced by 5% or more by**

9            **undisclosed additional liens: 56**

10   (c)     **Number of loans that suffered EPDs: 21**

11   (d)     **Number of loans in which the properties were stated to be owner-occupied**
            **but were not: 269**

12   (e)     **Eliminating duplicates, number of loans about which the Defendants made**

13           **untrue or misleading statements: 570**

14   (f)     **Eliminating duplicates, percent of loans about which the Defendants made**

15           **untrue or misleading statements: 34.2%**

16   *CWALT 2005-32T1:*

17

18   (a)     **Number of loans whose LTVs were materially understated: 229**

19   (b)     **Number of loans in which the owner's equity was reduced by 5% or more by**
            **undisclosed additional liens: 79**

20

21   (c)     **Number of loans that suffered EPDs: 3**

22   (d)     **Number of loans in which the properties were stated to be owner-occupied**
            **but were not: 125**

23   (e)     **Eliminating duplicates, number of loans about which the Defendants made**

24           **untrue or misleading statements: 343**

25   (f)     **Eliminating duplicates, percent of loans about which the Defendants made**
            **untrue or misleading statements: 54.2%**

26

27   *LMT 2005-1:*

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-104-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(a)     Number of loans whose LTVs were materially understated: 778

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 243

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 444

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,249

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 49.7%

*RAST 2005-A15*:

(a)     Number of loans whose LTVs were materially understated: 1,372

(b)     Number of loans that suffered EPDs: 29

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 743

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,861

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 31.1%

*WMALT 2006-3*:

(a)     Number of loans whose LTVs were materially understated: 612

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 95

(c)     Number of loans that suffered EPDs: 15

(d)     Number of loans in which the properties were stated to be owner-occupied but were not: 325

(e)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 857

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.1%

-105-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*CWALT 2006-12CB:*

    (a)    **Number of loans whose LTVs were materially understated: 880**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 151**

    (c)    **Number of loans that suffered EPDs: 12**

    (d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 463**

    (e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,228**

    (f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 43.0%**

*MLMI 2006-F1:*

    (a)    **Number of loans whose LTVs were materially understated: 140**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 41**

    (c)    **Number of loans that suffered EPDs: 2**

    (d)    **Number of loans in which the properties were stated to be owner-occupied but were not: 116**

    (e)    **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 241**

    (f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 53.0%**

*CWALT 2006-23CB:*

    (a)    **Number of loans whose LTVs were materially understated: 1,420**

    (b)    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 233**

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 774

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 2,071

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 43.7%

*MALT 2006-3:*

(a)     Number of loans whose LTVs were materially understated: 237

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 57

(c)     Number of loans that suffered EPDs: 8

(d)     Number of loans in which the properties were stated to be owner-occupied but were not: 109

(e)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 340

(f)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 38.5%

*FHAMS 2006-FA4:*

(a)     Number of loans whose LTVs were materially understated: 458

(b)     Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 484

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 230

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 903

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 54.5%

*CMALT 2006-A3:*

-107-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(a)    Number of loans whose LTVs were materially understated: 428

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 451

(c)    Number of loans that suffered EPDs: 8

(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 218

(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 786

*CWALT 2006-29T1:*

(a)    Number of loans whose LTVs were materially understated: 492

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 93

(c)    Number of loans that suffered EPDs: 19

(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 259

(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 693

(f)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 64.0%

*RAST 2006-A15:*

(a)    Number of loans whose LTVs were materially understated: 346

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 47

(c)    Number of loans that suffered EPDs: 19

(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 167

(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 469

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (f) Eliminating duplicates, percent of loans about which the Defendants made
2      untrue or misleading statements: 59.7%

3   *CWALT 2006-40T1:*

4

5    (a) Number of loans whose LTVs were materially understated: 383

6    (b) Number of loans in which the owner's equity was reduced by 5% or more by
7      undisclosed additional liens: 97

8    (c) Number of loans that suffered EPDs: 11

9    (d) Number of loans in which the properties were stated to be owner-occupied
       but were not: 195

10   (e) Eliminating duplicates, number of loans about which the Defendants made
11     untrue or misleading statements: 523

12   (f) Eliminating duplicates, percent of loans about which the Defendants made
13     untrue or misleading statements: 59.5%

14  *CWALT 2006-43CB:*

15

16   (a) Number of loans whose LTVs were materially understated: 1,499

17   (b) Number of loans in which the owner's equity was reduced by 5% or more by
18     undisclosed additional liens: 160

19   (c) Number of loans that suffered EPDs: 38

20   (d) Number of loans in which the properties were stated to be owner-occupied
       but were not: 733

21   (e) Eliminating duplicates, number of loans about which the Defendants made
22     untrue or misleading statements: 2,040

