# SCHEDULE 24 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendants UBS and MAST.

**Item 43.    Details of trust and certificate(s).**

    **(a)    Dealer that sold the certificate(s) to the Bank: UBS**

    **(b)    Description of the trust:** MASTR Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-2 was a securitization in March 2006 of 2,929 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by American Home Mortgage Corp., SunTrust Mortgage, Inc., and an undisclosed originator. American Home Mortgage Corp. originated 56.9% of all of the loans in the collateral pool, and SunTrust Mortgage, Inc. originated 40.08%. MALT 2006-2 Pros. Sup. S-30.

    **(c)    Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid $140,111,484 plus accrued interest on March 30, 2006.

    **(d)    Ratings of the certificate(s) when the Bank purchased them:**
        Standard & Poor's • AAA; Moody's • Aaa.

    **(e)    Current ratings of the certificate(s):**
        Standard & Poor's • CCC; Moody's • Ba3.

    **(f)    URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1355021/000116231806000324/m284_424b5.htm.

**Item 51.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

    (a)    The original LTVs of all of the loans in the collateral pool ranged from 18.75% to 100%, with a weighted average of 74.23%. MALT 2006-2 Pros. Sup. S-13.

    (b)    The original LTVs of the collateral group 1 Loans ranged from 18.75% to 100%, with a weighted average of 72.57%. MALT 2006-2 Pros. Sup. S-13.

    (c)    The original LTVs of the collateral group 2 Loans ranged from 18.75% to 100%, with a weighted average of 75.74%. MALT 2006-2 Pros. Sup. S-14.

    (d)    "Approximately 2.74% of the loans by cut-off date pool balance of the loans had loan to value ratios at origination in excess of 80%." MALT 2006-2 Pros. Sup. S-23.

    (e)    "Approximately 2.74% of the Loans, by Cut-Off Date Pool Balance for all of the Loan Groups, had LTV Ratios at origination of greater than 80% . . . ." MALT 2006-2 Pros. Sup. S-29.

    (f)    "[A]s of the Cut-off Date, the range of original Loan-to-Value Ratios of the Loans is 18.75% to 100% and approximately 2.74% of the Loans by Cut-off Date Pool Balance of the Loans, had Loan-to-Value Ratios at origination in excess of 80%." MALT 2006-2 Pros. Sup. S-76.

    (g)    In Annex A of the prospectus supplement ("Mortgage Loan Statistical Information"), UBS and MAST presented tables of statistics about the mortgage loans in the collateral pool. MALT 2006-2 Pros. Sup. A-1 to A-16. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $25,001 to $50,000, $50,001 to $75,000, $75,001 to $100,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original LTV Ratios," divided the loans in collateral group 1 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the

-- 2 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-2.

(h)     "The weighted average original LTV Ratio of the Collateral Group 1 Loans, by Cut-Off Date Pool Balance of the Collateral Group 1 Loans, was approximately 72.57%." MALT 2006-2 Pros. Sup. A-2.

(i)     In Annex A, UBS and MAST presented another table entitled "Original LTV Ratios." This table divided the loans in collateral group 2 into 11 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-7.

(j)     "The weighted average original LTV Ratio of the Collateral Group 2 Loans, by Cut-Off Date Pool Balance of the Collateral Group 2 Loans, was approximately 75.74%." MALT 2006-2 Pros. Sup. A-7.

(k)     In Annex A, UBS and MAST presented another table entitled "Original LTV Ratios." This table divided all of the loans in the collateral pool into 11 categories of original LTVs (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-12.

(l)     "The weighted average original LTV Ratio of the Loans, by Cut-Off Date Pool Balance of the Loans, was approximately 74.23%." MALT 2006-2 Pros. Sup. A-12.

-- 3 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 61.**     **Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 2,929 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,410 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 875 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $51,716,376 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 186 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,089,673 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 160 |
| Weighted-average LTV, as stated by Defendants | 74.23% |
| Weighted-average LTV, as determined by the model | 86.7% |

**Item 64.**     **Evidence from subsequent sales of refinanced properties:**

Of the 2,929 mortgage loans in the collateral pool, 1,072 were taken out to refinance, rather than to purchase, properties. For those 1,072 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,072 properties, 156 were subsequently sold for a total of approximately $40,658,067. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $55,511,700. Thus, those properties were sold for 73.2% of the value ascribed to them, a difference of 26.8%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 70.**     **Undisclosed additional liens:**

  **(a)**     **Minimum number of properties with additional liens: 95**

  **(b)**     **Total reduction in equity from additional liens: $6,964,719**

  **(c)**     **Weighted-average reduction in equity from additional liens: 72.2%**

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 81.        Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that secured the mortgage loans in the collateral pool of this securitization: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation. . . ." MALT 2006-2 Pros. Sup. S-33.

In the prospectus supplement, UBS and MAST made the following statement about the appraisals of the properties that were originated by American Home Mortgage Corp.: "Every American Home Loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." MALT 2006-2 Pros. Sup. S-35.

**Item 87.        Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS and MAST made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)        In Annex A of the prospectus supplement, described in Item 51, UBS and MAST presented a table entitled "Occupancy Status." The table divided the mortgage loans in collateral group 1 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-3.

(b)        In the "Occupancy Status" table, UBS and MAST stated that 75.16% of the mortgage loans in collateral group 1 were secured by a "Primary" residence, 21.17% by an "Investor" property, and 3.67% by a "Secondary" residence. MALT 2006-2 Pros. Sup. A-3.

-- 5 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c)      In Annex A, UBS and MAST presented another table entitled "Occupancy Status." The table divided the mortgage loans in collateral group 2 into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-8.

(d)      In the "Occupancy Status" table, UBS and MAST stated that 60.86% of the mortgage loans in collateral group 2 were secured by a "Primary" residence, 32.42% by an "Investor" property, and 6.71% by a 'Secondary" residence MALT 2006-2 Pros. Sup. A-8.

(e)      In Annex A, UBS and MAST presented another table entitled "Occupancy Status." The table divided all of the mortgage loans in the collateral pool into the categories "Primary," "Investor," and "Secondary." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. MALT 2006-2 Pros. Sup. A-14.

(f)      In the "Occupancy Status" table, UBS and MAST stated that 67.68% of the mortgage loans in the collateral pool were secured by a "Primary" residence, 27.06% by an "Investor" property, and 5.26% by a 'Secondary" residence MALT 2006-2 Pros. Sup. A-14.

Item 95.      Details of properties that were stated to be owner-occupied, but were not:

(a)      Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 165

(b)      Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 219

(c)      Number of loans on which the owner of the property owned three or more properties: 18

(d)      Number of loans that went straight from current to foreclosure or ownership by lender: 6

(e)      Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 333

-- 6 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-37 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)    "[E]xceptions to the underwriting standards described in this prospectus supplement are made in the event that compensating factors are demonstrated by a prospective borrower." MALT 2006-2 Pros. Sup.S-32.

On pages S-33 through S-35 of the prospectus supplement, UBS and MAST made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference. In particular, UBS and MAST stated that:

(a)    "Exceptions to the underwriting standards may be permitted where compensating factors are present." MALT 2006-2 Pros. Sup.S-34.

(b)    "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception[.]" MALT 2006-2 Pros. Sup.S-35.

