```
MAS1 LOAN 5303598451    MSP LOAN MASTER MAINT. & DISPLAY   10/30/08   13:55:35
     NAME J  TORRES     TYPE 13 1ST MTG,CONVEN W/O INS               GROUP
-- AQN1 -- ACQUISITION AND SALES ---------------------------------------------
  ACQN      ACQUISITION       OLD LOAN       ACQUISITION    OLD SVCR    Y/E RPTG
  DATE      PRIN BAL          NUMBER            ID          NUMBER    FROM ACQ DT
 060106     167756.00       1001119071       AMH0606S        ___         Y
(MMDDYY)                                                               (Y/N)


ACQUISITION    OLD LN # INDEX
   TYPE        STOP DATE
    3           030137
1-ORIGINATED   (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____

          LOAN SERV        NEW SERV          CONTRACT LOAN        SERV
          SOLD ID         LOAN NUMBER        SERV SOLD DT       TRANS DT
1ST      _____      _____      MMDDYY           MMDDYY
2ND      _____      _____

----------------------------* ADDITIONAL MESSAGES *--------------------------
PRESS PF14 FOR MEMOS
LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY
    TAXRDS:  REO - VENDOR DELINQUENT SEARCH
```

Loan Number: 5303703275   Source: Demand
Channel: Conduit Prime   Lender Name: American Home   Internal-RiskMit   Fraud Scheme:
Mortgagor Name: EBANKS JOY   Outgoing   Deal Name:

## Demand

Demand Letter Date: 08/19/2008
Demand Type: Internal Claim
Inv Demand Amount: $0.00
Investor: WMMSC
Seller Guide:
Repurchase Reason: 57-Misrepresentation
Repurchase Reason Dt: 08/26/2008

## Loan Detail

Demand Status: Contract Recovery
Demand Type: Internal Claim
Reason Type: Misrep No Fraud
Investor Analyst Name: Pirkey
IA Follow Up Date: 09/09/1999
Inv Buyout Analyst: Skeens
Lender Main LOB:
Lender LOB:
Lender Status:
Lender AE:
Lender TIN:
Current Demand Amt: $0.00
Retention Fee: $0.00
Makewhole Amount: $617,456.36
CR Analyst Name:
CR Case Number: American Home
CR Loan Status

Contract Reference:

| TITLE | | PART | CHAPTER | SECTION | SUB |
|---|---|---|---|---|---|

Reason For Repurchase:
Involuntary repurchase due to risk mit findings.

MI Findings Received:
MI Rescinded:
MI Review Complete:

Property Address: 290 BURDETTE RD
Property CITY/ST/ZIP: ATLANTA , GA 30327

## Imported Data

Original UPB: $1,000,000.00   LTV: 0
Original Investor Code: J80   CLTV:
Original Category Code 001   Old Loan Number: 1279110
Loan Close Date: 05/12/2006   UPB: $0.00
Product Description: F52   Investor Code: J80
Lo Type: CONV RES W/O PMI   Category Code: 001
Loan Term:   Investor Name: WMMSC M/S
ARM Indicator: N   Investor Loan Number: 601804505
Review Findings:   SERVICING SOLD ID:
Potential Recovery: Bulk Lender   Next Due Date: 08/01/2006
Underwriter:   Foreclosure Sale Date: 01/02/2007
Investor Notified:   REO Sale Date: 09/25/2007
Appeal Sent to MI Co:   Mancode: REO
Date Created: 08/20/2008   MAS1 USR4 Code: C
REPRCH REASN:   Recourse Type Code:

Edit | Main Menu | Comments | Review Summary | Approval Form | Loss Statement | Closed Summary | Balancing | Transfer

```
-- AQN1 -- ACQUISITION AND SALES -----------------------------------------
  ACQN       ACQUISITION      OLD LOAN       ACQUISITION   OLD SVCR    Y/E RPTG
  DATE        PRIN BAL         NUMBER            ID         NUMBER    FROM ACQ DT
  080106      999424.10       1279110        AMH0806S       ____          Y
 (MMDDYY)                                                               (Y/N)


ACQUISITION     OLD LN # INDEX
    TYPE         STOP DATE
     3            060137
1-ORIGINATED    (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____


           LOAN SERV        NEW SERV             CONTRACT LOAN       SERV
            SOLD ID        LOAN NUMBER           SERV SOLD DT      TRANS DT
     1ST                                            MMDDYY         MMDDYY
     2ND     _____     _____

---------------------------* ADDITIONAL MESSAGES *----------------------------
```

**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**LOSS MIT IND = 8 LOSS ANALYSIS COMP    FORECLOSURE REMOVAL**
**LOAN IS IN FORECLOSURE, F/C STOP = 9    LMT/REO SALE COMPLETED 09/25/07**

| | | | | |
|---|---|---|---|---|
| Loan Number: | 5303788615 | Source: | Internal-RiskMit | Lender Name: American Home | Fraud Scheme: |
| Channel: | Conduit Prime | Demand | Outgoing | Mortgagor Name: CHAPMAN MARY | Deal Name: |

## Demand

| Field | Value |
|---|---|
| Demand Letter Date: | 08/19/2008 |
| Demand Type: | Internal Claim |
| Inv Demand Amount: | $0.00 |
| Investor: | WMMSC |
| Seller Guide: | |
| Repurchase Reason: | 60-LTV |
| Repurchase Reason Dt | 08/27/2008 |

## Loan Detail

| Field | Value |
|---|---|
| Demand Status: | Contract Recovery |
| Demand Type: | Repurchase |
| Reason Type: | Valuation/Appraisal |
| Investor Analyst Name: | Pirkey |
| IA Follow Up Date: | 09/09/1999 |
| Inv Buyout Analyst: | Skeens |
| Lender Main LOB: | |
| Lender LOB: | |
| Lender Status: | |
| Lender AE: | |
| Lender TIN: | |
| Current Demand Amt: | $43,000.00 |
| Retention Fee: | $0.00 |
| Makewhole Amount: | $0.00 |
| CR Analyst Name: | |
| CR Case Number | American Home |
| CR Loan Status | |

Contract Reference:

| TITLE | | PART | CHAPTER | SECTION | SUB |
|---|---|---|---|---|---|

Reason For Repurchase:

Involuntary repurchase due to risk mit findings.

| Field | Value |
|---|---|
| MI Findings Received: | |
| MI Rescinded: | |
| MI Review Complete: | |

Property Address: 7018 HORNE ST
Property CITY/ST/ZIP: SPARTANBURG , SC 29303

## Imported Data

| Field | Value | Field | Value |
|---|---|---|---|
| Original UPB: | $43,000.00 | LTV: | 0 |
| Original Investor Code: | J80 | CLTV: | |
| Original Category Code | 001 | Old Loan Number: | 1213610 |
| Loan Close Date: | 05/31/2006 | UPB: | $0.00 |
| Product Description: | F57 | Investor Code: | J80 |
| Lo Type: | CONV RES W/O PMI | Category Code: | 001 |
| Loan Term: | | Investor Name: | WMMSC M/S |
| ARM Indicator: | Y | Investor Loan Number: | 601825637 |
| Review Findings: | | SERVICING SOLD ID: | |
| Potential Recovery: | Bulk Lender | Next Due Date: | 12/01/2006 |
| Underwriter: | | Foreclosure Sale Date: | 08/06/2007 |
| Investor Notified: | | REO Sale Date: | 09/26/2007 |
| Appeal Sent to MI Co: | | Mancode: | REO |
| Date Created: | 08/20/2008 | MAS1 USR4 Code: | C |
| REPRCH REASN: | | Recourse Type Code: | |

| Edit | | Main Menu | Comments | Review Summary | Approval Form | Loss Statement | Closed Summary | Balancing | Transfer |
|---|---|---|---|---|---|---|---|---|---|

-- AQN1 -- ACQUISITION AND SALES -----------------------------------------------

| ACQN DATE (MMDDYY) | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT (Y/N) |
|---|---|---|---|---|---|
| 090106 | 43000.00 | 1213610 | AMH0906S | ___ | Y |

ACQUISITION          OLD LN # INDEX
    TYPE              STOP DATE
     3                 060137
1-ORIGINATED         (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____

|     | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ |     |     |
| 2ND | _____ | _____ |     |     |

-------------------------* ADDITIONAL MESSAGES *----------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**DIST-TYPE = 1 INTEREST-ONLY LOAN          LOSS MIT IND = 8 LOSS ANALYSIS COMP**
**REMOVED LOSS MITIGATION          LMT/REO SALE COMPLETED 09/26/07**

Freddie Mac Confidential Information



**Freddie Mac**

We make home possible ™

Southeast/Southwest Office
2300 Windy Ridge Parkway, Suite 200
Atlanta, GA 30339
Phone: (770) 857-8800
Fax: (770) 857-8808

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

May 7, 2008

Tait O. Norton
WASHINGTON MUTUAL BANK
7301 Baymeadows Way
JAXB3182
Jacksonville, FL 32256

RE:   Seller/Servicer #:         112491
      Contract #:                0609186031
      Funding Date:              September 27, 2006
      Freddie Mac Loan #:        329699024
      Property Location:         PLAINFIELD, IL 60586-0000

Dear Mr. Norton:

The attached mortgage(s) were selected by Freddie Mac for a post purchase quality control review. As a result of the recently completed quality control review(s), Freddie Mac has determined that the attached mortgage(s) must be repurchased. Pursuant to Section 72.1 of the <u>Single-Family Seller/Servicer Guide</u> (the Guide), mortgages that do not comply with Freddie Mac's requirements must be repurchased. An explanation of why the attached mortgage(s) do not meet Freddie Mac's requirements is attached.

Repurchase of the mortgage(s) must be completed on or before **June 6, 2008**. The repurchase procedures to be followed are determined by the status of the mortgage, and are stated in full in Section 78.20 of the Guide and summarized as follows:

*   Active Mortgages: Repurchases of active mortgages are to be reported through the repurchase Loan Level Transaction to Freddie Mac via automated means using MIDANET [R]. The repurchase amount must be remitted to Freddie Mac via the telephonic cash remittance system by which you make your regular monthly remittances.

*   Inactive Mortgages: Repurchases of inactive mortgages must be reported as a payoff - mortgage repurchase. Proceeds must be remitted to Freddie Mac via the telephonic cash remittance system described above.

*   Real Estate Owned (REO): Repurchases of mortgages transferred to REO are accounted for and reported by remitting the proceeds to the applicable Freddie Mac office (Attention, REO Accounting Department) by check, accompanied by Form 105. The repurchase amount must be verified with the applicable REO Accounting Department.

NOTE:   If the status of the mortgage should change at any time prior to the actual repurchase, you should follow the procedures outlined above for the appropriate status at the time the repurchase funds are remitted.

Freddie Mac Confidential Information

Tait O. Norton                                          Funding Date: September 27, 2006
Page: 2                                                 Freddie Mac Loan #: 329699024
Date: May 7, 2008

At Freddie Mac's discretion, the repurchase price may also include any premium paid for mortgages purchased under the Gold Cash method of pricing.

Should you have any questions regarding the repurchase procedure, please refer to Section 78.20 of the Guide, or call Freddie Mac's 1-800-FREDDIE Customer Service Line.  You will be asked for your Seller/Servicer number.

If you have facts that you believe demonstrate that any loan complies with Freddie Mac's requirements, you may submit them with an explanation of why these facts support your position and why these facts were not included with the original quality control file.  In accordance with the requirements of Section 72.6 of the Guide, the submission must be full and complete and contain a summary of the relevant facts and a statement of why the decision should be reversed.  Any appeal must be submitted to the undersigned on or before the repurchase deadline indicated above.

Thank you for your prompt attention to this matter.

Sincerely,


Donna Revellese
Manager, Quality Control
(770) 857-8899

Attachment(s)

Tait O. Norton                                    Funding Date: September 27, 2006
Page: 3                                           Freddie Mac Loan #: 329699024
Date: May 7, 2008

LTV: 70%
Mortgage Purpose: Purchase (OO)
S/S Loan Number: 5303796535
Note Date: May 26, 2006

Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

**THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S MASTER COMMITMENT # T06080249 - STATED INCOME / STATED ASSET PROGRAM.**

**GENERAL ELIGIBILITY REQUIREMENTS**
The loan did not meet the requirements for a stated income stated asset purchase transaction.

* The loan application reflected stated assets of $14,325.32 from Fifth Third Bank including the earnest money deposit of $3,000.
* The file contained two months bank statements from Fifth Third Bank dated April 7, 2006 with an account balance of $1,110.82.
* The loan was not eligible for stated assets since the file contained asset documentation.
* The verified assets were insufficient in supporting the earnest money deposit of $3,000 and were inadequate for meeting the cash reserve requirement.

**DOCUMENTATION**
The file did not contain the following required documentation:

* Final title commitment and final title policy.

Case 3:10-cv-03039-SC  Document 99  Filed 09/24/10  Page 9 of 113

-- AQN1 -- ACQUISITION AND SALES ---------------------------------------------
   ACQN          ACQUISITION      OLD LOAN        ACQUISITION    OLD SVCR    Y/E RPTG
   DATE           PRIN BAL         NUMBER             ID         NUMBER     FROM ACQ DT
  090106         190661.09        1288667         AMH0906S        ___           Y
 (MMDDYY)                                                                     (Y/N)


ACQUISITION    OLD LN # INDEX
   TYPE          STOP DATE
    3             060137
1-ORIGINATED    (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500    RCRS CD:  __    CUST CD:  _____

           LOAN SERV       NEW SERV            CONTRACT LOAN        SERV
            SOLD ID       LOAN NUMBER          SERV SOLD DT       TRANS DT
     1ST                                          MMDDYY           MMDDYY
     2ND    _____    _____
           _____    _____

-------------------------------------------------------------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**ACTIVE LOSS MITIGATION              LOSS MIT IND = 1 PACKAGE RECEIVED**
**LOAN IS IN FORECLOSURE, F/C STOP = 5   365 DAYS PAST PROJECTED LEGAL DATE**

**Freddie Mac**
We make home possible ■

North Central Regional Office
333 West Wacker Drive, Suite 2500
Chicago, IL 60606
Phone: (312) 407-7400
Fax: (312) 407-7397

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

September 4, 2008

Lucy Snyder
Vice President
WASHINGTON MUTUAL BANK
7255 Baymeadows Way
JAXA2090
Jacksonville, FL 32256

| RE: | Seller/Servicer #: | 112491 |
|-----|--------------------|--------|
| | Contract #: | 0609186036 |
| | Funding Date: | September 27, 2006 |
| | Freddie Mac Loan #: | 329701916 |
| | Property Location: | MANASSAS, VA 20111-0000 |

Dear Ms. Snyder:

The above referenced mortgage was selected by Freddie Mac for a postfunding quality control review and was found to be not in compliance with the Purchase Documents. Pursuant to Section 72.1 of the *Single-Family Seller/Servicer Guide*, we are exercising our right to require repurchase. An explanation of why the mortgage does not meet Freddie Mac's requirements is attached.

**Repurchase of this mortgage, which is now in REO (or make whole) status, must be completed on or before October 4, 2008.**

*Failure to remit the appropriate repurchase funds by this date will result in you being assessed marketing expenses, fees and/or penalties.*

---

The necessary repurchase information/calculation may be obtained by:

- calling Real Estate Services at (972) 395-4000 or
- sending a written request by fax* to (972) 395-4467, Attn: RES Repurchase Dept.
- sending a written request by e-mail to "REO_Repurchase_Calculations@freddiemac.com"

\* You should receive REO repurchase/make whole calculations within 3 business days of your request.

---

**Please note that Freddie Mac initiates and continues marketing all REO properties until repurchase funds have been received and therefore may accept contracts and/or sell the property pending completion of the repurchase. All marketing efforts and contract negotiations are at the sole discretion of Freddie Mac until repurchase funds have been received.**

Please contact me at (312) 407-7543 if you have any questions regarding our decision on the loan. All matters relating to the REO disposition process must be directed to the above referenced numbers. Any appeal to this repurchase request must be received in writing by the above repurchase due date in order to be considered.

Freddie Mac Confidential Information

Lucy Snyder                                          Funding Date: September 27, 2006
Page: 2                                            Freddie Mac Loan #: 329701916
Date: September 4, 2008

Thank you for your prompt attention to this matter.

Sincerely,

Philip Walker
Manager, Quality Control
(312) 407-7543

Attachment(s)

Freddie Mac Confidential Information

Lucy Snyder

Page: 3

Date: September 4, 2008

Funding Date: September 27, 2006

Freddie Mac Loan #: 329701916

LTV:  80%

Mortgage Purpose: Purchase (OO)

S/S Loan Number:  5303797608

Note Date: June 9, 2006

Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

**THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S MASTER COMMITMENT #T04091750 – STATED INCOME/STATED ASSET PROGRAM.**

**FALSE REPRESENTATION – UNDISCLOSED MORTGAGES**

Freddie Mac has determined that the Borrowers' total monthly obligations were falsely represented.  The credit report *(or other source)* obtained as part of Freddie Mac's quality control process disclosed:

* A 400,00 mortgage opened May 30, 2006 with Countrywide Home Loans secured by property located in Springfield, VA.  The monthly payment for this mortgage was $2,930.
 * A 100,00 mortgage opened May 30, 2006 with Countrywide Home Loans secured by property located in Springfield, VA.  The monthly payment for this mortgage was $500 (estimated).

The obligations was/were not disclosed on the application and was/were not included as part of the Borrower's total monthly obligations.

It was noted that the initial loan application and loan transmittal summary stated the Borrower's income as $6,234 per month and the Co-Borrower's income as $4,317 per month.  The final loan application and loan transmittal summary stated the Borrower's income as $4,400 per month and the Co-Borrower's income as $2,500 per month.  The Seller's loan decision was based on the lower income amounts.

Using total income of $6,900 per month and including the undisclosed mortgages, the Borrowers' total debt payment-to-income ratio is 95%  The Master Agreement states the maximum allowable DTI is 50%.

**DOCUMENTATION**

The mortgage file submitted for quality control review lacked the following required documentation: (Guide Section 46.1)

* Title Policy

A request was made for the missing documentation; however, to date, no response has been received.