23   (f) Eliminating duplicates, percent of loans about which the Defendants made
24     untrue or misleading statements: 48.4%

25  *MALT 2007-1:*
26

27   (a) Number of loans whose LTVs were materially understated: 211

28

-109-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP / ATTORNEYS AT LAW / SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 70

(c)    Number of loans in which the properties were stated to be owner-occupied but were not: 119

(d)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 321

(e)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 48.9%

*CWALT 2007-3T1:*

(a)    Number of loans whose LTVs were materially understated: 500

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 90

(c)    Number of loans that suffered EPDs: 19

(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 274

(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 686

(f)    Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 58.9%

*RAST 2007-A5:*

(a)    Number of loans whose LTVs were materially understated: 522

(b)    Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 74

(c)    Number of loans that suffered EPDs: 14

(d)    Number of loans in which the properties were stated to be owner-occupied but were not: 223

(e)    Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 678

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(f)    **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 53.2%**

3428/001/X119862.v1

1   GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
    ROBERT A. GOODIN, State Bar No. 061302
2        rgoodin@goodinmacbride.com
    FRANCINE T. RADFORD, State Bar No. 168269
3        fradford@goodinmacbride.com
    ANNE H. HARTMAN, State Bar No. 184556
4        ahartman@goodinmacbride.com
5   505 Sansome Street, Suite 900
    San Francisco, California 94111
6   Telephone:      (415) 392-7900
    Facsimile:      (415) 398-4321
7

8   GRAIS & ELLSWORTH LLP
    DAVID J. GRAIS (*pro hac application submitted herewith*)
9   KATHRYN C. ELLSWORTH (*pro hac app. submitted herewith*)
    OWEN L. CYRULNIK (*pro hac application submitted herewith*)
10  70 East 55th Street
    New York, New York 10022
11  Telephone:      (212) 755-0100
    Facsimile:      (212) 755-0052
12

13  Attorneys for Plaintiff
14  Federal Home Loan Bank of San Francisco

15          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

16          IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

17

18  FEDERAL HOME LOAN BANK OF SAN            No. CGC-10-497839
    FRANCISCO,
19                                           **VOLUME 3 OF SCHEDULES OF**
20              Plaintiff,                   **FIRST AMENDED COMPLAINT**
                                             **(SCHEDULES 23-38)**
21      v.

22  DEUTSCHE BANK SECURITIES INC.;
    DEUTSCHE ALT-A SECURITIES, INC.;
23  DB STRUCTURED PRODUCTS, INC.;
    J.P. MORGAN SECURITIES, INC., F/K/A
24  BEAR, STEARNS & CO. INC.;
    STRUCTURED ASSET MORTGAGE
25  INVESTMENTS II, INC.;
    THE BEAR STEARNS COMPANIES, LLC,
26  F/K/A THE BEAR STEARNS
    COMPANIES, INC.;
27  COUNTRYWIDE SECURITIES
28

_____
    SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1  CORPORATION;
   CREDIT SUISSE SECURITIES (USA) LLC,
2  F/K/A CREDIT SUISSE FIRST BOSTON
   LLC;
3  RBS SECURITIES, INC., F/K/A/
4  GREENWICH CAPITAL MARKETS, INC.;
   RBS ACCEPTANCE, INC., F/K/A
5  GREENWICH CAPITAL ACCEPTANCE,
   INC.;
6  RBS HOLDINGS USA, INC., F/K/A
7  GREENWICH CAPITAL HOLDINGS,
   INC.;
8  MORGAN STANLEY & CO.
   INCORPORATED;
9  UBS SECURITIES, LLC;
10 MORTGAGE ASSET SECURITIZATION
   TRANSACTIONS, INC.;
11 MERRILL LYNCH, PIERCE, FENNER &
   SMITH, INC.;
12 WASHINGTON MUTUAL MORTGAGE
   SECURITIES CORP.;
13 WAMU CAPITAL CORP.; AND,
14 DOES 1-50,

15          Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

BLUEBIRD (888) 477-0700 www.bluebirdsuplxee.com
OFFICE SUPPLIES

## SCHEDULE 23 TO THE AMENDED COMPLAINT

To the extent that this Schedule is *incorporated* by reference into allegations in the amended complaint, those allegations are made against Defendants UBS and MAST.

**Item 43.      Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS

(b)      **Description of the trust:** MASTR Adjustable Rate Mortgages Trust, Mortgage Pass-Through Certificates, Series 2007-1 was a securitization in January 2007 of 4,944 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corp. and IndyMac Bank F.S.B. American Home Mortgage Corp. originated 78.27% of the loans in Loan Group I, and IndyMac Bank F.S.B. originated 16.16%. IndyMac Bank F.S.B. originated all of the loans in Loan Group II. MARM 2007-1 Pros. Sup. S-13 and S-55.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche I-2A1, for which the Bank paid $499,921,875 plus accrued interest on January 16, 2007.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's •  BBB; Moody's • B3.