On pages S-36 through S-37, UBS and MAST made statements about the underwriting guidelines of SunTrust Mortgage, Inc. All of those statements are incorporated herein by reference.

**Item 105.**    **Early payment defaults:**

(a)    **Number of the mortgage loans that suffered EPDs:** 76

(b)    **Percent of the mortgage loans that suffered EPDs:** 2.6%

(c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs:** 0.44%

-- 7 --

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 106.**     **90+ days delinquencies:**

    **(a)**     Number of the mortgage loans that suffered 90+ days delinquencies: 1,034

    **(b)**     Percent of the mortgage loans that suffered 90+ days delinquencies: 35.3%

    **(c)**     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 32.7%

**Item 107.**     **30+ days delinquencies in this securitization:**

    **(a)**     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 995

    **(b)**     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 34.0%

    **(c)**     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 114.**     **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-7 and S-92 of the prospectus supplement, UBS and MAST made statements about the ratings assigned to the certificates issued in this securitization. UBS and MAST stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS and MAST also stated: "It is a condition to the original issuance of the offered certificates that each class of offered certificates will have received the ratings set forth ... on page S-7 of this prospectus supplement." MALT 2006-2 Pros. Sup. S-92.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Item 117.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)   **Number of loans whose LTVs were materially understated: 875**

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 95**

(c)   **Number of loans that suffered EPDs: 76**

(d)   **Number of loans in which the properties were stated to be owner-occupied but were not: 333**

(e)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,145**

(f)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 39.1%**

**SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)**

## SCHEDULE 25 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)      **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A11CB was a securitization in September 2005 of 2,351 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. RAST 2005-A11 Pros. Sup. S-17.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in tranche 1-A-1, for which the Bank paid $172,000,000 plus accrued interest on September 30, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

(e)      **Current ratings of the certificate(s):**

Standard & Poor's •   AAA; Moody's •   Ba3.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095011705003845/a40596.txt.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "With respect to approximately 28.92% of the group 1 mortgage loans and 26.45% of the group 2 mortgage loans, respectively, in each case by the cut-off date principal balance of

**SCHEDULES OF THE FIRST AMENDED COMPLAINT** (*Deutsche*, 497839)

1   the mortgage loans in that loan group, at the time of origination of the first lien mortgage loan, the

2   originator of the mortgage loan also originated a second lien mortgage loan that will not be

3   included in the trust fund and is not reflected in the loan-to-value ratio tables included in this

4   prospectus supplement. The weighted average loan-to-value ratio of such group 1 mortgage loans

5   and group 2 mortgage loans are approximately 76.59% and 78.76%, respectively . . . ." RAST

6
7   2005-A11 Pros. Sup. S-12 to S-13.

8      (b)   "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or

9   less." RAST 2005-A11 Pros. Sup. S-18.

10     (c)   In the section of the prospectus supplement entitled "The Mortgage Pool," UBS

11  presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A11

12  Pros. Sup. S-20 to S-25. Each table focused on a certain characteristic of the loans (for example,

13  current principal balance) and divided the loans into categories based on that characteristic (for

14
15  example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to

16  $150,000, etc.). Each table then presented various data about the loans in each category. One of

17  the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the

18  group 1 loans into 18 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%,

19
20  20.01% to 25%, etc.). The table made untrue and misleading statements about the number of

21  mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

22  principal balance outstanding in each of these categories. RAST 2005-11 Pros. Sup. S-20.

23     (d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

24  Group 1 Mortgage Loans was approximately 71.22%." RAST 2005-A11 Pros. Sup. S-20.

25     (e)   In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-

26  Value Ratios for the Group 2 Mortgage Loans." This table divided the loans in group 2 into 17

27  categories of original LTV (for example, 15.01% to 20%, 20.01% to 25%, 25.01% to 30%, etc.).

28

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   The table made untrue and misleading statements about the number of mortgage loans, the

2   aggregate principal balance outstanding, and the percent of aggregate principal balance

3   outstanding in each of these categories. RAST 2005-A11 Pros. Sup. S-23.

4       (f)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

5   Group 2 Mortgage Loans was approximately 73.67%." RAST 2005-A11 Pros. Sup. S-23.

6   

7   **Item 61.       Details of the results of the AVM analysis:**

8

| | |
|---|---|
| Number of loans | 2,351 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,034 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 549 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $27,225,594 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 197 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,691,939 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 97 |
| Weighted-average LTV, as stated by Defendants (group 1) | 71.22% |
| Weighted-average LTV, as determined by the model (group 1) | 85.7% |

17  **Item 64.       Evidence from subsequent sales of refinanced properties:**

18      Of the 2,351 mortgage loans in the collateral pool, 1,517 were taken out to refinance,

19  rather than to purchase, properties. For those 1,517 loans, the value (denominator) in the LTV

20  was an appraised value rather than a sale price. Of those 1,517 properties, 119 were subsequently

21  sold for a total of approximately $31,122,455. The total value ascribed to those same properties in

22  the LTV data reported in the prospectus supplements and other documents sent to the Bank was

23  $37,218,000. Thus, those properties were sold for 83.6% of the value ascribed to them, a

24  difference of 16.4%. This difference cannot be accounted for by declines in house prices in the

25  areas in which those properties were located.

26

27

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

**Item 87.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." This table divided the mortgage loans in group 1 into the categories "Primary," "Investment," and "Second Home." For each category, the table stated the number of loans, the aggregate principal balance outstanding, and the percentage which that aggregate principal balance represented of the total aggregate principal balance outstanding in group 1. RAST 2005-A11 Pros. Sup. S-22.

(a)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that 89.82% of the mortgage loans in group 1 were secured by a "Primary" residence, 7.96% by an "Investment" property, and 2.11% by a "Second Home." RAST 2005-A11 Pros. Sup. S-22.

(b)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A11 Pros. Sup. S-24.

(c)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that 78.58% of the mortgage loans in group 2 were secured by a "Primary" residence, 17.93% by an "Investment" property, and 3.49% by a "Second Home." RAST 2005-A11 Pros. Sup. S-24.

**Item 95.** **Details of properties that were stated to be owner-occupied, but were not:**

(a)     Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 141

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

    (b)    **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 189**

    (c)    **Number of loans on which the owner of the property owned three or more properties: 14**

    (d)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 284**

**Item 98.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-27 through S-29 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

    (a)    "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A11 Pros. Sup. S-27.

    (b)    "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2005-A11 Pros. Sup. S-24.

    (c)    "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." RAST 2005-A11 Pros. Sup. S-25.

**Item 105.**    **Early payment defaults:**

    (a)    **Number of the mortgage loans that suffered EPDs: 16**

    (b)    **Percent of the mortgage loans that suffered EPDs: 0.7%**

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 106.**    **90+ days delinquencies:**

    (a)    **Number of the mortgage loans that suffered 90+ days delinquencies: 428**

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 18.2%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

**Item 107.**     *30+ days delinquencies in this securitization:*

(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 432

(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 18.4%

(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

**Item 114.**     Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-4 and S-79 to S-80 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and . . . Aaa by Moody's Investors Service, Inc. . . . ." RAST 2005-A11 Pros. Sup. S-79.