The subject loan was not eligible for sale to Freddie Mac.

NAME L Case 8:09-cv-03039-SC1 Documents 99 CONN 09/24/10 Page (ARM) 113 GROUP

-- AQN1 -- ACQUISITION AND SALES -------------------------------------------

| ACQN DATE | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT |
|---|---|---|---|---|---|
| 090106 | 317520.00 | 1316433 | AMH0906S | ___ | Y |
| (MMDDYY) | | | | | (Y/N) |

```
ACQUISITION     OLD LN # INDEX
    TYPE          STOP DATE
      3           070137
1-ORIGINATED     (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____
```

| | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ | | |
| 2ND | _____ | _____ | | |

----------------------------* ADDITIONAL MESSAGES *----------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**DIST-TYPE = 1 INTEREST-ONLY LOAN     DISCHARGED CH7 BANKRUPTCY**
**COMPLETED CH 7 BANKRUPTCY**



North Central Regional Office
333 West Wacker Drive, Suite 2500
Chicago, IL 60606
Phone: (312) 407-7400
Fax: (312) 407-7397

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

August 29, 2008

Lucy Snyder
Vice President
WASHINGTON MUTUAL BANK
7255 Baymeadows Way
JAXA2090
Jacksonville, FL 32256

RE:   Seller/Servicer #:        112491
      Contract #:               0609186030
      Funding Date:             September 27, 2006
      Freddie Mac Loan #:       329701924
      Property Location:        BAKERSFIELD, CA 93307-0000

Dear Ms. Snyder:

The above referenced mortgage was selected by Freddie Mac for a postfunding quality control review and was found to be not in compliance with the Purchase Documents. Pursuant to Section 72.1 of the *Single-Family Seller/Servicer Guide*, we are exercising our right to require repurchase. An explanation of why the mortgage does not meet Freddie Mac's requirements is attached.

**Repurchase of this mortgage, which is now in REO (or make whole) status, must be completed on or before September 28, 2008.**

*Failure to remit the appropriate repurchase funds by this date will result in you being assessed marketing expenses, fees and/or penalties.*

---

The necessary repurchase information/calculation may be obtained by:

- calling Real Estate Services at (972) 395-4000 or
- sending a written request by fax* to (972) 395-4467, Attn: RES Repurchase Dept.
- sending a written request by e-mail to "REO_Repurchase_Calculations@freddiemac.com"

\* You should receive REO repurchase/make whole calculations within 3 business days of your request.

---

**Please note that Freddie Mac initiates and continues marketing all REO properties until repurchase funds have been received and therefore may accept contracts and/or sell the property pending completion of the repurchase. All marketing efforts and contract negotiations are at the sole discretion of Freddie Mac until repurchase funds have been received.**

Please contact me at (312) 407-7543 if you have any questions regarding our decision on the loan. All matters relating to the REO disposition process must be directed to the above referenced numbers. Any appeal to this repurchase request must be received in writing by the above repurchase due date in order to be considered.

Freddie Mac Confidential Information

Lucy Snyder
Page: 2
Date: August 29, 2008

Funding Date: September 27, 2006
Freddie Mac Loan #: 329701924

Thank you for your prompt attention to this matter.

Sincerely,


Philip Walker
Manager, Quality Control
(312) 407-7543

Attachment(s)

Freddie Mac Confidential Information

Lucy Snyder                                   Funding Date: September 27, 2006
Page: 3                                     Freddie Mac Loan #: 329701924
Date: August 29, 2008


LTV: 70%
Mortgage Purpose: Purchase (Investment)
S/S Loan Number: 5303786791
Note Date: June 6, 2006

Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

**THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S MASTER COMMITMENT #T06080249 – STATED INCOME/VERIFIED ASSET PROGRAM.**

**DOCUMENTATION**
The mortgage file submitted for quality control review lacked the following required documentation:

* Final HUD-1 Settlement Statement

* Final title policy

A request was made for the missing documentation.  To date, this information is still outstanding.

NAME J Case 3:10-cv-03039-SC   Document 9    Filed 09/24/10   Page 17 of 113  GROUP
-- AQN1 -- ACQUISITION AND SALES ------------------------------------------------

| ACQN DATE | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT |
|---|---|---|---|---|---|
| 090106 | 143743.24 | 1316653 | AMH0906S | ___ | Y |
| (MMDDYY) | | | | | (Y/N) |

```
ACQUISITION   OLD LN # INDEX
   TYPE          STOP DATE
    3            070137
1-ORIGINATED    (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____
```

| | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ | | |
| 2ND | _____ | _____ | | |

--------------------------------------------------------------------------------

**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**LOSS MIT IND = 9 WORKOUT CANCELLED      REMOVED LOSS MITIGATION**
**LOAN IS IN FORECLOSURE, F/C STOP = 5    365 DAYS PAST PROJECTED LEGAL DATE**

Freddie Mac Confidential Information

 **Freddie Mac**

We make home possible℠

North Central Regional Office
333 West Wacker Drive, Suite 2500
Chicago, IL 60606
Phone: (312) 407-7400
Fax: (312) 407-7397

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

September 30, 2008

Lucy Snyder
Vice President
WASHINGTON MUTUAL BANK
7255 Baymeadows Way
JAXA2090
Jacksonville, FL 32256

RE:   Seller/Servicer #:        112491
      Contract #:               0608186035
      Funding Date:             August 29, 2006
      Freddie Mac Loan #:       329249347
      Property Location:        ROCKLIN, CA 95677-0000

Dear Ms. Snyder:

The above referenced mortgage was selected by Freddie Mac for a postfunding quality control review and was found to be not in compliance with the Purchase Documents. Pursuant to Section 72.1 of the *Single-Family Seller/Servicer Guide*, we are exercising our right to require repurchase. An explanation of why the mortgage does not meet Freddie Mac's requirements is attached.

**Repurchase of this mortgage, which is now in REO (or make whole) status, must be completed on or before October 30, 2008.**

*Failure to remit the appropriate repurchase funds by this date will result in you being assessed marketing expenses, fees and/or penalties.*

The necessary repurchase information/calculation may be obtained by:

- calling Real Estate Services at (972) 395-4000 or
- sending a written request by fax* to (972) 395-4467, Attn: RES Repurchase Dept.
- sending a written request by e-mail to "REO_Repurchase_Calculations@freddiemac.com"

* You should receive REO repurchase/make whole calculations within 3 business days of your request.

**Please note that Freddie Mac initiates and continues marketing all REO properties until repurchase funds have been received and therefore may accept contracts and/or sell the property pending completion of the repurchase. All marketing efforts and contract negotiations are at the sole discretion of Freddie Mac until repurchase funds have been received.**

Please contact me at (312) 407-7543 if you have any questions regarding our decision on the loan. All matters relating to the REO disposition process must be directed to the above referenced numbers. Any appeal to this repurchase request must be received in writing by the above repurchase due date in order to be considered.

Freddie Mac Confidential Information

Lucy Snyder                                    Funding Date: August 29, 2006
Page: 2                                        Freddie Mac Loan #: 329249347
Date: September 30, 2008


Thank you for your prompt attention to this matter.

Sincerely,


Philip Walker
Manager, Quality Control
(312) 407-7543

Attachment(s)

Freddie Mac Confidential Information

Lucy Snyder                                        Funding Date: August 29, 2006
Page: 3                                            Freddie Mac Loan #: 329249347
Date: September 30, 2008

LTV: 75%
Mortgage Purpose: Refinance (OO)
S/S Loan Number: 5303718307
Note Date: April 24, 2006

Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the
Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

**THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S
MASTER COMMITMENT #T06073149 – STATED INCOME/VERFIED ASSET PROGRAM.**

**CAPACITY**
Freddie Mac has determined that the stated income is not reasonable based on the Borrower's current position,
profession and tenure.

* The loan application stated the Borrower's profession as a superintendent, currently employed by Urata &
Sons Concrete for five years earning $7,500 per month.
* A reverification of the Borrower's employment with J. Senf, Payroll Supervisor at 916-638-5364, confirmed
that the Borrower's employment as a carpenter was terminated on February 7, 2006, two months prior to
closing.
* Research of two salary databasesSimplyHired.com and SalaryIndeed.com confirmed that experienced
carpenters located in the zip code where the Borrower is employed have a salary range of $18,000 to $47,000
annually.

The loan was not eligible for sale to Freddie Mac. Should you wish to appeal the decision, you must provide
documentation to evidence how you determined that the Borrower's stated income was reasonable.

NAME D ELDRIDGE     TYPE 13 1ST MTG,CONVEN W/O INS          GROUP

Case 3:10-cv-03039-SC  Document 89  Filed 09/24/10  Page 21 of 113

-- AQN1 -- ACQUISITION AND SALES ----------------------------------------------

| ACQN DATE (MMDDYY) | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT (Y/N) |
|---|---|---|---|---|---|
| 080106 | 221616.64 | 1260031 | AMH0806S | ___ | Y |

```
ACQUISITION     OLD LN # INDEX
   TYPE          STOP DATE
    3              050137
1-ORIGINATED     (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____
```

|  | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ | | |
| 2ND | _____ | _____ | | |

--------------------------------------------------------------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**DISCHARGED CH7 BANKRUPTCY           COMPLETED CH 7 BANKRUPTCY**
**LOAN IS IN FORECLOSURE, F/C STOP = 7   284 DAYS PAST PROJECTED LEGAL DATE**

*M^HUGH*

Confidential Information

**Freddie Mac**

We make home possible ™

Southeast/Southwest Office
2300 Windy Ridge Parkway, Suite 200
Atlanta, GA  30339
Phone: (770) 857-8800
Fax: (770) 857-8808

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information
of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against
unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer
Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

May 16, 2008

Tait O. Norton
WASHINGTON MUTUAL BANK
7301 Baymeadows Way
JAXB3182
Jacksonville, FL  32256

RE:   Seller/Servicer #:        112491
      Contract #:               0608186028
      Funding Date:             August 29, 2006
      Freddie Mac Loan #:       329220535
      Property Location:        MARIETTA, GA  30067-0000

Dear Mr. Norton:

The above referenced mortgage was selected by Freddie Mac for a postfunding quality control review and was
found to be not in compliance with the Purchase Documents.  Pursuant to Section 72.1 of the *Single-Family
Seller/Servicer Guide*, we are exercising our right to require repurchase.  An explanation of why the mortgage
does not meet Freddie Mac's requirements is attached.

**Repurchase of this mortgage, which is now in REO (or make whole) status, must be completed on or
before June 15, 2008.**

*Failure to remit the appropriate repurchase funds by this date will result in you being assessed marketing
expenses, fees and/or penalties.*

---

The necessary repurchase information/calculation may be obtained by:

- calling Real Estate Services at (972) 395-4000 or
- sending a written request by fax* to (972) 395-4467, Attn: RES Repurchase Dept.
- sending a written request by e-mail to "REO_Repurchase_Calculations@freddiemac.com"

* You should receive REO repurchase/make whole calculations within 3 business days of your request.

---

**Please note that Freddie Mac initiates and continues marketing all REO properties until repurchase
funds have been received and therefore may accept contracts and/or sell the property pending completion
of the repurchase.  All marketing efforts and contract negotiations are at the sole discretion of Freddie
Mac until repurchase funds have been received.**

Please contact me at (770) 857-8890 if you have any questions regarding our decision on the loan.  All matters
relating to the REO disposition process must be directed to the above referenced numbers.  Any appeal to this
repurchase request must be received in writing by the above repurchase due date in order to be considered.

Freddie Mac Confidential Information

Tait O. Norton
Page: 2
Date: May 16, 2008

Funding Date: August 29, 2006
Freddie Mac Loan #: 329220535

Thank you for your prompt attention to this matter.

Sincerely,

Laura Desin
Underwriter, Quality Control
(770) 857-8890

Attachment(s)

Freddie Mac Confidential Information

Tait O. Norton
Page: 3
Date: May 16, 2008

Funding Date: August 29, 2006
Freddie Mac Loan #: 329220535

LTV: 80%
Mortgage Purpose: Purchase (OO)
S/S Loan Number: 5303703721
Note Date: May 15, 2006

HOW DID WE REACH OUR CONCLUSIONS?
Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

THIS LOAN HAS BEEN UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S MASTER AGREEMENT #T06080249.

GENERAL ELIGIBILITY REQUIREMENTS
Freddie Mac has determined that the loan file did not meet the flood certification requirements per the Freddie Mac Seller/Servicer Guide, Section 46.20, which states that the flood zone determination must be documented as required in Section 58.3. Section 58.3 states that, a flood zone determination must be made for each property securing a Mortgage sold to Freddie Mac. The flood determination for the subject property was not included in the loan file and although Freddie Mac had requested this documentation, it was not received.

In addition, Freddie Mac has determined that the subject mortgage does not meet the terms of your negotiated waiver to deliver "Stated Income/Stated Assets" (SISA) Mortgages.  According to the terms of the Master Agreement #T06080249, Exhibit B, Page 16 of 18, which states that loans made to borrowers owning multiple non-owner occupied properties must meet the following requirements File must contain documentation evidencing the borrower's experience owning multiple investment properties  (two years' experience required); or Borrower has acquired or is in the process of acquiring a maximum of (including the subject property, if applicable.  Per the loan application and credit report, the Borrower had purchased two (2) investment properties in 4/2006 and 5/2006, in addition to the subject property on 5/2006.  Therefore, the Borrower had acquired three (3) properties (including the subject) within 6 months, which exceeds the maximum of two (2).

The subject mortgage was not eligible for sale to Freddie Mac.

NAME EL                                                                    GROUP

-- AQN1 -- ACQUISITION AND SALES ----------------------------------------

| ACQN DATE | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT |
|---|---|---|---|---|---|
| 080106 | 279920.00 | 1286611 | AMH0806S | ___ | Y |
| (MMDDYY) | | | | | (Y/N) |

ACQUISITION      OLD LN # INDEX
   TYPE            STOP DATE
    3              060137
1-ORIGINATED     (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500    RCRS CD: __    CUST CD: _____

| | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ | | |
| 2ND | _____ | _____ | | |

--------------------------* ADDITIONAL MESSAGES *------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**DIST-TYPE = 1 INTEREST-ONLY LOAN        LOSS MIT IND = 8 LOSS ANALYSIS COMP**
**FORECLOSURE REMOVAL**

Freddie Mac Confidential Information



North Central Regional Office
333 West Wacker Drive, Suite 2500
Chicago, IL 60606
Phone: (312) 407-7400
Fax: (312) 407-7397

We make home possible ™

HARD COPY TO FOLLOW E-MAIL

*This letter, any attached documents, and our related discussions and correspondence, contain Confidential Information of Freddie Mac (e.g., borrower information) that you have agreed to keep secure and confidential, and to protect against unauthorized access and/or use. Please refer to Sections 2.16 and 53.3 of the Freddie Mac Single-Family Seller/Servicer Guide, and any other confidentiality or non-disclosure agreements between our companies for additional details.*

August 5, 2008

Lucy Snyder
Vice President
WASHINGTON MUTUAL BANK
7255 Baymeadows Way
JAXA2090
Jacksonville, FL 32256

RE:     Seller/Servicer #:     112491
           Contract #:     0608186022
           Funding Date:     August 29, 2006
           Freddie Mac Loan #:     329220500
           Property Location:     CAPE CORAL, FL 33909-0000

Dear Ms. Snyder:

The attached mortgage(s) were selected by Freddie Mac for a post purchase quality control review. As a result of the recently completed quality control review(s), Freddie Mac has determined that the attached mortgage(s) must be repurchased. Pursuant to Section 72.1 of the <u>Single-Family Seller/Servicer Guide</u> (the Guide), mortgages that do not comply with Freddie Mac's requirements must be repurchased. An explanation of why the attached mortgage(s) do not meet Freddie Mac's requirements is attached.

Repurchase of the mortgage(s) must be completed on or before **September 4, 2008**. The repurchase procedures to be followed are determined by the status of the mortgage, and are stated in full in Section 78.20 of the Guide and summarized as follows:

*     Active Mortgages: Repurchases of active mortgages are to be reported through the repurchase Loan Level Transaction to Freddie Mac via automated means using MIDANET (R). The repurchase amount must be remitted to Freddie Mac via the telephonic cash remittance system by which you make your regular monthly remittances.

*     Inactive Mortgages: Repurchases of inactive mortgages must be reported as a payoff - mortgage repurchase. Proceeds must be remitted to Freddie Mac via the telephonic cash remittance system described above.

*     Real Estate Owned (REO): Repurchases of mortgages transferred to REO are accounted for and reported by remitting the proceeds to the applicable Freddie Mac office (Attention, REO Accounting Department) by check, accompanied by Form 105. The repurchase amount must be verified with the applicable REO Accounting Department.

NOTE:     If the status of the mortgage should change at any time prior to the actual repurchase, you should follow the procedures outlined above for the appropriate status at the time the repurchase funds are remitted.

Freddie Mac Confidential Information

Lucy Snyder
Page: 2
Date: August 5, 2008

Funding Date: August 29, 2006
Freddie Mac Loan #: 329220500

At Freddie Mac's discretion, the repurchase price may also include any premium paid for mortgages purchased under the Gold Cash method of pricing.

Should you have any questions regarding the repurchase procedure, please refer to Section 78.20 of the Guide, or call Freddie Mac's 1-800-FREDDIE Customer Service Line.  You will be asked for your Seller/Servicer number.

If you have facts that you believe demonstrate that any loan complies with Freddie Mac's requirements, you may submit them with an explanation of why these facts support your position and why these facts were not included with the original quality control file.  In accordance with the requirements of Section 72.6 of the Guide, the submission must be full and complete and contain a summary of the relevant facts and a statement of why the decision should be reversed.  Any appeal must be submitted to the undersigned on or before the repurchase deadline indicated above.

Thank you for your prompt attention to this matter.