(f)      **URL of prospectus supplement for this securitization:** A copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/815018/000116231807000075/m0087combined.htm.

**Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        The original LTVs of the mortgage loans in Loan Group I ranged from 14.29% to 100%, with a weighted average of 76.03%. MARM 2007-1 Pros. Sup. S-18.

(b)        The original LTVs of the mortgage loans in Loan Subgroup I-1 ranged from 14.29% to 100%, with a weighted average of 76.54%. MARM 2007-1 Pros. Sup. S-18.

(c)        The original LTVs of the mortgage loans in Loan Subgroup I-2 ranged from 14.36% to 100%, with a weighted average of 75.89%. MARM 2007-1 Pros. Sup. S-19.

(d)        The original LTVs of the mortgage loans in Loan Group II ranged from 18.12% to 95%, with a weighted average of 70.91%. MARM 2007-1 Pros. Sup. S-19.

(e)        "Approximately 18.40% of the group I loans (by aggregate principal balance as of the cut-off date) had loan-to-value ratios in excess of 80.00%, but no more than 100.00% at origination. Approximately 0.61% of the group II loans (by aggregate principal balance as of the cut-off date) had loan-to-value ratios in excess of 80.00%, but no more than 95.00% at origination." MARM 2007-1 Pros. Sup. S-41.

(f)        "Approximately 18.40% of the Group I Loans and approximately 0.61% of the Group II Loans, by Cut-Off Date Pool Balance of the Loans, had LTV Ratios at origination of greater than 80%. . . ." MARM 2007-1 Pros. Sup. S-49.

(g)        "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans is approximately 14.29% to 100.00% and approximately 16.82% of the Loans by aggregate Stated Principal Balance of the Loans as of the Cut-Off Date, had Loan-to-Value Ratios at origination in excess of 80%." MARM 2007-1 Pros. Sup. S-150.

-2-

(h)     In Annex II of the prospectus supplement ("Mortgage Loan Statistical Information"), UBS and MAST presented tables of statistics about the mortgage loans in the collateral pool. MARM 2007-1 Pros. Sup. II-1 to II-23. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $50,000 or less, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to Value Ratios," divided the loans in Subgroup I-1 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-3.

(i)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Subgroup I-1 Loans, by Cut-Off Date Pool Balance of the Subgroup I-1 Loans, was approximately 76.54%." MARM 2007-1 Pros. Sup. II-3.

(j)     In Annex II, UBS and MAST presented another table entitled "Original Loan-to-Value Ratios." This table divided the loans in Subgroup I-2 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-10.

(k)     "As of the Cut-Off Date, the weighted average original LTV Ratio of the Subgroup I-2 Loans, by Cut-Off Date Pool Balance of the Subgroup I-2 Loans, was approximately 75.89%." MARM 2007-1 Pros. Sup. II-10.

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1      (l)      In Annex II, UBS and MAST presented another table entitled "Original Loan-to-
2  Value Ratios." This table divided the Group I Loans into 11 categories of original LTV (for
3  example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and
4  misleading statements about the number of mortgage loans, the aggregate principal balance
5
6  outstanding, and the percent of aggregate principal balance outstanding in each of these
7  categories. MARM 2007-1 Pros. Sup. II-16.

8      (m)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group I
9  Loans, by Cut-Off Date Pool Balance of the Group I Loans, was approximately 76.03%." MARM
10  2007-1 Pros. Sup. II-16.

11      (n)    In Annex II, UBS and MAST presented another table entitled "Original Loan-to-
12  Value Ratios." This table divided the Group II Loans into 10 categories of original LTV (for
13
14  example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and
15  misleading statements about the number of mortgage loans, the aggregate principal balance
16  outstanding, and the percent of aggregate principal balance outstanding in each of these
17  categories. MARM 2007-1 Pros. Sup. II-21.