**Item 117.**     Summary of loans about which the Defendants made untrue or misleading statements:

(a)     Number of loans whose LTVs were materially understated: 549

(b)     Number of loans that suffered EPDs: 16

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 284

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 737

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 31.3%

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

# SCHEDULE 26 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.        Details of trust and certificate(s).**

**(a)        Dealer that sold the certificate(s) to the Bank:** UBS.

**(b)        Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR10 was a securitization in May of 2005 of 3,346 mortgage loans in one pool. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR10  Pros. Sup. S-4.

**(c)        Description of the certificate(s) that the Bank purchased:**

UBS offered and sold to the Bank a senior certificate in this securitization, in class A-2, for which the Bank paid $180,000,000 plus accrued interest on May 6, 2005.

**(d)        Ratings of the certificate(s) when the Bank purchased them:**

*Standard & Poor's* •   AAA; *Moody's* •   Aaa.

**(e)        Current ratings of the certificate(s):**

*Standard & Poor's* •   CCC; *Moody's* •   B2.

**(f)        URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at

http://www.sec.gov/Archives/edgar/data/1090295/000112528205002358/b406474_424b5.txt.

**Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the *prospectus supplement*, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

**(a)** "With respect to approximately 16.68% of the mortgage loans (based on the aggregate stated principal balance of the mortgage loans as of the cut-off date) at the time of

---

**SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)**

origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 74.94% . . . ." INDX 2005-AR10 Pros. Sup. S-14.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95.58% or less." INDX 2005-AR10 Pros. Sup. S-19.

(c)    In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-A10 Pros. Sup. S 20 to S-22. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Mortgage Loans," divided the loans in the collateral pool into 18 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-A10 Pros. Sup. S-20.

(d)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 70.98%." INDX 2005-AR10 Pros. Sup. S-20.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 61.**     **Details of the results of the AVM analysis:**

| Number of loans | |
|---|---|
| | 3,346 |
| Number of properties on which there was enough information for the model to determine a true market value | 765 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 385 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $26,256,300 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 149 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,202,300 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 54 |
| Weighted-average LTV, as stated by Defendants | 70.89% |
| Weighted-average LTV, as determined by the model | 81.3% |

**Item 87.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." The table divided the mortgage loans into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR10 Pros. Sup. S-21.

(b)     In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 93.53% of the mortgage loans were secured by a "Primary Home," 4.91% by an "Investment" property, and 1.56% by a "Second Home." INDX 2005-AR10 Pros. Sup. S-21.

**Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 99**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

      (b)      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 158**

      (c)      **Number of loans on which the owner of the property owned three or more properties: 17**

      (d)      **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

      (e)      **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 221**

**Item 98.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-24 through S-26 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

      (a)      "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR10 Pros. Sup. S-25.

      (b)      "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR10 Pros. Sup. S-25.

      (c)      "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR10 Pros. Sup. S-25.

**Item 106.**      **90+ days delinquencies:**

      (a)      **Number of the mortgage loans that suffered 90+ days delinquencies: 530**

      (b)      **Percent of the mortgage loans that suffered 90+ days delinquencies: 15.8%**

      (c)      **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

-4-

**Item 107.**   *30+ days delinquencies in this securitization:*

    (a)   **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 481**

    (b)   **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 14.4%**

    (c)   **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 114.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-64 to S-65 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR10 Pros. Sup. S-64.

**Item 117.**   **Summary of loans about which the Defendants made untrue or misleading statements:**

    (a)   **Number of loans whose LTVs were materially understated: 385**

    (b)   **Number of loans in which the properties were stated to be owner-occupied but were not: 221**

    (c)   **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 494**

    (d)   **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 14.8%**

-5-

# SCHEDULE 27 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)      **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A4 was a securitization in March 2005 of 952 mortgage loans, in one pool. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. RAST 2005-A4 Pros. Sup. S-3.

(c)      **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in class A-1, for which the Bank paid $149,718,750 plus accrued interest on June 10, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Fitch • AAA.

(e)      **Current ratings of the certificate(s):** Standard & Poor's • CCC; Fitch • CCC.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013605001814/file001.htm.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization

(a)      "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2005-A4 Pros. Sup. S-15.

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

(b)    In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A4 Pros. Sup. S-17 to S-19. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Mortgage Loans," divided the loans into 17 categories of original LTV (for example, 10.01% to 15%, 15.01% to 20%, 20.01% to 25%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A4 Pros. Sup. S-17.

(c)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 69.57%." RAST 2005-A4 Pros. Sup. S-17.

**Item 61.**    **Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 952 |
| Number of properties on which there was enough information for the model to determine a true market value | 360 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 166 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $7,707,209 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 85 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,065,707 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 20 |
| Weighted-average LTV, as stated by Defendants | 69.57 |
| Weighted-average LTV, as determined by the model | 73.8% |

**Item 70.**    **Undisclosed additional liens:**

(a)    Minimum number of properties with additional liens: 30

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(b)      **Total reduction in equity from additional liens: $2,072,963**

(c)      **Weighted-average reduction in equity from additional liens: 76.0%**

Item 87.      **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Mortgage Loans." The table divided the mortgage loans into the categories "Primary," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A4 Pros. Sup. S-18.

(b)      In the "Occupancy Types for the Mortgage Loans" table, UBS stated that 84.69% of the mortgage loans were secured by a "Primary" residence, 12.79% by an "Investment" property, and 2.52% by a "Second Home." RAST 2005-A4 Pros. Sup. S-18.

Item 95.      **Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 46**

(b)      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 73**

(c)      **Number of loans on which the owner of the property owned three or more properties: 5**

(d)      **Number of loans that went straight from current to foreclosure or ownership by lender: 1**

(e)      **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 104**

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 98.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-21 through S-23 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

(a) "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A4 Pros. Sup. S-21.

(b) "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2005-A4 Pros. Supp. S-25.

(c) "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." RAST 2005-A4 Pros. Sup. S-25.

**Item 105.** **Early payment defaults:**

(a) Number of the mortgage loans that suffered EPDs: 3

(b) Percent of the mortgage loans that suffered EPDs: 0.3%

(c) Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

**Item 107.** **30+ days delinquencies in this securitization:**

(a) Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 119

(b) Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 12.5%

(c) Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

**Item 114.**   **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-62 to S-63 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated AAA by each of Standard & Poor's Rating Services and Fitch Ratings. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and AAA by Fitch . . . ." RAST 2005-A4 Pros. Sup. S-62.

**Item 117.**   **Summary of loans about which the Defendant made untrue or misleading statements:**

(a)   **Number of loans whose LTVs were materially understated: 166**

(b)   **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 30**

(c)   **Number of loans that suffered EPDs: 3**

(d)   **Number of loans in which the properties were stated to be owner-occupied but were not: 104**

(e)   **Eliminating duplicates, number of loans about which the Defendant made untrue or misleading statements: 268**

(f)   **Eliminating duplicates, percent of loans about which the Defendant made untrue or misleading statements: 28.2%**

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

# SCHEDULE 28 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant UBS.

**Item 43.**   **Details of trust and certificate(s).**

(a)   **Dealer that sold the certificate(s) to the Bank:** UBS.

(b)   **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2004-IP2 was a securitization in December 2004 of 1,505 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. RAST 2004-IP2 Pros. Sup. S-4.