Sincerely,


Philip Walker
Manager, Quality Control
(312) 407-7543

Attachment(s)

Lucy Snyder                                                                 Funding Date: August 29, 2006
Page: 3                                                                     Freddie Mac Loan #: 329220500
Date: August 5, 2008


LTV:  70%
Mortgage Purpose: Refinance (Investment)
S/S Loan Number:  5303703572
Note Date: May 10, 2006

Freddie Mac has determined the above referenced loan is not of acceptable quality due to the violations of the
Single-Family Seller/Servicer Guide sections and/or Master Agreement as noted below.

**THIS LOAN WAS UNDERWRITTEN TO THE TERMS AND PROVISIONS OF THE SELLER'S
MASTER COMMITMENT #T06080249 – STATED INCOME/STATED ASSET PROGRAM.**

**NOTE: Freddie Mac purchased a total of three loans for this Borrower. All loans are being reviewed
concurrently.**

**DOCUMENTATION**
The mortgage file submitted for quality control review lacked the following required documentation: (Guide
Section 46.1)

* Title Policy
* Copy of note for second mortgage

A request was previously made for the missing title policy; however, in response to the request, we received
only a copy of the title commitment.

-- AQN1 -- ACQUISITION AND SALES ----------------------------------------------

| ACQN DATE | ACQUISITION PRIN BAL | OLD LOAN NUMBER | ACQUISITION ID | OLD SVCR NUMBER | Y/E RPTG FROM ACQ DT |
|---|---|---|---|---|---|
| 080106 | 241337.96 | 1284025 | AMH0806S | ___ | Y |
| (MMDDYY) | | | | | (Y/N) |

ACQUISITION       OLD LN # INDEX
    TYPE              STOP DATE
      3                060137
1-ORIGINATED        (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____

|  | LOAN SERV SOLD ID | NEW SERV LOAN NUMBER | CONTRACT LOAN SERV SOLD DT MMDDYY | SERV TRANS DT MMDDYY |
|---|---|---|---|---|
| 1ST | _____ | _____ | | |
| 2ND | _____ | _____ | | |

--------------------------------------------------------------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**LOAN IS IN FORECLOSURE, F/C STOP = 3   426 DAYS PAST PROJECTED LEGAL DATE**

Ms. Rhonda Klansky
Credit Specialist III
Home Loans Division
Washington Mutual
7255 Baymeadows Way
Mailstop: JAXA1090
Jacksonville, FL 32256

**Date of Notification:** 06/30/2008

**Action Requested: Remove This Loan From Our REO Inventory**

**Note: Please remit the current amount due using Special Remittance Code 315 - Repurchase Proceeds. Refer to our Servicing Guide for specific instructions.**

**Loan Information:**

| | |
|---|---|
| **Fannie Mae Loan No:** | 1701805851 (See last page of letter for additional loan details.) |
| **Servicer Loan Number:** | 5303632789 |
| **Borrower(s):** | CHARLES BRITT |
| **Property Address:** | 8839 77TH ST |
| | WOODHAVEN, NY 11421-2309 |
| **Seller Name:** | WASHINGTON MUTUAL MORTGAGE SECURITIES CORP. |
| **Seller No:** | 205650008 |
| **Servicer Name:** | WASHINGTON MUTUAL BANK |
| **Servicer No:** | 126690002 |
| **Broker/Originator:** | OPTIMUM HOME FUNDING INC |
| **REO Status:** | Listed |

**Amount Requested:** Amount requested is subject to change daily.

## Findings:

**Ineligible mortgage/incomplete or inaccurate delivery data:**

The subject mortgage was delivered to Fannie Mae in an Alt A bulk transaction as a 1 unit property. Our review of the loan indicated that the property was actually 2 units. The subject mortgage failed to meet contract parameters and was ineligible for delivery to Fannie Mae.

The subject mortgage was delivered to Fannie Mae in an Alt A bulk transaction with a representative FICO Score of 804. Our review of the loan indicated that the actual representative FICO Score was 784. The subject mortgage failed to meet contract parameters and was ineligible for delivery to Fannie Mae.

The subject mortgage was delivered to Fannie Mae in an Alt A bulk transaction with all loans in the pool to be underwritten to Washington Mutual's ALT A guidelines. The loan was delivered as a No Income/No Ratio loan. Washington Mutual's Alt A guidelines state that if the borrower's payment shock is 200% or greater than the loan must be processed under Full/Alt doc guidelines. The borrower's payment shock for this loan was 311%. The subject mortgage failed to meet contract parameters and was ineligible for delivery to Fannie Mae.

The subject mortgage was delivered to Fannie Mae in an Alt A bulk transaction with all loans in the pool to be underwritten to Washington Mutual's ALT A guidelines. The loan was delivered as a No Income/No Ratio loan. The loan file contained a 1003 and 1008 with $1,200 per month rental income disclosed. Washington Mutual's Alt A guidelines state that if income is stated on the URLA (1003), the loan cannot be processed with the No Income/No Ratio feature. The subject mortgage failed to meet contract parameters and was ineligible for delivery to Fannie Mae.

**Fannie Mae Contacts:**

Underwriting Consultant:          Jean Green
                                  jean_green@fanniemae.com
                                  404-398-6406

Underwriting Director:            Maria Brewster
                                  maria_b_brewster@fanniemae.com
                                  972-773-7919

Responses with additional information may be submitted via QAS or by contacting your Underwriting Consultant, if they are submitted no later than 07/30/2008.

**Additional Loan Information**

**Fannie Mae Loan Number:** 1701805851

**Servicer Loan Number:**

| | |
|---|---|
| **Borrower(s):** | CHARLES BRITT |
| **Property Address:** | 8839 77TH ST |
| | WOODHAVEN, NY 11421-2309 |
| **Review Type:** | Post Foreclosure Review |
| **LTV:** | 68.00% |
| **CLTV:** | 100.00% |
| **HCLTV:** | N/A |
| **Product:** | ALT-A No Ratio |
| **Occupancy:** | Principal |
| **Loan Purpose:** | Purchase |
| **Property Type:** | Detached |
| **AUS:** | DU |
| **Recommendation:** | Refer with Caution 4 |
| **Contract Number:** | LV0164 |
| **Closing Date:** | 04/07/2006 |
| **LPI Date:** | 05/01/2007 |
| **Special Feature Code(s):** | ALT-A No Ratio; No Flood Insurance - Not a Special Flood Hazard Area Property; 10- Year Interest Only Period - IO |
| **Origination Appraiser:** | SAILENDRA PERSAUD |

```
-- AQN1 -- ACQUISITION AND SALES ------------------------------------------------
   ACQN        ACQUISITION       OLD LOAN       ACQUISITION    OLD SVCR      Y/E RPTG
 · DATE         PRIN BAL         NUMBER             ID          NUMBER      FROM ACQ DT
  070106       417000.00        1232952         AMH0706S        ____           Y
 (MMDDYY)                                                                    (Y/N)


ACQUISITION     OLD LN # INDEX
    TYPE          STOP DATE
     3             050137
1-ORIGINATED      (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500    RCRS CD: __    CUST CD: _____


           LOAN SERV          NEW SERV                CONTRACT LOAN          SERV
           SOLD ID          LOAN NUMBER               SERV SOLD DT        TRANS DT
  1ST      _____       _____           MMDDYY            MMDDYY
  2ND      _____       _____


--------------------------* ADDITIONAL MESSAGES *--------------------------
```

**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**DIST-TYPE = 1 INTEREST-ONLY LOAN**
**LOAN IS IN FORECLOSURE, F/C STOP = 7   FULL SETTLEMENT       03/21/08**

Kotevski



200 South College Street
Charlotte, NC 28255
NC1-014-12-20

February 23, 2006

Attn: Becky Weaver
Conduit Repurchase Manager
Washington Mutual Mortgage Services Corp.
2210 Enterprise Dr.
Florence, SC 29501

RE:   Loan Number:      601382574
      Address:          38600 N ARBOR CT
                        WADSWORTH IL 60083

Dear Ms. Weaver,

Bank of America purchased the above referenced mortgage from Washington
Mutual Bank on April 30, 2004. During a post purchase credit and compliance
review of the mortgage loan file, we determined that there is a deficiency that
requires this loan to be repurchased. Please see below for our findings:

Borrower's employment:
The initial 1003 Residential Loan Application indicates that both borrowers were
employed by "Tires Plus" for six months.  Note the address was left blank.  The
final 1003 Residential Loan application signed at closing was left blank under
Employment Information.   The verbal VOE's, completed by Andrea Burke
indicate both of the borrowers are "Salesman".  The person that verified the
information was Evy Rivera, Regional Mgr for Demi's Tire, Inc. (Division of Tires
Plus).  In checking public records, it appears the borrowers were self employed
with Demi's Tire Inc. as the co-borrower; Verica Kotevski is the registered agent.
The secure.accurint.com web site shows the president as Branko Kotevski, our
borrower.  The Corporation file detail report indicates the incorporation date was
11/13/2002 and the involuntary dissolution was 4/01/2004.  Note the loan date
was 12/16/2003.  BOA did call the telephone number on the verbal VOE's and
did reach Evy Rivera (the person that verified their employments on 12/17/2003).
When she was questioned about the name of the company, she said she used to
work for Dem's Tire but referred us to speak with the company and would not
continue the conversation. BOA did confirm that the telephone number was a cell

Repurchase Notice V1.doc

**Bank of America**

200 South College Street
Charlotte, NC 28255
NC1-014-12-20

number.  All of the above indicate that the borrowers' have misrepresented their employment by not disclosing self employment.

APR/Finance charges on final Truth-in-Lending:
Using the HUD 1 from the subject closing, the finance charges are $3,829.06. The origination lender used $3,664.06 which is a difference of $165.00 and exceeds the $100 threshold.  The final APR is 5.8200.  The borrowers need to be refunded the $165.00 since the fees were under disclosed.  Please furnish BOA a copy of the cover letter, check payable to the borrowers and a FED X tracking receipt or other acceptable company that also uses a tracking receipt.   This should cure the deficiency.

Missing documentation:
From the credit report in the file, it appears we are missing pages 7-10.  Please furnish the complete credit report for subject loan.

Bank of America requests repurchase due to the misrepresentation of the employment as sited above and is a breach of the reps and warrants located in section 4.1 paragraph (o) & (jj).

Should you have any questions or believe that an appeal to Bank of America's decision is warranted, please forward your written response along with any supporting documentation to Lsbo_repurchase@bankofamerica.com.

Sincerely,

Shanthi Anupindi
Bank of America – LSBO Master Servicing
Phone: (704) 387-2423
Fax: (704) 388-6544
Shanthi.anupindi@bankofamerica.com

Case 1:18-cv-03038-SC13 Document 99 Filed 09/24/19 Page 36 of 113

```
-- AQN1 -- ACQUISITION AND SALES ---------------------------------------------
  ACQN        ACQUISITION         OLD LOAN      ACQUISITION    OLD SVCR    Y/E RPTG
  DATE         PRIN BAL            NUMBER           ID          NUMBER    FROM ACQ DT
 040104       493963.90           461015         AMH0404        ___          Y
(MMDDYY)                                                                    (Y/N)


ACQUISITION    OLD LN # INDEX
   TYPE         STOP DATE
    3
1-ORIGINATED    (MMDDYY)
2-PURCHASED
3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____


          LOAN SERV        NEW SERV           CONTRACT LOAN        SERV
           SOLD ID       LOAN NUMBER          SERV SOLD DT      TRANS DT
 1ST                                             MMDDYY          MMDDYY
 2ND      _____    _____
          _____    _____
```

------------------------------------------------------------------------------
**LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY**
**ACTIVE LOSS MITIGATION          LOSS MIT IND = 3 WORKOUT APPROVED**
**FULL SETTLEMENT        03/12/08   669 DAYS PAST PROJECTED LEGAL DATE**

**▲Triad Guaranty**
*Insurance*

September 26, 2008


Ms. Dawn Lehrmann
Washington Mutual Home Loans, Inc
Attn; Jax Recourse & Recovery
M/S: Jaxa2090
7255 Baymeadows Way
Jacksonville, FL 32256

SEP 2 9 2008

| Re: | Commitment/Certificate #: | 06-04184 |
|---|---|---|
| | Loan #: | 5303600737 |
| | Borrower: | Toler |
| | Property: | 927 Paxton Avenue |
| | | Cleveland, OH  44103 |


Dear Ms. Lehrmann:

It has come to our attention that the information submitted to Triad Guaranty, and upon which Triad Guaranty relied when agreeing to issue or accept delegation of this commitment/certificate, included documentation and/or representations of the subject transaction, which were materially false, incorrect or incomplete.  Triad Guaranty relies on the information submitted to determine whether to issue or accept delegation of coverage.  Had this information been known at commitment issuance, Triad Guaranty would not have agreed to issue or accept delegation of this commitment/certificate based on the facts, as they actually existed or would not have agreed to issue or accept delegation of this commitment/certificate at the current rates based on the facts, as they actually existed.

Under Section III. D and VI. C-D. of the master policy, the origination lender assumes responsibility for any material misrepresentation on the part of the borrower or any person supplying information on his or her  behalf. In addition, the originating lender agrees that loans which do not meet the delegated criteria are ineligible for coverage.  The originating lender agrees that Triad Guaranty may deny liability or rescind coverage on the certificate when it is subsequently determined that the information provided in the application process were false, incorrect, or incomplete in any respect that was material to the decision to insure or to issue at the current rates, or when it is determined that the loan does not meet the delegated criteria.

Upon review of the documentation supporting the certificate issued with respect to this loan, we obtained the information detailed for you in Addendum A to this letter.  Had Triad been aware of the information listed in Addendum A, we would not have insured this transaction, would not have insured it at the current rates, or would not have permitted its delegation. Consequently, we feel that we have no choice but to rescind this certificate and to refund all premiums that have been paid in connection with it. Attached is our check representing a full refund of all premiums paid under this certificate of insurance. We regret finding ourselves forced to take this action, but we feel that we have no other alternative under the circumstances.

Triad Guaranty Insurance Corporation
P.O. Box 2300 • Winston-Salem, NC 27102
101 South Stratford Road • Winston-Salem, NC 27104
336-723-1282 • 800-451-4872 • 336-917-5942 (Fax) • E-mail: lhardy@tgic.com

ALDL0004(P)

**▲Triad Guaranty**
*Insurance*

There may be other breaches of delegated authority or material misrepresentations contained in the application and we reserve all rights in this matter. The information provided in this letter is believed to be accurate, complete and not in dispute.

If you feel that we have made this determination based on erroneous information or if you have additional information that may affect our decision specifically stated in this letter, please forward your appeal in writing to my attention within 60 days of the date of this letter at the letterhead address. Be sure to include the specifics of your grounds for appeal and any documentation that you have which may dispute our findings to ensure that it receives our prompt consideration. Acceptance of the premium refund associated with this letter does not negate your right to file and appeal to this rescission. If the appeal is approved and the rescission is overturned you need only to refund the premiums returned to you with this rescission.

Sincerely,

Tracy Gray
Quality Assurance

Enclosure

Triad Guaranty Insurance Corporation
P.O. Box 2300 • Winston-Salem, NC 27102
101 South Stratford Road • Winston-Salem, NC 27104
336-723-1282 • 800-451-4872 • 336-917-5942 (Fax) • E-mail: lhardy@tgic.com

AUDL0006(P)

 **Triad Guaranty**
*Insurance*

## ADDENDUM A

Re:   Commitment/Certificate # 06-04184

The loan was submitted to Triad Guaranty by American Home Mortgage through delegated submission under Master Policy 38-0226-0004 to be insured as a rate/term refinance of an investment property.  The file was submitted to Triad as a verified income and assets loan program.  The loan was approved as a verified income and assets loan program.  During the process of Triad's Quality Assurance review, it was determined that the loan was approved outside of the approved delegated program guidelines.  Consequently, the loan does not comply with American Home Mortgage's approved delegated guidelines and is ineligible for coverage.

The Uniform Residential Loan Application dated March 3, 2006 (Exhibit A) indicates the borrower is employed with Republic Services of Ohio Hauling as a Truck Driver.  The application reflects that the borrower has been employed with this company for four years and earns $2,704.00 per month.

The Choice Series General Underwriting Guidelines (Exhibit B) state, "...For purposes of verifying income and employment for salaried borrowers obtain the borrower's pay stub covering the most recent thirty day period and reflecting year-to-date earnings, two years most recent W-2s, or two years most recent 1040s, a verbal verification of employment prepared five days prior to the closing."

The loan file contains a copy of the borrower's pay statements dated January 1, 2006 through January 7, 2006 and January 8, 2006 through January 14, 2006 (Exhibit C).  The loan file also contains a copy of the borrower's 2003 and 2004 W-2 and Earnings Summary (Exhibit D).

The loan file provided to Triad for review does not contain the borrower's 2005 W-2 and Earnings Summary and a pay statement that reflects the most recent 30 day period, nor is there any indication in the loan file provided to Triad that the documentation was requested at the time of loan approval.

Based on the investigative findings referenced above, Triad has determined that material misrepresentation exists in the loan file to include program.  The loan does not comply with approved delegated guidelines and therefore, is ineligible for coverage.