18      (o)    "As of the Cut-Off Date, the weighted average original LTV Ratio of the Group II
19  Loans, by Cut-Off Date Pool Balance of the Group II Loans, was approximately 70.91%".
20  MARM 2007-1 Pros. Sup. II-21.
21
22  **Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 4,944 |
| Number of properties on which there was enough information for the model to determine a true market value | 3,590 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 2,649 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $310,369,229 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 281 |

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

| | |
|---|---|
| Aggregate amount by which the true market values of those properties exceed their stated values | $25,295,455 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 986 |
| Weighted-average LTV, as stated by Defendants (group II) | 70.91% |
| Weighted-average LTV, as determined by the model (group II) | 86.29% |

**Item 64.      Evidence from subsequent sales of refinanced properties:**

Of the 4,944 mortgage loans in the collateral pool, 3,641 were taken out to refinance, rather than to purchase, properties. For those 3,641 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 3,641 properties, 718 were subsequently sold for a total of approximately $269,972,353. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $441,761,456. Thus, those properties were sold for 61.1% of the value ascribed to them, a difference of 38.9%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.      Undisclosed additional liens:**

     **(a)**     **Minimum number of properties with additional liens: 395**

     **(b)**     **Total reduction in equity from additional liens: $48,741,267**

     **(c)**     **Weighted-average reduction in equity from additional liens: 61.0%**

**Item 81.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of all of the properties that secured the mortgage loans in the collateral pool of this securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation . . . ." MARM 2007-1 Pros. Sup. S-57.

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans originated by American Home

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

Mortgage Corp.: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." MARM 2007-1 Pros. Sup. S-59.

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans originated by IndyMac F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." MARM 2007-1 Pros. Sup. S-61.

**Item 87.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Annex II of the prospectus supplement , described in Item 51, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Subgroup I-1 into the categories "Primary," "Investment," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-4.

(b)      In the "Occupancy Status" table, UBS and MAST stated that 55.7% of the loans in Subgroup I-1 were secured by a "Primary" residence, 33.72% by an "Investment" property, and 10.58% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-4.

(c)      In Annex II, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Subgroup I-2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-10.

(d)      In the "Occupancy Status" table, UBS and MAST stated that 86.9% of the loans in Subgroup I-2 were secured by a "Primary" residence, 7.96% by an "Investment" property, and 5.15% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-10.

(e)      In Annex II, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Group I into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-16.

(f)      In the "Occupancy Status" table, UBS and MAST stated that 80.01% of the loans in Group I were secured by a "Primary" residence, 13.64% by an "Investor" property, and 6.35% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-16.

(g)      In Annex II, UBS and MAST presented another table entitled "Occupancy Status." The table divided the loans in Group II into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MARM 2007-1 Pros. Sup. II-21.

(h)      In the "Occupancy Status" table, UBS and MAST stated that 84.42% of the loans in Group II were secured by a "Primary" residence, 12.98% by an "Investor" property, and 2.6% by a "Secondary" residence. MARM 2007-1 Pros. Sup. II-21.

Item 95.      **Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 417**

-7-

(b) **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 701**

(c) **Number of loans on which the owner of the property owned three or more properties: 77**

(d) **Number of loans that went straight from current to foreclosure or ownership by lender: 3**

(e) **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 1,006**

**Item 98.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-56 through S-62 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a) "[C]ertain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower." MARM 2007-1 Pros. Sup. S-57.

On pages S-58 to S-59 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a) "Exceptions to the underwriting standards may be permitted where compensating factors are present." MARM 2007-1 Pros. Sup. S-58.

(b) "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." MARM 2007-1 Pros. Sup. S-59.

(c) "When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and

-8-

**SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)**

frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility." MARM 2007-1 Pros Sup. S-28.

On pages S-60 to S-62, UBS and MAST made statements about the underwriting guidelines of IndyMac Bank F.S.B. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)     "Exceptions to underwriting standards are permitted in situations in which compensating factors exist." MARM 2007-1 Pros. Sup. S-62.

(b)     "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the adequacy of the mortgaged property as collateral." MARM 2007-1 Pros. Sup. S-29.

**Item 106.     90+ days delinquencies:**

(a)     **Number of the mortgage loans that suffered 90+ days delinquencies: 1,872**

(b)     **Percent of the mortgage loans that suffered 90+ days delinquencies: 37.9%**

(c)     **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%**

**Item 107.     30+ days delinquencies in this securitization:**

(a)     **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 1,746**

(b)     **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 35.3%**

(c)     **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 114.        Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 to S-8 and S-173 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated: "It is a condition to the issuance of the offered certificates that they receive the ratings set forth ... on page S-7 in this prospectus supplement." MARM 2007-1 Pros. Sup. S-173.

**Item 117.        Summary of loans about which the Defendants made untrue or misleading statements:**

     (a)        **Number of loans whose LTVs were materially understated: 2,649**

     (b)        **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 395**

     (c)        **Number of loans in which the properties were stated to be owner-occupied but were not: 1,006**

     (d)        **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 3,223**

     (e)        **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 65.2%**

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

BLUEBIRD (888) 477-0700 OFFICE SUPPLIES www.bluebirdofwire.com