(c)   **Description of the certificate(s) that the Bank purchased:** UBS offered and sold to the Bank a senior certificate in this securitization, in class 2-A-2, for which the Bank paid $121,344,001 plus accrued interest on December 17, 2004.

(d)   **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA; Moody's • Aaa.

(e)   **Current ratings of the certificate(s):** Standard & Poor's • AAA; Moody's • Aa2.

(f)   **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013604004430/file001.htm.

**Item 51.**   **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, UBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization

(a)   "With respect to approximately 29.14%, 28.68%, 37.04% and 30.78% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(in each case, based on the aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 76.89%, 75.42%, 77.04% and 74.83%, with respect to such group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans, respectively . . ." RAST 2004-IP2 Pros. Sup. S-10 to S-11.

(b)   "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 95% or less." RAST 2004-IP2 Pros. Sup. S-16.

(c)   In the section of the prospectus supplement entitled "The Mortgage Pool," UBS presented tables of statistics about the mortgage loans in the collateral pool. RAST 2004-IP2 Pros. Sup. S-18 to S-31. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current mortgage loan principal balances of $50,000 or less, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the loans in group 1 into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-18.

(d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 76.85%." RAST 2004-IP2 Pros. Sup. S-18.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(e)     In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-22.

(f)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 72.70%." RAST 2004-IP2 Pros. Sup. S-22.

(g)     In "The Mortgage Pool" section, UBS presented a table entitled "Original Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in group 3 into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-26.

(h)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 3 Mortgage Loans was approximately 75.50%." RAST 2004-IP2 Pros. Sup. S-26.

(i)     In the prospectus supplement, UBS presented a table entitled "Original Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in group 4 into 10 categories of original LTV (for example, 50% or less, 50.01% to 55%, 55.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-29.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 61.**     Details of the results of the AVM analysis:

| | |
|---|---:|
| Number of loans | 1,505 |
| Number of properties on which there was enough information for the model to determine a true market value | 625 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 257 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $18,519,445 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 150 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $14,925,200 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 42 |
| Weighted-average LTV, as stated by Defendants (Group 2) | 72.7% |
| Weighted-average LTV, as determined by the model (Group 2) | 80.94% |

**Item 87.**     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, UBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, UBS presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-19.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, UBS stated that 80.42% of the mortgage loans in group 1 were secured by an "Owner Occupied" property, 14.81% by an "Investment" property, and 4.77% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-19.

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(c)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in group 2 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-23.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, UBS stated that 87.96% of the mortgage loans in group 2 were secured by an "Owner Occupied" property, 8.69% by an "Investment" property, and 3.35% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-23.

(e)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-27.

(f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, UBS stated that 79.38% of the mortgage loans in group 3 were secured by an "Owner Occupied" property, 15.24% by an "Investment" property, and 5.37% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-27.

(g)     In "The Mortgage Pool" section, UBS presented a table entitled "Occupancy Types for the Group 4 Primary Mortgage Loans." The table divided the mortgage loans in group 4 into the categories "Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2004-IP2 Pros. Sup. S-30.

(h)   In the "Occupancy Types for the Group 4 Mortgage Loans" table, UBS stated that 86.04% of the group 4 mortgage loans were secured by a "Primary Home," 11.38% by an "Investment" property, and 2.58% by a "Second Home." RAST 2004-IP2 Pros. Sup. S-30.

**Item 95.**   **Details of properties that were stated to be owner-occupied, but were not:**

(a)   **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 81**

(b)   **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 139**

(c)   **Number of loans on which the owner of the property owned three or more properties: 10**

(d)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 202**

**Item 98.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-35 of the prospectus supplement, UBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, UBS stated that:

(a)   "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2004-IP2 Pros. Sup. S-34.

(b)   "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." RAST 2004-IP2 Pros. Sup. S-25.

(c)   "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

collateral. The most comprehensive of the programs emphasize both." RAST 2004-IP2 Pros. Sup. 25.

**Item 105.**    **Early payment defaults:**

    **(a)**    **Number of the mortgage loans that suffered EPDs: 8**

    **(b)**    **Percent of the mortgage loans that suffered EPDs: 0.5%**

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.14%**

**Item 106.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 88**

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 5.8%**

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 7.2%**

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-71 to S-72 of the prospectus supplement, UBS made statements about the ratings assigned to the certificates issued in this securitization. UBS stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

UBS also stated: "It is a condition to the issuance of the [Bank's certificate] that [it] be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." RAST 2004-IP2 Pros. Sup. S-71.

**Item 117.**    **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated: 257**

    **(b)**    **Number of loans that suffered EPDs: 8**

-7-

(c)   Number of loans in which the properties were stated to be owner-occupied but were not: 202

(d)   Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 396

(e)   Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 26.3%

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

# SCHEDULE 29 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**          **Details of trust and certificate(s).**

(a)          **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)          **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR21 was a securitization in August 2005 of 2,852 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR21 Pros. Sup. S-4.

(c)          **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank two senior certificates in this securitization, in class 3-A-1 and 4-A-1, for which the Bank paid $132,752,013 and $107,977,980, plus accrued interest, respectively, on August 30, 2005.

(d)          **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's • AAA for each of the Bank's certificates; Moody's • Aaa for each of the Bank's certificates.

(e)          **Current ratings of the certificate(s):** Standard & Poor's • CCC for the Bank's certificate in class 3-A-1 and B- for the Banks certificate in class 4-A-1; Moody's • Caa2 for each of the Bank's certificates.

1.          (f)          **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013605005578/file001.htm.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 51.        Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        "With respect to approximately 59.62%, 59.01%, 43.99% and 34.85% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans (in each case, based on the aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 78.25%, 79.02%, 77.06% and 77.32%, with respect to such group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans, respectively . . . ." INDX 2005-AR21 Pros. Sup. S-10.

(b)        "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100.00% or less." INDX 2005-AR21 Pros. Sup. S-17.

(c)        In the section of the prospectus supplement entitled "The Mortgage Pool," Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-AR21 Pros. Sup. S-18 to S-31. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the loans in group 1 into eight categories of original LTV (for example, 10.01% to 20%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

misleading statements about the number of mortgage loans, the aggregate principal balance

outstanding, and the percent of aggregate principal balance outstanding in each of these

categories. INDX 2005-AR21 Pros. Sup. S-18.

     (d)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

group 1 mortgage loans was approximately 75.28%." INDX 2005-AR21 Pros. Sup. S-18.

     (e)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

group 2 into nine categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%,

30.01% to 40%, etc.). The table made untrue and misleading statements about the number of

mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-21.

     (f)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

group 2 mortgage loans was approximately 75.59%." INDX 2005-AR21 Pros. Sup. S-21.

     (g)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

group 3 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-25.

     (h)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

group 3 mortgage loans was approximately 72.90%." INDX 2005-AR21 Pros. Sup. S-25.

     (i)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

group 4 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-28.

(j)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the group 4 mortgage loans was approximately 72.44%." INDX 2005-AR21 Pros. Sup. S-28.