Triad Guaranty Insurance Corporation
P.O. Box 2300 • Winston-Salem, NC 27102
101 South Stratford Road • Winston-Salem, NC 27104
336-723-1282 • 800-451-4872 • 336-917-5942 (Fax) • E-mail: lhardy@tgic.com

A1 DL0006(P)

Case 3:10-cv-03039-SC   Document 99   Filed 09/24/10   Page 40 of 113

```
 -- AQN1 -- ACQUISITION AND SALES -----------------------------------------
   ACQN        ACQUISITION      OLD LOAN      ACQUISITION   OLD SVCR    Y/E RPTG
 → DATE         PRIN BAL        NUMBER            ID         NUMBER    FROM ACQ DT
   060106       88200.00       1001157430      AMH0606S       ___          Y
   (MMDDYY)                                                              (Y/N)


 ACQUISITION     OLD LN # INDEX
    TYPE          STOP DATE
     3            030137
 1-ORIGINATED    (MMDDYY)
 2-PURCHASED
 3-SERV TRANSFER  SPEC CD: 500   RCRS CD: __   CUST CD: _____


            LOAN SERV        NEW SERV              CONTRACT LOAN        SERV
             SOLD ID       LOAN NUMBER             SERV SOLD DT       TRANS DT
 1ST                                                  MMDDYY           MMDDYY
 2ND        _____    _____
            _____    _____

 --------------------------------------------------------------------------
 LIFE-OF-LOAN: POTENTIAL RECOURSE TO PRIOR 3RD PARTY
 DIST-TYPE = 1 INTEREST-ONLY LOAN
 LOAN IS IN FORECLOSURE, F/C STOP = 5   518 DAYS PAST PROJECTED LEGAL DATE
```



# CONNOLLY BOVE LODGE & HUTZ LLP
### ATTORNEYS AT LAW

Christina M. Thompson
**TEL** (302) 884-6592
**FAX** (302) 658 0380
**EMAIL** cthompson@cblh.com

**WILMINGTON, DE**

The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
TEL: (302) 658 9141
FAX: (302) 658 5614
WEB: www.cblh.com

November 24, 2008

**BY FEDERAL EXPRESS**
EPIQ Bankruptcy Solutions, LLC
Attn: American Home Mortgage Claims Processing
757 Third Avenue, 3rd Floor
New York, NY  10017

Re:     **American Home Mortgage Holdings, Inc., et al.**
          **Case No. 07-11047 (CSS) (Jointly Administered)**

Dear Sir or Madam:

Enclosed please find an original plus one copy of Washington Mutual Mortgage Securities Corp.'s amended proof of claim against each of debtor entities in the above referenced matter, case nos. 07-11047 (CSS) through 07-11054 (CSS). Please file each of the enclosed original claims in each of the designated bankruptcy cases, and then return the extra time-stamped copy of each the claim to my attention in the self-addressed stamped envelope enclosed herewith.

Should you have any questions regarding the foregoing, please do not hesitate to contact me.  Thank you for your attention to this matter.

Very truly yours,

Christina M. Thompson

CMT/dap
Enclosures
#649123

ORIGIN ID: ZWIA (302) 888-6424
MAILROOM
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. ORANGE STREET
8TH FLOOR
WILMINGTON, DE 19801
UNITED STATES US

Ship Date: 24NOV08
ActWgt: 13.0 LB MAN
System#: 0032216/CAFE2350
Account: S 019125408

TO EPIQ BANKRUPTCY SOLUTIONS LLC
ATTN: AMERICAN HOME MORTGAGE CLAIMS.
757 THIRD AVENUE
3RD FLOOR
NEW YORK, NY 10017

FedEx
Express

E

Ref: 15082*2



Delivery Address
Barcode

BILL SENDER

PRIORITY OVERNIGHT
TRK# 9352 1874 4767    Form
0231

TUE
Deliver By
25NOV08
EWR    A1

10017  -NY-US    ZB OGSA

Part # 156148-434 NW7 10/06



CONNOLLY BOVE LODGE & HUTZ LLP
ATTORNEYS AT LAW

THE NEMOURS BUILDING
1007 NORTH ORANGE STREET
P.O. BOX 2207
WILMINGTON, DELAWARE 19899

File #: 15082-2

EPIQ Bankruptcy Solutions, LLC
Attn: American Home Mortgage Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

RECEIVED
NOV 25 2008
BY:

FORM B10 (Official Form 10)(04/07)

| UNITED STATES BANKRUPTCY COURT  FOR THE  DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor: AMERICAN HOME MORTGAGE CORP. | Case Number 07-11051 |
|---|---|

NOTE:  This form should not be used to make a claim for an administrative expense arising after the commencement of the case.  A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>J.P. MORGAN ACCEPTANCE CORPORATION I, ET AL<br>(AS SET FORTH IN THE ATTACHED SCHEDULE) | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and Address where notices should be sent:<br>JPMorgan Chase Legal and Compliance Department<br>1 Chase Manhattan Plaza, 26th Floor<br>New York, NY 10081<br>Attention: Alyssa Kelman<br>Telephone Number: (212)-552-0917 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☐ Check box if the address differs from the address on the envelope sent to you by the court.   THIS SPACE IS FOR COURT USE ONLY |

| Last four digits of account or other number by which creditor identifies debtor: N/A | Check here if this claim:  ☐ replaces<br>☒ amends  a previously filed claim, dated:  4/25/08 |
|---|---|

| 1.  **Basis for Claim**<br>☐ Goods sold<br>☐ Services performed<br>☐ Money Loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other  **SEE ATTACHED SCHEDULE** | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of your SS#: _____<br>Unpaid compensation for services performed<br>from _____ to _____<br> (date)  (date) |
|---|---|

| 2.  **Date debt was incurred: SEE ATTACHED SCHEDULE** | 3.   **If court judgment, date obtained:** |
|---|---|

4.    **Classification of Claim.**  Check the appropriate box or boxes that best describe your claim and state the amount of the claim at the time case filed. See reverse side for important explanations.

| **Unsecured Nonpriority Claim** $SEE ATTACHED SCHEDULE<br>☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or c) none or only part of your claim is entitled to priority. | **Secured Claim.**<br>☐ Check this box if your claim is secured by collateral (including a right of setoff).<br><br>Brief Description of Collateral:<br>☐ Real Estate  ☐ Motor Vehicle  ☐ Other _____<br>Value of Collateral:  $_____ |
|---|---|
| **Unsecured Priority Claim**<br>☐ Check this box if you have an unsecured claim, all or part of which is entitled to priority.<br>Amount entitled to priority  $_____<br>Specify the priority of the claim: | Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____ |
| ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B)<br><br>☐ Wages, salaries, or commissions (up to $10,950*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).<br><br>☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5). | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).<br><br>☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| 5.  **Total Amount of Claim at Time Case Filed:** | $ SEE ATTACHED SCHEDULE | | | SEE ATTACHED SCHEDULE |
|---|---|---|---|---|
| | (unsecured) | (secured) | (priority) | (Total) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

6.  **Credits:** The amount of all pay[ments on this claim has been credited and deducted] for the purpose of making this proof of claim.

7.  **Supporting Documents:** *Atta[ch copies of supporting documents, such as promisso]ry notes, purchase orders, invoices, itemized sta[tements of running accounts, contracts, judgm]ents, mortgages, security agreements, and evi[dence of perfection of lien.] SEE ADDITIO[NAL DOCUMENT]S. If the documents are not availa[ble, explain. If the documents are voluminous, attac]h a summary.*

8.  **Date Stamped Copy:**  To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)      0000010699

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED

APR 1 0 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date<br><br>April 9, 2009 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>Alyssa Kelman, JPMorgan Chase Legal and Compliance Department<br>Executive Director and Assistant General Counsel, Authorized Signatory |
|---|---|