**Item 61.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,852 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,839 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 928 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $54,645,880 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 295 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $20,662,528 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 137 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 72.90% |
| Weighted-average LTV, as determined by the model | 82.04% |
| Weighted-average LTV, as stated by Defendants (Group 4) | 72.44% |
| Weighted-average LTV, as determined by the model | 80.91% |

**Item 87.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section, of the prospectus supplement, described in Item 51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-19.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch stated that 89.29% of the group 1 mortgage loans were secured by a "Primary Home," 5.54% by an "Investment" property, and 5.17% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-19.

(c)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in Group 2 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-23.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch stated that 85.51% of the group 2 mortgage loans were secured by a "Primary Home," 10% by an "Investment" property, and 4.49% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-23.

(e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-26.

(f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Merrill Lynch stated that 91.62% of the group 3 mortgage loans were secured by a "Primary Home," 4.26% by an "Investment" property, and 4.12% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-26.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(g)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 4 Mortgage Loans." The table divided the mortgage loans in group 4 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR21 Pros. Sup. S-30.

(h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, Merrill Lynch stated that 86.83% of the group 4 mortgage loans were secured by a "Primary Home," 8.65% by an "Investment" property, and 4.52% by a "Second Home." INDX 2005-AR21 Pros. Sup. S-30.

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 207**

(b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 336**

(c)     **Number of loans on which the owner of the property owned three or more properties: 32**

(d)     **Number of loans that went straight from current to foreclosure or ownership by lender: 2**

(e)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 481**

**Item 98.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-35 of the prospectus supplement, Merrill Lynch made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Merrill Lynch stated that:

(a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR21 Pros. Sup. S-34.

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(b)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR21 Pros. Sup. S-24.

(c)     "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR21 Pros. Sup. S-25.

**Item 105.     Early payment defaults:**

(a)     Number of the mortgage loans that suffered EPDs: 16

(b)     Percent of the mortgage loans that suffered EPDs: 0.6%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

**Item 106.     90+ days delinquencies:**

(a)     Number of the mortgage loans that suffered 90+ days delinquencies: 663

(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 23.2%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

**Item 107.     30+ days delinquencies in this securitization:**

(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 646

(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 22.7%

(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

-7-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

**Item 114.**      **Statements about the ratings of the certificate(s) that the Bank purchased:**

On pages S-3 and S-64 to S-65 of the prospectus supplement, Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Merrill Lynch also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR21 Pros. Sup. S-64.

**Item 117.**      **Summary of loans about which the Defendants made untrue or misleading statements:**

(a)      **Number of loans whose LTVs were materially understated: 928**

(b)      **Number of loans that suffered EPDs: 16**

(c)      **Number of loans in which the properties were stated to be owner-occupied but were not: 481**

(d)      **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 1,190**

(e)      **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 41.7%**

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

## SCHEDULE 30 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**     **Details of trust and certificate(s).**

(a)     **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)     **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR7 was a securitization in April 2005 of 2,629 mortgage loans, in seven groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR7 S-4.

(c)     **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 3-A-2, for which the Bank paid $64,950,425 plus accrued interest on April 29, 2005.

(d)     **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's •   AAA; Moody's •   Aaa.

(e)     **Current ratings of the certificate(s):** Standard & Poor's •   B; Moody's •   Caa2.

(f)     **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095011705001640/a39679.txt.

**Item 51.**     **Untrue or misleading statements about the LTVs of the mortgage loans:**

(a)     At origination, 61.57% of the loans in group 1 were originated along with a second lien mortgage loan. The LTV of those loans was 79.35%. INDX 2005-AR7 Pros. Sup. S-11.

(b)     At origination, 61.62% of the loans in group 2 were originated along with a second lien mortgage loan. The LTV of those loans was 77.44%. INDX 2005-AR7 Pros. Sup. S-11.

---

**SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(c)    At origination, 46% of the loans in group 3 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.5%. INDX 2005-AR7 Pros. Sup. S-11.

(d)    At origination, 55.97% of the loans in group 4 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.21%. INDX 2005-AR7 Pros. Sup. S-11.

(e)    At origination, 37.66% of the loans in group 5 were originated along with a second-lien mortgage loan. The LTV of those loans was 74.49%. INDX 2005-AR7 Pros. Sup. S-11.

(f)    At origination, 55.17% of the loans in group 6 were originated along with a second-lien mortgage loan. The LTV of those loans was 79.58%. INDX 2005-AR7 Pros. Sup. S-11.

(g)    At origination, 56.28% of the loans in group 7 were originated along with a second-lien mortgage loan. The LTV of those loans was 77.57%. INDX 2005-AR7 Pros. Sup. S-11.

(h)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." INDX 2005-AR7 Pros. Sup. S-18.

(i)    In the section of the prospectus supplement entitled "The Mortgage Pool," Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-AR7 Pros. Sup. S-20 to S-41. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, range of current mortgage loan principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the mortgage loans in group 1 into eight

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.) The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-20.

(j)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 77.90%." INDX 2005-AR7 Pros. Sup. S-20.

(k)      In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%, 60.01% to 70%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-23.

(l)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 76.04%." INDX 2005-AR7 Pros. Sup. S-23.

(m)      In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in group 3 into 10 categories of original LTV (for example, 0.01% to 10%, 10.01% to 20%, 20.01% to 30%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-26.

(n)      "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 3 Mortgage Loans was approximately 75.46%." INDX 2005-AR7 Pros. Sup. S-26.

(o)      In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

group 4 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-30.

(p)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 4 Mortgage Loans was approximately 73.26%." INDX 2005-AR7 Pros. Sup. S-30.

(q)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 5 Mortgage Loans." This table divided the mortgage loans in Group 5 into eight categories of original LTV (for example, 10.01% to 20%, 20.01% to 30%, 30.01% to 40%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-33.

(r)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 5 Mortgage Loans was approximately 70.84%." INDX 2005-AR7 Pros. Sup. S-33.

(s)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 6 Mortgage Loans." This table divided the mortgage loans in group 6 into seven categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-36.

(t)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 6 Mortgage Loans was approximately 77.92%." INDX 2005-AR7 Pros. Sup. S-36.

(u)    In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original Loan-to-Value Ratios for the Group 7 Mortgage Loans." This table divided the mortgage loans in

-4-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

Group 7 into seven categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%, 50.01% to 60%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-39.

(v)     "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 7 Mortgage Loans was approximately 75.49%." INDX 2005-AR7 Pros. Sup. S-39.

**Item 61.       Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 2,629 |
| Number of properties on which there was enough information for the model to determine a true market value | 1,338 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 618 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $31,982,360 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 247 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,395,316 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 99 |
| Weighted-average LTV, as stated by Defendants (Group 3) | 75.46% |
| Weighted-average LTV, as determined by the model (Group 3) | 83.6% |

**Item 87.       Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the

-5-

**SCHEDULES OF THE FIRST AMENDED COMPLAINT** (*Deutsche, 497839*)

number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-21.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch stated that 89.72% of the mortgage loans in group 1 were secured by an "Owner Occupied" property, 7.95% by an "Investment" property, and 2.33% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-21.

(c)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in group 2 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-24.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch stated that 91.87% of the mortgage loans in group 2 were secured by an "Owner Occupied" property, 6.46% by an "Investment" property, and 1.67% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-24.

(e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-28.

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(f)     In "The Mortgage Pool" section, Merrill Lynch stated that 89.1% of the mortgage loans in group 3 were secured by an "Owner Occupied" property, 6.9% by an "Investment" property, and 4% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-28.