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------  x
In re:                                                         )   Chapter 11
                                                               )
AMERICAN HOME MORTGAGE CORP.,                                  )   Case No. 07-11051
                                                               )
                                                               )
                                                               )
                            Debtor.                            )
------------------------------------------------------------  x
```

**SCHEDULE TO AMENDED PROOF OF CLAIM FOR VARIOUS CLAIMS HELD BY**
**J.P. MORGAN ACCEPTANCE CORPORATION I AND RELATED ENTITIES**

**A.      BASIS OF CLAIM**

1.      J.P. Morgan Acceptance Corporation I ("JPMAC I") hereby files this Amended

Proof of Claim (the "Amended Claim") on behalf of itself, its officers and directors (including

the directors and officers named in the Additional Complaint (defined below)) and certain of its

affiliates (including, but not limited to, J.P. Morgan Securities, Inc.) and subsidiaries and all

other related entities (each a "Claimant," and collectively with JPMAC I, the "Claimants")[1] who

may be beneficiaries of, or who may have related rights, remedies or claims in connection with,

certain contractual, statutory or common law rights of indemnity, contribution, and/or

reimbursement for amounts that have been or may be incurred, liquidated, unliquidated, paid,

unpaid, fixed or otherwise contingent and arising from or related to certain existing, potential or

threatened litigation or other proceedings, described more fully below, that relate to the sale,

assignment, assumption or securitization of various mortgage loans originated by American

Home Mortgage Corporation ("AHMC" or the "Debtor") and the issuance of any related

---

[1] In light of the recent filing of the Additional Complaint (defined below), by this Amended Claim, the Claimants supplement the Original Claim (defined below) to, among other things, expressly identify as Claimants those Claimants who were already included generally as Claimants in the Original Claim (but were not specifically identified by name as Claimants in the Original Claim) and which have now been specifically named in the Additional Complaint, including JPMorgan Chase & Co., J.P. Morgan Mortgage Acquisition Corp. and the individual directors and officers named in the Additional Complaint.

Certificates in connection with, or relating to, any information provided by AHMC, including, but not limited to, information contained in any registration statements or prospectus supplements (collectively, the "AHMC Transactions"). Without limiting the foregoing, the AHMC Transactions include the sale, assignment, assumption or securitization of certain mortgage loans originated by AHMC and the issuance of the related Mortgage Pass-Through Certificates Series 2007-A2, Mortgage Pass-Through Certificates Series 2007-S1, Mortgage Pass-Through Certificates Series 2007-S2 and Mortgage Pass-Through Certificates Series 2007-S3 (the "2007 Certificates").

2.      This Amended Claim arises out of certain of the same transactions and related circumstances that were the subject of the original proof of claim that the Claimants filed on or about April 25, 2008, against the Debtor in the above captioned case (the "Original Claim"). This Amended Claim therefore supplements, and relates back to the date of filing of, the Original Claim.

3.      As noted in the Original Claim, AHMC and JPMAC I entered into various indemnity and contribution agreements relating to the AHMC Transactions, including, but not limited to, three indemnity and contribution agreements (collectively, the "Indemnity and Contribution Agreements"), which Indemnity and Contribution Agreements have been implicated by the allegations in the Additional Complaint. Copies of the Indemnity and Contribution Agreements are annexed hereto as Exhibits A, B and C, respectively.

4.      Pursuant to the Indemnity and Contribution Agreements, the Debtor agreed to indemnify and hold harmless each of the Claimants against, and to contribute to any amount paid or payable by any of the Claimants as a result of, any and all losses, claims, damages or liabilities, joint or several, including, but not limited to, any legal or other expenses incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action, to which any of them may become

2

subject under the Securities Act of 1933, the Securities Exchange Act of 1934 or other federal or

state statutory law or regulation, at common law or otherwise, relating to any information

furnished by the Debtor relating to certain of the 2007 Certificates.  The Claimants hereby file

this Amended Claim to, among other things, clarify that the Claimants' contractual rights of

indemnity and contribution pursuant to the Indemnity and Contribution Agreements which have

been recently implicated in the Additional Complaint are included in the Original Claim.

5.     On or about March 12, 2009, nearly one year after the Claimants had filed

their Original Claim, the Claimants were named in an additional complaint (the "Additional

Complaint") filed in the Supreme Court of the State of New York, County of New York,

Commercial Division, entitled Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase &

Co., et al., Index No. 600767/2009 (the "New York County Action"), alleging, among other

things, misrepresentation and omissions under sections 11, 12(a)(2), and 15 of the Securities Act

of 1933, 15 U.S.C. §§ 77k, 77l, and 77o, in connection with the AHMC Transactions.  A copy of

the Additional Complaint is annexed hereto as Exhibit D.  In the Additional Complaint, the

putative plaintiff class therein alleged that they have sustained damages in an amount to be

determined at trial, but averred that the various offerings that are the subject of the Additional

Complaint were worth "hundreds of millions of dollars."  See Additional Complaint at ¶ 3.

6.     Promptly after the Claimants received notice of the New York County

Action, the Claimants have hereby filed this Amended Claim for the purpose of, among other

things, including in the Original Claim the various contractual, statutory, common law and/or

other claims of indemnity, contribution and reimbursement against the Debtor for damages and

costs that have already been incurred and will likely continue to be incurred (including, but not

limited to, the legal costs and/or other expenses incurred in connection with investigating and

preparing to defend the Additional Complaint) as a result of the filing of the New York County

Action.  In addition, the Claimants' claims include direct claims they may have against the

Debtor under applicable state and federal laws on account of or relating to the facts and circumstances of the Additional Complaint and/or the AHMC Transactions.

      7.     To the extent the Debtor seeks to assume the Indemnity and Contribution Agreements in its Chapter 11 case, the claims asserted in this Amended Claim would be deemed administrative expenses claims entitled to payment in full as a first priority under section 507(a)(1) of title 11 of the United States Code.  To the extent, on the other hand, the Debtor seeks to reject the Indemnity and Contribution Agreements, pursuant to the Amended Chapter 11 Plan of Liquidation of the Debtors dated as of February 18, 2009 and confirmed on February 23, 2009 (Docket Nos. 7029 and 7042), it appears that the Claimants may file "Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under this Plan … within thirty (30) days after the Effective Date".  Upon information and belief, as of the filing of this Amended Claim, the Effective Date has yet to occur.

      8.     To date, the Claimants have not received any notice from the Debtor (or otherwise) indicating whether, or when, it may assume or reject the Indemnity and Contribution Agreements and/or the various other indemnity and contribution agreements related to the AHMC Transactions.  However, to the extent the Debtor may ultimately reject the Indemnity and Contribution Agreements and/or the various other indemnity and contribution agreements related to the AHMC Transactions as part of its Chapter 11 case, the Claimants file this Amended Claim in order to, among other things, preserve their rejection damages claim.

      9.     As attested by the absence of a specific damages amount or range in the underlying Additional Complaint, the amount of the Claimants' claims cannot be reasonably calculated or estimated at this time, but the Claimants do not waive their right to seek payment from the Debtor by not currently stating a specific amount.

**B.**    **<u>RESERVATION OF RIGHTS</u>**

10.     The Claimants hereby reserve all of the terms and conditions of the Original Claim, which are hereby incorporated by reference. The filing of this Amended Claim will not, and shall not be deemed to, prejudice any of the rights, remedies and privileges of the Claimants under the Original Claim.

11.     This Amended Claim hereby also incorporates by reference the reservation of rights provided in the Original Claim. In addition, the Claimants hereby reserve the right to modify, amend and/or supplement this Amended Claim and/or the Original Claim, at any time, in any manner, including to add additional claimants, and/or file additional proofs of claim for any additional claim which may be based on the same or additional set of facts, transactions, documents or grounds of liability, including, but not limited to, amending this Amended Claim and/or the Original Claim for the amount of legal fees, costs and other losses which (i) will likely continue to be incurred as a result of the New York County Action, or (ii) may be incurred as a result of any other civil action that may be commenced in the future against any of the Claimants arising out of or related to the AHMC Transactions and which are expressly provided for under the Indemnification and Contribution Agreements and/or the various other indemnity and contribution agreements related to the AHMC Transactions.

12.     This Amended Claim is, and shall be deemed to be, without prejudice to any claims, causes of action, rights, interests, or remedies that the Claimants have or may have against the Debtor or any other party, and nothing contained in this Amended Claim shall be construed as waiving, limiting or impairing in any way any of the Claimants' claims, causes of actions, rights, interests or remedies under the Indemnity and Contribution Agreements, the various other indemnity and contribution agreements related to the AHMC Transactions or under applicable law.

**C.     NAME AND ADDRESS OF WHERE NOTICES SHOULD BE SENT**

13.     All communications in connection with the Claims should be sent to:

JPMorgan Chase Legal and Compliance Department
1 Chase Manhattan Plaza
26th Floor
New York, NY 10081
Phone: (212) 552-0917
Fax: (212) 552-1295
Attention:     Alyssa Kelman
                    Executive Director and Assistant General Counsel

with copies to:

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300
Fax: (212) 839-5599
Attention:     Robert Pietrzak
                    Dorothy J. Spenner
                    Alex R. Rovira
                    Jeffery C. Steen

NY1 6925462

# Exhibit A

**J.P. Morgan Acceptance Corporation I**
**Mortgage Pass-Through Certificates, Series 2007-A2**

WHEREAS, pursuant to the Mortgage Loan Sale Agreement, dated as of April 1, 2006 (the "Purchase Agreement"), among J.P. Morgan Acquisition Corp., as purchaser (the "Purchaser") and American Home Mortgage Corp. ("American Home"), as seller; the Purchaser has purchased from American Home certain mortgage loans originated by American Home and has assigned to its Affiliate, J.P. Morgan Acceptance Corporation I (the "Depositor"), pursuant to an Assignment, Assumption and Recognition Agreement, dated as of May 1, 2007 (the "Assignment"), among the Purchaser, American Home, the Depositor, the Master Servicer and Trustee identified below, certain Mortgage Loans that are specified in such Assignment (the "Specified Mortgage Loans");

WHEREAS, capitalized terms used but not defined in this Indemnification Agreement have the meanings ascribed pursuant to the Purchase Agreement; and

WHEREAS, the Depositor will cause the Securitization of the Specified Mortgage Loans pursuant to a Pooling and Servicing Agreement, dated as of May 1, 2007, between the Depositor, Wells Fargo Bank, N.A., as master servicer and securities administrator (the "Master Servicer") and U.S. Bank National Association, as trustee (the "Trustee"), and the issuance of Mortgage Pass-Through Certificates, Series 2007-A2 (the "Certificates") thereunder, and pursuant to an Underwriting Agreement, dated as of May 31, 2007, and Purchase Agreement, dated as of May 31, 2007, each between the Depositor and J.P. Morgan Securities Inc. ("JPMSI"), and the sale of the Certificates thereunder to JPMSI, as underwriter and initial purchaser, respectively;

NOW THEREFORE, in consideration of the agreements contained herein, and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, American Home and the Depositor agree as follows:

1.  Indemnification and Contribution.

(a)    American Home agrees to indemnify and hold harmless the Depositor, its officers and directors and each person, if any, who controls the Depositor within the meaning of either Section 15 of the Securities Act of 1933, as amended (the "1933 Act") or Section 20 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), against any and all losses, claims, damages or liabilities, joint or several, to which the Depositor or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the American Home Information (as defined below) or any omission or alleged omission to state in the American Home Information a material fact required by 17 C.F.R. §229.1110(b) with respect to American Home, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and agrees to reimburse the Depositor and each such officer, director and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage,

liability or action as such expenses are incurred.  The foregoing indemnity agreement is in addition
to any liability which American Home may otherwise have.

> As used herein "<u>American Home Information</u>" means (x) the information and data
> concerning the Specified Mortgage Loans set forth on any computer tape (or other
> electronic or printed medium) furnished by American Home to the Purchaser or the
> Depositor and (y) the information set forth in the Prospectus Supplement, dated May 29,
> 2007, under the caption "The Originator—American Home Mortgage Corp."

The Depositor agrees to indemnify and hold harmless American Home, its officers and
directors and each person, if any, who controls American Home within the meaning of either
Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all losses, claims,
damages or liabilities, joint or several, to which American Home or any of them may become
subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at
common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in
respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged
untrue statement of a material fact contained in the Prospectus Supplement, dated as of May 29,
2007, provided by the Depositor (the "Depositor Information") or any omission or alleged
omission to state in the Depositor Information a material fact required to be stated therein or
necessary to make the statements therein, in light of the circumstances in which they were made,
not misleading, and agrees to reimburse American Home and each such officer, director and
controlling person promptly upon demand for any legal or other expenses reasonably incurred by
any of them in connection with investigating or defending or preparing to defend against any such
loss, claim, damage, liability or action as such expenses are incurred.  The foregoing indemnity
agreement is in addition to any liability which the Depositor may otherwise have.

(b)     Promptly after receipt by the indemnified party under this Section 1 of notice of any
claim or the commencement of any action, such indemnified party shall, if a claim in respect
thereof is to be made against the indemnifying party under this Section 1, notify the indemnifying
party in writing of the claim or the commencement of that action; <u>provided</u>, <u>however</u>, that the
failure to notify the indemnifying party shall not relieve it from any liability which it may have
under this Section 1 except to the extent it has been materially prejudiced by such failure; and
<u>provided further</u>, <u>however</u>, that the failure to notify the indemnifying party shall not relieve it from
any liability which it may have to any indemnified party otherwise than under this Section 1.

If any such claim or action shall be brought against an indemnified party, and it shall notify
the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and,
to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume
the defense thereof with counsel reasonably satisfactory to the indemnified party.  After notice
from the indemnifying party to the indemnified party of its election to assume the defense of such
claim or action, except as provided in the following paragraph, the indemnifying party shall not be
liable to the indemnified party under this Section 1 for any legal or other expenses subsequently
incurred by the indemnified party in connection with the defense thereof other than reasonable
costs of investigation.

The indemnified party shall have the right to employ separate counsel in any such action
and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the

2

expense of such indemnified party unless: (i) the employment thereof has been specifically authorized by the indemnifying party in writing; (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party, and the representation of both by the same counsel would be inappropriate due to the actual or potential differing interests between them; or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party within a reasonable period of time, in which case, if such indemnified party notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party, it being understood, however, the indemnifying party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to local counsel) at any time for all such indemnified parties.

The indemnifying party shall not be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(c)     If the indemnification provided for in this Section 1 is unavailable to the indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, respectively, in connection with the statements or omissions that result in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.

The parties agree that it would not be just and equitable if contribution pursuant to this Section 1(c) were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in this Section 1(c) above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 1(c) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim, except where the indemnified party is required to bear such expenses pursuant to this Section 1, which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentations (within the meaning of Section 11(f) of the 1933 Act), shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

152867v.2

(d)     The indemnity and contribution agreements contained in this Section 1 and the representations and warranties set forth in Section 2 shall remain operative and in full force and effect regardless of (i) any termination of the Purchase Agreement, (ii) any investigation made by any of the Depositor or American Home as Seller, their directors or officers or any person controlling any of them, by or on behalf of any them, and (iii) acceptance of and payment for any of the Certificates.

2.     Representations and Warranties.  American Home represents that:

(i)     it is validly existing and in good standing under the laws of its jurisdiction of formation or incorporation, as applicable, and has full power and authority to own its assets and to transact the business in which it is currently engaged;

(ii)     it is not required to obtain the consent of any other Person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Indemnification Agreement;

(iii)     the execution, delivery and performance of this Indemnification Agreement by it will not violate any provision of any existing law or regulation or any order decree of any court applicable to it or any provision of the charter or bylaws of such party, or constitute a breach, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home or on any mortgage, indenture, contract or other agreement to which such party is a party or by which it may be bound;

(iv)     no proceeding of or before any court, tribunal or governmental body is currently pending or, to the knowledge of each party, threatened against such party or any of its properties or with respect to this Indemnification Agreement or the Specified Mortgage Loans, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home;

(v)     such party has full power and authority to make, execute, deliver and perform this Indemnification Agreement and all of the transactions contemplated hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Indemnification Agreement.  When executed and delivered, this Indemnification Agreement will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, and by limitations of public policy under applicable securities law as to rights of indemnity and contribution thereunder; and

(vi)     this Indemnification Agreement has been duly executed and delivered by such party.

3.     Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Depositor will be mailed, delivered or telegraphed and confirmed to such party at 270 Park Avenue New York, New York 10017 Attention: General Counsel's

4

Office or, if sent to American Home will be mailed, delivered or telegraphed and confirmed to such party at 538 Broadhollow Road, Melville, NY 11747, Attn: Alan B. Horn, General Counsel.

    4.    Miscellaneous.  This Indemnification Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  This Indemnification Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns and the controlling persons referred to herein, and no other person shall have any right or obligation hereunder.  Neither this Indemnification Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.  This Indemnification Agreement may be executed in counterparts, each of which when so executed and delivered shall be considered an original, and all such counterparts shall constitute one and the same instrument.

[Signature Page Follows]

152867v.2

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this 31th day of May 2007.

AMERICAN HOME MORTGAGE CORP.

By _____
     Name:           Alan B. Horn
     Title:     Executive Vice President
               General Counsel & Secretary

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____
     Name:
     Title:

6

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this 31th day of May 2007.

AMERICAN HOME MORTGAGE CORP.

By _____
    Name:
    Title:

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____
    Name:       Rosa J. Hyun
    Title:      Vice President

# Exhibit B

EXECUTION COPY

**J.P. Morgan Acceptance Corporation I**
**Mortgage Pass-Through Certificates, Series 2007-S2**

WHEREAS, pursuant to the Mortgage Loan Sale Agreement, dated as of April 1, 2006 (the "Purchase Agreement"), among J.P. Morgan Acquisition Corp., as purchaser (the "Purchaser") and American Home Mortgage Corp. ("American Home"), as seller; the Purchaser has purchased from American Home certain mortgage loans originated by American Home and has assigned to its Affiliate, J.P. Morgan Acceptance Corporation I (the "Depositor"), pursuant to an Assignment, Assumption and Recognition Agreement, dated as of May 1, 2007 (the "Assignment"), among the Purchaser, JPMCBNA, the Depositor, the Master Servicer and Trustee identified below, certain Mortgage Loans that are specified in such Assignment (the "Specified Mortgage Loans");

WHEREAS, capitalized terms used but not defined in this Indemnification Agreement have the meanings ascribed pursuant to the Purchase Agreement; and

WHEREAS, the Depositor will cause the Securitization of the Specified Mortgage Loans pursuant to a Pooling and Servicing Agreement, dated as of May 1, 2007, between the Depositor, Wells Fargo Bank, N.A., as master servicer and securities administrator (the "Master Servicer") and U.S. Bank National Association, as trustee (the "Trustee"), and the issuance of Mortgage Pass-Through Certificates, Series 2007-S2 (the "Certificates") thereunder, and pursuant to an Underwriting Agreement, dated as of May 30, 2007, and Purchase Agreement, dated as of May 30, 2007, each between the Depositor and J.P. Morgan Securities Inc. ("JPMSI"), and the sale of the Certificates thereunder to JPMSI, as underwriter and initial purchaser, respectively;

NOW THEREFORE, in consideration of the agreements contained herein, and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, American Home and the Depositor agree as follows:

1.  Indemnification and Contribution.

    (a)       American Home agrees to indemnify and hold harmless the Depositor, its officers and directors and each person, if any, who controls the Depositor within the meaning of either Section 15 of the Securities Act of 1933, as amended (the "1933 Act") or Section 20 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), against any and all losses, claims, damages or liabilities, joint or several, to which the Depositor or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the American Home Information (as defined below) or any omission or alleged omission to state in the American Home Information a material fact required by 17 C.F.R. §229.1110(b) with respect to American Home, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and agrees to reimburse the Depositor and each such officer, director and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage,

152936v.2

liability or action as such expenses are incurred. The foregoing indemnity agreement is in addition to any liability which American Home may otherwise have.

As used herein "American Home Information" means (x) the information and data concerning the Specified Mortgage Loans set forth on any computer tape (or other electronic or printed medium) furnished by American Home to the Purchaser or the Depositor and (y) the information set forth in the Prospectus Supplement, dated May 30, 2007, under the caption "The Originator—American Home Mortgage Corp."

The Depositor agrees to indemnify and hold harmless American Home, its officers and directors and each person, if any, who controls American Home within the meaning of either Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all losses, claims, damages or liabilities, joint or several, to which American Home or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Supplement, dated as of December 22, 2006, provided by the Depositor (the "Depositor Information") or any omission or alleged omission to state in the Depositor Information a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and agrees to reimburse American Home and each such officer, director and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred. The foregoing indemnity agreement is in addition to any liability which the Depositor may otherwise have.