(g)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 4 Mortgage Loans." The table divided the mortgage loans in group 4 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-31.

(h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, Merrill Lynch stated that 90.9% of the mortgage loans in Group 4 were secured by an "Owner Occupied" property, 6.65% by an "Investment" property, and 2.45% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-31.

(i)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 5 Mortgage Loans." The table divided the mortgage loans in group 5 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-34.

(j)     In the "Occupancy Types for the Group 5 Mortgage Loans" table, Merrill Lynch stated that 85.94% of the mortgage loans in group 5 were secured by an "Owner Occupied" property, 12.16% by an "Investment" property, and 1.91% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-34.

-7-

(k)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 6 Mortgage Loans." The table divided the mortgage loans in group 6 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-37.

(l)     In the "Occupancy Types for the Group 6 Mortgage Loans" table, Merrill Lynch stated that 88.04% of the mortgage loans in group 6 were secured by an "Owner Occupied" property, 7.58% by an "Investment" property, and 4.38% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-37.

(m)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 7 Mortgage Loans." The table divided the mortgage loans in group 7 into the categories "Owner Occupied," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR7 Pros. Sup. S-40.

(n)     In the "Occupancy Types for the Group 7 Mortgage Loans" table, Merrill Lynch stated that 86.37% of the mortgage loans in group 7 were secured by an "Owner Occupied" property, 12.48% by an "Investment" property, and 1.15% by a "Second Home." INDX 2005-AR7 Pros. Sup. S-40.

**Item 95.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 174**

(b)     **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 252**

-8-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(c)     Number of loans on which the owner of the property owned three or more properties: 11

(d)     Number of loans that went straight from current to foreclosure or ownership by lender: 1

(e)     Eliminating duplicates, number of loans about which one or more of statements (a) through (d) is true: 360

**Item 98.**     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On pages S-43 through S-45 of the prospectus supplement, Merrill Lynch made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Merrill Lynch stated that:

(a)     "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." INDX 2005-AR7 Pros. Sup. S-44.

(b)     "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-AR7 Pros. 25.

(c)     "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR7 Pros. 25.

**Item 105.**     Early payment defaults:

(a)     Number of the mortgage loans that suffered EPDs: 9

(b)     Percent of the mortgage loans that suffered EPDs: 0.3%

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%

**Item 106.**     90+ days delinquencies:

(a)     Number of the mortgage loans that suffered 90+ days delinquencies: 531

(b)     Percent of the mortgage loans that suffered 90+ days delinquencies: 20.2%

-9-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(c)     Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%

Item 107.     30+ days delinquencies in this securitization:

(a)     Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 507

(b)     Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 19.3%

(c)     Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%

Item 114.     Statements about the ratings of the certificate(s) that the Bank purchased:

On pages S-3 and S-87 to S-88 of the prospectus supplement, Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Merrill Lynch also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR7 Pros. Sup. S-87.

Item 117.     Summary of loans about which the Defendants made untrue or misleading statements:

(a)     Number of loans whose LTVs were materially understated: 618

(b)     Number of loans that suffered EPDs: 9

(c)     Number of loans in which the properties were stated to be owner-occupied but were not: 360

(d)     Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 830

(e)     Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 31.6%

-10-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

## SCHEDULE 31 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-AR5 was a securitization in March 2005 of 1,871 mortgage loans, in four groups. The mortgage loans in the collateral pool of this securitization were originated by IndyMac Bank, F.S.B. INDX 2005-AR5 Pros. Sup. S-4.

(c)      **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 2-A-1, for which the Bank paid $143,958,886 plus accrued interest on March 30, 2005.

(d)      **Ratings of the certificate(s) when the Bank purchased them:** Standard & Poor's •  AAA; Moody's •  Aaa.

(e)      **Current ratings of the certificate(s):** Standard & Poor's •  A-; Moody's • Caa2.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000095013605001805/file001.htm.

**Item 51.**      **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

---

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

(a) "With respect to approximately 52.49%, 42.12%, 53.38% and 46.01% of the group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans (in each case, based on the aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date), respectively, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 78.97%, 78.27%, 79.02% and 79.49%, with respect to such group 1 mortgage loans, group 2 mortgage loans, group 3 mortgage loans and group 4 mortgage loans, respectively . . . ." INDX 2005-AR5 Pros. Sup. S-11.

(b) "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." INDX 2005-AR21 Pros. Sup. S-17.

(c) In the section of the prospectus supplement entitled "The Mortgage Pool," Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2005-AR5 Pros. Sup. S-19 through S-33. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, current principal balances of $50,000.01 to $100,000, $100,000.01 to $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans in each category. One of the tables, entitled "Original Loan-to-Value Ratios for the Group 1 Mortgage Loans," divided the loans in group 1 into eight categories of original LTV (for example, 10.01% to 20%, 30.01% to 40%, 40.01% to 50%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-19.

-2-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1        (d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

2   group 1 mortgage loans was approximately 77.57%." INDX 2005-AR5 Pros. Sup. S-19.

3        (e)   In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

4   Loan-to-Value Ratios for the Group 2 Mortgage Loans." This table divided the mortgage loans in

5   group 2 into seven categories of original LTV (for example, 30.01% to 40%, 40.01% to 50%,

6   50.01% to 60%, etc.). The table made untrue and misleading statements about the number of

7

8   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

9   principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-23.

10        (f)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

11   group 2 mortgage loans was approximately 76.28%." INDX 2005-AR21 Pros. Sup. S-23.

12

13        (g)   In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

14   Loan-to-Value Ratios for the Group 3 Mortgage Loans." This table divided the mortgage loans in

15   group 3 into six categories of original LTV (for example, 40.01% to 50%, 50.01% to 60%,

16   60.01% to 70%, etc.). The table made untrue and misleading statements about the number of

17   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

18   principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-27.

19

20        (h)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

21   group 3 mortgage loans was approximately 77.07%." INDX 2005-AR5 Pros. Sup. S-27.

22        (i)   In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Original

23   Loan-to-Value Ratios for the Group 4 Mortgage Loans." This table divided the mortgage loans in

24   group 4 into eight categories of original LTV (for example, 20.01% to 30%, 30.01% to 40%,

25   40.01% to 50%, etc.). The table made untrue and misleading statements about the number of

26   mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate

27   principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-31.

28

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1      (j)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the

2  group 4 mortgage loans was approximately 77.25%." INDX 2005-AR5 Pros. Sup. S-31.

3  **Item 61.**    **Details of the results of the AVM analysis:**

4

| | |
|---|---:|
| Number of loans | 1,871 |
| Number of properties on which there was enough information for the model to determine a true market value | 933 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 440 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $20,000,069 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 162 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,214,000 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 74 |
| Weighted-average LTV, as stated by Defendants (group 2) | 76.28% |
| Weighted-average LTV, as determined by the model (group 2) | 83.25% |

14  **Item 87.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

15

16      In the prospectus supplement, Merrill Lynch made the following statements about the

17  occupancy status of the properties that secured the mortgage loans in the collateral pool of this

18  securitization.