(b) Promptly after receipt by the indemnified party under this Section 1 of notice of any claim or the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Section 1, notify the indemnifying party in writing of the claim or the commencement of that action; provided, however, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have under this Section 1 except to the extent it has been materially prejudiced by such failure; and provided further, however, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 1.

If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party. After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, except as provided in the following paragraph, the indemnifying party shall not be liable to the indemnified party under this Section 1 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof other than reasonable costs of investigation.

The indemnified party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the

2

expense of such indemnified party unless: (i) the employment thereof has been specifically authorized by the indemnifying party in writing; (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party, and the representation of both by the same counsel would be inappropriate due to the actual or potential differing interests between them; or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party within a reasonable period of time, in which case, if such indemnified party notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party, it being understood, however, the indemnifying party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to local counsel) at any time for all such indemnified parties.

The indemnifying party shall not be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(c)     If the indemnification provided for in this Section 1 is unavailable to the indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, respectively, in connection with the statements or omissions that result in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.

The parties agree that it would not be just and equitable if contribution pursuant to this Section 1(c) were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in this Section 1(c) above.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 1(c) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim, except where the indemnified party is required to bear such expenses pursuant to this Section 1, which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party will be ultimately obligated to pay such expenses.  In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment.  No person guilty of fraudulent misrepresentations (within the meaning of Section 11(f) of the 1933 Act), shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

3

(d)    The indemnity and contribution agreements contained in this Section 1 and the representations and warranties set forth in Section 2 shall remain operative and in full force and effect regardless of (i) any termination of the Purchase Agreement, (ii) any investigation made by any of the Depositor or American Home as Seller, their directors or officers or any person controlling any of them, by or on behalf of any them, and (iii) acceptance of and payment for any of the Certificates.

2.    <u>Representations and Warranties</u>.  American Home represents that:

(i)    it is validly existing and in good standing under the laws of its jurisdiction of formation or incorporation, as applicable, and has full power and authority to own its assets and to transact the business in which it is currently engaged;

(ii)    it is not required to obtain the consent of any other Person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Indemnification Agreement;

(iii)    the execution, delivery and performance of this Indemnification Agreement by it will not violate any provision of any existing law or regulation or any order decree of any court applicable to it or any provision of the charter or bylaws of such party, or constitute a breach, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home or on any mortgage, indenture, contract or other agreement to which such party is a party or by which it may be bound;

(iv)    no proceeding of or before any court, tribunal or governmental body is currently pending or, to the knowledge of each party, threatened against such party or any of its properties or with respect to this Indemnification Agreement or the Specified Mortgage Loans, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home;

(v)    such party has full power and authority to make, execute, deliver and perform this Indemnification Agreement and all of the transactions contemplated hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Indemnification Agreement. When executed and delivered, this Indemnification Agreement will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, and by limitations of public policy under applicable securities law as to rights of indemnity and contribution thereunder; and

(vi)    this Indemnification Agreement has been duly executed and delivered by such party.

3.    <u>Notices</u>.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Depositor will be mailed, delivered or telegraphed and confirmed to such party at 270 Park Avenue New York, New York 10017 Attention: General Counsel's

4

152936v.2

Office or, if sent to American Home will be mailed, delivered or telegraphed and confirmed to such party at 538 Broadhollow Road, Melville, NY 11747, Attn: Alan B. Horn, General Counsel.

    4.   <u>Miscellaneous</u>.  This Indemnification Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  This Indemnification Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns and the controlling persons referred to herein, and no other person shall have any right or obligation hereunder.  Neither this Indemnification Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.  This Indemnification Agreement may be executed in counterparts, each of which when so executed and delivered shall be considered an original, and all such counterparts shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this 30th day of May 2007.

AMERICAN HOME MORTGAGE CORP.

By _____

    Name:      Alan B. Horn

    Title:      Executive Vice President

                General Counsel & Secretary

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____

    Name:

    Title:

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this _30_ day of May 2007.

AMERICAN HOME MORTGAGE CORP.

By _____
   Name:
   Title:

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____
   Name:
   Title:      Rosa J. Hyun
               Vice President

JPMMT 2007-S2 American Home Indemnification Agreement

# Exhibit C

EXECUTION COPY

**J.P. Morgan Acceptance Corporation I**
**Mortgage Pass-Through Certificates, Series 2007-S3**

WHEREAS, pursuant to the Mortgage Loan Sale Agreement, dated as of April 1, 2006 (the "Purchase Agreement"), among J.P. Morgan Acquisition Corp., as purchaser (the "Purchaser") and American Home Mortgage Corp. ("American Home"), as seller; the Purchaser has purchased from American Home certain mortgage loans originated by American Home and has assigned to its Affiliate, J.P. Morgan Acceptance Corporation I (the "Depositor"), pursuant to an Assignment, Assumption and Recognition Agreement, dated as of July 1, 2007 (the "Assignment"), among the Purchaser, JPMCBNA, the Depositor, the Master Servicer and Trustee identified below, certain Mortgage Loans that are specified in such Assignment (the "Specified Mortgage Loans");

WHEREAS, capitalized terms used but not defined in this Indemnification Agreement have the meanings ascribed pursuant to the Purchase Agreement; and

WHEREAS, the Depositor will cause the Securitization of the Specified Mortgage Loans pursuant to a Pooling and Servicing Agreement, dated as of July 1, 2007, between the Depositor, Wells Fargo Bank, N.A., as master servicer and securities administrator (the "Master Servicer") and U.S. Bank National Association, as trustee (the "Trustee"), and the issuance of Mortgage Pass-Through Certificates, Series 2007-S3 (the "Certificates") thereunder, and pursuant to an Underwriting Agreement, dated as of July 27, 2007, and Purchase Agreement, dated as of July 27, 2007, each between the Depositor and J.P. Morgan Securities Inc. ("JPMSI"), and the sale of the Certificates thereunder to JPMSI, as underwriter and initial purchaser, respectively;

NOW THEREFORE, in consideration of the agreements contained herein, and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, American Home and the Depositor agree as follows:

1. Indemnification and Contribution.

(a)    American Home agrees to indemnify and hold harmless the Depositor, its officers and directors and each person, if any, who controls the Depositor within the meaning of either Section 15 of the Securities Act of 1933, as amended (the "1933 Act") or Section 20 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), against any and all losses, claims, damages or liabilities, joint or several, to which the Depositor or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the American Home Information (as defined below) or any omission or alleged omission to state in the American Home Information a material fact required by 17 C.F.R. §229.1110(b) with respect to American Home, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and agrees to reimburse the Depositor and each such officer, director and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage,

159999v.2

liability or action as such expenses are incurred.  The foregoing indemnity agreement is in addition to any liability which American Home may otherwise have.

As used herein "American Home Information" means (x) the information and data concerning the Specified Mortgage Loans set forth on any computer tape (or other electronic or printed medium) furnished by American Home to the Purchaser or the Depositor and (y) the information set forth in the Prospectus Supplement, dated July 31, 2007, under the caption "The Originator—American Home Mortgage Corp."

The Depositor agrees to indemnify and hold harmless American Home, its officers and directors and each person, if any, who controls American Home within the meaning of either Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all losses, claims, damages or liabilities, joint or several, to which American Home or any of them may become subject under the 1933 Act, the 1934 Act or other federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based in whole or in part upon any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Supplement, dated as of December 22, 2006, provided by the Depositor (the "Depositor Information") or any omission or alleged omission to state in the Depositor Information a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, and agrees to reimburse American Home and each such officer, director and controlling person promptly upon demand for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability or action as such expenses are incurred.  The foregoing indemnity agreement is in addition to any liability which the Depositor may otherwise have.

(b)      Promptly after receipt by the indemnified party under this Section 1 of notice of any claim or the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under this Section 1, notify the indemnifying party in writing of the claim or the commencement of that action; provided, however, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have under this Section 1 except to the extent it has been materially prejudiced by such failure; and provided further, however, that the failure to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under this Section 1.

If any such claim or action shall be brought against an indemnified party, and it shall notify the indemnifying party thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying party, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party.  After notice from the indemnifying party to the indemnified party of its election to assume the defense of such claim or action, except as provided in the following paragraph, the indemnifying party shall not be liable to the indemnified party under this Section 1 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof other than reasonable costs of investigation.

The indemnified party shall have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the

2

expense of such indemnified party unless: (i) the employment thereof has been specifically authorized by the indemnifying party in writing; (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party, and the representation of both by the same counsel would be inappropriate due to the actual or potential differing interests between them; or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party within a reasonable period of time, in which case, if such indemnified party notifies the indemnifying party in writing that it elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party, it being understood, however, the indemnifying party shall not, in connection with any one such action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to local counsel) at any time for all such indemnified parties.

The indemnifying party shall not be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with its written consent or if there be a final judgment for the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(c)     If the indemnification provided for in this Section 1 is unavailable to the indemnified party or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, respectively, in connection with the statements or omissions that result in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.

The parties agree that it would not be just and equitable if contribution pursuant to this Section 1(c) were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in this Section 1(c) above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 1(c) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim, except where the indemnified party is required to bear such expenses pursuant to this Section 1, which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentations (within the meaning of Section 11(f) of the 1933 Act), shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

3

(d)     The indemnity and contribution agreements contained in this Section 1 and the representations and warranties set forth in Section 2 shall remain operative and in full force and effect regardless of (i) any termination of the Purchase Agreement, (ii) any investigation made by any of the Depositor or American Home as Seller, their directors or officers or any person controlling any of them, by or on behalf of any them, and (iii) acceptance of and payment for any of the Certificates.

2.     <u>Representations and Warranties</u>.  American Home represents that:

(i)     it is validly existing and in good standing under the laws of its jurisdiction of formation or incorporation, as applicable, and has full power and authority to own its assets and to transact the business in which it is currently engaged;

(ii)     it is not required to obtain the consent of any other Person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Indemnification Agreement;

(iii)     the execution, delivery and performance of this Indemnification Agreement by it will not violate any provision of any existing law or regulation or any order decree of any court applicable to it or any provision of the charter or bylaws of such party, or constitute a breach, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home or on any mortgage, indenture, contract or other agreement to which such party is a party or by which it may be bound;

(iv)     no proceeding of or before any court, tribunal or governmental body is currently pending or, to the knowledge of each party, threatened against such party or any of its properties or with respect to this Indemnification Agreement or the Specified Mortgage Loans, which would have a material adverse effect on the business, properties, assets or condition (financial or otherwise) of American Home;

(v)     such party has full power and authority to make, execute, deliver and perform this Indemnification Agreement and all of the transactions contemplated hereunder, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Indemnification Agreement.  When executed and delivered, this Indemnification Agreement will constitute the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, by the availability of equitable remedies, and by limitations of public policy under applicable securities law as to rights of indemnity and contribution thereunder; and

(vi)     this Indemnification Agreement has been duly executed and delivered by such party.

3.     <u>Notices</u>.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Depositor will be mailed, delivered or telegraphed and confirmed to such party at 270 Park Avenue New York, New York 10017 Attention: General Counsel's

4

Office or, if sent to American Home will be mailed, delivered or telegraphed and confirmed to such party at 538 Broadhollow Road, Melville, NY 11747, Attn: Alan B. Horn, General Counsel.

4.    Miscellaneous.  This Indemnification Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.  This Indemnification Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns and the controlling persons referred to herein, and no other person shall have any right or obligation hereunder.  Neither this Indemnification Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.  This Indemnification Agreement may be executed in counterparts, each of which when so executed and delivered shall be considered an original, and all such counterparts shall constitute one and the same instrument.

[Signature Page Follows]

159999v.2

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this 27 day of July 2007.

AMERICAN HOME MORTGAGE CORP.

By _____

    Name:         Alan B. Horn

    Title:        Executive Vice President

              General Counsel & Secretary

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____

    Name:

    Title:

IN WITNESS WHEREOF, the party named below has caused this Indemnification Agreement to be duly executed by their respective officers hereunto duly authorized, this __ day of July 2007.

AMERICAN HOME MORTGAGE CORP.

By _____
    Name:
    Title:

J.P. MORGAN ACCEPTANCE CORPORATION I

By _____
    Name: Rosa Hyun
    Title: Vice President

# Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK, COMMERCIAL DIVISION

———————————————————————— x

FORT WORTH EMPLOYEES' RETIREMENT
FUND, On Behalf of Itself and All Others Similarly
Situated,

                Plaintiff,

      vs.

J.P. MORGAN CHASE & CO., J.P. MORGAN
ACQUISITION CORP., JP MORGAN
ACCEPTANCE, J.P. MORGAN SECURITIES, INC.,
JP MORGAN MORTGAGE TRUST 2007-S2, JP
MORGAN MORTGAGE TRUST 2007-S3, JP
MORGAN MORTGAGE TRUST 2007-A3, JP
MORGAN MORTGAGE TRUST 2007-A4, JP
MORGAN ALTERNATIVE LOAN TRUST 2007-S1,
JP MORGAN ALTERNATIVE LOAN TRUST 2007-
A2, JP MORGAN MORTGAGE ACQUISITION
TRUST 2007-CH4, JP MORGAN MORTGAGE
ACQUISITION TRUST 2007-CH5, JP MORGAN
MORTGAGE TRUST 2007-A5, JP MORGAN
MORTGAGE TRUST 2007-A6, JP MORGAN
MORTGAGE ACQUISITION TRUST 2007-CH3, JP
MORGAN MORTGAGE ACQUISITION TRUST
2007-CH6, MOODY'S INVESTOR SERVICES,
INC., A DIVISION OF MOODY'S CORP.,
MCGRAW-HILL COMPANIES, INC., FITCH, INC.,
BRIAN BERNARD, LOUIS SCHIOPPO JR.,
CHRISTINE E. COLE, DAVID M. DUZYK,
WILLIAM KING, and EDWIN F. MCMICHAEL,

           Defendants.

———————————————————————— x

Index No.  *600767/2009*

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

FILED

MAR 1 2 2009

NEW YORK
COUNTY CLERK'S OFFICE

## SUMMARY OF THE ACTION

1.       This is a securities class action on behalf of all persons who acquired the Mortgage

Pass-Through Certificates ("Certificates") of JP Morgan Issuing Trusts (defined, *infra*) pursuant

and/or traceable to the J.P. Morgan Acceptance Corporation I ("JP Morgan Acceptance")

Registration Statement No. 333-141607 and accompanying Prospectus (collectively, the

"Registration Statement") and Prospectus Supplements, and were damaged thereby.  By this action,

Plaintiff Fort Worth Employees Retirement Fund ("Plaintiff") asserts solely strict liability and

negligence claims pursuant to the Securities Act of 1933 ("Securities Act") against defendants J.P.

Morgan Chase & Co. ("JP Morgan"); J.P. Morgan Acquisition Corp ("JP Morgan Acquisition"); JP

Morgan Acceptance; J.P. Morgan Securities, Inc. ("JP Morgan Securities"),[1] Moody's Investor

Services, Inc. ("Moody's"), a division of Moody's Corp.; McGraw-Hill Companies, Inc. ("McGraw-

Hill"); Fitch, Inc. ("Fitch"); Brian Bernard; Louis Schoppio, Jr.; Christine E. Cole; David M. Duzyk;

William King; and Edwin F. McMichael.

2.       This action arises from defendants' sale of mortgage pass-through certificates (the

"Certificates") based upon false and misleading offering documents.  Mortgage pass-through

certificates are securities entitling the holder to income payments from pools of loans and mortgage-

backed securities aggregated and bundled for the purpose of selling certificates to institutional

investors such as Plaintiff.  Similar to other asset-backed securities, the value of pass-through

certificates is dependent on the ability of the underlying borrowers to repay their loans (principal and

interest) and the adequacy of collateral in the event that borrowers cannot do so.

---

[1]       Collectively, JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP
Morgan Securities are sometimes referred to herein as the "JP Morgan Entities."

1

3.      On March 27, 2007, the JP Morgan Entities filed a Form S-3 Registration Statement No. 333-141607 ("Registration Statement")[2] and accompanying Prospectus with the Securities and Exchange Commission ("SEC") in connection with and for the purpose of issuing hundreds of millions of dollars of Certificates through JP Morgan Issuing Trusts (defined, *infra*). The JP Morgan Issuing Trusts issued the Certificates pursuant to the Registration Statement, which explained the structure of the Issuing Trusts and provided an overview of the Certificates. For example, the Registration Statement included information about the underwriting standards and the appraisals of the properties that were the subject of the underlying mortgage loans.

4.      The Certificates were then sold to investors by underwriters pursuant to a series of prospectus supplements that were also filed with the SEC and incorporated by reference into the Registration Statement ("Prospectus Supplements"). Each Prospectus Supplement included a detailed description of the particular JP Morgan Issuing Trust and the Certificates it would issue. For example, the Prospectus Supplements set forth data about the underlying loans, including the type and number of loans, the particular underwriting and appraisal standards employed by loan originators, mortgage rates, aggregated principal balance of the loans, the geographic concentration of the mortgaged properties and loan-to-value ratios.

5.      JP Morgan is one of the oldest financial services firms in the world. Since merging with Chase Manhattan Bank in 2000 to form JP Morgan Chase, JP Morgan has also acquired Bank One Corporation (2004), Bear Stearns (2008) and Washington Mutual (2008). As an integrated financial services firm, JP Morgan operates as an investment bank, asset manager and retail bank; JP Morgan also operates hedge funds and private equity investment vehicles.

---

[2]      On April 23, 2007, the JP Morgan Entities filed an Amended Registration Statement and Prospectus on Form S-3/A. References herein to the "Registration Statement" are to the April 23, 2007 Amended Registration Statement.

2

6.     JP Morgan Acceptance is a subsidiary of JP Morgan involved in the real estate and mortgage market, including mortgage lending and real estate finance.  JP Morgan established JP Morgan Acceptance for the purpose of creating entities to issue Certificates.  JP Morgan Acquisition acquired pools of mortgage loans originated by third party mortgage originators and then transferred the loans to JP Morgan Acceptance for deposit into special purpose entities – the JP Morgan Issuing Trusts.  The pools of mortgage loans were then securitized into asset-backed securities and sold by underwriters, including lead underwriter JP Morgan Securities, to investors as Certificates.

7.     The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows paid by the borrowers on the mortgages held by the JP Morgan Issuing Trusts.  As the underlying mortgage borrowers in each issuance pay their mortgages, distributions are made to the investors holding Certificates according to the terms of the particular Certificate as disclosed in the Prospectus Supplement disseminated with respect to that Certificate.  If the underlying borrowers do not pay their mortgages, losses pass to investors based on the seniority of their Certificates.  Consequently, the investment quality of the Certificates is inextricably connected to the quality of the mortgage loan pools held by each JP Morgan Issuing Trust.

8.     The asset-backed securities issued by the JP Morgan Issuing Trusts were divided into "tranches," each of which carried different priorities of seniority, payment, exposure to borrower defaults and interest payments.  The tranches thus provided for higher yields on riskier Certificates, and the Certificates theoretically permitted investors to select between safer and more risky investments according to their own risk tolerances.

9.     Each tranche of mortgage-pass through certificates is typically rated by at least one of the three ratings agencies: Defendants Moody's Investor Service, Inc., a division of Moody's; Standard & Poor's, a division of McGraw-Hill, and Fitch Ratings, a division of Fitch.  Moody's, Standard & Poor's and/or Fitch rated the tranches of Certificates issued by the JP Morgan Issuing

3

Trusts. The highest investment rating used by Moody's is AAA, and the highest rating used by Standard & Poor's and Fitch is AAA. The so-called "triple-A" or "AAA" ratings signal to investors that the subject investments are the highest investment-grade and carry the smallest degree of risk. Any security or investment instrument rated lower than BBB is considered below investment-grade, commonly referred to as "junk bonds." Those instruments that receive ratings BBB or better, but less than Triple-A are considered investment-grade.

      10.    Defendants Moody's, Standard & Poor's and Fitch (collectively, the "Rating Agencies" or "Rating Agency Defendants") directly and indirectly participated in and took the actions necessary for the distribution of the JP Morgan Issuing Trust Certificates. The Rating Agencies directly participated in selection of the underlying mortgages to be securitized and issued by the JP Morgan Issuing Trusts. Far from rating each tranche once they were assembled, the Rating Agencies pre-determined the ratings that would be assigned, which they could do because they were involved in the formulation of the Certificates. The Rating Agencies each assigned investment-grade ratings to most of the tranches of Certificates offered to investors and the ratings were expressly included in each of the Prospectus Supplements. These ratings determined, in part, the price at which the Certificates were sold to Plaintiff and other investors.

      11.    As explained above, the Registration Statement and Prospectus Supplements filed by the various JP Morgan Entities with the SEC in connection with the Certificates made representations about factors that investors use to determine whether the Certificates were good investments. As alleged herein, the Registration Statement, and Prospectus Supplements contained false and materially misleading information and omitted material information regarding the mortgage loans underlying the Certificates and the process by which JP Morgan Acquisition obtained the loans.

4