19      (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item

20  51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage

21  Loans." The table divided the mortgage loans in group 1 into the categories "Primary Home,"

22  "Investment," and "Second Home." The table made untrue and misleading statements about the

23  number of mortgage loans, the aggregate principal balance outstanding, and the percent of

24  aggregate principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup.

25  S-21.

26

27

28

-4-

**SCHEDULES OF THE FIRST AMENDED COMPLAINT** (*Deutsche*, 497839)

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch stated that 89.8% of the group 1 loans were secured by a "Primary Home," 7.69% by an "Investment" property, and 2.52% by a "Second Home." INDX 2005-AR5 Pros. Sup. S-21.

(c)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." The table divided the mortgage loans in group 2 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-24.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch stated that 90.06% of the group 2 mortgage loans were secured by a "Primary Home," 6.32% by an "Investment" property, and 3.62% by a "Second Home." INDX 2005-AR5 Pros. Sup. S-24.

(e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 3 Mortgage Loans." The table divided the mortgage loans in group 3 into the categories "Primary Home," "Investment," and "Second Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2005-AR5 Pros. Sup. S-28.

(f)     In the "Occupancy Types for the Group 3 Mortgage Loans" table, Merrill Lynch stated that 85.49% of the group 3 mortgage loans, were secured by a "Primary Home," 9.72% by an "Investment" property, and 4.79% by a "Second Home." INDX 2005-AR5 Pros. Sup. S-28.

(g)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 4 Mortgage Loans." The table divided the mortgage loans in group 4 into the categories "Primary Home," "Investment," and "Second Home." The table made

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

1   untrue and misleading statements about the number of mortgage loans, the aggregate principal

2   balance outstanding, and the percent of aggregate principal balance outstanding in each of these

3   categories. INDX 2005-AR5 Pros. Sup. S-32.

4

5         (h)     In the "Occupancy Types for the Group 4 Mortgage Loans" table, Merrill Lynch

6   stated that 85.97% of the group 4 mortgage loans were secured by a "Primary Home," 9.41% by

7   an "Investment" property, and 4.62% by a "Second Home." INDX 2005-AR5 Pros. Sup. S-32.

8   **Item 95.**     **Details of properties that were stated to be owner-occupied, but were not:**

9        **(a)**    **Number of loans on which the owner of the property instructed tax**

10             **authorities to send property tax bills to him or her at a different address: 99**

11        **(b)**    **Number of loans on which the owner of the property could have, but did not,**

12             **designate the property as his or her homestead: 181**

13        **(c)**    **Number of loans on which the owner of the property owned three or more**
          **properties: 7**

14        **(d)**    **Number of loans that went straight from current to foreclosure or ownership**

15             **by lender: 1**

16        **(e)**    **Eliminating duplicates, number of loans about which one or more of**
          **statements (a) through (d) is true: 243**

17   **Item 98.**     **Untrue or misleading statements about the underwriting standards of the**

18             **originators of the mortgage loans:**

19        On pages S-35 through S-37 of the prospectus supplement, Merrill Lynch made

20   statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are

21   incorporated herein by reference. In particular, Merrill Lynch stated that:

22        **(a)**    "Exceptions to these underwriting standards are permitted where compensating

23   factors are present . . . ." INDX 2005-AR5 Pros. Sup. S-36.

24

25        **(b)**    "Underwriting standards are applied by or on behalf of a lender to evaluate the

26   borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged

27   property as collateral." INDX 2005-AR5 Pros. Sup. S-25.

28

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

    (c)    "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as collateral. The most comprehensive of the programs emphasize both." INDX 2005-AR5 Pros. Sup. S-25.

**Item 105.**    **Early payment defaults:**

    (a)    **Number of the mortgage loans that suffered EPDs: 10**

    (b)    **Percent of the mortgage loans that suffered EPDs: 0.5%**

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.18%**

**Item 106.**    **90+ days delinquencies:**

    (a)    **Number of the mortgage loans that suffered 90+ days delinquencies: 345**

    (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies: 18.4%**

    (c)    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 16.5%**

**Item 107.**    **30+ days delinquencies in this securitization:**

    (a)    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 330**

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 17.6%**

    (c)    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 114.**    **Statements about the ratings of the certificate(s) that the Bank purchased:**

    On pages S-3 and S-77 to S-78 of the prospectus supplement, Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by

-7-

Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Merrill Lynch also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Standard & Poor's . . . and Aaa by Moody's Investors Service, Inc. . . . ." INDX 2005-AR5 Pros. Sup. S-77.

**Item 117.**  **Summary of loans about which the Defendants made untrue or misleading statements:**

    (a)  **Number of loans whose LTVs were materially understated: 440**

    (b)  **Number of loans that suffered EPDs: 10**

    (c)  **Number of loans in which the properties were stated to be owner-occupied but were not: 243**

    (d)  **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 583**

    (e)  **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 31.2%**

-8-

**SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)**

## SCHEDULE 32 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**      **Details of trust and certificate(s).**

(a)      **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)      **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-FLX6 was a securitization in July 2007 of 1,201 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. INDX 2007-FLX6 Pros. Sup. S-4.

(c)      **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 2-A-1, for which the Bank paid $85,984,138 plus accrued interest on September 17, 2007.

(d)      **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

(e)      **Current ratings of the certificate(s):**

Standard & Poor's •   B-; Moody's •   B2.

(f)      **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000114420407039567/v082442_424b5.htm.

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 14, 2007. Annexed to the registration statement was a prospectus. The

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)

prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 51.** **Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    "With respect to approximately 27.31[%] and 30.65% of the group 1 mortgage loans and group 2 mortgage loans, respectively, in each case by aggregate stated principal balance of the mortgage loans in the related loan group as of the cut-off date, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the issuing entity and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such group 1 mortgage loans and group 2 mortgage loans is approximately 75.45% and 75.61% respectively . . . ." INDX 2007-FLX6 Pros. Sup. S-31.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of less than or equal to 95%." INDX 2007-FLX6 Pros. Sup. S-40.

(c)    In "The Mortgage Pool" section of the prospectus supplement, Merrill Lynch presented tables of statistics about the mortgage loans in the collateral pool. INDX 2007-FLX6 Pros. Sup. S-42 through S-65. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, range of current mortgage loan principal balances of $50,000.01 to $100,000, $100,100.01 to $150,000, $150,000.01 to $200,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 22 such tables for the loans in group 1. In each table,

-2-

the number of categories into which the loans were divided ranged from one to 33. Thus, in "The Mortgage Pool" section, Merrill Lynch made hundreds of statements about the original LTVs of the loans in group 1. INDX 2007-FLX6 Pros. Sup. S-42 to S-49.

(d)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 1 Mortgage Loans was approximately 70.47%." INDX 2007-FLX6 Pros. Sup. S-43.

(e)   In "The Mortgage Pool" section, Merrill Lynch presented similar tables of statistics about the mortgage loans in group 2. In these tables, Merrill Lynch similarly made hundreds of statements about the original LTVs of the loans in Group 2. INDX 2007-FLX6 S-50 to S-57.

(f)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans was approximately 70.74%." INDX 2007-FLX6 Pros. Sup. S-51.

(g)   In "The Mortgage Pool" section, Merrill Lynch presented similar tables of statistics about all of the mortgage loans in the collateral pool. In these tables, Merrill Lynch similarly made hundreds of statements about the original LTVs of the loans. INDX 2007-FLX6 S-58 to S-65.