12.     Specifically, the JP Morgan Entities did not disclose in the documents, *inter alia*, that the loan originators that had originated the mortgages to borrowers had ignored and/or never intended to follow the stated underwriting and appraisal standards and guidelines, and that JP Morgan Acquisition ignored its loan purchasing guidelines.  The underlying mortgages were also loans on properties for which the collateral appraisals materially overstated the value of the underlying properties.  Thus, the Certificates that were sold to investors as investment-grade instruments were later revealed to be below investment-grade instruments.  As underlying mortgage borrowers become delinquent, default and suffer foreclosures, the purportedly investment-grade Certificates have been downgraded, cash flows have suffered and the Certificates have lost value.

13.     As a direct and proximate result of defendants' false and materially misleading statements and material omissions alleged herein, Plaintiff suffered damages when the truth about the risk profile and value of the Certificates became known, causing the price to drop.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.  Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant to §22 of the 1933 Act.  Section 22 of the 1933 Act states that "[e]xcept as provided in section 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be removed to any court in the United States."  Section 16(c) refers to "covered class actions," which are defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting claims under state or common law.  This is an action asserting federal law claims.  Thus, it does not fall within the definition of a "covered class action" under §16(b)-(c) and is therefore not removable to federal court under the Securities Litigation Uniform Standards Act of 1998.

Supreme Court Records OnLine Library - page 6 of 38

15.     The violations of law complained of herein occurred in this County, including the dissemination of false and materially misleading statements complained of herein into this County. The JP Morgan Entities conduct business in this County.

### PARTIES

16.     Plaintiff Fort Worth Employees' Retirement Fund acquired Certificates pursuant to and traceable to Registration Statement No. 333-141607.  Plaintiff has its principle offices at 4100 International Plaza, Suite 730, Ft. Worth, Texas 76109.  Plaintiff provides disability, retirement and survivor benefits to current and former employees (and their beneficiaries) of the City of Fort Worth, Texas.  Plaintiff purchased Certificates traceable to the Registration Statement and was damaged thereby.

17.     Defendant JP Morgan is a Delaware corporation with its principal executive office located at 270 Park Avenue, New York, New York 10017.  As a financial institution with extensive investment banking operations, JP Morgan underwrites a wide range of securities and other financial instruments, including asset-backed and mortgage-related securities.  JP Morgan owns and/or controls JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities. JP Morgan acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77(b)(a)(11).  As an underwriter, JP Morgan participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other members of the Class.

18.     Defendant JP Morgan Acquisition is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017.  JP Morgan Acquisition purchased the mortgage loans that underlie the Certificates issued by the JP Morgan Issuing Trusts from third-party loan originators.  JP Morgan Acquisition served as the "Sponsor/Seller" in the securitization of certain of the JP Morgan Issuing Trusts.  JP Morgan Acquisition, in coordination

6

with other JP Morgan Entities, worked with the Rating Agencies to structure the securitization transactions related to the Certificates.

19.     Defendant JP Morgan Acceptance is a special purpose Delaware corporation headquartered at 270 Park Avenue, New York, New York 10017. JP Morgan Acceptance filed the March 27, 2007 Registration Statement and Prospectus, which also incorporated by reference the Prospectus Supplements issued by the JP Morgan Issuing Trusts. JP Morgan Acceptance served in the role as "Depositor" in the securitization of the JP Morgan Issuing Trusts and was an "Issuer" of the Certificates within the meaning of Section 15 of the 1933 Act, 15 U.S.C. §77(b)(a)(4).

20.     Defendant JP Morgan Securities is headquartered in New York, New York. JP Morgan Securities acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77(b)(a)(11). As an underwriter, JP Morgan Securities participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and the other Class members.

21.     Defendant McGraw-Hill is a Delaware corporation with its principal place of business in New York, New York. Standard & Poor's is a division of McGraw-Hill that provides credit ratings, risk evaluation, investment research and data to investors. Standard & Poor's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Standard & Poor's participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Standard & Poor's also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

22.     Defendant Moody's is a division of Moody's Corp., a Delaware corporation with its principal place of business in New York, New York. Moody's provides credit ratings, risk

7

evaluation, investment research and data to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Moody's participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Moody's also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

23.     Defendant Fitch is a Nationally Recognized Statistical Rating Organization with dual headquarters in New York, New York and London, England, and its principal place of operations at One State Street Plaza, New York, New York 10004. Fitch, through Fitch Ratings, is a leading global rating agency. Fitch acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. §77b(a)(11). Fitch participated in drafting and disseminating the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members. Fitch also worked with the JP Morgan Entities in structuring the securitization transactions related to the Certificates and then provided the pre-determined credit ratings that it had agreed with the JP Morgan Entities to provide, as set forth in the Prospectus Supplements.

24.     Defendants JP Morgan Issuing Trusts were created and structured by the JP Morgan Entities to issue the Certificates pursuant to the Registration Statement and the Prospectus Supplements. With respect to each offering of Certificates by the Issuing Trusts, JP Morgan Acquisition served as the "Sponsor/Seller," JP Morgan Acceptance served as the "Depositor," and JP Morgan Securities served as the designated "Underwriter." The Defendant JP Morgan Issuing Trusts are:

- JP Morgan Mortgage Trust 2007-S2
- JP Morgan Mortgage Trust 2007-S3
- JP Morgan Mortgage Trust 2007-A3

8

- JP Morgan Mortgage Trust 2007-A4
- JP Morgan Alternative Loan Trust 2007-S1
- JP Morgan Alternative Loan Trust 2007-A2
- JP Morgan Mortgage Acquisition Trust 2007-CH4
- JP Morgan Mortgage Acquisition Trust 2007-CH5
- JP Morgan Mortgage Trust 2007-A5
- JP Morgan Mortgage Trust 2007-A6
- JP Morgan Mortgage Acquisition Trust 2007-CH3

25.     Defendant Brian Bernard ("Bernard") was, at all relevant times, the President of JP Morgan Acceptance. Bernard signed Registration Statement No. 333-141607.

26.     Defendant Louis Schoppio Jr. ("Schoppio") was, at all relevant times, the Controller and Chief Financial Officer of JP Morgan Acceptance. Schoppio signed Registration Statement No. 333-141607.

27.     Defendant Christine E. Cole ("Cole") was a director of JP Morgan Acceptance during the relevant period. Cole signed Registration Statement No. 333-141607.

28.     Defendant David M. Duzyk ("Duzyk") was a director of JP Morgan Acceptance during the relevant period. Duzyk signed Registration Statement No. 333-141607.

29.     Defendant William King ("King") was a director of JP Morgan Acceptance during the relevant period. King signed Registration Statement No. 333-141607.

30.     Defendant Edwin F. McMichael ("McMichael") was a director of JP Morgan Acceptance during the relevant period. McMichael signed Registration Statement No. 333-141607.

31.     Defendants JP Morgan, JP Morgan Acceptance and the JP Morgan Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

32.     Defendants JP Morgan, JP Morgan Securities and the Rating Agency Defendants are collectively referred to herein as the "Underwriter Defendants."

33.     Defendants Bernard, Schoppio, Cole, Duzyk, King and McMichael are collectively referred to herein as the "Individual Defendants."

9

**BACKGROUND**

<u>The Mortgage Industry, Secondary Mortgage Market and Mortgage Securitization</u>

34.     Until relatively recently, consumers wishing to finance the purchase of a home or other piece of real property obtained 30-year or 15-year fixed rate mortgages or conventional adjustable rate mortgages ("ARMs") through a mortgage lender that profited by servicing the loans and collecting interest payments over the life of the mortgage until it reached maturity.  Thus, the mortgage industry was traditionally characterized by a lending institution (*i.e.*, a loan originator) that held a direct interest in the subject property as collateral in the event that the borrower defaulted on the loan.

35.     The United States chartered Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and empowered the institutions to buy mortgages from banks and other loan originators, thus creating a secondary market for mortgages.  Once acquired, the loans were typically pooled together and then securitized to enable sale to investors as "mortgage-backed securities," commonly referred to as "MBS."  The advent of a secondary market altered the traditional model of mortgage origination because loan originators began to sell mortgages to GSEs. By acquiring the loan, GSEs acquired both the right to interest payments and the risk of default by the borrower.  When mortgage companies originated loans and then sold the mortgage into the secondary market, the originator would receive upfront proceeds in the form of fees in connection with issuance of the mortgage and cash when it sold the loan into the secondary market.  Upfront profits from fees and the immediate ability to sell mortgages into the secondary market fundamentally altered the incentives for loan originators because under such circumstances the entity making the loan could profit with almost no risk of loss.

10

36.     Investors who purchased MBS typically received monthly payments over the lifetime of the underlying loans in accordance with the borrowers' payments of principal and interest. However, GSEs were limited to purchasing loans that met particular underwriting standards. MBS purchased by GSEs were also discounted to account for an assumed rate or default on a certain percentage of loans. As real estate boomed, investment banks such as JP Morgan and others became active in and profited from the secondary market for mortgage loans. But unlike GSEs, investment banks were not constrained by the strict conditions and restrictions when purchasing loans from loan originators.

37.     The advent of unrestrained buying in the secondary mortgage market by non-GSE entities further separated loan originators from the risks inherent to loaning individuals money to buy property. The potential to sell most loans and thereby offload most risk turned mortgage lending into a volume business. To facilitate more loans – and with it more fees and sales revenue – originators offered increasingly aggressive and exotic loan products such as subprime mortgages to high credit risk borrowers, interest-only loans and negative-amortization "option ARM" loans.

38.     To further increase the number of loans written, originators simply abandoned or completely ignored stated underwriting standards. As a result, lenders not only issued loans based on little or no borrower documentation, but performed no additional due diligence or income verification, often approving loans within hours. Originators also made loans carrying low, "teaser" interest rates to borrowers who they knew would not have sufficient income to avoid default once the introductory rates expired and steered prime, qualified buyers to more expensive, exotic loans that created a serious risk of default that would not have existed had the borrower taken out a typical, fixed-interest rate mortgage. By using inflated appraisals that necessitated larger loans, originators also steered borrowers into larger loans that generated larger fees. The widespread use of "independent" originators and mortgage lenders who merely stood behind independent brokers

11

exacerbated these and other abusive practices because independent, non-employee brokers were inadequately supervised (if at all) and lending companies did little (if any) due diligence on the loans originated by such third parties.

39.     As the tendency for loan originators to push consumers to borrow more money than they could afford to repay turned into common industry practice, the market for non-prime loans issued to borrowers with poor credit histories and/or carrying exotic terms grew from less than $250 billion to almost $1 trillion by 2005.  By enabling consumers to borrow more, loan originators enabled consumers to spend more with the effect that housing prices rose – and kept rising.  Under conditions where housing prices perpetually increased, borrowers who had taken out loans that they could not afford were able to borrow against the increased equity in their property or sell their house at a price high enough to cover the loan (albeit to a buyer who was likely borrowing more than advisable in order to purchase the home).

40.     The merry-go-round was not sustainable and, eventually, loan originators' lending practices subsumed the housing market under a tidal wave of astronomical debt that was not affordable to those holding it.  When the merry-go-round finally stopped and housing prices leveled off and then declined, those who were in over their head had no equity to borrow against and no purchasers to sell their overpriced house to.  Without revenues from underlying borrowers who were now defaulting or adequate collateral to support MBS, the credit market began deteriorating and investors in MBS – directly or through derivative instruments such as mortgage pass-through certificates – experienced tremendous losses.

Mortgage Pass-Through Certificates

*Process of Creation*

41.     Initially, a "sponsor/seller" that either originated or acquired loans from other originators (typically the latter) sells an inventory of loans to a "depositor."  In this case, for

12

example, JP Morgan Acquisition acquired loans originated by various third parties and sold them to

JP Morgan Acceptance. The loans in the inventory acquired by the "sponsor/seller" typically vary

and may include conventional, fixed or adjustable rate mortgages secured by first and junior liens (or

a combination thereof), with various maturities.

       42.    Having acquired the loans, the "depositor" transfers (or "deposits") the acquired pool

of loans to the issuing trust entity. Here, JP Morgan Acceptance transferred the pool of loans to the

JP Morgan Issuing Trusts. The issuing trust securitizes the pool of loans such that the rights to the

cash-flows from the underlying mortgages can be sold to investors as pass-through certificates. The

securitization transactions are structured such that the risk of loss is divided among the different

tranches, each of which carry different levels of risk and yield. Losses amongst the underlying loans

(due to default, delinquency, etc.) are applied in reverse order of seniority – the most senior tranches

of pass-through certificates are often rated as the best quality (*i.e.*, "AAA") while junior tranches

usually carry lower ratings because they are less insulated from risk. Of course, the junior tranches

also offer greater yields than the more senior, and less risky, tranches. By working with

underwriters, the depositor and the ratings agencies, issuing trusts are able to ensure *ex ante* that

particular tranches of mortgage pass-through certificates will receive certain ratings at the time of

offering.

       43.    Having securitized the underlying mortgage pool into various tranches of pass-

through certificates, the issuing trust passes the certificates back to the depositor, which then passes

the certificates to one or more designated underwriters which, in turn, offer the certificates to

investors. Mortgage pass-through certificates must be offered to the public pursuant to a registration

statement and prospectus in accordance with the 1933 Act.

       44.    When investors purchase certificates they pay the underwriter who then pays the

proceeds back to the depositor, minus fees. In this case, the JP Morgan Issuing Trusts passed the

13

Certificates back to JP Morgan Acceptance, which then sent the Certificates to JP Morgan Securities for sale to investors. JP Morgan Securities then took a fee from the proceeds and remitted the remainder to JP Morgan Acceptance. Once certificates are sold, a loan servicer collects the payments and distributes them, through the issuing trust, to investors according to the distribution schedule set forth in a prospectus supplement for the life of the loan.

*Analyzing Mortgage-Pass Thru Certificates as Investments*

45.     Investors acquire mortgage pass-thru certificates with the expectation of receiving monthly payments. Investors pay for the right to monthly payments of principal and/or interest from the mortgage pool, depending upon the class of certificate purchased (a minority of certificates are interest-only). Typically, if the investor holds the certificate to maturity, the investor will have received total payments providing a complete return of the principal invested, plus an additional amount, in the form of interest, representing the risk premium (*i.e.*, rate of return) generated by the investment in the certificate. Investors may sell certificates they hold, in which case the purchaser stands in the shoes of the original purchaser. Of course, if the certificate is not performing in the manner set forth in the registration statement and/or prospectus supplement, then the certificate will not be salable at the price paid by the original investor.

46.     Fundamentally, certificate value is based on the ability of the borrowers in the underlying mortgage pool to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event that borrowers are delinquent or default. Loan underwriting and appraisal standards are therefore crucial to evaluating an investment in any mortgage pass-thru certificate – if underwriting or appraisals are faulty or standards are not adhered to, certificate owners suffer losses as the underlying loans do not generate sufficient income to make the monthly payments to investors.

14

47.     Investors frequently receive additional protection from loss through mechanisms known as "credit enhancements." Credit enhancements come in several forms, including overcollateralization, interest overage and insurance protection. "Overcollateralization" is the amount by which the total principal of the underlying loans exceeds the principal balance for the certificates and thereby serves as a cushion – if certain loans default and the investment vehicle cannot be made whole on those loans, the payments from the remaining loans are sufficient to cover the yield to investors without any losses. "Interest overage" is a similar mechanism – by structuring the certificates such that the weighted average interest rate of the mortgage loans is higher than the weighted average pass-through rate on the certificates (plus any fees), investors receive a cushion.

48.     A common way investors evaluate the adequacy of the real estate underlying the loan is to compare the appraised value of the real estate to the amount of the loan. This comparison, called the "loan-to-value ratio" or "LTV" is employed by investors to measure the risk that sale price of the underlying real estate in foreclose will satisfy the amount of the loan. A high LTV increases the risk to investors because it indicates that if the borrower defaults on the loan, the investor may not be able to be made whole by selling the underlying real estate.

49.     For example, an LTV of 60% means a $60,000 loan is secured by real estate determined by appraisal to have a fair market value of $100,000. An LTV of 110% means a $110,000 loan is secured by real estate with a fair market value of $100,000. From an investment perspective, an LTV of 110% is substantially riskier than an LTV of 60% because (absent intervening factors) there is a significantly greater risk that the sale proceeds from a loan with an LTV of 110% will not satisfy underlying debt and make the investor whole on the loan in the event of default. Additionally, a high LTV increases the likelihood that the borrower will "walk away from the property" in the event of financial difficulty – having paid less up front, the borrower has

15

less at risk in the property and therefore less incentive to protect his investment by making payments under the loan and avoiding default.

    50.    Thus, an investor's analysis of a certificate builds from and is dependent upon the underwriting standards and appraisals because assumptions about the likelihood of defaults and value of the underlying assets are necessarily built in to LTV ratios and the extent of any credit enhancements. In sum, if the underwriting and appraisal standards are not followed, the certificate will suffer losses because it will have been valued inaccurately when originally structured and sold.

## SUBSTANTIVE ALLEGATIONS

    51.    The Registration Statement (including the Prospectus) filed by Defendants with the SEC provided general information about the Certificates that the JP Morgan Issuing Trust would issue. Subsequently, the respective Prospectus Supplement issued by each JP Morgan Issuing Trust in connection with particular issuances of Certificates provided the specific terms of that offering.

    52.    The Registration Statement and each of the Prospectus Supplements identified JP Morgan Acceptance as the "Depositor"; JP Morgan Acquisition as the "Sponsor and Seller"; and JP Morgan Securities as the lead underwriter. According to the Registration Statement and Prospectus Supplements, the JP Morgan Acceptance acquired a pool of loans from JP Morgan Acquisition, which had purchased the loans or otherwise acquired the loans. JP Morgan Acceptance then worked with Underwriter Defendants (including Moody's and Standard & Poor's) and JP Morgan Acquisition to structure the securitization transactions and price the Certificates, which were then sold to investors by JP Morgan Securities. While each JP Morgan Entity acted in its stated capacity, the JP Morgan Entities were, individually and collectively, directed and controlled by JP Morgan.

False and Materially Misleading Representations and Material Omissions

    53.    The Registration Statement and Prospectus Supplements contained false and materially misleading information, and omitted material information, regarding origination of the

16

underlying loans, underwriting standards adhered to by loan originators, loan quality control, the type and sufficiency of collateral, appraisal standards, loan-to-value averages and credit enhancements.

54.     The following table sets forth the mortgage and lending companies that, according to the Prospectus Supplement for each respective Defendant JP Morgan Issuing Trust, originated at least 10% of the loans in the mortgage pool underlying the Certificates:

| JP Morgan Issuing Trust | Loan Originators (Percentage) |
|---|---|
| Mortgage Trust 2007-S2 | American Home Mortgage (37.05%)<br>Chase Originators (34.66%) |
| Mortgage Trust 2007-S3 | Chase Originators (58.50%)<br>American Home Mortgage (26.81%) |
| Mortgage Trust 2007-A3 | Chase Originators (62.84%)<br>PHH Mortgage (17.77%)<br>Wells Fargo Home Mortgage (11.87%) |
| Mortgage Trust 2007-A4 | Chase Home Finance LLC (67.62%) |
| Alternative Loan Trust 2007-S1 | Chase Originators (71.90%)<br>American Home Mortgage (15.93%) |
| Alternative Loan Trust 2007-A2 (Pool 1) | Chase Originators (57.87%)<br>American Home Mortgage (20.02%)<br>GreenPoint Mortgage Funding (11.75%) |
| Alternative Loan Trust 2007-A2 (Pool A) | Chase Originators (34.79%)<br>Quicken Loans (17.97%)<br>American Mortgage Network (17.83%)<br>Countrywide Home Loans (12.55%) |
| Mortgage Acquisition Trust 2007-CH4 | JP Morgan Chase Bank (100%) |
| Mortgage Acquisition Trust 2007-CH5 | JP Morgan Chase Bank (100%) |
| Mortgage Trust 2007-A5 | Chase Home Finance (47.10%)<br>PHH Mortgage (33.40%) |

17

| JP Morgan Issuing Trust | Loan Originators (Percentage) |
|---|---|
| Mortgage Trust 2007-A6 | National City Mortgage (31.23%)<br>PHH Mortgage (28.92%)<br>Chase Home Finance (24.18%) |
| Mortgage Acquisition Trust 2007-CH3 | JP Morgan Chase Bank (100%) |

55.     Defendants misrepresented the underwriting and lending standards employed by loan originators in connection with the loans underlying the Certificates in both the Registration Statement and Prospectus Supplements.

56.     Defendants stated in the Registration Statement that originators who made or first acquired the underlying loans to borrowers employed generally accepted underwriting standards, including complete evaluation of the ability of the borrower to repay the loan:

> Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts . . . .
>
> A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan-to-value ratios

18

under these programs are generally more restrictive than those under the lender's standard underwriting criteria.

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

57.      Chase Home Finance LLC ("Chase Home Finance") and JP Morgan Chase Bank (sometimes acting together, referred to herein as "Chase Originators") was a major loan originator for the Defendant JP Morgan Issuing Trusts.  For example, as set forth above, JP Morgan Chase Bank originated 100% of the loans in Defendant JP Morgan Mortgage Acquisition Trusts 2007-CH3, 2007-CH4 and 2007 CH-5.  Chase Home Finance originated 67% of the loans in Defendant JP Mortgage Trust 2007-A4 and 62% of loans in Defendant JP Morgan Mortgage Trust 2007-A3.  The Chase Originators also originated the majority of loans in Defendant JP Morgan Mortgage Trust 2007-S3 and were the largest underwriters by volume in Defendants JP Morgan Alternative Loan Trusts 2007-A2 and 2007-S1.  The Defendant JP Morgan Mortgage Trust 2007-S3 and 2007-A3 Prospectus Supplements stated, in part:

For "No Doc" program Chase Originator Mortgage Loans, no employment information, sources of income, income amount or assets are disclosed. Additionally, employment verification is not required.  The underwriting for such mortgage loans are based primarily or entirely on a stronger credit profile (evidenced by a higher minimum FICO credit risk score), a lower maximum product limit and additional due diligence performed on the collateral.

The "Stated Income Stated Asset" program (which is sometimes referred to as "Simply Signature") is a "reactive" program.  While income and assets are not verified, eligibility and approval are determined by an automated underwriting system and are based on a stronger borrower credit history and profile . . . .