(h)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 70.67%." INDX 2007-FLX6 S-59.

**Item 61.      Details of the results of the AVM analysis:**

| Number of loans | 1,201 |
|---|---|
| Number of properties on which there was enough information for the model to determine a true market value | 698 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 563 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $72,812,969 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 37 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,830,500 |

-3-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

| | |
|---|---|
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 145 |
| Weighted-average LTV, as stated by Defendants | 70.67% |
| Weighted-average LTV, as determined by the model | 87.5% |

**Item 64.     Evidence from subsequent sales of refinanced properties:**

Of the 1,201 mortgage loans in the collateral pool, 1,034 were taken out to refinance, rather than to purchase, properties. For those 1,034 loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of those 1,034 properties, 63 were subsequently sold for a total of approximately $21,951,038. The total value ascribed to those same properties in the LTV data reported in the prospectus supplements and other documents sent to the Bank was $36,508,000. Thus, those properties were sold for 60.1% of the value ascribed to them, a difference of 39.9%. This difference cannot be accounted for by declines in house prices in the areas in which those properties were located.

**Item 81.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Merrill Lynch made the following statement about the appraisals of all of the properties that secured the mortgage loans in the collateral pool of this securitization: "[A]n appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." INDX 2007-FLX6 Pros. Sup. S-69.

**Item 87.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Merrill Lynch made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 51, Merrill Lynch presented a table entitled "Occupancy Types for the Group 1 Mortgage Loans." The table divided the mortgage loans in group 1 into the categories "Primary Home,"

-4-

**SCHEDULES OF THE FIRST AMENDED COMPLAINT** (*Deutsche*, 497839)

"Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2007-FLX6 Pros. Sup. S-46.

(b)     In the "Occupancy Types for the Group 1 Mortgage Loans" table, Merrill Lynch stated that 86% of the group 1 mortgage loans were secured by a "Primary Home," 12.7% by an "Investment" property, and 1.3% by a "Secondary Home." INDX 2007-FLX6 Pros. Sup. S-46.

(c)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Group 2 Mortgage Loans." This table divided the mortgage loans in group 2 into the categories "Primary Home," "Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2007-FLX6 Pros. Sup. S-54.

(d)     In the "Occupancy Types for the Group 2 Mortgage Loans" table, Merrill Lynch stated that 96.64% of the group 2 mortgage loans were secured by a "Primary Home," 2.11% by an "Investment" property, and 1.25% by a "Secondary Home." INDX 2007-FLX6 Pros. Sup. S-54.

(e)     In "The Mortgage Pool" section, Merrill Lynch presented a table entitled "Occupancy Types for the Mortgage Loans." The table divided all of the mortgage loans in the collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. INDX 2007-FLX6 Pros. Sup. S-62.

-5-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche, 497839*)

(f)      In the "Occupancy Types for the Mortgage Loans" table, Merrill Lynch stated that 94.01% of the mortgage loans were secured by a "Primary Home," 4.73% by an "Investment" property, and 1.26% by a "Secondary Home." INDX 2007-FLX6 Pros. Sup. S-62.

**Item 95.**      **Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 76**

(b)      **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 165**

(c)      *Number of loans on which the owner of the property owned three or more properties: 24*

(d)      **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 229**

**Item 98.**      **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-68 through S-71 of the prospectus supplement, Merrill Lynch made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Merrill Lynch stated that:

(a)      "Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines." INDX 2007-FLX6 Pros. Sup. S-69.

(b)      "[E]xceptions to underwriting standards are permitted in situations in which compensating factors exist." INDX 2007-FLX6 Pros. Sup. S-70.

(c)      "Underwriting standards are applied by or on behalf of a lender to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral." INDX 2005-FLX6 Pros. Sup. S-36.

(d)      "Some programs place more emphasis on a borrower's credit standing and repayment ability while others emphasize the value and adequacy of the mortgaged property as

-6-

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

collateral. The most comprehensive of the programs emphasize both." INDX 2005-FLX6 Pros. Sup. S-36.

**Item 105.    Early payment defaults:**

    **(a)**    **Number of the mortgage loans that suffered EPDs: 8**

    **(b)**    **Percent of the mortgage loans that suffered EPDs: 0.7%**

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that experienced EPDs: 0.83%**

**Item 106.    90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies: 423**

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies: 35.2%**

    **(c)**    **Percent of all securitized, non-agency prime (including Alt-A) mortgage loans made at the same time as the loans in the collateral pool that suffered 90+ days delinquencies: 33.9%**

**Item 107.    30+ days delinquencies in this securitization:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on March 31, 2010: 427**

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on March 31, 2010: 35.6%**

    **(c)**    **Percent of all mortgage loans in the United States that were 30+ days delinquent on March 31, 2010: 14.7%**

**Item 114.    *Statements about the ratings of the certificate(s) that the Bank purchased:***

On pages S-9 and S-131 to S-132 of the prospectus supplement, Merrill Lynch made statements about the ratings assigned to the certificates issued in this securitization. Merrill Lynch stated that the Bank's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche*, 497839)

Merrill Lynch also stated: "It is a condition to the issuance of the Offered Certificates that they be assigned ratings not lower than [AAA] by S&P and [Aaa] by Moody's." INDX 2007-FLX6 Pros. Sup. S-131.

**Item 117.** **Summary of loans about which the Defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated: 563**

    **(b)**     **Number of loans that suffered EPDs: 8**

    **(c)**     **Number of loans in which the properties were stated to be owner-occupied but were not: 229**

    **(d)**     **Eliminating duplicates, number of loans about which the Defendants made untrue or misleading statements: 663**

    **(e)**     **Eliminating duplicates, percent of loans about which the Defendants made untrue or misleading statements: 55.2%**

-8-

BLUEBIRD
OFFICE SUPPLIES
(888) 477-0700   www.bluebirdonline.com

1

## SCHEDULE 33 TO THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against Defendant Merrill Lynch.

**Item 43.**     **Details of trust and certificate(s).**

(a)     **Dealer that sold the certificate(s) to the Bank:** Merrill Lynch.

(b)     **Description of the trust:** IndyMac INDX Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2007-FLX5 was a securitization in June 2007 of 1,337 mortgage loans, in two groups. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. *INDX 2007-FLX5 Pros. Sup. S-6.*

(c)     **Description of the certificate(s) that the Bank purchased:** Merrill Lynch offered and sold to the Bank a senior certificate in this securitization, in class 2-A-1, for which the Bank paid $118,626,259 plus accrued interest on September 13, 2007.

(d)     **Ratings of the certificate(s) when the Bank purchased them:**

Standard & Poor's •   AAA; Moody's •   Aaa.

(e)     **Current ratings of the certificate(s):**

Standard & Poor's •   AA-; Moody's •   B1.

(f)     **URL of prospectus supplement for this securitization:** A true copy of the prospectus supplement for this securitization is available at http://www.sec.gov/Archives/edgar/data/1090295/000089109207002691/e27537_424b5.txt.

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that the Bank purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 14, 2007. Annexed to the registration statement was a prospectus. The

SCHEDULES OF THE FIRST AMENDED COMPLAINT (*Deutsche,* 497839)