The Chase Originators have represented to the Seller that, except for approximately 70.99% of these Chase Originator Mortgage Loans, such Chase Originator Mortgage Loans were originated generally in accordance with such policies.  The Depositor believes that such Chase Originator Mortgage Loans subject to the exception in the previous sentence were originated generally in accordance with the underwriting guidelines set forth under the heading "The Originators—General Underwriting Guidelines" in this prospectus supplement.

19

58.     Certain JP Morgan Issuing Trust Prospectus Supplements, including the Defendant JP

Morgan Mortgage Trust 2007-S3 and 2007-A3 Prospectus Supplements stated, with respect to

"General Underwriting Guidelines":

> Underwriting standards are applied by or on behalf of a lender to evaluate a
> borrower's credit standing and repayment ability, and the value and adequacy of the
> related Mortgaged Property as collateral.  In general, a prospective borrower
> applying for a loan is required to fill out a detailed application designed to provide to
> the underwriting officer pertinent credit information.  As part of the description of
> the borrower's financial condition, the borrower generally is required to provide a
> current list of assets and liabilities and a statement of income and expenses, as well
> as an authorization to apply for a credit report which summarizes the borrower's
> credit history with local merchants and lenders and any record of bankruptcy.  In
> most cases, an employment verification is obtained from an independent source
> (typically the borrower's employer), which verification reports, among other things,
> the length of employment with that organization, the current salary, and whether it is
> expected that the borrower will continue such employment in the future.  If a
> prospective borrower is self employed, the borrower may be required to submit
> copies of signed tax returns . . . .

> The mortgagor may also have been required to authorize verifications of deposits at
> financial institutions where the mortgagor had demand or savings accounts.  In the
> case of investment properties and two to four unit dwellings, income derived from
> the mortgaged property may have been considered for underwriting purposes, in
> addition to the income of the mortgagor from other sources.  With respect to
> mortgaged property consisting of vacation or second homes, no income derived from
> the property generally will have been considered for underwriting purposes.  In the
> case of certain borrowers with acceptable payment histories, no income will be
> required to be stated (or verified) in connection with the loan application.

> Based on the data provided in the application and certain verification (if required), a
> determination is made by the original lender that the mortgagor's monthly income (if
> required to be stated) will be sufficient to enable the mortgagor to meet its monthly
> obligations on the mortgage loan and other expenses related to the property such as
> property taxes, utility costs, standard hazard insurance and other fixed obligations
> other than housing expenses.  Generally, scheduled payments on a mortgage loan
> during the first year of its term plus taxes and insurance and all scheduled payments
> on obligations that extend beyond ten months equal no more than a specified
> percentage of the prospective mortgagor's gross income.  The percentage applied
> varies on a case by case basis depending on a number of underwriting criteria,
> including the LTV ratio of the mortgage loan.  The originator may also consider the
> amount of liquid assets available to the mortgagor after origination.

> The mortgage loans have been originated under "full" or "alternative," "reduced
> documentation," "stated income/stated assets" or "no income/no asset" programs.
> The "alternative," "reduced," "stated income/stated assets" and "no income/no asset"

20

Supreme Court Records OnLine Library - page 21 of 38

programs generally require either alternative or less documentation and verification than do full documentation programs which generally require standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories. Generally, an "alternative" documentation program requires information regarding the mortgagor's income (*i.e.*, W-2 forms, tax returns and/or pay stubs) and assets (*i.e.*, bank statements) as does a "full doc" loan, however, alternative forms of standard verifications are used. Generally, under both "full" and "alternative" documentation programs at least one year of income documentation is provided. Generally, under a "reduced documentation" program, either no verification of a mortgagor's stated income is undertaken by the originator or no verification of a mortgagor's assets is undertaken by the originator. Reduced doc loans may also include loans having only one year of income verification and loans to mortgagors with acceptable payment histories and credit scores but no information or verification of the mortgagor's income. Under a "stated income/stated assets" program, no verification of either a mortgagor's income or a mortgagor's assets is undertaken by the originator although both income and assets are stated on the loan application and a "reasonableness test" is applied. Generally, under a "no income/no asset" program, the mortgagor is not required to state his or her income or assets and therefore, no verification of such mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on the estimated value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score.

These alternative sets of underwriting criteria are designed to facilitate the loan approval process. Loans underwritten under these programs are generally limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion. Permitted maximum loan to value ratios under these programs are generally more restrictive than those under the lender's standard "full" documentation programs . . . .

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan by loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

59.    The Prospectus Supplements issued in connection with Defendant JP Morgan Mortgage Trust 2007-A4 and JP Morgan Alternative Loan Trust 2007-S1 contained substantially similar representations concerning the underwriting practices of Chase Home Finance and the Chase Originators.

Supreme Court Records OnLine Library - page 22 of 38

60.     Defendants JP Morgan Mortgage Acquisition Trusts 2007-CH3, 2007-CH-4 and

2007-CH5 Prospectus Supplements stated with respect to loans originated by the JP Morgan Chase

Bank, in part:

*Underwriting Standards*

The CHM HLD Underwriting Guidelines consider the value and adequacy of the
mortgaged property as collateral for the proposed mortgage loan, but also take into
consideration the credit standing and repayment ability of the prospective borrower.
On a case by case basis, CHM HLD underwriters may determine that, based upon
compensating factors, a prospective borrower not strictly qualifying under the
underwriting risk category guidelines described below warrants an underwriting
exception. Compensating factors may include, but are not limited to, relatively low
loan-to-value ratio, relatively low debt-to-income ratio, stable employment and time
in the same residence . . . .

        \*      \*      \*

The Chase Home Mortgage Wholesale/Retail Underwriting Guidelines consider the
value and adequacy of the mortgaged property as collateral for the proposed
mortgage loan, but also take into consideration the borrower's credit standing and
repayment ability. On a case by case basis, Chase Home Mortgage may determine
that, based upon compensating factors, a prospective borrower not strictly qualifying
under the underwriting risk category guidelines described below warrants an
underwriting exception. Compensating factors may include, without limitation,
relatively low loan-to-value ratio, relatively low debt-to-income ratio, stable
employment and time in the same residence.

61.     PHH Mortgage Corporation ("PHH Mortgage") was a major loan originator for the

Defendant JP Morgan Issuing Trusts. For example, as set forth above, PHH originated more than

33% of the loans in Defendant JP Morgan Mortgage Trust 2007-A5; more than 24% of the loans in

Defendant JP Morgan Mortgage Trust 2007-A6; and more than 17% of the loans in Defendant JP

Morgan Mortgage Trust 2007-A3. The Defendant JP Morgan Mortgage Trusts 2007-A5 and 2007-

A6 Prospectus Supplements stated, in part:

PHH Mortgage's underwriting standards have been established based upon its
knowledge of the primary and secondary residential mortgage markets. They are
intended to originate investment-quality mortgage loans that are salable in the
secondary mortgage market. They are applied in originating or purchasing loans for
its own account, and in originating loans for, or purchasing loans from, other lenders
under various *"private-label"* programs. The application of the underwriting

22

standards represent a balancing of several factors that may affect the ultimate recovery of the loan amount, including but not limited to, the applicant's credit standing and ability to repay the loan, as well as the value and adequacy of the mortgaged property as collateral. PHH Mortgage may adapt its underwriting guidelines based upon the nature of a specific private-label relationship.

*General Underwriting Procedure*

The following describes the general underwriting procedures used for mortgage loans originated or purchased, and underwritten by PHH Mortgage. From time to time, exceptions to PHH Mortgage's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH Mortgage's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, equity, employment and residential stability.

PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made. As part of the loan application process, the applicant is required to provide information concerning his or her assets, liabilities, income and expenses (except as described below), along with an authorization to obtain any necessary third party verifications, including a credit report summarizing the applicant's credit history. Unless prohibited by applicable state law, the applicant is typically required to pay an application fee if application is made directly to PHH Mortgage.

PHH Mortgage makes substantial use of automated underwriting systems and procedures in implementing its underwriting guidelines. These systems are used in conjunction with PHH Mortgage's underwriting staff and control the loan approval process to ensure consistent loan decisioning and conditioning.

In evaluating the applicant's ability and willingness to repay the proposed loan, PHH Mortgage reviews the applicant's credit history and outstanding debts, as reported on the credit report. If an existing mortgage or other significant debt listed on the loan application is not adequately reported on the credit report, PHH Mortgage may request a written or oral verification of the balance and payment history of such debt from the servicer of such debt.

Except as described below, PHH Mortgage verifies the applicant's liquid assets to ensure that the client has adequate liquid assets to apply toward any required down payment, closing costs, prepaid interest, and a specified amount of cash reserves after the closing of the related mortgage. Additional liquid assets may not be verified.

62.     American Home Mortgage Corp. ("American Home Mortgage") was a major loan

originator for the Defendant JP Morgan Issuing Trusts. For example, as set forth above, American

Home Mortgage originated more than 37% of the loans in Defendant JP Mortgage Trust 2007-S2;

23

more than 26% of the loans in Defendant JP Morgan Mortgage Trust 2007-S3; and 16-20% of the

loans in Defendants JP Morgan Mortgage Trust 2007-S1 and JP Morgan Alternative Loan Trust

2007-A2.  The Defendant JP Morgan Alternative Loan Trust 2007-A2 and JP Morgan Mortgage

Trust 2007-S2 Prospectus Supplements stated, in part:

> American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgage property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to second homes and vacation properties, no income derived from the property will have been considered for underwriting purposes.  Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

> American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

> Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac, in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require.  Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products, the borrower may not be required to verify employment income, assets required to close or both.  For some other Alt-A products, the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

> American Home obtains a credit report for each borrower that summarizes each borrower's credit history.  The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report.  A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous

24

delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700. For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last twelve months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent twelve months. In general, for Alt-A loans, the borrower may have no more than one payment that was made over 30 days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter, Freddie Mac's Loan Prospector automated underwriting systems, a customized form of Fannie Mae's Desktop Underwriter called Custom Desktop Underwriter, or they have been manually underwritten by American Home's underwriters. American Home's Alt-A loan products generally have been approved manually by contract underwriters provided by certain mortgage insurance companies or by American Home's senior underwriters. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense, the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility. . . .

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

25

Supreme Court Records OnLine Library - page 26 of 38

63.     The adequacy of the mortgaged properties as security for repayment of the underlying loans is generally determined by appraisals, conducted in accordance with pre-established guidelines set forth in the JP Morgan Issuing Trust Prospectus Supplements.  Certain of the Defendant JP Morgan Issuing Trusts represented that appraisals were conducted in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.  For example, the "General Underwriting Guidelines" of JP Morgan Mortgage Trust 2007-S3 Prospectus Supplement stated:

> The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  *All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.*  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator.  The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property.   Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

The Defendant JP Morgan Mortgage Trusts 2007-A3, 2007-A4, 2007-A5, 2007-S1 and 2007-S2; and JP Morgan Alternative Loan Trusts 2007-A2 and 2007-S1 Prospectus Supplements contained substantially-similar or identical language regarding appraisals.  USPAP requires, with respect to real estate appraisals, *inter alia*:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

26

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*        \*        \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favor the cause of the client;

3.    the amount of a value opinion;

4.    the attainment of a stipulated result; or

5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

64.    The foregoing statements set forth in ¶¶56-63 were materially false and misleading because they affirmatively misrepresented and/or failed to disclose that:

(a)    loan originators ignored and abandoned stated underwriting standards during the period that the JP Morgan Entities were acquiring and securitizing mortgages and structuring and marketing the Certificates;

(b)    the JP Morgan Issuing Trusts did not acquire loans originated in conformity with the underwriting guidelines set forth in the Registration Statement and each respective Prospectus Supplement;

(c)    JP Morgan Acquisition had not adhered to its loan purchasing guidelines;

(d)    underwriting standards employed by loan originators did not properly analyze borrowers' credit standing and ability to repay the underlying loans;

(e)    loan originators made exceptions to underwriting standards despite the absence of stated compensating factors;

27

(f)     third-party brokers were unsupervised by loan originators who performed inadequate due diligence on the loans written by such brokers, including in contravention of stated standards; and

(g)     appraisals were inflated and not conducted in accordance with loan originators' stated standards and/or USPAP standards.

65.     As set forth above (¶¶9-10), the Rating Agency Defendants directly participated in structuring the securitization transactions and, as a condition to the issuance of the Certificates, provided pre-determined ratings which were investment-grade for virtually all tranches. The ratings provided by the Rating Agency Defendants did not represent the true risk of the Certificates because they were based on insufficient information and erroneous assumptions about the likelihood of default by borrowers in the underlying loan pools. Moreover, the Rating Agency Defendants were hopelessly conflicted -- the JP Morgan Entities would be unlikely to retain them for subsequent, highly-lucrative structured product offerings if they did not provide the ratings sought for the Certificates.

66.     Defendants pre-determined that the Certificates the JP Morgan Issuing Trusts issued would be investment grade. Defendants stated in the Registration Statement that:

> As to each series of securities, only those classes rated in an investment grade rating category by any rating agency will be offered by this prospectus and the related prospectus supplement . . . .

> It is a condition to the issuance of the securities of each series offered by this prospectus that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement.

67.     Because the JP Morgan Entities worked with the Rating Agency Defendants to structure the Certificates, the initial ratings for each tranche of Certificates issued by each JP Morgan Issuing Trust were investment grade and most tranches (also referred to as "Classes") were rated "AAA." For example, the JP Morgan Mortgage Trust 2007-S3 Prospectus Supplement indicated

28

that 120 of 124 offered classes of Certificates were rated "AAA" by both Fitch and Standard &
Poor's.

68.     The foregoing statements in the Registration Statement and Prospectus Supplements
regarding "investment grade" and "AAA" ratings as set forth and referenced in ¶¶66-67 were false
and misleading when made because Defendants misrepresented that:

(a)     the ratings reflected the actual credit quality of the loans;

(b)     the ratings considered the extent to which the payment stream on the loans
was adequate to make the payments set forth in the Prospectus Supplements; and

(c)     misrepresented that certain Certificates were investment grade when such
Certificates should have been classified as below investment grade under the Rating Agency
Defendant's pre-established rating guidelines.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff bring this action as a class action pursuant to CPLR 901, *et seq.*, on behalf of
all person or entities who acquired certificates pursuant and/or traceable to Registration Statement
No. 333-141607, from the effective date of the Registration Statement, March 27, 2007, through the
date of the filing of this action, and who were damaged thereby (the "Class"). Excluded from the
Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of
their immediate families and their legal representatives, heirs, successors or assigns and any entity in
which Defendants have or had a controlling interest.

70.     The members of the Class are sufficiently numerous that joinder of all members is
impracticable. While the precise number of Class members is unknown to Plaintiff at this time and
can only be ascertained through discovery, Plaintiff believes that there are thousands of members of
the proposed Class, and that the members of the Class may be identified from records maintained by
Defendants and/or notified of this action using the form of notice customarily employed in securities

29

class actions. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

71.     Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class sustained damages as a result of Defendants' misconduct alleged herein. Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel with significant experience in class action litigation and litigation involving alleged violations of the federal securities laws. Plaintiff has no interests that are contrary to, or in conflict with, those of the Class that Plaintiff seeks to represent in this Action.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members of the Class is impracticable and damages suffered by individual Class members may be relatively small whereas the expense and burden of individual litigation make it virtually impossible for the members of the Class to individually redress the wrongs done to them by Defendants. There will be no difficulty in the management of this Action as a class action.

73.     There is a well-defined community of interest in the questions of law and fact involved in this Action. The questions of law and fact common to the members of the Class which predominate over questions that may affect individual Class members are:

(a)     whether Defendants violated the 1933 Act;

(b)     whether statements made by Defendants to the investing public in the Registration Statement and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the JP Morgan Issuing Trusts; and

(c)     the extent and proper measure of damages sustained by the members of the Class.

30

## FIRST CAUSE OF ACTION
### Violation of Section 11 of the 1933 Act
#### (Against the Individual Defendants, Issuing Defendants
#### and Underwriter Defendants)

74.     Plaintiff repeats and realleges each and every allegation above as it set forth in full herein, to the extent that such allegations do not sound in fraud.

75.     This First Cause of Action is brought pursuant to Section 11 of the 1933 Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants.  This Cause of Action is predicated upon Defendants' strict liability for making false and misleading statements in the Registration Statement, Prospectus and Prospectus Supplements.

76.     The Registration Statement for the Certificates was materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

77.     The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

78.     The Individual Defendants each signed the Registration Statement.

79.     The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the JP Morgan Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Registration Statement, Prospectus and Prospectus Supplements for the Certificates.  The Underwriter Defendants were underwriters for the respective JP Morgan Issuing Trusts.

80.     The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the

31

statements contained in the Registration Statement, Prospectus and Prospectus Supplements at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

81.     The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement, Prospectus and Prospectus Supplements as set forth herein.

82.     Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Registration Statement, Prospectus and Prospectus Supplements were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

83.     The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Prospectus, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

84.     By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

85.     Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statement. At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

32

86.     Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

87.     By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the 1933 Act.

88.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Registration Statement, Prospectus and Prospectus Supplements at an earlier time.

**SECOND CAUSE OF ACTION**
**For Violation of Section 12(a)(2) of the 1933 Act**
**(Against the Issuing Defendants and Underwriter Defendants)**

89.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

90.     This Cause of Action is brought pursuant to Section 12(a)(2) of the 1933 Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

91.     The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectus for their own financial gain.  The Prospectus contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

92.     The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such

33

statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading. The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus, as set forth herein.

93.     Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant and/or traceable to the defective Prospectus. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectus.

94.     By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the 1933 Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant and/or traceable to the Prospectus.

95.     Plaintiff and the Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct.   Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the 1933 Act. Those Class members who have sold their Certificates are entitled to rescission, as set forth in Section 12(a)(2) of the 1933 Act. These plaintiffs hereby tender their Certificates, or proceeds from the sale thereof, to defendants named in this Cause of Action in exchange for the value of the consideration paid for such Certificates, plus interest.   In the alternative, these plaintiffs seek recovery of damages in an amount to be proven at trial.

96.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectus and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

34

## THIRD CAUSE OF ACTION
### For Violation of Section 15 of the 1933 Act
### (Against JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance
### and JP Morgan Securities)

97.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

98.     This Cause of Action is brought against defendants JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities as controlling persons, pursuant to Section 15 of the 1933 Act. Each of JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the 1933 Act. Each of JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the 1933 Act, as described herein.

99.     JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities, individually, possessed control, ownership and had positions making each them privy to, and provided each of them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

100.    By virtue of the wrongful conduct alleged herein, JP Morgan, JP Morgan Acquisition, JP Morgan Acceptance and JP Morgan Securities are liable to Plaintiff and other Class members for their sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying plaintiff as Class representative;

35

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.


DATED: March 11, 2009

Respectfully submitted,
SCOTT+SCOTT LLP


JOSEPH P. GUGLIELMO
29 West 57th Street, 14th Floor
New York, NY 10019
Telephone: (212) 223-6444
Fax: (212) 223-6334
Email: jguglielmo@scott-scott.com

DAVID R. SCOTT
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
Telephone (860) 537-5537
Fax: (860) 537-4432
Email: drscott@scott-scott.com

36

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF NEW YORK, COMMERCIAL DIVISION

| | |
|---|---|
| FORT WORTH EMPLOYEES' RETIREMENT FUND | Index No. _____ |
| v. | |
| J.P. MORGAN CHASE & CO, et al. | Class Action Complaint |

SCOTT + SCOTT, LLP
Attorneys for Plaintiff
29 West 57th St., 14th Flr.
New York, NY 10019
212-223-6444

**FILED**

MAR 1 2 2009

NEW YORK
COUNTY CLERK'S OFFICE